# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                          No. CR 14-2783 JB

THOMAS R. RODELLA and
THOMAS R. RODELLA, JR.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendant Thomas R. Rodella's Motion to Disqualify the U.S. Attorney's Office for the District of New Mexico, the Prosecutor in This Case, by Virtue of the U.S. Attorney Damon P. Martinez Being a Witness, filed September 4, 2014 (Doc. 37)("Motion"); and (ii) Defendant R. Rodella's Amended Motion to Disqualify the U.S. Attorney's Office for the District of New Mexico, the Prosecutor in this Case, by Virtue of U.S. Attorney Damon P. Martinez Being a Witness, filed September 5, 2014 (Doc. 38)("Amended Motion").  The Court held evidentiary hearings on September 15, 2014, and September 16, 2014.  The primary issues are: (i) whether the United States Attorney for the District of New Mexico, Damon Martinez, may be compelled to testify when his testimony does not concern the facts underlying the case and when his testimony can be sought from other witnesses; (ii) whether the United States Attorney's Office for the District of New Mexico should be disqualified from the case when Mr. Martinez may be biased against Defendant Thomas Rodella; and (iii) whether the United States Attorney's Office for the District of New Mexico should be disqualified from the case when Mr. Martinez may be called as a factual witness in the case.  Because Mr. Martinez' testimony is irrelevant to the case, and because

Rodella may obtain evidence that is the subject of Mr. Martinez' testimony from other sources, Mr. Martinez cannot be compelled to testify. Additionally, because a court should rarely -- if ever -- disqualify an entire United States Attorney's Office, and because one attorney's bias is not imputed to an entire government agency, the Court will not disqualify the United States Attorney's Office for the District of New Mexico. Accordingly, the Court will deny the Motion and the Amended Motion.[1]

## FACTUAL BACKGROUND

The Superseding Indictment, filed September 9, 2014 (Doc. 55)("Indictment"), alleges that on March 11, 2014, in Rio Arriba County, New Mexico, Rodella, while acting under color of state law, subjected a person -- Michael Tafoya -- to "unreasonable seizure by a law enforcement officer." Indictment at 1. Specifically, Rodella allegedly used unreasonable force and caused an "unlawful arrest by deputies of the Rio Arriba County Sheriff's Office." Indictment at 1. "This offense resulted in bodily injur[ies]" to a person, and included the "use and threatened use of a dangerous weapon." Indictment at 1. The Indictment further alleges that Rodella carried and brandished a firearm "during and in relation to a crime of violence for which the defendant may be prosecuted in a court of the United States," and that, "in furtherance of such crime, possessed and brandished said firearm." Indictment at 1-2.

Before the Grand Jury indicted Rodella, Mr. Martinez invited Rodella to a meeting on May 7, 2014, to discuss the relationship between the United States Forest Service ("Forest Service") and the Rio Arriba Sheriff's Office. See Amended Motion at 2; Affidavit of

---

[1] Rodella's requests in the Motion and the Amended Motion are identical. It appears that the only difference is that the Motion refers to the "U.S. Fish and Wildlife Service," Motion at 1-2, while the Amended Motion has replaced all of the references to the Fish and Wild Service with the term "U.S. Forest Service," Amended Motion at 1-2. The Court will decide both the Motion and the Amended Motion in this Memorandum Opinion and Order, but will refer to the Amended Motion to discuss Rodella's arguments.

Jean-Claude dei Fiori Arnold at 1-2, filed September 5, 2014 (Doc. 38-1)("Arnold Aff."). The discussions were to concern Forest Service special agents' assertions that they had authority to stop motorists outside of national forest lands and Rodella's refusal to deputize them as Rio Arriba County deputy sheriffs. See Amended Motion at 2. At the meeting, Rodella and five other individuals represented the Rio Arriba Sherriff Office; Mr. Martinez, along with several Assistant United States Attorneys ("AUSAs"), Forest Service attorneys, and Forest Service law enforcement officers, represented the Forest Service. Arnold Aff. at 3. Mr. Martinez requested that the meeting remain confidential and that no recordings be made. See Arnold Aff. at 3. During the meeting, Mr. Martinez threatened "Sheriff Rodella with arrest/prosecution if the sheriff or any of his deputies in any way interfered with any [Forest Service] law enforcement officer carry[ing] out his/her supposed legitimate mission anywhere in Rio Arriba County." Arnold Aff. at 4. In making this threat, Mr. Martinez "chastised the sheriff for challenging the authority and practices of [Forest Service] law enforcement personnel and, by doing so, fomenting unrest among the citizenry of the sheriff's jurisdiction." Arnold Aff. at 4.

## PROCEDURAL BACKGROUND

On September 4, 2014, Rodella filed the Motion to disqualify the United District Attorney's Office for the District of New Mexico, and on September 5, 2014, he filed the Amended Motion. See Motion at 1; Amended Motion at 1. A week later, on September 12, 2014, the United States filed the Response to Motion to Disqualify the U.S. Attorney's Office, filed September 12, 2014 (Doc. 76)("Response"). The Court held evidentiary hearings on September 15, 2014, and September 16, 2014.

1.      **The Briefs**.

Rodella asserts that he will call Mr. Martinez "as a witness at trial to elicit his confession that he threatened Mr. Rodella with arrest and prosecution."  Amended Motion at 2.  Rodella argues that this "testimony is relevant to demonstrate the improper motive and bias of U.S. Attorney Martinez because personal animosity between a prosecutor and a criminal defendant may be probative of an improper motive by the prosecutor."  Amended Motion at 2.  Rodella contends that a "United States Attorney can be disqualified from prosecuting a case if he or she has a personal or political relationship to a case."  Amended Motion at 3 (citing 28 C.F.R. § 45.2).  Rodella argues that the "disqualification of government counsel . . . has been allowed in certain circumstances particularly where there is a conflict of interest," and that "'the district court must make attorney-specific findings and legal conclusions before disqualifying attorneys from the USA's office.'"  Amended Motion at 3 (quoting United States v. Bolden, 353 F.3d 870, 879 (10th Cir. 2003)).  Rodella contends that, because Mr. Martinez "has a personal and political relationship to this case," and because he "personally threatened arrest and prosecution if Mr. Rodella did not comply with his demands to deputize federal law enforcement agents as Rio Arriba County deputy sheriffs," Mr. Martinez has been placed "squarely in the middle of the underlying conduct in this case, and he has a specific interest in prosecuting Mr. Rodella in order to remove him as sheriff."  Amended Motion at 4.

Rodella argues that the Court has "absolute discretion to permit a defendant to call the prosecutor as a witness if the prosecutor 'possesses information vital to the defense.'"  Amended Motion at 4 (quoting United States v. Wooten, 377 F.3d 1134, 1143 (10th Cir. 2004)).  Rodella notes that, to "call a prosecutor as a witness in his case, 'a defendant has an obligation to exhaust other available sources of evidence before a court should sustain efforts to call a participating

prosecutor as a witness.'"  Amended Motion at 4 (quoting United States v. Prantil, 764 F.2d 548,

551 (9th Cir. 1985)("Prantil")).  Rodella directs the Court to United States v. Troutman, 814 F.2d

1428 (10th Cir. 1987), where, Rodella argues, the United States Court of Appeals for the Tenth

Circuit upheld a district court's denial of a defendant's motion to disqualify the New Mexico

Attorney General and the Deputy Attorney General, who were approved "to act as Special

Assistant United State[s] Attorneys for the prosecution of criminal charges," because there were

a number of other potential witnesses who could provide testimony of the relevant meeting and

correspondence.  Amended Motion at 5 (citing United States v. Troutman, 814 F.2d at 1439-40).

Rodella argues that this case is more similar to the United States Court of Appeals for the Ninth

Circuit's case, Prantil.  See Amended Motion at 6.  Rodella contends that, in Prantil, the

defendant sought to call as a witness an AUSA, who had negotiated directly with the defendant

for his surrender.  See Amended Motion at 6.  Rodella argues that the Ninth Circuit reversed the

district court's refusal to permit the AUSA to testify, because the "testimony was not

duplicative" and "the defendant had shown  a compelling need to call the participating

prosecutor as a witness."  Amended Motion at 6.  Rodella contends that Mr. Martinez was a

direct participant in the meeting with Rodella and that Mr. Martinez "directly threatened Sheriff

Rodella with arrest and prosecution, a threat which he later made good on."  Amended Motion

at 6.  Rodella argues that Mr. Martinez is "a vital witness as he is the one who made these direct

threats" and that, "although there were other individuals present, the rules of evidence do not

allow the other witnesses to testify to statements made by" Mr. Martinez.   Amended Motion

at 6-7.  Rodella argues that Mr. Martinez "should be disqualified from the prosecution of this

case so that he may be called as a witness at trial."  Amended Motion at 7.

Rodella contends that, because Mr. Martinez is a "vital witness to the defense's case," the "disqualification of the entire United States Attorney's Office is warranted in this case." Amended Motion at 9.  Rodella refers the Court to 28 U.S.C. § 541 to argue that, because Mr. Martinez "is the U.S. Attorney, all Assistant United States Attorneys work under his authority and control."  Amended Motion at 9.  Rodella argues that, because Mr. Martinez "will be called as a witness at trial," he "cannot also prosecute this case."  Amended Motion at 9-10. Rodella contends that "disqualifying only U.S. Attorney Martinez does not cure the substantial conflicts of interest that exist in this case."  Amended Motion at 9-10.  Rodella maintains that there is no other attorney in the United States Attorney's Office for the District of New Mexico that "could prosecute the case without being subject to the authority and control of U.S. Attorney Martinez."  Amended Motion at 10.  Rodella contends that, because the job of the entire United States Attorney's Office for the District of New Mexico is to assist Mr. Martinez "in the prosecution of cases" and because Mr. Martinez "remains the supervisor of the Assistant United States Attorneys assigned to this case," the "entire office in this case is affected by U.S. Attorney Martinez' bias and motive."  Amended Motion at 10.  Rodella argues that a "separation of powers concern in this case is not sufficient to eliminate the conflict of interest," and that the "remedy is simple -- order the recusal of the U.S. Attorney's Office for the District of New Mexico and have the Department of Justice appoint a different U.S. Attorney to independently prosecute this case."  Amended Motion at 10.

Rodella attached to the Amended Motion an affidavit from Jake Arnold.  See Arnold Aff. at 1.  Arnold served as the Public Affairs Officer of the Rio Arriba Sheriff's Office from January 1, 2011, to August 5, 2014.  See Arnold Aff. at 1.  In his affidavit, Arnold describes the May 7,

2014, meeting between Rodella and Mr. Martinez and the threat that Mr. Martinez made to Rodella.  See Arnold Aff. at 1-4.

The United States responds by arguing that the Amended Motion is "baseless at its core because the charges against Defendant have precisely nothing to do with the U.S. Forest Service."  Response at 1.  The United States contends that no evidentiary hearing is necessary, because Rodella "has failed to show animus, has misrepresented his own affidavit, and cannot show a valid need to call USA Martinez to testify."  Response at 1.

First, the United States argues that Rodella has misrepresented Arnold's affidavit, which is attached to the Amended Motion.  See Response at 1-3.  The United States notes that Arnold's Affidavit states: "'Damon Martinez did threaten Sheriff Rodella with arrest/prosecution if the sheriff or any of his deputies in any way interfered with any USFS law enforcement officer carry[ing] out his/her supposed legitimate mission anywhere in Rio Arriba County.'"  Response at 1 (quoting Arnold Aff. at 4).  The United States argues that "interfering with a federal officer engaged in official duties is in fact a federal crime."  Response at 1-2 (citing 18 U.S.C. § 111). The United States equates Mr. Martinez' statement to the slogan: "You Drink, You Drive, You Lose."  Response at 2.  The United States contends that there is no evidence of animus, and that Rodella's evidence does nothing to "support[] the concept that USA Martinez's interest in this case is anything other than the completely appropriate interest which a United States Attorney does and should have in prosecuting violations of federal law."  Response at 2 (citing United States v. Mezzanatto, 513 U.S. 196, 209-10 (1995)).  The United States argues that Rodella's contention that Mr. Martinez threatened prosecution if Rodella did not deputize federal agents is contrary to and mischaracterizes Arnold's affidavit, which states that Mr. Martinez threatened prosecution if Rodella violated federal law.  See Response at 2.  The United States also addresses

Rodella's contention that Mr. Martinez "trumped up" charges against Rodella to remove him from office, by arguing that Rodella lost the Democratic Party primary election on June 3, 2014, which was more than two months before the Indictment was filed.  See Response at 3.

Second, the United States argues that Mr. Martinez will not be a witness at trial.  See Response at 3-6.  The United States contends that a prosecutor's motives are not admissible evidence at trial, because they are not relevant to any element of a claim or defense, they would confuse the jury, and they are more prejudicial than probative.  See Response at 3 (citing Fed. R. Evid. 401, 402, & 403).  The United States notes that the grand jury found probable cause to believe that the Indictment was true and argues that this "fact alone should be conclusive on this matter."  Response at 3-4 (citing Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978)). The United States contends that prosecutors "may exercise some selectivity in enforcement . . . so long as 'the selection was not deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'"  Response at 4 (quoting Bordenkircher v. Hayes, 434 U.S. at 364).  The United States argues that, without an allegation that the prosecution is based on race, religion, or another arbitrary classification, a prosecutor's decision whether to prosecute a case is not subject to judicial review.  See Response at 4 (quoting Wayte v. United States, 470 U.S. 598, 607-08 (1985)).  The United States contends that a prosecutor's state of mind encompasses all of a defendant's misdeeds, "including those that otherwise would be kept from the jury at trial; and in this case, there are plenty."  Response at 4.

