## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                           No. CR 14-2783 JB

THOMAS R. RODELLA and
THOMAS R. RODELLA, JR.,

       Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) Defendant Thomas R. Rodella's Notice of Intention to Offer Expert Testimony, filed September 8, 2014 (Doc. 42)("Notice"); and (ii) the United States' Objection to Defendant Thomas R. Rodella's Notice of Intention to Offer Expert Testimony (Doc. 42), filed September 12, 2014 (Doc. 69)("Objection").  The Court held an evidentiary hearing on September 16, 2014.  The primary issues are: (i) whether Harvey Stanford Sanders, M.D., is qualified to testify about the length of time it takes for a bruise to manifest after an injury; (ii) whether Dr. Sanders is qualified to testify whether the booking photograph of Michael Tafoya, the alleged victim, from the Rio Arriba County Jail, taken on March 11, 2014, shows evidence of facial bruising; (iii) whether Dr. Sanders' testimony about the time it takes a bruise to manifest after an injury would assist the jury; (iv) whether Dr. Sanders' testimony whether Tafoya's booking photograph shows evidence of facial bruising would assist the jury; (v) whether Dennis L. O'Brien's testimony about the acceleration differences between Tafoya's Mazda and Defendant Thomas R. Rodella's Jeep would assist the jury; and (vi) whether O'Brien's testimony reconstructing the scene of the accident would assist the jury.  Because Dr. Sanders has practiced reconstructive and plastic surgery for forty years, because much of

Dr. Sanders' practice involved traumatic facial injuries, and because Dr. Sanders used photographs regularly during his medical practice, Dr. Sanders is qualified offer opinion testimony about the amount of time it takes for a bruise to manifest and about whether a photograph shows evidence of bruising.  Additionally, because an ordinary jury would not likely know how long it takes for a bruise to manifest after an injury, Dr. Sanders' testimony regarding the amount of time it takes for a bruise to manifest would assist the jury.  Also, because a juror can observe from the booking photograph whether Tafoya's face is bruised without the assistance of expert testimony, Dr. Sanders' testimony that Tafoya's booking photograph does not show evidence of bruising would not assist the jury.  Finally, because the events surrounding the incident on March 11, 2014, are in dispute, and because O'Brien's testimony is based on reliable information, O'Brien's testimony would assist the jury.  The Court will sustain the Objection in part and overrule it in part.  The Court will permit Dr. Sanders to testify about the time that it takes a bruise to manifest after an injury, but the Court will exclude Dr. Sanders' testimony that Tafoya's booking photograph shows no evidence of a facial injury.  Additionally, the Court will permit O'Brien's testimony.

## FACTUAL BACKGROUND

The Superseding Indictment, filed September 9, 2014 (Doc. 55)("Indictment"), alleges that, on March 11, 2014, in Rio Arriba County, New Mexico, Rodella, while acting under color of state law, subjected a person -- Tafoya -- to "unreasonable seizure by a law enforcement officer."  Indictment at 1.  Specifically, Rodella allegedly used unreasonable force and caused an "unlawful arrest by deputies of the Rio Arriba County Sheriff's Office."  Indictment at 1.  "This offense resulted in bodily injury" to a person, and included the "use and threatened use of a dangerous weapon."   Indictment at 1.  The Indictment further alleges that Rodella carried and

brandished a firearm "during and in relation to a crime of violence for which the defendant may be prosecuted in a court of the United States," and that, "in furtherance of such crime, possessed and brandished said firearm."  Indictment at 1-2.

## PROCEDURAL BACKGROUND

On September 8, 2014, Rodella gave notice, pursuant to rule 16(b)(1)(a) and the Scheduling Order, filed August 15, 2014 (Doc. 8),  that he intends to introduce expert testimony at trial.  See Notice at 1.  Rodella notified the Court of his intention to call at trial Dr. Sanders and O'Brien as expert witnesses.  See Notice ¶¶ 1-2, at 1-2.   The United States objects to the testimony of both witnesses.  See Objection at 1.

### 1.    Dr. Sanders' Curriculum Vitae.

Dr. Sanders graduated from Rhodes College at Memphis, Tennessee, in 1963, with majors in Biology and English.  See Harvey Stanford Sanders, M.D., Curriculum Vitae at 1, filed September 8, 2014 (Doc. 42-1)("Sanders CV").   See also Transcript of Evidentiary Hearing at 38:3-9 (taken September 16, 2014)(Sanders, Gorence)("Tr.").[1]   Dr. Sanders attended medical school at the Tennessee School of Health Sciences in Memphis, Tennessee, and graduated in 1967.  See Sanders CV at 1.  From 1967 to 1972, Dr. Sanders completed his general residency at the Ochsner Clinic and Foundation in New Orleans, Louisiana, and from 1972 to 1974, Dr. Sanders completed residencies in plastic surgery at the University of Chicago Pritzker School of Medicine in Chicago, Illinois, and at Vanderbilt University in Nashville, Tennessee.  See Sanders CV at 1.  Dr. Sanders began serving in the Army Medical Corps during his time in medical school until 1978.  See Sanders CV at 1.  From 1974 to 2001, Dr. Sanders practiced reconstructive and plastic surgery at a number of hospitals in the Nashville Metropolitan Area.

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

See Sanders CV at 1.  Dr. Sanders was in a car accident near the end of his private practice.  See Tr. at 41:15-20 (Sanders).  Dr. Sanders suffered a torn rotator cuff, as a result of the accident, and he was forced to retire in 2001.  See Tr. at 41:15-42:8 (Gorence, Sanders).  Dr. Sanders has been a member of the American Medical Association, the Tennessee Medical Association, the Nashville Academy of Medicine, the American Society of Plastic and Reconstructive Surgery, the University of Chicago Surgical Society, and the Alton Ochsner Alumni Association.  See Sanders CV at 2.

**2.      Dr. Sanders' Testimony.**

Dr. Sanders has reviewed Tafoya's booking photograph, photographs of Rodella's sheriff badges, and Rodella's current badge.  See Notice ¶ 1, at 1.  Dr. Sanders will testify about facial bruising and the time periods in which a bruise becomes visible after trauma.  See Notice ¶ 1, at 1.  Dr. Sanders will testify that there is no evidence of trauma on Tafoya's neck and face area from either an anterior or posterior view as reflected in Tafoya's booking photograph from the Rio Arriba County jail, which was taken on March 11, 2014.  See Notice ¶ 1, at 1.  Specifically, Dr. Sanders will testify that there is no evidence of any abrasions, scratch marks, lacerations, or imbedded debris on Tafoya's facial area or neck.  See Notice ¶ 1, at 1-2.  Dr. Sanders will also testify that, had Tafoya suffered an injury more than four hours earlier, either marks or debris would be visible in the booking photograph.  See Notice ¶ 1, at 1-2.  Dr. Sanders will testify that Tafoya did not have an injury to his eye or eye socket, and that he did not have a black eye.  See Notice ¶ 1, at 2.  Dr. Sanders will also testify that there is no evidence of any physical damage to Tafoya's skin.  See Notice ¶ 1, at 2.  Rodella argues that Dr. Sanders' testimony will rebut the testimony of Special Agent John W. Howard of the Federal Bureau of Investigation ("FBI"),

who opined in his affidavit that there is evidence that Tafoya suffered a facial injury.  Notice ¶ 1, at 2.

The United States responds to this proffered testimony by arguing that "it does not appear that Sanders is qualified to give an opinion as to the aging of bruises or other superficial injuries."  Objection at 3.  The United States specifically argues that Dr. Sanders has not conducted any research or written any publications in the area of his proposed testimony, and that "he has not practiced any form of medicine for at least 13 years."  Objection at 3.  The United States contends that, even if Dr. Sanders were qualified to "render opinions on aging of bruises, his testimony should be disallowed because of his methodology or lack thereof."  Objection at 3 (internal quotation marks omitted).  The United States argues that the "entire basis of Sanders' opinion is his review of a single, grainy photograph taken of the victim by the detention facility after his arrest" and that this "opinion of what the picture depicts could not possibly assist the trier of fact."  Objection at 3.  The United States contends that there is no apparent methodology "involved in Sanders' analysis that would permit the court to assess the reliability" of Dr. Sanders' testimony and that, if "the reliability of an expert's methodology cannot be demonstrated, his testimony should be excluded."  Objection at 3 (citing United States v. Foghorn, No. CR 03-2365 JB, 2005 WL 6136334 at *4-5 (D.N.M. June 15, 2005)(Browning, J.)).

