| | | | |
|---|---|---|---|
| **SUBJECT** | SUSPENSION | **DATE** | JULY 19, 1985 |

**FROM**    CHIEF MAURICE L. CORDOVA

**TO**    OFFICER THOMAS R. RODELLA          **ATTENTION OF**
New Mexico State Police          Sergeant Esteban Herrera
P. O. Box 1628          Sergeant James Jennings
Santa Fe, New Mexico   87504-1628

The purpose of this correspondence is to provide written notice to you of your suspension, without pay, for a period of thirty (30) days. The dates of your suspension are as follows:

| | | |
|---|---|---|
| July 22, 1985 | August 5, 1985 | August 19, 1985 |
| July 25, 1985 | August 8, 1985 | August 22, 1985 |
| July 26, 1985 | August 9, 1985 | August 23, 1985 |
| July 27, 1985 | August 10, 1985 | August 24, 1985 |
| July 28, 1985 | August 11, 1985 | August 25, 1985 |
| July 29, 1985 | August 12, 1985 | August 26, 1985 |
| August 1, 1985 | August 15, 1985 | August 29, 1985 |
| August 2, 1985 | August 16, 1985 | August 30, 1985 |
| August 3, 1985 | August 17, 1985 | August 31, 1985 |
| August 4, 1985 | August 18, 1985 | September 1, 1985. |

This suspension is for your violation of New Mexico State Police Rules & Regulations, Rule No. 112.0, which reads, "employees shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Department. Conduct unbecoming an employee shall include that which brings the Department into disrepute or reflects discredit upon the employee as a member of the Department, or that which impairs the operation or efficiency of the Department or employee. . .". This violation occurred as the result of the incidents involving your wife, Bernice.

In addition, your admitted violation of the New Mexico Controlled Substances Act constitutes a violation of New Mexico State Police Rules & Regulations, Rule No. 110.1, which reads, "[Employees shall] obey all laws of the United States, or any State and local jurisdiction . . .".

The investigation by the Inspections & Internal Affairs Division reflects that you acknowledge your wrongdoing, but that your actions were the result of, what appears to be severe domestic strife, which does not, however, excuse your actions. Although you may feel this suspension is severe discipline, more severe disciplinary action could possibly have been taken if the Inspections & Internal Affairs Division had found that you have exhibited this type behavior with the public during the course of your duties. The investigation, however, reflects that, since being commissioned as a New



GOVERNMENT EXHIBIT

1

RODELLA_SP_GJS 000130

Mexico State Police Officer, you have performed your duties in a responsible manner. Furthermore, as aforementioned, it is quite evident this has all resulted from your reaction to severe domestic strife, and I now believe you have learned from this experience and such incidents will not reoccur. Regardless, I must remind you that, should any future similar incidents occur, either during the course of this suspension or upon your return to active duty, you can be assured I will not hesitate to process your termination from this Department.

I have requested that Sergeant James Jennings, currently on special assignment with the Inspections & Internal Affairs Division, monitor your actions during the course of your suspension. Therefore, you are hereby directed to contact, via public service, Sergeant Jennings each Monday for the duration of this suspension to assure him that you are conducting yourself responsibly during the course of your suspension.

The investigation by the Inspections & Internal Affairs Division also indicates to me that you may possibly be in need of psychiatric or other counselling, and I am currently considering this matter further. I anticipate that I may, in the future, direct that you seek such counselling for your own well being.

You are to turn in all State-owned equipment to Sergeant Herrera for the duration of this suspension.

Upon return from suspension on September 2, 1985, you will resume your duties as a New Mexico State Police Officer in the Uniformed Bureau, assigned to the Santa Rosa Sub-District. Enclosed herewith you will find your transfer orders.

I trust, Officer Rodella, that you will, henceforth, conduct yourself, both on and off duty, in nothing but the most exemplary manner and that I will not be required to take any other disciplinary action.

MLC:er

Enclosure

cc: State Police Board Members
    Personnel File


_Thomas B. Rodella_      _7/22/85_
R E C E I V E D         D A T E

_Witnessed by Sgt. Steve Herrera 7-22-85_

RODELLA_SP_GJS 000131

# INTER-DEPARTMENTAL CORRESPONDENCE

**SUBJECT**   COMPLAINT LETTER ON OFFICER THOMAS   **DATE**   July 17, 1985
RODELLA - COMPLAINANT MRS. BERNICE
(GOMEZ) RODELLA

**FROM**   SERGEANT JAMES O. JENNINGS
Inspections and Internal Affairs

**TO**   **ATTENTION OF**

CHIEF MAURICE L. CORDOVA

### SYNOPSIS:

On June 25, 1985, Captain Eddie Castillo assigned me to investigate
the allegations outlined in a complaint letter dated June 20, 1985.
The complainant was Mrs. Bernice Rodella and the complaints were
directed to Officer Thomas Rodella, her husband, presently assigned
to the Governor's Security Division and living in Abiquiu, New Mexico.

### DETAILS:

On June 24, 1985, Chief Cordova's office received a letter dated June
20, 1985, from Mrs. Bernice (Gomez) Rodella.  In the letter she stated
that she had ignored the actions of Officer Rodella, her husband, for
the last year, but she thought these problems had to be recognized and
brought forth because of the abuse to herself, her family, his job and
others who might be involved in the future.  The letter outlined several
areas of alleged wrongdoings by Officer Thomas Rodella which included
physically and brutally attacking her and others, using a gun to intimidate
or harrass, using his position and state police equipment to attempt to
do bodily harm to others, his problem with alcohol and the fact that he
uses marijuana.  Mrs. Rodella further stated that she feels she can no
longer deal with the physical abuse that she has taken from Officer
Rodella and resents being told by Officer Rodella that his father and
himself are "The Law" in the county and no one would believe her side of
the story anyway.  Mrs. Rodella included with her letter a copy of her
sick leave record from her place of employment so as to confirm her
allegations concerning the physical attacks on herself and the work
days missed because of the injuries sustained.  Mrs. Rodella said that
Officer Rodella has on more than one occasion let the air out of the
tires on her vehicles to prevent her from leaving the residence and
has changed the locks on the doors at their residence to deny her any
entry.  She also states that on June 4, 1985, while with Officer

RODELLA_SP_GJS 000132

Rodella she was beaten severely and he attempted to strangle her with a belt. She went to the health center in Cuba, New Mexico on June 5, 1985, to be examined.

On July 8, 1985, I traveled to Cuba, New Mexico and obtained a copy of the medical record that Mrs. Rodella spoke of from the checkerboard area health system, dated June 5, 1985. According to the record, Sylvia Alona, physician's assistant and Dr. Leonard Cain treated her. The report does state that there were numerous bruises on her body and a large bruise on her neck as well as what was diagnosed as swelling in the upper spine area. A copy of the medical report is being retained by this division.

It should be noted that during my investigation, Mrs. Rodella was formally interviewed by myself on two (2) different occasions. The initial interview was on July 8, 1985, and the second interview was conducted on July 11, 1985. During the initial interview Mrs. Rodella stated that the contents of the letter was true and complete. On July 10, 1985, she called me and told me that the letter she had written was false and she wanted to rescind it because the allegations were not true. On July 11, 1985, she again called me and this time stated that she had been forced by Officer Rodella to place the call to me stating that her complaint was not valid. She claimed that she had been beaten up during the altercation and had bruises to confirm the assault. She said that she had been forced to write a letter withdrawing her complaint and this was done against her will and better judgement.

