CONFIDENTIAL

# DEPARTMENT OF PUBLIC SAFETY

## INTRA-DEPARTMENTAL CORRESPONDENCE

**DATE:**  JULY 18, 1994

**FROM:**  RICHARD C DE BACA, CABINET SECRETARY
CHIEF JOHN DENKO, JR.

**TO:**  SERGEANT TOMMY RODELLA
DPS/NEW MEXICO STATE POLICE
POST OFFICE DRAWER D
ESPANOLA, NEW MEXICO  87532



RECEIVED JUL 21 1994

**SUBJECT:**  DHP APPEAL -- SUSPENSION

--------------------

In accordance with your request for a hearing before the Disciplinary Hearing Panel to appeal your suspension pursuant to New Mexico State Police Rule 182.0, a hearing was conducted today, July 18, 1994, pursuant to New Mexico State Police Rules and Regulations, Rule No. 182.3.  The hearing did commence; however, during the course of the hearing, your attorney, on your behalf, and Chief Counsel Robert D. Gardenhire on behalf of Chief John Denko and I, stipulated to your acceptance of the suspension contingent upon conditions set forth in correspondence dated July 18, 1994, attached hereto and incorporated herein.

Therefore, we are hereby providing written notice to you of your suspension from active duty, without pay, for a period of thirty (30) working days for violation of New Mexico State Police Rules and Regulations.  The dates of your suspension are as follows:

| | | |
|---|---|---|
| July 25, 1994 | August 1, 1994 | August 8, 1994 |
| July 26, 1994 | August 2, 1994 | August 9, 1994 |
| July 27, 1994 | August 3, 1994 | August 10, 1994 |
| July 28, 1994 | August 4, 1994 | August 11, 1994 |
| July 29, 1994 | August 5, 1994 | August 12, 1994 |
| | | |
| August 15, 1994 | August 22, 1994 | August 29, 1994 |
| August 16, 1994 | August 23, 1994 | August 30, 1994 |
| August 17, 1994 | August 24, 1994 | August 31, 1994 |
| August 18, 1994 | August 25, 1994 | September 1, 1994 |
| August 19, 1994 | August 26, 1994 | September 2, 1994. |

It is your responsibility to make arrangements with our Personnel Management Bureau for uninterrupted insurance coverage and other affected benefits for the duration of this suspension.

The suspension is for your violation of New Mexico State Police Rules and Regulations, Rule Nos. 110.0(.2), 112.0(.8), and the Department of Public Safety Code of Conduct, III. POLICY A., D., and E.(2).

GOVERNMENT EXHIBIT

2

RODELLA_SP_GJS 000219

Because of the conditions stipulated to and your acceptance of this disciplinary action, you have waived your right to request a review of this action to the Department of Public Safety Advisory Commission pursuant to New Mexico State Police Rules & Regulations, Rule No. 186.7.

We acknowledge the brief meeting, at your request, between Chief Denko, you, your attorney, Mr. Couleur, and Mr. Gardenhire that occurred this morning after this matter was resolved. This was a very positive meeting and we all acknowledge your stated loyalty to the New Mexico State Police and your desire, together with ours, to move forward and put this matter behind us.

By forwarding this Suspension Notice (with its attachment) to Captain Sal Luna, I am hereby directing him to hand deliver it to you and forward the original Notice, signed by you, to the Office of Legal Affairs. You are directed to turn in all State-owned equipment to Captain Sal Luna, or his designee, for the duration of this suspension.

_____          _____
R E C E I V E D                                              D A T E

Attachment

Copy to:   Deputy Chief Robert L. Gonzales
           Major Jerry Smith
           Captain Sal Luna
           Office of Professional Standards
            & Internal Affairs
           Personnel Management Bureau

RODELLA_SP_GJS 000220

State of New Mexico

# DEPARTMENT of PUBLIC SAFETY
P.O. Box 1628
Santa Fe, New Mexico 87504-1628
(505) 827-3370 — FAX (505) 827-3434

**DIVISIONS**

**Administrative Services**
(505) 827-9161

**Special Investigations**
Albuquerque — (505) 841-4660

**State Police**
(505) 827-9001

**Technical & Emergency Support**
(505) 827-3375

**Training & Recruiting**
(505) 827-9251

BRUCE KING
Governor

RICHARD C DE BACA
Secretary

July 18, 1994

HAND-DELIVERED

Douglas E. Couleur, Esq.
Post Office Box 6138
Santa Fe, New Mexico  87502

Re:  Sergeant Tommy Rodella

Dear Mr. Couleur:

This will confirm Sergeant Tommy Rodella has agreed to accept the discipline imposed in Secretary C de Baca and Chief Denko's intra-departmental correspondence dated June 15, 1994, subject to the following three conditions:

1.  That Sergeant Rodella will not be transferred from New Mexico State Police District 7 due to the investigation that resulted in the aforementioned June 15, 1994, intra-departmental correspondence;

2.  That Sergeant Rodella will not be transferred from New Mexico State Police District 7 as a result of the Jicarilla matter; and

3.  That intra-departmental correspondence dated June 15, 1994, will be amended to strike the following phrase at the top of page 3: "as an attempt to gain favor to solicit votes for your wife" and will now read, in its place, "as unprofessional" and all references to Rule 133.2 and 136.0 are deleted.

Both parties agree that the disciplinary action and all matters related thereto as set forth in the June 15, 1994, intra-departmental correspondence are fully resolved.

ROBERT D. GARDENHIRE, CHIEF COUNSEL
NEW MEXICO DEPARTMENT OF PUBLIC SAFETY

APPROVED:

DOUGLAS E. COULEUR, ESQ.

*New Mexico*
≡ **DRUG FREE** ≡
*It's a State of Mind!*

RODELLA_SP_GJS 000221

DEPARTMENT OF PUBLIC SAFETY 

INTRA-DEPARTMENTAL CORRESPONDENCE

---

DATE:      JUNE 15, 1994

FROM:      SECRETARY RICHARD C DE BACA
           CHIEF JOHN DENKO, JR.

TO:        SERGEANT TOMMY RODELLA
           DPS/NEW MEXICO STATE POLICE
           POST OFFICE DRAWER D
           ESPANOLA, NEW MEXICO  87532

SUBJECT:   SUSPENSION

------------------------

The Office of Professional Standards & Internal Affairs' investigation, based on allegations against you of misconduct, is concluded. You have been apprised of this investigation. The Office of Professional Standards & Internal Affairs has sustained the allegation of misconduct, and we concur with that determination. Sergeant Rodella, as a supervisor with the New Mexico State Police Officer, your actions in requesting the dismissal or cancellation of citations from your subordinates and co-workers was totally unprofessional and improper. This behavior is totally unacceptable.

We are hereby providing written notice of your suspension from active duty, without pay, for a period of thirty (30) working days for violation of New Mexico State Police Rules and Regulations.

The dates of your suspension are:

| | | | |
|---|---|---|---|
| July 4, 1994 | July 11, 1994 | July 18, 1994 | July 25, 1994 |
| July 5, 1994 | July 12, 1994 | July 19, 1994 | July 26, 1994 |
| July 6, 1994 | July 13, 1994 | July 20, 1994 | July 27, 1994 |
| July 7, 1994 | July 14, 1994 | July 21, 1994 | July 28, 1994 |
| July 8, 1994 | July 15, 1994 | July 22, 1994 | July 29, 1994 |

| | |
|---|---|
| August 1, 1994 | August 8, 1994 |
| August 2, 1994 | August 9, 1994 |
| August 3, 1994 | August 10, 1994 |
| August 4, 1994 | August 11, 1994 |
| August 5, 1994 | August 12, 1994. |

It is your responsibility to make arrangements with our Personnel Management Bureau for uninterrupted insurance coverage and other affected benefits for the duration of this suspension.

RODELLA_SP_GJS 000222

You have specifically violated new Mexico State Police Rules and Regulations, Rule No. 110.0(.2), 112.0(.8), 133.2, 136.0 and the Department of Public Safety Code of Conduct, III. POLICY A., D., and E.(2), which state, in pertinent part, as follows:

> Rule No. 110.0(.2) - "Employees shall: '.2 Obey all Rules and Regulations, policies, procedures, directives and lawful orders issued by supervisors; and . . . '"

> Rule No. 112.0(.8) - Employees shall conduct themselves at all time, both on and off duty, in such a manner as to reflect most favorably on the Department. Conduct unbecoming an employee shall include that which brings the Department into disrepute or reflects discredit upon the employee as a member of the Department, or that which impairs the operation or efficiency of the Department or employee. These shall include but not be limited to the following: . . . '.8 Employees shall maintain a level of good moral character in their personal and business affairs, which is in keeping with the highest standards of the law enforcement profession. Employees shall not participate in any incident which impairs their ability to perform their duties or impedes the operation of the Department or causes the Department to be brought into disrepute.'"

> Rule 133.2 - "Employees are prohibited from: 'e. Soliciting votes in support of, or in opposition to, any partisan candidates.'"

> Rule 136.0 - "Employees will not use their position or permit use of their position for personal or financial gain whether directly or indirectly for themselves or any other individual or group."

> Department of Public Safety Code of Conduct: III. POLICY . . . "A. Employees of the State of New Mexico, as public employees, must in all instances maintain the highest standards of conduct. They are expected to conduct themselves, while on or off official duty, in a manner which will reflect favorably upon the State of New Mexico."

> Department of Public Safety Code of Conduct: "D. Employees shall not use, or permit the use of, the Department to gain special privileges or benefits, and shall maintain the highest professional standards in all transactions.

> Department of Public Safety Code of Conduct: "E. . . . Employees shall not: . . . '2. take unfair advantage of other employees;"

Sergeant Rodella, you violated New Mexico State Police Rules and Regulations, and the Department of Public Safety Code of Conduct, enumerated above, when you asked co-workers and subordinates under your command to reduce, alter, dismiss, or assist acquaintances, relatives, and friends of friends with traffic citations. The numerous requests made by you as New Mexico State Police supervisor to solicit the cancellation of these

traffic ciations was perceived by officers as an attempt to gain favor to solicit votes for your wife. Your statement that you attempted to "help" these people is not credible.

Sergeant Rodella, as New Mexico State Police Officers, we are to uphold the law, protect the citizens we serve and, above all, maintain credibility, respect and honor. Your actions have tarnished these values and the fact that you believe you did nothing wrong is incomprehensible. Of the twenty-nine officers interviewed in this matter, twenty-five stated that their perception of your requests for help was to solicit them to dismiss or cancel the citations. Based on the investigation, you made a total of ninety-three requests to have citations dismissed or cancelled. How could you or anyone perceive your actions to be helpful and virtuous? The fact that you used your position as a supervisor to influence assistance in this regard is absolutely and ethically unjust.

Your actions clearly constitute a violation of the above referenced rules and regulations and the Department of Public Safety Code of Conduct.

On a related issue, you also violated NMSA 1978, Section 66-8-134(A) (Repl. Pamp. 1978) which states:

> Any person who cancels or solicits the cancellation of any uniform traffic citation other than as provided in the Motor Vehicle Code is guilty of a misdemeanor.

Whether or not you believe your actions to be a violation of Section 66-8-134(A), the facts, in this instance, speak for themselves. As the law currently reads, you have indeed violated Section 66-8-134(A). You state in your interview that ". . . solicitation is a very strong word. It's a very strong word, uh, in the dictionary if you read it, it's, it's a formal request, I've never requested the dismissal of a citation." According to Webster's II, New Riverside Dictionary, solicit is "1. To try to obtain. 2. To beg: entreat. 3. To tempt; entice." Sergeant Rodella, we have determined that your actions fit every meaning of the word solicit and whether or not your requests were made informally or formally are of no consequence to the statutory meaning of Section 66-8-134(A).

Whether or not Section 66-1-134(A) is applicable, those rules and regulations and the Department of Public Safety Code of Conduct, enumerated above, are definitely applicable.

Your actions will not be tolerated. Your position as a supervisor will not be used to influence any subordinate or co-worker to alter, reduce or dismiss any citation. You have jeopardized your supervisory abilities by imposing upon your subordinates to assist you and have lost their respect. Instead of setting a positive example, you brandished yourself as a negative example. You are encouraged to reevaluate your loyalty to the New Mexico State Police and to personally decide how important your career as a Sergeant with the New Mexico State Police is to you.

Pursuant to New Mexico State Police Rules and Regulations, Rule No. 182, as adopted on January 1, 1994, you should notify Chief John Denko, in writing, within five days of your receipt of this correspondence if you desire a hearing before a Disciplinary Hearing Panel. Should you request a hearing before the Panel, the actions described above will be held in abeyance until they make their recommendation and other appropriate review occurs.

By forwarding this Notice of Suspension to Captain Sal Luna, or his designee, I am hereby directing him to hand-deliver it to you and forward a copy, signed by you, to the Office of Legal Affairs.

_____          _____06/15/94_____
RECEIVED                                                DATE

Copy to:     Deputy Chief Robert Gonzales
             Major Jerry Smith
             Captain Sal Luna
             Office of Professional Standards
                & Internal Affairs
             Personnel Management Bureau

DEPARTMENT OF PUBLIC SAFETY

INTRA-DEPARTMENTAL CORRESPONDENCE



INVESTIGATIVE REPORT

**DATE:** JUNE 8, 1994

**FROM:** LIEUTENANT CHRIS D. MAES
OFFICE OF PROFESSIONAL STANDARDS &
INTERNAL AFFAIRS

**THROUGH:** MAJOR FRANK R. TAYLOR, COMMANDER
OFFICE OF PROFESSIONAL STANDARDS &
INTERNAL AFFAIRS

**TO:** CHIEF JOHN DENKO, JR.

**SUBJECT:** ADMINISTRATIVE INVESTIGATION
RE: SERGEANT THOMAS R. RODELLA
ALLEGATIONS:  MISCONDUCT
OPSIA CASE NO. 93-037-A2-07

--------------------

**INVESTIGATIVE SUMMARY:**

On May 12, 1993, you requested an administrative investigation be conducted regarding allegations of misconduct brought against Sergeant Thomas R. Rodella by Major Jerry Smith.  Specifically, it is alleged that during the month of June or July 1992, Sergeant Rodella solicited Officer Eddie Luechtefeld to dismiss a driving while intoxicated citation issued to Mr. Ross Borrego.  It is also alleged that Sergeant Rodella solicited other officers within District Seven, over an extended period of time, to dismiss citations for various traffic violations.

At the conclusion of this investigation, through interviews, statements and other documents obtained, it was determined that the allegation of misconduct, solicitation of Officer Eddie Luechtefeld to dismiss charges of Driving While Intoxicated against Mr. Ross Borrego, was **NOT SUSTAINED**.

It was also determined that despite Sergeant Rodella's contention that his requests for officers to **"help"** regarding citations were simply acts of passing on messages, twenty-five of the twenty-nine interviewed commissioned officers stated that their perception of the requests were that Sergeant Rodella was soliciting them to dismiss or cancel the citations.  It was also **"common knowledge"** among the officers that at one time or another Sergeant Rodella

RODELLA_SP_GJS 000229

would request their assistance regarding citations for various individuals and that the basis for these requests was for either personal or political reasons.   Therefore, the allegation of misconduct, that Sergeant Rodella solicited officers within District Seven to dismiss citations for various traffic violations, is **SUSTAINED**.

Additionally, at the conclusion of this investigation, through interviews, statements and other documents obtained, it was determined that Sergeant Thomas R. Rodella used his position as a Sergeant with the New Mexico State Police for personal gain based on corroborating statements by officers who **"feared retaliation"** if they did not comply with Sergeant Rodella's request to **"help"** violators with citations issued to them.   Therefore, as a result of this investigation an additional allegation of misconduct arose, and that allegation was **SUSTAINED.**

**INVESTIGATION DETAILS:**

On July 5, 1992, at approximately 2145 hours, Officer Eddie Luechtefeld stopped and arrested Mr. Ross Borrego for driving while intoxicated on State Road 68 Milepost 188.   During the weeks following Mr. Borrego's arrest, Sergeant Rodella allegedly attempted to persuade Officer Luechtefeld to dismiss the charges against Mr. Borrego, by insinuating what the political ramifications would be if they were not dismissed.

