DEPARTMENT OF PUBLIC SAFETY

INTRA-DEPARTMENTAL CORRESPONDENCE

DATE:       MARCH 14, 1995

FROM:       SECRETARY DARREN WHITE
            CHIEF FRANK TAYLOR

TO:         SERGEANT THOMAS R. RODELLA
            DPS/NEW MEXICO STATE POLICE
            POST OFFICE DRAWER D
            ESPANOLA, NEW MEXICO 87532

SUBJECT:    DISCIPLINARY ACTION SUBSEQUENT TO
            HEARING BEFORE DISCIPLINARY HEARING PANEL
            SUSPENSION

------------------------

After a proceeding conducted on February 27, 1995, pursuant to New Mexico State Police
Rules and Regulations, Rule No. 182.0, and based on the FINDINGS OF FACT AND
CONCLUSIONS OF LAW attached hereto, we are hereby providing written notice to you of
your suspension from active duty, without pay, for a period of thirty (30) working days for
violation of New Mexico State Police Rules and Regulations. The dates of your suspension
will be determined upon your return to active duty status.

The suspension is for your violation of New Mexico State Police Rules and Regulations as
cited in your suspension notice dated December 27, 1994, which you were provided notice of
on December 28, 1994, and in the attached FINDINGS OF FACT AND CONCLUSIONS OF
LAW which rule violations were determined by the Disciplinary Hearing Panel. You will note
the Disciplinary Hearing Panel, pursuant to Rule 182.5, recommended an amendment to the
initial penalty. That recommendation was for your demotion from sergeant to patrolman. We
are taking that matter under advisement and will not address their recommendation at this
time.

Sergeant Rodella, the seriousness of your involvement in this entire incident is evident. Your
disciplinary history is extensive, and we will not tolerate further disregard for the rules,

GOVERNMENT
EXHIBIT
3

RODELLA_SP_GJS 000944

regulations, policies, and procedures which govern this Department. We trust, you will henceforth, conduct yourself in nothing but the most exemplary manner, on or off duty, and make a genuine effort to demonstrate these abilities and to assume your position as a supervisor in a reputable and competent manner.

Pursuant to New Mexico State Police Rules and Regulations, Rule No. 182.7, you may request a review of this action if you do so in writing to the Department of Public Safety Advisory Commission, through Chief Taylor, within five (5) days of your notification of this action. If you request the review, the suspension will be held in abeyance pending the review by the Department of Public Safety Advisory Commission.

You are directed to turn in all state-owned equipment for the duration of this suspension to Captain Sal Luna or his designee.

MAR. 2 2 1995

_____          _____
DATE                                 RECEIVED


Copy to:     Deputy Chief Willard Morrow
             Major Jerry Smith
             Captain Sal Luna
             Office of Professional Standards
                & Internal Affairs
             Personnel File

***BEFORE THE DISCIPLINARY HEARING PANEL***
***FEBRUARY 27, 1995***

***IN RE: THE DISCIPLINARY PROCEEDING***
***REGARDING SERGEANT THOMAS R. RODELLA***

Members of the Disciplinary Hearing Panel, Chairman, Major John Cordova, Captain Mike Francis, and Lieutenant Louie Medina, convened on Monday, February 27, 1995, at 10:30 a.m. and heard testimony and accepted evidence in the above-referenced matter. Assistant Counsels John Templeman and John Wheeler were present at separate times to advise the Panel on questions of law. The Panel accepted Exhibits marked 1 through 9, Exhibits 10, 11, and 12, being photographs of the scene; and Exhibit 13, being the Office of Professional Standards and Internal Affairs administrative file, as submitted by Captain John Pearson, appearing as the representative for the Secretary and the Chief's case. From Sergeant Rodella, the Panel accepted Exhibits A (Affidavit of Corrine Martinez), B (copy of a statement made by Delano Garcia), C (statement from Dr. David Riley), D (correspondence from Chief Denko, with attachments and response, related to medication), and Exhibits 14 and 15 (statements of Jicarilla Game and Fish Officers Watts and Vicente). Testimony was heard from Mr. Sam Herrera, Mr. Aquilino Valdez, and Ms. Martha Valdez, on specific matters clarifying statements they had previously given to Captain Pearson during

RODELLA_SP_GJS 000946

his investigation; and from Debbie Rodella, wife of Sergeant Rodella, regarding matters related to the investigation (since she had not previously given a statement to Captain Pearson). Officer Thomas Salazar also testified as a rebuttal witness called by Captain Pearson. After reviewing the evidence, the Panel makes the following FINDINGS OF FACT AND CONCLUSIONS OF LAW.

### *FINDINGS OF FACT:*

The Disciplinary Panel finds that:

1. During the morning of November 13, 1993, Sergeant Rodella, accompanied by his mother Maria Valdez, her husband Samuel Herrera, his uncle Aquilino Valdez, and an acquaintance Corrine Martinez, traveled together in a private automobile for the purpose of hunting deer.

2. That, at approximately 12:20 p.m. on that date, Sergeant Rodella was observed by Jicarilla Conservation Officers, Tom Watts and Eudane Vicente, as a passenger in the vehicle, on the Jicarilla Apache Reservation. Sergeant Rodella was observed putting a smooth bore rifle with a scope mounted on it out of the right front passenger window and the officers heard and observed the rifle recoil when fired at a mule deer decoy;

3. That, the conservation officers stopped the vehicle and issued Jicarilla Apache Tribal citations to Sergeant Rodella and to the driver, Mr.

2

Samuel Herrera, for hunting big game out of season, hunting big game without a permit or license, and to shoot from a road;

4.   That the only member of the party licensed for hunting off of the reservation was Mrs. Maria Valdez;

5.   That, Sergeant Rodella either fired the shot at the decoy or allowed Mr. Herrera to do so in violation of the Jicarilla Apache tribal law;

6.   That Sergeant Rodella conspired with others in the vehicle to hunt big game out of season, to hunt big game without a permit or license, and shooting from a road.

