C

Supreme Court of New Mexico.
Inquiry Concerning a Judge, Nos. 2006–133, 2007–062, 2007–071, 2007–078.
IN the MATTER OF Thomas R. RODELLA, Magistrate Court Judge, Rio Arriba County, New Mexico.

No. 31,086.
Aug. 7, 2008.

**Background:** Petition was brought for permanent removal of magistrate judge. Judicial Standards Commission recommended that magistrate judge be permanently removed from office.

**Holdings:** The Supreme Court held that:
(1) Commission was not required to refer petition to special masters to ensure objectivity;
(2) magistrate judge committed misconduct in engaging in ex parte communications with witness, informing her that she did not have to respond to subpoena, and in altering recusal document;
(3) evidence did not support Commission's finding that purpose of magistrate judge's reporting a party for a suspected forgery was to harass and intimidate the party;
(4) magistrate judge engaged in misconduct, while campaigning, in promising to rule in favor of campaign supporters in future litigation;
(5) magistrate judge could be investigated and discipline for misconduct occurring while he was a candidate not yet in office;
(6) evidence did not support finding that magistrate judge engaged in willful misconduct in involving himself in setting bond and drafting release order for a friend arrested for driving while intoxicated (DWI); and
(7) permanent removal from the bench was warranted as discipline.

Permanent removal ordered.

West Headnotes

**[1] Justices of the Peace 231 ⇐10**

231 Justices of the Peace
   231I Appointment, Qualification, and Tenure
      231k10 k. Suspension or Removal. Most Cited Cases

Judicial Standards Commission did not abuse its discretion in failing to refer petition for permanent removal of magistrate judge to special masters to ensure objectivity, despite magistrate's judge's claim that Commission had connections to executive branch and was politically biased; there were sufficient checks on political influence, both in the form of Commission confidentiality, and in Supreme Court's power to review the Commission's actions. West's NMSA Const. Art. 6, § 32; West's NMSA § 34–10–2.1(A)(3).

**[2] Judges 227 ⇐11(8)**

227 Judges
   227I Appointment, Qualification, and Tenure
      227k11 Removal or Discipline
         227k11(5) Proceedings and Review
            227k11(8) k. Reference and Review. Most Cited Cases

Decision whether to appoint special masters is left to the discretion of the Judicial Standards Commission. West's NMSA § 34–10–2.1(A)(3).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[3] Judges 227** 🔑11(8)

227 Judges
    227I Appointment, Qualification, and Tenure
        227k11 Removal or Discipline
            227k11(5) Proceedings and Review
                227k11(8) k. Reference and Review. Most Cited Cases

When called upon to discipline a judge, Supreme Court undertakes an independent evaluation of the record to determine whether clear and convincing evidence supports Judicial Standards Commission's recommendation, but in so doing, Supreme Court may give weight to the evidentiary findings of those who were able to judge credibility.

**[4] Judges 227** 🔑11(7)

227 Judges
    227I Appointment, Qualification, and Tenure
        227k11 Removal or Discipline
            227k11(5) Proceedings and Review
                227k11(7) k. Evidence. Most Cited Cases

Clear and convincing evidence, supporting judicial discipline, is evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.

**[5] Judges 227** 🔑11(7)

227 Judges
    227I Appointment, Qualification, and Tenure
        227k11 Removal or Discipline
            227k11(5) Proceedings and Review
                227k11(7) k. Evidence. Most Cited Cases

For Supreme Court to discipline a judge, there need not be clear and convincing evidence to support each and every one of the Judicial Standards Commission's evidentiary findings; rather, Supreme Court must be satisfied by clear and convincing evidence that there is willful judicial misconduct which merits discipline.

**[6] Judges 227** 🔑11(8)

227 Judges
    227I Appointment, Qualification, and Tenure
        227k11 Removal or Discipline
            227k11(5) Proceedings and Review
                227k11(8) k. Reference and Review. Most Cited Cases

Supreme Court reviews Judicial Standards Commission's conclusions of law and recommendations for discipline de novo.

**[7] Justices of the Peace 231** 🔑10

231 Justices of the Peace
    231I Appointment, Qualification, and Tenure
        231k10 k. Suspension or Removal. Most Cited Cases

Magistrate judge's conduct, in engaging in ex parte communications with alleged victim in domestic violence case set to be heard by him, telling victim she did not have to respond to a subpoena, and in recusing himself and then altering recusal document to state that he had only considered recusing himself, violated Code of Judicial Conduct provisions requiring judge to uphold integrity and independence of the judiciary, requiring judge to avoid impropriety and appearance of impropriety, prohibiting judge from initiating, permitting, or considering ex parte communications concerning a proceeding, requiring judge to dispose of all judicial matters promptly, efficiently, and fairly, and requiring a judge to recuse when the judge has a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

personal bias concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding. NMRA, Rules 21-100, 21-200(A), 21-300(B)(7 8), 21-400(A)(1).

[8] Justices of the Peace 231 ⟶10

231 Justices of the Peace
    231I Appointment, Qualification, and Tenure
        231k10 k. Suspension or Removal. Most Cited Cases

In judicial discipline proceedings, magistrate judge failed to preserve for Supreme Court review claim that Judicial Standards Commission erred in failing to give notice of allegations of evidence tampering, where magistrate judge failed to object to any questioning on the topic of tampering with evidence. NMRA, Rule 11-103(A)(1); Judicial Standards Commission Rules 22(A), 23(A).