The United States notes that Rodella has not cited a case, statute, or rule that would cause Mr. Martinez' meeting to be admitted into evidence to show Mr. Martinez' motive in prosecuting the case.  See Response at 4.  The United States maintains that Mr. Martinez cannot provide any testimony that concerns Rodella's guilt or innocence, because Mr. Martinez was not involved in

the conduct underlying the case -- the conduct described in the Indictment.  See Response at 5.  The United States differentiates Prantil, by arguing that, in Prantil, the AUSA, who should have testified, was the same person to whom the defendant made the false statement for which he was charged.  See Response at 5 (citing Prantil, 764 F.2d at 548).  The United States contends that, in Prantil, the prosecutor was involved in the underlying conduct of the case, and that there was no such involvement here.  See Response at 5.

The United States maintains that there are substantial government interests weighing against allowing Rodella to call Mr. Martinez as a witness.  See Response at 5.  The United States contends that the Tenth Circuit has held that prosecutors should generally not be allowed to testify, because, if they testify, they might be disqualified, which would be inefficient and disruptive to the prosecution of criminal cases.  See Response at 5-6 (citing United States v. Wooten, 377 F.3d at 1142).  The United States notes that Rodella concedes that a prosecutor may not be called as a witness if other witnesses are available who can provide the same testimony.  See Response at 6 (citing United States v. Troutman, 814 F.2d at 1439-40).  The United States argues that Rodella identified six other witnesses who can testify about Mr. Martinez' statements.  See Response at 6.  The United States addresses Rodella's contention that the other witnesses could not testify about Mr. Martinez' statements, because the Federal Rules of Evidence would not allow them, by arguing that no evidentiary rule prohibits the other witnesses from testifying, because the testimony would not be inadmissible hearsay if Mr. Martinez' statements were not offered for the truth of the matter asserted.  See Response at 6.

Finally, the United States argues that it would be inappropriate to disqualify the entire United States Attorney's Office.  See Response at 7-8.  The United States argues that Rodella has failed to show an actual conflict of interest or a need to present Mr. Martinez' testimony at trial,

which are the only potential bases for disqualification.  See Response at 7.  The United States

contends that Department of Justice regulations do not support disqualification, because Rodella

has asserted only a single incident of political disagreement, and the regulations state that they

are "'not intended to create rights enforceable by private individuals or organizations.'"

Response at 7 (quoting 28 C.F.R. § 45.2)(citing United States v. Vega, 317 F. Supp. 2d 599, 604

(D.V.I. 2004)).  The United States notes that Rodella has conceded "that numerous opinions find

that disqualification of an entire U.S. Attorney's Office is an extraordinary and drastic measure."

Response at 7 (citing United States v. Bolden, 353 F.3d at 879; Crocker v. Durkin, 159 F. Supp.

2d 1258, 1284 (D. Kan. 2001)(Murguia, J.); Bullock v. Carver, 910 F. Supp. 551, 559 (D. Utah

1995)(Boyce, M.J.)).  The United States asserts that a district court's order disqualifying an

entire United States Attorney's Office has never been upheld on appeal.  See Response at 7.  The

United States contends that the Tenth Circuit has warned that "'disqualifying an entire United

States Attorney's Office is almost always reversible error regardless of the underlying merits of

the case.'"  Response at 7 (quoting United States v. Bolden, 353 F.3d at 876).

     **2.**       **The September 15, 2014, and September 16, 2014, Evidentiary Hearings.**

The Court held evidentiary hearings on September 15, 2014, and September 16, 2014.  At

the hearings, Rodella called Sergeant Kenneth Olson of the New Mexico State Police to testify.

See Transcript of Evidentiary Hearing at 3:19-4:10 (taken September 15, 2014)("Sept. 15, 2014,

Tr.")(Gorence).[2]  Rodella called Olson to testify, because there were two police reports released

that concerned the incident underlying the Indictment.  See Sept. 15, 2014, Tr. at 7:24-8:7

(Gorence).  The first report alleged simple assault, which is a petty misdemeanor, while the

---

[2]The Court's citations to the transcripts of the hearings refer to the court reporter's
original, unedited versions.  Any final transcripts may contain slightly different page and/or line
numbers.

second report alleged battery, aggravated assault with a deadly weapon, and false imprisonment, which are felonies.  See Sept. 15, 2014, Tr. at 8:5-18 (Gorence).  Rodella asserted that Olson's signature is on the reports, and Rodella argued that changing the original report to add the additional charges violated state police policies.  See Sept. 15, 2014, Tr. at 8:4-13 (Gorence). Rodella contended that the report was changed at the bequest of Olson's supervisors, by a directive from Mr. Martinez, or by a request from the Federal Bureau of Investigation ("FBI"). See Sept. 15, 2014, Tr. at 8:22-9:1 (Gorence).  Rodella argued that, if Mr. Martinez directed the report be changed, then it shows that Mr. Martinez carried out his threat against Rodella and falsified records in the process.  See Sept. 15, 2014, Tr. at 9:1-11 (Gorence).  Rodella also argued that, if the United States Attorney's Office ordered the report be changed, then this change shows a motive and bias against Rodella, which he is entitled to prove at trial by calling Mr. Martinez to testify.  See Sept. 15, 2014, Tr. at 71:19-24 (Gorence).

Olson testified that he supervises New Mexico State Patrolmen in Espanola, Rio Arriba County, parts of Santa Fe, New Mexico, and parts of Taos, New Mexico.  See Sept. 15, 2014, Tr. at 5:13-23 (Gorence, Olson).   In March, 2014, Patrolman Orlando Sanchez was one of the officers whom Olson supervised.   See Sept. 15, 2014, Tr. at 5:24-6:15 (Gorence, Olson). Sanchez investigated the complaint that Tafoya made against Rodella.  See Sept. 15, 2014, Tr. at 6:22-7:10 (Gorence, Olson).  Sanchez made a report of the incident, which Olson approved.  See Sept. 15, 2014, Tr. at 7:11-14 (Gorence, Olson).  Olson testified that patrolmen make police reports, then the sergeant signs-off on the reports, and finally the lieutenant reviews the reports for errors.  See Sept. 15, 2014, Tr. at 19:12-16 (Olson).  Olson approved Sanchez' report on June 6, 2014, but he testified that the report was not final until his supervisors signed-off on it.  See Sept. 15, 2014, Tr. at 10:22-11:8 (Gorence, Olson).   The original report stated that the

investigation was for a simple assault.  See Sept. 15, 2014, Tr. at 11:19-12:2 (Gorence, Olson).

Olson's supervisor amended the report to include allegations of battery, aggravated assault with a

deadly weapon, and false imprisonment.  See Sept. 15, 2014, Tr. at 13:10-19 (Gorence, Olson);

id. at 14:25-15:3 (Olson).   Olson testified that his supervisor, Lieutenant Travis Skinner,

determined that there were errors in the original report and that the charges did not fit the

allegations; so the charges in the report were changed.  See Sept. 15, 2014, Tr. at 19:14-20:9

(Olson).  Olson testified that he added the additional charges to the report at Skinner's direction.

See Sept. 15, 2014, Tr. at 20:25-22:6 (Gorence, Olson).   Olson also talked to Skinner's

supervisor, Captain Robert Thornton, about changing the report.   See Sept. 15, 2014, Tr. at

24:6-27:11 (Gorence, Olson).  While it is not clear when Olson amended the report, he believes

it was on June 6, 2014, because that is the date listed on the report, but he is not sure because of

the large number of reports that he reviews daily. See Sept. 15, 2014, Tr. at 14:15-22 (Gorence,

Olson); id. at 20:16-24 (Gorence, Olson); id. at 23:4-24:2 (Gorence, Olson).  Olson testified that,

if the report had been changed on a later date, he should have changed the date on the report but

that he did not.  See Sept. 15, 2014, Tr. at 36:14-37:13 (Gorence, Olson).

Olson testified that he had no reason to believe that the changes to the report came from

the FBI or the United States Attorney's Office.  See Sept. 15, 2014, Tr. at 28:4-20 (Gorence,

Olson).  Olson testified that the changes were not supplemental to the original report, but instead

were merely correcting errors in the original report.  See Sept. 15, 2014, Tr. at 33:5-34:18

(Gorence, Olson).  When Olson signed off on the original report, he believed that the simple

assault charge was correct, see Sept. 15, 2014, Tr. at 22:15-19 (Gorence, Olson), but testified that

he also thought that the facts support the three additional charges that were added later, see Sept.

15, 2014, Tr. at 38:19-24 (Peña, Olson).  Olson also testified that Sanchez did not sign the report,

but that he wrote Sanchez' initials on the report, which is his normal practice for when the patrolman, who prepared a report, is not available to sign it.  See Sept. 15, 2014, Tr. at 10:9-21 (Gorence, Olson).

Rodella also called Sanchez to testify.  See Sept. 15, 2014, Tr. at 44:10-11 (Gorence). Sanchez testified that he was assigned to the Tafoya case because he was on call when Tafoya reported the incident, and he was the next patrolman in the rotation to be assigned a case.  See Sept. 15, 2014, Tr. at 46:14-25 (Gorence, Sanchez).  Sanchez alleged simple assault in his original report after talking to Thornton about the investigation.  See Sept. 15, 2014, Tr. at 48:4-12 (Gorence, Sanchez).  Sanchez testified that Thornton told him to label the report as an informational report and let the District Attorney decide whether to add more charges.  See Sept. 15, 2014, Tr. at 49:13-18 (Sanchez).  Sanchez testified that he signed the report when he turned it into Olson and that he always signs his name on reports that he gives to Olson.  See Sept. 15, 2014, Tr. at 51:16-21 (Gorence, Sanchez).  After Sanchez turned the report into Olson, Olson told him that he needed to change the assault charge to a battery charge.  See Sept. 15, 2014, Tr. at 54:20-23 (Sanchez).  Sanchez testified that Olson told him to change the report on June 9, 2014.  See Sept. 15, 2014, Tr. at 59:22-25 (Gorence, Sanchez).  Sanchez testified that he had never seen a police report changed in the manner that this report was changed.  See Sept. 15, 2014, Tr. at 60:15-61:7 (Gorence, Sanchez).  After the report was changed to add the additional charges, Sanchez did not sign it.  See Sept. 15, 2014, Tr. at 63:16-64:3 (Gorence, Sanchez). Sanchez believed that once he turned in his report and Olson approved it, it could not be changed except through supplementing it or through showing some reason why the report needed to be changed.  See Sept. 15, 2014, Tr. at 68:11-20 (Gorence, Sanchez).

Rodella called the Chief of the New Mexico State Police, Pete Kassetas, to testify.  See Transcript of Evidentiary Hearing at 135:3-9 (taken September 16, 2014)("Sept. 16, 2014, Tr.")(Gorence, Kassetas, Clerk).  Kassetas testified that he reviewed Sanchez' report and made some grammatical changes, but that he did not add the additional charges.  See Sept. 16, 2014, Tr. at 138:4-12 (Gorence, Kassetas); id. at 139:24-140:13 (Gorence, Kassetas).  Kassetas recalled that he asked to review the report after seeing a news story about the incident.  See 145:5-10 (Gorence, Kassetas).  Kassetas testified that he expected that the FBI would request a copy of the report, so he reviewed it to ensure that it had all of the necessary information, and that, after the report was finalized, he reached out to the FBI to see if they wanted to see the New Mexico State Police's case file on the incident.  See Sept. 16, 2014, Tr. at 146:13-18 (Kassetas); id. at 147:19-24 (Gorence, Kassetas).  Kassetas has talked to the FBI about the case, but not before Sanchez' report was finalized.  See Sept. 16, 2014, Tr. at 145:11-146:10 (Gorence, Kassetas).  Kassetas testified that neither the FBI nor the United States Attorney's Office was involved in changing the charges in Sanchez' report.  See Sept. 16, 2014, Tr. at 154:16-21 (Gorence, Kassetas).

Rodella also called Thornton to testify.  See Sept. 16, 2014, Tr. at 195:13-20 (Gorence, Thornton, Clerk, Court).  Thornton testified that, after Olson looked at the report, he also examined it.  See Sept. 16, 2014, Tr. at 195:7-15 (Gorence, Thornton).  Thornton testified that he has not communicated with the FBI or the United States Attorney's Office in connection with the case.  See Sept. 16, 2014, Tr. at 196:14-18 (Gorence, Thornton).  Thornton testified that he was the person who made the decision to change the misdemeanor assault charge to felonies.  See Sept. 16, 2014, Tr. at 198:3-12 (Gorence, Thornton).  Thornton noted that Kassetas had reviewed the report but that Kassetas had not indicated to him whether the charges in the report should be

changed.  See Sept. 16, 2014, Tr. at 198:24-199:15 (Gorence, Thornton).  Thornton testified that the original report, which charged only a simple assault, was not a final report, because it needed to be changed.  See Sept. 16, 2014, Tr. at 203:10-15 (Thornton).

After hearing the testimony from Olson, Sanchez, Kassetas, and Thornton, Rodella conceded that there was no evidence that the FBI or the United States Attorney's Office requested that the police report be changed, and he withdrew the portion of his Motion to Disqualify that alleged that Sanchez' police report was changed at the FBI's behest or at the request of the United States Attorney's Office.  See Sept. 16, 2014, Tr. at 205:14-24 (Gorence).

Rodella also called Arnold to testify.  See Sept. 15, 2014, Tr. at 77:5 (Gorence).  Arnold served as the Public Affairs Officer of the Rio Arriba Sheriff's Office for three and a half years. See Sept. 15, 2014, Tr. at 78:1-9 (Gorence, Arnold).  Arnold testified about the May 7, 2014, meeting, which he discussed in his affidavit.  See Sept. 15, 2014, Tr. at 84:17-85:11 (Gorence, Arnold).  Rodella tasked Arnold with arranging the meeting.  See Sept. 15, 2014, Tr. at 85:5-11 (Arnold).  Arnold thought that, from Rodella's perspective, the issues at the meeting were: (i) whether Rodella should deputize Forest Service officers; (ii) whether Forest Service officers could stop people outside the boundaries of the national forest; and (iii) whether Forest Service officers could give citations to people within the boundaries of the national forest for state law violations, but prosecute the violations in federal court.  See  Sept. 15, 2014, Tr. at 86:9-87:11 (Arnold).