The United States further argues that Dr. "Sanders' description or opinion of what the picture depicts lacks any relevance because it cannot assist the jury," and because "the jury is just as capable of drawing its own conclusions from what they see in the detention facility photograph."  Objection at 4.  The United States contends that Rodella is attempting "to usurp the jury in determining the victim's credibility" regarding Tafoya's testimony that "Rodella

smacked him on the right cheek with his badge on March 11, 2004." Objection at 4.  The United

States argues that the jury should be able to "listen to the victim's testimony, view the detention

facility photograph, and draw its own conclusion."  Objection at 4.  The United States argues that

Dr. Sanders' testimony "not only invades the province of the jury, but would lead to confusion

and should be disallowed under" rules 403 and 702 of the Federal Rules of Evidence.  Objection

at 4.

The United States also filed several medical journal articles that concern the ability to age

bruises.  See Email re Medical Journal Articles, filed September 18, 2014 (Doc. 88); Email re

Medical Journal Articles, filed September 17, 2014 (Doc. 91).  One article concerns a study that

discussed the difficulty of determining the age of a bruise through assessing the color of the

bruise.  See Vanessa K. Hughes & Neil E. I. Langlois, Use of Reflectance Spectrophotometry

and Colorimetry in a General Linear Model for the Determination of the Age of Bruises,

Forensic Sci. Med. Pathology (2010).  A second article found that attempting to determine the

age of a bruise, based solely on photographs, does not lead to a precise determination of the

bruise's age.  See Terence Stephenson & Yvona Bialas, Estimation of the Age of Bruising, in

Archives of Diseases in Childhood 53 (1996).   A third article also found that a visual

examination of the coloration of a bruise cannot lead to a precise determination of the bruise's

age.  See Marie M.J. Lecomte, Tim Holmes, Daniel P. Kay, Joane L. Simons, & Sue K. Vintiner,

The Use of Photographs to Record Variation in Bruising Response in Humans, Forensic Sci. Int'l

231 (2013).  A fourth article concluded that forensic experts cannot accurately determine the age

of bruises from photographs, but that experts can place photographs of the same bruise -- taken

over time -- in chronological order.  See M.L. Pilling, P. Vanezis, D. Perrett, & A. Johnston,

Visual Assessment of the Timing of Bruising by Forensic Experts, J. of Forensic and Legal Med.

17 (2010). A final article, similarly, found that forensic experts cannot determine the age of a bruise through visual assessment, despite the expert's amount of experience. See Sophie E. Grossman, A. Johnston, P. Vanezis, & D. Perrett, Can We Assess the Age of Bruises?  An Attempt to Develop an Objective Technique, Med. Sci. L. 51 (2011).

3.    **The September 16, 2014, Evidentiary Hearing Concerning Dr. Sanders' Testimony.**

The Court held an evidentiary hearing on September 16, 2014. See Tr. at 37:1-88:10 (Neda, Gorence, Sanders, Court). At the hearing, Dr. Sanders testified that his medical license is still current in Tennessee, but that he is not board certified, even though he passed the written portion of the general surgery and plastic surgery boards. See Tr. at 42:17-43:9 (Gorence, Sanders). Dr. Sanders testified that he has previously testified as an expert witness in fifty to one-hundred different cases. See Tr. at 59:19-60:16 (Gorence, O'Brien). Dr. Sanders has, however, never testified as an expert witness in aging a facial injury based solely on a photograph, and he has not provided expert testimony since 1994. See Tr. at 66:4-7 (Neda, Sanders); id. at 68:3-13 (Neda, Sanders). Dr. Sanders testified that he is not currently a practicing physician, but that every week he reads two medical journals -- the New England Journal of Medicine[2] and the American Medicine Association Journal.[3] See Tr. at 67:7-22 (Neda, Sanders).

---

[2]The New England Journal of Medicine "is published by the Massachusetts Medical Society and is among the most prestigious peer-reviewed medical journals" and is "the oldest-continuously published" medical journal.  The New England Journal of Medicine, Wikipedia.org,  http://en.wikipedia.org/wiki/The_New_England_Journal_of_Medicine  (last visited Nov. 17, 2014).

[3]Dr. Sanders is likely referring to the Journal of American Medical Association, which "is a weekly peer-reviewed medical journal published by the American Medical Association." JAMA (Journal), Wikipedia.org, http://en.wikipedia.org/wiki/JAMA_%28journal%29 (last visited Nov. 17, 2014).

Dr. Sanders testified that, in over forty years of practicing reconstructive surgery, he encountered patients with facial bruising, discoloration, and abrasions at least once a week.  See Tr. at 45:24-46:11 (Gorence, Sanders).  Additionally, Dr. Sanders testified that approximately twenty to twenty-five percent of his practice involved traumatic facial surgeries, which amounted to around 1,000 to 1,500 cases.  See Tr. at 46:21-47:23 (Gorence, Sanders).  Dr. Sanders testified that bruising, abrasions, swelling, and discoloration may be manifestations of a facial injury, and that he has expertise in discerning these manifestations.  See Tr. at 46:7-20 (Gorence, Sanders); id. at 47:24-48:4 (Gorence, Sanders).  Dr. Sanders further testified that facial bruising, lacerations, abrasions, discoloration, and patient history are all important factors in determining a patient's injury level.  See Tr. at 48:7-49:5 (Gorence, Sanders).

Dr. Sanders testified that, before every surgery, he used photographs of patients to evaluate the physical trauma to the patients' faces and to determine a plan of action for the surgery.   See Tr. at 49:6-50:14 (Gorence, Sanders); id. at 51:9-17 (Gorence, Sanders).  Dr. Sanders testified that, in evaluating a photograph, he first makes sure no one has tampered with the photograph; second, he examines the light source for the photograph; and third, he looks at the position of the person's face in the photograph.   See Tr. at 49:21-50:14 (Gorence, Sanders).  In diagnosing an injury from a photograph, Dr. Sanders testified that he looks for swelling by bisecting the face, contrasting the symmetry between the two sides, and looking at the lighting of the photograph and at changes in coloration.  See Tr. at 50:15-51:8 (Gorence, Sanders).  Dr. Sanders testified that he was provided Tafoya's booking photograph from March 11, 2014, which was taken about five to five-and-a-half hours after a car accident.  See Tr. at 51:18-52:20 (Gorence, Sanders).  Dr. Sanders testified that he was also provided a replicate sheriff badge.  See Tr. at 52:21-53:4 (Gorence, Sanders).  Dr. Sanders testified that he read that a

badge had been slammed against Tafoya's face.   See Tr. at 53:12-19 (Gorence, Sanders). Dr. Sanders testified that he tested the badge by slamming it against his forearm and waiting five hours to see if there was a bruise.  See Tr. at 53:12-25 (Gorence, Sanders).  Dr. Sanders testified that his forearm was a little red for about ten minutes, but that no bruising or anything else occurred.   See Tr. at 53:24-25 (Gorence, Sanders); id. at 69:6-17 (Neda, Sanders).  Dr. Sanders testified that, if an adult man slammed the badge on Tafoya's face, while Tafoya was lying in a prone position, Dr. Sanders would expect there to be severe lacerations or at least some type of abrasion.  See Tr. at 53:25-54:4 (Sanders).

Dr. Sanders testified that, in examining Tafoya's booking photograph, he did not see evidence of facial trauma marks, swelling, discoloration, or abrasions.   See Tr. at 54:9-16 (Gorence, Sanders).  Dr. Sanders described how the photograph showed no evidence of trauma except for a red mark under Tafoya's eye, which Dr. Sanders testified could have been caused by something other than trauma, including heat from the lights.  See Tr. at 54:18-56:24 (Gorence, Sanders); id. at 69:18-70:9 (Neda, Sanders); id. at 78:8-24 (Neda, Sanders).  Dr. Sanders testified that with a ninety-five percent certainty, he thought the photograph did not show any evidence of a facial injury.  See Tr. at 58:25-59:17 (Gorence, Sanders).  Dr. Sanders testified that, because of the lighting of the photograph, he could not determine whether there was bruising on sixty to seventy percent of Tafoya's left side of his face.   See Tr. at 73:22-25 (Neda, Sanders). Dr. Sanders testified that there is sufficient lighting on the right side of Tafoya's face to determine if there was a bruise.  See Tr. at 76:12-15 (Neda, Sanders).  Dr. Sanders testified that he would not "quibble" with the conclusions from a study, which found that bruising is not reliably determined from photographs because of the number of variables in photography, including lighting.   Tr. at 73:17-74:4 (Neda, Sanders); id. at 75:12-24 (Neda, Sanders).

Dr. Sanders additionally testified that photographs are not reliable for determining the age of a bruise, because of variables in lighting and the positioning of the subject. <u>See</u> Tr. at 75:15-24 (Neda, Sanders). Dr. Sanders also testified, however, that he was not going to try to age a bruise based on a photograph, but instead would merely testify that there is not bruise in the photograph. <u>See</u> Tr. at 79:4-80:4 (Gorence, Sanders). Dr. Sanders testified that the visual assessment of bruises is reliable and that, if there is a good photograph with good lighting, he can tell if there is bruising. <u>See</u> Tr. at 77:16-78:5 (Neda, Sanders). Dr. Sanders testified that forensics is not his field of study. <u>See</u> Tr. at 74:9-19 (Neda, Sanders).