### INTERVIEW WITH OFFICER ROBERT CHAVEZ, N.M.S.P.

On June 28, 1985, Captain Eddie Castillo and myself interviewed Officer Robert Chavez who is assigned to district seven, Espanola, New Mexico, about his knowledge of the alleged wrongdoings by Officer Thomas Rodella. Officer Chavez stated that Officer Rodella was his coach officer and he had no knowledge of him abusing alcohol and he never knew of him smoking marijauna or physically abusing anyone. He did recall Mrs. Rodella complaining to him about Officer Rodella hurting her and showed him some bruises on her arms. He stated that he had heard that Officer Rodella had a drinking problem, but had no first hand knowledge of this. Officer Chavez concluded by saying that Mrs. Rodella told him that Officer Rodella becomes violent when he drinks and likes to physically abuse her, also, that he is very jealous of her. A copy of this interview is being held by this division.

On July 11, 1985, I again interviewed Mrs. Bernice Rodella concerning
complaints she had concerning her husband, Officer Thomas Rodella. She
claims that on July 9, 1985, Tommy Rodella came to Gallina and helped
her family with various jobs. The next morning he asked her to go to
Cuba, New Mexico with him for lunch. On the way back from Cuba he
became angry with her and broke the windshield in her car, ripped her
blouse and slapped her around. He drove her to his home in Abiquiu,
New Mexico where she stayed until the next day.

On July 10, 1985, she contends that he forced her to call and tell me
that the allegations she had made against him were not true and she
wanted to rescind the letter that she wrote to the chief. She stated
that he struck her with a large belt until she agreed to make the call
and write the letter withdrawing her complaints.

On July 11, 1985, Mrs. Rodella called me and said she had been forced
by Officer Thomas Rodella to call and write the letter and she wished
to see me again to give another statement concerning his brutality.
At the conclusion of the interview I took pictures of the bruises on
Mrs. Rodella and the damaged windshield on her vehicle. The statement
and pictures are being retained by this division.

## INTERVIEW WITH OFFICER RANDY BERTRAM, N.M.S.P.

On July 8, 1985, I interviewed Officer Randy Bertram of the New Mexico
State Police who is stationed in Cuba, New Mexico. He stated that on
January 30, 1985, he was assigned to go to Gallina, New Mexico and be
present at the residence of Bernice Rodella while Tommy Rodella got a
vehicle from the residence which he claimed was his. He stated he met
Officer Rodella near the residence and he was accompanied by his father,
Deputy Sheriff Robert Rodella and one other male subject, who was unknown
to Officer Bertram. Officer Bertram stated that Tommy Rodella opened the
pickup parked at the residence and found that there was no key in the
ignition. He then walked to a Chevrolet Corvette also parked in the
yard and he got a key out of his pocket and drove away. According to
Officer Bertram, Officer Rodella never entered the residence and was
very polite. Mrs. Rodella's father accused them of stealing the car,
but Officer Bertram confirmed the vehicle was registered to both Officer
Rodella and Mrs. Rodella. Officer Bertram was told that Bernice Rodella
was not at home because she was attending a basketball game.

## INTERVIEW WITH LIEUTENANT CLARENCE FILIP, N.M.S.P.

On July 1, 1985, Captain Eddie Castillo interviewed Lieutenant Clarence Filip, assistant district commander of the district seven office in Espanola, New Mexico. Lieutenant Clarence Filip stated that he was aware of the alleged physical abuse on Mrs. Rodella because she had informed him of this on January 6, 1985. She told him that she didn't want to make a report, she just wanted to inform him of the situation. She said that Tommy became violent at times and that they were having problems.

Lieutenant Filip stated he received a call from Mrs. Rodella on February 28, 1985, and she stated that Tommy and her were separated and she was living in Gallina, New Mexico temporarily. She also stated that Tommy was outside her residence at this time and he was breaking into a pickup truck. She stated he had driven his patrol car to her residence and he was not in uniform. Lieutenant Filip called Sergeant Goke and told him to go to Gallina and check on the incident. He said Sergeant Goke had intercepted Officer Rodella and due to the incident Officer Rodella was given a written reprimand by Captain Tarazon. A copy of the letter of reprimand is being retained by this division.

Lieutenant Filip stated that he had no complaints about Officer Rodella's work performance and knew of no instance where he had been under the influence of alcohol or drugs on or off duty.

## INTERVIEW WITH MRS. BERNICE (GOMEZ) RODELLA

On July 8, 1985, I interviewed Mrs. Bernice Rodella about the letter she wrote to Chief Cordova complaining about her husband, Officer Tommy Rodella. She stated to me that all of what she complained about was true except that in her letter she said he smoked marijuana quite often and she stated in this interview that she only knew of him smoking marijuana on two (2) occasions. Once in Albuquerque, New Mexico and once in Abiquiu, New Mexico. She said she had filed for a divorce in June and she no longer wanted him around her or her family. She also stated that a girl at the New Mexico State Police complex in Santa Fe, New Mexico, by the name of Naomi was giving Officer Rodella inside information and he knows every move that myself and the Internal Affairs Division makes and has access to all the reports pertaining to his investigation.

On July 11, 1985, I interviewed Mr. Raymond Cordova, nephew to Bernice
Rodella. He stated that in May (exact date unknown) he was with Bernice
and Thomas Rodella in their pickup and they had been drinking. A fight
broke out between Mr. Cordova and Officer Rodella and at this time
Tommy opened the glove box of the truck and removed a .22 caliber pistol.
Officer Rodella then grabbed Mr. Cordova by his shirt and pointed the
pistol at his face. Mr. Cordova recalls that Officer Rodella did not
shoot the gun, but returned it to the glove box and the incident was
over. A copy of this statement is being retained by this division.

## INTERVIEW WITH OFFICER THOMAS RODELLA, N.M.S.P.

On July 12, 1985, I interviewed Officer Thomas Rodella of the New Mexico
State Police concerning the allegations leveled against him by his wife,
Bernice (Gomez) Rodella. During this interview we covered all the
points that his wife brought out and in essence he agreed with her on
all points. He did say that he thought she exaggerated on some points,
but he stated that he does at times become violent when he drinks. He
has physically abused his wife many times and on occasion he has struck
her with a belt. He does admit to smoking marijuana, but states that
this was done at her request. He admits to releasing the air out of the
tires on her vehicles to prevent her from leaving the residence. He also
admits to changing the locks on their residence to deny her any access to
it. He stated he did point a pistol at Raymond Cordova, who is the nephew
to Bernice Rodella, during an altercation, but he said he knew the gun
was unloaded. Officer Thomas Rodella stated that his marriage has been
unstable because of Bernice's jealous nature and the fact that she wants
to know his every moment and also wants him under foot at all times. He
denies ever using his service revolver or any other weapon to intimidate
or harrass his wife and he also denies making the statement that he and
his father are "The Law" in the county. He stated that he did not force
Bernice to call me and ask that the investigation be dropped or forced
her to write the letter to Chief Cordova withdrawing her complaint.

Officer Rodella wants to salvage his marriage, but thinks the difference
in their ages and the problems he has had with her family have had a
negative impact on the situation. He stated that he has quit drinking
so as to prove to Bernice that he can control his temper and stated he
has smoked marijuana, but Bernice had asked him to do so. When I asked
him about a transfer from his present duty station he thought that it
was doubtful as to whether this might correct the problems with his wife.

He thought if a transfer was in order, he should be given his choice
of duty stations so he would be happy and possibly his wife and himself
could patch things up in their marriage.

Officer Rodella stated that if he could he would like to salvage his
marriage, even in the light of the fact that his wife has filed for
a divorce and if he is given the ultimatum of choosing between his wife
and his job, he would give up his job. He also stated he needs more
time with his wife to patch up their differences and has not been
afforded the time he needs from his present assignment with Governor's
Security. A copy of the taped interview with Officer Thomas Rodella
is being retained by this division for future reference.

## CONCLUSION:

Upon concluding my investigation, I have found that Officer Thomas Rodella
did in fact commit the crime of smoking marijuana while off duty. He did
do bodily harm to his wife on more than on occasion by physically assault-
ing her and he did use a weapon (pistol) to threaten another person during
an altercation in which he was under the influence of alcohol. My findings
are based on statements obtained from his wife, by Officer Rodella's own
admission and by others knowledgeable of the facts in this investigation.