During the course of an interview conducted by Captain Tommy Cantou, Office of Professional Standards and Internal Affairs, with Officer Luechtefeld on November 30, 1992, Officer Luechtefeld brought forth the allegation regarding Sergeant Rodella having solicited him to dismiss the DWI citation issued to Mr. Borrego, as well as allegations that Sergeant Rodella solicited officers within District Seven, and other districts, to dismiss or cancel citations for friends or relatives.

Officer Eddie Luechtefeld was interviewed on May 21, 1993, at the Office of Professional Standards and Internal Affairs in Santa Fe, New Mexico.   Officer Luechtefeld was assigned to District Seven from  May 9, 1992 until March 27, 1993, and is currently assigned to District Six, Gallup, New Mexico. Officer Luechtefeld was asked to elaborate on the actions of Sergeant Rodella concerning Mr. Ross Borrego.  Officer Luechtefeld stated Sergeant Rodella contacted him on July 10, 1992 and advised him to Sergeant Rodella to Santa Fe, New Mexico.  Officer Luechtefeld stated Sergeant Rodella told him, **"Well we're going up there.  The Chief wants to see you."** Officer Luechtefeld indicated he did not believe him and when he advised Sergeant Rodella he wanted to speak with Captain Tarazon and

**RODELLA_SP_GJS 000230**

ascertain what the Chief wanted, Sergeant Rodella told him, **"Not really."**   This request to drive Sergeant Rodella to Santa Fe puzzled Officer Luechtefeld because he was assigned to work the **"North north patrol."**  Officer Luechtefeld stated, **"There were two south patrol officers which are a lot closer than I am.  There were two north patrols which were closer than I am and I was the only one on my patrol.  I asked, and I, I kinda asked him about that and he said, well if, he figured that uh, maybe I needed a break from being way up there and that maybe I'd like to go to Santa Fe and he just wanted to talk to me anyway.  Um, we didn't even make it out of town yet, out of Espanola going to Santa Fe when, when he brought up uh, Ross Borrego and I told him, 'Yes, that I arrested him for DWI.'  At that time he told me uh, he only blew a, a .09. Uh, I explained to him that with other circumstances that the judge had already brought that to my attention also and that I still felt that I could prove his impaired driving due to alcohol with that and that uh, I was still pursuing the case.   At that time he explained to me that uh, that I was wasting my time, that I wasn't gonna win, in so many words he, he told me um, 'It's, it's gonna get dismissed anyway.'   I remember him saying that exactly.  Um, from there he explained to me that I ought to just go dismiss it and uh, at that time I told him that, that I had no problem dismissing the other citations and, that were speeding or any traffic violation.   But that DWI was s-a serious violation and I wasn't about to dismiss it and, and turn into something like that or it turn into a big mess.  That it wasn't worth it.  Um, from there he continued making statements to include the one that I stated earlier, that he told me Ross Borrego was worth 60 votes. Um, that's kinda when, when I opened my mouth a little bit too much and I'm sure I upset him.  I wasn't thinking to the fact that his wife was a State Representative or fixing to be and, and I kinda made a bad remark uh, uh, that I wouldn't become a politician and jeopardize my job with that.  Um, from there he, he explained to me that what caused me to say that was the fact that he told me I might need a favor later on.  He told me um, 'The judge is catching heat on it and everything and that if I helped her out on it, later on should I need an extra favor or I should, should I need her to be a little more harsh on somebody, that she would owe me one.' And I started making the statements, from there he got kind of upset. . . . That from there, that that's when he uh, he said again, 'That the State Police is a political animal whether the Chief wants to recognize that or not.'  Um, I continued to stay quiet 'cuz I realized I did upset him pretty bad with the comments about not wanting to become a politician and jeopardize my job with that."**

Officer Luechtefeld indicated Sergeant Rodella asked him to dismiss citations on at least seven (7) other occasions and stated that when he initially arrived in District Seven he had been **"warned by the other officers."**   Officer Luechtefeld stated, **"Specifically,**

RODELLA_SP_GJS 000231

Officer Glenn Trujillo. . . . He explained to me um, what, what to watch out for.  He explained about the Captain um, his personality.  He explained to me, 'Write your citations every chance you get 'em because if you don't you won't get enough because the calls will start coming. . . . He also warned me about Sergeant Rodella.  He said, 'You're, you're working up there too,' uh, write a lot because uh, the Captain wants 75 and Tommy wants 15.  It was kind of a joke going around and I was told that by other officers but different numbers.  It was just a saying, 'Seventy for the Captain, ten for Tommy.'"  Officer Luechtefeld elaborated on the seven citations Sergeant Rodella requested he dismiss stating, "Sergeant Rodella even approached me exactly as the other officer would a-advising me you know, that he comes up and, and he puts his hand on your back, 'Hey are you in a ticket dismissing mood?'  And that's exactly how he approached me on those.  I was counting to see how many.  Um, after this incident where, where uh, I upset him in the car refusing to dismiss the citation and, and uh, speaking lowly of politicians, he never asked me again to dismiss a citation.  And it was my understanding the other officers noticed that he wasn't asking them either."  Officer Luechtefeld was asked to respond to following question.  "Do you, do you have any reasoning or know for a fact why his requests may have stopped?"  Officer Luechtefeld responded, "I have no idea.  Maybe I, I worried him with that.  Uh, maybe he felt he couldn't trust me.  That, that I was gonna uh, complain about this which I had no intentions of.  I wasn't ever looking to push him.  The only reason it came up to, to this point now that I mention it was when they asked me why I didn't trust Sergeant Rodella, or why I felt I couldn't work under him as a supervisor, or if I felt he had anything against me. . . . Um, the Captain and Lieutenant were, had to have been aware of it.  I mean if, if the patrolman can come up and tell me this when I get there, surely they knew about it and I figured that's the way it was and I left it alone."  Officer Luechtefeld indicated he was approached by Sergeant Rodella to dismiss citations within the first month he was stationed in District Seven.  "That was the exact year of the election.  The, the jokes continued on with that too of uh, him politicking and uh, during our ride there was a little bit of attention at the district meeting too because it was brought up at the office that, we weren't gonna be politicking."

Officer Luechtefeld was asked to respond to the following question.  "Did you feel compelled at any time to dismiss the citations when you were asked by Sergeant Rodella?"  Officer Luechtefeld responded, "Everytime. . . . I didn't want any problems with him for the same reason I didn't bring this up till they, they finally asked my why uh, why I couldn't trust him."  Officer Luechtefeld indicated he was told by the other officers to stay away from the office, "Avoid it at all costs."  Officer Luechtefeld stated, "I wanted to avoid Sergeant Rodella also with that."  Officer Luechtefeld indicated he never brought up Sergeant Rodella's

practices to any of the other supervisors in District Seven, but he did speak to Officer Gerald Anderson. **"Officer Anderson advised me over and over that I needed to file a complaint um, against Sergeant Rodella, because after this incident I started receiving certain harassment and they were aware of the incident that already occurred, that this uh, confrontation on the DWI um, me telling him about missing other citations that I put in the basket to be processed and they they're supposed to be taken to the, to Magistrate Court and there's no record there.  Things like that that are missing."** Officer Luechtefeld did recall having discussed these matters with Sergeant Forrest Smith.  Officer Luechtefeld stated, **"He was aware of it on numerous times.  And the same thing. Sergeant Smith said, 'Well if you don't want to complain, no one can make you write a complaint.'  He said, he said but um, 'The least thing you can do is to make sure you're documenting it.'  Um, some of the incidents, like this here was to the best of my knowledge, I recall writing it down on a daily. . . My dailies are missing okay?  Um, at a later time some time in July, I was approached by Sergeant Rodella telling me that he was missing three of my weeklies and the dailies that go with 'em.  Okay.  At the same time, they were June dailies and weeklies but he had already checked my monthly and approved my monthly."**

Officer Luechtefeld was asked to respond to the following question. **"Are you familiar with any other officers in the district or District 07 that were solicited by Sergeant Rodella to dismiss citations?"**  Officer Luechtefeld responded, **"It's, it's my understanding every one of 'em.  The, the only one that hasn't ever mentioned it, the only one that hasn't ever really uh, talked about it which he may have been approached too, but I'm not sure that he was, 'cuz he, he didn't discuss it a lot.  The only two are Officer Perea and he was on sick leave most of the time and when I first there.  And the other one is Officer Joe Schiel."**

Officer Luechtefeld indicated that the disposition on the Ross Borrego DWI citation was dismissed as it **"ran the six month rule."** Officer Luechtefeld indicated that on June 6, 1992, he arrested Debbie Rodella's (Sergeant Rodella's spouse) brother for parties to a crime.  Officer Luechtefeld stated, **"Tommy's brother-in-law.  He made it very clear to me.  He attempted to call uh, Sergeant Rodella while we were at the office several times and things along that. . . It's way past 6 months okay, on that.  I never received a court date I never received a disposition of a good, guilty plea."**

Officer Luechtefeld indicated that when Sergeant Rodella wanted a citation dismissed, the procedure would be to **"Void"** the citation. Officer Luechtefeld was asked to respond to the following question. **"If I was able to find copies of citations that were voided by you, would that be, would those be good indications to you that those**

were citations that you were approached by Sergeant Rodella?"
Officer Luechtefeld responded, **"Yes. The only other citations that
I voided that, that I would void out than those, those seven, they
would be all May or June citations. They would say 'void' on 'em."**

Officer Luechtefeld brought up another incident involving Officer
Daniel Mora. Officer Mora arrested an individual by the name of
Luis Montoya. Officer Luechtefeld stated, **"During that evening
Officer Rodella wasn't even on duty but somehow he heard about the
incident, that they arrested a subject for interfering with him,
trying to apprehend the, the pursuit suspect. . . He approached
Officer Mora and he asked him if he could just let him go, uh, give
him a break, just go ahead and let him go. From there Officer Mora
went to uh, Officer Mora's coach officer and Officer Av-Valdez
advised him that if uh, that he wouldn't do it. . . . He told him,
'Tell him you'll do it, if it's a direct order. If he's ordering
you as a Sergeant to let him go, then you go ahead and let him go,
but tell him that's what you're gonna put down.' Uh, he went back
and he told Sergeant Rodella that and Sergeant Rodella said, 'No,
uh, I can't do that. I can't order you to do that.' Uh, he left
the office and uh, he went with the family to the jail to bond the
subject out."**

Officer Luechtefeld was asked, **"Do you feel that uh, when these
people that Sergeant Rodella is asking you to dismiss citations on,
was it for personal reasons, political reasons, can you elaborate
a little bit on that?"** He responded, **"Sergeant Rodella can not
have that much family and he can not have that many friends. I was
just one subject. They warned me when I got there. In, in less
than a month's time, seven citations. . . . The, things like
citations. Okay. He asked on that numerous, how can he have that
many friends in all these different areas and what's more the
majority of 'em are in uh, his wife's voting district. That's I
think why I had so many all at once, seven all at once. Because
her voting district was part of my patrol. Um, the other thing,
every time you, you go and, and arrest someone, I mean it's a very
common thing. Very common. You arrest somebody, 'Well I know
Sergeant Rodella, I know Tommy and I'll, I'll call him and he owes
me a favor, you know. I helped his wife.' And they'll tell you
that."**

Officer Luechtefeld was given the following list of names and asked
if he knew if they were aware of Sergeant Rodella's activities
concerning the solicitation of citations:

| | |
|---|---|
| Lieutenant Forrest Smith | Officer Gerald Anderson |
| Sergeant Joe Mascarenas | Officer Andrew Evaskovich |
| Officer Joseph Griego | Officer Ralph Jurado |
| Officer James Henderson | Officer Joseph Madrid |
| Officer Michael Mendez | Officer Robert Perea |

**RODELLA_SP_GJS 000234**

Officer Daniel Mora            Officer Joseph Schiel
Officer Glen Trujillo         Officer Freddie De La O
Officer Chris Valdez

Officer Luechtefeld indicated he was aware all of the aforementioned officers knew aware of Sergeant Rodella soliciting officers to dismiss citations. He stated, regarding Officer Freddie De La O, **"Very aware of it. He was receiving a lot of pressure from Tommy."** He also stated, **"It's easier for me to say who I, I'm sure Tommy wouldn't approach. I, I'm sure Sergeant uh, Rodella wouldn't approach uh, Lionel."**

Lieutenant Forrest Smith was interviewed on June 1, 1993, in Espanola, New Mexico at the District Seven Office. Lieutenant Smith was assigned to District Seven in March 1990, and is currently the Assistant District Commander in District Seven. Lieutenant Smith indicated he had personal knowledge regarding the allegations against Sergeant Rodella. Lieutenant Smith indicated that Sergeant Rodella had **"solicited"** him to dismiss citations, saying, **"Yes he did. Uh, a couple of times when he was a criminal agent, he had come to me and asked me about citations, it I could do him a favor is the way he would put it. . . . In both of those cases I'd, I'd told him no that I could not and since then he has not asked me anything you know, or has not asked to uh, get a citation dismissed since then."** Lieutenant Smith indicated Sergeant Rodella asked him to dismiss these citations within the first six to eight months he was in District Seven saying, **"This guy's a good friend of mine. Could you do 'em a favor."** Lieutenant Smith indicated his interpretation of what Sergeant Rodella wanted was, **"He wanted me to dismiss the citation um, because it was a friend of his or a buddy."** Lieutenant Smith indicated he did have personal knowledge of Sergeant Rodella asking other officers in District Seven to dismiss citations. He stated, **"I had been put on notice a number of times by different officers. Uh, Officer Eddie Luechtefeld was one, Officer Glenn Trujillo, um, Officer Gerald Anderson, Officer Joe Madrid, um, Officers uh, uh, De La O, Freddie De La O . . . That, that most every officer within the district has been solicited to dismiss citations a number of times. . . . I brought it to the attention of my Lieutenant at the time who was Eloy Lopez."**

Lieutenant Smith stated, **"Lieutenant Lopez . . . Either noted it down in his um, uh, daily journal, uh, that he has. That he, that he kept at um, but as far as actually seeing him do things about it, to then Agent Rodella or later Sergeant Rodella, I never saw anything about it. Uh, when he, prior to when he was, he was promoted, I went to the Lieutenant and I had a couple of lengthy discussions with him about my concerns about Agent Rodella's**

RODELLA_SP_GJS 000235

becoming a Sergeant to these men and that the problems that were
gonna come about because of his political activity and dismissing
citations within the district.  Um, Lieutenant Lopez at the time
seemed concerned.  I brought up the situation that uh, was brought
to my attention by Officer Luechtefeld and Officer Glenn Trujillo
where um, supposedly a citation was dismissed from, for a, a gal
that works over at the bank and her husband works at Henry
Valencia's.  He's the floor manager or something over there.  And
by dismissing the citation he was given a van to use for um,
campaigning for his wife to go around doing small communities and
take his wife around, uh, for the campaign of her becoming a state
representative.  Now that information came to me through those two
officers.  I brought it to the attention of the Lieutenant who
wrote stuff down, but I don't know if he ever has or not. . . .
Officer De La O came to me at one time one uh, he said, 'What
should I do about these cit-dismissing these citations?'  And I
said, 'What citation?'  He said, 'Well Sergeant Rodella keeps
coming to me and asking me to dismiss citations.'  And I told him
at that time that he was not to do it, that it was illegal and that
it wasn't proper. . . . The impression that I got was that Sergeant
Rodella was using his authority over De La O and pretty much
telling him that it was okay, or, or conveying a message that it
was okay to dismiss citations, or to do favors for these people.
Uh, I believe he has documentation for that.  Officer Luechtefeld
had told me of some citations that he had, when he first got here
particularly, he had dismissed a number of citations for Officer,
for Sergeant Rodella who was his direct supervisor at the time.  I
brought that information up to my Lieutenant at the time and also
when it came to an end and one of the problems that, that started
between Rodella and Luechtefeld was there was a case on a DWI
citation, where he had arrested a subject for DWI and uh, Sergeant
Rodella went to Luechtefeld and asked him to have the citation
dismissed.  Luechtefeld refused and this upset Sergeant Rodella.
Uh, at one point he even said, 'Look this guy is worth fifty
votes,' something to that effect. . . . From that point on is when
the uh, problems with Rodella and Luechtefeld began."  Lieutenant
Smith indicated Officer Luechtefeld's refusal to dismiss the DWI
citation against Mr. Ross Borrego caused the deterioration in the
relationship between Sergeant Rodella and Officer Luechtefeld,
saying they had a good relationship up until that point.
Lieutenant Smith stated, **"The accusations on Eddie Luechtefeld's
part is that it's like a, you know the not citations but the seven
day recaps were turned in.  He had copies of 'em and that's, he was
concerned that, that Tommy Rodella may have done something to the
seven day recaps."**

Lieutenant Smith elaborated on Sergeant Rodella being **"The
vindictive type, and his ability to go out of his way. . . . That
I that was the crux of the beginning of the, the relationship
problems with Luechtefeld and Tommy Rodella, was the citations.**

**RODELLA_SP_GJS 000236**

Luechtefeld quit dismissing the citations because he didn't feel good about 'em.  He felt wrong, wrong uh, and he wouldn't do a DWI citation and that's where the problems began."  Lieutenant Smith stated,  "I could see the problem right after I got here with Sergeant Rodella and politics and playing with the game.  Uh, like I said, I did bring it up with my Lieutenant at the time. . . . I feel like with my Lieutenant at the time 'cuz I could see it coming.  We could all see it coming a mile away, but nothing was done about it.  It got worse and worse.  There was one faction of the democratic party and there's another faction on the other side that against the Naranjo plan and all that down the line."  Lieutenant Smith confirmed that Sergeant Rodella made promises to people and used his position as a Sergeant with the New Mexico State Police Department to satisfy those promises.  He also stated, "There was a house in Velarde right off the main road that had a big sign for Debbie Rodella when she was running for State Representative and camp, had campaigned for her. . . . They wanted a special patrol to go, keep going by the house and, and watch the house while they were gone.  Which is somewhat unusual. . . I think that Tommy Rodella has utilized his position as a State Police officer to gain these votes, to uh, repre-misrepresent himself in that capacity in campaigning for his wife and offering basically offering uh, that to dismiss citations and get things taken care of through his position with the Department."