7.   That, on November 13, 1993, at 2:25 p.m., Debbie Rodella called the State Police Office in Espanola and advised the communications officer that her husband would be on sick leave as his doctor had advised that he needed bed rest.  Ms. Rodella did this with authorization and allowance by Sergeant Rodella;

8.   Sergeant Rodella was to have started his shift at 6:00 p.m. on November 13, 1993, but claimed 8 hours of sick leave for that shift;

9.   During the evening of November 13, 1993, Sergeant Rodella had dinner at a restaurant, visited with friends, stopped at a relative's home in Dulce, and drove onto Chama for the night instead of either working or being ill;

3

RODELLA_SP_GJS 000948

10.  That Sergeant Rodella, during the evening of November 13, 1993, solicited assistance from Officer Thomas Salazar to aid him in setting up a meeting with Sergeant Stanley Montoya of the Jicarilla Apache Tribe's Game and Fish Department, either that night or the next day;

11.  That a meeting was arranged and held on November 14, 1993, and present were Sergeant Stanley Montoya, Sergeant Gifford Vigil, Sergeant Rodella, his wife, and Officer Salazar.  During this meeting, Sergeant Rodella made an offer, as a New Mexico State Police Officer, to provide training and do community service in lieu of appearing in tribal court because if found guilty of these charges, he would lose his position with the Department of Public Safety.

## CONCLUSIONS OF LAW

The Disciplinary Hearing Panel concludes:

1.  That Sergeant Rodella's actions in joining the others on November 13, 1993, and violating Jicarilla Apache Tribe hunting laws, show a failure to obey laws of the jurisdictions in which he was present, in violation of New Mexico State Police Rule 110.1.  Charges were resolved in Jicarilla Apache Tribal Court by payment of a fine;

2.  That, during his actions on November 13, 1993, in engaging in the activities that led to the shooting of the deer decoy and then in soliciting

4

RODELLA_SP_GJS 000949

Officer Salazar's assistance to set up a meeting with tribal law enforcement; and further, on November 14, 1993, in offering to use his status as a New Mexico State Police Officer for personal gain, Sergeant Rodella violated New Mexico State Police Rules 111.0 and 136.0.

3. That, Sergeant Rodella, in authorizing or allowing his wife to report him sick at 2:25 p.m. on November 13, 1993, and in not being, by virtue of his activities later on that night, either ill or unable to perform his duties, violated New Mexico State Police Rule 112.2. in feigning illness;

4. That, the activities described in the Findings of Fact and Conclusions of Law, above, constitute a violation of the Department's Code of Conduct and of New Mexico State Police Rule 112.8, in that they reflect conduct which brings the Department into disrepute or reflects discredit upon the employee as a member of the Department, or which impairs the efficiency or operation of the Department or employee;

5. That the Disciplinary Hearing Panel concludes that the suspension without pay, as reflected in the Suspension Notice dated December 27, 1994, from Secretary Richard C de Baca and Chief John Denko, Jr., to Sergeant Thomas Rodella suspending him for 30 working days, is fully warranted under the circumstances of this case.

5

RODELLA_SP_GJS 000950

## RECOMMENDED AMENDMENT TO PENALTY

1.  The Panel takes specific note that the disciplinary history provided to it shows two prior thirty-day suspensions. Based on that information and on the facts of the incident it has reviewed as noted above, the Panel believes that Sergeant Rodella does not meet the standards required by the New Mexico State Police for supervisory personnel, and that he should be demoted from Sergeant, through proper proceedings, to the position of patrolman.

Submitted by:

MAJOR JOHN CORDOVA
CHAIRMAN

DATED: 3/8/8.5

6

RODELLA_SP_GJS 000951

PEARSON: Okay. Did Sergeant Rodella use or attempt to use his position as a New Mexico State Police officer to influence you to do something other than what you did?

PANZY: Well he asked for a break.

PEARSON: Did he ask you?

PANZY: Yes.

PEARSON: How did he, how did he ask you?

PANZY: Just says you know, some, "I work for State Police, you know. State Police [unintelligible]." He says, "Can you give me a break?"

PEARSON: Did he explain what he meant by "give him a break?"

PANZY: No, that's all he asked for.

PEARSON: What did your, what was your response?

PANZY: I just told him, "I'm sorry," you know. I just issued him the citations and I had two officers witness use, doing the sheet so, and that was it.

PEARSON: Did he say anything else?

PANZY: No.

PEARSON: Did anybody else use, or attempt to use their position to influence you in your decisions?

PANZY: No.

PEARSON: Did anybody attempt to use their position to threaten you?

PANZY: No.

PEARSON: Has this inc-incident affected the relationship between the Jicarilla Apache Tribe and the New Mexico State Police?

PANZY: I don't think so.

PEARSON: Okay. Has this incident affected the image of the New Mexico State Police within the Jicarilla Apache Tribe?

PEARSON: That's Udane. Okay. Now is, Samuel Herrera is the driver?

PANZY: Yes.

PEARSON: Is that correct?

PANZY: Mm-hmm.

PEARSON: How is Mr. Herrera dressed in this photo?

PANZY: How is he dressed?

PEARSON: Yeah, describe his clothing for me.

PANZY: Well he had a camouflage uh, kind of a little jacket, light jacket with gray, gray pants and a brown cow-...

PEARSON: Do they look like, do they look like jeans or do they look like gray pants?

PANZY: Hmm, I guess they look like jeans.

PEARSON: Okay. And what color is the shirt?

PANZY: He's got a blue shirt and with a green camou over it.

PEARSON: Okay. And a light brown hat?

PANZY: Mm-hmm.

PEARSON: Okay. How is Sergeant Rodella dressed in that photograph?

PANZY: He was wearin', he's wearin' green camou pants, green baseball cap and he had a, he's got a blue sweater on with a stripe, white stripe across it.