[9] Justices of the Peace 231 ⟶10

231 Justices of the Peace
    231I Appointment, Qualification, and Tenure
        231k10 k. Suspension or Removal. Most Cited Cases

Clear and convincing evidence did not support Judicial Standards Commission's finding that the purpose of magistrate judge's reporting a party for a suspected forgery was to harass and intimidate the party and prevent him from testifying before the Commission in judicial discipline proceedings, even though judge's report of suspected forgery was filed shortly after judge was notified that he was being investigated by the Commission on a complaint made by the party. UJI 14-2402.

[10] Judges 227 ⟶11(7)

227 Judges
    227I Appointment, Qualification, and Tenure
        227k11 Removal or Discipline
            227k11(5) Proceedings and Review
                227k11(7) k. Evidence. Most Cited Cases

In judicial discipline proceedings, intent to intimidate or threaten can be inferred from the circumstances.

[11] Justices of the Peace 231 ⟶10

231 Justices of the Peace
    231I Appointment, Qualification, and Tenure
        231k10 k. Suspension or Removal. Most Cited Cases

Magistrate judge's conduct, while campaigning, in promising to rule in favor of campaign supporters in future landlord-tenant litigation, and advising them how to excuse the other local magistrate, violated Code of Judicial Conduct provisions requiring judge to uphold the integrity and independence of judiciary, requiring judge to avoid impropriety and appearance of impropriety, prohibiting judge from allowing family, social, or political relationships to influence judge's conduct and judgment, requiring judge to be faithful to the law and not be swayed by partisan interests, prohibiting a judge from initiating, permitting, or considering ex parte communications concerning a proceeding, prohibiting judge from making pledges, promises, or commitments, with respect to cases, that are inconsistent with a judge's impartial performance of his adjudicative duties, and requiring candidates for election to judicial office to maintain the dignity appropriate to the office and act in a manner consistent with the impartiality, integrity, and independence of the judiciary. NMRA, Rules 21-100, 21-200(A, B), 21-300(B)(2, 7, 11), 21-700(B)(1).

[12] Justices of the Peace 231 ⟶10

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

231 Justices of the Peace
    231I Appointment, Qualification, and Tenure
        231k10 k. Suspension or Removal. Most Cited Cases

Magistrate judge could be investigated and disciplined for misconduct that occurred during his campaign when he promised to rule in favor of campaign supporters in future litigation, even though magistrate judge was a candidate not in office at time of such misconduct. West's NMSA Const. Art. 6, § 32; NMRA, Rule 21–901.

[13] Judges 227 &#x232B;11(1)

227 Judges
    227I Appointment, Qualification, and Tenure
        227k11 Removal or Discipline
            227k11(1) k. In General; Constitutional and Statutory Provisions. Most Cited Cases

Purpose of constitutional provision governing authority of Judicial Standards Commission is to achieve an efficient and well disciplined judicial system possessing the highest degree of integrity. West's NMSA Const. Art. 6, § 32.

[14] Judges 227 &#x232B;11(2)

227 Judges
    227I Appointment, Qualification, and Tenure
        227k11 Removal or Discipline
            227k11(2) k. Standards, Canons, or Codes of Conduct, in General. Most Cited Cases

Candidate for judicial office was required to comply with all provisions of the Code of Judicial Conduct and uphold the integrity of the judiciary.

[15] Justices of the Peace 231 &#x232B;10

231 Justices of the Peace
    231I Appointment, Qualification, and Tenure
        231k10 k. Suspension or Removal. Most Cited Cases

Clear and convincing evidence did not support Judicial Standards Commission's finding that magistrate judge engaged in willful misconduct in involving himself in setting bond and drafting release order for a friend arrested for driving while intoxicated (DWI), where the treatment the friend received was not inappropriate.

[16] Judges 227 &#x232B;11(4)

227 Judges
    227I Appointment, Qualification, and Tenure
        227k11 Removal or Discipline
            227k11(4) k. Grounds and Sanctions. Most Cited Cases

In imposing discipline on judges, Supreme Court looks at such factors as the nature of the misconduct and patterns of behavior.

[17] Justices of the Peace 231 &#x232B;10

231 Justices of the Peace
    231I Appointment, Qualification, and Tenure
        231k10 k. Suspension or Removal. Most Cited Cases

Permanent removal from the bench was warranted as discipline for magistrate judge who engaged in willful misconduct by engaging in ex parte communication with witness and informing her that she did not have to respond to subpoena, altering recusal document, and promising to rule in favor of campaign supporters in future litigation; pattern of misconduct was not corrected, but increased in its seriousness, despite training and mentoring, magistrate judge

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

demonstrated poor judgment, and judge's testimony in disciplinary proceedings lacked credibility.

[18] Judges 227 €—11(4)

227 Judges
    227I Appointment, Qualification, and Tenure
        227k11 Removal or Discipline
            227k11(4) k. Grounds and Sanctions. Most Cited Cases

Supreme Court cannot allow a judge who lacks credibility to preside over cases in which he is charged with weighing evidence and determining the credibility of others.

[19] Judges 227 €—11(5.1)

227 Judges
    227I Appointment, Qualification, and Tenure
        227k11 Removal or Discipline
            227k11(5) Proceedings and Review
                227k11(5.1) k. In General. Most Cited Cases

Award of costs for judicial disciplinary proceedings is not limited to proceedings before the Supreme Court, but includes proceedings before the Judicial Standards Commission. NMRA, Rule 27–403.

[20] Justices of the Peace 231 €—10

231 Justices of the Peace
    231I Appointment, Qualification, and Tenure
        231k10 k. Suspension or Removal. Most Cited Cases

Judicial Standards Commission could not recover from disciplined magistrate judge the costs of its investigation or reimbursement for the Commission's travel and per diem expenses, expenses which relate to its core function and for which the Commission should seek funding from the legislature. NMRA, Rule 27–403.