Arnold testified that Rodella, Rodella's wife, and a former county commissioner were present at the meeting and that two other people from Rio Arriba County appeared telephonically.  See Sept. 15, 2014, Tr. at 87:18-24 (Arnold).  Arnold testified that there were also a number of people at the meeting on behalf of the Forest Service, including Mr. Martinez,

an AUSA, other federal attorneys, and Forest Service officers.  See Sept. 15, 2014, Tr. at 88:4-15 (Gorence, Arnold).  Arnold testified that the meeting did not end cordially, but instead ended with Mr. Martinez threatening Rodella.  See Sept. 15, 2014, Tr. at 88:22-89:11 (Gorence, Arnold).  Arnold later testified that the meeting ended politely, but that there was tension in the room.  See Sept. 15, 2014, Tr. at 96:17-97:3 (Peña, Arnold).  Arnold characterized Mr. Martinez' threat as follows:

> A.    That the sheriff had better toe the line he better not do anything to interfere with the United States Forest Service officers, or there were going to be some severe consequences.
>
> . . . .
>
> A.    I think he said that there might be . . . arrests and prosecutions coming from any interference . . . with U.S. Forest Service law enforcement officers.   I'm not sure that that was subsequently just to sheriff Rodella but it was to anybody up in Rio Arriba [C]ounty that might try to interfere with the U.S. Forest Service officers.

Sept. 15, 2014, Tr. at 89:14-90:1 (Gorence, Arnold).  Arnold believed that the interference that Mr. Martinez mentioned had to do with interfering with Forest Service officers stopping people outside the boundaries of the national forest without reasonable suspicion or probable cause, because that was what they had been discussing earlier in the meeting.  See Sept. 15, 2014, Tr. at 93:7-16 (Peña, Arnold).  Arnold did not remember the threat being tied to an agreement to deputize Forest Service officers.  See Sept. 15, 2014, Tr. at 94:5-95:19 (Peña, Arnold); id. at 96:10-16 (Peña, Arnold).  Rodella, however, had been adamant, since 2011, that he would not deputize the Forest Service officers, and Mr. Martinez made the threat of arrest and prosecution shortly after Rodella stated that he would not deputize the Forest Service Agents.  See Sept. 15, 2014, Tr. at 100:12-101:7 (Gorence, Arnold); id. at 102:24-103:3 (Gorence, Arnold).

Rodella argued that he is entitled to call Mr. Martinez as a witness at trial. See Sept. 15, 2014, Tr. at 105:17-20 (Gorence). Rodella argued that he has a right under the Sixth Amendment to the Constitution of the United States of America to call witnesses, which includes calling Mr. Martinez as a witness. See Sept. 15, 2014, Tr. at 107:12-15 (Gorence). Rodella argued that his counsel had previously called both an AUSA as a witness and, in a state court case, a United States Attorney as a witness. See Sept. 15, 2014, Tr. at 105:22-106:2 (Gorence). Rodella argued that a person cannot be both the prosecutor and a witness in the same proceeding. See Sept. 15, 2014, Tr. at 106:2-5 (Gorence). Rodella argued that, if Mr. Martinez is a witness in the case, then the entire United States Attorney's Officer for the District of New Mexico cannot prosecute the case, because every local AUSA derives his or her authority from Mr. Martinez. See Sept. 15, 2014, Tr. at 106:13-21 (Gorence). Rodella noted that the remedy would not be to dismiss the Indictment, but instead, would be to have a different United States Attorney's Office prosecute the case. See Sept. 15, 2014, Tr. at 106:23-107:9 (Gorence).

Rodella further argued that, because a federal statute prohibits interfering with federal agents, does not mean that everything a federal agent does is immunized from all interference. See Sept. 16, 2014, Tr. at 207:2-8 (Gorence). Rodella argued that there is a legitimate issue whether Forest Service officers can cite individuals for state law infractions if the officers are not deputized. See Sept. 16, 2014, Tr. at 207:14-16 (Gorence). Rodella contended that Mr. Martinez threatening him with arrest, and then arresting him shortly afterwards, creates the appearance of a conflict of interest. See Sept. 16, 2014, Tr. at 207:16-22 (Gorence). Rodella argued that the trial will be a political trial and that he will call Mr. Martinez to testify that he threatened Rodella. See Sept. 16, 2014, Tr. at 208:9-21 (Gorence). Rodella noted that the United States did

not bring in any witnesses to refute his assertion that Mr. Martinez made the threat. See Sept. 16, 2014, Tr. at 208:21-209:1 (Gorence).

The United States responded by arguing that there is an enormous gap between what Arnold testified happened at the May 7, 2014, and what Rodella says happened at the meeting. See Sept. 16, 2014, Tr. at 209:22-25 (Peña). The United States argued that Arnold testified, and swore in his affidavit, that Mr. Martinez said that, if Rodella got in the way of Forest Service business, then it would be a federal crime and that he would be subject to arrest and prosecution. See Sept. 16, 2014, Tr. at 210:1-6 (Peña). The United States contended that Rodella's representation of Mr. Martinez' statement would cause Mr. Martinez' statement to be a federal crime -- extortion -- because Mr. Martinez told Rodella to do things his way or suffer the consequences. See Sept. 16, 2014, Tr. at 210:11-18 (Peña). The United States argued that this characterization is contrary to Arnold's affidavit and testimony. See Sept. 16, 2014, Tr. at 210:18-20 (Peña). The United States maintained that the meeting was a normal meeting in which two agencies did not see eye-to-eye and nothing more. See Sept. 16, 2014, Tr. at 210:21-25 (Peña). The United States referred to the Response to argue that there are a significant number of factors that make courts reluctant to second-guess prosecutorial motives. See Sept. 16, 2014, Tr. at 210:25-211:7 (Peña).

Rodella replied by arguing that the United States mischaracterized the meeting, which Rodella contended was neither normal nor amicable. See Sept. 16, 2014, Tr. at 211:24-212:8 (Gorence). Rodella argued that a key issue at the meeting was whether Rodella should deputize federal agents, and that, when he refused to do so, the meeting stopped and Mr. Martinez threatened him. See Sept. 16, 2014, Tr. at 212:11-213:4 (Gorence). Rodella maintained that Mr. Martinez did not threaten to arrest Rodella if he arrested a Forest Service officer, but instead

threatened to arrest Rodella if he interfered with what they were doing.  See Sept. 16, 2014, Tr. at 213:5-10 (Gorence).   Rodella argued that the United States conceded that Mr. Martinez threatened Rodella and that, when a public official, whom the President of the United States has appointed, threatens an elected state official, the context provides for a political trial, and that basis, alone, is sufficient to require recusal.  See Sept. 16, 2014, Tr. at 213:20-214:3 (Gorence).

The Court then announced its ruling that it would not disqualify the United States Attorney's Office for the District of New Mexico and that it would not permit Rodella to call Mr. Martinez as a witness.  See Sept. 16, 2014, Tr. at 214:4-218:20 (Court).

## LAW REGARDING CALLING PROSECUTORS AS WITNESSES

"The government has a substantial interest in not allowing its prosecutors to testify because doing so generally requires disqualification of the prosecutor."  United States v. Wooten, 377 F.3d at 1142 (citing ABA Model Rules of Prof'l Conduct R. 3.7 ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness . . . .").  See United States v. Hasan, No. CR 05-0174 JHP, 2006 WL 1207737, at *2 (N.D. Okla. May 2, 2006)(Payne, J.).   Disqualification of a prosecutor, who also testifies, is grounded in the longstanding "advocate-witness rule."  United States v. Bin Laden, 91 F. Supp. 2d 600, 622-24 (S.D.N.Y. 2000)(Sand, J.).   See United States v. Manners, No. CR 05-0220 M, 2006 WL 3026110, at *2 (N.D. Tex. Oct. 25, 2006)(Lynn, J.).   "The advocate-witness rule prohibits an attorney from appearing as both a witness and an advocate in the same litigation."  Prantil, 764 F.2d at 552-53.  The Ninth Circuit has identified a number of policies that are served by applying the advocate-witness rule "in the context of a criminal prosecution."  Prantil, 764 F.2d at 553.

First, barring testimony by the participating prosecutor "eliminates the risk that a testifying prosecutor will not be a fully objective witness given his position as an

advocate for the government." United States v. Johnston, 690 F.2d 638, 643 (7th Cir. 1982)(en banc). Second, the rule prevents the prestige and prominence of the prosecutor's office from being attributed to testimony by a testifying prosecutor. Id. See United States v. Cerone, 452 F.2d 274, 288 (7th Cir. 1971)(prosecutor not disqualified as a witness under the "awesome office" theory so long as prosecutor does not otherwise participate in trial) . . . . Third, the rule obviates the possibility of jury confusion from the dual role of the prosecutor wherein the trier-of-fact is asked to segregate the exhortations of the advocate from the testimonial accounts of the witness. United States v. Johnston, 690 F.2d at 643. Naturally, the potential for jury confusion is perhaps at its height during final argument when the prosecutor must marshall all the evidence, including his own testimony, cast it in a favorable light, and then urge the jury to accept the government's claims. Hence there is a very real risk that the jury, faced with the exhortations of a witness, may accord testimonial credit to the prosecutor's closing argument. Id. Finally, the rule expresses an institutional concern, especially pronounced when the government is a litigant, that public confidence in our criminal justice system not be eroded by even the appearance of impropriety. Id. See Model Code of Professional Responsibility EC 5-9, 5-10.

Prantil, 764 F.2d at 553.

The Tenth Circuit has held that a "district court may decline to allow the defendant to call the prosecutor as a witness 'if it does not appear the prosecutor possesses information vital to the defense,'" because "[s]uch disqualifications would, of course, be tremendously inefficient and disruptive to the prosecution of criminal cases." United States v. Wooten, 377 F.3d at 1142-43 (quoting United States v. Troutman, 814 F.2d at 1439). While a criminal defendant has a right under Sixth Amendment to "compulsory process for obtaining witnesses in his favor," U.S. Const. amend. VI, which "'includes the right to present witnesses in his or her own defense,'" this right is subject to restrictions, United States v. Wooten, 377 F.3d at 1142 (quoting United States v. Powell, 226 F.3d 226, 1199 (10th Cir. 2000)). These restrictions include a district court's ability to exclude testimony if the testimony is not relevant or if the United States' "'interest in excluding the evidence outweigh[s] the defendant's interest in its admittance.'" United States v. Powell, 226 F.3d at 1199 (quoting Richmond v. Embry, 122 F.3d 866, 872 (10th Cir. 1997)). The Tenth Circuit has held that the United States' "substantial interest" in not

allowing a prosecutor to testify outweighs a defendant's interest in admitting the testimony unless the "'prosecutor possesses information vital to the defense.'"  United States v. Wooten, 377 F.3d at 1143 (quoting United States v. Troutman, 814 F.2d at 1439).  Many courts have held that a prosecutor's testimony is not vital to the defense, or there is no compelling need for the testimony -- as some United States Courts of Appeals require,  see, e.g., Prantil, 764 F.2d at 554 -- if the defendant can obtain the evidence from another source, other than the prosecutor's testimony, see, e.g., United States v. Wooten, 377 F.3d at 1143;  United States v. Troutman, 814 F.2d at 1440; Prantil, 764 F.2d at 551 ('[A] defendant has an obligation to exhaust other available sources of evidence before a court should sustain a defendant's efforts to call a participating prosecutor as a witness."); United States v. Watson, 952 F.2d 982, 986 (8th Cir. 1991), cited with approval by United States v. Wooten, 377 F.3d at 1143; United States v. Hasan, 2006 WL 1207737, at *2 ("As a general rule, where the evidence can be obtained through another witness courts have refused to allow the defendant to call the prosecutor."); United States v. Bin Laden, 91 F. Supp. 2d at 624 ("Because those third parties can testify as to everything that occurred during those interviews, any need for [the prosecutors] to testify is quite limited."); United States v. Campbell, No. CR 04-0424 RWS, 2005 WL 6436621, at *8 (N.D. Ga. Oct. 24, 2005)(Story, J.)("[S]uch need tends not to exist where other witnesses are available to testify to the same subject . . . ."); United States v. Manners, 2006 WL 3026110, at *2; United States v. Brothers, 856 F. Supp. 388, 391 (M.D. Tenn. 1993)(Higgins, J.)("In this case, there were many other investigating agents present . . . who can testify to what occurred during the meetings. . . .  Therefore, [the prosecutors] should not be compelled to testify.").

In Prantil, the Ninth Circuit held that the district court erred by not compelling an AUSA, Charles Gorder, to testify.  See 764 F.2d at 551.  Gorder: (i) conducted an examination of the

defendant before a Grand Jury, for which the defendant was charged with perjury; (ii) was involved in discussions with the defendant, during which he made false statements for which he was prosecuted; and (iii) negotiated with the defendant to surrender a fugitive, which the defendant was harboring and giving aid.  See 764 F.2d at 551.  The district court prohibited the defendant from subpoenaing Gorder as a witness and from substituting Gorder with another AUSA.  See 764 F.2d at 552.  The Ninth Circuit reversed this decision, holding that Gorder "was both a witness to and a participant in the factual events at issue"; that is, Gorder "was a witness to, and indeed a participant in, some aspect of all of the events alleged in the indictment." 764 F.2d at 551-52.  The Ninth Circuit noted that a defendant must "exhaust other available sources of evidence before a court should sustain a defendant's efforts to call a participating prosecutor as a witness," but noted that the quantity and quality of the other available grounds must be taken into consideration.  764 F.2d at 551-52.  The only other available witness to the statements made to Gorder was an FBI agent, who heard some, but not all of the conversations between the defendant and Gorder.  See 764 F.2d at 552.  The Ninth Circuit held that, because the defendant had a compelling need to call Gorder as a witness, the district court should have allowed the defendant to call him as a witness and should have disqualified him from prosecuting the case.  See 764 F.2d at 554.