Dr. Sanders testified that, based on the face's vascular structure, he would expect to see bruising or swelling on the face within thirty minutes of receiving a facial injury. <u>See</u> Tr. at 56:25-57:19 (Gorence, Sanders). Dr. Sanders testified that, because of the fragile bones of the mandible, lower jaw, and skull, the face -- especially the area around the eye socket -- is more susceptible to bruising than other areas of the body, and that bruising would occur almost immediately. <u>See</u> Tr. at 57:13-58:24 (Gorence, Sanders). He testified that he did not review or rely on any publications in rendering his opinion on bruising, but said that any basic plastic-surgery textbook would provide the information. <u>See</u> Tr. at 70:10-22 (Neda, Sanders). The United States asked Dr. Sanders if he was familiar with the <u>Forensic Science and Medical Pathology</u>; with the <u>Journal on Forensic and Legal Medicine</u>; with the <u>Forensic Science International Journal</u>; with <u>Journal of Medicine, Science, and the Law</u>; with the <u>Royal Society of Medicine Journal</u>; with any research on aging bruises by utilizing reflective spectrophotometry; or with research on aging bruising through photographs. <u>See</u> Tr. at 71:3-74:8 (Neda, Gorence, Sanders, Court); <u>id</u>. at 76:21-77:15 (Neda, Sanders). Dr. Sanders testified that he was not

familiar with any those journals or with that research.  See Tr. at 71:3-73:21 (Neda, Gorence, Sanders, Court); id. at 76:21-77:15 (Neda, Sanders).

Rodella argued that Dr. Sanders has a background and experience in using photographs to assess whether a person has suffered an injury, which would assist the jury in deciding a central issue in the case.  See Tr. at 80:21-81:12 (Gorence).  Rodella noted that Dr. Sanders did not observe Tafoya first-hand, but only studied the booking photograph.  See Tr. at 81:20-82:2 (Gorence).  Rodella argued that, in Tafoya's complaint to the state police, Tafoya alleged that Rodella hit him in the face with a badge, and that Dr. Sanders' testimony would go to the issue whether Rodella hit Tafoya in the face and whether Tafoya suffered an injury.  See Tr. at 82:2-22 (Gorence).  When asked about Dr. Sanders' experiment of hitting himself in the forearm with a badge, Rodella argued that Dr. Sanders will testify about that experiment and will testify that Rodella's badge has points on it, which creates the potential for lacerations.  See Tr. at 82:23-83:18 (Gorence, Court).  Rodella argued that the jury will be required to determine whether Tafoya suffered a physical injury, and that Dr. Sanders' background and qualifications make his testimony useful to the jury.  See Tr. at 84:13-18 (Gorence).  Rodella argued that Dr. Sanders used a methodology of studying the photograph by bisecting the photograph, comparing each half for swelling.  See Tr. at 86:4-13 (Gorence).

The United States responded by arguing that the booking photograph is grainy and that it appears to show puffiness on Tafoya's face, which is something the jury should determine.  See Tr. at 85:4-6 (Neda).  The United States argued that, while Dr. Sanders practiced medicine for a long time, he has never acted as an expert witness in a case such as this one, and that Dr. Sanders does not have any methodology or basis for his testimony, other than simply looking at the photograph.  See Tr. at 85:7-14 (Neda).  The United States argued that Dr. Sanders' testimony

- 11 -

would simply usurp the jury's duty to make its own assessment of the photograph.  See Tr. at 85:14-17 (Neda).

**4.    O'Brien's Curriculum Vitae.**

O'Brien served as a law enforcement officer and as a traffic reconstructionist for the past twenty-two years.  See Dennis L. O'Brien, Curriculum Vitae at 1, filed September 8, 2014 (Doc. 42-2)("O'Brien CV").  O'Brien served as a police officer with the San Juan Tribal Police Department in San Juan Pueblo, New Mexico, from 1991 to 1994.  See O'Brien CV at 2.  He then served as a Lieutenant in the Santa Fe County Sheriff's Office in Santa Fe, New Mexico, from 1994 to 2009.  See O'Brien CV at 1.  From 1998 to 2008, O'Brien owned a traffic crash reconstruction business, Impact Dynamics.  See O'Brien CV at 1.  O'Brien then served as the president, senior traffic crash reconstructionist, and photogrammetrist and forensic 3D animator for Crashteams New Mexico Inc. from 2008 to 2014.  See O'Brien CV at 1.  O'Brien currently serves as the president, forensic crash specialist, and 3D animation expert for Forensic Crash Specialists Inc.  See O'Brien CV at 1.

O'Brien has attended a number of courses around the nation and in Canada on accident investigation and reconstruction.  See O'Brien CV at 2-3.  He has a Federal Police Officer Certification and New Mexico Law Enforcement Officer Certification.  See O'Brien CV at 4.  O'Brien is a member of the Accreditation Commission for Traffic Accident Reconstruction, the National Association of Professional Accident Reconstructionists Specialists, Inc., and the Licensed State of New Mexico Private Investigator.  See O'Brien CV at 4.  O'Brien has previously served as an expert witness in a number of cases in federal and state court in New Mexico and Colorado.  See O'Brien CV at 5.

5.    **O'Brien's Testimony**.

Rodella plans on calling O'Brien as "an expert in accident reconstruction."  Notice ¶ 2, at 2.  O'Brien will testify about the "the capabilities of the jeep driven by Tommy Rodella, Jr., [Rodella's son,] as well as the vehicle driven by Mr. Tafoya."  Notice ¶ 2, at 2.  Rodella also contends that O'Brien will "analyze the photographs taken after Mr. Tafoya's vehicle came to rest after hitting a utility pole."  Notice ¶ 2, at 2.  O'Brien offered a report, which detailed his opinions regarding the March 11, 2014, incident.  See Vehicle Dynamics Analysis at 1-4, filed September 8, 2014 (Doc. 42-3)("O'Brien Report").  In forming his report and opinions, O'Brien reviewed maps, telephone records, reports that the New Mexico State Police and the Rio Arriba Sheriff's Office created, an FBI complaint form, and a statement by Tafoya.  See O'Brien Report at 3.  O'Brien also visited the site on September 7, 2014, and inspected and photographed Rodella's Jeep.  See O'Brien Report at 3.  Rodella, Jr., escorted O'Brien along the route of the incident and detailed to O'Brien his version of the events.  See O'Brien Report at 3.  O'Brien tested the acceleration of Rodella's Jeep and obtained performance specifications from an identical Mazda to that of Tafoya's.  See O'Brien Report at 3.

O'Brien made the following conclusions:

1.    The Mazda 3 accelerates at a much faster rate than the Jeep

2.    The Mazda 3 would attain 30 mph in 2.3 seconds and 60 mph in 7.4 seconds

3.    The Jeep would attain 30 mph in 5.6 seconds and 60 mph in 11.3 seconds

   A.    If Mr. Rodella Jr. paused the Jeep to allow the Sheriff to walk back to it and re-enter the vehicle after the Mazda sped away, that time would also be added to the acceleration time and would also indicate that the Mazda would have a large lead on the Jeep, which if acceleration continued, could create a gap/distance where the Jeep would not be able to close

4.      The displaced dirt and tire marks visible in the law enforcement
        photographs are consistent with an aggressive maneuver where the driver
        accelerated backwards and cut the tires to the right, followed by braking to
        swing the front-end of the Mazda around roughly 180-degrees from west
        to east

        A.      This evidence is consistent with information provided by
                Mr. Rodella Jr. about the manner in which Mr. Tafoya was
                operating his vehicle just prior to impacting the pole

        B.      It is also consistent with the path of travel of the Mazda
                where it backed-up and struck the pipe, which protruded
                out of the ground by 2-feet, after first spinning around

O'Brien Report at 4.

The United States objects to O'Brien's testimony, arguing that the testimony "fails to meet the requirements" of rules 702 and 403, as well as the requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Objection at 1. The United States concedes that "O'Brien appears to be a qualified accident reconstructionist" and, thus, "does not object to his qualifications under" rule 702. Objection at 4. Rather, the United States argues that O'Brien's testimony is "based on unreliable methodology." Objection at 4. The United States argues that O'Brien "proposes to testify that the acceleration capacity of the victim's Mazda exceeded that of the defendant's Jeep SUV" and that O'Brien "apparently intends to opine that the SUV could not have kept up with the Mazda." Objection at 4. The United States argues that "O'Brien does not know what speeds were maintained by the vehicles[,] . . . whether such speeds were consistent or fluctuated," or "to what extend the victim or the defendant tapped into their respective vehicle's acceleration capabilities when they re-entered CR 399 or entered and exited turns." Objection at 4. The United States argues that an expert's testimony must be "'based on sufficient facts and data.'" Objection at 5 (quoting Fed. R. Evid. 702(b)). The United States contends that the "only facts Mr. O'Brien has are acceleration data on two vehicles" and that he

- 14 -

plans on using these facts "to describe this chase to the jury as if he witnessed it." Objection at 5. The United States argues that O'Brien's "testimony is based on speculation," which does "not satisfy the reliability requirement of Rule 702." Objection at 5.