Officer Thomas Rodella violated the following rules and regulations:

110.1    Obey all laws of the United States, or any State and local
         jurisdiction in which the employees are present;

Penalty - 172.0 Like offenses.

172.0    Offenses not included in the following list shall result in
         penalties similar to those specified for listed offenses of
         comparable seriousness. These are the penalties which will
         be imposed for these offenses and for similar, unlisted
         offenses, unless the Chief or Board decide otherwise. Charges
         and penalties are not limited to these listed violations.

Like offenses is State Statute 30-31-23-B1; Controlled Substance;
Possession Prohibited.                                    ,

112.0    Employees shall conduct themselves at all times, both on and
         off duty, in such a manner as to reflect most favorably on the

> Department. Conduct unbecoming an employee shall include
> that which brings the Department into disrepute or reflects
> discredit upon the employee as a member of the Department,
> or that which impairs the operation or efficiency of the
> Department or employee. These shall include but not be
> limited to the following:

Violation of Rule 112.0 has a penalty of reprimand to thirty (30) days.

## RECOMMENDATION:

Due to the seriousness of the crime and the violations involved in this
matter, I would recommend that Officer Thomas Rodella be compelled to
seek psychiatric counseling. I, also, recommend that he be suspended
no less than thirty (30) days and that he be transferred to a duty
station in the southern zone, so he might resolve his problems and not
to be influenced by family and friends.

JOJ:cyg

This is an interview with Bernice Rodella.  I'm Sergeant James Jennings.
The date is July the 11th, 1985.  The time is 5:14 p.m.  Also present
during the interview is Captain Eddie Castillo.


JENNINGS:        Mrs. Rodella, would you relate to me what has transpired
                 between you and your husband, Officer Tommy Rodella
                 since I last saw you Monday morning of this week?

RODELLA:         Tommy came over Monday afternoon and he basically
                 he went to my sister's house.  He went to work first
                 where I work, and then he went to my sister's house
                 and asked me to go over.  I went over to just acted
                 like there was nothing wrong and that everything was
                 okay.  And that afternoon he and well, I guess my
                 brother-in-law and my nephew went out to get some
                 hay and that was about the extent of that that afternoon.
                 He stayed here that night and the next morning he asked
                 me if ... he asked me not to go to work that he needed
                 to ... to talk to me and ....

JENNINGS:        Now, this would have been Tuesday morning, right?

RODELLA:         Tuesday morning.  And he asked me to go have lunch
                 with him in Cuba.  So we went on to Cuba and after
                 we had lunch out there he met up with two of the
                 officers out there which told him that you had been
                 out there on Monday.

JENNINGS:        Do you know which two ... which two officers that
                 could have been?

RODELLA:         Jerry Chavez and Paul Mares and I talked to Paul
                 Mares just a few minutes and when Tommy returned
                 back to the car to talk to me.  He was kind of mad
                 and he said, "What did Paul tell you."  And I said,
                 "Tell you about me."  And I said, "He didn't tell
                 me anything about you, we didn't talk about you."
                 And he was real quiet all the way and up to ... to
                 the junction of 112 and 96 he kept it going on to
                 on 112 and I asked him where are you going and he
                 says, "Show you who I am."  So then he stopped the
                 car on the dirt road and tore the buttons off my
                 shirt and punched the windshield off the car and
                 busted it.  And he started slapping me around.  And
                 I told him I had to come back to work that afternoon.
                 So he finally let me ... you know let me go and said,
                 "Okay, I'll drive you back to ... to work."  And that
                 afternoon he waited for me and he told me that I was
                 going back home with him to Abiquiu.  So he waited for
                 me and he made sure that I followed him and right
                 about around Youngsville, I remembered that I had
                 forgotten some letters at school and that I needed.

RODELLA:            So I blinked my lights and I asked him to stop and
                    I told him, "I'll be back, I'll ... I'm going to
                    pick up this letter."  And he said, "Well, you are
                    not going by yourself, I'm going with you."  So he
                    got in the car and just as we came up he was ... he
                    was just made I guess.  And I told him, "Well, Tommy
                    you know I've told you let's ... you know let's just
                    split."  You know "What are you doing together you
                    know if we can't you know get along."  And he said,
                    "You are not reading me."   And I told you, "You are
                    not leaving me."  And I said, "Well, why did you pop
                    the windshield off the car?"  And he just started
                    punching at me when I mentioned that to him.  And I
                    was driving and he was just hitting me and slapping
                    all over the place.  And I said, "Well, didn't you have
                    enough with breaking the windshield."  He said, "I'll
                    even break the transmission of the car if you want me
                    to."  So then we drove on into Gallina and he pushed me
                    all over the place till got to the office.  When I picked
                    up those letters.  We got back in the car and we just
                    kept on going past Youngsville.  He didn't even pick
                    up his truck there.  He left it there.  And just as
                    we got to Abiquiu he told me, "You are going to come
                    that close to death Bernice, I'm really let you have
                    it this time."  "You have played long enough  with
                    me."  He just kept on and on the way and slapping me
                    and just punching me and we got up to Abiquiu and
                    right in front of Bodies there was two (2) police cars
                    there.  So he just kept on going past Abiquiu and then
                    he stopped on the side of the road and kind of waited
                    for those police officers to go by and then we returned
                    back to the house.  And when we got to the house he
                    told me, "you are going to get it, you are going to get
                    it."  But he didn't do anything to me that night.  He
                    didn't ... he didn't punch me till the next morning.
                    He told me, Well, I said, "I have to go to work."  He
                    said, "You are not going until you have make that call."
                    I said, "Tommy I can't call."  "I'm not going to call."
                    "I've already written that letter and that's where I
                    stand."  He says, "you are going to call."  I said,
                    "I'm not going to call."  And he just kept going at
                    it and he says, "Well, if you are not."  And he got
                    this huge belt that he had and he started hitting me
                    with hit.

JENNINGS:           You mentioned it before that he had hit you with

RODELLA_SP_GJS 000140

JENNINGS:        a belt.  Does he do this often?

RODELLA:         Yes.

JENNINGS:        With the same belt?

RODELLA:         Yes.  A huge thing that's he got.

JENNINGS:        Do you feel intidimated or do you fell harrassed
                 by him generally when you are around him or are
                 there moments or days or times when there is no
                 problem with Officer Rodella, your husband?

RODELLA:         Anymore I can't tell.  You know he ... he'll just
                 get into this mood, but lately it's just been an
                 everyday accord.

JENNINGS:        Has he ... has he that he is having trouble at work
                 or has anything been to the point where he is frustrated
                 in taking his frustrations out on you.  Do you think?

RODELLA:         I've often asked him you know, "Do you want to talk
                 about something or you know, would you like to talk
                 about some thing?"  If he is having problems with
                 something, I don't know what's it's all about."

JENNINGS:        I talked to you yesterday morning which was Wednesday
                 July 10, 1985 when you called me at the office and
                 that is when you told me that you were going to send
                 a letter and rescinding the letter that you had written
                 earlier saying that the claims that you had made were
                 not right and that you were going to ...you were in
                 so many words exonerating your husband of any ... of
                 any wrongdoing that he may have committed in your
                 eyes.  Where were you at when you made this call and
                 why did you make the call?

RODELLA:         I was in Abiquiu and I was forced to do it by him.
                 I just ... I couldn't take the beatings anymore so
                 I gave in.  I said, "I'll call."

JENNINGS:        Did you ... you told me that the letter would be mailed
                 that day and that the chief should be receiving it
                 today which was Thursday or Friday tomorrow.  You wrote
                 the letter also and this was not of your free will?

RODELLA:         It was not of my free will.