In closing, Lieutenant Smith stated, "The, my concern at this point is that Sergeant Rodella at, is now trying to back track and befriend some of these officers and also I think that Officer, or Sergeant Rodella is now going to start looking for ways to get back at people that have turned him in or, I know he's looking for ways on Luechtefeld because of this investigation he was going through his personnel file and he was specifically looking for things against Luechtefeld to use that in this defense. . . . I feel that Sergeant Rodella has lost his effectiveness in this area, that he cannot perform his duties properly without compromising himself as New Mexico State Police within the Espanola area. . . . He needs to be removed from this area. . . . He has no respect of the men and the men won't work for him and don't, they balk at taking orders or suggestions or anything from Rodella. . . They feel that he is, he is so involved politically in the area that that is his number one priority.  The men below him are second, third, fourth, fifth, down the list.  But number one is his politics and the furtherance of his political career and his wife's political career."

Officer Freddie De La O was interviewed on May 26, 1993 in Espanola, New Mexico at the District Seven Office.  Officer De La O was assigned to District Seven in December 1992, and is currently assigned to District Seven, Abiquiu, New Mexico.  Officer De La O confirmed that Sergeant Rodella has asked him to dismiss citations

"five or six times." Officer De La O stated, "Well uh I was working nights and uh one weekend I went out and worked pretty hard, and gave out a lot of citations on US 84, and I'd stopped a lot of people from the Coyote area and issued them citations, and at the time that I was at home, oh I'd say between, about 11 to 1 before I'd go to work at the four o'clock, he would call me at home and he asked me uh, you gave so and so a citation on so and so date, and I'd say, yes, sir, he says, 'Can you help me out, he's a good friend of mine,' and uh you know, of course he's the Sergeant you know, I didn't wanna say no, you know, I had barely been on so go into the Magistrate Court and dismiss a citation." Officer De La O indicated he had written the name of one of the individuals in a pocket planner book, and has made that information available. Officer De La O stated, ". . . and uh on one he confronted me there in the office, he had asked me to come in his office, he needed to speak with me, and I got in his office and he had asked me, he says, 'You gave a girl, gave me the name, a citation on Highway 84.' I says, yes I did. He says, 'Well how did she act." I said well she wasn't too happy about the citation, and then he says, 'Well she's a real good friend of the family's, I can't ask you to dismiss it, but can you help her out." You know, me being a patrolman and him being a Sergeant, you know, I said, yea okay that's fine, and after this I confronted, at the time who was my Sergeant, Sergeant Forrest Smith, who's a Lieutenant now here in Espanola, uh you know, I asked him if I should keep doing this and he told me, he says, don't do it anymore, if Sergeant Rodella asks you to dismiss any more citations, tell him that I told you that you weren't supposed to do anymore, because you could get in big trouble for that, so uh ever since then he's asked the guys to ask me to dismiss citations." Officer De La O indicated Officer Ralph Jurado and Officer Daniel Mora had asked him to dismiss citations for Sergeant Rodella. Officer De La O did not dismiss the citations as per Sergeant Forrest Smith's direction. Officer De La O indicated his refusal to dismiss citations did "jeopardize" their relationship. He stated, "Yes, yea he uh before you know, he's really friendly with you when wants something, and then when you deny him that you're gonna do it, that you're not gonna do it, he uh rather than ignores you, you know, he doesn't confront you like he does when he wants something, and then he's always uh little things on reports and stuff he's always nit picking." Officer De La O indicated that prior to denying Sergeant Rodella the courtesy of dismissing the citations, he was not "nit picking." Officer De La O indicated he felt he was compelled to dismiss the initial citations due to Sergeant Rodella's position as a Sergeant on the New Mexico State Police Department and because of fear of retaliation. He also indicated that Sergeant Rodella's persistence in wanting citations dismissed made him ". . . angry, cuz I go out there, you know, and do my job and he's asking me to dismiss my citations." Officer De La O was asked to respond to the following question. "Did any of you, did the other Sergeants or Lieutenants

or Captain at that time ever ask you to dismiss a citation?" He
responded, "No sir, just Sergeant Rodella."

Officer De La O was asked to respond to the following question.
"And what are the basis or what do you base the people that he
wants citations dismissed for or for him for officers to help him
on citations on these people, do you find it that they're friends
of his, could it be political motivated?" He responded, "It's
politically motivated. . . . Well for the reason being is uh for
one citation he has asked me for, uh he stated that it was a couple
of votes for him."

Officer Freddie De La O was re-interviewed on January 28, 1994, in
Santa Fe, New Mexico at the Office of Professional Standards and
Internal Affairs regarding a pocket planner he kept documenting
some of his conversations with Sergeant Thomas Rodella. Officer
was asked, ". . . March 17th and 23rd, there are some entries made
into this pocket planner. Could you read to me what is written on
March 23rd please." He responded, "I wrote in there uh, 'Unit 115
asks to cite Dennis into court. Advised negative. Uh, he is to
pay his penalty assessment.'" This notation was made with regard
to a penalty assessment citation Officer De La O issued to Mr.
Dennis Silva, specifically, citation number 790-1605659, issued on
March 22, 1993 at 0712 hours on US 84, Milepost 203. Officer De La
O indicated he did not change this document in any manner and to
his knowledge Mr. Silva paid the penalty assessment citation.

During the course of this investigation I reviewed citations from
various months throughout 1992 and 1993. Two other citations
written by Officer De La O were found. Citation number 790-1606363
was issued to Mr. Milner Branch from Coyote, New Mexico on March
16, 1993. Officer De La O was asked, "With respect to this
citation that we're discussing uh, it appears that all the
information, pertinent information has been filled out. Mr. Branch
acknowledged and signed the penalty assessment, uh, indicating that
he would agree to remit an eighty-one dollar fine, although in
looking at the citation, it has 'Void' written across it. Uh, can
you tell me what, why the citation was voided?" He responded, "Yes
sir. Um, during that week, um, the 16th, um, I had uh, Sergeant
Mascarenas's uh, unit which is 118 and it is a, a slick top. At
uh, that time, I had just gotten released from uh, Coach Officer
period and uh, I'd issued uh, quite a few citations that week. Uh,
I'd issued uh, those citations when uh, Sergeant Rodella had
approached me and uh, asked me if, if uh, I could uh, void out the
citations, help him, out. He had stated to me that he couldn't uh,
ask me to drop it, but you know, if I could help him out on it and
being my Sergeant at the time, I agreed to it." Officer De La O
was then asked, "Okay. With respect to the third and final
citation I have in my possession, is 790-1606359 -- can you

identify that citation please?" He responded, "Yes sir.  It is uh, a speeding citation I had issued to Anthony Casados from Tierra Amarilla, and was issued on the 16th of March of '93 at 10:52 A.M. . . . Um, as before I had stated that uh, during the, March 16th that week, I had had a slick top State Police unit which belonged to uh, Sergeant Mascarenas.  Uh, which is Unit 118.  I had uh, gone out and issued uh, quite a few citations that week.  Uh, Sergeant Rodella had approached me and, and asked me if I could help him out also on that citation, also him being my Sergeant at the time, I agreed to it."  Sergeant Rodella told Officer De La O that he had known both of the aforementioned individuals for a long time and that they were from the local area, causing Officer De La O to feel compelled to dismiss or cancel these citations for Sergeant Rodella.

Officer Larry Chavez was interviewed on May 25, 1993, in Albuquerque, New Mexico.  Officer Chavez was assigned to District Seven for four years and one month.  Officer Chavez worked directly under Sergeant Rodella and indicated Sergeant Rodella did solicit him to dismiss citations, ". . . right around 20 or maybe even more."  Officer Chavez indicated initially he would dismiss the citations for Sergeant Rodella. He stated, "Okay.  At first uh, he would come up and ask if we would do him a favor.  Uh, at this point I was still new, so-called, 'Wet behind the ears,' uh, I would do it as a favor to him.  Uh, later on he started asking, it seemed like for every 10 citations I wrote, he was asking on 4 or 5 of 'em for dismissals.  Uh, at that point I deci-I, started telling him, 'No, I wouldn't dismiss tickets," and he stopped talking to me uh, and he even spread some rumors with the Magistrate judges that I was worthless and that I didn't know what I was doing, which in turn, I had to prove myself and had to work extra hard."  Officer Chavez indicated he did not feel compelled to dismiss the citations, but that ". . . towards the end, yes."  Officer Chavez was asked, "Why did you feel that you had to dismiss the citations for the Sergeant, or if he was an Agent at the time?"  He responded, "Well first of all, he's got, he's real political.  He's got a lot of resources everywhere."  Officer Chavez indicated it was common knowledge that all of the officers in District Seven had been approached by Sergeant Rodella to dismiss citations.

Officer Chavez stated, regarding Sergeant Rodella's political connections, "Uh, I think that it was both uh, personal and political because I think during the campaigning process he promised a lot of things and uh, I think he was using, and this is all my opinion, but I think he was using his uh, Sergeant's stripes uh, with the New Mexico State Police to get a lot of the things done that he promised through his campaign."  Officer Chavez related an incident which occurred in February or March 1993.  He stated, "I had a DWI case with Municipal Court in Espanola, and he called me down there to Alamogordo and was asking me if I was gonna

make the court case and I said, 'Yeah, I'm gonna make it.   You
know, it's a subpoena.   I'll be in trouble if I don't go.'  And he
said, 'Well, okay.   If you do show up, can you come late?'. . . On
this occasion I told him uh, 'No, I'm gonna go to court.   Uh, if
he, if the subject wants, he can plea bargain when I get there.   Or
if he doesn't show up, I'll ask for a warrant.   But I'm gonna show
up,' and we left it at that and I did show up and I think he, he
did a plea agreement.   Anyway the, the guy was found guilty on the
DWI."


Officer William R. Parsons was interviewed on May 27, 1993, in
Santa Fe, New Mexico at the Office of Professional Standards and
Internal Affairs.   Officer Parsons was assigned to District Seven
from November 1990 through February 1992.    Officer Parsons
confirmed he had been contacted by Sergeant Rodella to dismiss
citations on at least two occasions, possibly three.   He stated,
**"I'd stopped this individual uh I believe on US 84 around Hernandez
somewhere and I had given him a speeding citation uh either the
next day or the day after that, Sergeant Rodella approached me and
asked if uh I remembered issuing the ticket and I told him I did,
he uh asked, I believe he asked the general demeanor of the guy
that I'd stopped and as I recall I said it was fine, he asked if I
would consider dismissing the ticket this was a friend of his,
somebody that he had known for sometime. . . I told him that I'd
look at the ticket uh and first I asked if he'd taken the PA or uh
court appearance and I believe Tommy told me that he'd taken the
court appearance, I told him I'd look at my notes and if he had not
uh given me any particular problems uh that I would take care of
the ticket, I would go ahead and dismiss it.   I believe that I did,
yes."**

Officer Parsons elaborated on why Sergeant Rodella's requests to
have citations dismissed did not **"alarm"** him.   He stated, **"It
didn't take long to understand that Tommy knows a lot of people in
the valley, I guess he's been there a long time, I don't know if he
was born there or not, but he knows a lot of people up there, and
uh given the fact that he knows so many individuals up there and
has personal contact with them for what ever reason, I guess no it
didn't surprise me or alarm particularly and I, inasmuch as that
was I was a Rookie at the time, first year with the Department."**
Officer Parsons indicated that during his tenure in District Seven
it was common knowledge that Sergeant Rodella would solicit all of
the officers at one time or another to dismiss citations.   He
stated, **"It was pretty generally accepted that that was something
that happened uh fairly frequently. . . . Again I just assumed this
was sort of the course of business, uh I had heard when I was in
the Academy that it did happen on occasion and no big deal was ever
made of it so I, like I say if I'd been alarmed about it I would of
made some specific notation, I wasn't so I didn't."**    Officer

Parsons indicated he did not feel compelled to dismiss the citation
saying, **". . . but no I felt no special obligation to do it for
Tommy."**  Officer Parsons indicated Sergeant Rodella would not
specifically ask him to **"dismiss"** a citation.  He would ask, **"Could
you help me out with this?"**  The interpretation though was that
Sergeant Rodella wanted the citation **"dismissed."**


Sergeant Quintin McShan was interviewed on May 21, 1993, in Santa
Fe, New Mexico at the Office of Professional Standards and Internal
Affairs.  Sergeant McShan was assigned to District Seven on two
separate occasions, from 1984 through 1986 or 1987 and then from
1990 through 1992.  Sergeant McShan, regarding whether he had
personal knowledge of the allegations brought against Sergeant
Rodella, stated, **"It hinges on soliciting.  I talked to him about
citations issued to people that uh, depending on your definition of
solicit. . . . No.  He never said, 'Dismiss a citation on this
individual.' . . . Um, he, what he did was he asked, you know, he
presented that, 'If it's okay with you, you can look it, using some
discretion on a particular violation.'  I remember that occurring
a couple of times. . . . This individual was good guy.  He's done
this, he's done that, he's alright you know.  Is there anything you
can do for him?  Along those lines."**  Sergeant McShan indicated
this did occur **"a couple of, three times in the past prior."**
Sergeant McShan did recall one of the requests from Sergeant
Rodella was regarding an male individual whom he had arrested for
DWI, but could not recall the specific name or date.  He recalled
he did not dismiss the citation or help the individual and let the
court take it's course of action.  He stated, **"I, I brought it up
with him and I told him I felt the guy was not, not a law-biding
citizen and uh, and nothing would be gained from a dismissal.  And
I didn't see any lee-way concerning his alcohol blood content so we
went for it and he said okay."**

Sergeant McShan indicated it was common knowledge within District
Seven that Sergeant Rodella would solicit many of the other
officers in the District to dismiss citations.  He also felt, **"It
would be pleasing to him** [Sergeant Rodella] **if I went and dismissed
it.  I thought that would mean more on a personal level.  He would
be uh, gratified if I stopped the prosecution or dismissed or
didn't show for court. . . . Just specific people with specific
ties to him."**  Sergeant McShan indicated these ties would be,
**"political and personal."**


Officer Mark Romero was interviewed on May 27, 1993, in Santa Fe,
New Mexico at the Office of Professional Standards and Internal
Affairs.  Officer Romero was assigned to District Seven from
December 1988 until December 1990.  Officer Romero stated, **"Thomas
Rodella did, did approach me on some violators that I had cited**

that were I guess in relation or, or friendship within uh, the Rodella family. And uh, he did a-asked or requested uh, I would uh, help him out by dismissing citations. . . . It was more than once but uh, I don't exactly know how many. . . . He'd uh, this approach was you know, if I'd help him out by, by how, you know, we're doing somethin' for this person that I had written the citation for." Officer Romero indicated his interpretation regarding Sergeant Rodella's requests' was, ". . . that of either voiding it or dismissing it. . . I, I do go along with his wishes." Officer Romero indicated he was aware Sergeant Rodella had contacted Lieutenant David Osuna regarding the dismissal of a citation. Officer Romero also indicated he did not recall any specific names or dates of individuals Sergeant Rodella was wanting citations dismissed on. He indicated he did not feel compelled to dismiss the citations, but did it as, a "courtesy for him." Officer Romero stated, "The only, pattern I picked up on the only time he ever notified me was actually when uh, it came to a citation in relation to, to avoiding one or, or, or dismissing one."