PEARSON: Okay. When you approached the white Bronco, is this the same way Mr. Herrera was dressed when you approached the Bronco? Is he standing outside right now?

PANZY: Um, I believe so.

PEARSON: Okay. Is this the same way that Sergeant Rodella was dressed when he was seated in the Bronco as he is right now standing outside the Bronco?

PANZY:     I did not see him sittin' inside the Bronco, but as he got out he put on that jacket.

PEARSON:   So you don't know what he was wearing under the jacket?

PANZY:     No, unh-unh.

PEARSON:   Okay.  Was there anybody else in that party dressed the same way that Sergeant Rodella was dressed?

PANZY:     No.

PEARSON:   Where were the other passengers in the vehicle?  Were there other passengers?

PANZY:     Yes, there was three more.  They were sitting in the back seat.

PEARSON:   That would be Mr. Valdez, uh, Ms. Valdez and Ms. Martinez.  Is that correct?

PANZY:     Yes.

PEARSON:   On the date and time in question, did a person seated in the vehicle previously described, discharge a rifle into a deer decoy?

PANZY:     Yes, he did.

PEARSON:   Okay.  Again, but you did not see that?

PANZY:     Yes.  I...

PEARSON:   Is that correct?

PANZY:     Yes, I could not see it, but, and I was...

PEARSON:   To your knowledge, what side of the vehicle did the shot come from?

PANZY:     According to what uh, Officer Watts and Vicente told me, it was from the passenger side.

PEARSON:   Okay.  Did you or another identify the person that discharged the weapon?

PANZY:     What was that?

RODELLA_SP_GJS 000695

# INTERVIEW

PEARSON: The time is approximately 1:58 P.M., August 18, 1994. The following is a voluntary statement given by Larson Panzy. This statement is given to Lieutenant John Pearson of the Department of Public Safety, Office of Professional Standards and Internal Affairs. Would you please state your full name and business mailing address?

PANZY: Larson Panzy. Post Office Box 313, Dulce, New Mexico.

PEARSON: What's your date of birth and social security number please?

PANZY: 12-21-62. Social security number 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.

PEARSON: Who are you employed with?

PANZY: The Jicarilla Apache Tribe.

PEARSON: What is your position?

PANZY: Uh, Biological Technician. Reserve Conservation Officer.

PEARSON: Who is your immediate supervisor?

PANZY: Tom Watts.

PEARSON: Okay. As was stated before the tape was turned on, I've been assigned by Chief John Denko of the New Mexico State Police to conduct an administrative investigation, regarding allegations of conduct unbecoming, which have been brought against Sergeant Tommy Rodella of the New Mexico State Police. It has been alleged that on November the 13th, 1993, at approximately 12:20 P.M., Sergeant Rodella was a passenger in a white Ford Bronco, travelling northbound on State Road 112 on the Jicarilla Apache Reservation. Sergeant Rodella was observed by conservation Officers Tom Watts, Udane, Udane Vicente and Larson Panzy, that's you, discharging a rifle from the passenger's side of the white Ford Bronco into a mule deer decoy. As the allegations were just stated, are they clear to you as to what has been alleged against Sergeant Rodella?

PANZY: Yes.

PEARSON: Okay. Were you on duty on November the 13th, 1993?

PANZY: Yes.

PEARSON: What were your assigned duties that day?

RODELLA_SP_GJS 000689

PEARSON: Has this incident affected the image of the New Mexico State Police within the Jicarilla Apache Tribe?

VICENTI: No. Not really. I mean.

PEARSON: Have you heard any statements or any comments made about the State Police, Sergeant Rodella in particular?

VICENTI: Well they di-most people just figured that he should have known better. You know, he's the law, a law enforcement individual, so he should have known better.

PEARSON: In the future, will Sergeant Rodella be welcome on the Jicarilla Reservation?

VICENTI: Probably. We'd watch him. [Laughs] Now that we know who he is, but he still gots the right to be here I guess.

PEARSON: Is there any doubt in your mind that Sergeant Rodella squeezed the trigger on that .7 mm rifle into the deer decoy on November the 13th, 1993?

VICENTI: No.

PEARSON: You're positive?

VICENTI: Oh yeah.

PEARSON: Eudane, I don't have anything else I'd like to ask you at this time. Is there anything that I've either overlooked or forgotten that you feel you'd like to add that would be important at this time?

VICENTI: No. I think you covered all the bases pretty good.

PEARSON: Very well. We will conclude the interview. The time is approximately 1:44 P.M.

I CERTIFY THAT THE FOREGOING IS, TO THE BEST OF MY KNOWLEDGE AND BELIEF, A TRUE AND CORRECT TRANSCRIPTION OF THE STATEMENT OF MR. EUDANE VICENTI, TAKEN ON AUGUST 18, 1994, AND TRANSCRIBED ON SEPTEMBER 15, 1994.

_____
MICHELE MAXWELL

interviewed. We're not singling out certain officers. I've gone back to 1990. I've interviewed officers that are transferred out of the district as well, that way there's no disparity as far as uh, rookies or ethical, ethnical backgrounds or whatever. So all officers that have been stationed here since 1990 will be interviewed.

FS:     Okay.

CM:     Uh, you do have a concern as you stated that he's gonna backtrack try and look for ways to retaliate against officers that have, have uh, testified against him so to speak on, on uh,...

FS:     Right.

CM:     ...(unintelligible--both talking) of Internal Affairs?

FS:     Yes. And I, I feel that, I feel that Sergeant Rodella has lost his effectiveness in this area, that he cannot perform his duties properly without compromising himself as New Mexico State Police within the Espanola area. And I feel that if anything comes out of this investigation, I think that the only thing that, that could be done if he is not fired and not released from duty from New Mexico State Police, he needs to be removed from this area. Because he's, he's completely lo-lost his effectiveness, he has no respect of the men and the men won't work for him and don't, they balk at taking orders or suggestions or anything from Rodella. Uh, they, they try and circumvent anyway that they can. They don't like to work with him or for him. They feel that he is, he is so involved politically in the area that that is his number one priority. The men below him are second, third, fourth, fifth, down the list. But number one is his politics and the furtherance of his political career and his wife's political career.