**340 James A. Noel, Elizabeth A. Garcia, Paul J. Kennedy, Albuquerque, NM, for Judicial Standards Commission.

Law Offices of E. Justin Pennington, E. Justin Pennington, Albuquerque, NM, for Respondent.

*619 OPINION
PER CURIAM.

{1} This case came before us on a petition for the permanent removal of Magistrate Judge Thomas R. Rodella. While this Court does not agree with all the findings and conclusions of the Judicial Standards Commission (the Commission), after our own review of the record, we hold that sufficient clear and convincing evidence was introduced to conclude that Judge Rodella committed willful misconduct. Moreover, we agree with the Commission that the evidence demonstrates that Judge Rodella's testimony lacked credibility. This lack of credibility and an apparent unwillingness to admit mistakes, combined with sufficient evidence of willful misconduct, lead us to conclude that Judge Rodella cannot serve as a judge. We therefore adopt the Commission's recommendation *620 **341 that Judge Rodella be permanently removed from office.

BACKGROUND

{2} Judge Rodella was initially appointed to the Rio Arriba Magistrate Court in April 2005. He resigned from the position in July 2005 after his involvement in one of the matters that is the subject of this disciplinary proceeding. The next year, however, Judge Rodella successfully ran for election to the same position, and he was sworn in as magistrate judge in January 2007. This judicial standards case addresses Judge Rodella's conduct in each of those three periods: during the period when he had been appointed to the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

bench; during his election campaign; and during the period after he had been elected to the bench. The Commission investigated Judge Rodella's involvement in three separate cases that came before Judge Rodella and determined that he violated the Code of Judicial Conduct, Rules 21–100 through 21–901 NMRA, and committed willful misconduct in office. The first was a DWI case that occurred shortly after Judge Rodella was appointed to the Rio Arriba Magistrate Court in April 2005, in which Judge Rodella was found to have involved himself in a friend's case. The second was a landlord-tenant case that had its origins in the period between Judge Rodella's resignation in July 2005 and his subsequent election in November 2006. In that case, Judge Rodella was found to have promised to rule in favor of campaign supporters in future litigation. The third was a domestic violence case set to be heard by Judge Rodella in June 2007. In that case, Judge Rodella was found to have engaged in ex parte communications with a witness, telling her she did not have to respond to a subpoena.

{3} The Commission filed a petition with this Court recommending that Judge Rodella be permanently removed from the bench, pay the costs of the proceedings, and receive a formal reprimand. Judge Rodella responded to the petition, making the following legal and factual arguments: (1) that, as a matter of law, the Commission lacked jurisdiction to investigate, consider, and make recommendations concerning Judge Rodella's conduct when he was not in office, and that because he was not yet a judge, under Rule 21–900(B), he was only required to comply with Rules 21–700, 21–800, 21–900, and 21–901(A); (2) that the Commission's findings on witness intimidation and evidence tampering deprived Judge Rodella of due process because he received no notice of these allegations and thus could not adequately respond; (3) that the Commission is politically biased and should have referred the matter to special masters for fact finding; and (4) that several of the findings are not supported by substantial evidence.

DISCUSSION

{4} As a threshold matter, we address Judge Rodella's argument that the Commission is politically biased and should have referred this disciplinary matter to special masters. We will address Judge Rodella's other arguments in the context of the three separate incidents from which the allegations of misconduct arose.

The Appointment of Special Masters

[1] {5} Judge Rodella argues to this Court that the Commission is a political entity and that it acted improperly by failing to refer the investigation and fact finding in this matter to special masters in order to ensure objectivity. He contends that this Court has already recognized "the potential for undue influence over judicial affairs by the Executive through JSC proceedings." *See State ex rel. Judicial Standards Comm'n v. Espinosa*, 2003–NMSC–017, 134 N.M. 59, 73 P.3d 197. Judge Rodella suggests that the executive branch, having previously encouraged the judge to resign, was displeased with his subsequent election and also had a contentious relationship with the judge's wife, who is a member of the New Mexico Legislature. Judge Rodella also represents that because the executive director of the Commission was appointed by the governor, the proceedings were politically biased.

{6} We are not persuaded that the Commission is either inherently biased or that there is evidence that it was biased in its investigation or examination of Judge Rodella. In *Espinosa,* we reviewed the history of the Commission, recognizing that it was intended to be an independent body composed *621 **342 of judges, members of the bar, and citizens to " 'oversee and investigate the performance, conduct and fitness of members of the judiciary.' " *Id.* ¶¶ 2, 10 (quoting the 1967 Report of the Constitutional Revision Commission at 88). We also observed that while "our Constitution expressly permits the encroachment of the executive branch into the judicial branch," *id.* ¶ 9, the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Commission has no "power to remove or sanction judges," but only makes recommendations to this Court, which has final decision making authority, *id.* ¶ 13. Thus, we concluded, "the Commission plays no role in the traditional functions of the judiciary." *Id.*

{7} We also emphasized that

the Commission works in near total confidentiality. The Governor has no access to the complaints filed before the Commission unless and until they are made public when a recommendation is made to this Court. Thus, the Governor will not be in a position to interfere with an ongoing investigation, and our Constitution has thereby provided another check on potential abuse of power.

*Id.* ¶ 15. Accordingly, there are sufficient checks on political influence, both in the form of confidentiality, and in this Court's power to review the Commission's actions, to ensure the independence of the Commission in fulfilling its role in overseeing judicial conduct.