The Tenth Circuit has affirmed district courts' refusals to call prosecutors as witnesses when the defendant could obtain evidence from another source.  In United States v. Troutman, the defendant was convicted of extortion for trying to solicit political donations by awarding, or withholding, state contracts.  See 814 F.2d 1433-35.  The United States appointed the New Mexico Attorney General and the Deputy Attorney General as Special AUSAs to prosecute the case.  See 814 F.2d at 1435.  The defendant attempted to call the Attorney General as a witness

to testify about the process of awarding state contracts and the circumstances surrounding the state contracts involved in the extortion allegations, but the district court did not allow him to so. See 814 F.2d at 1439.  The Tenth Circuit affirmed the district court's decision.  See 814 F.2d at 1440.  The Tenth Circuit held that that the Attorney General's testimony "was not vital to the defense and could be obtained through other witnesses."  814 F.2d at 1440.  The Tenth Circuit noted that four individuals, who attended a meeting with the Attorney General that involved the state contracts, testified at trial, and, thus, the Attorney General's testimony would "have been cumulative."  814 F.2d at 1440.  Accordingly, the testimony was not vital to the defense.  See 814 F.2d at 1440.

In United States v. Wooten, the Tenth Circuit affirmed a district court's decision to not compel a prosecutor to testify about his reasons for not prosecuting the defendant for a prior incident.  See 377 F.3d at 1141-43.  The prosecutor introduced at trial, pursuant to rule 404(b) of the Federal Rules of Evidence, evidence that the defendant had a history of violence towards the victim in the case.  See 377 F.3d at 1141.  This history of violence included an incident in which the defendant threatened the victim with a knife.  See 377 F.3d at 1141.  The defendant sought to introduce evidence that the prosecutor in his case previously made the decision to not prosecute him for the knife incident.  See 377 F.3d at 1141.  The district court gave the prosecutor a choice: either testify as a witness, and be disqualified from the case, or provide the defendant with all discovery materials regarding the knife incident and permit them to be introduced at trial.  See 377 F.3d at 1141.  The prosecutor chose the latter.  See 377 F.3d at 1141.  The discovery documents, which were introduced at trial, included a memorandum that stated that the prosecutor did not find sufficient probable cause to prosecute the defendant for the knife incident and that the allegations against the defendant, concerning the knife incident, were unfounded.

See 377 F.3d at 1141.  The Tenth Circuit affirmed the district court's resolution of the issue by holding that because the memorandum was a sufficient substitute for the prosecutor's testimony, and because of the prosecutor's substantial interest in not being called as a witness, the district court did not abuse its discretion by not requiring the prosecutor to testify.  See 377 F.3d at 1142-43.

## LAW REGARDING DISQUALIFICATION OF A UNITED STATES ATTORNEY'S OFFICE

"'The disqualification of Government counsel is a drastic measure and a court should hesitate to impose it except where necessary.'"  United States v. Bolden, 353 F.3d at 878 (quoting Bullock v. Carver, 910 F. Supp. at 559).   Courts that that have allowed for the disqualification of government attorneys do so only in "limited circumstances."  United States v. Bolden, 353 F.3d at 878 (citing Young v. United States, 481 U.S. 787, 807 (1987)(finding an actual conflict of interest when prosecutor represented another party benefiting from case); United States v. Heldt, 668 F.2d 1238, 1275 (D.C. Cir. 1981)(noting that prosecutor should be disqualified if the criminal defendant brought against the prosecutor a "bona fide civil action alleging bad faith in the performance of official duties"); Prantil, 764 F.2d at 552-53 (holding that prosecutor should have been disqualified when he was a witness in the trial)).  However, "[d]isqualification of an entire United States Attorneys Office is nearly[3] unprecedented."

---

[3]The Honorable Dickinson R. Debevoise, Senior United States District Judge for the District of New Jersey, stated that the "[d]isqualification of an entire United States Attorneys Office is nearly unprecedented."  United States v. Manna, Nos. CR 88-0239 DRD, CIV 97-2034 DRD, 2006 WL 3063456, at *8 (D.N.J. Oct. 25, 2006)(Debevoise, J.)(emphasis added).  A more accurate statement would be that the disqualification of an entire United States Attorney's Office is unprecedented.  While a few district courts have disqualified an entire United States Attorney's Offices, each has been reversed on appeal.  See United States v. Bolden, 353 F.3d at 879 (noting that every United States Court of Appeal to consider the disqualification of an entire United States Attorney's Office has reversed the disqualification).  The Court has been unable to find a case in which an entire United States Attorney's Office has been disqualified and

United States v. Manna, Nos. CR 88-0239 DRD, CIV 97-2034 DRD, 2006 WL 3063456, at *8 (D.N.J. Oct. 25, 2006)(Debevoise, J.).   "[E]very circuit court that has considered the disqualification of an entire United States Attorney's office has reversed the disqualification." United States v. Bolden, 353 F.3d at 879 (citing United States v. Whittaker, 268 F.3d 185 (3d Cir. 2001); United States v. Vlahos, 33 F.3d 758 (7th Cir. 1994); United States v. Caggiano, 660 F.2d 184 (6th Cir. 1981)).

"While a private attorney's conflict of interest may require disqualification of that attorney's law firm in certain cases, such an approach is not favored when it comes to the office of the United States Attorney."   United States v. Hasarafally, 529 F.3d 125, 128 (11th Cir. 2008)(citations omitted)(refusing to disqualify the Department of Justice even though the United States Attorney General had previously served as a United States district court judge, where he presided over a number of cases that the Department of Justice appealed, because the Attorney General had voluntarily recused himself from the cases over which he presided).   "[B]ecause disqualifying government attorneys implicates separation of powers issues, the generally accepted remedy is to disqualify 'a specific Assistant United States Attorney . . . , not all of the attorneys in' the office."   United States v. Bolden, 353 F.3d at 879 (quoting Crocker v. Durkin, 159 F. Supp. at 1284)(alterations in United States v. Bolden but not in original).   "[I]f the disqualification of one government attorney could serve as the predicate for the disqualification of the entire United States Attorney's Office, the administration of justice would be irreparably damaged."   Grand Jury Subpoena of Ford v. United States, 756 F.2d 249, 254 (2d Cir. 1985). The Tenth Circuit has stated that it can "only rarely -- if ever -- imagine a scenario in which a district court could properly disqualify an entire United States Attorney's office," and that

---

the disqualification was not reversed on appeal.  Disqualification of an entire office is, thus, unprecedented.

"disqualifying an entire United States Attorney's Office is almost always reversible error regardless of the underlying merits of the case." United States v. Bolden, 353 F.3d at 875-76. The Tenth Circuit may have left open the possibility that an entire United States Attorney's Office may be disqualified in certain situations by holding that a "district court must make attorney-specific factual findings and legal conclusions before disqualifying attorneys from the USA's office." United States v. Bolden, 353 F.3d at 880. The Tenth Circuit did not, however, state what findings and conclusions must be made to warrant the disqualification of an entire office. See United States v. Bolden, 353 F.3d at 880.

Courts have refused to disqualify entire United States Attorney's Offices even in light of fairly extreme circumstances. In United States v. Morris, 313 F. App'x 125 (10th Cir. 2009)(unpublished),[4] the Tenth Circuit refused to disqualify the United States Attorney's Office for the Northern District of Oklahoma even though the United States Attorney for that district had previously served as private counsel in the civil case that accompanied the criminal one. See 313 F. App'x at 131-32. The Tenth Circuit noted that the United States Attorney did not

---

[4]United States v. Morris is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent , . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that United States v. Morris, Blackwell v. Strain, 496 F. App'x 836 (10th Cir. 2012)(unpublished), and United States v. Coleman, 483 F. App'x 419 (10th Cir. 2012) have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

participate in the criminal case, but instead two other attorneys from his office, who were not connected with the civil case, prosecuted the criminal case.  See 313 F. App'x at 132.  In Cope v. United States, 272 F. App'x 445 (6th Cir. 2008)(unpublished), the United States Court of Appeals for the Sixth Circuit held that the defendant's counsel was not ineffective by not filing a motion to disqualify the United States Attorney's Office for the Eastern District of Kentucky. See 272 F. App'x at 449-50.  There, the defendant was charged with attempting to murder an AUSA, who served in that United States Attorney's Office.  See 272 F. App'x at 449-50.  The Sixth Circuit held that, because the AUSA against whom the murder attempt was orchestrated, did not participate in the prosecution, and because of "the strong preference not to exclude an entire United States Attorney's office from a case," failing to file a motion to disqualify the office was not objectively unreasonable.  272 F. App'x at 450.

Similarly, in United States v. Basciano, 763 F. Supp. 2d 303 (E.D.N.Y. 2013), the Honorable Nicholas G. Garaufis, United States District Judge for the Eastern District of New York, refused to disqualify the United States Attorney's Office for that district in a case in which the defendant was alleged to have solicited the murder of an AUSA from that office.  See 763 F. Supp. 2d at 312-14.  The defendant argued that the United States Attorney's Office had an "axe to grind with him," and that the attorneys in the office showed an "untoward interest" in his case and were "overly zealous [in their] pursuit of the death penalty against him."  763 F. Supp. 2d at 312-13 (internal quotation marks omitted).  Judge Garaufis refused to disqualify the office, noting that "an entire U.S. Attorney's Office should only be disqualified, if ever, when special circumstances demonstrate that the interest of justice could only be advanced by this drastic remedy."  763 F. Supp. 2d at 314.  Judge Garaufis found that no such special circumstances existed but instead found that the office did not possess "anything more than 'the appropriate

interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged.'"  763 F. Supp. 2d at 314 (quoting Wright v. United States, 732 F.2d 1048, 1056 (2d Cir. 1984)).

## LAW REGARDING PROSECUTORIAL VINDICTIVENESS

A prosecutor has broad discretion to initiate and conduct criminal proceedings, see United States v. Armstrong, 517 U.S. 456, 464 (1996), and, as long as there is probable cause that the accused committed an offense, the decision to prosecute rests in the prosecutor's discretion,  see United State v. Vallo, 238 F.3d 1242, 1249 (10th Cir. 2001).  "A prosecutor cannot, however, punish a person simply because 'he has done what the law plainly allows him to do.'"   United States v. Neha, 376 F. Supp. 2d 1230, 1232 (D.N.M. 2005)(Browning, J.)(quoting United States v. Goodwin, 457 U.S. 368, 372 (1982)).  "When a defendant exercises constitutional or statutory rights in the course of criminal proceedings, the government may not punish him for such exercise without violating due process guaranteed by the federal Constitution."  United States v. Raymer, 941 F.2d 1031, 1040 (10th Cir. 1991).  The defendant bears the burden of establishing either "(1) 'actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness.'"  United States v. Sarracino, 340 F.3d 1148, 1177 (10th Cir. 2003)(quoting United States v. Lampley, 127 F.3d 1231, 1245 (10th Cir. 1997)).  See United States v. Raymer, 941 F.2d at 1040.

To establish actual vindictiveness, the defendant must demonstrate: "(1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus."  United States v. Wilson, 262 F.3d 305, 314 (4th Cir. 2001). "To find 'actual vindictiveness requires direct evidence, such as evidence of a statement by the prosecutor, which is available only in a rare case.'"  United States v. Johnson, 221 F.3d 83, 94

(2d Cir. 2000)(quoting United States v. Johnson, 171 F.3d 139, 140 (2d Cir. 1999))(internal quotation marks omitted).  "'To establish vindictive prosecution, a defendant must show that the prosecutor has some personal 'stake' in deterring the defendant's exercise of his constitutional rights, and that the prosecutor's conduct was unreasonable.'"  United States v. Wade, 266 F.3d 574, 585 (6th Cir. 2001)(quoting United States v. Wells, 211 F.3d 988, 1001-02 (6th Cir. 2000)).  Because an actual vindictiveness contention requires objective evidence that the prosecutor's actions were designed to punish the defendant for asserting his legal rights, such allegations are "exceedingly difficult" to establish.  United States v. Gary, 291 F.3d 30, 34 (D.C. Cir. 2002)(quoting Maddox v. Elzie, 238 F.3d 437, 446 (D.C. Cir. 2001))(internal quotation marks omitted).

The Supreme Court of the United States of America has held that there was no presumption of vindictiveness when a prosecutor made threats during plea negotiations, see Bordenkircher v. Hayes, 434 U.S. 357, 365 (1978), or when additional charges were filed after the defendant requested a jury trial, see United States v. Goodwin, 457 U.S. at 384.  In United States v. Goodwin, the Supreme Court explained:

> There is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting.  In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance.  At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized . . . .
>
> In addition, a defendant before trial is expected to invoke procedural rights that inevitably impose some "burden" on the prosecutor.  Defense counsel routinely file pretrial motions to suppress evidence; to challenge the sufficiency and form of an indictment; to plead an affirmative defense; to request psychiatric services; to obtain access to government files; to be tried by jury.  It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter.  The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates.

. . . .

> A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct. As we made clear in Bordenkircher, the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution.

457 U.S. at 381-82. The Supreme Court also noted: "To presume that every case is complete at the time an initial charge is filed, however, is to presume that every prosecutor is infallible -- an assumption that would ignore the practical restraints imposed by often limited prosecutorial resources." United States v. Goodwin, 457 U.S. at 382. The Tenth Circuit, however, has rejected the proposition that a presumption of vindictiveness may never arise in a pre-trial setting. See United States v. Doran, 882 F.2d 1511, 1520-21 (10th Cir. 1990)("The lesson of Goodwin is that proof of a prosecutorial decision to increase charges after a defendant has exercised a legal right does not alone give rise to a presumption in the pretrial context."); United States v. Raymer, 941 F.2d at 1040. The Tenth Circuit has held: "In light of the Goodwin admonition against *per se* rules in the pretrial setting, we conclude that a totality-of-the-circumstances approach is particularly appropriate in the post-mistrial setting . . . ." United States v. Doran, 882 F.2d at 1521. The Tenth Circuit has explained that, "in those pretrial settings which are genuinely distinguishable from Goodwin and Bordenkircher, we look at the totality of the objective circumstances to decide whether a realistic probability of vindictive prosecution exists." United States v. Raymer, 941 F.2d at 1040.