6.     **The September 16, 2014, Evidentiary Hearing Concerning O'Brien's Testimony.**

At the September 16, 2014, evidentiary hearing, O'Brien testified that the United States Attorney's Office had previously retained him as an expert. See Tr. at 120:8-24 (Gorence, O'Brien). O'Brien testified about the photographs from the incident scene and testified that he studied the photographs and used the photographs to form his opinions. See Tr. at 122:23-130:21 (Gorence, O'Brien, Court). O'Brien relied on the tire tracks, the vehicles' positions, the angle of the vehicles' tires, the displaced dirt, and a trench in the dirt -- all of which are depicted in the photographs -- to form his opinion. See Tr. at 122:23-130:21 (Gorence, O'Brien, Court). O'Brien testified that he believes that a deputy sheriff or a police officer took the photographs, and that, at the police academy, police officers are given a certain level of training in photography. See Tr. at 161:8-162:12 (Neda, O'Brien). O'Brien testified that the tire tracks, as depicted in the photographs, indicate that Tafoya conducted an aggressive driving maneuver that resulted in the front-end of the Mazda being swung around roughly to a 180-degree angle. See Tr. at 129:22-130:25 (Gorence, O'Brien). O'Brien testified that he characterized the Mazda's maneuver as aggressive, because it would take a lot of acceleration and force to cause a vehicle to initiate a 180-degree rotation while moving backwards. See Tr. at 131:24-132:15 (Gorence, O'Brien). O'Brien further testified that, over the course of his career, he has characterized a vehicular maneuver as aggressive, when that characterization is applicable. See Tr. at 159:9-160:18 (Neda, O'Brien). When asked if O'Brien's opinions would change, if Rodella, Jr. were to testify at trial, consistent with the version of events that Rodella,

Jr., gave O'Brien, O'Brien testified that his opinions would be the same as in his report.  See Tr. at 131:11-22 (Gorence, O'Brien).  O'Brien further testified that he was certain of his opinions to a reasonable degree.  See Tr. at 160:19-21 (Neda, O'Brien).

Rodella argued that O'Brien is relying on photographs to reconstruct the scene of the incident, which is what accident reconstructionists do "day in and day out."  Tr. at 167:15-19 (Gorence).  Rodella noted that the United States has not argued that O'Brien is not qualified but only that his testimony is irrelevant.  See Tr. at 176:24-177:2 (Gorence).  Rodella argued that O'Brien's testimony -- that Tafoya drove in an aggressive manner -- is relevant to whether Rodella used excessive force, because Rodella's use of force must be evaluated by what Rodella confronted at that time.  See Tr. at 167:8-168:7 (Gorence).  Rodella argued that O'Brien's testimony is relevant and probative under rules 401 and 402 of the Federal Rules of Evidence. See Tr. at 170:1-5 (Gorence).  Rodella argued that, without an expert witness, the jury would be left with photographs of the tire marks and no basis to understand what occurred.  See Tr. at 168:13-16 (Gorence).  Rodella contended that O'Brien's testimony -- that the Mazda was driving aggressively -- will corroborate the testimony of the jogger, who saw the chase.  See Tr. at 173:13-174:17 (Gorence, Court).  Rodella argued that Tafoya used his Mazda as a deadly weapon, by trying to hit Rodella, and that O'Brien's testimony will provide a factual basis for what happened during the incident.  See Tr. at 175:21-176:8 (Gorence).  Rodella maintained that O'Brien's testimony will demonstrate what happened, which Rodella contends is that the Mazda almost ran over him, and that the amount of force that Rodella was entitled to use will be based partly on how aggressive Tafoya drove.  See Tr. at 178:23-189:10 (Gorence).  Rodella also argued that O'Brien's testimony will be relevant to impeach Tafoya's testimony as to what happened.  See Tr. at 179:18-24 (Gorence).  To alleviate concerns of hearsay, Rodella argued

that O'Brien could sit in the courtroom and listen to the sworn testimony at trial.  See Tr. at

177:2-7 (Gorence).

The United States did not contest O'Brien's qualifications as an expert witness.  See Tr.

at 116:11-15 (Neda).  The United States argued that it did not object to O'Brien's methodology

in determining that Tafoya's Mazda could accelerate at a faster rate than Rodella's Jeep, but

argued that this testimony is irrelevant.  See Tr. at 122:2-12 (Neda, Court).  The United States

argued that O'Brien should not be able to testify, based solely on the car's acceleration

capabilities and on Rodella's version of the facts, how the two cars traveled and how large of a

gap was between the cars.  See Tr. at 157:25-158:13 (Neda).  The United States argued that,

because it concedes that the Mazda was in front of the Jeep and that the Mazda was trying to get

away from the Jeep, the only potential relevance of the evidence would be to show that the car's

maneuvering was somehow an assault on Rodella.  See Tr. at 170:16-171:5 (Neda).  The United

States argued that evidence of an assault would only be relevant if Rodella testified that he was

standing next to the Mazda while it was coming at him and that, without evidence that Rodella

was standing immediately next to the Mazda, O'Brien's testimony is irrelevant to whether the

amount of force used by Rodella was excessive.  See Tr. at 171:5-172:1 (Neda).

## LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided Daubert v. Merrell Dow

Pharmaceuticals, Inc., trial courts have had the responsibility to make certain that proffered

experts will assist the jury in understanding the evidence and in determining the factual issues it

must decide."   United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M.

2011)(Browning, J.).  "The Court now must not only decide whether the expert is qualified to

testify, but, under Daubert v. Merrell Dow Pharmaceuticals, Inc., whether the opinion testimony

is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224. "Daubert v. Merrell Dow Pharmaceuticals, Inc. requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.

 1. **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

 **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

 **(b)** the testimony is based on sufficient facts or data;

 **(c)** the testimony is the product of reliable principles and methods; and

 **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g. physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."). An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank,

374 F.3d 917, 928 (10th Cir. 2004).   The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.   See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).   Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications."   Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

**2.      The Standard in Daubert v. Merrell Dow Pharmaceuticals, Inc.**

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact.   See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., No. 03-1160 BB/LAM, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).   The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate;

(iv) the existence of standards and whether the witness applied them in the present case; and

(v) whether the witness' method is generally accepted as reliable in the relevant medical and

scientific community. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95. The court

is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from

the data; whether the witness has adequately accounted for alternative explanations for the effect

at issue; whether the opinion was reached for the purposes of litigation or as the result of

independent studies; or whether it unduly relies on anecdotal evidence. See Witherspoon v.

Navajo Ref. Co., 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146

(1997)). The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp.:

> Rule 702 requires the district court to "ensure that any and all scientific testimony
> or evidence is not only relevant, but reliable." [Bitler v. A.O. Smith Corp.,
> 391 F.3d 1114, 1120 (10th Cir. 2004)](quoting Daubert, 509 U.S. at 589 . . .).
> This obligation involves a two-part inquiry. Id. "[A] district court must [first]
> determine if the expert's proffered testimony . . . has 'a reliable basis in the
> knowledge and experience of his [or her] discipline.'" Id. (quoting Daubert, 509
> U.S. at 592 . . . .). In making this determination, the district court must decide
> "whether the reasoning or methodology underlying the testimony is scientifically
> valid. . . ." Id. (quoting Daubert, 509 U.S. at 592-93 . . .). Second, the district
> court must further inquire into whether proposed testimony is sufficiently
> "relevant to the task at hand." Daubert, 509 U.S. at 597 . . . .

397 F.3d 878, 883-84 (10th Cir. 2005)(footnote omitted). "The second inquiry is related to the

first. Under the relevance prong of the Daubert analysis, the court must ensure that the proposed

expert testimony logically advances a material aspect of the case . . . . The evidence must have a

valid scientific connection to the disputed facts in the case." Norris v. Baxter Healthcare Corp.,

397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir.

1995)(on remand from the Supreme Court); Daubert v. Merrell Dow Pharm., Inc., 509 U.S.

at 591)). If the expert's proffered testimony fails on the first prong, the court does not reach the

second prong. See Norris v. Baxter Healthcare Corp., 397 F.3d at 884. In Kumho Tire Co. v.

Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert v. Merrell Dow Pharmaceuticals, Inc., to non-scientific expert testimony.  See 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.").  The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert v. Merrell Dow Pharmaceuticals, Inc., will not apply to all cases:

> Our emphasis on the word 'may' thus reflects Daubert's description of the Rule 702 inquiry as a flexible one.  Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test.  And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert v. Merrell Dow Pharmaceuticals, Inc., the court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619 JB/DJS, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595).  "Despite this focus on methodology, 'an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations omitted)(internal quotation marks omitted). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 881.  The Tenth Circuit noted in Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206.  The United States Court of Appeals for the Ninth Circuit noted in Claar v.

Burlington Northern Railroad Co., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method.  Certainly, scientists may form initial tentative hypotheses.  However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-503 (citation omitted).

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact.  In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083 JB/WPL, 2006 WL 4079623, at *10 (Dec. 15,

2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir.

2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion.

See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated

connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found

to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific

presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo.

1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation."). A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. at 146. See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, S.J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans."). Courts have excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N. R.R. Co., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

   3.   **Necessity of Evaluating an Issue Under** Daubert v. Merrell Dow Pharmaceuticals, Inc.

   The restrictions in Daubert v. Merrell Dow Pharmaceuticals, Inc. apply to both "novel" expert testimony and "well-established propositions." Daubert v. Merrell Dow Pharm, Inc., 509 U.S. at 593 n.11 ("Although the Frye[4] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to

---

   [4]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule Fed. R. Evid. 702, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States, 293 F. at 1014.

unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11. "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert . . . ." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the [polymerase chain reaction] methodology, and in fact some courts have indicated their acceptance of it.").

## LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence." Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403). "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401 ("Evidence is

- 24 -

relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")).  "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'"  United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012)(Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's notes).  Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989).  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."  United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991))(internal quotation marks omitted).  "In performing the 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value."  Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1274 (10th Cir. 2000).  The "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."  United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980).  The Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . .  This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(citation omitted).

Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response from the jury, or if the evidence otherwise tends to adversely affect the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.  See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999). "Evidence is not unfairly prejudicial simply because it is damaging to an opponent's case." United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(quoting United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003)).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee notes)(emphasis in original).

## ANALYSIS

Because Dr. Sanders is qualified to testify as an expert, and because Dr. Sanders' testimony concerning the time it takes a bruise to manifest after a facial injury is sustained will assist the jury, the Court will allow Dr. Sanders to testify about the amount of time it takes for a

bruise to manifest.  Because the jury can determine whether Tafoya's booking photograph shows evidence of a bruise without the assistance of expert testimony, the Court will exclude Dr. Sanders' testimony whether the booking photograph shows evidence of bruising.  Also, because O'Brien's testimony would assist the jury in determining what occurred on March 11, 2014, and because O'Brien's testimony is reliable, the Court will allow O'Brien to testify.  The Court will, thus, sustain the Objection in part and overrule it in part.

## I.   THE COURT WILL ADMIT SOME OF DR. SANDERS' TESTIMONY, BUT WILL EXCLUDE HIS TESTIMONY CONCERNING TAFOYA'S BOOKING PHOTOGRAPH.

Dr. Sanders is qualified to testify as an expert, because of his forty years of experience as a plastic and reconstructive surgeon.  See Sanders CV at 1.  A large portion of Dr. Sanders' practice involved traumatic facial injuries, see Tr. at 45:24-47:23 (Gorence, Sanders), and studying photographs of patients with facial injuries, see Tr. at 49:6-50:14; 51:9-17 (Gorence, Sanders).  Dr. Sanders' testimony about the amount of time it takes for a facial bruise to manifest after an injury is relevant to this case, helpful to the jury, and proper expert testimony.  See United States v. York, 600 F.3d 347, 361 (5th Cir. 2010).  See also Fed. R. Evid. 701 (advisory committee's notes (2000 amendments)).  Dr. Sanders' opinions concerning the booking photograph, however, will not assist the jury, and the Court will exclude the testimony.  See Fed. R. Evid. 702.

### A.   DR. SANDERS IS QUALIFIED TO GIVE EXPERT TESTIMONY.

Dr. Sanders is qualified to testify as an expert witness.  "Rule 702 uses a liberal definition of 'expert.'"  United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224 (quoting Fed. R. Evid. 702 advisory committee's notes to 1972 proposed rules).  Dr. Sanders worked as a plastic and reconstructive surgeon for forty years.  See Sanders CV at 1.  During that time, a large number of

his patients suffered traumatic facial injuries, which included bruising, discoloration, and abrasions. See Tr. at 45:24-46:11 (Gorence, Sanders). Dr. Sanders approximated that he has treated around 1,000 to 1,500 patients, who suffered facial trauma. See Tr. at 46:21-47:23 (Gorence, Sanders). Additionally, Dr. Sanders regularly used photographs to evaluate the physical trauma to his patients' faces. See Tr. at 49:6-50:14 (Gorence, Sanders). Before every procedure he performed, Dr. Sanders examined photographs of the patients' injuries. See Tr. at 51:9-17 (Gorence, Sanders). At the September 16, 2014, evidentiary hearing, Dr. Sanders detailed his specific methodology in studying photographs of facial injuries. See Tr. at 49:21-51:8 (Gorence, Sanders). The Court concludes that, because of Dr. Sanders' forty years of practice as a reconstructive and plastic surgeon, which included treating traumatic facial injuries and using photography, Dr. Sanders is qualified to give expert testimony regarding the amount of time it takes for a bruise to manifest after an injury and to testify about Tafoya's booking photograph.

> **B.  THE COURT WILL PERMIT DR. SANDERS TO TESTIFY TO THE AMOUNT OF TIME IT TAKES FOR A BRUISE TO MANIFEST AFTER AN INJURY.**

The Court will permit Dr. Sanders to testify that, after a person suffers a facial injury, a bruise will be visible within thirty minutes. See Tr. at 56:25-57:19 (Gorence, Sanders). An expert's testimony must be relevant to the facts of a case and helpful to the jury. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., 2005 WL 5988649, at *2. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Rodella is charged with violating 18 U.S.C. § 242. See Indictment at 1. A defendant convicted under § 242 can be imprisoned for "not more than one year," but if

the prosecutor proves that "bodily injury results," a defendant can be "imprisoned for not more than ten years." 18 U.S.C. § 242. The Indictment alleges that Rodella's violation of § 242 "resulted in bodily injury" to Tafoya. Indictment at 1. Whether Tafoya suffered a bodily injury is, therefore, a fact of consequence, because if Rodella is convicted and the United States proves that Rodella caused bodily injury, Rodella's potential sentencing is amplified from less than one year imprisonment to less than ten years imprisonment. See 18 U.S.C. § 242.

Tafoya's booking photograph was taken between five to five-and-a-half hours after the incident alleged in the Indictment. See Tr. at 51:18-53:4 (Gorence, Sanders). Whether Tafoya suffered a bodily injury is an essential element in this case. See 18 U.S.C. § 242. According to Dr. Sanders' testimony, a bruise will manifest within thirty minutes of receiving a facial injury. See Tr. at 56:25-57:19 (Gorence, Sanders). If evidence of a facial injury is not apparent in the booking photograph, Dr. Sanders' testimony is relevant to whether Tafoya suffered a facial injury five hours earlier. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95. Dr. Sanders' testimony is relevant to the issue whether Tafoya's face should be bruised five hours after being struck. If a bruise does not normally manifest until six hours after an injury, then the jury could determine that the lack of bruising in the booking photograph is irrelevant to whether Tafoya suffered a facial injury, because a bruise would not be apparent until after the photograph was taken. If, however, as Dr. Sanders testified, a bruise would be apparent within five hours of suffering an injury, the jury could use this information to determine that the lack of bruising in the booking photograph indicates that Tafoya did not suffer a facial injury.[5]

_____

[5]The Court is not opining whether the booking photograph shows evidence of bruising. At the evidentiary hearing on September 16, 2014, Dr. Sanders testified that the photograph does not show evidence of bruising, while the United States believes that the photograph shows evidence of bruising. See Tr. at 54:9-16 (Gorence, Sanders); id. at 85:4-9 (Neda). The Court is merely concluding that, if the jury were to find that the booking photograph does not show

Dr. Sanders' testimony is, therefore, relevant to an essential fact in the case and will assist the jury in determining that essential fact.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95.