JENNINGS:    And in this letter which I do not have a copy of yet, you deny that you ... you say that ... you say that the original letter was false.  Is this true?

RODELLA:    What I'm ... what I said in the letter was that I wished to withdrawn the complaint letter that I had sent in on June 20th.

JENNINGS:    Have you at any point in time during your acquaintance with and your marriage to Tommy Rodella ever filed a criminal complaint for assault or attempted to get a restraining order preventing him from coming around your presence or your property?

RODELLA:    I hadn't thought about filing a criminal complaint again him.  I did talk to my attorney about getting retraining order, but at that time he moved into Santa Fe, so I figured you know he was going to be here in Santa Fe so I wouldn't need it.  So I told him you know just forget about the restraining order, but he had set one up for me.

JENNINGS:    Okay, as far as the ... the fact that he has assaulted you and so forth, do you know of any other incidents since you have known him or known of him whether he acts in a violent nature?

RODELLA:    No.  other than you know with me.

JENNINGS:    You told me during the interview Monday that you didn't know of him drinking on duty or you could not recall anytime that he would drink on duty.  Do you still stand by this.

RODELLA:    Yes.

JENNINGS:    You also told me that he had smoked marijuana in your presence twice.  Once in Abiquiu and once in Albuquerque. Are there any more times that you can recall or were there any other people present?

RODELLA:    No.

JENNINGS:    You also contend that he ran you off the road on more than one occasion.  One time with his police car.  Is this also the truth to the best of your knowledge.

RODELLA:    Yes, it is.

JENNINGS:       Captain Castillo do you have any questions to ask?

CASTILLO:       Bernice, when he made you make those phone calls
                who did you place the phone calls to?

RODELLA:        Yesterday?

CASTILLO:       Whenever you called Santa Fe.  Remember you mentioned
                to me ....

RODELLA:        Oh, to you?

CASTILLO:       To me.

RODELLA:        Or what?  Which calls are you referring to?

CASTILLO:       The ones that you said that he made you call?

RODELLA:        Well, he had ... he had gone into my office on
                Tuesday and he said, "Call, call right now cause
                I want to be present."  "I want to hear what you
                have to say."  And I called and I asked for you
                and the girl told me that you wouldn't be in until
                Thursday and that you were out and that you wouldn't
                be in until the following day.  So he was listening
                and he said, "Well, are you going to call Jennings."
                "Cause he's going to be in."  Jennings is going to
                be in.  So I think that's why he made go over on
                Tuesday afternoon so I could call yesterday.

CASTILLO:       And he was present both times ....

RODELLA:        Yes, he was.  He was present.

CASTILLO:       Okay.

JENNINGS:       So you went to Abiquiu with him Tuesday afternoon
                and stayed the night at his mobile home there in
                Abiquiu and made the call Wednesday morning to me.

RODELLA:        Yes.

JENNINGS:       Were you forced to go to Abiquiu with him and were
                you forced to spend the night with him against your
                will?

RODELLA:        Well, he drove ... he drove my car.  Took the keys
                out of the car and hid my purse the minute we got
                there so I had no way of running out.  I wasn't
                even going to try actually.

CASTILLO:        Are you afraid of Tommy Rodella?

RODELLA:         Actually like I told you ... I guess I told  you
                 Monday that I wasn't afraid of him anymore, but I
                 sure am.

JENNINGS:        What do you think the state police should do in an
                 instance of this ... in the fact that you are married
                 and this could be determined a domestic disturbance
                 problem.  How do you think the state police could
                 ... could best serve your needs and Officer Rodella's
                 needs in this crisis?

RODELLA:         I don't know.  I tried explaining to him cause he
                 asked me "Well, why did you write that letter?"
                 And I said, "I was hoping Tommy I says, that you
                 would get it (Inaudible) straightened out.  You know.
                 Realized what you are doing and either quit ... quit
                 you know your not your job, but ... I've never asked
                 him to quit his job.  But you know his behavior.  So
                 he could straighten out his behavior.

JENNINGS:        Have you ever asked him to submit to psycological
                 evaluations due to the problem that he may or may
                 not have?

RCDELLA:         No, I have not.

JENNINGS:        I have no further questions unless you do Captain
                 Castillo.

CASTILLO:        No questions.

JENNINGS:        Mrs. Rodella do you have anything further to add
                 to this interview?

RCDELLA:         I sure don't.

JENNINGS:        The interview will then conclude at 5:27 p.m. on July
                 the 11th, 1985.

This is an interview with Bernice Rodella. I'm Sergeant James Jennings with the New Mexico State Police. The interview is being conducted on July the 8th, 1985. The time is now 1:00 p.m.

JENNINGS: Mrs. Rodella I'm here to speak with you about a letter that you addressed to Chief Cordova dated June the 20th, 1985 whereas you make mention of the fact that Officer Tommy Rodella your husband has physically and mentally abused you through the prior months. Also made mention of alcohol abuse and the use of the drug marijuana. On occasions. I'd like to go through this complaint letter with you and let you address some of these things that you have mentioned. The ... and you have them numbered. As of ... as on the first occasion you mentioned on December 17th, 1984, you mentioned that Officer Rodella took you out of your residence in Abiquiu and drove you to state road 84 and pulled you out of the car by your hair and left lying on the roadway. And threatened to shoot you with his service revolver if you didn't walk back home. You asked him not to shoot you because of your children. After this incident or beating you were unable to work for two days. Is this a true account of the incident Mrs. Rodella?

RODELLA: Yes, it is.

JENNINGS: Uh ... you mentioned that he pulled you out of the car by your hair and left you lying on the roadway. Did he physically abuse you at this time? Did he beat you up with his fist.? Did he kick or how did he ... how did he abuse you?

RODELLA: He just punched me out.

JENNINGS: With his fist?

RODELLA: With his fist. Kicked me and just about everything. Pulled my hair.

JENNINGS: Okay, you mentioned that he threatened you with his service revolver was he in uniform at this time?

RODELLA: No, he wasn't.

JENNINGS: Did he carry ... does he carry his uniform ... Uh .. his service revolver with him on ... on many occasions?

RODELLA: No. No, not on too many occasions.

JENNINGS: So he just happened to have his service revolver with him on this occasion when he was off. And he threatened

JENNINGS:       to shoot you with the gun.  Is this true?

RODELLA:        Yes.

JENNINGS:       Was this at night or during the day?

RODELLA:        It was at night.

JENNINGS:       Did Uh ... on ... on the second occasion you mentioned
                on January the 5th, 1985, you said that he was acting
                strangely and you left the house and upon your return
                the locks had been changed.  When you returned later
                in the day that you found vehicles to be flat.  What
                vehicles are you referring to?

RODELLA:        I'm referring to the Bronco and the Corvette.

JENNINGS:       Okay.  When you mentioned ... when you say flat were the
                tires damaged or was the air just let out of the tires?

RODELLA:        The air was let out of the tires.

JENNINGS:       Okay, did you let anybody know about this incident
                at all on this day?

RODELLA:        Uh ... the next day I advised Lieutenant Filip what
                had happened.

JENNINGS:       Did you see him in person or call him on the phone?

RODELLA:        I talked to him on the phone first and then I went
                into the office.

JENNINGS:       Okay.  Did you tell him about anything else on this
                date.  Anything about the physical abuse that had
                occurred to you?  Or anything of the happenings in
                the past when you and your husband Officer Rodella?

RODELLA:        No, he just asked me if we were having problems
                between us.  I guess he kind of asked me is he was
                abusing me and I said, "yes."

JENNINGS:       Okay, on item number three in your letter you state
                that on February the 9th, 1985 he beat you up again.
                When you say again are you indicating that this was
                these beatings were on a regular basis and had occurred
                many times in the past?  Or once before in the past or
                what exactly do you ... do you mean?

RODELLA:        It was a pattern.  This has happened before.