Officer John Briscoe was interviewed on May 24, 1993, in Las Cruces, New Mexico at the District Four Office. Officer Briscoe was assigned to District Seven from December 1988 until August 1992. Officer Briscoe indicated he had personal knowledge regarding Sergeant Rodella soliciting officers in District Seven and indicated that the Sergeant asked him to dismiss citations, "Six or seven times." Officer Briscoe indicated he did dismiss these citations as per Sergeant Rodella's request. He stated, "It was, a couple of times he says, 'It's a friend of mine. He's, you know, he's being good to me,' and you know, or something like that." Officer Briscoe felt Sergeant Rodella's motivation for wanting the citations dismissed was personal. Officer Briscoe was asked, "Did you feel compelled in any way to dismiss the citations?" He responded, "Yeah. . . . He's, he's a lot, he's like that you know. Do, it was just y-you know, little speeding tickets which come a dime a dozen. I didn't really uh, mind it that, and Tommy does hold it against you if you, if you would not seen it happen." Officer Briscoe felt if he had not dismissed the citations, he would have been on, "Tommy's bad side."

Regarding his personal knowledge about other officers in District Seven who had been approached by Sergeant Rodella, Officer Briscoe stated, "I think most of 'em were approached at some time or another." Officer Briscoe indicated no one else would request dismissal of citations like Sergeant Rodella.

Officer Joseph Schiel, III, was interviewed on June 2, 1993, in Espanola, New Mexico at the District Seven Office. Officer Schiel

has been assigned to District Seven since March, 1987.  Officer
Schiel acknowledged he had personal knowledge that Sergeant Rodella
solicited officers in District Seven to dismiss citations.  Officer
Schiel stated, **"Sergeant Rodella has approached me several times in
the past to request that I dismiss speeding citations or the, if I
could give him a break, give his friend a break on the, the
speeding citations.  Uh, it hasn't happened any time recently, it
was about a, about a year, year and a half ago I just got tired of
it and just quit you know, when they'd ask for dismissal, I'd say,
'No.' . . . But I've, I probably over the 6 years up here,
dismissed half a dozen speeding citations for him. . . . I, I
didn't keep track of 'em.  Um, they might at the Magistrate Court
office 'cuz I always signed a notice down there and I always made
a note that it was requested by Sergeant Rodella or whoever might
have requested.  I always make a note of my dismissals."**  Regarding
the method Sergeant Rodella would use he stated, **". . . Joe I need
to talk to you or if you have a minute can  I, can I talk to you.
. . . You wrote a friend of mine. . . . He, he's a good friend of
mine.  Can you, can you help me out on it."**  Regarding feeling
compelled to comply with Sergeant Rodella's requests he stated, **"I
never felt any pressure from him to, to do it.  And he never, never
made any threats or, or anything along those lines."**  Officer
Schiel elaborated on a conversation he had with Officer John
Briscoe in March 1993, and stated, **"Officer John Briscoe who used
to be stationed here, he's in Roswell now, called me and said,
'Joe,' he said, 'Tommy called me,' he said, 'I don't want you to,
if he's there I don't want you to let him know that you're talking
to me.'  He said, 'But he called me to ask if I would call you to
see if you would dismiss such and such citation.' . . . I said, 'I
don't dismiss citations for anybody any more you know.'"**

Officer Schiel indicated he interpreted Sergeant Rodella's requests
to **"Help him with a citation,"** to mean **"Signing a Notice of
Dismissal . . . or you know, not show up if it was a court
citation."**  Officer Schiel continued, **"So ev-everybody up here um,
has asked me at one, uh, not everybody, but the majority of
officers have asked me at one time or another you know, I could
help 'em out with a citation and I'm no different.  I've asked once
or twice myself.  But it got to the point that you don't mind once
or twice you know for somebody.  But it got to the point that it,
it was you know, it seemed like every other week that, that
Sergeant Rodella was calling and, or calling me into his office or
stopping me in the parking lot to ask if I could help him with this
or that you know and other. . . . When he would call me at home, I
knew what it was about.  When he'd call and say, 'Joe this is
Tommy,' I knew it was one of two things.  Either it was a shift
change or that I had written a, a citation that he wanted to see if
I could. . . . You know, and after a while it just got to the point
that it was so often that I just, I just didn't, I don't do it for
anybody any more.  You know I just, it got to be too much of a**

headache.  To the point that even the judge uh, Richard Martinez, when he'd see me come into the office and, and ask for a dismissal he would say, 'Oh, is this another one for Tommy?'"  Officer Schiel did confirm he was aware all of the officers in District Seven, Espanola proper, had on one occasion or another been contacted by Sergeant Rodella to dismiss a citation or citations. He stated, **"I think that I got approached and the officers that were in El Rito and Abiquiu probably got approached a little bit more because our patrol area is over towards Coyote and Gallina which is the area where Sergeant Rodella was stationed as a patrolman."**

Officer Joseph Griego was interviewed on May 26, 1993, in Espanola, New Mexico at the District Seven Office.  Officer Griego acknowledged he had personal knowledge regarding the allegations against Sergeant Rodella.  Officer Griego indicated that Sergeant Rodella had, in the past, asked him to dismiss citations on at least **"four occasions."**  Officer Griego indicated he did not dismiss the citations as requested by Sergeant Rodella and stated, **"Well reason being cuz uh some of the citations were for suspended drivers licenses and I can't dismiss that type of citations, plus the offenses that they were cited for, they were justified citations.  I told him I couldn't do it."**  Officer Griego indicated Sergeant Rodella had asked him to dismiss the citations because the individual was a **"Friend. . . . He didn't come right out and say dismiss them, he said can you help me with these citations?"**  Regarding his interpretation of exactly what Sergeant Rodella wanted done with the citations, he stated, **"Uh I assumed that meant uh either don't prosecute the citation or ask the Judge if he, if it can be dismissed."**

Officer Ralph Jurado was interviewed on May 26, 1993, in Espanola, New Mexico at the District Seven Office.  Officer Jurado has been assigned to District Seven for approximately one year.  Officer Jurado indicated he was aware of the allegations against Sergeant Rodella, but was unaware of any other officers in District Seven that were solicited.  Officer Jurado indicated Sergeant Rodella asked him to dismiss **"one"** citation sometime in January, 1993. Officer Jurado stated, **"It was a, it was uh, it was an accident kinda DWI, anyway it was a DWI thing just to go to court and help the girl out, and I said, well if she, you know, I'll do like the lawyers do it, get a plea going, I'll talk to the Judge and see what I can do as far as like the citations. . . . He wants her record cleaned off the scale. . . . I can't do that, and I told Sergeant Rodella I'm not gonna stick my neck out anybody, I will try and help her."**  Officer Jurado indicated her name was Nena Torres and that she was a friend of Sergeant Rodella's family. Officer Jurado indicated he did not feel compelled to help Sergeant Rodella.  He stated, **"No I didn't wanna help em, the way he asked**

me, I was like no I don't wanna help. . . . Well the way he talked
to me. . . . It was like, no I want it all clean, I don't want it
to be on her record."


Officer Joseph Madrid was interviewed on May 26, 1993, in Espanola,
New Mexico at the District Seven Office.  Officer Madrid has been
assigned to District Seven for approximately five and a half years.
Officer Madrid stated he did have **"some personal knowledge"**
regarding the allegations brought against Sergeant Rodella and
indicated Sergeant Rodella had asked him to **"fix the citation . .
. roughly maybe 3 times."**  Officer Madrid indicated he did dismiss
the citations upon Sergeant Rodella's requests because he felt he
had to.  He stated, **"Him being a Sergeant, it's like uh you know if
you don't do it something might come down in the future, you know,
and I don't need the hassle right now."**  Officer Madrid indicated
the individuals Sergeant Rodella wanted help with on their
citations, were **". . . friends of his needed a little bit of help."**
Officer Madrid indicated he knew of a **"few"** officers Sergeant
Rodella had contacted to dismiss citations.   Officer Madrid
indicated he knew Officer Andy Henderson had refused to help
Sergeant Rodella and that **"they don't talk at all."**


Officer Chris Valdez was interviewed on June 2, 1993, 1993, in
Espanola, New Mexico at the District Seven Office.  Officer Valdez
has been assigned to District Seven for four and a half years and,
specifically, Espanola proper for two and a half years.  Regarding
the allegations against Sergeant Rodella, Officer Valdez stated,
**"He's asked me to help people out with citations. . . . I'm also
aware of another situation that occurred in June of last year uh,
with a Luis Montoya."**  Officer Valdez was asked, **"Did the Sergeant
approach you and ask you if you would help him with a citation?"**
He responded, **"Yeah.  The only thing is I'm not playing words the
way, you know, the way he says it, the way he's asked is he's said
uh, 'So and so asked me to ask you to help him, him out with a
citation.'  He's never said, 'Help me out with this citation.'"**
Officer Valdez indicated his interpretation of Sergeant Rodella's
request was **". . . dismiss it or ask for a deferred sentence on,
on that part. . . . That's what I usually do is just, uh, recommend
a deferred sentence if I go in front of the judge."**  Officer Valdez
indicated Sergeant Rodella asked him approximately five times to
help out with citations.  He indicated he had refused to help
Sergeant Rodella on several occasions, and those were due to the
attitude of the particular individual.

Regarding Luis Montoya, Jr., Officer Valdez indicated that Mr.
Montoya was arrested by Officer Daniel Mora for resisting and
obstructing an officer on June 18, 1992.  He stated, **". . . the
lady started wanting to argue with me.  She asked, she wanted me to**

call Tommy Rodella at that time and I told her we already had a
supervisor.   I pointed out towards Joe and told her that was our
unit supervisor. . . . When we got here to the, to the office Tommy
was here, Tommy Rodella was here.   We were coming in, walking in
and Tommy came out and said if uh, we could, if I, if we could
help, if I could help out Luis Montoya."   Officer Valdez indicated
Sergeant Rodella was not on duty that particular evening and it is
unknown who contacted Sergeant Rodella.


Officer Miguel Mendez was interviewed on December 29, 1993, in
Espanola, New Mexico at the District Seven Office.  Officer Mendez
has been assigned to District Seven for approximately two years.
Regarding the allegations against Sergeant Rodella, Officer Mendez
stated, **"He approached me approximately two times um, he didn't
tell me to dismiss 'em.  He didn't ask me to dismiss 'em.  He just
asked me if there was anything I could do to help this person with
a citation.  If I could help 'em."**  Officer Mendez could not recall
any names or dates of the individuals Sergeant Rodella approached
him about.  He also indicated Sergeant Rodella **". . . never ordered
me to do anything like that.   He just asked me if there was
anything I could do for, for some, on a citation.  But um, he never
threatened me or anything like that."**


Officer Glen Trujillo was interviewed on December 21, 1993, in
Albuquerque, New Mexico at the District Five Office.   Officer
Trujillo was assigned to District Seven from February 1991 until
June 1993, when he was reassigned to District Five, Los Lunas Sub-
District.  Regarding the allegations against Sergeant Rodella, he
indicated Sergeant Rodella had approached him **"10 to 20"** times.
Officer Trujillo could not recall any exact names of individuals or
dates  Sergeant  Rodella  approached  him  on.    Officer  Trujillo
indicated Sergeant Rodella contacted him with his requests in June
1992 and that Sergeant Rodella did not contact any more after that
time to dismiss citations.  He stated, **'Cuz um, he accused me of,
of um, there was a, there was an interview, there was a interview,
or there was a Major that came down and talked to him about it--
dismissing citations and he believed that I had something to do
with it.  That I had possibly sent Tim Baughman to, to Headquarters
about him dismissing citations and he had um, thought I was the one
to blame for it.   So after that he never approached me on it."**
Officer Trujillo indicated Sergeant Rodella approached him within
the first month he was stationed in District Seven.   Regarding
Sergeant Rodella's approach, he stated, **"Just basically come up to
me and, and ask me you know, 'You either provide a citation or a
copy of the citation or the name,' and basically asked me if um,
I'd be willing to help him out when this individual, on this
certain individual, as far as you know, taking care of it.  Some of
them were friends or you know, um, relatives.  That's basically how**

he came about it." Officer Trujillo indicated he did refuse to **"dismiss a citation(s)"** for Sergeant Rodella and Sergeant Rodella was **". . . upset at, maybe at the point, but he didn't, he didn't hold a grudge on me."** Officer Trujillo did not feel compelled to assist Sergeant Rodella, because **". . . the time that I, that I helped him out, he wasn't even my Sergeant. He was a criminal agent."**

Officer Trujillo was asked, **"What, you had some tenure in District 07, do you recall ever having discussions with newer officers that were arriving in the district to warn them that Sergeant Rodella would be approaching to dismiss citations?"** He responded, **"Yeah, I, believe I mentioned to some officers just to be on the, you know, lookout. . . . Just telling them you know, 'Guys, Officer Rodella would, would approach you and you know,' I just told them just to be on the lookout for that basically. To me I felt uncomfortable when I'm dismissing citations."** Officer Trujillo indicated **"just the officers there in District 07, Espanola"** were approached by Sergeant Rodella. He was unaware of any officers that were not approached by Sergeant Rodella. Officer Trujillo did notify his immediate supervisor, Sergeant Forrest Smith, at the time of Sergeant Rodella's requests. Officer Trujillo indicated he has in the past dismissed citations not only for Sergeant Rodella, but for a lot of other officers within the Department.


Agent James Henderson was interviewed on December 29, 1993, in Espanola, New Mexico at the District Seven Office. Agent Henderson is currently assigned to the Criminal Investigations Bureau, District Seven. Prior to his assignment to CIB, he was assigned in Uniform in District Seven and has been in District Seven for approximately four and a half years. Agent Henderson indicated he had been approached by Sergeant Rodella to dismiss citations approximately five or six times, but was unable to recall the names or dates of the Sergeant's requests. Agent Henderson indicated the last time Sergeant Rodella asked him to dismiss a citation he was **"an Agent,"** not a Sergeant. Agent Henderson recalled that Sergeant Rodella would ask if he was in a **"ticket dismissing mood."** Agent Henderson stated, **"I would go down to Magistrate Court and just file a dismissal -- written dismissal. Uh, I don't remember if I ever talked to the judge. I just told the judge to let it go or whatever."**

Agent Henderson was asked, **"Okay. Did you ever feel compelled to help Sergeant Rodella?"** He responded, **"I was of the opinion with Tommy -- Tommy knows a lot of people in the valley and if you didn't dismiss it, it's gonna get taken care of somewhere. Uh, I was always of the opinion Tommy knows a lot of people in this valley and it was always my opinion and uh, if I didn't dismiss it, it's gonna get lost, it's gonna get six month ruled, maybe the**

judge 'll take care of it, uh, to me it was a lost cause. **At that point I would just go ahead and dismiss it instead of mess with the hassle."** Agent Henderson indicated that Sergeant Rodella would make these requests for his **"friends and relatives"** and that this practice **"happened a lot. . . . Uh, a lot of people got to be a hassle so many times, etcetera. But uh, it's, it's a big practice. I mean it was, it's not a, a small case here, a small case here. It was just everybody. I mean I can't think of one person that hasn't been approached by him."**

Officer Tommy Hooper was interviewed on May 27, 1993, in Santa Fe, New Mexico at the Office of Professional Standards and Internal Affairs. Officer Hooper has been assigned to District One, Santa Fe for approximately six months. Regarding the allegations against Sergeant Rodella, Officer Hooper stated, **"I have heard that he does ask people to dismiss citations, I had heard that."** Officer Hooper indicated he was contacted by Sergeant Rodella, but was unable to recall the name of the individual or the exact date. He stated, **"Okay, one day when I went 10-08, when I went on duty, Dispatch told me that uh I needed to call Sergeant Rodella, uh and so I got his number and uh before I called him, Officer Bob Parsons had me call himself, I did and Officer Parsons stated to me that uh the call was going to be in reference to dismissing citation, so he warned me ahead of time what it was probably going to be about. . . . So I did call Sergeant Rodella and it was in reference to dismissing a citation.** I don't remember the defendants name uh what Sergeant Rodella told me was that he talked to the guy and he told the guy that he couldn't ask me to dismiss the citation, but that he would talk to me about it and he told me that this certain individual had done some things for officers such as finding places for them to live, I believe he worked for the Highway Department and he had helped us out a lot, and he said that he told the guy he would talk to me about it." Officer Hooper indicated he interpreted Sergeant Rodella's request **". . . to dismiss the citation. . . . I said that I would uh I said that I would contact the guy and talk to him, or I think I told him to have the guy contact me, and that I would explain to him that I could not dismiss the citation, and I never heard anything from the guy since."** Officer Hooper indicated Officer Michael Hogan was present during the entire conversation with Sergeant Rodella.