CM:     Uh, you say that the men try to circumvent him (TAPE GOES LOW) and that they don't have any respect for him and uh, they balk at, at uh, requests that he makes or orders that he gives 'em. Is this collectively or are there certain officers?

FS:     No this is collectively.

CM:     You would say that, that uh, every officer then that's, that not only works directly under him, but it was, works with him, him uh, feels the same way?

FS:     Yes. There's a, there's probably a couple of officers I

RODELLA_SP_GJS 000578

SALAZAR:    Mm, my wife and family.

PEARSON:    Okay.  And did he have anybody with him?

SALAZAR:    Uh, his wife and uh, all the people that I knew were
just his wife.  I don't know...

PEARSON:    Did you know her prior to that night or had you been
introduced to her that night?

SALAZAR:    Uh, introduced and, beforehand.

PEARSON:    Okay.  Was there any other people with Sergeant Rodella
at that time?

SALAZAR:    Mmm, I didn't notice anyone at that time.

PEARSON:    Okay.  Where in the Jicarilla Inn did you happen to
contact Sergeant Rodella?

SALAZAR:    No, he was standing at the restaurant entrance and I
was coming out of the video shop.

PEARSON:    Did you see him or did he see you first?

SALAZAR:    Don't know.

PEARSON:    Did you approach him or did he approach you?

SALAZAR:    I don't remember that.

PEARSON:    When you met that night at the Jicarilla Inn, what did
uh, Sergeant Rodella say to you?

SALAZAR:    From what I remember, we greeted each other.  I don't
know who greeted who first or, or that.  Uh, I asked
him what he was doing here, I don't remember his
response.  And then I remember him saying um, "I got in
trouble."   And I looked at him.   And uh, he says,
"Let's go, let's move over here to a corner," because
we were pretty much in the middle of, of the hallway
there.  And we moved to the corner and uh, he showed me
what trouble he was in.  He told me he was, he was
cited for hunting on the reservation.

PEARSON:    At that time, did Sergeant Rodella make any admission
to you of his guilt or innocence?

SALAZAR:    No, no.

PEARSON:    Be sure to speak up for the microphone.

SALAZAR:    No, no.

PEARSON:    How did he explain to you what had had happened to cause him to feel like he was in trouble?

SALAZAR:    I knew that he was in trouble when he showed me the citations. He never went into detail with me of what had occurred.

PEARSON:    He actually showed you the physical violator copy of the citation?

SALAZAR:    Correct.

PEARSON:    And what did he ask you to do?

SALAZAR:    Uh,...

PEARSON:    If anything.

SALAZAR:    ...he asked if I had, if I knew Stanley Montoya and I advised him, "Yes, I did," and he asked if there was a way he could uh, meet with him. Or get a meeting with him and I says, "I'll try."

PEARSON:    Did he ask you to set a meeting with Stanley Montoya at any certain time?

SALAZAR:    No, he didn't. No.

PEARSON:    Was that kinda left up in the air until whenever you could contact Mr. Montoya you would get back with Sergeant Rodella and set it up?

SALAZAR:    Well I advised him to check back with me because I wasn't gonna go out of my way to look for this man.

PEARSON:    Okay.

SALAZAR:    And which he did.

PEARSON:    Which Sergeant Rodella did?

SALAZAR:    Yes.

PEARSON:    Okay.  Now is this about all that was said between the
            two of you here at the uh, Inn in Jica-in uh, Dulce?

SALAZAR:    Yes, pretty much.

PEARSON:    So you left that night...

SALAZAR:    Yes.

PEARSON:    ...from the Inn?

SALAZAR:    Yes I did.

PEARSON:    Where did you go then?

SALAZAR:    I went home.

PEARSON:    Okay.  And uh, what transpired then?

SALAZAR:    I was home for maybe 15, 20 minutes.  My wife sent me
            down to the Conoco to pick up uh, some items that she
            needed and with my luck, there was Stanley.

PEARSON:    Okay.  Did you approach Stanley Montoya?

SALAZAR:    I greeted to him, I uh, stated, "I hear you caught one
            of our own."  He said, "Yes."  And I says, "How does it
            look for him?"  He goes, "Not too good."  I says, "Is
            there any way to help?"  He goes, "No."  I says, "What
            happened?"  He goes, "I wouldn't mind helping, but I
            don't like, I didn't enjoy his attitude in thinking
            that he could badge his way out of the incident."

PEARSON:    Meaning Sergeant Rodella?

SALAZAR:    Correct.

PEARSON:    Okay.

SALAZAR:    Uh, I says, I asked if he would meet with him, he says,
            "Well I'll think about it," but didn't really sound
            interested in it to begin with and that was basicle-
            basically it.

PEARSON:    Okay.

SALAZAR:    I left.

RODELLA_SP_GJS 000776

PEARSON:     Then, then where did you go?

SALAZAR:     I went home.

PEARSON:     When was the next time you heard from either Stanley
             Montoya or Sergeant Rodella?

SALAZAR:     Had to of been that same night. Well I'm not sure. I,
             I, my memory doesn't serve me right now. I, I don't
             know whether uh, whether Stanley said he would meet
             with him or not. But a meeting was set up.

PEARSON:     Does this jog your memory that uh, there was possibly
             Sergeant Rodella was going to visit a Levi Pasada here
             in or around Dulce? Does that ring a bell to you?

SALAZAR:     Yes, it does.

PEARSON:     Okay. Did Sergeant Rodella tell you that that's where
             he was going to be?

SALAZAR:     Yes, he did.