[2] {8} Having created the Commission as an independent body, Article VI, Section 32 of the New Mexico Constitution, provides that the Commission may "order a hearing to be held before it concerning the discipline, removal or retirement of a justice, judge or magistrate, or the commission may appoint three masters who are justices or judges of courts of record to hear and take evidence in the matter and to report their findings to the commission." Consistent with the Constitution, NMSA 1978, § 34–10–2.1(A)(3) (1977), provides that the Commission shall, "if the commission deems it necessary or convenient, appoint three masters, who are justices or judges of courts of record, to hear and take evidence ... who shall report their findings to the commission." And Rule 20 of the Judicial Standards Commission Rules, promulgated under the authority of Article VI, § 32, provides that "[t]he commission, by a majority vote of its members, may appoint three (3) masters who are judges of courts of record to hear and take evidence in any hearing and to report their findings to the commission." Thus, the decision whether to appoint special masters is left to the discretion of the Commission, and we have been presented with no evidence of an abuse of that discretion. Indeed, we note that the examiner in this matter was neither the executive director of the Commission nor a regular member of the Commission's staff, but a former New Mexico Supreme Court Justice, who had been appointed to this Court by a prior governor. And though the Commission retained the ultimate authority to recommend removal to this Court, as noted above, we independently review the proceedings below to determine, de novo, whether to accept the recommendation of the Commission.

{9} We therefore turn to the merits of the case and address the Commission's findings and Judge Rodella's defenses in the context of each of the three separate incidents, examining whether the evidence demonstrates that Judge Rodella committed willful misconduct in office, and if so, whether his conduct was sufficiently egregious to warrant removal from the bench. As we have previously written, " '[willful] misconduct in office is improper and wrong conduct of a judge acting in his official capacity done intentionally, knowingly, and, generally, in bad faith. It is more than a mere error of judgment or an act of negligence.' " *In re Locatelli,* 2007–NMSC–029, ¶ 8, 141 N.M. 755, 161 P.3d 252 (per curiam) (quoting *In re Martinez,* 99 N.M. 198, 203, 645 P.2d 861, 866 (1982)).

**STANDARD OF REVIEW**

[3][4][5][6] {10} When we are called upon to discipline a judge, we undertake an independent evaluation of the record to determine whether clear and convincing evidence supports the Commission's recommendation, but in so doing, "we may give weight to the evidentiary findings of those who were able to judge credibility." *In re Castellano,* 119 N.M. 140, 149–50, 889 P.2d 175, 184–85 (1995) (per cu-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

riam). Clear and convincing evidence is evidence that "instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's *622 **343 mind is left with an abiding conviction that the evidence is true." *State ex rel. Children, Youth & Families Dep't v. Joseph M.,* 2006–NMCA–029, ¶ 15, 139 N.M. 137, 130 P.3d 198 (internal quotation marks and quoted authority omitted). " There need not be clear and convincing evidence to support each and every one of the Commission's evidentiary findings. Rather, we must be satisfied by clear and convincing evidence that there is willful judicial misconduct which merits discipline." *In re Castellano,* 119 N.M. at 149, 889 P.2d at 184. We review conclusions of law and recommendations for discipline de novo. *In re Griego,* 2008–NMSC–020, ¶ 6, 143 N.M. 698, 181 P.3d 690 (per curiam).

{11} Accordingly, we examine the evidence in each of the three incidents at issue to determine whether the evidence supports the Commission's findings, whether those findings support the conclusions, and whether the findings and conclusions justify removing Judge Rodella from the bench. We begin with the most recent incident, which occurred in the context of a domestic violence case in which a victim did not want to testify against her husband.

**The Domestic Violence Case**

[7] {12} This matter occurred in May and June 2007, after Judge Rodella had been elected magistrate judge. The Commission found the following facts. Judge Rodella met with the complaining witness, who had been subpoenaed by the State to appear and testify in her husband's trial. In an ex parte conversation, Judge Rodella told the witness that if she did not want to testify at her husband's trial, there would be no adverse legal consequences. The witness subsequently told the victim's advocate from the district attorney's office that Judge Rodella had led her to believe that she could decide for herself whether or not to testify at her husband's trial. On the day of the trial, the witness failed to appear, and the assistant district attorney informed the judge that the district attorney's office had been informed of an ex parte conversation between the witness and a judge who had told her that she did not have to appear. Judge Rodella indicated he was recusing from the case and began drafting a document recusing himself, which he signed and showed to the assistant district attorney. The state's other witnesses then understood they could leave. Later, however, when the complaining witness appeared, Judge Rodella recalled the case and dismissed it without prejudice. The assistant district attorney objected and asked to see the recusal document, but was denied access to it. When the recusal document was subsequently produced, it was different from the document reviewed by the assistant district attorney.

{13} After reviewing the record, we determine that the findings concerning the ex parte conversation between Judge Rodella and the state's complaining witness were supported by clear and convincing evidence in the form of the testimony of the court clerk and the complaining witness. We also determine that the Commission's findings concerning Judge Rodella's recusal and the altered recusal document were supported by clear and convincing evidence in the form of the testimony of the assistant district attorney.