To establish a presumption of vindictiveness, the test is "whether, as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or punitive animus towards the defendant because he exercised his specific legal right." United States v. Raymer, 941 F.2d at 1042 (internal quotation marks omitted). If the

defendant satisfies this burden, the United States must "justify its prosecutorial decision based on 'legitimate, articulable, objective reasons.'"   United States v. Sarracino, 340 F.3d at 1177 (quoting United States v. Raymer, 941 F.2d at 1040)(internal quotation marks omitted).   If, however, the defendant does not carry its burden of establishing either element, the Court does not need to address the United States' justification for its actions.   See United States v. Sarracino, 340 F.3d at 1177.   In United States v. Wood, 36 F.3d 945 (10th Cir. 1994), the Tenth Circuit upheld a finding of prosecutorial vindictiveness when the decision was "not based on any new evidence or change in circumstances, and it was made soon after Defendant exercised a legal right to the government's advantage."   36 F.3d at 947.

## RELEVANT LAW REGARDING A RACIALLY SELECTIVE LAW ENFORCEMENT CLAIM

"'[T]he Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures.'"   Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1166 (10th Cir. 2003)(quoting United States v. Avery, 137 F.3d 343, 352 (6th Cir. 1997)).   In the civil context, the Tenth Circuit has recognized that "claims asserting selective enforcement of a law on the basis of race are properly brought under the Equal Protection Clause, and that the right to equal protection may be violated even if the actions of the police are acceptable under the Fourth Amendment."   Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1166.   A racially selective law enforcement claim exists where the government conduct had a discriminatory effect and where a discriminatory purpose motivated the conduct.   See Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168 ("The requirements for a claim of racially selective law enforcement draw on what the Supreme Court has called 'ordinary equal protection standards.'   The plaintiff must demonstrate that the defendant's actions had a discriminatory effect and were motivated by

a discriminatory purpose." (quoting United States v. Armstrong, 517 U.S. at 465)).   "The

discriminatory purpose need not be the only purpose, but it must have been a motivating factor in

the decision."   Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168 (citing Villanueva v.

Carere, 85 F.3d 481, 485 (10th Cir. 1996)).   "Statistical evidence can be used to show both

discriminatory effect and discriminatory purpose."   Blackwell v. Strain, 496 F. App'x 836,

839-40 (10th Cir. 2012)(unpublished)(citing Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at

1168).   The Tenth Circuit has recognized that proving discriminatory intent in this context is a

high bar, and cases in which this bar is met are rare:

> Statistical evidence alone is rarely enough to show discriminatory purpose.
> Although the Supreme Court "has accepted statistics as proof of intent to
> discriminate in certain limited contexts," only in "rare cases [has] a statistical
> pattern of discriminatory impact demonstrated a constitutional violation."
> McCleskey v. Kemp, 481 U.S. 279, 293 & n.12 . . . (1987); Vill. of Arlington
> Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 . . . (1977)("Sometimes a
> clear pattern, unexplainable on grounds other than race, emerges from the effect
> of the state action. . . .  But such cases are rare.").  This is because, to prevail on
> an equal protection claim, a plaintiff "must prove that the decisionmakers in his
> case acted with discriminatory purpose."   McCleskey, 481 U.S. at 292 . . . .
> Examples of "those rare cases in which a statistical pattern of discriminatory
> impact demonstrated a constitutional violation" include Gomillion v. Lightfoot,
> 364 U.S. 339, 340-41 . . . (1960), and Yick Wo v. Hopkins, 118 U.S. 356, 373-74
> . . . (1886).  McCleskey, 481 U.S. at 293 n.12 . . . .  In Gomillion, the Supreme
> Court held a state legislature violated the Fifteenth Amendment when it altered a
> city's boundaries "from a square to an uncouth twenty-eight-sided figure,"
> thereby excluding 395 of 400 black voters without excluding a single white voter.
> 364 U.S. at 340-41 . . . .   The Court held that "the conclusion would be
> irresistible, tantamount for all practical purposes to a mathematical
> demonstration" that the state acted with a discriminatory purpose. Id. at 341 . . . .
> In Yick Wo, an ordinance required laundry operators to obtain a permit, and all
> but one of the white applicants received permits while none of the over 200
> Chinese applicants received permits.   118 U.S. at 373-74 . . . .   The Court
> determined that the statistical disparity "warrant[ed]" and "require[d] the
> conclusion" the state acted with a discriminatory purpose.  Id.  "Absent a pattern
> as stark as that in Gomillion or Yick Wo," however, "impact alone is not
> determinative, and the Court must look to other evidence."   Vill. of Arlington
> Heights, 429 U.S. at 266 . . . (footnote omitted); see also Chavez v. Ill. State
> Police, 251 F.3d 612, 647-48 (7th Cir. 2001).

Blackwell v. Strain, 496 F. App'x at 840.

In the context of a 42 U.S.C. § 1983 claim, the Tenth Circuit in Marshall v. Columbia Lea Regional Hospital noted:

> To withstand a motion for summary judgment, a plaintiff in a § 1983 suit challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect.

345 F.3d at 1168.  The Tenth Circuit explained that, in "the absence of an overtly discriminatory policy or of direct evidence of police motivation," most § 1983 claims for racially selective law enforcement rely on "statistical comparisons between the number of black or other minority Americans stopped or arrested and their percentage in some measure of the relevant population." 345 F.3d at 1168.  The Tenth Circuit pointed out that "[t]his requires a reliable measure of the demographics of the relevant population, a means of telling whether the data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population."  345 F.3d at 1168 (internal citations omitted)(citing Chavez v. Ill. State Police, 251 F.3d 612, 640-45; United States v. Armstrong, 517 U.S. at 469-70).  "[A] police officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose in this context."  Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168.

In Blackwell v. Strain, the defendant appealed from the district court's denial of summary judgment based on qualified immunity where the plaintiff alleged that "he was stopped, detained, subjected to a heightened inspection level, and issued a citation . . . because he is black," in violation of his equal-protection rights.  496 F. App'x at 837.  The plaintiff, Blackwell, was

driving a tractor-trailer on Interstate Highway 10 when the defendant officer, Strain, at the Point of Entry ("POE") in Lordsburg, New Mexico, asked him to pull his truck to the side, and, during an inspection, discovered alcohol in violation of New Mexico transportation regulations. See 496 F. App'x at 838. Strain ordered Blackwell to remove his tractor-trailer from service for twenty-four hours and assessed him a $250.00 penalty. See 496 F. App'x at 838. The Honorable M. Christina Armijo, United States District Judge for the District of New Mexico, denied summary judgment to Strain, concluding that, based on three statistical sets that Blackwell produced, a jury could reasonably conclude that a discriminatory purpose motivated Strain. See 496 F. App'x at 840-41. The Tenth Circuit reversed, however, and ordered the district court to enter summary judgment in Strain's favor, concluding that the first data was irrelevant, as it did not provide sufficient statistics about Strain specifically, and the other two data sets were insufficient as a matter of law to show discriminatory purpose, as "[e]ven assuming these statistical data sets are valid and reliable, they do not show a pattern of discrimination as stark as that in Gomillion or Yick Wo." 496 F. App'x at 841.

    In relation to the first data set, the Tenth Circuit stated that Blackwell's expert was prepared to testify about data which tended to show that law enforcement activities at the POE "produce 'race based differentials in outcomes'" and that "'30.6% of the arrests by Officer Strain at the POE are Blacks, even though Black truckers make up only 14.6% of the truckers passing through the POE.'" Blackwell v. Strain, 496 F. App'x at 841. The Tenth Circuit concluded that these statistics were irrelevant based on two grounds. First, because most of the data was based on law enforcement conduct of "personnel at the POE as a whole, rather than the conduct of Officer Strain individually," the jury could not rely on it to find a discriminatory purpose as "'it would be a gross misuse of statistical data to extrapolate about [a particular officer's conduct]

merely from aggregate data that covers many other individuals.'" 496 F. App'x at 841 (quoting

United States v. Coleman, 483 F. App'x 419, 421(10th Cir. 2012)(unpublished))(alterations in

original).  Second, the Tenth Circuit concluded that, "of those individuals Officer Strain stops,

detains, and subjects to a heightened inspection level, a high percentage he ultimately arrests are

black, more than double the percentage of truck drivers passing through the POE who are black."

496 F. App'x at 841.   The Tenth Circuit stated that the statistical evidence did not prove

discriminatory purpose, "because there is no reliable measure of the demographics of the

relevant population, no means of telling whether the data represent similarly situated individuals,

and no point of comparison to the actual incidence of crime among different racial segments of

the population."  496 F. App'x at 841.

> Blackwell's second statistical data set showed that,

> [a]t the POE, Officer Strain arrests Blacks at a rate that is twice their
> representation in the population of truckers passing through the POE, whereas the
> percentage of Blacks arrested by Officer Strain as the result of patrolling (where,
> as Dr. Williams hypothesized, it is more difficult for Officer Strain to confirm the
> driver's ethnicity prior to initiating law enforcement activity) closely corresponds
> to the percentage of Black truckers in the population of truckers passing through
> the POE.

496 F. App'x at 842 (original alterations omitted).  The Tenth Circuit noted:

> [T]he record indicates the arrest data, at least with respect to arrests made while
> on patrol, includes individuals who are not truck drivers.  Thus, it appears we lack
> a reliable measure of the demographics of the relevant population, i.e., the
> percentage of individuals, as opposed to truck drivers, in the areas Officer Strain
> patrols who are black.

496 F. App'x  at 843 (emphasis in original).  The Tenth Circuit went further, however, stating:

> This comparison of the percentage of black individuals arrested by Officer Strain
> as the result of patrolling with the percentage of black truckers he arrested passing
> through the POE is inappropriate.   Even assuming its validity, however, this
> statistical comparison does not show a stark pattern of discrimination similar to
> that in Gomillion or Yick Wo.  That is, the statistics are not so compelling that the
> only explanation for the anomalies therein is intentional racial discrimination.

> Thus, standing alone, this statistical evidence is not evidence from which a jury
> could reasonably infer Officer Strain was motivated by a discriminatory purpose.

496 F. App'x at 843 (emphasis in original).

The third statistical data set that the Tenth Circuit held was insufficient as a matter of law to prove discriminatory purpose was the seven searches that Strain performed the day of Blackwell's search, which Blackwell asserted showed that Strain subjected black truckers to more intrusive inspections than others.  See 496 F. App'x at 843.  The Tenth Circuit held that the sample, although relevant, was, on the one hand, unreliable, as it was based on too small of a sample, and, on the other hand, even if reliable, was not statistically significant enough to meet the Gomillion v. Lightfoot or Yick Wo v. Hopkins standard for discriminatory purpose:

> [T]he district court cited to statistical evidence regarding inspections conducted
> by Officer Strain at the POE:
>
>> [O]n the date that Officer Strain encountered [Blackwell], Officer
>> Strain inspected seven trucks.  Three of the seven truckers (43%),
>> well in excess of their representation (14.6%) in the population of
>> truckers passing through the POE were Black, and every one of the
>> Black truckers was subjected to a Level II inspection, which
>> includes a safe loading check.  The two truckers who were White
>> were subjected to Level III inspections.  Two of the truckers were
>> Hispanic: one was subjected to a Level III inspection and one was
>> subjected to a Level II inspection.
>
> (citations omitted).  This statistical evidence, although relevant, is based on seven
> inspections performed by Officer Strain on a single day and is, therefore, not
> reliable.  See United States v. James, 257 F.3d 1173, 1180 (10th Cir. 2001)
> (stating that a sample size may be "too small to provide reliable statistical
> results"); Chavez [v. Ill. State Police], 251 F.3d at 643 (noting that a sample size
> must be "sufficiently large to be reliable").  Even assuming its reliability,
> however, it does not show a stark pattern of discrimination like that in Gomillion
> or Yick Wo, and, therefore, cannot by itself demonstrate discriminatory purpose.

Blackwell v. Strain, 496 F. App'x at 843.  The Tenth Circuit concluded that, based on the failure of these three statistical data sets to support his contention that Strain acted with a discriminatory purpose, "Blackwell failed to meet his burden."  496 F. App'x at 844.

- 36 -

## ANALYSIS

The Court will deny the Motion.  The Court will not permit Rodella to call Mr. Martinez as a witness at trial.  Mr. Martinez' testimony is irrelevant, and Rodella can obtain evidence of his testimony from other sources.  The Court will also not disqualify the United States Attorney's Office for the District of New Mexico.  Mr. Martinez will not be disqualified, because the Court will not compel him to testify, and because Rodella has not produced any evidence of an actual conflict.  Additionally, even if the Court disqualified Mr. Martinez, the Court would disqualify only him from the case and not the entire United States Attorney's Office for the District of New Mexico.

## I.    THE COURT WILL NOT COMPEL MR. MARTINEZ TO TESTIFY AT TRIAL.

Rodella may not call Mr. Martinez to testify at trial.  The Sixth Amendment guarantees a criminal defendant "compulsory process for obtaining witnesses in his favor."  U.S. Const. amend. VI.  The right to "compulsory process includes the right to call witnesses in his or her defense."  United States v. Powell, 226 F.3d at 1199 (citing Washington v. Texas, 388 U.S. 14, 18-19 (1967)).  This right, however, is subject to certain restrictions, including a district court's ability to exclude testimony if it is irrelevant or if the United States' interest in excluding the testimony outweighs the defendant's interest in having the testimony admitted.  See United States v. Wooten, 377 F.3d at 1142.  Here, Mr. Martinez' testimony is irrelevant, and the United States' interest in excluding the testimony outweighs Rodella's interest in admitting it, because Rodella can obtain evidence of the testimony from other sources.