Testimony concerning the time it takes for a bruise to develop is classic expert testimony. "The advisory committee notes to Rule 701 [of the Federal Rules of Evidence] adopt[ed] the distinctions between lay and expert testimony as set forth in State v. Brown, 836 S.W.2d 530, 549-50 (Tenn. 1992)."  United States v. York, 600 F.3d at 361.  See Fed. R. Evid. 701 (advisory committee's notes (2000 amendments)("The amendment incorporates the distinctions set forth in State v. Brown, 836 S.W.2d 530, 549 (1992) . . . .").  In State v. Brown, the Supreme Court of Tennessee held that testimony concerning the length of time it would take for a bruise to develop was inappropriate lay witness testimony, because a lay witness can only testify to "results from a process of reasoning familiar in everyday life," while "an expert's testimony results from a process of reasoning which can be mastered only by specialists in a field."  836 S.W.2d at 549-50.  The court reasoned that testimony concerning the length of time it would take for a bruise to develop required "specialized skill or expertise," and that only an expert witness could testify on the subject.  836 S.W.2d at 550.  Rule 701, which deals with opinion testimony of lay witnesses, adopted State v. Brown's holding that distinguished between lay and expert witnesses by limiting what opinion testimony a lay witness may provide.  See Fed. R. Evid. 701 advisory committee's notes (2000 amendments).  As the court in State v. Brown held, a witness testifying to the time it takes for a bruise to manifest requires special skills and expertise beyond that which an ordinary person possesses.  See State v. Brown, 836 S.W.2d at 550.  Dr. Sanders possesses these special skills and expertise.

---

evidence of bruising, which is a possibility, Dr. Sanders' testimony would be relevant to assisting the jury in determining whether Tafoya suffered a facial injury.

The United States submitted a number of articles that discussed the inability of experts to determine the age of a bruise through visual examinations.  <u>See</u> Hughes & Langlois, <u>supra</u>; Stephenson & Bialas, <u>supra</u>; Lecomte, Holmes, Kay, Simons, & Vintiner, <u>supra</u>; Pilling, Vanezis, Perrett, & Johnston, <u>supra</u>; Grossman, Johnston, Vanezis, & Perrett, <u>supra</u>.  These articles, however, concern the aging of a bruise and not the time in which it takes for a bruise to manifest after an injury.  <u>See, e.g.</u>, Hughes & Langlois, <u>supra</u>.  The articles concern whether experts can determine the age of a bruise after it has already manifested.  <u>See, e.g.</u>, Hughes & Langlois, <u>supra</u>.  Dr. Sanders will not testify how old a bruise is or what a bruise's coloration indicates about the bruise's age.  Indeed, Dr. Sanders testified that he does not believe Tafoya's booking photograph shows any evidence of a bruise.  <u>See</u> Tr. at 54:9-16 (Gorence, Sanders).  Dr. Sanders' testimony will only be that, if a facial injury causes a bruise, the bruise will manifest within thirty minutes after the injury.  <u>See</u> Tr. at 56:25-57:19 (Gorence, Sanders).  The articles that the United States submitted do not address this conclusion.  Indeed, the United States does not offer any evidence that Dr. Sanders' testimony about the timing of bruises is wrong or unreliable.

Dr. Sanders is qualified to testify to the amount of time it takes for a bruise to manifest after a person suffers a facial injury.  His testimony is relevant and will assist the jury with an essential fact.  There is no evidence that the opinion is wrong, unreliable, or the product of an improper method.  The Court will, thus, permit Dr. Sanders to testify about the amount of time that it takes for a bruise to manifest after a person receives a facial injury.  <u>See</u> <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. at 594-95.

C.     THE COURT WILL EXCLUDE DR. SANDERS' TESTIMONY CONCERNING TAFOYA'S BOOKING PHOTOGRAPH.

The Court will exclude Dr. Sanders' testimony whether Tafoya's booking photograph shows evidence of bruising.  Rodella seeks to introduce Dr. Sanders' testimony that Tafoya's booking photograph shows no evidence of facial trauma.  See Notice at 1.  The United States argues that this testimony would usurp the jury's determination of Tafoya's credibility, and that the jury should be able to listen to Tafoya's testimony, view the photograph, and draw its own conclusions.  See Objection at 4.  Dr. Sanders testified that, in determining whether the photograph evidenced facial bruising, he viewed the photograph, bisected Tafoya's face on the photograph, took the lighting into account, and contrasted the symmetry and color between the two sides.  See Tr. at 50:15-51:8 (Gorence, Sanders).  Using this methodology, Dr. Sanders testified that he did not see any evidence of facial trauma marks, swelling, discoloration, or abrasions.  See Tr. at 54:9-16 (Gorence, Sanders).  While Dr. Sanders' methodology is detailed, his methodology boils down to looking at the photograph and deciding whether Tafoya's face appears to be bruised.  Whether a person's face appears to be bruised or swollen falls within a juror's "common knowledge and experience," and permitting expert testimony on the issue would "usurp the jury's primary role as the evaluator of evidence."  Ram v. N.M. Dep't of Env't, 2006 WL 4079623, at *10 (citing United States v. Rodriguez-Felix, 450 F.3d at 1123).

Courts routinely preclude expert testimony that compares photographs of a suspect and another individual.  See United States v. Dorsey, 45 F.3d 809, 815 (4th Cir. 1995); United States v. Harris, 995 F.2d 532, 535 (4th Cir. 1993); United States v. Brewer, 783 F.2d 841, 842 (9th Cir. 1986); Darco v. United States, No. CIV 04-1378 CPS, 2005 WL 1804475, at *5 (E.D.N.Y. July 28, 2005)(Sifton, S.J.).  The United States Court of Appeals for the Ninth Circuit, in United States v. Brewer, held that the district court's exclusion of an expert witness was not manifestly

unreasonable, because "the untrained jury could compare the photographs of the robber with those of [the defendant] without the special assistance of an expert"; thus, the expert's testimony comparing photographs of the robber and the defendant would "not be helpful to the jury." 783 F.2d at 842.   In the same way that an untrained jury can compare photographs of a suspect and a defendant, an untrained jury can also look at a booking photograph and determine whether Tafoya's face is bruised without the assistance of expert testimony.

Courts allow experts to testify about the contents of photographs if the testimony provides the jury with some information that is beyond their common knowledge.  For instance, in Korsko v. Pizarro, No. CIV 07-1745 MRK, 2010 WL 3615021 (D. Conn. Sept. 10, 2010)(Kravitz, J.), the Honorable Mark R. Kravitz, United States District Judge for the District of Connecticut, permitted an expert witness to testify to about a photograph of a wound to determine the age of a victim's wounds.  See 2010 WL 3615021, at *4.  In United States v. Boyajian, No. CR 09-933(A) CAS, 2013 WL 4189649 (C.D. Cal. Aug. 14, 2013)(Snyder, J.), the Honorable Christina A. Snyder, District Judge for the Central District of California, permitted an expert witness to testify that the large number photographs that a defendant possessed, depicting feet and legs of prepubescent girls, was indicative of a sexual attraction to a particular part of a body.  See 2013 WL 4189649, at *12, 17.  In United States v. Gomes, 279 F. App'x 861 (11th Cir. 2008)(unpublished), the United States Court of Appeals for the Eleventh Circuit upheld a district court's decision to permit an expert witness to testify to the age of children, who were depicted in photographs.  See 279 F. App'x at 871.  While testimony concerning the age of a wounds, indications of a particular fetish, and the age of children may be outside the common knowledge of a jury, whether a person's face is swollen or bruised is not.  An untrained juror can look at the booking photograph and determine, just as easily as Dr. Sanders, whether Tafoya's

face shows discoloration or swelling.   See United States v. Brewer, 783 F.2d at 842.   If

Dr. Sanders' testimony falls within the juror's common knowledge and usurps the jurors' role as

the primary fact finder, the Court must exclude the testimony.   Ram v. N.M. Dep't of Env't,

2006 WL 4079623, at *10.

> The advisory committee's notes to rule 702 states:
>
> There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

Fed. R. Evid. 702 advisory committee notes to 1972 proposed rules (quoting M. Ladd, Expert

Testimony, 5 Vand. L. Rev. 414, 418 (1952)).   An ordinary, untrained layman can look at a

photograph and determine whether the subject's face appears to be bruised or swollen.   Expert

testimony on the issue is, thus, inappropriate and irrelevant.   See Ram v. N.M. Dep't of Env't,

2006 WL 4079623, at *10.   Because Dr. Sanders' testimony that Tafoya's booking photograph

does not show evidence of bruising or discoloration falls within an ordinary juror's common

knowledge, Dr. Sanders' testimony is not admissible.   See United States v. Rodriguez-Felix, 450

F.3d at 1123 n.2 ("Where expert testimony addresses an issue of which the jury is already

generally aware, such testimony does not assist the jury.")(quoting United States v. Welch 368

F.3d 970, 974 (7th Cir. 2004), overruled on other grounds 543 U.S. 1112 (2005))(alterations

omitted)).   An ordinary juror can look at the booking photograph and determine whether there is

evidence of bruising.   See United States v. Brewer, 783 F.2d at 842.   Permitting this testimony

would allow Dr. Sanders to usurp the jury's role as the primary fact finder.   See Ram v. N.M.

Dep't of Env't, 2006 WL 4079623, at *10.

Dr. Sanders' testimony that the booking photograph does not show evidence of bruising or facial injuries is not helpful to the jury. The opinion will usurp the jury's role as the primary fact finder. Accordingly, the Court will exclude this testimony.