JENNINGS:       Does this pattern that you refer to normally occurr
                when he has been drinking or when he is upset because
                of an argument whether he's been drinking or sober or
                could you give me  ... relate to me when and why these
                things occur?

RODELLA:        At first I thought that they were because of the
                drinking, but after a while it didn't matter whether
                he had been drinking or not.  So I really couldn't
                you know say whether it was because of his drinking or
                why it was.

JENNINGS:       On February the 9th, here this item number 3, do you
                remember what provoked the argument that you had or
                why he abused you at this time?

RODELLA:        I can't remember.

JENNINGS:       On February the 28th, 1985, your item number four you
                state that again this time he had his service revolver
                pointed at your face bruising you badly.  Do you recall
                why the argument started then?

RODELLA:        It's that incident that I talked to you about where
                he ... we had an argument and I said, "I'm leaving."
                And I asked him, "What do you want."  And he said,
                "You take everything with you."  And I asked him, "Do
                I take the pickup."  He said, "Everything"and I brought
                everything cause I wasn't working.  And uh ... around
                that time he ... he decided that he needed transportation.
                So he was going to pick up the truck from Gallina.
                And he tried breaking in because I would not let him
                have the key.  So that's when my father and my brothers
                walked out and asked him to leave ... not to break in.
                If anybody knew that that wasn't right, it should be
                him.

JENNINGS:       On this occasion now when you had the argument, you were
                at his mobile home in Abiquiu.  Is this not true?

RODELLA:        Yes.  That's correct.  I was in Abiquiu.

JENNINGS:       Okay, later that evening you've related to me that
                he came to your home in ... in Gallina and he tried
                to break into the pickup?

RODELLA:    First he went in the house.  My son was in there.
            I was at my mother's house and he asked, "Where's
            your mom and Patrick said, "I guess she's ... she's
            at grandma's house."  And he went through my purse
            and he took all the keys to the other vehicles.  But
            the one to the pickup I had it in my pocket.

JENNINGS:   Okay.  Who is the pickup ... is it in joint registration
            between you and him?

RODELLA:    Yes, it was.

JENNINGS:   So, it would ... it was actually his pickup as well.

RODELLA:    Yes, it was.

JENNINGS:   On item number 5 you contend that on March 21st, 1985,
            while attending the state basketball tournaments he
            took you out on the parking lot of the Civic and
            started beating you.  He stopped when he realized
            your father was watching.  Can you tell me why he
            took you out of the Civic Auditorium and began
            beating you and did you see your father watch this
            beating that you took?

RODELLA:    Well, I can't tell you why he was mad, but you know
            he was mad that day for some reason and he (Inaudible
            for a couple of words).  Uh ....

JENNINGS:   Had he been drinking on this occasion?

RODELLA:    Uh ... I'm sure he had.  I'm not saying that he was
            drunk, but I'm sure he had been drinking.  And the
            reason I say my father saw something was that he was
            walking right behind us and we were arguing.  He was
            pushing me around, but I knew my father wasn't going
            to go up to him and tell him to leave me alone and
            then he went and sat in the pickup.  So I know that
            my father must have seen something.  And Tommy was
            aware that my father was around.

JENNINGS:   Okay, you left the civic center and you drove out on
            the interstate and he just abused me again.  Did he
            physically punch you, kick you, and in the vehicle
            or what happened then?

RODELLA:    In the vehicle while he was driving he kept my hair
            and punching me till he finally stopped the car.

RODELLA: And he just let me have it. And by have it I mean punching me everywhere. Pulling my hair.

JENNINGS: Okay, the next day you were still in Albuquerque and you said, we again argued and he started at me again this time he hit me until I passed out. Was this at a motel room?

RODELLA: No, this was at my home in Albuquerque.

JENNINGS: You say when you came back I begged him to leave me alone or take me to the hospital cause I couldn't even walk.

RODELLA: Yes, it was.

JENNINGS: How long did you stay off work because of this or did you miss work because of this?

RODELLA: I did miss work because of this and it must of been a couple of days that I was out.

JENNINGS: Okay. Your work record indicates that on March the 21st and 22nd it indicated taht you were at a tournament.

RODELLA: Uh ... huh.

JENNINGS: On your sick leave record and on the 25th and the 26th it indicates that you were again missed, but it gives no reason. Does either one of the days have anything to do with the incident?

RODELLA: Both.

JENNINGS: You are speaking of the 21st and 22nd?

RODELLA: I'm speaking of the 25th and the 26th.

JENNINGS: Okay. Did he offer to take you to the hospital that day or did you ever go to the hospital or to a doctor?

RODELLA: No, I didn't go. He told me he was leaving. That Uh ... that I would never see him again. He was going to leave and then all of sudden he decided that he wasn't to leave. But I did tell him that I would be going to the hospital if he left me. Because of the condition that I was in. And he finally decided, No, we should come back to Abiquiu and try to work things out. Then that night we drove back to Abiquiu. And I did not go to the hospital or to a doctor.

JENNINGS:       Okay.  That was the incident in Albuquerque on March
                21st and on March 22nd.  Right?

RODELLA:        That's correct.

JENNINGS:       Okay.  You stated on April the 6th, 1985 he was called
                by some of his friends to a party at Canones.  According
                to your item number six.  He was on duty and he asked
                you to go with him in which you did.  On the way to
                the party he began to argue and by the time you arrived
                at the residence in Canones you decided not to leave
                the vehicle and you waited in his unit.  "I waited for
                awhile, but figured that the music and the noise  ...
                by the music and the noise that he wouldn't be coming
                out soon."  So you walked to a friends home and returned
                to your place in Abiquiu.  You found the vehicle to be
                ... have flat tires.  You knew that he would beat you
                up on his return needless to say a repeat of his behavior.
                Is this a true account of what happened that night?

RODELLA:        That's correct.

JENNINGS:       And upon his return to your home there in Abiquiu that
                night did he again beat you up?

RODELLA:        Yes, he did.

JENNINGS:       Was anyone else with him when he arrived at your house?

RODELLA:        No, there was no one with him.

JENNINGS:       Was he working this evening?

RODELLA:        Yes, he was.

JENNINGS:       Had he been drinking when he arrived home?

RODELLA:        No.  No.

JENNINGS:       On your item number 7 on May 2nd, 1985, while you
                visited with your sister at her home in Gallina you
                say that he became pretty drunk and he decided that
                he was going to try out his truck and invited your
                nephew and yourself and you said he drove like a
                maniac and you tried to talk him to slowing down
                and he got into a argument and started fighting
                and pulled out a gun and pointed it at his head.
                He warned your nephew to keep quiet because he and
                his father had full control of the county and nobody
                better mess with him.  Is this true?

RODELLA:        That is correct.

JENNINGS:       At this time during the altercation did he ... did he
                ever fire the weapon or what type of weapon was it?

RODELLA:        It was a .22.

JENNINGS:       Was it his weapon or was it someone elses?

RODELLA:        It's mine.  And good thing that it had no bullets in
                it.  But he kept cocking it at his head.

JENNINGS:       Was it a revolver or an automatic?  Semi automatic pistol?

RODELLA:        It's a  ....

JENNINGS:       Did the cylinder revolve or was it ....

RODELLA:        Yes.

JENNINGS:       Did he ... he did make reference that evening that him
                and his father were the law and he had full control of
                the county and that nobody could touch him.  Is this
                true?

RODELLA:        That's correct.

JENNINGS:       Didhe make mention of this quite often?

RODELLA:        He ... he made mention of it to me on several occasions
                to it that night.  He Uh ... he mentioned it to me.

JENNINGS:       And what is your nephew's name?

RODELLA:        Raymond Cordova.

JENNINGS:       Does he live here in Gallina?

RODELLA:        Yes, he does.

JENNINGS:       Do you remember any other incidents where he pulled
                the gun out other than the one on yourself and on
                your nephew where he attempted to use a gun or had
                a gun in his possession and became angry and threatened
                to use the gun?