Officer Eugene Alvarez was contacted in Las Cruces, New Mexico on January 10, 1994, at the District Four Office. Officer Alvarez indicated he was assigned to District Seven from June 1984 through January 1991, with a temporary assignment in Governor Security. Officer Alvarez indicated Sergeant Rodella was assigned to the Criminal Investigations Bureau during his tenure in District Seven and that he had very little contact with then Agent Rodella. He

also stated he did not have any personal knowledge regarding the allegations which have been brought against Sergeant Rodella, nor was he ever approached by Sergeant Rodella to dismiss any citations.

Retired Major Robert Trippeer was contacted in Las Cruces, New Mexico on January 10, 1994, at the District Four Office. Major Trippeer indicated he had a conference with Sergeant Rodella and Captain Joe Tarazon **"sometime in 1992."** Major Trippeer was not able to recall the date of this conference, but it did pertain to Sergeant Rodella's practice of soliciting officers to dismiss citations. Major Trippeer stated Sergeant Rodella vehemently denied any such actions. Major Trippeer did not have any documentation available to support the date or time of the conference.

Officer Daniel Mora was interviewed on December 29, 1993, in Espanola, New Mexico at the District Seven Office. Officer Mora has been assigned to District Seven for approximately one and a half years. Officer Mora indicated he was approached **"Three or four times"** by Sergeant Rodella, but could not recall names of individuals or dates of the requests. Regarding Sergeant Rodella's requests, Officer Mora stated, **"He just come up to me and asked me, 'Did you cite so and so today?' And I said, 'Well let me check my citations.' I checked my citations and I said, 'Yes, I did.'"**

Officer Daniel Mora was re-interviewed on February 1, 1994, in Espanola, New Mexico at the District Seven Office regarding information which arose regarding Luis Montoya, Jr. Mr. Montoya was arrested by Officer Mora on June 18, 1992, in the Cordova, New Mexico area. Officer Mora stated, **". . . Sergeant Tommy Rodella confronted me. I was, I was still with my coach officer and he confronted me and he asked me well what did he do. And I explained to him what happened. And apparently, from what I gathered, Sergeant Rodella knew the family. The Montoya family. And he asked me, he goes, 'Well is there anyway you can help him out?' And I said, 'Well there's nothing I can do Sarge because, you know, he, I had to physically fight him to get him handcuffed. He threw a punch at me.' I said I even chipped my tooth in the process. I said, and I knew, I don't know what to do. And he goes okay. Well there's nothing, if there's nothing you can do then there's nothing you can do, he goes. And I said well what do you mean by helping? What can I do to help him out? He goes well maybe possibly just saying in court that, you know, that after you . . . because after I did arrest him he was cooperative through the whole thing. And he said well maybe you can mention something like that in court. And I said well I'll see what I can do. And he said okay, well**

there's no." Officer Mora indicated he did not mention anything in court regarding Mr. Montoya's cooperative manner.


Officer Thomas Salazar was interviewed on December 29, 1993, in Espanola, New Mexico at the District Seven Office. Officer Salazar has been assigned to District Seven, Chama Sub-District for three years.  Officer Salazar indicated he had been approached by Sergeant Rodella to dismiss citations on **"approximately five occasions."**  Officer Salazar was unable to recall the names or dates in which Sergeant Rodella requested his assistance.  Officer Salazar indicated the best he could recall was that Sergeant Rodella has not approached since the fall of 1992.  Regarding Sergeant Rodella's approach, Officer Salazar stated, **"His terminology is uh, he called me 'Tocallo, uh, I need a favor.'  And I said, 'What is it?'  And he says, 'Well I, you caught this guy speeding.  Uh, do you think you can dismiss it?'  Pretty much.  I say, 'Yes.'"**  Officer Salazar dismissed the citations through the Magistrate Court and indicated he did feel compelled to dismiss them.  He stated, **"Personally I felt that if I didn't do it, somewhere down the line it would turn and bite me."**  Officer Salazar felt **"personally,"** that he knew of the **"troubles"** Officer Luechtefeld had with Sergeant Rodella and **". . . wanted no part of that.  I figured it was just easier to keep him out of my hair by doing it.  Uh, I felt that somewhere during time that it would really affect my career being that he is a supervisor and I still have to answer to him, uh, he could make my life a little bit more miserable by waking me up at four in the morning to come for a relay."**  Officer Salazar indicated that the relationship between Sergeant Rodella and the individuals he wanted the citations dismissed for were either friends or relatives.

Officer Salazar indicated he did have a conversation with Officer Eddie Luechtefeld regarding Sergeant Rodella.  He stated, **"What I was told was uh, uh, 'Be careful with Sergeant Rodella reference uh, he'll probably be calling you to dismiss tickets and it seems uh, the reason for this is he's doing people favors for the political outcome of his wife's doings.'"**  Officer Salazar indicated he was aware that Officer Ted Ulibarri and Officer Lionel Martinez had been contacted by Sergeant Rodella for the purpose of requesting citations be dismissed.  Officer Salazar did notify Sergeant Richard Martinez regarding Sergeant Rodella's requests. Officer Salazar indicated Sergeant Martinez told him to **"Be very careful of what you do."**  Officer Salazar's interpretation of Sergeant Martinez' warning was to be aware Sergeant Rodella was a supervisor.


Officer Lionel Martinez was interviewed on December 29, 1993, in Espanola, New Mexico at the District Seven Office.  Officer

Martinez has been assigned to District Seven, Tierra Amarilla for approximately three years.  Officer Martinez stated he had been approached by Sergeant Rodella to dismiss citations on two occasions.  Regarding these two occasions Officer Martinez stated, **"I couldn't specify on one of 'em.  But I specifically remember him calling me and asking me that  he needed help with a citation.  I believe it was a female.  Uh, on a second occasion I clearly remember because at the time I, that I wrote the a-the, the uh, citation, the subject or the violator stated that he was Sergeant Tommy Rodella's father-in-law.  Uh, later on, uh, S-Sergeant Tommy Rodella contacted me personally by phone at the Chama Sub-district office inquiring as to whether or not it would be possible for me to dismiss a citation on his father-in-law.  After uh, some discussion, uh, feeling repercussions, uh, I agreed to dismiss the citation on Mr. Rodella on Sergeant Rodella's father-in-law."**  Officer Martinez was unable to recall the name of the second individual, or the date of the violation.

Regarding the fear of repercussions on the part of Sergeant Rodella, Officer Martinez stated, **"Uh, S-Sergeant Rodella is a su-supervisor.  In absence of our supervisor in Chama, Sergeant Rodella on, on occasion is our active supervisor.  Uh, I've known Tommy all of my life and uh, I just felt like uh, when he asked for a favor, the implication was, 'Would you help me?  And if you don't, or else.'  That kind of uh, that's the attitude that I received when he asked me.  That's the reason why I th-I thought that in his method of asking, he may have implied, 'You better help me or else,' and that's the only reason I say that."**  Officer Martinez was asked, **"And did the 'or else' ever come about?"**  He responded, **"No, because I've uh, I dismissed it."**  Officer Martinez did notify Sergeant Richard Martinez regarding Sergeant Rodella's requests to have the citations dismissed.


Officer Theodoro Ulibarri was interviewed on December 29, 1993, in Espanola, New Mexico at the District Seven Office.  Officer Ulibarri has been assigned to District Seven, Chama for approximately two years.  Officer Ulibarri indicated he had been approached by Sergeant Rodella to dismiss a citation on one occasion.  He stated, **"What I can recall, he called me to help him on a citation.  Uh, somebody from the area in Espanola and when he called me uh, I had told him I had turned the citation in 'cuz the, the subject had done a penalty assessment, was not a court appearance, so I no long, no control over that citation and that was basically the end of the conversation."**  Officer Ulibarri indicated he was contacted by Sergeant Rodella's father, Robert Rodella, who is employed with the Espanola Police Department.  He stated, **"Um, his father Robert Rodella, works with Espanola PD.  He contacted me to help me on a citation that Officer Leo Martinez gave um, even though it was for Tommy Rodella. . . . Uh, Robert**

**Rodella told me that uh, he needed some help on a citation.  If I could talk to Leo on a citation."**  Officer Ulibarri indicated Sergeant Rodella never did contact him directly regarding this particular incident.  Officer Ulibarri was unable to recall the name or date of the citation.  When Sergeant Rodella contacted Officer Ulibarri regarding the penalty assessment citation, he indicated Sergeant Rodella stated to him he needed a favor on the citation.  Officer Ulibarri indicated he was aware most all of the officers in District Seven, specifically, Espanola and Chama had been contacted by Sergeant Rodella to dismiss citations.


Officer Gerald Anderson was interviewed on January 3, 1994, in Espanola, New Mexico at the District Seven Office.  Officer Anderson has been assigned to District Seven, Ojo Caliente, for approximately one year.  Officer Anderson indicated he had been contacted approximately three times by Sergeant Rodella to dismiss citations.  Officer Anderson stated, **"Yes.  I, I had stopped uh, Alfred Montoya on State Road 68, uh, May 15, 1992, uh, for speeding.  I did cite Mr. Montoya for exceeding the speed limit. After this uh, citation, I was confronted uh, by Sergeant Rodella. I don't recall if it was that particular day or exactly when the day was he had contacted me requesting to know if I could uh, assist him with the dismissing of the citation.  And he had uh, mentioned the fact that uh, Mr. Montoya was a school board member and uh, and that if I could help him dismiss a citation.  So I advised him, yeah that I, I would.  I dismissed the citation for him and I went to the Magistrate and uh, filed uh, what I thought was a criminal dismissal and later I was contacted by Judge Martinez to meet with him in his office, which I did and Judge Martinez, Richard Martinez advised me that I had uh, dismissed on a civil dismissal, not on a criminal dismissal, therefore, it was invalid.  And at that time he then requested that I not dismiss the citation.  And asked me at that point if Sergeant Rodella had asked me to dismiss it and I said 'Yes he did.'  And he advised, he said, 'I thought, I thought so.  I thought that he had asked you, he would ask you to dismiss this for him.'  So at that point I didn't uh, I didn't file a dismissal on it and uh, and then at that point uh, s-Judge Martinez had had  asked me uh, had some concerns and advise, he stated to me that, that there had been several people that had called his office and uh, asked him about citations, whether or not they have gone through to him.  And uh, and he stated, 'What do you mean?'  And I say, 'Well we're just calling to check whether or not this citation was sent to your office because Sergeant Rodella said that he would take care of the citation,' and he mentioned that to me on that same day.  And then he also mentioned to me that uh, the concern of other officers within the district about uh, being unsatisfied you know, being, being somewhat unsatisfied about the fact that uh, Sergeant Rodella was**

confronting them so much about dismissing citations and he expressed that to me as well."

Officer Anderson was also approached by Sergeant Rodella on a DWI citation, although Officer Anderson could not recall the individual's name or the date of the arrest. Officer Anderson advised Sergeant Rodella that the District Attorney's Office was involved in the prosecution and he could not help him out. The third incident involved Gary Martinez who Officer Anderson had arrested for DWI. He stated, ". . . Tommy didn't directly approach me on this one. Uh, my particular reason for, for thinking why he didn't was because of the fact that some of this had, had previously got started up, so basically what he did was, my, it's my opinion that he contacted his father, who contacted Joe Madrid, who contacted me concerning Gary Martinez and that's, uh, Joe said that uh, Sergeant Rodella's father contacted him and requested him call me and ask me if I'd dismiss the citation on Gary Martinez. . . . But I did not uh, did not dismiss the citation on that individual." Officer Anderson indicated Sergeant Rodella would approach him by asking if he could help him out with a particular individual. Sergeant Rodella would tell him that he knew the person real well, or he would ask how he could help out a particular individual.

Officer Anderson indicated he did feel compelled to help Sergeant Rodella. He stated, "Uh, somewhat I, I did feel obligated that you know, uh, at the failure to dismiss the citations, might result in some unfairness in you know, in the future with him. I know I worked with Ser-hu, Sergeant Rodella as a patrolman and as well as a Sergeant and I'm, I know his capabilities and, and what, what he can do and what he'll try to do to an individual that, and maybe you know, tends to disagree with him. So I felt somewhat compelled to dismiss it because I felt in the event that I didn't that uh, you know in, in, in the future that I could uh, suffer for, for that." Officer Anderson related he had observed Officer Luechtefeld's relationship with Sergeant Rodella deteriorate and had observed Sergeant Rodella "embarrass" Officer Luechtefeld in front of Sergeant Rodella's father-in-law and other police officers in the area at the Cowboy Restaurant, and he did not want to be put in this situation with Sergeant Rodella. Officer Anderson based the deterioration on Officer Luechtefeld failing to help Sergeant Rodella on a citation. He stated, "The one particular individual uh, Freddie Montoya, I feel that, that uh, he was politically tied in with, with Sergeant Rodella and uh, his wife Debbie Rodella and I felt that was one of the particular reasons why he was wantin' the citations dismissed so bad and that was why, another reason why s-Judge Richard Martinez did not want it dismissed. Uh, it was a battle of uh, of politics here."

Officer Andrew K. Evaskovich was interviewed on January 3, 1994, in Espanola, New Mexico at the District Seven Office.  Officer Evaskovich has been assigned to District Seven, Espanola for approximately one year.  Officer Evaskovich indicated he had been approached by Sergeant Rodella in May 1993 to assist Eddie Velarde on a speeding citation.  He stated, **"Uh, Sergeant Rodella asked me to help him out with the citation.  He said that uh, Mr. Velarde was a good guy and you know, it, it he would appreciate it if I would help him out with it and I told Sergeant Rodella to advise Mr. Velarde to go ahead and make the uh, go to the arraignment for the citation and then we would uh, discuss it later.  Um, my reasons for doing this is because I be-felt that if, I had directly told Sergeant Rodella no, that uh, I would suffer uh, suffer repercussions."**  Regarding his reasons for fearing repercussions, Officer Evaskovich stated, **"Because uh, Eddie Luechtefeld uh, was approached by Sergeant Rodella to dismiss a citation.  I believe it was a DWI citation and he refused and after that, he starting having problems with uh, Sergeant Rodella as far as their working relationship."**

Officer Evaskovich was asked, **"Were you aware, or are you aware that it was common practice for Sergeant Rodella to ask almost all the officers within District 07 proper, stationed in Espanola, to dismiss a citation or to help him with a citation?"**  He responded, **"Yes, beca-well that was one of the first things that was pointed out to me when I came to district.  Was that Sergeant Rodella did have a, a citation or dismiss a citation.  For approaching officers and asking them out with citations."**  Officer Evaskovich indicated Sergeant Rodella did not make any requests regarding the dismissal of citations after May 1993, **"I believe it's because uh, word got out that there is an investigation being conducted against him for soliciting dismissal of citations."**  Regarding Sergeant Rodella's approach, Officer Evaskovich said it was, **"Could you help me out with this?  Or could you help him out as a favor to me?"**

Sergeant Joe Mascarenas was interviewed on January 5, 1994, in Santa Fe, New Mexico at the Office of Professional Standards and Internal Affairs.  Sergeant Mascarenas has been assigned to District Seven for approximately nine and a half years.  Sergeant Mascarenas indicated Sergeant Rodella has never asked him to help him with a citation or dismiss a citation, **". . . probably simply because I, I don't write that many citations."**  Sergeant Mascarenas indicated Officer Eddie Luechtefeld had spoken to him regarding Sergeant Rodella's requests to dismiss citations.  He stated, **"He just mentioned the fact that he uh, that uh, Sergeant Rodella had uh, uh, didn't like him simply because he had refused to help somebody with a ticket I think.  And I think he mentioned it was a DWI and I'm, I'm not sure."**  Sergeant Mascarenas indicated it was common knowledge.  He stated, **". . . but since my office is right**

RODELLA_SP_GJS 000255

next to the field office, I hear a lot of these conversations going on.  Y-yeah he would say you know, you know, nobody ever said dismissed, you know, but they did say that he had asked them to help the people out."