PEARSON:     Okay. Uh, did you in fact then go to Mr. Pasada's
             residence to try and locate Sergeant Rodella?

SALAZAR:     Yes, I did.

PEARSON:     The night of November the 13th or the next morning?

SALAZAR:     The same, the same evening.

PEARSON:     Okay. And were you in fact uh, successful in locating
             Sergeant Rodella?

SALAZAR:     No.

PEARSON:     Did you talk to anybody at the Pasada residence?

SALAZAR:     A young boy.

PEARSON:     Had Sergeant Rodella been at that residence prior to
             that?

SALAZAR:     No, unh-unh.

PEARSON:     Did you ever establish whether or not Mr. Pasada, or
             Levi Pasada knows Sergeant Tommy Rodella?

SALAZAR:     I'm sure they know each other of the past.

PEARSON:     But you don't know that for a fact.

SALAZAR:     I know that for a fact, I can't prove it, but I know it for a fact.

PEARSON:     Okay.  So you were unsuccessful in locating him at the Pasada residence?

SALAZAR:     Correct.

PEARSON:     So what did you do then?  You went home?

SALAZAR:     I went home.

PEARSON:     What happens, what's the next chain of uh, in this event?

SALAZAR:     [Sighs]

PEARSON:     Did you have any more contact with Sergeant Rodella on the night of Novrember-November the 13th?

SALAZAR:     If I did, it'd have to been over the phone.

PEARSON:     But you don't recall?

SALAZAR:     Well somewhere in between there, the meeting had to of been set.

PEARSON:     Okay.  Uh,...

SALAZAR:     You know, you know what I mean?

PEARSON:     Again in your previous statement to Sergeant Sena, it says uh, you received a phone call from Sergeant Rodella asking me, meaning yourself, if you had contacted Stanley and uh, you told him you didn't know where he was, but you'll call his home and see what he wants.  If he wants to meet with you or not.

SALAZAR:     Okay, I follow you now.

PEARSON:     Okay.

SALAZAR:     I know where I'm at.

RODELLA_SP_GJS 000778

PEARSON:     Okay.  Now, did you in fact call Sergeant Montoya at that time and establish some time for Sergeant Rodella and him to meet?

SALAZAR:     Somewhere down the line I must've.  But I don't, I don't remember if that was set up uh, at the [unintelligible] I contacted Stan.

PEARSON:     Okay.  According to this, you're, in your statement you said that you called him at his residence and contacted Sergeant Montoya and he, and, and Sergeant Montoya then advised to have Sergeant Rodella come by uh, his office...

SALAZAR:     Okay.

PEARSON:     ...at 10:00 the next morning.

SALAZAR:     Correct then.

PEARSON:     Okay.

SALAZAR:     That's what occurred.

PEARSON:     Is that about right?

SALAZAR:     Yes sir.

PEARSON:     Okay.  Then did you in fact call Tommy Rodella back and...

SALAZAR:     No, I think...

PEARSON:     ...advise him?

SALAZAR:     ...I think Tommy was keeping in touch with me because I don't, I had no idea where he was at.

PEARSON:     Okay.  Did you tell him about the meeting set up for 10:00 the next morning?

SALAZAR:     Yes, I did.

PEARSON:     And uh, did he ask you at that time to meet him and take him to that location because he didn't know where it was?

SALAZAR:     Correct.

PEARSON:     Okay.  Did you have a prearranged time and place to
             meet Sergeant Rodella so you could take him to
             Sergeant...

SALAZAR:     No.

PEARSON:     ...Montoya?

SALAZAR:     No.

PEARSON:     Did you make a statement to him somewhere, you'll be
             around because you're having a hard time getting out?

SALAZAR:     Yeah.  It snowed a foot and a half that night.

PEARSON:     And then by the time you did get out, uh, he was
             already at the meeting place?

SALAZAR:     Correct.

PEARSON:     Okay.  Where was that meeting place?

SALAZAR:     At the Game and Fish Department.

PEARSON:     Is that here in Dulce?

SALAZAR:     Correct.

PEARSON:     Where is it from where we are right now?

SALAZAR:     Uh, west on 64 s-uh, stop, at the stop sign take a left
             and a quick right.  Altogether maybe a mile and a half
             from here.

PEARSON:     Okay.

SALAZAR:     West.

PEARSON:     And when you arrived at the uh, Game and Fish office,
             what did you observe?

SALAZAR:     Uh, that a discussion was already going on.  They
             discussed whatever they were gonna discuss.

PEARSON:     Okay.  First of all, before we get too far, who was
             present when you arrived?

SALAZAR:     Tom, Sergeant Rodella, his wife, S-S-Stanley Montoya

and Gifford Vigil.

PEARSON:     Vigil or Valarde?

SALAZAR:     Valarde.  I'm not sure.  I always tell you when it's
             Vigil.

PEARSON:     Okay.  'Cuz in the statement earlier you said Gifford
             Valarde is spelled V-a-l-a-r-d-e.

SALAZAR:     Okay.  What's the, the gentleman up here in your, I
             mean in your, yep.  In Albuquerque is whether it's
             Vigil or Valarde.  What does the top sheet say?  It's
             Vigil.  Should be Vigil.

PEARSON:     Okay.  So if you said "Valarde," you just meant
             "Vigil."

SALAZAR:     Yeah, yes sir.

PEARSON:     Okay.  Was there already a conversation taking place
             when you walked in?

SALAZAR:     Yes, there was.

PEARSON:     As close as you can remember Tommy, I need you to tell
             me what you overheard and who said what.

SALAZAR:     From what I overheard, it was more of a, of Tommy uh,
             trying to uh, figure out a way to get out the situation
             he was in.  Uh,...

PEARSON:     Can you remember any type of the words that he was
             using and who he was addressing that to?