{14} We find it significant that Judge Rodella's version of what occurred differed from the accounts given by the other witnesses. Judge Rodella acknowledged meeting with the complaining witness in his courtroom. However, whereas the victim and the court clerk testified that, initially, Judge Rodella and the witness were alone in the courtroom, Judge Rodella stated that his clerk was present for the entire meeting. And whereas his clerk testified that she had delivered the domestic violence case file to Judge Rodella and that the judge had asked her if the court had subpoenaed the complaining witness, Judge Rodella testified that he had told his clerk to check if there was a file, but that he did not recall her bringing a file to him, noting that he would not have spoken with

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

the witness if he had known she was a witness in a case. In contrast to the testimony of the other witnesses, Judge Rodella testified that it was not until several minutes after the complaining witness started talking that he learned her husband was a defendant in a domestic violence matter in magistrate court. In addition, the complaining witness *623 **344 testified, very credibly, that Judge Rodella told her that it would be up to her whether to testify at trial, that she knew her husband best, and that he had never seen anyone arrested for not showing up. Judge Rodella, however, could not recall telling her she could ignore a subpoena to appear as a state's witness at trial. Instead, he testified that he told her she would have to discuss the matter with the district attorney's office and that whatever decision she made about going to see the district attorney should be made in the best interests of her family. However, the complaining witness had no memory of Judge Rodella telling her to talk to the district attorney's office. And she testified that it was clear to her that if she did not appear, the case would be dismissed.

{15} In addition, Judge Rodella's version of what subsequently occurred on the day of the trial differed from the account given by the assistant district attorney. Judge Rodella testified that when the complaining witness failed to appear, the assistant district attorney requested a continuance and the defense attorney moved to dismiss the case. The defense attorney's account of what occurred, however, did not mention that he moved to dismiss, and the assistant district attorney testified that no such motion was made and that he did not have time to request a continuance. In addition, Judge Rodella testified that after the assistant district attorney reported that he had been informed of ex parte communications between the victim and a judge, he drafted some bench notes, which he showed to the assistant district attorney, indicating he was considering recusing even though the assistant district attorney had not named him directly. The assistant district attorney's recollection of these bench notes was different. He testified that the document he had been shown stated that the judge had recused, and not that he was only considering recusing, and that the judge had told him he could send his witnesses home.

{16} Thus, the assistant district attorney testified that he was shocked when the case was recalled, and he subsequently asked to see a copy of the document he had been shown and which he testified had been placed in the court file. He was told, however, that it was only bench notes and not a part of the record. Subsequently, a recusal document was produced for the Commission, which indicated the assistant district attorney had moved for a continuance, that the defense attorney had moved to dismiss, and that Judge Rodella had considered recusing but changed his mind. The assistant district attorney testified, however, that this was not the same document he had reviewed and that he had been told it was an edited copy.

{17} We agree with the Commission's determination that Judge Rodella's testimony "in many respects was not credible." As the Commission stated, "[T]o have accepted [Judge Rodella's] testimony as true, the Commission would have needed to find that all of the other witnesses ... perjured themselves." We also agree with the Commission's determination that the testimony of the other witnesses was credible. And we agree with the Commission's conclusions that Judge Rodella's conduct in this matter violated the following provisions of the Code of Judicial Conduct: Rule 21–100 (requiring a judge to uphold the integrity and independence of the judiciary); Rule 21–200(A) (requiring a judge to avoid impropriety and the appearance of impropriety and to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary); Rule 21–300(B)(7) (prohibiting a judge from initiating, permitting, or considering ex parte communications concerning a pending or impending proceeding); Rule 21–300(B)(8) (requiring a judge to dispose of all judicial matters promptly, efficiently, and fairly); and Rule 21–400(A)(1) (requiring a judge to recuse when

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

the judge has a personal bias concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding). We also agree, particularly in light of the lack of credibility in Judge Rodella's testimony, that Judge Rodella's conduct constituted willful misconduct in office.

[8] {18} We are not persuaded by Judge Rodella's argument that the charge of evidence tampering violated his right to due process. Although the record shows that the notice of formal proceedings was not amended to conform to proof of evidence tampering,*624 **345 as is permitted under Judicial Standards Commission Rule 25, our review of the record shows that Judge Rodella raised no objections at the hearing to any questioning on the topic of tampering with evidence. This issue, therefore, was not preserved for review. See Rule 11–103(A)(1) NMRA; Judicial Standards Commission Rules 22(A) and 23(A).

### The Landlord–Tenant Case

[9] {19} This matter had its origins in the period in 2006 when Judge Rodella was campaigning for election to the position of magistrate court judge in Rio Arriba County, the position from which he had resigned earlier in that same year. The Commission made the following findings. While campaigning, Judge Rodella visited the home of a married couple who lived in Chimayo. Judge Rodella asked for the couple's help in the upcoming election and said that he would help them if they ever had a problem in court. When he later learned from their daughter of a problem they were having with a tenant, he met with the couple again, reviewed their rental agreement, told them the contract looked good, and recommended that they file suit. Judge Rodella told the couple that they should wait until he was elected before filing their case and explained how they could excuse the other local magistrate judge to make sure he heard their case. After Judge Rodella was elected, the couple filed their complaint and excused the other judge. At the hearing on the case, however, Judge Rodella appeared impatient with the couple, particularly the wife, and recused himself. The couple then filed a complaint with the Commission. Subsequently, Judge Rodella sent a letter to the Administrative Office of the Courts (AOC)—the judicial agency responsible for administrative oversight of magistrate courts—informing the AOC Director that he suspected the husband had forged a document in the case. The Commission found that the letter initiated an investigation by the state police and that Judge Rodella had intended to harass the husband and prevent him from testifying before the Commission.

{20} After reviewing the evidence in support of these findings, we are not persuaded that sufficient clear and convincing evidence in the record supports the Commission's finding that the purpose of Judge Rodella's letter to the AOC Director reporting a suspected forgery was to harass and intimidate the husband and prevent him from testifying. To support such a finding, the evidence needed to show that Judge Rodella knowingly intimidated or threatened the husband to prevent him from testifying. See UJI 14–2402 NMRA.