### A.    MR. MARTINEZ' TESTIMONY IS IRRELEVANT IN THIS CASE.

Mr. Martinez' testimony is irrelevant in this case.  Rodella contends that Mr. Martinez' testimony is relevant because it will show an improper bias against Rodella.  See Amended

Motion at 2.   The Court concludes that, based on the evidence that Rodella has presented, Mr. Martinez' testimony would not show any illegitimate bias against Rodella.   Additionally, even if Mr. Martinez' testimony would evidence some illegitimate bias, that bias is irrelevant, because it would not help the jury in determining whether Rodella is guilty or innocent.

### 1.   There Is No Evidence of an Unlawful Bias Against Rodella.

Rodella has not presented any evidence that Mr. Martinez is biased against him.   To show an improper bias, Rodella has offered an affidavit that Arnold prepared and testimony from Arnold.   This affidavit and testimony, however, fail to show that Mr. Martinez is improperly biased against Rodella.   Rodella argues that Mr. Martinez "personally threatened arrest and prosecution if Mr. Rodella did not comply with his demands to deputize federal law enforcement agents as Rio Arriba County deputy sheriffs," which shows that Mr. Martinez "has a specific interest in prosecuting Mr. Rodella in order to remove him as sheriff."   Amended Motion at 4. This assertion lacks support in the evidence.

In Arnold's affidavit, Arnold characterized the threat as follows:

However, at the meeting, Damon Martinez did threaten Sheriff Rodella with arrest/prosecution if the sheriff or any of his deputies in any way interfered with any [Forest Service] law enforcement office carry[ing] out his/her supposed legitimate mission anywhere in Rio Arriba County.   Damon Martinez, in making those comments, chastised the sheriff for challenging the authority and practices of [Forest Service] law enforcement personnel and, by doing so, fomenting unrest among the citizenry of the sheriff's jurisdiction.

Arnold Aff. at 4.   Arnold then stated in his affidavit:

It was clear to me and other members of the "Rio Arriba delegation" that Damon Martinez was referring to previous public comments by the sheriff in which he had stated that [Forest Service] law enforcement officers were violating the law by stopping travelers on the highways outside the boundaries of the national forests without reasonable suspicion or probable cause and were doing so lacking status as New Mexico peace officers.

- 38 -

Arnold Aff. at 4.  At the September 16, 2014, evidentiary hearing, Arnold characterized Mr. Martinez' threat as follows:

> A.    That the sheriff had better toe the line he better not do anything to interfere with the United States Forest Service officers, or there were going to be some severe consequences.
>
> . . . .
>
> A.    I think he said that there might be . . . arrests and prosecutions coming from any interference . . . with U.S. Forest Service law enforcement officers.   I'm not sure that that was subsequently just to sheriff Rodella but it was to anybody up in Rio Arriba county that might try to interfere with the U.S. Forest Service officers.

Sept. 15, 2014, Tr. at 89:14-90:1 (Gorence, Arnold).  Arnold testified that the threat was made shortly after Rodella stated that he would not deputize Forest Service officers, see Sept. 15, 2014, Tr. at 100:12-101:7 (Gorence, Arnold); id. at 102:24-103:3 (Gorence, Arnold), but Arnold testified that he did not remember the threat being tied to an agreement to deputize Forest Service officers, see id. at 94:5-95:19 (Peña, Arnold); id. at 96:10-16 (Peña, Arnold).  Rather, Arnold testified that he believed that Mr. Martinez was referring to Forest Service officers stopping people outside the boundaries of the national forest.  See Sept. 15, 2014, Tr. at 93:7-16 (Peña, Arnold).

Based on this evidence, which Rodella presented, it does not appear that Mr. Martinez' threat was in any way related to forcing Rodella to deputize Forest Service officers.  The evidence also does not show that Mr. Martinez sought to replace Rodella with a sheriff who would deputize Forest Service officers.  The evidence suggests that Mr. Martinez threatened Rodella to not interfere with Forest Service officers stopping people on public highways outside of the national forest boundaries.  See Sept. 15, 2014, Tr. at 93:7-16 (Peña, Arnold); Arnold Aff. at 4.  This testimony is in line with the United States' characterization of the threat, which is that

Mr. Martinez threatened Rodella that, if he violated federal law by interfering with a federal office engaged in official duties, he would be subject to arrest and federal prosecution.  See Response at 1-2 (citing 18 U.S.C. § 111).

18 U.S.C. § 111 states:

**(a)**    **In general.** -- Whoever --

> **(1)**    forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114[5] of this title while engaged in or on account of the performance of official duties; or
>
> **(2)**    forcibly assaults or intimidates any person who formerly served as a person designated in section 1114 on account of the performance of official duties during such person's term of service,

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to

---

[5]18 U.S.C. § 1114 states:

Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance, shall be punished --

> **(1)**    in the case of murder, as provided under section 1111;
>
> **(2)**    in the case of manslaughter, as provided under section 1112; or
>
> **(3)**    in the case of attempted murder or manslaughter, as provided in section 1113.

18 U.S.C. § 1114.  Section 111, thus, applies to interfering with the official duties of "any officer or employee of the United States or of any agency in any branch of the United States Government."  18 U.S.C. § 1114.  See 18 U.S.C. § 111.

commit another felony, be fined under this title or imprisoned not more than 8 years, or both.

18 U.S.C. § 111.  In light of § 111, Mr. Martinez' threat appears to be: "If you break the law, we will arrest and prosecute you."  Certainly it is permissible for a prosecutor -- especially a United States Attorney -- to threaten a person with prosecution if that person violates the law.  The Mission Statement for the United States Attorney's Office for the District of New Mexico states that its mission is:

> To represent the Criminal and Civil interests of the United States.
>
> The United States Attorney's Office for the District of New Mexico will:
>
> 1. Ensure public safety against foreign and domestic threats.
>
> 2. Prosecute and defend criminal and civil cases with fairness and justice for all.
>
> 3. Protect the rights of victims, witnesses and the public.
>
> 4. Enhance the cooperation of law enforcement agencies and community groups.
>
> 5. Inform and educate the public with the goal of building trust and deterring crime.
>
> 6. Enhance the quality of life through community programs.
>
> 7. Serve as a model of ethical and professional conduct.
>
> 8. Provide a work environment to maximize the achievement of these goals.

Mission Statement, United States Attorney's Office District of New Mexico, http://www.justice.gov/usao/nm/mission.html (last visited November 7, 2014).  To ensure public safety and to protect the public, Mr. Martinez' main tool is the prosecution of federal crimes.  Prosecuting crimes that have already been committed, however, will have little value in protecting the public unless the prosecution has some effect of deterring future crimes.  In sentencing convicted

criminal defendants, one of the Court's goals is to deter future criminal conduct by others.  See 18 U.S.C. § 3553(a)(2)(B).  Mr. Martinez has two options to deter criminal conduct: (i) prosecute federal crimes and hope that potential offenders learn of the prosecution; or (ii) warn potential offenders that they will be prosecuted for violating federal crimes.  One option is reactive and requires a person to first commit a crime, while the other is proactive and can be effective without a crime being committed.  Just because Mr. Martinez chose the proactive option does not support a finding that Mr. Martinez harbored some invidious motive or that he has some improper bias against Rodella.  Mr. Martinez' conduct appears to be nothing more than a United States Attorney doing his job to deter potential criminal conduct.

While Mr. Martinez' threat may indicate some ill-will or animosity between Mr. Martinez and Rodella, ill-will, by itself, does not constitute an improper bias by a prosecutor toward a defendant.  See Phelps v. Hamilton, 59 F.3d 1058, 1067 (10th Cir. 1995).  In Phelps v. Hamilton, the Tenth Circuit held:

> [W]e note that animus or ill-will between the parties does not, by itself, constitute retaliation.  Indeed, no prosecutor looks favorably upon lawbreakers -- whether they be purveyors of obscenity, drug dealers or those committing hate crimes.  Thus, demonstrating a history of personal animosity between the prosecutor and the defendant is not, by itself, sufficient to show that a prosecution was commenced in bad faith.  See Davila v. Texas, 489 F. Supp. 803, 809 (S.D. Tex. 1980)(explaining that even a long and bitter personal history between the prosecutor and the defendant as well as the prosecutor's zealousness in prosecuting the case did not bring the case within the bad faith exception to Younger [v. Harris, 401 U.S. 37 (1971)]).  That is not to say that personal animosity -- if shown to exist -- may not be probative of an improper motive, but in and of itself, such evidence cannot meet the burden of demonstrating that the prosecution was commenced in bad faith or to harass.

Phelps v. Hamilton, 59 F.3d at 1067.  Bias -- or vindictiveness -- is improper only if it is based on a desire to deter a defendant's exercise of his or her constitutional rights.  See United States v. Wade, 266 F.3d at 585.  A bias may also be improper if it is motivated, in part, because of a

defendant's protected class -- such as race.  See United States v. Alabi, No. CR 11-2292 JB, 2013 WL 2284956, at *33 (D.N.M. May 15, 2013)(Browning, J.)("A racially selective law enforcement claim exists where the government conduct had a discriminatory effect and where a discriminatory purpose motivated the conduct." (citing Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168).  Here, Rodella has not alleged that Mr. Martinez' threat, or the subsequent prosecution, was related to deterring Rodella's exercise of some constitutional right.  See United States v. Wade, 266 F.3d at 585.  Additionally, Rodella has not alleged that the threat or prosecution was based on some protected classification.  See United States v. Alabi, 2013 WL 2284956, at *33.  Instead, Mr. Martinez' threat appears to be nothing more than "an animus or ill-will between" a prosecutor and a potential law breaker.  Phelps v. Hamilton, 59 F.3d at 1067.

Rodella argues that § 111 does not shield a federal agent from every kind of interference, and, as an example, Rodella contends that an FBI agent pulling a gun on a mattress salesman would not be within the performance of the agent's official duties.  See Sept. 16, 2014, Tr. at 207:2-13 (Gorence).  Rodella argues that there is a legitimate issue whether Forest Service officers can cite individuals for state law infractions if the officers are not deputized.  See Sept. 16, 2014, Tr. at 207:14-16 (Gorence).

Rodella is correct in noting that § 111 applies only when a federal officer is engaged in the performance of official duties, see 18 U.S.C. § 111(a)(1), and Rodella may be correct that Forest Service officers may not lawfully stop motorists outside the boundaries of national forests unless they have first been deputized.[6]  These arguments, however, are best made in a case in

---

[6]At least one state court upheld a Forest Service officer stopping a motorist outside the boundaries of a national forest.  See People v. Viveros, No. C038834, 2002 WL 31631030, at *2 (Cal. Ct. App. Nov. 22, 2002)(unpublished).  That court, however, upheld the stop as a citizen's arrest and did not decide whether the officer had authority, based on federal jurisdiction, to make the stop.  See People v. Viveros, 2002 WL 31631030, at *1 ("Second, [the defendant] argues

which a defendant is being prosecuted under § 111 for interfering with Forest Service officers stopping motorists outside the boundaries of the national forest.  Rodella has been charged under 18 U.S.C. § 242 for allegedly violating a person's constitutional rights in an incident that is unrelated to the Forest Service or its officers.  See Indictment at 1.  These arguments are, thus, inapplicable in this case.

Because Rodella has not produced any evidence that Mr. Martinez is improperly biased against him, the Court concludes that Mr. Martinez' testimony is irrelevant in this case.

### 2. Even if Mr. Martinez Is Illegitimately Biased Against Rodella, Evidence of this Bias Is Irrelevant in This Case.

Even if Rodella produced evidence that Mr. Martinez is biased against him, this evidence would be irrelevant in this case.  The primary issue at trial is whether Rodella violated 18 U.S.C. § 242.  Mr. Martinez' possible bias against Rodella is irrelevant to Rodella's guilt or innocence.  Several United States Courts of Appeals have held that evidence of a prosecutor's vindictive motive is inadmissible at trial, because a prosecutor's motive is independent whether a defendant is guilty or innocent.  See United States v. Clay, 618 F.3d 946, 955-56 (8th Cir. 2010); United States v. Abboud, 438 F.3d 554, 579-80 (6th Cir. 2006); United States v. Berrigan, 482 F.2d 171, 174-76 (3d Cir. 1973).

In United States v. Berrigan, the United States Court of Appeals for the Third Circuit, in an opinion that Judge Aldisert authored, and Judges Van Dusen and Rosenn joined, affirmed a district court's ruling that evidence of discriminatory prosecution is not an issue for the jury to decide, but that it could be raised before the Court either before or after the trial.  See 482 F.2d at 174.  The Third Circuit noted that by "both tradition and constitutional mandate the jury is

---

because the stop took place 15-20 miles outside of forest service land, Captain Rush was acting outside his federal jurisdiction.  Because we find Captain Rush acted within his authority as a private citizen, we need not address defendant's second contention.").

given the responsibility of determining guilt or innocence according to instructions of law delivered by the court," and that the issue "of discriminatory prosecution relates not to the guilt or innocence of" the defendants.  United States v. Berrigan, 482 F.2d at 175.  In United States v. Abboud, the Sixth Circuit affirmed the district court's decision to prevent the defendants from introducing evidence of selective prosecution at trial.  See 438 F.3d at 579.  The Sixth Circuit relied on United States v. Berrigan to hold that evidence of selected prosecution was not an issue for the jury to decide because it did not go to the defendants' guilt or innocence.  See United States v. Abboud, 438 F.3d at 579-80 (quoting United States v. Berrigan, 482 F.2d at 175).  In United States v. Clay, the defendant sought to introduce evidence at trial of the prosecutor's animosity towards him to show "evidence of this vindictive prosecution to the jury."  618 F.3d at 955.  The United States Court of Appeals for the Eight Circuit affirmed the district court's decision to consider the issue before trial, rather than allowing the jury to decide if the United States engaged in selective prosecution.  See United States v. Clay, 618 F.3d at 955-56.  Finally, in United States v. Simpson, 226 F. App'x 556 (6th Cir. 2007)(unpublished), the Sixth Circuit affirmed the district court's ruling to quash a subpoena to call an AUSA to testify at trial.  See 226 F. App'x at 562.  The defendant sought to present the AUSA's testimony to establish a claim of vindictive prosecution.  See United States v. Simpson, 226 F. App'x at 562.  The Sixth Circuit noted that the defendant has a Sixth Amendment compulsory process right to obtain witnesses in his favor; however, the right "does not entitle the defendant to present evidence that is irrelevant."  United States v. Simpson, 226 F. App'x at 562.  The Sixth Circuit held that, because evidence of the AUSA's vindictive prosecution did not go to "the ultimate issue of [the defendant]'s guilt or innocence," it was irrelevant to the case and that the district court properly excluded the testimony.  226 F. App'x at 562-63.