## II.   THE COURT WILL PERMIT O'BRIEN'S TESTIMONY.

The Court will permit O'Brien to testify at trial. The United States does not challenge O'Brien's qualifications as an expert witness. See Objection at 4. Rather, the United States challenges the methodology that O'Brien used,[6] see Objection at 4, and argues that his testimony is irrelevant, see Tr. at 122:2-12 (Neda, Court). The United States argues that O'Brien's opinion that Rodella's Jeep could not have kept up with Tafoya's Mazda is unsupported speculation, because O'Brien does not know what happened during the chase and his conclusion is contrary to eyewitness testimony. See Objection at 4-5. The United States also argues that O'Brien's testimony about what happened at the end of the dirt road is based on photographs that lack forensic value. See Objection at 5. The United States, thus, argues that O'Brien's proffered testimony is not reliable. See Objection at 4-6.

### A.   O'BRIEN'S METHODOLOGY IS RELIABLE.

The Court should determine the reliability of O'Brien's testimony by considering a non-exclusive list of factors: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert v.

---

[6]At the evidentiary hearing, the United States stated that it was not challenging O'Brien's methodology. See Tr. at 122:7-10 (Neda)("[T]herefore my objection is not based on the methodology."). In the Objection, however, the United States argued that O'Brien's testimony is based on "unreliable methodology." Objection at 4. In any case, the Court concludes that O'Brien's methodology is reliable and that his testimony is relevant.

Merrell Dow Pharm., Inc., 509 U.S. at 594-95.  The Court should also consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; and whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence.  Witherspoon v. Navajo Ref. Co., 2005 WL 5988649 at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. at 146).  The Court concludes that O'Brien's testimony is reliable.

### 1.    The Acceleration Differences Between the Vehicles.

To form his conclusions on the acceleration differences between the vehicles, O'Brien compared the acceleration factors of the Mazda and of the Jeep, and converted those factors into an acceleration rate measured in feet per second.  See O'Brien Report at 3.  O'Brien obtained the two vehicle's acceleration factors from the Expert AutoStats database.[7]  See O'Brien Report at 3. O'Brien also tested the acceleration on Rodella's Jeep.  See O'Brien Report at 3.  Based on this test, and the acceleration rate for Tafoya's Mazda, which is listed in the Expert AutoStats database, O'Brien opined that Tafoya's Mazda could accelerate faster than Rodella's Jeep.  See O'Brien Report at 3-4.  This methodology -- that a car, which accelerates faster, will beat another car, which accelerates slower, during a chase -- appears to be sound.  O'Brien tested his methodology by comparing the acceleration rates between the two vehicles.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594.  He also used set standards -- the acceleration rates between the vehicles.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594.  While neither side has introduced evidence to suggest whether the notion that a faster car will drive faster is

---

[7]Expert AutoStats appears to be a computer program, which 4N6XPRT Systems® produces, that contains information on over 43,000 vehicles that are sold in the United States to assist accident investigations and accident reconstructionists.  See Expert AutoStates®, 4N6XPRT.com, http://www.4n6xprt.com/4n6as.htm (last visited Nov. 10, 2014).

generally accepted within the scientific community, common sense would suggest that it is.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594.  Additionally, O'Brien's conclusion is not the result of an unfounded extrapolation of the data nor is it based on anecdotal evidence.  See Witherspoon v. Navajo Ref. Co., 2005 WL 5988649 at *3.  Some factors weigh in favor of unreliability -- including O'Brien preparing his report for the purpose of litigation.  See Witherspoon v. Navajo Ref. Co., 2005 WL 5988649 at *3.  The majority of the factors, however, weigh in favor of reliability.

The United States' argument against O'Brien's opinion regarding the vehicles' acceleration is not so much an argument against the reliability of his opinion as it is an argument against the weight that the jury should give his opinion.  The United States mischaracterizes O'Brien's testimony.  O'Brien's proffered testimony is that Tafoya's Mazda could accelerate at a faster rate than Rodella's Jeep.  See O'Brien Report at 4.  O'Brien's proffered testimony, specifically, will be that Tafoya's Mazda accelerates at a faster rate than Rodella's Jeep and that

> [i]f Mr. Rodella Jr. paused the Jeep to allow the Sheriff to walk back to it and re-enter the vehicle after the Mazda sped away, that time would also be added to the acceleration time and would also indicate that the Mazda would have a large lead on the Jeep, which if acceleration continued, could create a gap/distance where the Jeep would not be able to close.

O'Brien Report at 4.  O'Brien's opinion is not that Rodella could not have caught Tafoya's Mazda or that the two cars were not traveling close together.  Instead, his opinion is that, if the Mazda continuously accelerated, the Jeep would not have been close to the Mazda.  See O'Brien Report at 4.

The United States is free to argue that Tafoya did not continuously accelerate as he sped away from Rodella, and the United States purportedly has an eyewitness who can support this conclusion.  See Objection at 5.  See also Greenwell v. Boatwright, 184 F.3d 492, 487 (6th Cir.

1999)(holding that accident reconstructionist's testimony was admissible, despite contrary eyewitness testimony, because expert "testimony is not inadmissible simply because it contradicts eyewitness testimony").  It will be for the jury to decide the manner in which Tafoya was driving the Mazda; O'Brien's testimony will simply provide them with information concerning the capabilities of the two cars to assist them in their determination.

### 2.    The Events at the End of the Dirt Road.

As to O'Brien's opinion regarding what happened at the end of the dirt road, the United States argues that O'Brien's opinion is based on thirteen photographs that Rio Arriba Sherriff Officers, and not O'Brien or another accident reconstructionist, took.  See Objection at 5.  The United States argues that these "photographs lack any forensic value" and are not good grounds on which O'Brien can form an opinion as to what occurred at the end of the dirt road.  Objection at 5.  The United States' sole contention to this portion of O'Brien's testimony is that the photographs, on which O'Brien relied, are unreliable.  See Objection at 5-6.

"'Accident reconstruction is a concept that is generally accepted by the community.'" Chavez v. Marten Transp. Ltd., No. CIV 10-0004 MV/RLP, 2012 WL 988011, at *2 (D.N.M. Mar. 22, 2012)(Vazquez, J.)(quoting Munroe v. U.S. Xpress, Inc., No. CIV 06-4103, 2007 WL 2476763, at *1 (D.S.D. Aug. 27, 2007)(Piersol, J.)).  See, e.g., Vigil v. Burlington N. & Santa Fe Ry. Co., 521 F. Supp. 2d 1185, 1201 (D.N.M. 2007)(Brack, J.); BNSF Ry. Co. v. LaFarge S.W., Inc., No. CIV 06-1076 MCA/LFG, 2009 WL 4279843, at *6 (D.N.M. Feb. 12, 2009)(Armijo, J.). The Tenth Circuit has noted:

> We have allowed accident reconstruction experts to testify to facts from which they claim to be able to give an accurate picture of the sequence of events immediately preceding an accident.  See Brandt v. French, 638 F.2d 209, 211 (10th Cir. 1981).  These facts include: "vehicle mass; direction of skid marks; dimensions of vehicles involved; dents, breaks and paint transfers of vehicles;

road surface textures; and physics principles of mechanics such as inertia, velocity, coefficients of friction, and operating characteristics of vehicles." Id.

Tuato v. Brown, 85 F. App'x 674, 677 n.3 (10th Cir. 2003)(unpublished).[8]

Several courts have upheld the admission of an accident reconstructionist's testimony when the accident reconstructionist relies on a number of sources, including photographs of the scene, in forming his or her opinion. In Miles v. General Motors Corp., 262 F.3d 720 (8th Cir. 2001), the United States Court of Appeals for the Eighth Circuit held that the testimony of an accident reconstructionists was reliable when the reconstructionists relied on police reports, photographs of the scene, the plaintiff's medical records and radiology reports, witness statements, depositions, and medical literature. See 262 F.3d at 724. In Rogers v. Romeri, No. 96-5281, 110 F.3d 64 (6th Cir. Apr. 4, 1997)(unpublished), the United States Court of Appeals for the Sixth Circuit held that the district court did not err in admitting an accident reconstructionist's expert testimony when the reconstructionist relied on Tennessee Highway Patrol statements, a police report, photographs from the scene, deposition testimony, another expert's report, the investigation report of the accident, and a diagram of the scene. See Rogers v. Romeri, No. 96-5281, at *5.