RODELLA:        More than once.

JENNINGS:    On your incident number eight.  You say that on May
the 10th, 1985, while vactioning in California he
became angry and grabbed a wire hanger and started
hitting you and tearing your clothes and kicking you
around.  You say there you couldn't get in touch with
anyone.  Did you go to a doctor or see anyone in the
medical profession because of this beating?

RODELLA:    No, I didn't.

JENNINGS:    Did he threaten you at this time about keeping quiet?
Or has he ever told you that you better not say anything
to anyone?

RODELLA:    Yes, all the time.  This is constantly.

JENNINGS:    Were you bruised because of the beating that you took
on this day?   May 10th?

RODELLA:    Very badly bruised.  My legs especially.

JENNINGS:    On May the 22nd, 1985, which you term as an eye opener.
He contacted you at work and advised you that you better
beware when you got home that evening.  Would you relate
to me what happened that day?

RODELLA:    Uh ... he had called me here at work to tell me that ...
we had gone out that weekend before the 22nd and we
had gone out to Chama and we had a little incident
happen to us and anyway.  On May 22nd this lady called
him and apologized for what had happened and he called
me to tell me this.  And he started accusing me that
I was seeing someone else.  And I got angry and I hung
up on him.  I said, "I don't have time like that to
argue with you at work."  And he called me back and
he said, "Don't you ever hang up on me."  And you better
watch out cause this evening you are going to get when
you come home."  So you know I thought one of his games,
But then I thought I can't take a chance anymore.  So
I tried getting a hold of Officer Chavez and I talked to
his fiance and asked her to have him return my call here
at work.  And later on that day I decided I needed to do
something.   Take care of some business before anything
else would happen.  Which was basically changing my car
titles back to my original name and going to the bank
taking some business that I had there.  And I went on
to Espanola and I did this.  And upon my return to
Abiquiu I ... he was there at the house and he was just
taking off in his patrol car and he saw me go by.  I
didn't dare stop.  So he followed me.  He tried running
me off the road.  So I turned as fast as I could.  And

RODELLA:        I thought well, I don't have  ... stand a chance
                coming this way.  There's no traffic going towards
                Espanola if anything happens to me.  So I turned
                and headed on back to Espanola and he followed me
                and once I got to Espanola he signaled me to stop.
                And I stopped.  And then we talked for awhile and
                that's is when I was going  ... he told me to go
                back home.  "I'll be there after awhile."  So I
                came on home.  And when we got home the same thing
                happened again.

JENNINGS:       Did he Uh ... say anything to you that evening about
                ... about he didn't care who found out about this
                he was going to abuse you again and again.

RODELLA:        Yeah, he told me he says, I asked him, "Tommy, if you
                just let me leave, I'll leave."  And he said, "No,
                Bernice I'm not using you or abusing you."

JENNINGS:       Did you tell him that you had been to Lieutenant Filip?

RODELLA:        No, he never knew about this.  Cause if he would have
                known he would have probably just ... and when he found
                out about Officer Chavez he made it hard on Officer
                Chavez too.  I really didn't want to involve anyone
                else because ... and he kept telling me after he found
                out that I had contacted Officer Chavez.  He kept
                telling me "Yeah, you, Lieutenant Filip and Robert are
                to screw me."  "You really want to screw me."  (Inaudible).
                So ....

JENNINGS:       You say that on your number 10 on May 30th, 1985, he
                called you go to Abiquiu and talk ... excuse me on
                May 30th, ....

RODELLLA:       I left ...

JENNINGS:       You left Officer Rodella.

RODELLA:        I left him.  By left I mean I packed my stuff and
                you know ... A few things that I had and ...and I left.

JENNINGS:       Okay.  And ... and you say that on June 4th, he called
                you to talk and you went to his mobile home in Abiquiu
                and at this time what happened?

RODELLA:        He just started pushing me around and beating me up
                with a humongeous belt he had.  And he wrapped it around
                my throat.  My neck.  My neck area.  And he tried
                strangling me.

JENNINGS:      Did you Uh ... did you pass out at this time or ....

RODELLA:       No, I didn't.  I ... they asked me the same question
               at the Cuba Health Center if I passed out.  I did not
               pass out.  I was trying ... I was trying to fight it.
               I was trying to fight the pressure on my neck.

JENNINGS:      Uh ... when did you go to the Cuba Health Center for
               treatment?

RODELLA:       On June the 5th.  My sister Martha took me.  Her and
               her husband took me to the clinic that night.

JENNINGS:      What is your sister's name?

RODELLA:       Martha Corriz.

JENNINGS:      Does she live here in Gallina as well?

RODELLA:       Yes, she does.

JENNINGS:      You said in your letter to the chief's office that
               he's intimidated you to the point that you are
               running scared.  You said, he threatened to kill you
               and your family if they got involved.  And he stated
               time and time again that no officer would believe
               me anyway and in this country he would get away with
               murder.  Is this true?

RODELLA:       No, in the county of Rio Arriba.  Meaning the county
               of Rio Arriba.

JENNINGS:      Has any of his family ever contacted you?  His father
               or any of his other family?

RODELLA:       No.  As a matter of a fact his mom and I get along
               very well.  And on number eight I went to her and
               I showed her the bruises on my body because I said
               if anything happens I want you to know that this is
               what I have been getting.  She agreed with me telling
               me that I should do something about it at that time
               cause she herself had ... had taken beatings from
               her husband at one time.  And she said, "And I don't
               want you to go through the same thing you know that
               I had gone through."  So I do talk to her and I do
               get along with her very well.  The father I don't
               have nothing to do with him.

RODELLA_SP_GJS 000160

JENNINGS:    You stated that when he drinks the problem is compounded especially smokes marijuana.  How often does drink. Have you ever seen him drink on duty?

RODELLA:    No, I haven't.

JENNINGS:    How often does he drink?

RODELLA:    Oh, this is usually on his days off.

JENNINGS:    Does he drink to excess normally?

RODELLA:    Uh ... I would say so.

JENNINGS:    And how many times have you seen him or are you aware of him smoking marijuana?

RODELLA:    I guess I probably blew it a little a bit there, but I have seen him smoke it twice.

JENNINGS:    And where was this at?

RODELLA:    Uh ... once in Albuquerque at my home in Albuquerque and once in Abiquiu.

JENNINGS:    Do you know where he obtained the marijuana from?

RODELLA:    I have no idea.

JENNINGS:    You stated in your letter to the chief that you realized that his family is the law as he says.  As he said and he will do anything to get even with ... with you and your family.  Is this true?

RODELLA:    Yes.

JENNINGS:    Has he told you this frequently?

RODELLA:    Yes, as a matter of a fact he rubs it in quite often that he's got it ... you know he's got it made with his father, with his uncles which was a ex-state policeman. And that ....

JENNINGS:    What is his uncles name?

RODELLA:    Leo.  I mean I just don't stand a chance.  And he's asked ... asked me quite often.  "Bernice why don't you move from Gallina and get out of here."  "Get away."

JENNINGS:   Who has asked you that?

RODELLA:    Tommy has.  You know when we have argued and tried
            to talk about things.  We can't make it, you know
            get out."  So you know to me it's ...he's warning
            me about something.

JENNINGS:   Have you contact with your husband Tommy since you
            wrote the letter?

RODELLA:    Yes, I have.

JENNINGS:   Do you recall when it was?

RODELLA:    I've seen him and I've talked to him as late this
            morning.  He called me and he told me that he knew
            that someone from your office would be coming down
            and that he wanted me to tell them that everything
            that I had written this letter was a lie.

JENNINGS:   And he told you that this morning on the phone?

RODELLA:    Well, he's been telling me off and on, but he reminded
            me this morning that I should tape this conversation.

JENNINGS:   Did he call you?