Sergeant Richard E. Martinez was interviewed on January 13, 1994, in Santa Fe, New Mexico at the Office of Professional Standards and Internal Affairs.  Sergeant Martinez has been assigned to District Seven, Chama Sub-district for approximately ten years.  Sergeant Martinez indicated that Sergeant Rodella has not approached him to dismiss a citation or help him with a citation.  He did indicate he had personal knowledge that Sergeant Rodella had solicited officers under his direct supervision to dismiss citations.  Regarding a conversation Sergeant Martinez had with Officer Thomas Salazar, he stated, **"Okay. I recall that he approached me wanting to know if it was okay for him to dismiss a ticket upon Sergeant Rodella's request.  I don't recall who the citation was written to or why, but uh I advised Officer Salazar that I, myself would not do it. That it was up to him.  Well yeah I advised him that it was not uh, proper to dismiss a citation once it's written and that uh that I wouldn't do it.  If I recall right, later on he told me that uh, that Sergeant Rodella was const, uh, always after him on that ticket. He finally had dismissed."**  Sergeant Martinez indicated he has overheard the officers under his direct supervision, **". . .**

**talking with one another about him calling them and asking them to help him out on a citation."**

Lieutenant David Osuna was interviewed in Santa Fe, New Mexico on January 3, 1994, at the Office of Professional Standards and Internal Affairs in the Headquarters building.  Lieutenant Osuna was assigned to District Seven in October 1978 and left in 1983. He was reassigned in January 1985 and left in March 1987. Lieutenant Osuna was then reassigned as a Sergeant in the Criminal Division, District Seven, in June 1988 and transferred to Santa Fe, New Mexico in March 1991.  During the course of Lieutenant Osuna's tenure in District Seven he indicated Sergeant Rodella, **". . . never asked me to dismiss any citations or, or I shouldn't say 'Dismiss,' or to assist in uh, helping out on the citations.  Uh, the only time that uh, Tommy asked me to help him out with a citation was, I would say about a year ago sometime.  I, I don't know the exact date.  I issued a, I was traveling up to Tierra Amarilla to do a Detention Center and I stopped some guy from Canones and I gave him a citation for speeding and uh, I'm not sure if it was that night or the next night that Tommy called me or got a hold of me and, and uh, asked me if I would help him out on the citation.  I voided it."**  When asked, **"Were you aware as his supervisor that he was contacting officers to dismiss citations for**

**friends or relatives?,"** he responded, **"I knew that he was contacting other officers uh, to help him out on the citations."**


Officer Barbara Y. Anderson was interviewed on December 29, 1993, in Santa Fe, New Mexico at Headquarters in the Office of Professional Standards and Internal Affairs.  Officer Anderson was assigned to District Seven from August 1991 through May 1992.  Officer Anderson indicated that during her tenure in District Seven Sergeant Rodella was initially a Criminal Agent and then promoted to Sergeant in the Uniform Division.  Officer Anderson indicated Sergeant Rodella did solicit or asked her to help with citations.  She indicated this occurred on **"two occasions."**  Officer Anderson indicated she did not recall any of the names of the individuals or the dates Sergeant Rodella requested assistance in dismissing these citations.  Officer Anderson indicated she believes she assisted Sergeant Rodella by either voiding the citations or dismissing them, but she could not recall.  She indicated she did not feel compelled or obligated to help him with the citations and that she did not have any personal knowledge Sergeant Rodella was soliciting other officers in the district to dismiss citations.


Lieutenant Eloy C. Lopez was interviewed in Santa Fe, New Mexico on January 3, 1994, in the Office of Professional Standards and Internal Affairs.  Lieutenant Lopez was assigned to District Seven as the Assistant District Commander from July 1988 through April 1993.  Regarding the allegations brought against Sergeant Rodella he stated, **"I don't have any direct knowledge of that.  The only thing I recall is that uh, some of the comments uh, rumor in the squad room.  But there was no single officer that came to me and said directly, 'The Sergeant had asked me to dismiss uh, a John Doe or Jane Doe citation.'"**  Lieutenant Lopez was asked if he recalled a conversation Lieutenant Forrest Smith claims to have had with him regarding Sergeant Rodella's alleged requests for dismissal or cancellation of citations and he stated, **"Sergeant Smith mentioned to me at one time perhaps during the summer of ninety--I'm trying to say '92 after a State Police function at, at Albuquerque, that the subject had come up that Rodella has uh, had been asking uh, quite a few officers to dismiss tickets uh, for different reasons. And uh, I remember that after that, Major Trippeer came on board out of Espanola supposably at the uh, direction of the Chief to talk to Rodella.  Something to that effect.  And um, I don't remember an initial uh, complaint submitted by the receiving supervisor which was uh, Forrest Smith, but I believe that was the context of our uh, conversation."**  Lieutenant Lopez indicated he made Captain Joe Tarazon aware of his conversation with Sergeant Smith regarding Sergeant Rodella soliciting the officers in District Seven to dismiss citations.  Lieutenant Lopez indicated he was never approached by Sergeant Rodella to dismiss any citations.

Lieutenant Lopez was unaware of the tension between Officer Eddie Luechtefeld and Sergeant Thomas Rodella.   Regarding the relationship he stated, **"I believe in the beginning they were pretty good friends.   And towards the end uh, things were not working out and I transferred uh, Luechtefeld under the direction of um, Forrest uh, Smith.   I think what happened is that uh, Luechtefeld came on board and then he didn't submit seven day recaps perhaps for a month and a half or something and then in the tracking of those uh, recaps and dailies, he could not come up with anything to reconstruct his activity.   And uh, he started to put it together and I guess all the inquiries by uh, the Sergeant Rodella at that time, somehow or another started to create uh, bitter tensions between both of them and I think eventually in December we ended up getting the recaps that, that we were missing back in July if I'm not mistaken."**   Regarding Mr. Ross Borrego, Lieutenant Lopez stated,  **"I believe that name was mentioned at one point, but I don't remember the uh, context of this Ross Borrego as to uh, what he was directly involved, but that name uh, rings a bell."**


Officer Mikell M. Hogan was interviewed on January 27, 1994, in Truth or Consequences, New Mexico at the Sub-District Office. Officer Hogan was assigned to District Seven from December 1, 1988 through November 21, 1992.  Officer Hogan indicated that during his tenure in Abiquiu, New Mexico Sergeant Rodella approached him to dismiss or help with citations approximately two times, but he could not recall the dates or names of the individuals.   Officer Hogan indicated Sergeant Rodella's requests would have been in 1989, but again he could not recall the exact date.   Regarding Sergeant Rodella's requests he stated, **"His approach was pretty straight forward. He would uh, he'd just ask uh, he would uh, uh, state uh, that a citation was given to a friend of his or an acquaintance of his and uh, he would request uh, some sort of help with that particular citation."**

Regarding the allegations that Sergeant Rodella solicited officers in District Seven to dismiss or cancel citations, Officer Hogan stated, **"Um, it became common knowledge uh, within District Seven that uh, that Tommy Rodella would ask uh, uh, anybody, anybody in the Uniform Division uh, who was capable of issuing a citation for assistance uh, to help get that suspect or subject out of a citation.   Tommy would, would uh, would do that.   It was pretty knowledgeable."**   Officer Hogan indicated that although Sergeant Rodella was in the Criminal Division during his tenure in Abiquiu, New Mexico, he would still solicit the officers within the District.

Officer Hogan elaborated on a phone conversation he was privileged to during the time he was stationed in Santa Fe, New Mexico, however he could not recall the exact date or name of the

individual Sergeant Rodella was requesting Officer Hooper's assistance on. Initially, Officer Hogan overheard dispatch contact Officer Hooper on the radio to call Sergeant Tommy Rodella in Espanola, New Mexico. He stated, **"I uh, I overheard, I believe it was dispatch, they had uh, they gave uh, Officer Hooper uh, the call to return Sergeant Rodella's uh, telephone call and uh, I, I told Officer Hooper that uh, I would, I guaranteed him, promised him that uh, that Sergeant Rodella was gonna ask him for uh, some sort of assistance on a citation that he, that Officer Hooper issued to somebody that Tommy knows. He was gonna ask for help on that. . . . After I enlightened him that that's what Sergeant Rodella was, was going to ask uh, he had a, had a few minutes to think about it before returning the call. And uh, his response to uh, Sergeant Rodella was that he would have to get back to him on it. . . . I overheard the conversation because Officer Hooper had him on the speaker phone and uh, I, I, me, myself and Officer Hooper were the only ones in the Squad Room in the District 01 office and uh, specifically the conversation consisted of uh, Sergeant Rodella uh, asking Officer Hooper to uh, help him with a citation on a subject uh, that was apparently a friend of Tommy's, Rodella's."** Officer Hogan corroborated Officer Hooper's statement regarding the phone conversation which took place between Officer Hooper and Sergeant Rodella.


Sergeant Thomas R. Rodella was interviewed on February 9, 1994, in Santa Fe, New Mexico at Headquarters. Sergeant Rodella is currently assigned to District Seven as a Sergeant in the Uniform Division. Sergeant Rodella was promoted to Sergeant and assigned to District Seven in February 1992. Prior to Sergeant Rodella's promotion he was assigned as a Criminal Agent in District Seven. Sergeant Rodella was asked, **"Have you ever solicited any officers to dismiss or cancel a citation or citations?"** He responded, **"No I don't feel I've ever asked any one to dismiss citations."** Sergeant Rodella was asked, **"Have you ever asked any officers in District Seven or any other District to help you dismiss or cancel a citation for a good friend or relative of yours?"** He responded, **"I've never asked anyone to dismiss any citations, I have delivered messages, and I have explained to officers that uh, in fact there has been friends and relatives that have asked for help with citations."** Sergeant Rodella elaborated on this first issue. He stated, **"Basically Lieutenant uh, when I've talked to officers uh, I've done one of two things either I've uh, explained to them that uh, such a person is asking for help if they can help them out. On other occasions I've uh, I've told 'em that I'm not asking them to dismiss citations, and that uh, basically delivering a message."**

Sergeant Rodella was asked if he was familiar with Mr. Ross Borrego and he indicated he knew who he was, but was not associated with him in any other manner either professionally, socially or

otherwise.  Sergeant Rodella was aware Officer Luechtefeld had
arrested Mr. Borrego for Driving While Under the Influence of
Intoxicating Liquor on July 5, 1992 within the city limits of
Espanola, New Mexico.  Sergeant Rodella was asked, **"Did you have
conversations with Officer Luechtefeld regarding Mr. Borrego's
arrest?"**  He stated, **"Yes I did. . . I recall that uh, I can't
recall the circumstances, but I do recall that Eddie Luechtefeld
and I were riding to Santa Fe together in one unit.  And he brought
up the fact that Municipal Judge Delores Vigil and Robert Seeds who
was, I believe a councilman at the time, had asked him to dismiss
the citation for Ross Borrego."**  Sergeant Rodella did not recall
ever having told Officer Luechtefeld the charges against Mr.
Borrego were going to be **"dismissed anyway."**  Sergeant Rodella
stated he did not ever have a conversation with Officer Luechtefeld
attempting to explain he should just go ahead and dismiss the
charges against Mr. Borrego.  Regarding Officer Luechtefeld's
statement that **"Mr. Borrego is worth sixty votes,"**  Sergeant
Rodella indicated he never made the aforementioned comment.
Sergeant Rodella was asked, **"Did you express to Officer Luechtefeld
that the judge was catching heat on this one and that if Officer
Luechtefeld helped her out, should he ever need an extra favor or
should he need the judge to be a little more harsh on somebody that
she would owe him one?"**  He responded, **"I may have said something
along those lines, but I don't recall if those would have been the
words I used."**  Sergeant Rodella indicated he did not have any
influence on the Municipal Judge to have Mr. Borrego's charges
reduced or dismissed.  Sergeant Rodella was asked, **"Did Officer
Luechtefeld's refusal to help you with Mr. Borrego upset you to the

point you would have initiated retaliation against Officer
Luechtefeld?"**  He responded, **"No."**

Regarding Sergeant Rodella's relationship with Officer Luechtefeld.
Sergeant Rodella was asked, **"Do you get along with Officer
Luechtefeld?"**  He responded, **"We worked together, uh co-workers
would have been our relationship."**  Sergeant Rodella indicated he
did not socialize with Officer Luechtefeld.  He stated, **"I don't
even recall ever having had lunch with him."**  Sergeant Rodella
supervised Officer Luechtefeld for **"a few months."**  Sergeant
Rodella was asked, **"During that time did you have the occasion to
counsel, warn or otherwise document Officer Luechtefeld for either
submitting late reports or failing to submit reports?"**  Sergeant
Rodella responded, **"Yes I did. . . . I know that I documented it on
my dailies when I talked to him, I don't know that I, I don't
recall if I documented everytime I talked to him but, I know it's
documented in my dailies. . . . Basically it would have been
something to the effect that I uh, spoke with Officer Eddie
Luechtefeld uh, in regards to late reports."**  Sergeant Rodella
indicated he recalled several occasions when he had to contact
Officer Luechtefeld regarding his late reports.  Sergeant Rodella

indicated there were instances when Lieutenant Lopez would bring to
his attention outstanding pending reports from Officer Luechtefeld.
Sergeant Rodella was instructed by Captain Joe Tarazon and
Lieutenant Eloy Lopez to **"write Officer Luechtefeld up"** for
continually submitting late reports.  Sergeant Rodella drafted the
complaint form, dated August 18, 1992, which alleged Officer
Luechtefeld had not submitted seven day recaps along with daily
activity logs from July 1992 through August 1992.  Sergeant Rodella
did not know where the complaint went after he submitted it to
Lieutenant Eloy Lopez.  He did not recall if an investigation was
ever done in conjunction with the complaint.  Sergeant Rodella
explained he was not sure why the complaint was filed on August 18,
1992 for reports which were due on August 1, 1992.  He explained
further that the sergeants in District Seven have separate baskets
and when the reports are put in them all of the sergeants check one
another's reports, regardless of which sergeant the officer's
supervisor.  He was unaware of which reports Officer Luechtefeld
had not submitted.  Sergeant Rodella advised he was familiar with
Mr. Ben Chacon to whom Officer Luechtefeld issued citation number
790-1262700, dated June 6, 1992.  With regard to this citation
Sergeant Rodella was asked, **"Did you ask Officer Luechtefeld to
cancel or dismiss this citation?"**  He responded, **"No"** and he did
not recall ever seeing the citation issued to Mr. Chacon.