SALAZAR:     He mostly addressed uh, Stanley.  Stanley was in the
             driver's seat as, there's no question there.  Uh, if I
             s-s-Tom never uh, gosh there.  Admitted to doing what
             he did.  But he was always trying to figure out a way
             to get out of it.  You know, he offered his own
             personal experiences and, and uh, trying to help him
             out and do what he could to get out of the situation.

PEARSON:     Okay.  Did you hear uh, Mrs. Rodella saying anything?

SALAZAR:     No, not really.  She was basically quiet.

PEARSON:     Again, did Mrs. Ro-did you observe or overhear Mrs.

Rodella saying anything?

SALAZAR: Yes, I did.

PEARSON: And what was that?

SALAZAR: She stated that she was in an influential position and she had ways of helping the tribe.

PEARSON: Is that all of basically you heard? Did she say of how she could help the tribe and what she would do for them?

SALAZAR: She didn't go into detail.

PEARSON: What did that appear to be in your view of the situation?

SALAZAR: Somebody's trying hard to get out of the present situation they're in.

PEARSON: Did Sergeant Montoya appear to be receptive to any of their ideas for the resolution of this problem?

SALAZAR: No, he didn't care.

PEARSON: Did Sergeant Rodella in your presence ever say that he would do a service for the tribe in return for any dismissal or consolation in these charges?

SALAZAR: He said that he would offer what he knew, whatever training he personally has received uh, to get himself out of the situation.

PEARSON: Okay. How long from the time you arrived till the end of the conversation? How long a time frame are we talking about?

SALAZAR: Maybe 15, 20 minutes.

PEARSON: That was about it?

SALAZAR: Yes.

PEARSON: When the meeting broke up, did there appear to be a resolution to any problems?

SALAZAR: In my own opinion, no.

PEARSON:    Okay.  Elaborate on that.  What, what did you see or hear or observe that gives you that idea?

SALAZAR:    Being caught in the middle and knowing what position Tommy was and knowing what position the Game & Fish Department was, I knew the Game & Fish Department was one up on him.  And for the simple reason is uh, they were gonna fry a big fish here.

PEARSON:    Did it appear to you that the Game & Fish was going after Sergeant Rodella because of who he was more so than what he had done?

SALAZAR:    No, no, not really. Uh, a lot of uh, animosity kicked in after the fact.  Uh,...

PEARSON:    Animosity  between  Sergeant  Rodella  and  Sergeant Montoya?

SALAZAR:    The whole thing.  Everybody involved including myself. Uh, it turned out to be a big issue because the community got involved and the community had something to say and uh, a lot of people found out real quick and the locals wanted something done and...

PEARSON:    Okay.  Now, after the meeting was over, did Sergeant Rodella and his wife then depart from Dulce to your knowledge?

SALAZAR:    They left.  I have no idea where they went.

PEARSON:    Okay.  Did you and Sergeant Montoya and Gifford Vigil have an opportunity to discuss this matter any further?

SALAZAR:    Yes.

PEARSON:    And what was said?

SALAZAR:    I asked uh, Stanley what he thought and he just shook his head.  I knew that was gonna be it, because what could Tommy offer these guys?

PEARSON:    He shook his head more like in a...

SALAZAR:    Like...

PEARSON:    ...in a disgusted manner or a negative manner or just that nothing could be done for it.

SALAZAR:     Nothing could be done.  His mind was made up.  The charges were filed.  He was gonna back his personnel and see what the outcome was you know, and which I understood and I knew that was going to occur.

PEARSON:     Did Sergeant Rodella ever ask you to intervene on his behalf in order to try and cut a deal?

SALAZAR:     Ask that again please.

PEARSON:     Did Sergeant Rodella ever ask you to intervene on his behalf in attempt to cut a deal with the Jicarillas?

SALAZAR:     No, not really.  All Sergeant Rodella asked of me was to set up a meeting with him and Stanley and I did that.

PEARSON:     Okay.  Since the occurrence on the 13th, of which I know you weren't there, and subsequently the meeting on the 14th, have you drawn any conclusions based on the knowledge you have of the case?

SALAZAR:     Hmm, I think the confusion of uh, the, the people that said, that, that seen Tommy shoot that deer are probably right. Because I know the gentlemen. They've always been good to me and they're true to what they say.  Uh, the process confused himself somewhere down the line, to where the outcome was whatever that gentleman paid the final notice in court.  Uh, it was just mass confusion after awhile because everybody found out and a lot of people got involved and uh, it shook up the Game & Fish personnel.  The people that will say for sure, for sure Tommy shot that deer I would think is Udane and Tom Wat because of the two type of gentlemen that they are.  Well at least what I think.

PEARSON:     Okay.

SALAZAR:     But they are.

PEARSON:     Let me ask you a question in regards to that.  To your knowledge, do they know Sergeant Tommy Rodella prior to this incident?

SALAZAR:     No.

PEARSON:     Would  they  have  anything  to  gain  by  prosecuting

JICARILLA APACHE TRIBAL COURT

DULCE, NEW MEXICO

NOS. CV-8554, 8555, 8556, 8557, 8558 and 8559

JICARILLA APACHE TRIBE and
GAME AND FISH DEPARTMENT
OF THE JICARILLA APACHE TRIBE,

       Plaintiffs,

vs.

THOMAS RODELLA and
SAMUEL HERRERA.

       Co-Defendant and
       Co-Defendants In Rem.

## JOINT RELEASE AND STIPULATED JUDGMENT

THIS MATTER comes before the Court upon the parties' joint release of all claims, and upon their stipulations, as set forth herein, to wit:

1. That the parties herein have agreed that for the sole consideration of Two Thousand Five Hundred Dollars ($2,500) paid to the Game and Fish Department of The Jicarilla Apache Tribe and to the Jicarilla Apache Tribe, which sum constitutes payment of any and all claims derivative from the complaints herein filed, the receipt of which is hereby acknowledged, said Game and Fish Department and Jicarilla Apache Tribe do hereby release and forever discharge Samuel Herrera, Thomas Rodella and Maria Herrera, their agents, successors, heirs, executors, administrators and assigns of and from any and all claims,

RODELLA_SP_GJS 000825

actions, causes of action, demands, rights, damages, costs, expenses and compensation whatsoever, which said Tribe or its agencies have or which may hereafter accrue on account of or in any way growing out of the filing of these enumerated Complaints, and/or the incidents alleged to have occurred on or about November 13, 1993, allegedly on or upon lands of said Tribe.