[10] {21} In this case there was no clear and convincing evidence that Judge Rodella intended to intimidate or harass when he wrote to the Director of the AOC—on the advice of his attorney and with the help of an employee of his attorney. Although the examiner attempted to make Judge Rodella admit that the letter asked the AOC to refer the alleged forgery to law enforcement, Judge Rodella denied this. The relevant portion of the letter reads as follows: "I am submitting this letter with the expectation that you will keep it in confidence other than sharing the information contained within it and/or the enclosed documents with an appropriate law enforcement or prosecutorial agency." Even if the letter is construed as a request for an investigation, we do not agree that such a request demonstrates an intent to intimidate. As a general principle, intent can be inferred from the circumstances. See *State v. Hoeffel,* 112 N.M. 358, 361, 815 P.2d 654, 657 (Ct.App.1991) ("Intent can be

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

proved by circumstantial evidence."). However, in this case, the inferences the Commission drew from the circumstances are not supported by clear and convincing evidence. Judge Rodella's action in reporting a suspected forgery to the agency overseeing the magistrate courts shortly after being notified that he was being investigated by the Commission is not sufficient to support such a finding of an intent to intimidate. Because we hold that the evidence was insufficient to support a finding of witness intimidation, we do not address whether Judge Rodella's right to notification of this charge was violated.

[11] {22} We conclude that the rest of the Commission's findings are supported by *625 **346 clear and convincing evidence, although we note confusion in the testimony of the Commission's witnesses about who initiated the discussions between the Chimayo couple and Judge Rodella and about who accompanied him on his visits. There was, however, sufficient evidence of a clear and convincing nature for the Commission to find that Judge Rodella promised the couple he would help them in court with their landlord-tenant case and advised them on how to excuse the other magistrate judge. This evidence was corroborated by their excusal of the other judge. And although the couple's daughter testified somewhat inconsistently about when she spoke with Judge Rodella about her parents' problems with a renter, her testimony corroborated the essence of theirs. We also note that the couple's motivation for filing a complaint with the Commission was Judge Rodella's failure to follow through on his promise to assist them, further supports a finding that such a promise was made.

{23} As in the domestic violence case, Judge Rodella's testimony in this case conflicted with the testimony of the other witnesses. Judge Rodella contested their version of the facts. He testified that when he was campaigning, he left a card at the couple's home, and that he subsequently visited them once, before the primary election. He denied ever having told the couple that he would help them with a court matter or that he discussed their landlord-tenant problem with them. While he acknowledged having spoken to the couple's daughter, he denied talking with her about her parents or their landlord-tenant problem. He also denied having advised the couple how to excuse the other local magistrate.

{24} After conducting our independent review of the record, therefore, we conclude that there was sufficient evidence to support the Commission's conclusions that Judge Rodella violated the following provisions of the Code of Judicial Conduct: Rule 21–100 (requiring a judge to uphold the integrity and independence of the judiciary); Rule 21–200(A) (requiring a judge to avoid impropriety and the appearance of impropriety and to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary); Rule 21–200(B) (prohibiting a judge from allowing family, social, or political relationships to influence the judge's conduct and judgment); Rule 21–300(B)(2) (requiring a judge to be faithful to the law and not be swayed by partisan interests); Rule 21–300(B)(7) (prohibiting a judge from initiating, permitting, or considering ex parte communications concerning a pending or impending proceeding); Rule 21–300(B)(11) (prohibiting a judge from making pledges, promises, or commitments, with respect to cases, that are inconsistent with a judge's impartial performance of his adjudicative duties); and Rule 21–700(B)(1) (requiring candidates for election to judicial office to maintain the dignity appropriate to the office and act in a manner consistent with the impartiality, integrity, and independence of the judiciary). Because Judge Rodella did recuse from the Martinez case, we are not persuaded that clear and convincing evidence supports a conclusion that he violated Rule 21–400(A)(1) (requiring a judge to recuse when the judge has a personal bias concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding).

{25} We emphasize that, in addition to the misconduct described above, Judge Rodella's credibility

again was an issue. As the Commission observed, in order to believe Judge Rodella's version of events, it would have had to find that all the other witnesses in the matter had perjured themselves. The evidence persuades us, therefore, that Judge Rodella was not forthright in his testimony about his actions in this matter and that his actions constituted willful misconduct.

[12][13] {26} In addition to challenging the Commission's findings and conclusions in this matter, Judge Rodella argues that the Commission had no authority to investigate his conduct or to petition this Court to discipline him based on that conduct because he was not a judge. Specifically, Judge Rodella argues that the authority granted to the Commission in Article VI, Section 32 to investigate judicial misconduct and recommend discipline to this Court is limited to cases of "willful misconduct in office, persistent failure or inability to perform a judge's duties, or habitual intemperance," and does not extend*626 **347 to authority to conduct that occurred when he was not a judge. Moreover, he argues that only those provisions of the Code of Judicial Conduct addressing elections are relevant to his conduct during the campaign. *See* Rules 21–700, 21–800, 21–900, and 21–901. We are not persuaded that such a formalistic reading of Article VI, Section 32 is consistent with its purpose, which is " 'to achieve an efficient and well disciplined judicial system possessing the highest degree of integrity.' " *Espinosa,* 2003–NMSC–017, ¶ 10, 134 N.M. 59, 73 P.3d 197 (quoting 1967 Report of the Constitutional Revision Commission at 88).