Here, Mr. Martinez' testimony -- even if it did evidence some bias -- is irrelevant to the ultimate issue in the case: Rodella's guilt or innocence. See United States v. Simpson, 226 F. App'x at 562-63. Evidence of Mr. Martinez' purported bias against Rodella may be used to support a vindictive or selected prosecution defense, but the Court -- rather than the jury -- properly considers such a defense. See United States v. Berrigan, 482 F.2d at 174. Mr. Martinez' testimony is, thus, irrelevant[7] and should not be presented to the jury at trial. See United States v. Wooten, 377 F.3d at 1142 (noting that the district court may restrict a defendant's compulsory process right to present witnesses if the testimony is irrelevant).

Rodella points to Prantil to support his contention that he can call Mr. Martinez as a witness. See Amended Motion at 6. In Prantil, however, the prosecutor was a witness and participant in the underlying events in the case, i.e., the "events alleged in the indictment." 764 F.2d at 551, 556. The defendant in Prantil did not seek the prosecutor's testimony to argue that the prosecutor was biased against him, but instead to ask him about the "his knowledge of the facts vital to the defendant's defense." Prantil, 764 F.2d at 552. Here, Mr. Martinez was not a participant or witness to the incident described in the Indictment. Rodella cannot elicit any testimony from Mr. Martinez that concerns the March 11, 2014, incident. Rodella can, at best, hope to elicit testimony from Mr. Martinez that indicates that Mr. Martinez is biased against

---

[7]Along the same lines, the Court would exclude Mr. Martinez' testimony under rules 402 and 403 of the Federal Rules of Evidence. See Fed. R. Evid. 402 & 403. Rule 402 states that "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. Rule 403 states that evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Because Mr. Martinez' testimony is not relevant to Rodella's guilt or innocence, the Court will exclude his testimony at trial under rule 402. See Fed. R. Evid. 402. Additionally, with no relevance at trial, it has little to no probative value, and would likely confuse or mislead the jury in its determination of Rodella's guilt or innocence. The danger of jury confusion, thus, substantially outweighs the probative value of Mr. Martinez' testimony, and the Court will exclude his testimony under rule 403. See Fed. R. Evid. 403.

Rodella. This testimony, however, is irrelevant to the crime charged and will be excluded from the trial.[8]

**B.    RODELLA COULD PRESENT EVIDENCE OF MR. MARTINEZ' THREAT THROUGH OTHER SOURCES.**

Rodella could present evidence of Mr. Martinez' threat through other sources. Rodella asserts that he wants to call Mr. Martinez as a witness to testify that he threatened Rodella at the May 7, 2014, meeting. See Sept. 16, 2014, Tr. at 208:9-21 (Gorence). As laid out above, evidence of the May 7, 2014, meeting and of Martinez' threat is irrelevant to the issues at trial, but even if it were relevant, Rodella still may not call Mr. Martinez as a witness, because he can present evidence of the threat from other sources. Rodella can call Mr. Martinez to testify only if Rodella can show that Mr. Martinez' testimony is "vital to the defense." United States v. Wooten, 377 F.3d at 1143 (quoting United States v. Troutman, 814 F.2d at 1439). Numerous

---

[8]Rodella does not allege vindictive prosecution and did not request for Mr. Martinez to testify at the evidentiary hearings. If Rodella had requested the Court to compel Mr. Martinez to testify at the evidentiary hearings, under an allegation of vindictive prosecution, the Court would have denied the request. Several courts have indicated that a defendant is not entitled to discovery or to an evidentiary hearing on a vindictive prosecution claim until the defendant first presents "'some evidence tending to show the existence of the essential elements of'" a vindictive prosecution claim. United States v. Adams, 870 F.2d 1140, 1146 (6th Cir. 1989)(quoting United States v. Schmucker, 815 F.2d 413, 418 (6th Cir. 1987)), cited with approval by United States v. P.H.E., Inc., 965 F.2d 848, 860 (10th Cir. 19992)). See United States v. Falcon, 347 F.3d 1000, 1004 (7th Cir. 2003)("To obtain the evidentiary hearing [the defendant] seeks, he must offer sufficient evidence to raise a reasonable doubt that the government acted properly in bringing the illegal reentry charge." (citing United States v. Monsoor, 77 F.3d 1031, 1034 (7th Cir. 1996)). A vindictive prosecution claim requires "evidence of hostility or punitive animus toward the defendant because [he or she] exercised a specific legal right." United States v. Battles, 745 F.3d 436, 459 (10th Cir. 2014)(internal quotation marks omitted)(alterations omitted). Here, Rodella has not presented any evidence that Mr. Martinez initiated the prosecution against him because he exercised some protected right. Instead the only evidence Rodella presents is that Mr. Martinez threatened him not to violate federal law. Because Rodella has not presented evidence of vindictiveness, he is not entitled to an evidentiary hearing -- where he could call Mr. Martinez as a witness -- to try to support his vindictive prosecution claim. See United States v. Adams, 870 F.2d at 1146.

courts have held that a prosecutor cannot be called to testify if the defendant can obtain the same information from another source.  See, e.g., United States v. Wooten, 377 F.3d at 1143.

Here, Rodella can introduce evidence of Mr. Martinez' threat from a number of other sources.  Arnold testified that, including Rodella, five individuals from Rio Arriba County attended the May 7, 2014, meeting.  See Sept. 15, 2014, Tr. at 87:18-24 (Arnold).  Arnold also attended that meeting.  See Arnold Aff. at 3.  There were also a large number of people at the meeting, other than Mr. Martinez, who represented the Forest Service.  See Sept. 15, 2014, Tr. at 88:4-15 (Gorence, Arnold); Arnold Aff. at 3.  If Rodella chooses not to testify, there are still five other individuals from his delegation, who can testify about Mr. Martinez' threat -- one of whom has already shown a willingness to testify for Rodella: Arnold.  See Sept. 15, 2014, Tr. at 87:18-24 (Arnold); Arnold Aff. at 3.  Rodella could also subpoena an official from the Forest Service to testify about Mr. Martinez' threat.  Essentially, Rodella has a variety of options, other than calling Mr. Martinez to testify.

Rodella argues that "the rules of evidence do not allow the other witnesses to testify to statements made by U.S. Attorney Martinez to Sheriff Rodella."  Amended Motion at 5-6.  It is unclear to which rules of evidence Rodella refers.  While rules 402 and 403 would not allow the other witnesses to testify about the threat, because evidence of Mr. Martinez' bias is irrelevant, see United States v. Berrigan, 482 F.2d at 174, rules 402 and 403 would equally apply to Mr. Martinez' own testimony.  Rodella may be referring to rule 802's prohibition against hearsay.  See Fed. R. Evid. 802.  This rule, however, is inapplicable, because Mr. Martinez' threat is not hearsay.  See Tompkins v. Cyr, 202 F.3d 770, 779 n.3 (5th Cir. 2000)(holding that threats are not hearsay because they are verbal acts rather than factual statements offered for their truth); United States v. Thomas, 86 F.3d 647, 654 n.12 (7th Cir. 1996)("Indeed, the threats

were not hearsay, for the threats were not admitted to prove the truth of the words asserted, but rather were admitted as 'verbal acts' that potentially affected the credibility of witnesses."). Rodella is seeking to introduce the threat to show that Mr. Martinez is biased. The threat would not be offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). Accordingly, the threat is not hearsay. See Fed. R. Evid. 801(c). It is, thus, hard to understand which rules of evidence would prohibit the other witnesses from testifying to Mr. Martinez' threat, and the Court believes that none would.

Because Rodella could call a number of other witnesses to testify about Mr. Martinez' threat, Rodella has not shown that Mr. Martinez' testimony is vital to his defense. See United States v. Wooten, 377 F.3d at 1143; United States v. Troutman, 814 F.2d at 1439. While the Ninth Circuit allowed the defendant to call an AUSA to testify in Prantil, the Ninth Circuit noted that there were no other witnesses who could have provided the necessary testimony. See 764 F.2d at 551-52. There, an FBI agent could have presented some of the relevant testimony, but not all of it, because the FBI agent listened only to some of the discussions between the AUSA and the defendant. See Prantil, 764 F.2d at 552. This case is more similar to United States v. Troutman, where a number of witnesses testified to the facts, which the defendant wished to present through the prosecutor's testimony. See 814 F.2d at 1440 (holding that the district court properly denied request to compel prosecutor to testify because the prosecutor's testimony was not vital to the defense). Here, there are a number of people who can testify to the threat that Mr. Martinez made to Rodella. See Arnold Aff. at 4. Unlike Prantil, each of these witnesses heard the entire threat and can testify to what Mr. Martinez said at the May 7, 2014, meeting. Cf. Prantil, 764 F.2d at 552 ("[T]he prosecutor contends that his testimony . . . was unnecessary and cumulative because the defendant could have presented some testimony on this

point through an FBI agent who listened to some, <u>but not all</u>, of the relevant discussions."
(emphasis added)).

Because Rodella can introduce evidence of Mr. Martinez' threat from other sources,
Mr. Martinez's testimony is not vital to Rodella's defense, and because Mr. Martinez' testimony
is not vital to Rodella's defense, the United States' substantial interest in not permitting a
prosecutor to testify outweighs Rodella's interest in presenting Mr. Martinez' testimony.  <u>See</u>
<u>United States v. Wooten</u>, 377 F.3d at 1142-43.  Accordingly, Rodella cannot call Mr. Martinez to
testify about the threat.[9]

## II.   THE COURT WILL NOT DISQUALIFY THE UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF NEW MEXICO.

The Court will not disqualify the United States Attorney's Office for the District of New
Mexico.  The Tenth Circuit has warned that "disqualifying an entire United States Attorney's
office is almost always reversible error regardless of the underlying merits of the case" and that
"every circuit court that has considered the disqualification of an entire United States Attorney's
office has reversed the disqualification."  <u>United States v. Bolden</u>, 353 F.3d at 875-76, 879.  The
Tenth Circuit even noted that it "can rarely -- if ever -- imagine a scenario in which a district
court could properly disqualify an entire United States Attorney's office."  <u>United States v.</u>
<u>Bolden</u>, 353 F.3d at 875.  Despite the Tenth Circuit's clear warnings against disqualification, it
has indicated that it may be appropriate to disqualify an entire office by holding that a "district

---

[9]While the Court finds that Rodella could introduce evidence of Mr. Martinez' threat
from other sources to conclude that Rodella may not call Mr. Martinez as a witness, the Court is
not giving Rodella permission to parade in these witnesses at trial to testify about the threat.  The
Court has already concluded that evidence of the threat, and of a purported bias or motive against
Rodella, is irrelevant to the issues at trial, and, thus, the Court will exclude evidence of the threat
from trial.  <u>See</u> <u>United States v. Simpson</u>, 226 F. App'x at 562-63.  The discussion about the
availability of the other witnesses is to show that there are several grounds for not permitting
Rodella to call Mr. Martinez as a witness.

court must make attorney-specific factual findings and legal conclusions before disqualifying attorneys from the USA's office." United States v. Bolden, 353 F.3d at 880 (citing Fullmer v. Harper, 517 F.2d 20, 22 (10th Cir. 1975)).[10]   No court has, however, disqualified an entire United States Attorney's Office without being reversed.  See United States v. Bolden, 353 F.3d at 879; United States v. Perdigao, No. CR 07-0103, 2008 WL 2705454, at *2 (E.D. La. July 9, 2008)(Fallon, J.).   Disqualifying an entire United States Attorney's Office would be almost certain reversible error, and the Court will decline Rodella's invitation to disqualify the entire United States Attorney's Office for the District of New Mexico.

Rodella's argument for the disqualification of the entire office operates on two levels. First, Rodella argues that the Court must disqualify Mr. Martinez.  Second, Rodella argues that, because Mr. Martinez is head over the United States Attorney's Office for the District of New Mexico, and because every attorney in the office is under Mr. Martinez' authority and control, if the Court disqualifies Mr. Martinez, the Court should disqualify the entire office.  Rodella's argument fails at both levels.  First, the Court will not disqualify Mr. Martinez.  Second, even if the Court were to disqualify Mr. Martinez, his disqualification would not affect the rest of the office.

---

[10]The Tenth Circuit made this proclamation at the end of an opinion in which it reversed a district court's decision to disqualify an entire United States Attorney's Office.  See United States v. Bolden, 353 F.3d at 880.   Read in context, the Tenth Circuit's holding may be indicating that it is possible -- under very egregious circumstances -- to disqualify an entire United States Attorney's Office.  By the text of its holding -- "disqualifying attorneys from the USA's office" -- and in light of the Tenth Circuit's harsh warnings against disqualifying an entire office, the Tenth Circuit's holding should likely be interpreted to mean that, before disqualifying an individual attorney, a "district court must make attorney-specific factual findings and legal conclusions." United States v. Bolden, 353 F.3d at 880.   Indeed, the case which the Tenth Circuit cited for its holding involved the disqualification of a single attorney. See Fulmer v. Harper, 517 F.2d at 21-22.  It is, thus, likely that a district court, in a criminal case, can only disqualify an entire United States Attorney's Office after making specific factual findings and legal conclusions for every single attorney in the office and finding that each attorney -- examined individually -- must be disqualified from the case.