_____

[8]Tuato v. Brown is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent , . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that Tuato v. Brown has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

Here, in forming his opinions, O'Brien relied on the New Mexico State Police report, telephone records, Google Maps[9] printouts -- some of which Rodella, Jr., drew to show his version of events -- the FBI's Complaint form, and a statement by Tafoya.  See O'Brien Report at 3.  O'Brien also inspected the Jeep and drove the route of the incident with Rodella, Jr., who told O'Brien his version of the events.  See O'Brien Report at 3.  This amount of information is comparable to the amount of information that the Eighth and Sixth Circuits held were sufficient to find accident reconstructionist's testimony reliable.  See Miles v. General Motors Corp., 262 F.3d at 724; Rogers v. Romeri, No. 96-5281 at *5.  Moreover, O'Brien is doing what the Tenth Circuit said accident reconstructionists do.  He is using the road's texture, the vehicles' operating characteristics, and the tire marks' direction "to give an accurate picture of the sequence of events immediately preceding an accident." Tuato v. Brown, 85 F. App'x at 677 n.3 (citing Branch v. French, 638 F.2d at 211).

The United States' main contention is that an accident reconstructionist did not take the photographs on which O'Brien relies.  See Objection at 5.  The United States does not explain why O'Brien may not rely on photographs someone other than an accident reconstructionist takes.  The United States suggests that an accident reconstruction must either personally observe the scene of the accident or must review photographs that another accident reconstructionist takes.  Both of these options are inefficient and unworkable.  In this case, Rodella was not indicted until August 12, 2014, which is nearly six months after the incident occurred.  See Indictment, filed August 12, 2014 (Doc. 1).  The accident took place on a dirt road; thus, any tire tracks or useable evidence would likely be long gone sixth months after the incident.  To

---

[9]Google Maps "is a desktop and mobile web mapping service application and technology provided by Google, offering satellite imagery, street maps, and Street View perspectives." Google Maps, Wikipedia.org, http://en.wikipedia.org/wiki/Google_Maps (last visited Nov. 11, 2014).

introduce accident reconstructionist testimony at trial, Rodella would have had to anticipate that he would be indicted -- six months before he was -- and would have had to hire an accident reconstructionist to document the scene of the accident immediately after it occurred.  This requirement would be unduly burdensome and would essentially preclude any accident reconstructionist from ever testifying in court.  The second option would be to have the Rio Arriba Sheriff's Department -- and essentially every law enforcement body -- to have a certified accident reconstructionist on staff to document every accident that occurs within its jurisdiction. This requirement too would be burdensome.  While such a practice may be beneficial, it would be burdensome to require the sheriff's department to expend the necessary resources to maintain an accident reconstructionist on staff and to keep the reconstructionist's certification up-to-date.

Courts have often found the use of photographs to be appropriate material on which accident reconstructionists can rely.  See Chavez v. Marten Transp., Ltd., 2012 WL 988011, at *2.  The Honorable Martha A. Vazquez, United States District Judge for the District of New Mexico, has noted:

> Courts have held these types of materials to be an appropriate foundation for expert opinions . . . in reconstructing an accident scene.  See Miles v. Gen. Motors. Corp., 262 F.3d 720, 724 (8th Cir. 2001)(testimony properly based on expert's review of police report, photographs of scene, plaintiff's medical records, plaintiff's radiology reports, witness statements and depositions, and medical literature); Paine v. Johnson, No. 06C 3173, 2010 WL 749857 (N.D. Ill. Feb. 25, 2010)(expert's accident reconstruction properly based upon traffic collision report, and photographs of vehicle after accident and accident site); North[ v. Ford Motor Co.], 505 F. Supp. 2d [1113,] 1118 [(D. Utah 2007)(Stewart, J.)(accident scene photographs and measurements taken by highway patrol at scene were sufficient basis for accident reconstruction opinion "such that it is not mere speculation and guesswork and, thus, meets the Daubert standard for admission").

Chavez v. Marten Transp., Ltd., 2012 WL 988011, at *2 (concluding that expert's opinion was reliable when he relied on depositions, an accident report, medical records, a worker's compensation complaint, expert reports, photographs, and MRI films in forming his opinions).

Based on the amount of information that O'Brien has reviewed in forming his opinion, the opinion is reliable.  See Chavez v. Marten Transp., Ltd., 2012 WL 988011, at *2.  O'Brien did not need to take photographs of the accident scene; he is free to rely on photographs that the Rio Arriba Sheriff's Office took.  See North v. Ford Motor Co., 505 F. Supp. 2d at 1118 (allowing accident reconstructionist's testimony when it was based on photographs that the Utah Highway Patrol took).  This portion of O'Brien's testimony is, thus, reliable.

### B.      O'BRIEN'S TESTIMONY IS RELEVANT.

The United States argues that O'Brien's testimony is irrelevant.  See Tr. at 122:2-12 (Neda, Court).  Specifically, the United States argues that the acceleration difference between the vehicles is irrelevant.  See Tr. at 122:2-12 (Neda, Court).  The United States also argues that O'Brien's testimony, concerning the events at the end of the dirt road, is irrelevant unless Rodella was standing next to the Mazda when Tafoya made the 180-degree turn and Tafoya nearly hit Rodella, which may be evidence of an assault on Rodella.  See Tr. at 170:16-172:1 (Neda).

Relevancy is a low bar that requires the evidence to have "any tendency to make a fact more or less probable than it would be without the evidence," and that requires the "fact [be] of consequence in determining the action."  Fed. R. Evid. 401.  O'Brien's testimony is relevant. The jury must decide what occurred on March 11, 2014, to determine whether Rodella used excessive force and whether Rodella had probable cause to arrest Tafoya.  See Indictment at 1 (charging Rodella with using unreasonable force and causing an unlawful arrest).  An excessive force claim is evaluated under an objectively reasonable standard. See Saucier v. Katz, 533 U.S. 194, 207 (2001), abrogated on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009).  The Tenth Circuit has explained:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Weigel v. Broad, 544 F.3d 1143, 1151-52 (10th Cir. 2008)(quoting Graham v. Connor, 490 U.S. 386, 396 (1989))(internal quotation marks omitted).  The amount of force that Rodella was permitted to use against Tafoya will, thus, be measured by the amount of force an objectively reasonable officer would have used, considering the totality of the circumstances that Rodella faced.  See Weigel v. Broad, 544 F.3d at 1151.

Similarly, an officer needs probable cause to conduct an arrest.  See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011)(Browning, J.)(quoting Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000)), aff'd 512 F. App'x 841 (10th Cir. 2013)(unpublished).  Probable cause is also determined by an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  This standard is determined by a "totality-of-the-circumstances analysis."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004)(internal quotation marks omitted).  Whether Tafoya's arrest was lawful will, thus, be measured by whether a "man of reasonable caution" would have believed that an offense was committed based on the "facts and circumstances within" Rodella's knowledge.  United States v. Valenzuela, 365 F.3d at 896.

To determine whether Rodella used excessive force or conducted an unlawful arrest, the jury will need to consider the totality of the circumstances that Rodella faced.  See United States

v. Valenzuela, 365 F.3d at 896; Weigel v. Broad, 544 F.3d at 1151.  The manner in which Tafoya drove the Mazda contributes to the totality of the circumstances.  Specifically, if Tafoya drove in an aggressive or unlawful manner, Rodella may have had probable cause to arrest him. See N.M. Stat. Ann. § 66-8-113 (outlawing reckless driving).  Additionally, if Tafoya was driving in a manner that posed an immediate threat to Rodella or others, and was driving in a manner that indicated he was actively resisting arrest or attempting to evade arrest, Rodella would have been justified in using a greater amount of force.  See Weigel v. Broad, 544 F.3d at 1151-52.  The manner in which Tafoya drove -- specifically whether he drove aggressively at the end of the dirt road -- is relevant to whether Rodella used excessive force or conducted an unlawful arrest.

The acceleration difference between the vehicles and the gap between the vehicles are also relevant.  The United States asserts that Rodella's Jeep drove close behind Tafoya's Mazda during the chase.  See Objection at 4-5.  The distance between the Jeep and Mazda may be relevant to the reasonableness of Rodella's conduct, which is probative to whether he used excessive force.  See Saucier v. Katz, 533 U.S. 207.  The jury may properly consider O'Brien's testimony to determine whether to believe Rodella's version of events -- that the Jeep was not close to the Mazda -- or the United States' version of events -- that the Jeep was right behind the Mazda.  Because the reasonableness of Rodella's conduct is a fact of consequence in the case, O'Brien's testimony is relevant.  See Fed. R. Evid. 401.

**IT IS ORDERED** that the United States' Objection to Defendant Thomas R. Rodella's Notice of Intention to Offer Expert Testimony (Doc. 42), filed September 12, 2014 (Doc. 69), is sustained in part and overruled in part.  Harvey Stanford Sanders, M.D, may testify about the amount of time it takes for a bruise to manifest after a traumatic incident.  The Court will

exclude the remainder of Dr. Sanders' testimony.  Additionally, the Court will permit Dennis L.

O'Brien to testify.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Tara C. Neda
Jeremy Pena
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Robert J. Gorence
Louren M. Oliveros
Gorence & Oliveros PC
Albuquerque, New Mexico

       *Attorneys for the Defendant*