RODELLA:    Yes, he called me.  And that I should tape this
            conversation and that I should take the tape to him
            so he could hear it.  And that I better tell you that
            everything I wrote here is a lie.

JENNINGS:   What did you tell him?

RODELLA:    I told him that I would try.  Cause that's all I
            could say.  I just don't want to argue with him.
            And in many times I told him, "Hey, I'll do it."
            I just didn't want ... I just knew what would happen.

JENNINGS:   Did he threaten you at all today on the phone about
            the interview that would be conducted with you if you
            ... if you failed to do what he told you?

RODELLA:    He didn't threaten me, but I can ... I can sense it.
            He didn't tell me "You are going to be sorry."  Or
            anything like this.  It's the way he worded it.  He
            wanted me to tape it and take to him.  You know so
            he could hear what I had said.

JENNINGS:   Since you have been ... when did you get married

JENNINGS:        to Tommy Rodella?

RODELLA:         November the 10th, 1984.

JENNINNGS:       Did he beat you at all before you became married?

RODELLA:         One time last year.  It was in August and I went to
                 Mexico without letting him know.  And when I got back
                 he asked me where I had been.  And I said, "Well,
                 you don't have to know where I have been."  And
                 we were on the way to T.A. and he stopped on the
                 middle of the road.  I had some film of pictures
                 that I had taken in Mexico and he just threw them
                 out the window.  And he found out where I had been
                 and he just ... he slapped me quite a bit.  But at
                 that time I thought well, he's mad because I didn't
                 tell him where I was going.  And after that you
                 know I could just see it.  You know.  Well, actually
                 after we got married I could see it.  For anything
                 little thing that happened.  He didn't need a reason.

JENNINGS:        Have you filed for a legal separation or divorce at
                 all?

RODELLA:         Yes, I have.

JENNINGS:        When did you do this?

RODELLA:         Uh ... I can't remember when I did this.  Sometime
                 in the early part of June.  I believe.

JENNINGS:        You filed for divorce?

RODELLA:         Yes, I did.

JENNINGS:        Is he aware of this?

RODELLA:         Yes, he is.  Cause that girl also told him that ...

JENNINGS:        When you refer to this girl would you ... would tell
                 me a little bit about this.  Are you talking about
                 the girl at the state police office?

RODELLA:         Yes, I am.  I'll tell ... And I'll tell you what
                 I went up to Tommy's house last week sometime and
                 I had no sooner when the phone rang and they started
                 talking about someone that was in an accident and
                 they were trying to get to him and she told him that

RODELLA: yes that she thought that there might even be a tap on the phone. And ... and that this certain person whoever they were referring to had seen our divorce in the paper and was showing everybody there at the state police complex. I then asked him who ... who is this girl and he told me that it was a girl that he had met and that she was keeping him posted on everything that was going on. Everytime you people would contact me. Every phone call that you would make. She would make a note of it and let him know. And let him know, I guess.

JENNINGS: Did he give you her name?

RODELLA: Yes, well, he gave me a name. I don't know if that's the name. But he did give me a name.

JENNINGS: What was that name?

RODELLA: Naomi.

JENNINGS: Did he say where she worked or who she worked for there at the state police?

RODELLA: I asked him what department that she worked at because I wanted to make sure that next time I have a complaint or any kind of ... that she doesn't get a hold of it. And he told me that she worked under where the files or something like that. That she had access to personnel files.

JENNINGS: How many times approximately would you say that he has physically abused you since you have known him?

RODELLA: I really couldn't even count them. Count them if I wanted to.

JENNINGS: And you stated earlier sometimes he abuses you when he's been drinking and sometimes when he's not drinking.

RODELLA: That's right.

JENNINGS: It doesn't matter?

RODELLA: It doesn't matter anymore.

JENNINGS: Are the arguments primarily over money, over vehicles, over ... over your activities when you are not around him. What ... what generally provokes arguments?

RODELLA: What generally provokes the arguments is that if he wants me to get rid of everything that I got. He Uh ...

RODELLA: that's basically it. He wants me to get of everything I have. That I own. And think that's it.

JENNINGS: Do you have anything further to add to this interview, Mrs. Rodella?

RODELLA: Nothing other than like I say, I felt rather bad knowing that I wrote this letter and ... and someone got a hold of it and told him everything that ....

JENNINGS: The time is 1:31 p.m. on July the 8th, 1985. The tape was just changed from side one to side two. Mrs. Rodella would you again tell me ... repeat the statement that you just made?

RODELLA: What I was saying was that I was concerned because of the letter that I had written and the confidentiality or whatever basically was I guess (Inaudible) of the department.

JENNINGS: Okay. You are complaint to the state police is this. Your husband Officer Tommy Rodella has physically and mentally abused you and that part of this has happened you feel while he is on duty and part of it while he is off duty. You also contend that the ... the use of alcohol and marijuana has been part of the scenario and also that the information that you have been giving the state police in the form of the complaint has been made know to him point by point and that it has not been confidential. Is this true?

RODELLA: Yes.

JENNINGS: Do you have anything further that you would like to add to the interview or to say at this time Mr. Rodella?

RODELLA: No, I guess that's it.

JENNINGS: What would you term just and proper ... what would you term a just proper solution to this problem between you and your husband, Officer Rodella?

RODELLA: The only solution to the problem ... to my problem you know ... as far as getting a divorce or whatever has been taken care of. But what I am afraid of is that you know it's not going to stop at that. That's what I am concerned with. It's not going to stop at that.

JENNINGS:     Have you contemplated getting  a  restraining order
              against him visiting or your family on your property
              or any other time?

RODELLA:      Well, he is so sharp that he probably wouldn't do it.
              He would have somebody else you know do whatever he
              had to do to me.  And he would ... after this letter
              I'm sure he's going to want to get revenge.  Some way
              or another.

JENNINGS:     Does he know about the letter that you wrote ... does
              ... has he ever seen it that you know of?

RODELLA:      I showed it to him.  Because he told me that he knew
              what was in it.  He told me that he was going to read
              it.  And I said, "Yeah, I'll show it to you."  "I'm
              Not afraid."  "I'll show it."  I showed it to him.
              He's got a copy of it.  Cause I gave him a copy.

JENNINGS:     You gave him a copy of the letter?

RODELLA:      I gave him a copy of the letter after he told me that
              that ... this girl had basically ... well, he ... he
              went step by step telling me what was in the letter.
              Yeah, I'll give you a copy myself.  I said.

JENNINGS:     You knew that he no longer works on patrol out of
              the Espanola District.  Did you not?

RODELLA:      Yes, I do.

JENNINGS:     Has he ever confronted you with the fact that he has a
              new job and more power or anything of this nature?

RODELLA:      Uh ... not in so many words, but not directly, but
              indirectly I would say.

JENNINGS:     Are you still afraid of Officer Rodella at this time?

RODELLA:      No, I'm not.  Not anymore.

JENNINGS:     When you went to the clinic in Cuba, who did you see
              there?

RODELLA:      I went to the emergency room and I can't remember
              who the man was that saw me.

JENNINGS:     Was this a doctor or a physician's assistant or what?

RODELLA:      A p.a. (physician's assistant).

JENNINGS:     They do have a record of the x-rays and so forth that
              they took there.

RODELLA:      Uh ... huh.

JENNINGS:     You have a bruise on your left forearm.  Is this a
              bruise that was caused from any confrontation that
              you may have had with Officer Rodella?

RODELLA:      Yes.

JENNINGS:     When was it.  Do you recall?

RODELLA:      It was July 1st.

JENNINGS:     Did he come to your house at that time?

RODELLA:      He Uh ... we came over.  I came to show him a copy of
              the letter that I had written and he read it and he
              just got furious and he pushed me (Inaudible) and he
              beat me up.  And (Inaudible) and he tried to get into
              my desk to see what else he could find.  And I locked
              it as fast I could and he cut his finger somewhere.