The following list of officers were interviewed in conjunction with
this investigation.  Sergeant Rodella was asked specific questions
regarding each officer.

| | |
|---|---|
| Lieutenant Forrest Smith | Officer Fred De La O |
| Lieutenant Eloy Lopez | Officer Larry Chavez |
| Lieutenant David Osuna | Officer Barbara Anderson |
| Sergeant Joe Mascarenas | Officer William Parsons |
| Sergeant Richard Martinez | Officer Mark Romero |
| Sergeant Quintin McShan | Officer John Briscoe |
| Officer Joseph Schiel | Officer Joseph Griego |
| Officer Ralph Jurado | Officer Joseph Madrid |
| Officer Chris Valdez | Officer Miguel Mendez |
| Officer Glen Trujillo | Agent James Henderson |
| Officer Tommy Hooper | Officer Eugene Alvarez |
| Officer Daniel Mora | Officer Thomas Salazar |
| Officer Lionel Martinez | Officer Theodoro Ulibarri |
| Officer Gerald E. Anderson | Officer Andrew Evaskovich |
| Officer Mikell Hogan | |

Sergeant Rodella was asked to respond to the following statement.
**"Lieutenant Forrest Smith has stated that when you were in the
Criminal Division, that you had gone to him and asked him if he
would do you a favor and dismiss or cancel citations on two
occasions.  Is this true?"**  He responded, **"I don't recall the
incidents."**

Sergeant Rodella was asked to respond to the following statement. **"Officer Freddie De La O has stated that you asked him on approximately five or six occasions to cancel or dismiss citations for good friends of yours. Is this true?"** He responded, **"I mentioned two citations to Officer Eddie Luec-uh, or Officer Freddie De La O."** Sergeant Rodella could not recall the names of the individuals he discussed with Officer De La O. The citations were shown to Sergeant Rodella. The first citation was issued to Dennis Silva. Regarding this citation, Sergeant Rodella stated, **"I never asked him to dismiss that citation. Uh, Mr. Silva came to me and told me that he wanted to change it from a penalty assessment to a court citation."** The second citation, number 790-1606363, was issued to Milner Branch by Officer De La O on March 16, 1993. Regarding this citation, Sergeant Rodella was asked, **"Did you ask Officer De La O to cancel or dismiss this citation?"** He responded, **"No."**

Sergeant Rodella was asked to respond to the following statement. **"Officer Larry Chavez has stated that you asked him on at least twenty occasions, possibly even more to cancel or dismiss citations for good friends of yours. Is this true?"** He responded, **"I never asked him to dismiss any citations. I may have discussed citations with him, but I never asked any one to dismiss citations."** Sergeant Rodella was asked if Officer Chavez was lying in making this statement. He responded, **"I think he's misleading by saying, that I asked him to dismiss citations."**

Sergeant Rodella was asked to respond to the following statement. **"Officer William Parsons has stated that you asked him on at least two occasions possibly three to dismiss or cancel citations. Is this true?"** He responded, **"The same thing with Officer Parsons, uh, I may have discussed citations with him. But I never asked him or ordered him to dismiss citations."**

Sergeant Rodella was asked to respond to the following statement. **"Sergeant Quintin McShan has stated that you asked him on a couple of occasions to dismiss or cancel citations. Is this true?"** He responded, **"I don't agree with the wording, uh, that's being used uh, asked him to dismiss citations, no."** He was asked if Sergeant McShan was lying in making this statement. He responded, **"I don't believe that uh, he's being correct in saying that I asked him to dismiss."**

Sergeant Rodella was asked to respond to the following statement. **"Officer Mark Romero has stated that you approached him on more than one occasion to dismiss or cancel citations for relatives or friends of yours. Is this true?"** He responded, **"I don't ever recall having talked to Officer Mark Romero on any citations."** He was asked if Officer Romero is lying by making this statement. He responded, **"Again, I believe that uh, if there was any discussion,**

the fact that he's saying that I asked him to dismiss is misleading."

Sergeant Rodella was asked to respond to the following statement. **"Officer John Briscoe has stated that you approached him six or seven times to dismiss or cancel citations for friends of yours. Is this true?"** He responded, **"Officer Briscoe I discussed citations with him, but uh, same thing I, believe his statement is misleading I never asked him to dismiss citations."** He was asked if Officer Briscoe is lying by making this statement. He responded, **"I believe he's being misleading if that's his statement."**

Sergeant Rodella was asked to respond to the following statement. **"Officer Schiel has stated that you approached him about a half a dozen times to dismiss or cancel citations for friends of yours. Is this true?"** He responded, **"Officer Joe Schiel, if that's his statement, is being misleading I never asked him to dismiss citations."** When asked if he thought Officer Schiel was lying by making this statement, he responded, **"If that in fact's his statement, he's being misleading."**

Sergeant Rodella was asked to respond to the following statement. **"Officer Joseph Griego has stated that you approached him on at least four occasions to dismiss or cancel citations. Is this true?"** He responded, **"Officer uh, Joseph Griego again I may have discussed citations with him but, I never asked him to dismiss citations."** Sergeant Rodella was asked if he thought Officer Griego was lying by making that statement. He responded, **"If this in fact is his statement, it's been misleading."** Sergeant Rodella was asked to respond to the following statement. **"Officer Ralph Jurado has stated that you approached him on at least one occasion to dismiss a citation or cancel it. Is this true?"** He responded, **"If that in fact is his statement, it's been misleading."** Sergeant Rodella was shown a copy of the accident report and DWI citation issued to Elena Torres. She was involved in an accident on January 13, 1993, on State Road 399. Sergeant Rodella indicated he did not actually know Ms. Torres, but knows her father. He was asked, **"Did you ever contact Officer Jurado to dismiss or cancel the charges against Ms. Torres?"** He responded, **"No."** Sergeant Rodella was asked if Officer Jurado was lying by making this statement. He responded, **"If in fact that's his statement he's been misleading."** Sergeant Rodella provided information regarding this particular matter. Sergeant Rodella indicated he came upon the accident involving Ms. Torres, and due to his lack of experience in the detection of DWI drivers, he had requested Officer Jurado respond to the scene, handle the accident, and perform the necessary tests in order to determine whether Ms. Torres was DWI. Sergeant Rodella indicated he did have conversations with Officer Jurado about the charges filed against Ms. Torres. He stated, **"I believe it was, it**

was sometime later I don't believe it was that night. . . Basically I, what I told Officer Jurado and, again, I don't, I don't recall the exact words, but I asked Officer Ralph Jurado that uh, if, if it was possible to help her with what he could, was never any mention about dismissing the citation." Sergeant Rodella was asked to elaborate and explain what he meant by asking Officer Jurado to help Ms. Torres out with what he could.  He responded, **"Well, a lot of times the judges when it comes uh, when it comes time for uh, sentencing they ask the officers their opinion.  And it's at that time the officer can say the person was was uh, very helpful the officer, or or the person didn't resist uh, and leave it up to the uh, judge as opposed to asking for a harsh sentence."**  Sergeant Rodella was asked, **"In essence are you asking the officer to persuade the judge that the individual should be given a lighter sentence, is that what your intent was?"** He responded, **"I wouldn't uh, I wouldn't agree with that in it is self in saying that I asked the officer to be lenient with her and Officer Ralph Jurado under-should have understood cause I explained to him exactly what I meant,  I, I told him that uh, if he could offer what ever he had offered other people under the uh, the uh, circumstances.  In other words I, I just want to make it clear that this arrest would have never been made if I wouldn't have called Officer Ralph Jurado.  It was I that called Officer Ralph Jurado to the scene."**

Sergeant Rodella was asked to respond to the following statement. **"Officer Joseph Madrid has stated that you approached him on approximately three times to dismiss or cancel citations and has also indicated that he felt compelled to dismiss these citations because you are a Sergeant with the New Mexico State Police.  Is this true?"** He responded, **"Uh, again as far as Officer Joe Madrid goes, I never asked him to dismiss any citations I discussed, I may have discussed citations with him.  As far as Officer Joe Madrid feeling compelled uh, I never, I don't recall ever having been his Sergeant uh."**  Sergeant Rodella explained Officer Madrid has never been under his direct supervision.  It was explained to Sergeant Rodella his authority is not limited to the officers that he processes reports for and, in fact, that it extends to the Chama Sub-District and the Taos Sub-District, as well as all of the officers assigned to the Espanola area.  Sergeant Rodella was asked if he felt Officer Madrid was lying by making the statement.  He responded, **"I don't think he's being truthful in in saying that uh, I compelled him in anyway if he felt compelled uh, he felt compelled but I never did anything to to make him feel compelled."**

Sergeant Rodella was asked to respond to the following statement. **"Officer Chris Valdez has stated that you approached him on approximately five occasions to cancel or dismiss citations.  Is this true?"**  He responded, **"If that in fact is Officer Valdez' statement.  I never asked him to dismiss any citations."**  Regarding whether Sergeant Rodella felt if Officer Valdez was lying by making

the statement.  He responded, **"If this is his statement it's
misleading."**

Sergeant Rodella was asked to respond to the following question.
**"Officer Miguel Mendez has stated that you approached him
approximately two times to help him with individuals on citations.
It was stated that you asked the Officer, if he could help these
individuals. Is this true?"** He responded, **"What I would have told
Officer Mendez is if he could help these people, if that's what the
statement says, yes it's true."**

Sergeant Rodella was asked to respond to the following statement.
**"Officer Glenn Trujillo has stated you approached him on
approximately ten to twenty times to cancel or dismiss citations
for friends or relatives of yours.  Is this true?"** He responded,
**"No."** He was asked if he thought Officer Trujillo was lying.  He
responded, **"If that in fact is his statement it's misleading."**

Sergeant Rodella was asked to respond to the following statement.
**"Officer James Henderson has stated you approached him on at least
five or six occasions to cancel or dismiss citations for friends or
relatives of yours.  He indicated that these requests came when you
were a Criminal Agent and stationed in District Seven.  Is this
true?"** He responded, **"I never ah ah, I never asked Officer James
Henderson to dismiss citations."** Sergeant Rodella was asked if he
knew Ms. Tina Herrera.  She received citation number 790-1381137 on
September 2, 1992, from Officer Henderson.  This citation was
ultimately dismissed in the Rio Arriba Magistrate Court by Judge
Richard Martinez after an order suspending her license was sent to
the Motor Vehicle Division.  Sergeant Rodella was asked if he had
exerted any influence on Judge Martinez to dismiss the citation.
He indicated he knew of the citation, but did not approach Officer
Henderson or the Judge to influence dismissal of this particular
citation.  Additionally, Sergeant Rodella indicated Sergeant Joe
Mascarenas relayed information to him regarding this citation.  He
indicated it was Officer Eddie Luechtefeld that initiated a
conversation with Officer Henderson regarding the dismissal of Ms.
Herrera's citation.  Sergeant Rodella indicated it was stated that
Ms. Herrera was Officer Luechtefeld's girlfriend.

Sergeant Rodella was asked to respond to the following statement.
**"Officer Tommy Hooper, District One Santa Fe, stated you contacted
him in reference to dismissing a citation for a Highway Department
employee.  It was also stated that to Officer Hooper by you that
this individual had done some things for officers, such as finding
places for them to live.  Is this true?"** He responded, **"What I
told Officer Tommy Hooper was, as a supervisor I couldn't ask him
to dismiss any citations.  That this individual wanted to know if
Tommy Hooper could help him.  Tommy asked me where I knew this guy
from and uh, that may have been when I told him that this gentleman**

had helped other officers in the past and that's how I knew him."
Regarding whether he felt Officer Hooper was lying regarding his
statement, Sergeant Rodella stated, **"If his statement was that I,
that I requested the dismissal or solicited the dismissal of the
citation, that's misleading."**

Sergeant Rodella was asked to respond to the following statement.
**"Officer Eugene Alvarez indicated during his tenure in District
Seven, you were assigned to the Criminal Division, okay, Officer
Eugene Alvarez indicated that you never asked him to dismiss or
cancel any citations.  Do you recall ever having any conversations
with Officer Alvarez regarding citations?"**   Sergeant Rodella
responded, **"I don't recall, no."**

Sergeant Rodella was asked to respond to the following statement.
**"Officer Daniel Mora has stated you approached him on three or four
occasions to cancel or dismiss citations.  Is this true?"**   He
responded, **"I may have discussed several citations with him or the
two or three that he mentions.  But again, I never asked him to
dismiss or solicited the dismissal of the citation."**   Regarding
whether he felt Officer Mora was lying, he responded, **"If this in
fact is his statement, yes."**  Sergeant Rodella was asked to explain
his involvement with Officer Mora's arrest of Luis Montoya, Jr.  He
stated, **"The uh, the Montoya family had contacted me at home that
evening in regards to an incident that occurred, had occurred in
Cordova.  Basically, their concern was was that there was not a
supervisor at the scene.  Uh, they wanted to know if I could go to
the uh, office and meet with them.  Upon my arrival at the office
I met with Sergeant Joe Mascarenas, who told me that he in fact had
been at the scene, and had had conversation with the family.  Uh,
basically what what occurred on that incident, is uh, and and I
don't know if you're aware of it there was a lawsuit that was filed
and it was settled.  What occurred there was the family was asking
for assistance, and the conversation between Officer Mora and I was
if he could issue him traff-non-traffic citations, a criminal
citation, that was the discussion.  There was never any discussion
of uh, of uh, not filing charges."**  Sergeant Rodella indicated he
was off duty and responded at the family's request, which he does
on a regular basis when he is contacted off duty.  He **"looks into
it, yes."**  Sergeant Rodella did not go 10-8 on June 18, 1992 to
conduct his inquiry into the Montoya family's request for his
assistance.

Sergeant Rodella was asked to respond to the following statement.
**"Officer Thomas Salazar has stated you have approached him on
approximately five occasions to dismiss or cancel citations.  Is
this true?"**  He responded, **"If that in fact is his statement that
I asked him to dismiss citations or solicited the dismissal of
citations that's misleading."**  Regarding whether Officer Salazar
was lying in his statement.   He responded, **"If that's his**

statement, it's misleading yes." Sergeant Rodella was asked to respond to the following statement. **"Officer Salazar has also stated he felt compelled to dismiss the citations for fear of retaliation on your part."** He stated, **"No, I can't, I just uh, don't see any reason why he would have felt compelled."**

Sergeant Rodella was asked to respond to the following statement. **"Officer Lionel Martinez has stated you contacted him on two occasions to dismiss or cancel citations.   Is this true?"** He responded, **"I don't recall ever having contacted him on any citations."** He was asked, **"Is Officer Martinez lying?"** He stated, **"If that in fact is his statement it's misleading, yes."** Sergeant Rodella was asked if he was familiar with Jose A. Martinez.   He responded, **"Yes I am . . . He's my father-in-law."**   Mr. Martinez was issued citation number 790-1298073 on March 6, 1992 by Officer Martinez.   Sergeant Rodella indicated he was aware of the citation. He indicated Mr. Martinez contacted him shortly after he was issued the citation.   Sergeant Rodella was asked if he contacted Officer Martinez to help Mr. Martinez with the citation.   He responded, **"No. . . Uh, if I may can I explain what what occurred that on that particular uh, citation?   It was late in the evening, what month was it, okay on on the evening of the citation I believe it was gosh, about ten o'clock or so, and my father-in-law stopped by the office by the State Police office uh, to tell me that he had received a citation.   But at the same time to tell me that Officer Leo Martinez had told him that he would take care of citation for him.   When I called for Officer Leo Martinez that evening, I called to thank him not to ask for, or solicit the dismissal.   What my father-in-law had told me was that, Lionel had told him he was going to take care of it."**   He was asked, **"Is Officer Martinez lying then during his compelled statement where he's indicated that you contacted him, and asked him for help on this citation?"**   He responded, **"Yes.     If that in fact is his statement, it's misleading, yes."**   Sergeant Rodella was asked to respond to the following statement.   **"Officer Martinez has also stated he felt compelled to assist you with your request to dismiss or cancel the citations based upon your position as a Sergeant with the New Mexico State Police, and feared retaliation if he did not comply with your request?"**   He responded, **"There was never uh, any request.   Therefore, I don't know why he felt, would have felt compelled or threatened or intimidated.   Whatever, whatever the statement includes."**

Regarding Office Theodoro Ulibarri, Sergeant Rodella was asked **"You approached him on one occasion to dismiss or cancel a citation.   Is this true?"**   Sergeant Rodella responded, **"If that in fact is his statement, that I contacted him to dismiss or solicited the dismissal of a citation it's not true."**   Regarding whether Officer Ulibarri was lying in his statement.   Sergeant Rodella stated, **"If that's his statement, it's misleading."**

Sergeant Rodella was asked to respond to the following statement. **"Officer Gerald Anderson has stated you contacted him on three separate occasions to dismiss or cancel citations.  Is this true?"** Sergeant Rodella stated, **"Again, if that's his statement, it's misleading."**  Whether Officer Anderson was lying in his statement, Sergeant Rodella responded, **"If that's his statement, it's misleading."**   Sergeant Rodella was asked to respond to Officer Anderson's statement that he also felt compelled to dismiss or cancel these citations for Sergeant Rodella, based upon his position as a Sergeant with the New Mexico State Police, and feared retaliation if he had not complied with his requests.  He stated, **"I don't see any reason why he would have felt that I would have retaliated or, or felt that there was a threat, that I would have retaliated against him."**  Mr. Alfredo Montoya was issued citation number 790-1365763 on May 15, 1992, by Officer Gerald Anderson. Sergeant Rodella indicated he knows Mr. Montoya, who is a current County Commissioner in Rio Arriba County.   Sergeant Rodella indicated he was aware Mr. Montoya had received this citation.  He was asked, **"Did you have any influence with the Judge in Rio Arriba County to uh, have them dismiss the charges against Mr. Montoya."** He responded, **"No."**  Sergeant Rodella indicated he did have a conversation with Officer Anderson regarding this citation, **"Basically to deliver a message from Alfredo to Gerry, that he was requesting assistance on the citation."**

Sergeant Rodella was asked to respond to the following statement. **"Officer Andrew Evaskovich has stated you contacted him on one occasion to cancel or dismiss a citation.   Is this true?"**  He responded, **"I don't ever recall having talked to Officer Evaskovich on any citations."**  When asked whether Officer Evaskovich was lying in his statement.  Sergeant Rodella stated, **"If that in fact is his statement, I believe he is, I, like I said I don't recall."**

Sergeant Rodella was asked, **"Sergeant Joe Mascarenas has stated that you have never asked him to cancel or dismiss any citations. Is this true?"** He responded, **"I'm sure it's true, he doesn't issue enough citations in District Seven."**

Sergeant Rodella was asked, **"Sergeant Richard Martinez has stated that you have never asked him to cancel or dismiss any citations. Is this true?"** He responded, **"I don't recall ever having discussed anything with him."**   Sergeant Rodella was made aware of the officers in the Chama Sub-District having notified Sergeant Martinez of his requests and Sergeant Rodella indicated he was not aware of the officers concerns with his requests.