2.    Concomitantly, the parties herein have agreed that Samuel Herrera, Thomas Rodella and Maria Herrera, their agents, successors, heirs, executors, administrators and assigns, do hereby release, acquit and forever discharge the Game and Fish Department of The Jicarilla Apache Tribe and the Jicarilla Apache Tribe, and their agents, of and from any and all claims, actions, causes of action, demands, rights, damages, costs, expenses and compensation whatsoever, which said parties have or which may hereafter accrue on account of or in any way growing out of the filing of these enumerated Complaints, and/or the incidents alleged to have occurred on or about November 13, 1993, allegedly on or upon lands of said Tribe.

3.    That the parties herein have further agreed that said Tribe and its agencies shall return to Samuel Herrera, Thomas R. Rodella and Maria Herrera the following: one (1) white 1987 Ford Bronco, New Mexico license no. 103 AHN; one (1) Browning Arms bolt action 7mm Remington Magnum rifle, serial no. 18639PT717 w/Busnell 3x9 scope; one(1) New Haven by Mossberg model 900 BHT, 243 Winchester rifle, serial no. 1110199; one (1) Llama semi-automatic .45 calibre pistol, serial no. C10154, and all other

2

items taken by the Tribe and/or listed on the tow authorization form made November 13, 1993.

4. That it is understood and agreed that this settlement constitutes a compromise of a disputed claim or claims, and that the payment made pursuant to this agreement is not to be construed as an admission of liability on the part of the party or parties hereby released and that said releasees deny liability therefor and intend merely to avoid litigation and resolve this matter.

5. That the parties hereto intend further to mutually forever release each and every party of and from any and all claims, actions, causes of action, demands, rights, damages, costs, expenses, and compensation whatsoever, which said parties have or may have had as against each and every party hereto arising from the matters raised in these proceedings; and no liability whatsoever shall hereafter attach as against any party to this action.

6. That the undersigned parties further declare and represent that no promise, inducement or agreement not herein expressed has been made to the undersigned, and that this Release contains the entire agreement between the paries hereto, and that the terms of this Release are contractual and not a mere recital, and constitute the parties' stipulations and agreements.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED:

1. That the Court has jurisdiction over the parties and subject matter herein.

3

RODELLA_SP_GJS 000827

2.    That the parties' stipulations and agreements set forth hereinabove are fair and reasonable.

3.    That the terms and conditions of the parties' stipulations and agreements, set forth hereinabove be, and they hereby are, made the Order of the Court.

4.    That upon compliance by the parties with the terms and conditions of said stipulations and agreements, these matters be, and they hereby are dismissed.

5.    The parties shall bear their respective attorney fees and costs.

DATED this _30th_ day of June, 1994 in Dulce.

_____
CAREY VICENTI, Chief Judge

APPROVED:

_____
THOMAS RODELLA

_____
SAMUEL HERRERA

_____
MARIA HERRERA

By:

_____
JICARILLA APACHE TRIBE

_____
CHRISTOPHER B. CHANEY
Attorney for Jicarilla Apache Tribe

_____
DOUGLAS COULEUR
Attorney for Thomas Rodella

_____
JOSE A. SANDOVAL
Attorney for Samuel Herrera
    and Maria Herrera

4

RODELLA_SP_GJS 000828

# COMPLAINT FORM

| | |
|---|---|
| OPSIA CASE NO.<br>94-060-A2-07 | DATE & TIME OF INCIDENT<br>November 13, 1993    1225 Hrs. |
| DATE & TIME REPORT RECEIVED<br>November 13, 1993    1700 Hrs. | ALLEGATION/OFFENSE<br>Conduct Unbecoming (2 Counts) Abuse of Sick Leave and Falsification of Official Reports |
| REPORT RECEIVED (Person, Phone, Letter)<br>Letter Followed on Nov. 17, 1993 | LOCATION OF INCIDENT<br>SR 112 Jicarilla Apache Reservation |

## EMPLOYEE INFORMATION

| | |
|---|---|
| NAME<br>Sergeant Thomas R. Rodella | ASSIGNMENT/DUTY STATION<br>Uniform Bureau / Espanola, NM |

## COMPLAINING/REPORTING PARTY INFORMATION

| | |
|---|---|
| NAME<br>Sergeant Stanley Montoya<br>PHONE NUMBERS    759-3442 | ADDRESS<br>Box 552<br>Dulce, NM |

## NARRATIVE OF COMPLAINT

Complainant States That on Nov. 13, 1993 Sgt. Rodella was observed Discharging a Rifle into a Mule Deer Buck Decoy. After Being Arrested and Cited into Tribal Court, Sgt. Rodella, Accompanied By His Wife, Debbie Rodella met with Complainant on Nov. 14, 1993 and Allegedly made an offer As a New Mexico State Police Officer To Provide Tribal officers with Training and To Perform Community Services in Lieu of Appearing Before The Tribal Court Because if Convicted He Could Lose His Employment with The Department of Public Safety. Additionally, on Nov. 13, 1993 and Nov. 14, 1993 Sgt. Rodella Claimed Sick Leave on His Daily Recap and His Seven Day Recap For The Days These Alleged Activities Took Place.