[14] {27} We acknowledge the difficulties facing magistrate judges, who must engage in what has been termed "the rough-and-tumble of politics" every four years and campaign for elected office. *See* NMSA 1978, § 45–1–3 (2000) (requiring magistrate judges to run for election every four years); *see also Republican Party of Minnesota v. White,* 536 U.S. 765, 794, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (observing that campaigns for judicial elective office "may foster disrespect for the legal system"). However, our Code of Judicial Conduct applies, with very limited exceptions, to "all candidates for judicial office," including candidates for positions on the magistrate court bench. *See* Rule 21–901. Thus, as a candidate for judicial office, Judge Rodella was required to comply with all provisions of the Code and uphold the integrity of the judiciary.

{28} This Court has previously held that a judge can be disciplined for misconduct occurring during a previous term if that judge is subsequently re-elected, and that such "acts of misconduct ... follow the judge to any subsequent judicial office." *In re Romero,* 100 N.M. 180, 183, 668 P.2d 296, 299 (1983). In this case, although Judge Rodella was not in office when he promised to rule in the Chimayo couple's favor and when he advised them how to excuse the other judge, his conduct affected the functioning of the judicial system, and that conduct undermines public confidence in an independent, impartial, and competent judiciary. For us to hold that conduct occurring during a campaign, which violates the Code of Judicial Conduct and which has a direct impact on the performance of a judge's adjudicative responsibilities, is immune from investigation by the Commission would be inconsistent with the purpose of Article VI, Section 32. Accordingly, we hold that, under the circumstances of this case, the Commission's investigation of Judge Rodella's conduct while campaigning, which had a direct impact on the judicial process, was authorized by the New Mexico Constitution.

**The DWI Case**

[15] {29} This matter arose shortly after Judge Rodella was appointed to the magistrate court in April 2005. The Commission found the following facts. On July 4, 2005, a resident of Rio Arriba County was arrested for DWI and taken to the jail in Tierra Amarilla. Because the defendant's son knew Judge Rodella, as both were members of the same religious organization, the son called Judge Rodella for help in obtaining his father's release. Before the defendant had

been booked into the jail, Judge Rodella had several contacts with the defendant's family and called the jail, setting a $500 bond. Throughout the evening, Judge Rodella made at least ten phone calls, either to the jail or the defendant's family, concerning the defendant's arrest, and attempted to obtain his release from custody. When no one was available to accept the bond, Judge Rodella changed his release order to release the defendant to the custody of his wife. At approximately 10:00 p.m., Judge Rodella got out of bed and drove from Española to Tierra Amarilla and hand-delivered a release order. Judge Rodella also set and presided over the defendant's arraignment. Judge Rodella subsequently recused in the case after news articles reported on the matter, and he resigned his position as magistrate shortly afterwards.

{30} Based on these findings, the Commission concluded that Judge Rodella "abused his power and improperly involved himself" in the DWI case. More specifically, the Commission concluded that by "embroiling himself with the case of someone with whom his impartiality might reasonably be questioned," Judge Rodella violated the following*627 **348 provisions of the Code of Judicial Conduct: Rule 21-100 (requiring a judge to uphold the integrity and independence of the judiciary); Rule 21-200(A) (requiring a judge to avoid impropriety and the appearance of impropriety and to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary); Rule 21-200(B) (prohibiting a judge from allowing family, social, or political relationships to influence the judge's conduct and judgment); and Rule 21-400(A)(1) (requiring a judge to recuse when the judge has a personal bias concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding). These violations, the Commission concluded, constituted willful misconduct.

{31} While the basic facts in this matter are not disputed, a majority of the members of this Court concludes that the Commission's determination that Judge Rodella's actions constituted willful misconduct in office is not supported by clear and convincing evidence. First, Judge Rodella's actions in assuring that the defendant had access to bail and in setting bond, even though the bond set deviated from a bond schedule set by the presiding judge, were within his authority as a judge. Second, the evidence indicates that the number of telephone calls Judge Rodella engaged in resulted, in part, from problems at the jail. The supervisor at the jail testified that he spoke to Judge Rodella "about three times." The initial call was to find out what the charges were, and the other calls were related to bond issues. The first of the telephone conversations with the defendant's family occurred when the defendant's son called to report that his father had been arrested for DWI, and the subsequent calls were necessitated by confusion over the bond issues. Specifically, after Judge Rodella set bond, no one was available to accept the bond payment, and because no one was available to accept the bond payment, Judge Rodella drafted a release order so that the defendant could be released without bond. Judge Rodella tried to fax the release order to the jail, but because the fax machine at the jail was unavailable, he was told he had to hand deliver it.

{32} Unlike other disciplinary cases in which this Court has determined a judge interfered in a case involving friends and family members, the treatment the defendant received in this case was not inappropriate. See, e.g., In re Ramirez, 2006-NMSC-021, ¶ 4, 139 N.M. 529, 135 P.3d 230 (per curiam) (describing how the judge showed his court identification to an officer issuing a citation to his son and his son's friends, used a volunteer bailiff to assist them in responding to a citation, and spoke to the judges assigned to the cases); In re Griego, 2008-NMSC-020, ¶ 3, 143 N.M. 698, 181 P.3d 690 (adjudicating traffic cases involving family members, friends, and family members of friends and staff, outside the presence of a representative of the state, and involving his staff in this conduct). Indeed, the evidence showed that Judge Rodella had also ordered the release of another de-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

fendant on the same day.