## A.    THE COURT WILL NOT DISQUALIFY MR. MARTINEZ.

Rodella argues that the Court should disqualify Mr. Martinez because he will call Mr. Martinez as a witness at trial, because Mr. Martinez has a personal or political relationship to the case, because of the timing of Mr. Martinez' threat, the arrest, and the prosecution, and because there is the appearance of a conflict of interest.   These arguments do not warrant Mr. Martinez' disqualification.

### 1.    Rodella Cannot Compel Mr. Martinez to Testify.

The majority of Rodella's argument is centered on calling Mr. Martinez as a witness at trial.  See Amended Motion at 4-7; Sept. 15, 2014, Tr. at 106:2-5 (Gorence).  Rodella is correct that a prosecutor may not prosecute and testify in the same case.[11]  See United States v. Wooten, 377 F.3d at 1142 (citing ABA Model Rules of Prof'l Conduct R. 3.7 ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness . . . .")).  Rodella may not, however, call Mr. Martinez as a witness, because Mr. Martinez' testimony is irrelevant, and because Rodella can obtain evidence of Mr. Martinez' testimony from other sources.  See United

---

[11]This general rule is subject to limited exceptions, which can arise only "under extraordinary circumstances."  United States v. Sharma, 394 F. App'x 591, 594 (11th Cir. 2010)(unpublished)(citing United States v. Crockett, 506 F.2d 759, 760 (5th Cir. 1975)).  The Ninth Circuit noted such circumstances in which a prosecutor may appear as both an advocate and witness:

> Such exceptions include those situations where: the proposed testimony relates to a purely formal or uncontested matter; the need for the testimony could not have been reasonably anticipated and the evidence is necessary to prevent a miscarriage of justice; and where a particular attorney's familiarity with a case is such that withdrawal will irreparably injure his client's case.  See Model Code of Professional Responsibility E-C 5-10 & accompanying footnotes.   These exceptions are narrowly interpreted and "where the question arises, doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an advocate."  Id. EC 5-10.

Prantil, 764 F.2d at 553 n.2 (alterations omitted).

States v. Wooten, 377 F.3d at 1142-43.  Mr. Martinez will not testify in this case, and, thus, the

Court will not disqualify him.

> ### 2.  Mr. Martinez' Personal and Political Relationships Do Not Warrant Disqualification.

Rodella also cites to 28 C.F.R. § 45.2 to argue that a "United States Attorney can be

disqualified from prosecuting a case if he or she has a personal or political relationship to a

case."  Amended Motion at 3 (citing 28 C.F.R. § 45.2).  Section 45.2 states:

> (a)   Unless authorized under paragraph (b) of this section, no employee shall participate in a criminal investigation or prosecution if he has a personal or political relationship with:
>
> > (1)   Any person or organization substantially involved in the conduct that is the subject of the investigation or prosecution; or
> >
> > (2)   Any person or organization which he knows has a specific and substantial interest that would be directly affected by the outcome of the investigation or prosecution.

28 C.F.R. § 45.2(a).  Section 45.2(d), however, states: "This section pertains to agency

management and is not intended to create rights enforceable by private individuals or

organizations."  28 C.F.R. § 45.2(d).  Accordingly, the Department of Justice intended section

45.2 for internal management and not to give private litigants -- such as Rodella -- a right to

disqualify a prosecuting attorney.  See 28 C.F.R. § 45.2(d).  Yet, even if § 45.2(a) allowed for a

criminal defendant to seek disqualification of a government attorney, Rodella's argument would

still fail.  Section 45.2(c) defines the personal and political relationships that are pertinent in

§ 45.2(a).

> (c)   For the purposes of this section:
>
> > (1)   Political relationship means a close identification with an elected official, a candidate (whether or not successful) for elective, public office, a political party, or a campaign

organization, arising from service as a principal adviser thereto or a principal official thereof; and

(2)     Personal relationship means a close and substantial connection of the type normally viewed as likely to induce partiality.  An employee is presumed to have a personal relationship with his father, mother, brother, sister, child and spouse.  Whether relationships (including friendships) of an employee to other persons or organizations are "personal" must be judged on an individual basis with due regard given to the subjective opinion of the employee.

28 C.F.R. § 45.2(c).  Rodella does not allege that Mr. Martinez has a political or personal relationship with Rodella.  Section 45.2(c)'s definitions of political and personal relationships involve only amicable relationships, and, based on Rodella's arguments and characterizations of the May 7, 2014, meeting, Mr. Martinez' relationship with Rodella seems far from amicable. Rodella also does not allege that Mr. Martinez has a political or personal relationship with anyone who will benefit from the prosecution.  The alleged victim -- Tafoya -- may be considered a beneficiary of the prosecution.  Rodella has not, however, alleged that Mr. Martinez has any political or personal relationship with Tafoya.  Section 45.2, thus, does not lead to Mr. Martinez' disqualification.

### 3.     The Timing of Mr. Martinez' Threat, and of the Arrest and Prosecution of Rodella, Do Not Warrant Disqualification.

Rodella also argues that Mr. Martinez threatening him with arrest, and then arresting him shortly afterwards, creates the appearance of a conflict of interest.  See Sept. 16, 2014, Tr. at 207:16-22 (Gorence).  This argument has two flaws.

First, Mr. Martinez' threat and then the arrest of Rodella does not create the appearance of a conflict of interest.  As noted earlier, Mr. Martinez' threat constituted nothing more than a threat that, if Rodella violated the law, he would be subject to arrest and to prosecution.  There was nothing impermissible about this threat, and Rodella's subsequent arrest was unrelated to the

subject of the threat.  At most, it appears that Mr. Martinez threatened Rodella not to violate the law, and when Rodella allegedly violated a different law, Rodella was arrested and subject to prosecution.  This detailed order of events does not create the appearance of a conflict of interest.

Second, even if these events created the appearance of a conflict of interest, an appearance of a conflict of interest is insufficient to warrant disqualification.  See United States v. Lorenzo, 995 F.2d 1448,  1453 (9th Cir. 1993)(noting that the appearance of is insufficient to warrant disqualification without a showing of actual prejudice); United States v. Nosal, No. C 08-0237 MHP, 2009 WL 482236, at *3 (N.D. Cal. Feb. 2009)(Patel, J.)(same).  The Supreme Court has held that a stronger showing of a conflict of interest is necessary to warrant the disqualification of a prosecutor than the disqualification of a judge.  See Young v. United States, 481 U.S. at 807.  While the appearance of impropriety, or of a conflict of interest, may be sufficient to disqualify a judge, it is inadequate to disqualify a prosecutor.  See Young v. United States, 481 U.S. at 807.  Courts that have disqualified government attorneys have done so in "limited circumstances."  United States v. Bolden, 353 F.3d at 878 (citing Young v. United States, 481 U.S. at 807 (finding an actual conflict of interest when prosecutor represented another party benefiting from case); United States v. Heldt, 668 F.2d at 1275 (noting that prosecutor should be disqualified if the criminal defendant has brought against the prosecutor a "bona fide civil action alleging bad faith in the performance of official duties"); Prantil, 764 F.2d at 552-53 (holding that prosecutor should have been disqualified when he was a witness in the trial)).  "'In an adversary system, prosecutors are necessarily permitted to be zealous in the enforcement of the law.'"  Young v. United States, 481 U.S. at 807 (quoting Marshall v. Jerrico, Inc., 446 U.S. 238, 248 (1980)(brackets omitted).  While zealous advocacy in prosecuting a case, which might eliminate the defendant's freedoms and subject him or her to retribution, certainly

creates the appearance of a bias against the defendant or even of a conflict of interest between the prosecutor and the defendant, this advocacy is nothing more than the prosecutor fulfilling his or her duties.  Mr. Martinez threatening Rodella with arrest and prosecution and then later prosecuting Rodella does not create an actual conflict of interest that would warrant disqualification.  The chronology of events does nothing to create anything other than the appearance that Mr. Martinez is fulfilling the duties assigned to him

### 4.   Mr. Martinez and Rodella's Respective Offices Do Not Warrant Disqualification.

Finally, Rodella argues that Mr. Martinez, whom the President appointed, threated Rodella, who is an elected state official, and that this scenario creates a sufficient basis to require Mr. Martinez' recusal from the case.  See Sept. 16, 2014, Tr. at 213:20-214:3 (Gorence). Rodella does not explain why, or how, Mr. Martinez' and Rodella's positions require Mr. Martinez' recusal or disqualification.  As noted earlier, Mr. Martinez' threat was nothing more than a threat to not violate federal law, which creates a deterrent effect to uphold the rule of law and to protect the public.  Perhaps Rodella is attempting to argue that Mr. Martinez is pursuing the prosecution for purely political reasons -- that is, because of Rodella's position on political issues.  Rodella has not, however, presented any evidence to this effect.

Rodella also may be arguing that the case implicates federalism concerns.  It is not uncommon for federal prosecutors to prosecute state officials for violating federal law.  See, e.g., United States v. Vigil, 506 F. Supp. 2d 571 (D.N.M. 2007)(Browning, J.).  A federal prosecutor threatening a state official with prosecution for violating federal law should not be viewed any differently than the federal prosecutor threating a normal citizen to deter future criminal conduct. Moreover, the statute under which Rodella is charged -- 18 U.S.C. § 242 -- appears to have been enacted with federalism in mind.  Section 242 permits federal prosecutors to prosecute someone

who, under color of state law, deprives another of their rights that are "secured or protected by the Constitution or laws of the United States."  18 U.S.C. § 242.  By the text of the statute, it appears that Congress intended § 242 to be used by federal prosecutors to prosecute state officials for violating another's federal rights.   Accordingly, Mr. Martinez and Rodella's respective political offices do not warrant Mr. Martinez' disqualification; rather their respective offices are indicative of § 242 being used in the manner in which it was intended.  This argument does not cause the Court to disqualify Mr. Martinez.

**B.    EVEN IF THE COURT DISQUALIFIED MR. MARTINEZ, THE COURT WOULD NOT DISQUALIFY THE ENTIRE UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF NEW MEXICO.**

The Court will not disqualify Mr. Martinez from the case.  Yet, even if the Court had, it would not disqualify the entire United States Attorney's Office for the District of New Mexico. Rodella argues that, because the entire United States Attorney's Office for the District of New Mexico is under Mr. Martinez' authority and control, if the Court disqualifies Mr. Martinez, the Court should also disqualify the entire office.  See Amended Motion at 9.  The Tenth Circuit has stated that it can "only rarely -- if ever -- imagine a scenario in which a district court could properly disqualify an entire United States Attorney's office."  United States v. Bolden, 353 F.3d at 875.  This sentence seems odd if all it took to disqualify an entire office was to find that the United States Attorney over that office was disqualified.  In light of the Tenth Circuits' warning that "disqualifying an entire United States Attorney's office is almost always reversible error regardless of the underlying merits of the case," the Court is hard-pressed to disqualify an entire office even in light of a novel situation.  United States v. Bolden, 353 F.3d at 876.  Moreover, the Tenth Circuit has already addressed the issue whether an entire United States Attorney's Office

should be disqualified if the United States Attorney over that office is disqualified.  See United States v. Morris, 313 F. App'x at 131-32.

In United States v. Morris, the Tenth Circuit affirmed the district court's refusal to disqualify the United States Attorney's Office for the Northern District of Oklahoma even though the United States Attorney for that district had previously served as private counsel in the civil case that accompanied the criminal one.  See 313 F. App'x at 131-32.  This situation would likely qualify as an actual conflict of interest that would require the United States Attorney's disqualification.  See Young v. United States, 481 U.S. at 807.  The Tenth Circuit held, however, that the district court did not abuse its discretion in denying the defendant's motion to disqualify the entire office.  See United States v. Morris, 313 F. App'x at 132.  The Tenth Circuit quoted United States v. Bolden for the proposition that "'the generally accepted remedy is to disqualify a specific Assistant United States Attorney, not all the attorneys in the office.'"  United States v. Morris, 313 F. App'x at 132 (quoting United States v. Bolden, 353 F.3d at 878).  The Tenth Circuit noted that two other attorneys from the office prosecuted the case and that these attorneys did not have "even a remote connection with [the] civil case."  United States v. Morris, 313 F. App'x at 132.  Accordingly, United States v. Morris indicates that the remedy for a United States Attorney's disqualification is the same as the remedy for an AUSA's disqualification: disqualify the specific attorney and allow other attorneys from the office prosecute the case.  See 313 F. App'x at 132.

Here, the Court will not disqualify Mr. Martinez; however, even if the Court disqualified Mr. Martinez, the Court would not disqualify the entire United States Attorney's Office for the District of New Mexico.  The Court would instead order that different attorneys from the office, who are not disqualified, may prosecute the case.  This remedy is consistent with Tenth Circuit

case law and does not run afoul of the Tenth Circuit's strict warnings against disqualifying an entire United States Attorney's Office.  See United States v. Morris, 313 F. App'x at 132; United States v. Bolden, 353 F.3d at 876.

**IT IS ORDERED** that: (i) Defendant Thomas R. Rodella's Motion to Disqualify the U.S. Attorney's Office for the District of New Mexico, the Prosecutor in this Case, by Virtue of the U.S. Attorney Damon P. Martinez Being a Witness, filed September 4, 2014 (Doc. 37), is denied; and (ii) Defendant R. Rodella's Amended Motion to Disqualify the U.S. Attorney's Office for the District of New Mexico, the Prosecutor in this Case, by Virtue of U.S. Attorney Damon P. Martinez Being a Witness, filed September 5, 2014 (Doc. 38), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Tara C. Neda
Jeremy Peña
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Robert J. Gorence
Louren M. Oliveros
Gorence & Oliveros PC
Albuquerque, New Mexico

*Attorneys for the Defendant*