JENNINGS:     This was here in your office at the administration
              office ... school office here at Gallina?

RODELLA:      Yes, this was after work and I came to pick up a
              little (Inaudible).  To show it to him and let him
              know that I had written a letter.  And I went back
              to Abiquiu with him to take them back and he didn't
              let me come back that day.  So the next day I had
              to come and work and he told me, "No, you are not
              go work."  And later on that afternoon ... I told
              him, Tommy, I said, "You better realize that I have
              made up my mind that I am going to let people know
              what you have done to me."  And I have to Tommy that
              girls name is going to come up.  And he got mad and
              he started pulling my hair and puched me and gave me
              a black eye.  I'm just barely getting rid of it now.

JENNINGS:     And the bruise on your arm was caused by him?

RODELLA:      Yes, it was.

JENNINGS:     It's on your left forearm?

RODELLA:        Right.

JENNINGS:       Okay, was this when he grabbed you or when he hit you?

RODELLA:        I really don't know.

JENNINGS:       When you said on that occasion he did both.  He grabbed you and he hit you?

RODELLA:        Uh ... huh.

JENNINGS:       Do you have anything further to add?

RODELLA:        Only that he's been trying to talk me into trying to tell me that there is no truth to that letter.

JENNINGS:       And what are you telling me here today?

RODELLA:        And I'm telling you that there is.  That everything that I wrote there is true.  Except for that item number ... it's not an item it's just where it says that he has a drinking problem and it is compounded by which happens quite often and what I meant to say is this ... his behavior happens quite often.  Not smoking marijuana.  It happens quite often.  And that he drinks quite often.

JENNINGS:       He does drink quite often, but you have see smoke marijuana on two (2) occasions?

RODELLA:        Right.

JENNINGS:       Mrs. Rodella I can't ask you administratively nor can I demand that  you take a polygraph examination, but on the information that you have afforded me here. Would you take a polygraph examination if afforded one to ... concerning the facts that you have given me here today?

RODELLA:        I guess.

JENNINGS:       Okay, the interview will end  at 1:38 p.m. on July the 8th, 1985.

June 20, 1985

Chief Maurice Cordova
New Mexico State Police
P.O. Box 1628
Santa Fe, NM  87501

Dear Chief Cordova:

I have made several appointments to meet with you, however I was
unable to keep them due to my personal appearance, my apologies.
Therefore, it is with deep regret that I approach you in this
manner, as of today I have no alternative.

During the past year, I have tried ignoring Officer Rodella's
unprofessional behavior, his drinking problem and the abuse of
his position as a patrolman, however this has gone beyond my
tolerance and hereby request that you give this matter your
immediate  attention.

First of all, my family is fearful of this man.  They have seen
how he reacts at times.  My children feel that they lost their
father to this department and they see their mother being abused
by someone representing the same department.  Since Officer Rodella
represents your department and our state, the following are reasons
why I feel you as chief need to be apprised of these facts.  I am
listing different occurrences to give you an idea of what I am
referring to:

1.  On December 17, 1984, Officer Rodella took me out of our
    residence in Abiquiu, and drove me on SR 84, pulled me
    out of the car by the hair and left my lying out on the
    roadway.  He then threatened to shoot me with his service
    revolver if I didn't walk back home.  I asked him not to
    shoot me because of my two (2) children.  After this
    incident/beating I was unable to work for two (2) days.

2.  On January 5, 1985, he was acting strangly and I left
    the house, upon my return he had changed the locks in
    the house.  I couldn't get in and left again.  When I
    returned the next day I found all the vehicles flat.

RODELLA_SP_GJS  000182

I reported this incident to Lieut. Filip just for the record.
Upon my return from Espanola on 1/06/85, after talking to
Lieut. Filip, I met him and his brother past Abiquiu, he
forced me off the highway. He then jumped into the pickup
I was driving and while it was still moving, started beating
me up and again left me so bruised I couldn't go work for (3)
days.

3. On February 9, 1985, he beat me up again and on

4. February 28, 1985, again, this time he had his service
   revolver pointed at my face bruising me badly.

5. On March 21, 1985, while attending the State Basketball
   Tournaments in Albuquerque, he took me out on the parking
   lot of the Civic and started beating me. He stopped when
   he realized that my father was watching. Officer Rodella
   then took me out on the interstate and just abused me.
   The next day while in Albuquerque we again argued and he
   started at me again, this time he hit me until I passed out.
   When I came back, I begged him to leave me alone or take
   me to the hospital as I couldn't even walk. Again after
   this incident I missed work because of my appearance.

6. On the evening of April 6, 1985, he was called by some of
   his friends to a party in Canones. Since he was on duty
   he asked me if I would go with him and foolishly, I agreed.
   On our way up, we involved ourselves in an argument. By
   the time we arrived at Canones, I told him I wouldn't get
   down and instead waited in the unit. I waited for awhile
   but figured from the music and the noise that he wouldn't
   be coming out soon. I then walked to a friend's house.
   Upon my return to Abiquiu that night, I found the vehicles
   flat; therefore, I knew he would beat me up upon his return.
   Needless to say, a repeat of his behavior.

7. On May 2, 1985, while we visited with my sister at her home
   in Gallina, he got pretty drunk and decided he was going
   to try out his truck. He invited my nephew and took me along.
   He drove like a manic and in the process of us trying to talk
   him into slowing down, he got in an argument with my nephew
   and started fighting, pulled out a gun and pointed it to
   his head. He warned my nephew to keep quiet because he and
   his father had full control of this county and nobody better
   mess with him.

RODELLA_SP_GJS 000183

8. On May 10, 1985, while vacationing in California, he had some
   kinky idea and because I didn't agree with him, he just got
   violent, grabbed a wire hanger and started hitting me, tore
   my clothes and kicked me around. There I couldn't get in
   touch with anyone.

9. On May 22, 1985,.., which was the eyeopener for me, he
   contacted me at work and advised me that I better beware
   when I got home that evening. I was terrified. I made an
   effort to contact Officer Chavez to see if he would be
   around the area so he could help me. I was unable to make
   contact with Officer Chavez on that day and proceeded to
   go home but decided to go to Espanola and upon my return
   to Abiquiu, I met him and he tried forcing me off the
   highway into an embankment. He was in his patrol car and
   followed me back into Espanola. I was frightened to stop.
   After getting back home that evening, he told me he didn't
   care who found out about what he was doing, he was going to
   use and abuse me again and again.

10. On May 30, 1985, I left Officer Rodella with the hope that
    he would realize what he was doing. He called me to go
    to Abiquiu and talk on June 4, 1985. I went over and he
    tried strangulating me with a belt. I had to go to the
    Cuba Health Center for treatment and reported to them
    exactly what had happened.

These are but a new of the instances in which he has been abusive.
You might say I could have reported him. Chief, I know I couldn't
he had intimidated me to the point that I was running scared. I
couldn't call anyone. He threatened to kill me and my family
if we got involved and he stated time and time again that no
officer would believe me anyway, and in this county he could
get away with murder.

Officer Rodella has a drinking problem and is compounded when he
smokes  marijuana (this happens quite often). I feel that you
or his immediate supervisor need to give this some attention.

I have since June 5, 1985, been staying in Gallina, however I
fear for my family. I realize "his family is the law" as he
says, and he will do anything to get even with us.

I understand that he has been "promoted" as he says to work with
the Governor. I will do what is in my power to see that this
man is evaluated and kept from thinking that instead of being
promoted, he be reprimanded.

Officer Rodella will repudiate everything that I have revealed
as he has done it before, however, I will strongly stand on my
word.

For your information I am sending a copy of the days I've had to
be out of work for his erratic behavior.

Chief, please do something about this officer before he really
hurts someone.

Sincerely,

Bernice Gomez Rodella