Sergeant Rodella was asked, **"Lieutenant David Osuna has stated he canceled a citation as per your request on August 12, 1992.  Do you recall this?"** He responded, **"I recall having uh, mentioned a**

**RODELLA_SP_GJS 000268**

citation to Lieutenant David Osuna yes. . . . basically deliver a
message."

Sergeant Rodella was asked to respond to the following statement.
**"Officer Barbara Anderson has stated that you contacted her on two
separate occasions to cancel or dismiss citations.  Is this true?"**
He responded, **"If that's Officer Anderson, Barbara Anderson's
statement that I asked her, solicited the dismissal of the
citations, it's misleading."**  Regarding Officer Anderson's
truthfulness, he stated, **"If that in fact is her statement, it's
misleading, yes."**

Sergeant Rodella was asked, **"Lieutenant Eloy Lopez has stated you
never contacted him to dismiss or cancel any citations.  Is this
true?"**  He responded, **"I don't recall ever having discussed
anything with Lieutenant Lopez."**

Sergeant Rodella did recall having a conversation with Retired
Major Robert Trippeer and Captain Joe Tarazon.  He indicated the
conversation was in the summer of 1992.  He was asked to elaborate
on the contents of the conversation.  He stated, **"Basically,
Major's purpose for, for going to Espanola was on the Chief's
request.  To contact me, and uh, he explained to me that it was not
a, it was not a discussion, uh, it was not a dialogue that it was
a monologue and basically that the Chief wanted me to know that he
didn't want me asking officers to dismiss citations. . . I asked to
see the Chief."**  Sergeant Rodella did not interpret the message
from Chief Denko to be an order, but merely a message and felt he
had complied with the request.  Sergeant Rodella stated, **"I, the
reason I wanted to to meet with the Chief, and I requested to meet
with the Chief is I wanted to explain to him what had occurred in
the past.  In other words, uh, to explain to him that there was not
solicitation to dismiss citations, it was discussions about
citations.  But there was never the solicitation of dismissal of
citations."**

Sergeant Rodella was asked to respond to the following statement.
**"Officer Mikell Hogan has stated that you approached him on two
occasions to cancel or dismiss citations, is this true?"**  He
responded, **"I don't ever recall having discussed any citations with
Officer Hogan.  But uh, if his statement is that I, that I
solicited the dismissal of citations, that's incorrect."**  Regarding
Officer Hogan's truthfulness in his statement, Sergeant Rodella
stated, **"If that's his statement it's misleading."**

Sergeant Rodella was asked to explain what his interpretation of
him **"Relaying messages from friends requesting officers help with
citations"** is.  He stated, **"Uh, Major let let me just uh, clarify
this if I may uh, a lot of, a lot of uh, people that contacted me**

were uh, people that I didn't know or people that I was merely acquainted with uh, their, their you know their request was to see what I could do to help them.  I would explain to them you know, I can't, there's not, uh you know I didn't issue the citation, there's nothing I can do, but I can tell the officer you know, I can, I can explain to the officer that you called me and see what the officers willing to do."  Sergeant Rodella indicated he did not expect anything from the officer he would contact with respect to delivering the message from the violator.

Sergeant Rodella was asked to elaborate on his conversations with Officer Freddie De La O regarding two citations in which he had delivered messages.  He stated, **"Officer De La O I recall having told him uh, uh, the first time that I contacted him, that as supervisor I could not ask him to dismiss any citations, but that this off-this uh, individual had contacted me and they wanted to know if uh, he could help them out, the individual did."**

Sergeant Rodella was asked to explain what his terminology meant with regard to the responses he gave pertaining to the officers' statements, when they would describe his requests to have them dismiss citations.  When asked if he thought the officers were lying in their statements, Sergeant Rodella would respond, **"It's misleading."**  Sergeant Rodella responded, **"Major uh, what I mean by that is, is yes in fact I did uh, contact them on a citation,  I may have contacted them on a citation, but if in fact their statement is that I solicited the dismissal of the citation that to me means that I walked up to them and told them uh, for example, Major Taylor uh, would you dismiss a citation.  Major Taylor uh, uh, uh, this citation uh, some request for dismissal of the citation.  As I indicated uh, you know what I merely did was deliver messages uh, if, if Major Taylor contacted me I, I'd tell the officer Major Taylor contacted me he wants to know if you can help him with the citation."**

Sergeant Rodella was asked, **"Did you ever feel being put in an awkward position by so many people asking you to help them on citations and then you again, a pattern seems to be here that you continuously went to the officers asking for help.  Did that ever cause you any problems or, or make make it feel awkward in what you were doing?"**  Sergeant Rodella responded, **"No Major uh, I, I never felt that uh, the officers were uncomfortable with my contacts with them as far as citations went.  They never brought to my attention, no one ever brought to my attention that they were uncomfortable with it."**

Sergeant Rodella was asked to explain what he meant when he responded a person wanted **"help,"** with a citation.  He stated, **"Well, Major on a lot of uh, on a lot of the citations, what the individual wanted was for the citation to be changed from a penalty**

assessment to a court citation. A lot of citations, uh, what uh, the individual wanted was was some leniency. I left it open for the officer to contact the individual. I never, as, as I've indicated I never asked anyone would you dismiss a citation for, for such and such an individual."

Sergeant Rodella was asked if he knew of any other officers that were were put in the same position as he was, being contacted by violators soliciting help on citations. Sergeant Rodella indicated **"everyone"** was put in the same position he had been placed in with violators contacting them for **"help on a citation."** Sergeant Rodella responded, **"Yes I do, uh, I worked as a patrolman there uh, I was contacted by, by the supervisors of District Seven on several occasions uh, even even as a Sergeant I have been contacted by a lot of supervisors on citations. But you know for the record uh, let me, let me indicate that uh, whenever I've been contacted I've never felt compelled, intimidated, or threatened into, into dismissing any citations."** Sergeant Rodella indicated he has voided and dismissed citations for other officers in the past.

Sergeant Rodella was asked to respond to the following question. **"Did you ever tell any of the officers in District Seven, 'Are you in a ticket dismissing mood?'"** He responded, **"No."**

Sergeant Rodella was asked, **"Did you ever solicit the dismissal of citations from any of these people that we've mentioned?"** He responded, **"I never solicited the dismissal of any citation from anyone. Including the people that uh, have been mentioned here."**

Sergeant Rodella was asked, **"Did you ever feel awkward that your position may have compromised the officers, by what you were asking them?"** He responded, **"I never did, no. I never felt that they felt compelled or threatened or intimidated into dismissing citations."** Sergeant Rodella indicated no one had ever questioned or brought these actions to his attention. He also indicated, Major Trippeer never told him anyone felt threatened or intimidated regarding his requests of the officers.

In closing Sergeant Rodella stated, **". . . I just want to make it clear uh, there was never, you know, I never contacted anyone and asked them would you dismiss this citation, there was never any solicitation of a dismissal of a citation. You know I did discuss uh, citations with officers but I think you know, in, in, depth I've explained what the conversations entailed."**

Sergeant Rodella indicated he was a uniformed patrolman for approximately seven years and had been contacted on several occasions by supervisors to help them with citations. When asked what his interpretation was of what exactly the supervisors wanted done with the citations, he stated, **"What, what I would do is I'd**

ask them what, 'What do you want?' I mean is there a change of venue that you want is, is do you want me to change it from a penalty assessment to court citation what is that you want."
Sergeant Rodella indicated he never remembered not complying with an officers or supervisors request for **"help,"** on a citation he was contacted on.


He was asked, **"Since May 12, 1993 have you asked any officers or did you ever contact or since then have you contacted any officers or relayed any messages from individuals to help on citations?"**
He responded, **"No. . . I felt that whatever it was I was doing that the department was one, not comfortable with it, number two, I felt that if there was a problem with the officers if their interpretation was wrong I wanted to see what the outcome of this was. I don't necessarily feel that there was anything wrong with what I did, but I felt that obviously if, if the administration for one reason or another felt that it needed to be looked into I wanted to know what the outcome was, so I could know how to, how to proceed. That was my whole purpose for wanting to meet with the Chief and explain to him what I, you know what was going on. I believe that if the Chief would have given me the opportunity to see him at that time and explain to him what was being said, at that time if the Chief felt that what I was doing was, was soliciting the dismissal of a citation, although I didn't agree with his interpretation of it, it would have ceased."**

Sergeant Rodella indicated his interpretation of the solicitation of the dismissal of a citation was a very serious allegation.
He stated, **". . . solicitation is a very strong word. It's a very strong word, uh, in the dictionary if you read it, it's, it's a formal request, I've never requested the dismissal of a citation. I, there was it, all it was was one dis-discussion from one officer to another it was never an indication or any implication that I wanted the dismissal of a citation."**

Sergeant Rodella was asked, **"Did you ever again, for clarification did you ever stop to think that approximately 24 or 25 officers**

**interpreted your relaying of a message as being that to dismiss or cancel a citation?"** He responded, **"No."**

Sergeant Rodella indicated he did not feel placed in an **"awkward"** position, based on his position as a Sergeant with the New Mexico State Police. He stated, **"The reason I felt that was you know, we're looking, we're looking at one small percentage of requests that were being made, there were several requests being made there was requests for for uh, patrol courtesy patrols in the areas, there was requests for investigations, I mean follow up investigations, there was requests for copies of reports uh, for**

the officers to contact them on investigation, there were several requests that would come in.  To me it was just another request." Sergeant Rodella indicated he was aware of the law regarding the solicitation of officers for the dismissal of citations.

Sergeant Rodella indicated he was very careful in his wording when he relayed a message to an officer regarding an individual requesting help on a citation.  Sergeant Rodella also indicated he had consulted with Captain Leo Martinez to obtain guidance in this particular area.  Sergeant Rodella stated, ". . . In fact I went to the extent of meeting with Captain Martinez, Leo Martinez here at the district office.  And explaining to him you know, Captain how how do you handle these situations you know and he explained to me, verbatim what I have told other officers, he explained to me that this was what he would tell them when there was request that came into his office."

Sergeant Rodella reiterated he never contacted Officer Eddie Luechtefeld regarding any citations and that he never contacted Officer Luechtefeld on the Ross Borrego citation.

Sergeant Rodella stated the allegation as it is stated in the Notice of Investigation regarding his solicitation of Officer Eddie Luechtefeld to dismiss charges against Mr. Borrego is **"totally false."**

Sergeant Rodella stated the allegation as it is stated in the Notice of Investigation regarding his solicitation of other officers in District Seven and other districts is **"misleading."**

Sergeant Rodella was put on notice to refrain from contacting any of the officers discussed in this investigation as statements have been made regarding their fear of retaliation by Sergeant Rodella.

## INVESTIGATIVE CONCLUSIONS AND FINDINGS:

At the conclusion of this investigation, through interviews, statements and other documents obtained, it was determined the statements that were to have been made by Sergeant Rodella to Officer Eddie Luechtefeld regarding the solicitation of the dismissal of the charges which were brought against Mr. Ross Borrego were not corroborated by any other source.  Officer Luechtefeld indicated he had made notations on his daily activity logs regarding these statements but the daily activity logs for the period July 4, 1992 through July 31, 1992 do not exist in the District Seven files or the Department of Public Safety Records Division.  Therefore, the allegation that Sergeant Thomas R. Rodella solicited Officer Eddie Luechtefeld to dismiss the charges against Mr. Ross Borrego is **NOT SUSTAINED**.

**RODELLA_SP_GJS 000273**

Twenty-nine commissioned officers, assigned to District Seven between 1990 and the present, were interviewed regarding the allegation of solicitation of citation dismissals by Sergeant Rodella.  Despite Sergeant Rodellas' statement that this role in the requests for **"help"** with citations was simply as a messenger, twenty-five of the officers stated that their perception of his requests for **"help"** was that he was soliciting them to dismiss or cancel the citations.  According to the compelled statements given by the interviewed officers, Sergeant Rodella made approximately ninety-three requests to have citations dismissed or canceled. Only four of the twenty-nine officers interviewed were never contacted by Sergeant Rodella with requests to **"help"** with citations.  Additionally, it was **"common knowledge"** within District Seven that eventually every officer would be approached by Sergeant Rodella to have a citation dismissed or canceled.  Several officers indicated they feared retaliation by Sergeant Rodella if they failed to comply with his requests because of his position as a sergeant in a supervisory capacity with the New Mexico State Police.  The statement, **"Are you in a ticket dismissing mood"** was corroborated by two officers.

Lieutenant Forrest Smith stated, **"I feel that Sergeant Rodella lost his effectiveness in this area, that he cannot perform his duties properly without compromising himself as New Mexico State Police within the Espanola area. . . . He's completely lost his effectiveness, he has no respect of the men and the men won't work for him and don't, they balk at taking orders or suggestions or anything from Rodella.  Uh, they, they try and circumvent anyway that they can.  They don't like to work with him or for him.  They feel that he is, he is so involved politically in the area that is his number one priority."**

Therefore, based on the interviews, statements, and overwhelming perception of the officers regarding the requests made by Sergeant Rodella, it is determined that Sergeant Rodella solicited officers in District Seven to dismiss or cancel citations.  The perception of some of the officers was that Sergeant Rodella solicited votes in support of a partisan candidate, Mrs. Debbie Rodella, who is a State Representative for the State of New Mexico.  Therefore the allegation of misconduct is **SUSTAINED.**

Additionally, the investigation determined Sergeant Rodella used his position as a Sergeant with the New Mexico State Police for personal gain.  This determination was based on the statements made by several officers that they **"feared retaliation"** if they did not comply with his requests. Ultimately, twenty-five of the officers at one time or another dismissed or canceled citations as per Sergeant Rodella's request.

Based on the findings, Sergeant Thomas R. Rodella violated the following Rules and Regulations, Policies and Procedures:

**110.0**   Employees shall:

  . . .

  **.2**   Obey all Rules and Regulations, policies, procedures, directives and lawful orders issued by supervisors;  and

**112.0**   Employees shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Department.  Conduct unbecoming an employee shall include that which brings the Department into disrepute or reflects discredit upon the employee as a member of the Department, or that which impairs the operation or efficiency of the Department or employee. These shall include but not be limited to the following:

  **.8**   Employees shall maintain a level of good moral character in their personal and business affairs, which is in keeping with the highest standards of the law enforcement profession.  Employees shall not participate in any incident which impairs their ability to perform their duties or impedes the operation of the Department or causes the Department to be brought into disrepute.

**136.0**   Employees will not use their position or permit use of their position for personal or financial gain whether directly or indirectly for themselves or any other individual or group.

**RODELLA_SP_GJS 000275**