## FINDINGS/CONCLUSIONS OF INVESTIGATION AND MISCELLANEOUS COMMENTS

FINDINGS:  ☐ Sustained  ☐ Not Sustained  ☐ Unfounded  ☐ Exonerated

ASSIGNED INVESTIGATOR: Lt. John E. Pearson    DATE COMPLETED:

SIGNATURE OF REPORTING PARTY OR SUPERVISOR TAKING COMPLAINT:    Lt. John E. Pearson

04/9

RODELLA_SP_GJS  000830

PEARSON: The time is approximately 10:05 A.M., September 28, 1994. The following is a statement given by Sergeant Thomas R. Rodella. Statement is given to Major Frank Taylor and Lieutenant John Pearson of the Department of Public Safety, Office of Professional Standards and Internal Affairs. For the record, would you please state your full name and business mailing address?

RODELLA: Thomas Robert Rodella. Mailing address, P.O. Drawer D, Espanola, New Mexico 87532.

PEARSON: And what is your date of birth and social security number?

RODELLA: Date of birth, 10/30/61. SOC, 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.

PEARSON: Who are you employed with?

RODELLA: Department of Public Safety.

PEARSON: What division?

RODELLA: State Police, New Mexico State Police.

PEARSON: And for how long sir?

RODELLA: Hmm, in October it'll be 12 years.

PEARSON: What is your current duty assignment?

RODELLA: I'm assigned to the Uniform uh, Division in, in Espanola.

PEARSON: Who is your immediate supervisor?

RODELLA: Uh, Lieutenant Alfred Arana.

PEARSON: And who is your District Commander?

RODELLA: Uh, Captain Sal T. Luna.

PEARSON: As I stated before the tape was turned on, I've been assigned by Chief John Denko of the State Police Division of the Department of Public Safety, to conduct an administrative investigation regarding allegations of conduct unbecoming an officer, specifically two counts--abuse of sick leave and falsification of official reports. It has been alleged that on November the 13th, which is a Saturday, 1993, at approximately 12:20 P.M., you were a passenger in a white Ford Bronco, travelling northbound on State Road 112, on the Jicarilla Apache Reservation. You were observed by Conservation Officers Tom Watts and Udane Vicenti, discharging a rifle from the passenger's side of the white Ford Bronco, into a mule deer decoy, described as a full body mount, 4 by 5 mule deer buck. On November the 14th, which was the following day on a Sunday, 1993, you and your wife Debbie Rodella, met with

RODELLA_SP_CJs 000094

Sergeant Stanley Montoya of the Jicarilla Apache Game and Fish Department, during which you allegedly made an offer as a New Mexico State Police Officer, to provide Tribal Officers with training and to perform community services in lieu of appearing before the tribal court, because if convicted, you would lose your employment with the Department of Public Safety, New Mexico State Police. And additionally on November the 13th and 14th, 1993, you claimed sick leave on your daily recap and your seven day recap for the days these alleged activities took place. Now, as the allegations were just stated, do you have any questions regarding those allegations?

RODELLA: No.

PEARSON: Okay. Again, I'd like to show you a copy in the file of a intra-departmental correspondence written to you from Chief Denko, signed by Major Jerry Smith for the Chief, on July the 20th, 1994, outlining the allegations against you. Is this a representative copy of the letter you received?

RODELLA: Yes, it is.

PEARSON: And there is no changes as far as you know?

RODELLA: I, I'm sure it's the same.

PEARSON: Have you read and signed the Compelled Employee Statement form?

RODELLA: Excuse me. Yes, I did.

PEARSON: Do you have any questions regarding that form?

RODELLA: No.

PEARSON: By having read and signed that form, do you understand that you are compelled to answer all questions truthfully that are narrowly or directly related to these allegations?

RODELLA: Yes, I do.

PEARSON: Going back to November the 13th, 1993, were you on the Jicarilla Apache Reservation?

RODELLA: Yes, I was.

PEARSON: For what purpose were you on the Jicarilla Reservation?

RODELLA: I had accompanied my um, my mother and her boyfriend up to the uh, the area in question. My s-my purpose or my

dawned on me what had happened until later. And uh, I kept on looking to my left and, and I knew there wasn't enough cover on the left hand or the left hill where he had told us the doe was for the doe to seek cover, so I turned to my right and uh, we hadn't driven very far. I can't give you a distance, but it wasn't, you know, given the conditions it wasn't maybe a minute, maybe and uh, I saw it under, it was, I think it's like a...

PEARSON: You saw what?

RODELLA: I saw the, the decoy. And it was under a, well we call 'em sebinos, but they're a cedar tree. It was like underneath a cedar tree. So uh, I pulled out the rifle and I looked at it through the scope and I leaned over and I was tellin' 'em and, and at this time I, you know, I want to make this statement, it was not a 4 by 5. And I leaned back to tell the, the, the rest of the party what was going on. Sam was looking through the scope, or I assume that's what he was doing. And I was telling him how big he was when the shot went off. Um, we were, we kind, I was shocked I guess, is, is the word, and we sat there for awhile. The, the deer didn't move so we continued down the road. I don't recall if there was any conversation per se. And uh, we drove about another 50 yards I guess, from our left hand side there was a couple of Jicarilla units that drove out. They stopped us.

PEARSON: What happened?

RODELLA: Uh, his name appears on the face of the report. I can't recall his name. But I believe he was the only Anglo in the bunch. Uh,...

PEARSON: Mr. Tom Watts.

RODELLA: Watts. He had a I think it was an AR 15 in his hand. He came out and he pointed it at us and uh, told us to get out of the vehicle. So I got out and uh, I still thought everything was gonna be okay. Uh, and uh, the first thing out of his mouth was uh, "He, he's a passenger. He's the one that fired the shot." And I...

PEARSON: Indicating you?

RODELLA: Yes. And I said, "No, I didn't. No, I didn't," and I looked at Sam and Sam had uh, about two or three months prior to that, sometime in that uh, in that time frame he had had uh, quadruple bypass and I looked at him. I [sighs] I felt bad for him. I felt sick for him. Uh, he looked, he looked awful pale. And I expected him to say something. He just, he just stood there on

RODELLA_SP_GJS 000899