{33} While we are troubled by Judge Rodella's failure to adhere to the bond schedule set by the presiding judge and by his actions in setting the defendant's arraignment before himself, the majority believes that while these actions demonstrate a lack of judgment, they do not constitute willful misconduct. This poor judgment, however, was not improved by training and mentoring and, instead, appears to have established a pattern of misconduct demonstrated in the willful misconduct in the subsequent cases.

**Removal**

{34} In the recent past, we have removed judges from the bench when their conduct threatened the integrity and independence of the judiciary. *See In re Griego,* 2008–NMSC–020, ¶¶ 18–21, 143 N.M. 698, 181 P.3d 690 (removing Judge Griego for a pattern of conduct demonstrating a lack of respect for and commitment to the law and for an attempt to explain that conduct that lacked credibility); *In re Garza,* 2007–NMSC–028, ¶¶ 1, 28, 29, 141 N.M. 831, 161 P.3d 876 (per curiam) (removing Judge Garza permanently for criminal conduct that threatened "the integrity and independence of the judiciary, to the judiciary's commitment to the law, and to the public trust"); *628**349In re Castellano,* 119 N.M. at 150, 889 P.2d at 185 (removing Judge Castellano for a "pattern [of behavior that] adversely affected his reputation for impartiality, independence, and integrity").

[16] {35} In imposing discipline on judges, this Court looks "at such factors as the nature of the misconduct and patterns of behavior." *In re Garza,* 2007–NMSC–028, ¶ 26, 141 N.M. 831, 161 P.3d 876. We also note that the *Model Code of Judicial Conduct* states that when imposing discipline on judges, courts should consider "factors such as the seriousness of the transgression, the facts and circumstances that existed at the time of the transgression, the extent of any pattern of improper activity, whether there have been previous violations, and the effect of the improper activity upon the judicial system or others." Scope ¶ 6 (2007).

[17][18] {36} In this case, we see a pattern of misconduct that was not corrected, but which increased in its seriousness, despite training and mentoring. In addition, we are deeply troubled by the Commission's determination, which our independent review of the record supports, that Judge Rodella's testimony lacked credibility. When a new judge, through lack of knowledge, experience or judgment, acts in ways that are inconsistent with his or her new role, we hope that such conduct can be corrected through discipline in the form of training, mentoring, and supervision. However, when a judge denies making mistakes, he or she cannot learn from the mistakes, and there is little that can be done to correct the behavior. Under such circumstances, to allow a judge who is not truthful to remain on the bench betrays the public trust and threatens the integrity and independence of the judiciary as a whole. And, as we wrote in *In re Griego,* we cannot allow a judge who lacks credibility "to preside over cases in which he is charged with weighing evidence and determining the credibility of others." *In re Griego,* 2008–NMSC–020, ¶ 21, 143 N.M. 698, 181 P.3d 690. Accordingly, we adopt the Commission's recommendation that Judge Rodella be permanently removed from the bench.

**Costs**

[19][20] {37} We note, initially, that because we conclude that no misconduct occurred in the DWI case, no costs will be awarded for that matter. Although we will address the specific amount of costs to be awarded in a separate order, we write to clarify which costs are recoverable under Rule 27–403 NMRA, which provides that when we discipline a judge following Commission proceedings, this Court "may direct that expenses of the Commission incurred in the disciplinary proceedings be paid by the judge." In its costs bill, in addition to seeking reimbursement for the costs of witnesses, depositions, and transcripts,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

the Commission also requested reimbursement for travel expenses for the commissioners, and investigation costs and services. Judge Rodella, by contrast, argues that the only proceedings for which the Commission may be awarded costs are the proceedings before this Court and not proceedings before the Commission.

{38} We are not persuaded by Judge Rodella's argument that the only disciplinary proceedings for which costs may be awarded are those before this Court. Judge Rodella argues that Rule 27–301 NMRA states that disciplinary proceedings are commenced only when the Commission files a petition with this Court. Rule 27–301, however, is specifically limited to the initiation of disciplinary proceedings in this Court. It does not define the term "proceedings." Other rules refer to the proceedings before the Commission. *See, e.g.,* Rules 27–101, –302 NMRA. Because the proceedings before the Commission are the functional equivalent of a trial, the proceedings in which most costs are incurred, we do not read Rule 27–403 to limit the award of costs to the proceedings before this Court.

{39} We recently addressed the question of specifically which disciplinary hearing costs should be borne by the party being disciplined in *New Mexico Board of Veterinary Medicine v. Riegger,* 2007–NMSC–044, 142 N.M. 248, 164 P.3d 947. Looking to Rule 1–054 NMRA for guidance, we held that while costs listed under that rule were presumed assessable to the disciplined party, the disciplinary authority could not seek to *629 **350 be reimbursed for the costs of the hearing officer or the hearing venue without violating the due process of the party being disciplined. *See id.* ¶¶ 26–32 (observing that to ensure fair and impartial proceedings, the operational costs of the courthouse, including paying the staff and the judge, should be paid by the state).

{40} We conclude, therefore, that while costs listed under Rule 1–054 are presumptively assessable against Judge Rodella, the Commission cannot recover the costs of its investigation or reimbursement for the Commission's travel and per diem expenses, expenses which relate to its core function and for which the Commission should seek funding from the legislature.

## CONCLUSION

{41} For the foregoing reasons, we conclude that Judge Rodella committed willful misconduct in office and order his permanent removal from the bench. Judge Rodella is ordered to pay costs as determined by separate Order to be issued by this Court.

{42} **IT IS SO ORDERED.**

N.M.,2008.
In the Matter of Rodella
144 N.M. 617, 190 P.3d 338, 2008 -NMSC- 050

END OF DOCUMENT