1               IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW MEXICO

3

4    UNITED STATES OF AMERICA,

5          Plaintiff,

6          VS.                       CR. NO. 14-2783 JB

7    THOMAS R. RODELLA, SR.,

8          Defendant.

9

10                        VOLUME 2

11          Transcript of Motion Proceedings before
     The Honorable James O. Browning, United States
12   District Judge, Albuquerque, Bernalillo County,
     New Mexico, commencing on September 16, 2014.
13

14   For the Government:  Ms. Tara C. Neda; Mr. Jeremy
     Pena
15
     For the Defendant:   Mr. Robert Gorence
16

17

18

19

20          Jennifer Bean, FAPR, RDR, RMR, CCR
                United States Court Reporter
21              Certified Realtime Reporter
                  333 Lomas, Northwest
22              Albuquerque, NM  87102
                Phone:  (505) 348-2283
23                Fax:  (505) 843-9492

24

25



SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                 201 Third NW, Suite 1630
Santa Fe, NM 87501                          Albuquerque, NM 87102
(505) 989-4949                                      (505) 843-9494
FAX (505) 820-6349                              FAX (505) 843-9492
                                                    1-800-669-9492
                                          e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1          THE COURT:  Good morning everyone.  I
 2   appreciate everyone making themselves available to me
 3   this morning.
 4          All right.  Given where we are, I think the
 5   best thing to do is probably go to the pretrial
 6   conference, and discuss a few things.  Y'all have
 7   done a lot of this.  This shouldn't take too long.
 8   But let's see if we can take those issues up and try
 9   to start dealing with the experts.  Length of trial,
10   Ms. Neda, what do you think?  How long do you think
11   the trial is going to last?
12          MS. NEDA:  I'm hoping just one week,
13   because I assume the jury selection will take some
14   time on Monday, but I think we both agreed we would
15   finish this up by the end of the week.
16          THE COURT:  You actually told us four days,
17   so I guess I'm surprised that we're going into a full
18   week.  What's your thoughts?
19          MS. NEDA:  If jury selection isn't lengthy,
20   I would say four days, sir.
21          MR. GORENCE:  Your Honor, can we remain
22   seated for this portion?
23          THE COURT:  That would be fine.
24          MR. GORENCE:  I concur with Ms. Neda that
25   initially I thought four days.  But I see by the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    tentative rulings by the Court that if we get into

2    three 404(b) incidents, I think that will -- and I

3    hadn't anticipated that when we first talked about

4    length of trial, Your Honor -- but I think that will

5    greatly increase, at least by a day.  And if we're

6    counting all three -- because that's going to be a

7    fair amount of developing; I'll be bringing in

8    photographs of where they were, what transpired, and

9    I anticipate very lengthy cross-examination -- then

10   there will be other testimony about those incidents.

11   So I'm modifying my original estimate by virtue of

12   some of the Court's tentative rulings.

13           I know we have a tentative ruling.  I'm

14   ready to argue at some point on the SOPs.  And if

15   they come in, I think that will -- again, I'm not

16   arguing or quibbling with the Court's ruling -- but

17   I'm modifying by virtue of things I didn't anticipate

18   early on.

19           So I think it will take all of the week by

20   virtue of other things that will be at issue in this

21   case that I hadn't contemplated when we first talked.

22   So --

23           THE COURT:  Well, we've got to come up with

24   a firm date.  Let's get it done in one week.  I think

25   that's plenty of time to try this case.  Because I've

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   got to tell the jury on Monday how long this trial
 2   will last, and I don't want to just go in there with
 3   a:  Well, we're going to go a little longer and stuff
 4   like that.  You've got five days to try the case.
 5   Get it done in that period of time.
 6            MR. GORENCE:  Yes, Your Honor.
 7            THE COURT:  Closings:  Do you want closings
 8   before or after instructions?
 9            MS. NEDA:  I would like the closings after
10   the instructions, so that we may refer to them.
11            THE COURT:  Mr. Gorence?
12            MR. GORENCE:  I concur.
13            THE COURT:  All right.  We talked about the
14   courtroom.  It will be here.  Preliminary
15   instructions.  I sent it to you yesterday.  Ms. Neda,
16   Mr. Pena, do y'all have any objections, comments,
17   suggestions on that?
18            MR. PENA:  Yes, Your Honor, we do have some
19   problems with the instructions that -- on page 7 it
20   does indicate that the Court is referencing
21   Defendant's Proposed 1 and 2 -- oh, the preliminary
22   one, just  the preliminary one, Your Honor?
23            THE COURT:  Yes.
24            MR. PENA:  I have no problem with that.
25            MR. GORENCE:  No problem.  I know this is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   to give the jury a feel.  I have no problem with

2   that.  I know we have other issues with regard to the

3   final jury instructions.

4            THE COURT:  And I haven't worked on those.

5   I obviously looked at your finals to come up with the

6   elements here.  But what were you going to say, Mr.

7   Pena, what issue did you have?

8            MR. PENA:  They pertained to defendant's

9   proposed jury instructions 1 and 2, sir.

10            THE COURT:  Oh, okay.  But the preliminary

11   instruction is fine?

12            MR. PENA:  Yes.

13            THE COURT:  Okay.  Notice it says

14   notetaking, questions by jurors.  All that was

15   fine --

16            MR. PENA:  Yes, sir.

17            THE COURT:  -- with everybody?  That was

18   all right with you, Mr. Gorence?

19            MR. GORENCE:  Yes, Your Honor.

20            THE COURT:  How many alternates do you want

21   to have for this trial?

22            MS. NEDA:  Two.

23            MR. GORENCE:  I think that would be

24   sufficient.

25            THE COURT:  All right.  We'll do two.  Do

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  you want to discharge them before they deliberate?

2  Do you want to keep them both under charge?  Do you

3  want to keep one under charge, discharge the other?

4          MS. NEDA:  Keep them under charge.

5          MR. GORENCE:  I concur, Your Honor.

6          THE COURT:  All right.  We'll keep them

7  both under charge then.

8          Let's talk about how we're going to run the

9  trial.  We can do a rather traditional trial; start

10  time at 8:30 or 9:00, take a break for lunch, close

11  at 5:00, if we're staying on-track; 5:30 or 5:00,

12  depending on whether we're staying on-track.  Or we

13  could start early and run through lunch, just take

14  short breaks, and break a little bit earlier in the

15  day.  What's your thoughts?  Traditional, or do you

16  want to do something different here?

17          MS. NEDA:  Traditional, but for the fact

18  that if there are evidentiary issues that need to be

19  addressed outside the presence of the jury, we could

20  do that during lunch break or come in early.

21          THE COURT:  All right.  You want to use a

22  traditional schedule?

23          MR. GORENCE:  That's okay, Your Honor.

24          THE COURT:  All right.  So we'll ask you to

25  be here on Monday at 8:30.  We'll try to have the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    jury in here at 9:00.  We'll break for lunch, and
 2    we'll close -- we'll shoot for 5:00.  If the case
 3    isn't moving rapidly, and we're not staying on-track,
 4    then, if we need to, we'll work till 5:30.
 5              Openings:  What's the length of your
 6    opening and who will be making it?  I put you in
 7    there, Ms. Neda, so how long will your opening last?
 8              MS. NEDA:  Less than 30 minutes.  So I'll
 9    put a 30-minute limit on it.
10              THE COURT:  Okay.  Mr. Gorence.
11              MR. GORENCE:  Ms. Oliveros will be opening,
12    Your Honor, and I would anticipate all of 30 minutes.
13    And I'd ask for 40, just to be safe, if we're on a
14    clock.
15              THE COURT:  All right.  You don't have to
16    tell me if you don't want to, but it helps make -- as
17    far as the preliminary instruction, do you expect to
18    make your opening at the beginning?
19              MR. GORENCE:  Yes, Your Honor.  There is no
20    doubt that will occur.
21              THE COURT:  Okay.  The defendant is not in
22    custody, so I don't have to worry about those issues.
23              Exhibits:  Any issues with exhibits that we
24    need to discuss, Ms. Neda?
25              MS. NEDA:  Yes, I did e-mail some
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

184

1   objections to exhibits of the defense pursuant to our

2   deadline.  I didn't get any objections from the

3   defense for ours.  But with respect to theirs, one is

4   Facebook screen shots from the victim's Facebook, and

5   I would object to it.

6            THE COURT:  I'm not sure I got the

7   objections to --

8            MS. NEDA:  No, they were to be shared

9   amongst --

10            THE COURT:  So y'all just made an informal

11  objection?

12            MS. NEDA:  Well, I interpreted the order to

13  be that we should exchange objections to see what we

14  could stipulate to.  With respect to Exhibit I, I did

15  communicate by the deadline that I object to Exhibit

16  I, because all it is is --

17            THE COURT:  I'm not even sure I have --

18  okay.  I do have the defendant's exhibit list.  So

19  Exhibit I is the only one you have an objection to?

20            MS. NEDA:  They've produced the other two

21  that I had objections to.  I don't have -- well,

22  let's address Exhibit I.  And I'm going to bring it

23  up to the Court since you don't have it; is that

24  right?

25            THE COURT:  I don't have the exhibits.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    I've got an exhibit list.

2            MS. NEDA:  Okay.  Here is a notebook of the

3    exhibits proposed by the defense.

4            THE COURT:  Is that the only one you have

5    an objection to is Exhibit I?

6            MS. NEDA:  Yes, but I have to just address

7    the other two in just a moment.  But with respect to

8    Exhibit I, I have a firm objection.  And the Court

9    can see what it is, is screen shots from the victim's

10   Facebook.  They don't pertain to this case in any

11   way, shape, or form.  They are poetry.

12           THE COURT:  What do you --

13           MR. GORENCE:  I plan on, Your Honor,

14   without getting -- I don't know if I'm going to

15   introduce them, but I certainly can confront

16   Mr. Tafoya with questions about what he has posted,

17   and statements.  If there is an objection at that

18   time to the question, I would anticipate the

19   Government making that objection and the Court ruling

20   on it.  The only -- and this was submitted as an

21   abundance of caution -- that if he denied statements

22   that he wrote, I would plan on introducing them.  At

23   this point, I don't plan on introducing, depending on

24   the answer.  But I will at least in some of my

25   questions to Mr. Tafoya, I want to -- he's made

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   certain assertions in what the Government

2   characterizes as poetry.  I characterize it a

3   different way.  But anyway, I plan to ask him certain

4   questions, and if he denies it, then I would confront

5   him with his own statements from Facebook.

6              THE COURT:  Well, let me have Ms. Wild make

7   a copy of this.  I understand the issue.

8              MS. NEDA:  Well, I didn't articulate it

9   completely, but it obviously would be hearsay if it

10  was introduced.  But also relevance.  It's completely

11  irrelevant.  It's poetry he would send out to friends

12  on Facebook and get their feedback about poetry.  I

13  think what Mr. Gorence wants to do is take sentences

14  from the poetry and ask the victim, isn't it true you

15  feel this way or that way, which is not relevant to

16  the case.

17             THE COURT:  Well, let me make a copy of

18  that, and --

19             MS. NEDA:  Yes.

20             THE COURT:  And then I'll review it.  And

21  it may or may not be relevant, but I probably can't

22  make that determination without reviewing the

23  document and seeing what the question is going to be.

24  Any other issues with exhibits, Ms. Neda?

25             MS. NEDA:  Let me just confirm because
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   there is no identification.  With respect to the

2   phone records, it doesn't indicate who these are.

3   That's Exhibit G.

4           MR. GORENCE:  Your Honor, these were

5   produced by the Government, Verizon.  I've stipulated

6   to the authenticity of the phone records.  They

7   pertain to Mr. Rodella's phone, Undersheriff Crespin.

8   And the Bates stamps are on there -- and I know the

9   Government has subpoenaed these -- and with the

10  numbers I'm fairly confident, given that they gave

11  them to us to begin with that, they know who they

12  belong to, and they will be authenticated for the

13  jury.  If the Government wants, we'll put them all

14  in.  But these are the relevant time periods and the

15  relevant dates.  That's Mark Thompson's phone --

16          MS. NEDA:  I don't object to that.  My

17  question was that in the defense exhibit list, I

18  believe they said Jake Arnold's phone.  And we did

19  not obtain the Verizon records for Jake Arnold's

20  phone.  But these are the ones disclosed to you.

21  There is no objection.

22          MR. GORENCE:  I think they're all Bates

23  stamped, Your Honor.  And I don't know if

24  Mr. Arnold's phone will be appropriate.  At this

25  time, I don't know if I'll be introducing those.  But

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    we have the Sheriff's, Mr. Thompson's, Mr. Crespin's,

2    and Randy Sanchez.  And I think the Government has

3    all those.  These are records that we obtained from

4    them.

5         MS. NEDA:  Absolutely.  And we do not

6    object to that.  It's just that it says -- in the

7    exhibit list, it doesn't say that.  It says Jake

8    Arnold's phone.

9         Now, with respect to Government's Exhibit

10   H, it is the dispatch logs.  Defendant's Exhibit H,

11   these are dispatch logs.  I have no problems having

12   somebody describe this, but I know that an

13   explanation is required just to introduce these into

14   evidence.  And make argument based simply on the

15   documents without explanation, I think is -- would

16   lead to confusion.  So I think a foundation witness

17   needs to be provided to explain how the information

18   is entered.  I know that even we, as we studied this,

19   realized that it isn't what it appears to be on its

20   face.  And you do have to interview the various

21   dispatch personnel to get an explanation of that.  So

22   I don't have a problem with testimony about this and

23   even the admission of this record, provided there is

24   a foundation made via an explaining witness.

25         THE COURT:  Do you intend to have somebody

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   provide a foundation on that?

2           MR. GORENCE:  Again, Your Honor, this was

3   produced by the Government, but I'll amend our

4   witness list to call the dispatcher for that

5   foundation that the Government wants, Ms. Quintana.

6   And I will do that today to accommodate the

7   Government's concerns about how the document is

8   created.

9           And I understand now, because there is a

10  lot of information on that, as it pertains to towing

11  records, and I think the Government is now clued into

12  that.  But I will amend the witness list to bring the

13  dispatcher.

14          THE COURT:  All right.  Ms. Neda, do you

15  have any other issues?

16          MS. NEDA:  No.  But Ms. Quintana, if you

17  notice on our witness list, we are bringing her, and

18  she could speak to where her entries are.  She's not

19  the only one that's on this.  That's all I need to

20  mention.  And we're not intending to bring anybody

21  but Ms. Quintana.

22          THE COURT:  Is she a dispatcher?

23          MS. NEDA:  She is, and she's on the

24  dispatch log along with others.

25          THE COURT:  Is that sufficient that you put

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  your exhibit in through her?

2          MR. GORENCE:  I will.  I'm just always --

3  if for some reason they don't call her, I better have

4  her under subpoena.  Unless the Government is making

5  an ironclad representation she'll be here, then I

6  won't go to the trouble.  And maybe that would be a

7  lot easier because that would accommodate at least

8  describing the process for how a dispatch computer --

9  well, computer assisted dispatch, a CAD, is created.

10  So if they're going to call her, then I won't, and we

11  can take care of this authentication issue.

12          MS. NEDA:  All right.  And Exhibit J -- I'm

13  sorry, yeah, J -- Defense Exhibit J -- I guess we

14  have no objection.  We originally objected because we

15  didn't have a copy of it.  We now do.  So there is no

16  objection to Exhibit J, Your Honor.

17          The final objection is if the defense

18  intends to offer the original indictment into

19  evidence, and, of course, we would object to that.

20          MR. GORENCE:  Your Honor, this will be --

21  and I think it was clear -- as well as the dismissal

22  against Thomas Rodella, Jr., and it would only come

23  in with regard to Thomas Rodella, Jr., his motive and

24  bias, the fact that he was first accused of

25  wrongdoing, then dismissed.  And I can pull the case

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    law, but the fact that he was charged by the

2    Government then dismissed will be relevant for the

3    jury to evaluate his credibility.  And that's the

4    only way it could come in.  I don't have a problem

5    with a limiting instruction in terms of it doesn't --

6    it's only relevant to Tommy Rodella's Jr.'s

7    credibility; that he was charged, arrested; the

8    Government moved to detain him, and keep him in jail.

9    That's a matter of public record.  When they filed

10   that on August 15, he was released.  But that is

11   relevant to his credibility, Your Honor, and that's

12   the basis for it.

13        THE COURT:  How does that help you?  Why

14   would you want to introduce that?

15        MR. GORENCE:  Your Honor, I appreciate

16   maybe the Court's more experienced.  But I think it's

17   relevant that the jury understands that he was a

18   defendant in this case, and dismissed.  The

19   Government can get into their reasons; they can ask

20   about his -- and I'm talking about his illustrious

21   war record.  We'll get into his service-connected

22   injury, and all of that.  But I do want to show that

23   the Government charged him, because that's the truth

24   in this case.  And it will give the jury the full

25   feel and flavor that if he has any animus towards the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  Government, that would be important for the jury to

2  assess.

3           MS. NEDA:  Your Honor, it's not relevant,

4  and Mr. Gorence doesn't get into the background of

5  Mr. Rodella, Jr.  So everything Mr. Gorence has just

6  discussed is wholly irrelevant.  Obviously, the

7  indictment is not admissible.  And with respect --

8           THE COURT:  Are you calling Rodella, Jr.?

9           MS. NEDA:  No.  It's on the defense witness

10 list.

11          THE COURT:  I guess if he wants to impeach

12 his own witness, it's his business, isn't it?

13          MS. NEDA:  And you know the reason why it

14 was dismissed -- I don't know that we need to discuss

15 it in open court right now -- with respect to Mr.

16 Thomas Rodella, Jr., but it had nothing to do with

17 the defendant not being culpable.  So that's why it's

18 irrelevant.  And plus, an indictment should never be

19 in evidence, as the jury is going to be instructed by

20 you, sir, in the jury instructions.  The jury is

21 going to be instructed that an indictment is not

22 evidence.  How conflicting it would be if an

23 indictment was actually admitted into evidence for

24 them, as a piece of evidence for them to consider.

25          And then I just noticed that attached to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    this indictment is the United States' unopposed

2    motion to dismiss Mr. Rodella, Jr.  The United

3    States' motion is a piece of evidence?  Since when?

4    And if it is, why wouldn't you put in all the motions

5    which lay out this case very nicely.  But, of course,

6    it is not evidence.  We're trying to make sense out

7    of nonsense.  These items are not evidence.  They're

8    not relevant.  They are hearsay.  And there is a lot

9    of background behind both these -- this event -- that

10   doesn't necessarily have to be put into the court,

11   into the trial.

12          THE COURT:  Well, I'm not sure the issue.

13   I mean, if anything, it seems to me that the

14   Government might have an interest in talking about

15   the fact that, if Rodella, Jr. testifies, that he was

16   indicted in this case.  So I'm a little confused

17   about who is fighting over what here.

18          But anyway, I think the issue is probably

19   relevance.  Do we need to get the indictment in?  The

20   reason I'm concerned about the indictment, it

21   contains additional counts against Mr. Rodella, Sr.

22   And I'm wondering if that should not be in front of

23   the jury, because we want them to focus on the

24   indictment that I will give to them.

25          MR. GORENCE:  Well, Your Honor, I think

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    that's all handled by a limiting instruction.  And I
2    won't be arguing that the indictment now was
3    dismissed with regard to certain counts.  I know --
4    and I can get the case law -- in terms of a charge
5    against a witness is always relevant to show motive
6    and bias.  And when it's dismissed -- and I most
7    certainly, in credentialing this witness --
8             THE COURT:  I'm just wondering if the
9    indictment itself needs to come into evidence.  I'm
10   not saying keep it out as far as your questioning
11   Rodella, Jr.  But it also contains additional charges
12   against Rodella, Sr.
13            MR. GORENCE:  Well, Your Honor, I think the
14   Government has got an issue on penalties.  And I
15   don't plan on getting into the specific time counts
16   of each thing that Mr. Rodella faced.  Because, as
17   you would with a cooperating defendant, you can show
18   what he would have faced, and what he's now
19   potentially facing by virtue of the benefit.  But I
20   do want to show that he was charged in a conspiracy
21   with his father.  I want to show that he was charged
22   in falsifying --
23            THE COURT:  Well, I'll look at your cases.
24   But give some thought to whether all that can be --
25   I'm sure Rodella, Jr. is going to give you the answer
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   you want.  So you can probably say, Weren't you

2   charged with a conspiracy, and all that, without

3   maybe the additional charges against Rodella, Sr.

4   coming in, and the jury setting there thinking about

5   those.

6           MS. NEDA:  Your Honor -- and I would ask

7   the Court to reserve its ruling on this, and require

8   a showing by Mr. Gorence -- because I am absolutely

9   certain that there will be no support for admitting

10  an indictment into evidence.  It would open up a

11  whole can of worms.

12          THE COURT:  I'll look for your -- if you

13  want to give me some law on that, I'll be glad to

14  look at it.

15          MR. GORENCE:  I'll do that, Your Honor.

16  And I do want to --

17          MS. NEDA:  And the motion, and the --

18          THE COURT:  Hold on, hold on.  I'm going to

19  have to talk to you both about court etiquette here,

20  okay?  Yesterday -- and you've done it again today --

21  you continue to interrupt me.  And that's going to

22  probably at some point boil over, and I'll have to

23  call you down in front of the jury.  So let's start

24  today.

25          MS. NEDA:  All right.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        THE COURT:  Watch me.  If I'm talking, you

2   stop.  Y'all talk to the Court; don't talk to each

3   other.  I'm usually pretty good about prompting you:

4   Thank you, Ms. Neda; thank you, Mr. Gorence.  You

5   know when you're over.  When Mr. Gorence is up here

6   arguing, don't you be making comments about it.  But

7   let's use normal court etiquette.

8        All right.  What other issues do you have

9   on exhibits?

10       MS. NEDA:  Well, in addition to the

11  indictment, Your Honor, I was also mentioning that

12  there is a motion.

13       THE COURT:  I understand.

14       MS. NEDA:  Okay.  So that, as well, is

15  being objected to.

16       THE COURT:  I understand the issue.

17       MS. NEDA:  Now, with respect to any of the

18  other exhibits, they're just all hearsay.  For

19  instance, the written report from the Rio Arriba

20  County Sheriff's Office, the investigative report.

21  That doesn't come in, it's hearsay.  The witnesses

22  will testify to how they conducted their

23  investigation.  But their actual report is not

24  evidence.  There are statements, very self-serving,

25  written by the defendant about what transpired.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    That's Exhibit A.  I don't know if the Court has
 2    these exhibits.  Exhibit A, for instance, starts off
 3    on this first page, is the supplemental prepared by
 4    Vince Crespin, which parrots the --
 5               THE COURT:  Well, I'm not sure this is very
 6    profitable.  We'll just skip exhibits.  We'll just
 7    argue them one at a time at trial.
 8               MS. NEDA:  All right.
 9               THE COURT:  I thought there might be some
10    way to assist with exhibits.  I'd understood that you
11    had one objection on Exhibit I, about the Facebook.
12    And now it's going through every one of the exhibits.
13    And that's not what I had in mind.
14               Is there any exhibits -- any issues with
15    exhibits that I can help with on your side, Mr.
16    Gorence?
17               MR. GORENCE:  Your Honor, we've objected to
18    the Government's exhibits pertaining to the SOPs, and
19    training manuals, and the rest of them.  And what I'd
20    like to do is, I will get -- some of these have to do
21    with foundation, and that's what Ms. Neda is really
22    talking about.  I don't want to stipulate at this
23    point, because I don't know.  But what I will do by
24    the end of the day is I will indicate and copy the
25    Court on what we will stipulate prior to the start of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the trial.  And to be candid, I think it's going to

2    be the majority.  I've got one -- most of the

3    photographs.  I know that there are phone call logs,

4    but again, I'm waiting to see how they're

5    authenticated.  So, Your Honor, I think it would be

6    best -- I will send an e-mail, then we handle them

7    one by one that we can't agree to.

8            THE COURT:  All right.  Are there any

9    issues or disputes with witnesses that I need to deal

10   with other than what we're going to have to deal with

11   as far as experts this morning, Ms. Neda?

12           MS. NEDA:  Yes, Your Honor.  I filed a

13   motion, it's Document 68, objection to the defense

14   failure to name its witnesses in a timely fashion by

15   the Court's deadline.  I mean, I understand that

16   sometimes you have to amend --

17           THE COURT:  Well, I thought we dealt with

18   Gail at the last hearing.  Is there anything to add

19   on Gail?

20           MR. GORENCE:  No, Your Honor.  And I still

21   have an investigator pursuing that.  And I understand

22   the Government's concern.  I would ask that if I have

23   an amended with a name -- and I'd like to have till

24   Thursday -- let's see, it's Tuesday -- Thursday by

25   5:00 -- then I won't be calling her.  I'm not going

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   to surprise at the last minute with a witness

2   unless -- and I think rebuttal witnesses are always

3   apropos.  If Mr. Tafoya were to deny something, I can

4   always call a witness, even someone not on the

5   witness list, to impeach a Government witness.  And

6   so what I'm saying is I don't intend on calling her,

7   if I haven't got her.

8           On the other hand, I think the Court's well

9   aware -- this is a court rule, it's not a rule of

10   criminal procedure -- we're complying with the

11   Court's rule.  But it certainly doesn't limit the

12   defense from calling impeachment witnesses.

13   Obviously, I've seen Mr. Tafoya's report, but I've

14   never talked to him.  He won't talk to -- so my first

15   opportunity to really hear what he's going to say

16   under oath is when I cross-examine him.  And if he

17   says something that contradicts what he's told

18   someone else, I believe the Court's scheduling order

19   doesn't preclude us from coming in and calling a

20   rebuttal witness.

21           THE COURT:  Well, make sure that it's a

22   true rebuttal witness.  Make sure that it cannot be

23   anticipated.  So if you know right now you're going

24   to have to impeach Mr. Tafoya, and you know you're

25   going to impeach him with another witness, identify

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that person now, and be prepared to call it -- well,

2    obviously in your case-in-chief, but make sure it's a

3    true rebuttal witness.

4              MR. GORENCE:  Yes, sir, Your Honor.

5              THE COURT:  Other than Gail, is there

6    anything I can really do with the objections?

7              MS. NEDA:  Well, Your Honor, as my

8    objection states, Witness No. 19 is actually -- is an

9    infinite series of witnesses.  It says any witness

10   who deals with discovery.

11             THE COURT:  Well --

12             MR. GORENCE:  Your Honor, I'll retract

13   that.  I think the idea is to avoid surprises.  And

14   if we have received information from the Government,

15   it's certainly no surprise.  And I know that's a

16   civil response.

17             THE COURT:  Yeah.  Let's just not rely upon

18   that one.  So if you've got a witness, even if it's

19   been disclosed in discovery, why don't you get that

20   and file an amended trial witness list.

21             MR. GORENCE:  Yes, Your Honor.

22             THE COURT:  All right.  Anything else on

23   exhibits or witnesses, Ms. Neda?

24             MS. NEDA:  Has the Court -- I want to make

25   clear on the order, Mr. Gorence is to disclose the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    identity of any other witnesses he can on Thursday?

 2              THE COURT:  Is that right?

 3              MR. GORENCE:  I've committed to that, Your

 4    Honor.

 5              THE COURT:  Anything else, Ms. Neda?

 6              MS. NEDA:  With respect to pretrial issues?

 7              THE COURT:  No, just witnesses.

 8              MS. NEDA:  Oh, witnesses.  No, sir.

 9              THE COURT:  All right.  How about you, Mr.

10    Gorence, anything further?

11              MR. GORENCE:  No.

12              THE COURT:  Are there any discovery issues

13    outstanding I need to deal with, Ms. Neda?

14              MS. NEDA:  Discovery on the part of the

15    United States, no.  We disclosed everything.  And I

16    believe Mr. Gorence has now disclosed all his

17    exhibits.

18              THE COURT:  Any discovery issues, Mr.

19    Gorence?

20              MR. GORENCE:  The only thing is what I

21    raised yesterday, Your Honor.  Some research is still

22    continuing.  I believe the Government has an

23    obligation to turn over communications to the State

24    Police to the extent it relates to an explanation for

25    a doctored report, as we heard, then we'll follow-up
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    on that today at 11:00.  I believe that it's

2    relevant.  It might not be a witness statement, but,

3    as I said, research is continuing as to whether

4    Mr. Howard, seated in the back, will be called.  And

5    if need be, we have to go through a CFR procedure,

6    which has to be served in D.C., so that wouldn't

7    happen today with Mr. Howard.

8            But I think fundamental due process, now

9    that we've heard the testimony yesterday, as

10   conflicting as it was between Sergeant Olson and

11   Patrolman Orlando Sanchez, and we'll see how that

12   transpires.  But I have a discovery request that I've

13   made that the Government turn over any and all

14   information to the extent it exists with regard to

15   FBI or U.S. Attorney communication to the State

16   Police requesting them to change a document.

17           So I've made that on the record.  There

18   isn't a motion, but I will call it an oral motion in

19   court.  And I believe that it is exculpatory and

20   needs to be turned over pursuant to Brady versus

21   Maryland on this issue regarding the recusal of the

22   U.S. Attorney.

23           THE COURT:  Mr. Pena, do you want to

24   respond or anything?

25           MR. PENA:  Of course, the United States is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    fully aware of its Giglio obligations.  If we had any
 2    awareness of something like that existing, we would
 3    have turned it over long ago.  But we will continue
 4    to maintain --
 5              THE COURT:  So you don't think there is any
 6    FBI or U.S. Attorney's communications or documents
 7    that indicate communications between the U.S.
 8    Attorney's Office and the FBI about charges in state
 9    court?
10              MR. PENA:  Absolutely not, to my knowledge,
11    Your Honor.
12              THE COURT:  All right.  I've got your
13    instructions.  And I'll try to get you a final set.
14    By that, I don't mean that it won't be subject to
15    revision.  I just mean it will be the final jury
16    instructions.  I'll try to get that to you this week
17    so that you can start looking at it and making
18    comments or suggestions.
19              Other than the motions that we have to deal
20    with today, any other motions in limine anybody
21    anticipates filing, Ms. Neda?
22              MS. NEDA:  Not at this point.  There is a
23    couple pending matters that we still need to address.
24              THE COURT:  All right.  And you don't
25    expect anything further?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          MR. GORENCE:  Nothing additional.  The only

2     thing I would like to return to, Your Honor, is that

3     and I know you told us -- I don't have a copy, a

4     transcript of our hearing before on the voir dire --

5     the Court will be handling issues related to APD

6     excessive force, and you'll be handling all of the

7     publicity related issues.

8          THE COURT:  What my memory is -- and I

9     talked to Ms. Wild about this -- because of the

10    commitments we made to the length of the voir dire

11    earlier is that y'all were going to -- I think you

12    were the one that wanted me to handle some of those

13    questions.  And my recollection is Ms. Neda didn't

14    have any objection to the Court asking those

15    questions.  You were going to supply Ms. Neda with a

16    list of those questions.  If y'all are in agreement,

17    then give those to me.  And then those are the ones

18    that I was going to go over in addition to the ones

19    that I normally go over.  So --

20          MR. GORENCE:  With that, Your Honor -- and

21    I haven't -- in fact, I thought the Court was going

22    to handle that -- I haven't done that procedure.

23    What I will do is get those questions to Ms. Neda.  I

24    know we're going to be here all day, and my partner

25    is on a flight to Philadelphia.  But I will have them

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to Ms. Neda by 10:30 tomorrow morning.  And again,

2    some of this -- they're just generally broad

3    questions.  The publicity, I'm assuming the Court's

4    going to handle.

5              THE COURT:  The publicity, I'll handle up

6    here at the bench, so I'll handle that.

7              MR. GORENCE:  So I don't have to have draft

8    questions?

9              THE COURT:  I guess the questions that I

10   was remembering that you were interested was the APD

11   and excessive force issues.  And I'd like to see

12   y'all talk about that and see exactly what you want

13   the Court to ask on that.

14             MR. GORENCE:  I will have them over to Ms.

15   Neda tomorrow by 10:00, Your Honor.

16             THE COURT:  If there is no objection to

17   those, the Court will just include those as part of

18   its questioning.

19             We've got the Daubert issues this morning.

20   Anybody expect any further Daubert issues to be

21   raised, Ms. Neda?

22             MS. NEDA:  No, Your Honor.

23             THE COURT:  Mr. Gorence?

24             MR. GORENCE:  No, Your Honor.

25             THE COURT:  I proposed to use, in talking

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    to the jury on Monday about the case description,
2    statement of the case, just to use the indictment --
3    superseding indictment, use that then to find out if
4    anybody knows about the case.  Anybody want to do
5    anything different on that, Ms. Neda?
6              MS. NEDA:  No, Your Honor.
7              THE COURT:  Does that work for you, Mr.
8    Gorence?  That's what I'll do.  I've looked at the
9    proposed voir dire.  Do you have any objection to the
10   Government's proposed voir dire?
11             MR. GORENCE:  I don't.
12             THE COURT:  Do you have any to the
13   defendant's proposed voir dire?
14             MS. NEDA:  I don't.
15             THE COURT:  I've talked about witness list,
16   jury list.  If you need any further technology for
17   the courtroom, let Ms. Wild know.
18             The trial I was going to have this week
19   cleared up because of a Daubert hearing, so if you
20   need to come in and set anything up, Ms. Wild can
21   help you get in here and work with our IT people.
22             Generally, I have Ms. Wild put on the Elmo
23   a copy of the preliminary instructions and the final
24   instruction, so the jurors can read along with us as
25   I read them.  Is that acceptable, Ms. Neda?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. NEDA:  That's fine, Your Honor.

 2              THE COURT:  Mr. Gorence?

 3              MR. GORENCE:  Yes, Your Honor.

 4              THE COURT:  And I'll also give a copy of

 5     the jury instructions to each one of the jurors so

 6     that they have it when they go back to deliberate.

 7     Is that acceptable?

 8              MS. NEDA:  Yes, sir.

 9              THE COURT:  Mr. Gorence, is that okay?

10              MR. GORENCE:  Yes, Your Honor.

11              THE COURT:  How long do you think your

12     closing will last?  Who will be giving it?

13              MS. NEDA:  I'll be giving it.  About an

14     hour, and I'll probably split it 50/50.

15              THE COURT:  All right.  Mr. Gorence?

16              MR. GORENCE:  An hour; I'd ask for an hour

17     and ten minutes, actually.  No more than that.  And I

18     will be giving it.

19              THE COURT:  All right.  Let me return now

20     to the issue at the very beginning.  Y'all think you

21     can get this case done in five days, or am I

22     shortchanging anybody here?

23              MS. NEDA:  I'm pretty brief, Your Honor.  I

24     think we can.

25              THE COURT:  Mr. Gorence?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        MR. GORENCE:  Even with what I said might

2   be expanded, I heard the Court, we're going to

3   finish.  We'll work hard.

4        THE COURT:  I'm backtracking.  If you can't

5   get it down in five, I don't want anybody to walk out

6   of here -- I don't want to put unreasonable limits on

7   it.  But I need to plan the next week.  I'm also

8   thinking about what we tell the jury, so we don't end

9   up with jury problems, if this thing were to drift

10  over into the next week.  I'd rather know that now,

11  and deal with it now, rather than tell the jury we

12  can get it done in a week, and then we can't, and

13  then I've got jury problems on the following week.

14        MS. NEDA:  I do believe we can finish it by

15  the end of the week, Your Honor.

16        MR. GORENCE:  Your Honor, what would help

17  is how long the Government anticipates their

18  case-in-chief.  Now, I know they can't estimate

19  cross-examination length.  And I don't know if

20  they're going to actually call everyone on their

21  list.  But I know Ms. Neda is very experienced.  It

22  would help me, because I think our case will take at

23  least a day, and probably a day and a half.  So I can

24  really answer that question better if the Government

25  could estimate what it does have control over, which

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    is how long do they think -- I mean, jury selection
2    and openings, and given there has been some
3    publicity.  But you know, if we get jury selection,
4    openings, maybe start a witness on Monday, does the
5    Government really anticipate that they can then put
6    their case on in two days, all day Tuesday, all day
7    Wednesday?  If they go much longer than Thursday at
8    noon, then we won't finish with the defense
9    presentation of evidence.
10            If there is any -- hopefully, we can work
11   out jury instruction issues beforehand and close.  So
12   my concern is if the Government recesses at the end
13   of Thursday, then, because they take three days, in
14   essence, to put their case on, then we won't finish.
15   That's my inquiry is how long do they think it will
16   take to put their case-in-chief on.
17            THE COURT:  Do you have an estimate, Ms.
18   Neda?
19            MS. NEDA:  I am brief.  But I don't know
20   how long cross will be.  If they match my brevity,
21   then I say two, two-and-a-half days, most.
22            THE COURT:  What do you think, Mr. Gorence?
23            MR. GORENCE:  Well, if it's two-and-a-half
24   days, as I said -- and we -- I'm really not counting
25   Monday, because I anticipate there could be -- and I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    know what happens with the publicity issue; that

2    really slows down a voir dire, in my experience, when

3    you have to take individual members of the panel, go

4    to the bench, and have the required questions:  What

5    did you hear or see or learn; from what source;

6    feelings about it; and then the ultimate, can you set

7    it aside?  And if there is a panel -- and I've seen

8    the panel in terms of the length -- you know, jury

9    selection could be an all-day affair, if there is a

10   lot of response to that, or people that have heard

11   about this case or other aspects of -- you know,

12   anything else about Sheriff Rodella, know his wife,

13   who is a state representative.

14           So worst case scenario, if we have all

15   day -- and I don't think it will take longer than a

16   day -- but if we take all day, and then openings at

17   the length that we have estimated, and then the

18   Government takes two-and-a-half days, that puts us

19   Thursday, noon-ish, before we even start.

20           So I think a full week -- we won't get it

21   done earlier than the week.  And I think the distinct

22   possibility is that they'd be deliberating even the

23   next week.  I just throw that out there.

24   Two-and-a-half days, and we have a full day on jury

25   selection, puts us mid-Thursday.  And that will be

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    hard pressed to finish by Friday.

2            THE COURT:  All right.  Well, think about

3    it during the day, and I'll probably come back to

4    this question at the end of the day, so that we get a

5    little bit firmer idea.  Maybe some of the rulings

6    today will give you a little better idea, and you can

7    give me an estimate at the end of the day.  Because I

8    think we've got to figure out what we're going to

9    tell the jury about how many days we're anticipating

10   this is going to take, or otherwise, we're not going

11   to get a firm sense from them as to whether they're

12   available for all those days.

13           All right.  Let me go back.  This will be,

14   I guess, the final issue, then I'll let you raise

15   some issues, if you have them.  On the exhibit list,

16   you were talking to Ms. Neda about Exhibit A having

17   hearsay.  Anything else you want to say about the

18   exhibits, other than the reports may contain hearsay

19   and not be admissible?

20           MS. NEDA:  If we're handling them now, the

21   main objection to introducing investigative reports

22   would be hearsay.

23           THE COURT:  Okay.  Anything else you want

24   to say on the exhibit list, the defendant's exhibit

25   list?

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                     (505) 843-9494
FAX (505) 820-6349                                                          FAX (505) 843-9492
                                                                                    1-800-669-9492
                                                                         e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1          MS. NEDA:  That's the same objection I have

2     on a couple of the others, because they're just

3     reports and so forth:  New Mexico State Police

4     reports, the RASO reports, witness statements, rather

5     than the witness themselves.  So they are all

6     hearsay.  That would be my main objection.

7          THE COURT:  Do you intend to introduce

8     those or just use them for cross?

9          MR. GORENCE:  Your Honor, I agree.  The

10    statement alone cannot come in unless there is a

11    foundation.  The declarant, the person who wrote the

12    statement has to be there.  It may be assuming they

13    testify.  There are different issues, whether it

14    actually comes in, is used to refresh recollection.

15    But I understand what Ms. Neda is saying.  I'm also

16    saying I know they don't come in by themselves.  The

17    difference, however, is I do intend to introduce both

18    versions of the State Police documents to show -- and

19    the testimony we heard yesterday, and I know they

20    won't be offered for the truth, but the fact that

21    there were these machinations going on, and changed

22    reports from what was -- you heard the testimony.

23          But I will most definitely, and the

24    Government knows, I have put Patrolman Sanchez,

25    Lieutenant Olson, and I know that Lieutenant Skinner,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Captain Thornton, and the Chief of Police, Mr.

2    Kassetas, were all served either last night or this

3    morning.  And they'll be here.  And I may be amending

4    my witness list in terms of what they say.

5           But so what I'm saying is with Exhibit A,

6    with Vince Crespin, he's on our witness list.  I

7    understand it's hearsay; it may be relevant once he

8    testifies.  As a stand-alone document, it could never

9    come in.  It is hearsay.

10          The State Police reports, that's a totally

11   different matter, in terms of what we've begun to

12   unearth yesterday.  And I will be introducing both of

13   those.

14          THE COURT:  All right.  Anything else on

15   exhibits, Ms. Neda?

16          MS. NEDA:  With respect to what Mr. Gorence

17   just discussed, I already had raised that that would

18   be irrelevant as well.  The only testimony thus far

19   is that the Government had nothing to do with

20   charging decisions.

21          THE COURT:  All right.  I think we covered

22   all of your issues with the exhibits.  You said most

23   of them you were going to be sending over a letter,

24   Mr. Gorence.  So I'll wait and see what that says,

25   unless you have something you want to raise about

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    exhibits today.
2              MR. GORENCE:  I don't, Your Honor.
3              THE COURT:  Ms. Wild, can you think of
4    anything else we need to cover?
5              THE CLERK:  No, sir.
6              THE COURT:  Mr. Pena, Mr. Gorence?  You got
7    your jury questionnaires?  They were available
8    yesterday to pick them up.
9              MS. NEDA:  We have not seen them.  We did
10   order them.
11             THE COURT:  They're available in the
12   clerk's office.  Mr. Pena, Mr. Gorence, Ms. Oliveros
13   have all tried cases in front of me.  Ms. Neda, you
14   haven't.  Are there any particular questions you have
15   that you want to ask the Court about how I conduct
16   things?  Any questions or issues?
17             MS. NEDA:  No, sir.
18             THE COURT:  And Mr. Pena, do you have any?
19             MR. PENA:  No, sir.
20             THE COURT:  Mr. Gorence, anything else you
21   want to raise about the trial?
22             MR. GORENCE:  I've had a few with you, Your
23   Honor, and I think I know how the Court works.
24             THE COURT:  All right.  Let's then take
25   up -- you had an expert, Mr. Gorence, that I think
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    needed to get out of here.  So do you want to take

 2    your motion up first, your expert?

 3              MR. GORENCE:  Yes, Your Honor.  This is --

 4    we have noticed Dr. Harvey Stanford Sanders.  He's

 5    here, and I will call him, Your Honor.

 6              THE COURT:  All right.  Dr. Sanders, if

 7    you'll come up.  Is there any reason to invoke the

 8    rule this morning?

 9              MR. GORENCE:  No, Your Honor.

10              THE COURT:  Mr. Pena, Ms. Neda?

11              MR. PENA:  No, sir.

12              THE COURT:  Dr. Sanders, if you'll raise

13    your right hand, Ms. Wild will swear you in before

14    you're seated.

15              HARVEY STANFORD SANDERS, M.D.,

16         after having been first duly sworn under oath,

17         was questioned and testified as follows:

18              THE CLERK:  Please be seated.  State your

19    name for the record, please.

20              THE WITNESS:  You might excuse me, Your

21    Honor.  You might want to speak up, I wear hearing

22    aids, and I have a sensory neural type of loss.

23              MR. GORENCE:  I will do that.

24

25                   DIRECT EXAMINATION
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   BY MR. GORENCE:
 2       Q.   Doctor, would you state your name for the
 3   Court.
 4       A.   My full name is Harvey, H-A-R-V-E-Y,
 5   Stanford Sanders.
 6       Q.   Are you a medical doctor, Dr. Sanders?
 7       A.   I'm a medical doctor.
 8       Q.   Would you tell the Court a little
 9   background?  I want to start, where did you go to
10   college?
11       A.   I went to college at Rhodes College, a
12   small liberal arts college in Memphis, Tennessee, and
13   received a bachelor's degree in English and biology.
14       Q.   Rhodes?  Was that also called Memphis
15   College?
16       A.   Rhodes at Memphis is the name of the
17   college now.
18       Q.   Oh, okay, I misunderstood.
19       A.   When I attended in '63, it was called
20   Southwestern.
21       Q.   Okay.  After you graduated -- and you said
22   you had a agree in biology and English?
23       A.   Correct.
24       Q.   What did you do after that?
25       A.   I went to medical school.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.    Where did you go to medical school?

2      A.    I went to medical school at the University

3    of Tennessee at Memphis, which is now known as the

4    University of Tennessee Health Sciences.

5      Q.    Did you graduate from the University of

6    Tennessee at Memphis with a degree as a medical

7    doctor?

8      A.    I did.

9      Q.    What year?

10     A.    June 1967.

11     Q.    After you graduated, what did you do?

12     A.    I went to New Orleans, Louisiana, and for

13   the first year I served a surgical internship.  And

14   then for the following four years, I served a

15   complete general surgery residency.  Following my

16   general surgery residency, I went to the University

17   of Chicago for the first year of training in plastic

18   surgery.

19     Q.    What year did you do that?  And that's --

20     A.    I beg your pardon?

21     Q.    That's the Pritzker School of Medicine at

22   the University of Chicago?

23     A.    Pritzker School of Medicine at the

24   University of Chicago.

25     Q.    And you did a year residency in, you said,

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 820-6349                                    FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    plastic surgery?

2         A.   I did my first year of plastic and

3    reconstructive surgery at the University of Chicago.

4    My second year, my chief resident year, I did at

5    Vanderbilt University in Nashville, Tennessee;

6    Vanderbilt School of Medicine.

7         Q.   And just by way of background, you did that

8    first residency at the University of Chicago in '72

9    and '73.  And then you were at Vandy from '73 through

10   '74?

11        A.   That's correct.

12        Q.   I'll speak up.  I'm sorry, Mr. Sanders.  Is

13   that better?

14        A.   That's okay.

15        Q.   After you completed those residencies, did

16   you commence the practice of medicine?

17        A.   I did.

18        Q.   Where?

19        A.   In Nashville, Tennessee.

20        Q.   Okay.  Did you also -- were you in the

21   Army, Dr. Sanders?

22        A.   Only as a reservist.  Was in Berry Plan 2,

23   meaning that I got a deferral during the years of the

24   Vietnam War, and then I had to serve six extra years

25   in the Reserve program of the Army.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Did you do those six years in Reserves in

2   the U.S. Army?

3      A.   That's correct.

4      Q.   Did you do that as a medical doctor?

5      A.   I was in the U.S. Army Medical Corps,

6   that's correct.

7      Q.   And you did that from '72 to '78?

8      A.   Actually, I was in that from -- in the

9   Berry Plan from 1964, I guess, till 1978.

10      Q.   Were you honorably discharged, Dr. Sanders?

11      A.   Honorably discharged.

12      Q.   Now, you said you started your private

13   practice of medicine in Nashville, Tennessee?

14      A.   That's correct.

15      Q.   How long did you stay in private practice?

16      A.   I was in private practice of plastic

17   reconstructive surgery from July of 1974 until

18   December of 2001.

19      Q.   At that point did you retire?

20      A.   Yes.  Actually I was disabled.  I sustained

21   a rear end -- I was rear-ended by a lady talking on

22   the cellphone.  And when she did so, the whiplash

23   gave -- it tore out the nerves to my rotator cuff.

24   And I tried to stay in practice for three more years,

25   but was unable to do so.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 820-6349                                              FAX (505) 843-9492
                                                                     1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                        e-mail: info@litsupport.com

1     Q.   Did that have -- that accident have an

2   effect on your ability to practice surgery?

3     A.   It almost totally destroyed the ability to

4   practice.  I was essentially a one-armed plastic

5   surgeon.

6     Q.   Did that accident have any -- did it result

7   in any cognitive impairment to you whatsoever?

8     A.   No cognitive -- no cognitive disability at

9   all.

10    Q.   I just need to -- and obviously, it's very

11  difficult, if not impossible, to be a surgeon absent

12  one hand?

13    A.   Exactly.

14    Q.   After your retirement, did you move to New

15  Mexico?

16    A.   I did not move to New Mexico until 2008.

17    Q.   Where do you now live?

18    A.   I now live in Lyden, New Mexico.

19    Q.   And where is that?

20    A.   That would be about 13 miles north of

21  Espanola.

22    Q.   Do you still have a license?  Do you still

23  have a license to practice medicine?

24    A.   My license is currently in the State of

25  Tennessee.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  Were you board certified,

2   Dr. Sanders?

3      A.   No, I was not board certified.  There are

4   some of us doctors, surgeons, who really don't

5   believe in board certification.  However, I did pass

6   the written part of both the surgery, general surgery

7   and plastic surgery boards.

8      Q.   I have a CV that actually was typed by my

9   office off of an e-mail -- and maybe I

10  misunderstood -- because it says "board certified in

11  surgery, board certified in plastic surgery."  Did

12  you have those board certifications, or did I

13  misunderstand you?

14     A.   No, I was not board certified.  I only

15  passed the written examinations of both boards.

16     Q.   And you said there was a reason you decided

17  not to do that?

18     A.   Yes, there was -- some of us think that an

19  oral examination is more of a man-made examination.

20  It's very difficult to ask another individual and to

21  get a true answer, if you're not at a particular

22  case.  In other words, an oral examination is more of

23  how would you handle a laceration of the face, and

24  would you give a general broad answer to that, to the

25  latter.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 820-6349                                              FAX (505) 843-9492
                                                                    1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1          MR. GORENCE:  Your Honor, I want to

 2     amend -- we attached as Exhibit A to our notice a CV.

 3     But this would have been -- as I said, it was

 4     prepared by my office.  And I think I misunderstood

 5     an e-mail.  So I would amend it to indicate that it

 6     says licenses and certifications at the bottom, as

 7     the doctor has now testified he was not board

 8     certified in surgery nor plastic surgery.  So I want

 9     to bring that to the Court's attention.

10          THE COURT:  All right.

11     Q.   What about professional memberships and

12     committees?

13     A.   I served on many committees for the

14     Nashville Academy of Medicine.  I was a member of the

15     American Society of Plastic Reconstructive Surgeons

16     of America.  I was a member of the American Medical

17     Association, Tennessee Medical Association, the

18     Tennessee Plastic Surgical Association, the St.

19     Thomas Hospital Association, Park View Hospital

20     Association, the Baptist Hospital Association.  And

21     that's about all I was a member of.  I was not a

22     great joiner of professional organizations.

23     Q.   Have you ever lost your license or your

24     privileges at any facility?

25     A.   Oh, no.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Doctor, would you define the different

2   disciplines in both -- what's involved with plastic

3   surgery, then you've mentioned another discipline,

4   which is reconstructive surgery.  Would you describe

5   for the Court what those disciplines entail?

6      A.   Plastic surgery is the discipline of what

7   today we call cosmetic surgery.  And over the years,

8   plastic surgeons have evolved to the point that the

9   vast majority do nothing other than cosmetic surgery.

10   As a reconstructive surgeon, which I was trained to

11   do, you might want to specialize in hand surgery,

12   traumatic surgery of the face, head and neck cancer

13   surgery, cosmetic surgery.  In my particular case, I

14   enjoyed the general practice of plastic surgery in

15   all of these disciplines.

16      Q.   Okay.  Including reconstructive surgery?

17      A.   Including reconstructive surgery.  I never

18   did less than 25 to 30 percent of reconstructive

19   surgery in my practice.

20      Q.   Okay.  I want to go back and ask you

21   questions, particularly as it relates to

22   reconstructive surgery that is not cosmetic --

23      A.   Sure.

24      Q.   -- as it relates to facial injuries, facial

25   bruising or facial trauma.  So let me ask you, did

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

224

1   you deal in your practice -- that spanned

2   approximately 40 years, did it not?

3        A.   If you include the residency, that's about

4   right.

5        Q.   Okay.  Well, in your 40 years of practice,

6   especially, as I said, with reconstructive surgery,

7   did you have any experience in those areas I just

8   said:  Facial trauma, facial bruising, facial injury?

9        A.   Virtually every week.  I mean, I can't

10  think of when you did not have an experience in

11  evaluating bruising, discoloration, abrasions, that

12  sort of thing.

13       Q.   Okay.  Let me ask the different types.

14  When I use the word "facial injury" -- and you've

15  talked about -- you said bruising, abrasion, swelling

16  and did you say discoloration?

17       A.   Sure.

18       Q.   Are those all manifestations of facial

19  injury?

20       A.   They may be.  Whenever you evaluate the

21  face, you do it -- there are two points you consider.

22  Number one, the possibility or the presence of

23  physical trauma.  And number two, one function of the

24  face is to elicit the emotions of the individual.  So

25  you're always looking for the emotions of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    individual, as well as any sign of physical trauma.

2         Q.   Now, I want to go back.  In your 40 years,

3    can you approximate for the Court, either as a

4    percentage of your practice or the number of cases

5    that you dealt with about -- and I mean estimates,

6    because obviously you have to ballpark a career of

7    over 40 years -- but I need to quantify your

8    experience.  Other than just saying on a weekly

9    basis, how much did you deal with patients that had

10   facial injuries, as you've defined, whether it's

11   abrasions, lacerations, swelling, discoloration,

12   things of that -- how much did you deal with that?

13        A.   From the time I began my plastic surgery

14   residency until I retired, I can't remember any week

15   that I didn't have some physical trauma patient in my

16   office.  If I had to quantitate it by percentage, I

17   would say 20 to 25 percent of my practice was

18   traumatic facial surgery.

19        Q.   If I were to ballpark that, would that be

20   hundreds of patients over 40 years with traumatic

21   facial injury?  Would that be 1,000 or more than

22   1,000?

23        A.   Over a lifetime, I did between 3 and 500

24   major cases per year.  I did that for 27 and a half

25   years.  You can figure that out.  It will be

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    somewhere around 15,000 cases.  It would be over
2    1,000, 1500 facial trauma cases in a lifetime for a
3    plastic surgeon, which is a little more than most.
4         Q.   Let me ask, by virtue of your training and
5    experience, and then with the amount of practice
6    you've had with facial injuries, do you have the
7    expertise as a doctor to discern the various
8    manifestations of a facial injury?
9         A.   Certainly, I do.
10        Q.   Explain that for the Court.
11        A.   I'm not sure I understand.
12        Q.   Well, what I'm saying is -- let me go back.
13   If a patient had a bruise, a laceration, an abrasion,
14   discoloration, would that be something that was
15   significant to you in ascertaining before you started
16   your course of treatment and/or surgery?
17        A.   Oh, certainly.  You'd take the history of
18   the patient -- if I understand your question, you
19   take the history of the patient, and you find out
20   exactly what happened, when it happened, the
21   circumstances under which it happened.  And at the
22   same time you're thinking about the emotions of the
23   patient as you're looking at that face.  You're also
24   thinking about the function of the face as you're
25   evaluating that injury.  Does that answer your
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    question?

2         Q.   It does.  And I'm using the word -- I guess

3    the word I should use is a "history" of the patient.

4    In taking that history and doing a physical exam,

5    would it be important to you to determine the level

6    of injury?  In other words, ascertain whether

7    bruising existed, lacerations?

8         A.   Absolutely.

9         Q.   Okay.  And you have experience at that, as

10   you've described to us?

11        A.   Oh, yes.

12        Q.   Now, did you have, in your practice,

13   occasion to use photographs at all?

14        A.   Oh, you photographed everyone you treated

15   before and after.

16        Q.   Okay.  Well, I want to touch on that.

17   Because in this case you never examined Michael

18   Tafoya, did you?

19        A.   No.

20        Q.   Okay.  But you saw a picture?

21        A.   One picture.

22        Q.   We're going to talk about that in terms of

23   what you reviewed in a second.  But before I get

24   there, I want to get background information in terms

25   of your use of photographs as a diagnostic tool and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    your experience with that.  So maybe I'll be more

2    specific.  But let me start with how did you use

3    photographs in your practice?

4         A.   Okay.  In every photograph, when you take a

5    photograph of a face, as I said before, if it is from

6    trauma, you're evaluating for physical trauma.  You

7    are always evaluating for emotional trauma, because

8    that, again, is one function of the face is to reveal

9    an individual's emotions.  The first thing you do

10   when you look at that photograph is to be sure it's

11   not tampered.  In other words, to be sure there is no

12   blurring of the photograph; to be sure it's a true

13   photograph.

14        The second thing you would look at would be

15   the lighting.  What's your light source?  Is it from

16   behind the patient, in front of the patient, maybe

17   quartering the patient.

18        The third thing you would look for is the

19   position of the face from the perpendicular plane.

20        And the last thing you would look for is

21   the canting; in other words, the obliquity of the

22   patient's face toward the camera.

23        Q.   So you would use this photograph, and how

24   would you use that, then, as a diagnostic tool?

25        A.   Number one, you would look for unusual

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    color.
 2              Number two, you would look for swelling,
 3    realizing that if you bisect the face, you are not
 4    going to see total symmetry.  The face, a normal
 5    face, shows about 90 percent symmetry.  If you
 6    bisected the face and you made one photograph of one
 7    side, one photograph of the other, they would look
 8    like two similar individuals, but they would not be
 9    the same.  So you're looking for symmetry, number
10    one, okay?
11              You're looking for lighting.  You're
12    looking for any change in color.  Although you're
13    also remembering that that patient could be flushing,
14    if you've never seen the photo, or that patient could
15    be embarrassed.  The patient could be shy.  Or the
16    patient could be angry, as I'm expressing right here.
17    So you're examining all those variables.  And from
18    there you make your treatment plan.
19              Is there anything else?
20    Q.    Well, no, but would you do that with every
21    patient that had facial trauma prior to -- would you
22    use a photograph as the diagnostic tool that you just
23    described?
24    A.    Oh, sure.  I mean, before you operate on
25    them, you use the photo for your plan of action -- I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    mean for your plan, your surgical procedure.

 2        Q.   So you did it in every case for 40 years?

 3        A.   Exactly, exactly.

 4        Q.   But in this case, Dr. Sanders, did I

 5    contact you -- and it's within the last 10 days --

 6    and did I -- whenever, a week ago -- and ask you to

 7    review any materials?

 8        A.   I believe you did on Saturday of last week,

 9    that's correct.

10        Q.   And what were you provided with?

11        A.   I was provided with one photo.

12        Q.   A photo of Mr. Tafoya?

13        A.   I wasn't given the name.  I don't know who

14    it was.

15        Q.   Let me show you.  Did you bring that with

16    you, the materials you reviewed?

17        A.   I do not have it.

18            MR. GORENCE:  This has been marked on our

19    exhibit list, Your Honor, part of the D series.

20        Q.   But were you provided with a photograph?

21        A.   That's the photograph.

22            MR. GORENCE:  This is in D, Your Honor.

23        Q.   What else were you provided?

24            MR. GORENCE:  And for the record, that

25    photograph is Mr. Tafoya.  It was part of the booking

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      records of Mr. Tafoya on March 11, 2014, the day of

2      the -- as alleged in the indictment, Your Honor.  The

3      Government has a copy.

4           Q.   What else were you provided with?

5           A.   I was told that this photo was taken of an

6      individual approximately five to five-and-a-half

7      hours following incarceration.

8           Q.   Okay.  Did you -- were you provided with

9      anything else?  Did you see any badges of Sheriff

10     Rodella, photographs of badges?

11          A.   Yes, I also saw a badge of Sheriff

12     Rodella's.

13          Q.   Did you actually see the actual -- the

14     badge he now has that replicates the badges that were

15     seized by the FBI?

16          A.   I did.

17          Q.   Now, what was your methodology after you

18     received the photograph as well as -- did you have

19     anything else besides the badges, Dr. Sanders?  Let

20     me ask that question.

21          A.   Well, when I examined the badge -- you're

22     talking about the badge?

23          Q.   Yeah.

24          A.   When I examined the badge, I, of course,

25     took my hand over it, examined it, turned it over,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    found it to be secure in a leather case, remarkably

2    smooth.  And actually what I did, I took the badge --

3    and because the skin of the inner forearm is similar

4    to the skin of the face -- I believe I read it in the

5    paper that the badge had been slammed -- slammed

6    against the patient's face.  So I slammed the badge

7    against my forearm.  And then I slammed the badge

8    against my other forearm.  And when I say "slam," I'm

9    73 years old, but I can give a pretty good lick.

10        Q.    Every volunteer can.

11        A.    I waited for five years -- I mean, five

12   hours, and I really didn't see anything.  It would be

13   my contention that a slam by an adult man, with a

14   patient in the prone position, with his head lifted

15   back, would result in a pretty severe bruise,

16   laceration; at the very minimal, an abrasion of some

17   type.

18        Q.    Okay.  Well, let me ask on the photograph

19   then -- and you've indicated previously an experience

20   with discerning facial trauma of any kind --

21        A.    Exactly.

22        Q.    -- and use of photographs.  So in this

23   case -- and you described a methodology that you

24   looked at.  What was -- when you looked at the

25   photograph of Mr. Tafoya, did you see any evidence of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

233

1    facial trauma, facial injuries, in the form of

2    swelling, discoloration, abrasion?

3         A.   There was none.  And if I could see your

4    photograph again.

5         Q.   It might be easier.

6         A.   Oh, great, thanks.  Okay, number one, the

7    lighting is coming -- you can go ahead and back it up

8    a little bit.  Okay, now, for everyone's convenience.

9              And number one, the lighting is coming from

10   the top of the patient, I'm going to guess at four to

11   six feet, a little bit in front of the patient.  And

12   there is almost total shadow on the left side.

13             However, if you again bisect that face and

14   you look for symmetry, you will see the symmetry of

15   the entire face.  You understand my point, is well

16   within 90 percent, okay?  Indicating a normal face,

17   no evidence of facial fractures, no evidence of

18   swelling, and no evidence of discoloration.  There is

19   a red spot below the right orbit of the eye,

20   indicating I don't know what.  It could be anything

21   from light coming from the patient's right;

22   embarrassment, as I'm sure the patient has not been

23   incarcerated every other day or something, so he

24   could be embarrassed in front of the camera.  His

25   hair is neatly combed.  There is no evidence of

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 820-6349                                                FAX (505) 843-9492
                                                                  1-800-669-9492
**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

1    debris, dirt, blood, bruising.  He has a pimple in

2    his right frontal area.

3         Q.   If you want to mark on the screen,

4    Doctor -- this wonderful technology --

5         A.   I beg your pardon?

6         Q.   If you want to mark the screen, you can use

7    your finger to circle what you're talking about for

8    the benefit of Judge Browning.

9         A.   Okay.  We've got a little area right here.

10   Are you all catching me there?

11             MR. GORENCE:  I think it has to be turned

12   on.

13        A.   It's the right forehead is what I'm

14   pointing on, that pimple.  But if you look at the

15   shadow on the left side --

16             MR. GORENCE:  There you go.

17        A.   -- you really cannot see anything other

18   than the arch of the cheekbone, okay?  And if you

19   look at the arch of the cheekbone on the left, the

20   patient's left, you look at the arch of the cheekbone

21   on the patient's right, that being the arch of the

22   cheekbone, they're basically symmetrical.

23        Q.   What significance does that have to you

24   with regard to your opinion that there is no facial

25   trauma?

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                                         Albuquerque, NM 87102
(505) 989-4949                                                                     (505) 843-9494
FAX (505) 820-6349                                                           FAX (505) 843-9492
                                                                                  1-800-669-9492
                                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1     A.   There is no evidence of facial trauma, is

2   what I'm trying to say.  That's exactly right.  The

3   arch of the nose is perfect.  You couldn't do better

4   rhinoplasty, if you don't mind my saying so.

5          The question right here of the redness

6   could be anything from the light source coming in

7   this direction.  The patient is very slightly canted

8   upward, and he is approximately three to five degrees

9   toward the left, making more light on the right side

10   than the left side of the face.  Basically, you have

11   a face of an individual at repose, with no evidence

12   of physical trauma.

13     Q.   Do you have any experience -- and we'll get

14   into exactly when this photograph was taken, and what

15   time Mr. Tafoya was taken into custody -- but if it's

16   alleged that this incident took place between 6:08

17   and 6:15 p.m. on March 11, and these booking

18   documents indicate approximately 10:30 -- so it's a

19   little over four hours, maybe four and a half -- do

20   you have any experience in how a bruise -- or let me

21   put it this way -- facial trauma manifests itself

22   over time?

23     A.   With the vasculature of the face, which is

24   so great, you would begin to see swelling, bruising

25   in the vast majority of cases within 30 minutes; I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    mean, within 10 minutes.

2        Q.   Now, you're saying because of -- explain

3    that -- the vascular structure; you're saying because

4    of the quantity of blood vessels in the face --

5        A.   That's exactly right.

6        Q.   -- okay, you see evidence -- if there had

7    been trauma, it would manifest itself sometime within

8    30 minutes?

9        A.   Oh, yes.  And to add to that, if you take

10   the amount of fatty tissue around the orbit, around

11   the sub-zygomatic area --

12       Q.   What is that?

13       A.   I'm sorry, below the cheek, below the

14   cheek.  There are fat pads, which will swell very,

15   very easily.  The bones of the face are as fragile as

16   egg shells, excepting the mandible, which is the

17   lower jaw, and the skull.

18       Q.   Now, you talked about vascular structure

19   and bruising occurring more easily on the face, is

20   that true, than other parts of the body?

21       A.   Yes.

22       Q.   So is that particularly true around the eye

23   sockets?

24       A.   Absolutely true around the eye socket.

25       Q.   Why do you say that?



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.   Well, the eye socket -- if you look at the
2   orbit, if you anatomize -- or if you dissected the
3   orbit, you see an eyeball, which is what most of us
4   see.  But what you don't see is the fat pad that
5   surrounds the eye, superior, laterally, medially, and
6   inferiorly.  That's there for a purpose.  It's there
7   to absorb energy; i.e., a blow from external forces.
8            When that happens, the blood vessels within
9   the periorbital area, and because the thinness of the
10  face and the superb vascularity of the eyelids,
11  you're going to get bruising almost immediately.
12  Anyone who has sustained a black eye or has seen a
13  black eye occur, would know that.
14       Q.   But I want your testimony to be based on
15  your training and experience as a medical doctor,
16  with 40 years of practice, and what you've already
17  outlined.  How much was dealing with exactly issues
18  pertaining to facial trauma?
19       A.   We're talking at three to four hours
20  post-injury.  I don't see any injury.
21       Q.   And what is your degree of certainty in
22  expressing that opinion, Doctor?
23       A.   Within 95 percent.  I see some, what I
24  would call evidence of emotional trauma.  But even
25  then, I cannot be sure of that because of the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    darkness on the other side of the slide.

 2         Q.   Okay.  Well, let me put it this way:  It's

 3    not a medical malpractice act -- or case, I should

 4    say -- but do you hold these opinions to a reasonable

 5    degree of medical certainty --

 6         A.   Yes.

 7         Q.   -- that you're expressing?

 8              Have you ever testified in court?  Did you

 9    ever have a forensic practice?

10         A.   I can remember going to court maybe five to

11    ten times over a 27-year period.  And that was always

12    either in the defense of a peer surgeon, or maybe the

13    defense of a patient.  I can't remember, to tell you

14    the truth.  Basically, I would usually give a

15    deposition.

16         Q.   Okay.  But you testified as an expert?

17         A.   At several, um-hum.

18         Q.   And you've approximated that over the

19    course of --

20         A.   Maybe --

21         Q.   Let me ask the question --

22         A.   -- 50.

23         Q.   How many times?

24         A.   Maybe 50 to 100 times in 27 and a half

25    years.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.   Okay.

2     A.   And as a resident.

3     Q.   Were you ever not qualified as an expert in

4   the field of plastic and reconstructive surgery after

5   being tendered to a court?

6     A.   I've never had my credentials questioned.

7     Q.   Do you have any other opinions that you'll

8   be expressing in this case, Doctor?  And if so, I

9   want to ask about your methodology.  Other than, as I

10  understand it, no facial injury, particularly -- and

11  you've described how likely that would be in the

12  facial area -- if injury being defined as swelling,

13  discoloration, lacerations, or abrasion?  I think

14  I've got them all.  There is no evidence of that on

15  this photograph?

16    A.   There is none.

17    Q.   There is none?

18    A.   There is none.  Nor of the neck, I might

19  add.  There is no evidence of injury.

20         MR. GORENCE:  I pass the witness, Your

21  Honor.

22         THE COURT:  Thank you, Mr. Gorence.

23         Ms. Neda, do you want to cross-examine

24  Dr. Sanders?

25         MR. GORENCE:  Your Honor, could we approach

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

240

```
1    for one second.
2              THE COURT:  You may.
3              (The following proceedings were held at the
4    bench.)
5              MR. GORENCE:  This may come up at trial as
6    well, but Mr. Rodella has a prostate issue and needs
7    to use the bathroom, and we might have to take more
8    frequent breaks.  But he's telling me it's a dire
9    emergency right now.
10             THE COURT:  Right now?  All right.  I was
11   going to take a break in about five minutes or ten
12   minutes anyway.  So why don't we go ahead and take
13   our break, and you come back in and you can go ahead
14   and do your cross-examination.
15             (The following proceedings were held in
16   open court.)
17             THE COURT:  All right.  We'll be in recess
18   for a few minutes.
19             (The Court stood in recess.)
20             THE COURT:  All right.  Dr. Sanders, I'll
21   remind you that you're still under oath.
22             THE WITNESS:  Sure.
23             THE COURT:  Ms. Neda, if you wish to
24   cross-examine Dr. Sanders, you may do so at this
25   time.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. NEDA:  Thank you.

 2              THE COURT:  Ms. Neda.

 3                     CROSS-EXAMINATION

 4    BY MS. NEDA:

 5         Q.   Dr. Sanders, I just want to begin by

 6    completing the curriculum vitae information before we

 7    get into your testimony.

 8         A.   Sure.

 9         Q.   Thank you, sir.  And I understand you've

10    corrected the licenses and certifications.  My

11    question is have you seen this curriculum vitae

12    prepared on your behalf by the defense as Exhibit A?

13         A.   I believe I have.  I can't read it from

14    there.

15         Q.   Okay.

16              MS. NEDA:  If I may approach the witness

17    and give him a copy?

18              THE COURT:  You may.

19         Q.   Doctor, have you seen that before?

20         A.   Yes.  There is an error there.  It's Rhodes

21    College in Memphis.

22         Q.   Rhodes College in Memphis?

23         A.   Yes, or "at Memphis."

24         Q.   Okay, sir.

25         A.   And the rest of it is basically correct.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

242

```
 1        Q.    Until you get down to the licenses and
 2   certifications?
 3        A.    Yes, that's right.  I am not board
 4   certified.
 5        Q.    So if I eliminated the last two entries on
 6   the first page of Exhibit A --
 7        A.    You're fine.
 8        Q.    Okay.  Sir, would you turn the page,
 9   please, of Exhibit A.  And there are the professional
10   memberships and committees to which at one time you
11   belonged?
12        A.    That's correct.
13        Q.    Okay.  Can you tell us when you belonged to
14   the American Medical Association, or do you still
15   belong?
16        A.    I'm currently a member.
17        Q.    Okay.  And Tennessee Medical Association?
18        A.    I'm currently a member there.
19        Q.    Okay.  The reason I'm asking is when you
20   testified earlier, I thought I heard you say you
21   were.  And so I just wanted to get the time frames of
22   your membership.
23        A.    Well, I'm a retired member of the Tennessee
24   Medical Association.  I guess, for all the American
25   Medical Association knows, I'm an active member.  I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    send my dues in.  I am retired from the American

2    Society of Plastic and Reconstructive Surgery.  I am

3    retired from the University of Chicago Surgical

4    Society.  I am still a member of the Alton Ochsner

5    Alumni Association.

6         Q.   What is that, the latter?

7         A.   I served my general surgery residency at

8    the Ochsner Clinic and Foundation in New Orleans.

9    Dr. Ochsner was a very famous surgeon in the '40s and

10   '50s.  Actually, he was the first surgeon to

11   recognize the nature of cancer of the lung; in other

12   words, that it was caused by smoking.  And his

13   specialty at the time was thoracic surgery.  I did my

14   surgical internship and my general surgery residency

15   at the Ochsner Clinic in New Orleans.

16        Q.   Thank you, Doctor.  And you have nothing

17   else to add to this curriculum vitae?

18        A.   Not right off.

19        Q.   All right.  Thank you, sir.

20             Now, you said that you have testified in

21   the past as an expert in plastic surgery; is that

22   correct?

23        A.   That's correct.

24        Q.   And in doing so, sir, did you have occasion

25   to testify about the aging of facial injuries and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

244

1    bruising?

2         A.   Yes.

3         Q.   Okay.  And when was that?

4         A.   Oh, that was between the years of 1974, all

5    the way up to probably the year 2000.

6         Q.   All right.  And you testified, as you are

7    testifying today?

8         A.   Um-hum.  Generally, it would be a

9    deposition, rather than having to come in court.  And

10   generally, most of the cases were regarding physical

11   trauma.

12        Q.   And did you examine the patient or just a

13   photograph on those occasions?

14        A.   Oh, no.  These were my patients that I'd

15   operated on.  Most of them, the vast majority, I'll

16   put it that way.

17        Q.   All right.  Today you're testifying about

18   the aging of an injury on the face of a victim only

19   depicted in a photograph?

20        A.   That's exactly right.  I did not have the

21   option of examining the patient, you're correct.

22        Q.   Okay.  So have you ever testified as an

23   expert regarding the aging of a facial injury based

24   solely on a photograph?

25        A.   Not that I can recall.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

245

1       Q.   Were you provided any other pictures of

2  this victim to make a comparison?

3       A.   No, ma'am, I was not.

4       Q.   All right.

5       A.   I was provided with two things -- if I may,

6  Your Honor.  I was provided with two things.  Number

7  one, the photograph.  The only history I got was that

8  the photograph was taken approximately five to

9  five-and-a-half hours after incarceration.

10      Q.   Understood.  And then you were provided a

11 badge by Mr. Gorence?

12      A.   I'm sorry?

13      Q.   And then you were provided a badge by Mr.

14 Gorence?

15      A.   That's correct.

16      Q.   I just want to confirm your testimony.  I

17 asked you the number of times you were called to

18 analyze -- or testified as an expert, excuse me --

19 regarding the aging of a superficial injury simply

20 from a photograph.  And the answer is never, except

21 for this case; is that correct?

22      A.   I can't recall it.

23      Q.   All right.  Currently, you're not a

24 practicing physician because of that traffic accident

25 in 2004?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    That is correct.

2        Q.    And do you maintain any -- do you

3   participate in the medical community, either by

4   teaching or acting as an expert or authoring

5   articles, or anything?

6        A.    I read two journals weekly.  One is the New

7   England Journal of Medicine, and the other one is the

8   American Medicine Association Journal.  Two of our

9   sons are physicians, one being an orthopedic surgeon

10  in Chattanooga, Tennessee; the other being an

11  emergency room physician in south Louisiana.  And I

12  would say we talk probably somewhere between three

13  and 10 times a week.  I kept my current medical

14  education hours up until 2006.  Then, knowing that I

15  would never go back into plastic surgery --

16       Q.    Right.

17       A.    -- I let it go.  So all I do is a lot of

18  medical reading.  I'll discuss medicine and its

19  facets all day long, with anyone.  But usually it's

20  with my boys more than anyone else.

21       Q.    And the last time you provided expert

22  testimony, Doctor, was when, do you think?

23       A.    I would guess at 1994.

24       Q.    And do you recall why you had to give

25  expert testimony in 1994, sir?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   I believe it was a peer associate was being

2    sued for an error or mistake during surgery; a

3    technical error, I believe it was.

4    Q.   I see.

5    A.   I defended my associate.  The associate won

6    the case, and that's it.

7    Q.   Good.  Have you had to experience the same

8    discomfort of a medical malpractice suit against

9    yourself?

10    A.   No.

11    Q.   You're very fortunate.

12    A.   Ma'am, it's very unusual --

13    Q.   I know it is.

14    A.   -- never to have had a suit.

15    Q.   Yes, sir.

16         Now, your method in this particular case,

17    which caused you to reach the opinion that you see no

18    physical injuries on the face of this victim, was

19    your examination of this single photograph; correct?

20    A.   That's correct.

21    Q.   Okay.  You compared it to --

22    A.   And the history of being -- having been

23    incarcerated for five hours.

24    Q.   Yes, sir.  I'm sorry I missed that part --

25    I mean, I didn't miss it; I just failed to mention

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

248

 1    it.

 2               Okay.  And then for purposes of rendering

 3    an opinion about your reasonable expectation of when

 4    an injury should appear, you struck your arm twice,

 5    one on one forearm, and the other on the other

 6    forearm; and you saw nothing after five hours?

 7        A.    That's correct.

 8        Q.    Did you see anything after 10 or 30

 9    minutes?

10        A.    It was a little bit red for about 10

11    minutes, and then it went away.

12        Q.    Then it went away.

13               And you do notice on the photograph of the

14    victim -- this one and only -- that there seems to be

15    pinkness and puffiness on the right cheek, but you

16    don't know its source; is that right?

17        A.    I do not know its source.  Now, I see the

18    redness.  Unfortunately, I cannot see any puffiness.

19    And probably the reason for that is, if you look at

20    the photo, the light source on the patient's left is

21    just absent.  You cannot even discern the color of

22    the patient's eyes on the left side.

23        Q.    It's sort of shadowy, isn't it?

24        A.    The lighting is horrible.  That's not why

25    he had the picture, though.  But yes, you see a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    redness there.  Swelling or puffiness, I do not see.

2         Q.   Okay.  And so you can't say one way or the

3    other what caused that?

4         A.   No.

5         Q.   Now, can you tell us -- your methodology

6    was the viewing of this picture, and consideration of

7    the time frame of five to five-and-a-half hours, and

8    of course your experience.  Can you tell us what

9    publications lay out that methodology or support that

10   methodology so -- that you rely on to render the

11   opinion you are?

12        A.   Well, any of your basic plastic surgical

13   textbooks in the division of physical trauma.  And

14   the management of physical trauma can tell you that,

15   or what you asked.  I did not look at any plastic

16   surgery textbook to interpret the findings I have

17   right here.  I didn't need to.

18        Q.   All right.

19        A.   There was no evidence of fracture.  There

20   was really no evidence of discoloration.  The

21   symmetry was okay.  So I just did not need to refer

22   to a bibliographical source.

23        Q.   Now, are you familiar with the journal,

24   "Forensic Science and Medical Pathology"?

25        A.   No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And do you know Doctors V.K. Hughes and

2   Neil E. Langlois?

3      A.   No.

4      Q.   Are you familiar with "Experimentation in

5   Order to Determine the Age of Bruises by the Use of

6   Reflectance Spectrophotometry"?

7      A.   I'm sorry.  Can you say that again?

8      Q.   Yes, sir.  Are you familiar with the

9   research conducted by various scientists to determine

10  the age of bruises by utilizing reflectance

11  spectrophotometry?

12     A.   Oh, no, I'm not familiar with that at all.

13     Q.   Okay.  Then you would not be familiar, for

14  instance, that in December 2010, in the attempt to

15  age bruising, it was determined that using 147

16  subjects, and 233 reflectance spectrophotometry

17  scans, aging of bruising could not be reliably

18  determined?  Would you quibble with that?

19     A.   That's foreign --

20          MR. GORENCE:  Your Honor --

21     A.   -- to me.  I was a practicing plastic

22  surgeon.

23          THE COURT:  Hold on, Dr. Sanders.

24          MR. GORENCE:  I would ask that if she's

25  going to ask the question, some of these terms, that

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                 Albuquerque, NM 87102
(505) 989-4949                                                                     (505) 843-9494
FAX (505) 820-6349                                                                 FAX (505) 843-9492
                                                                                   1-800-669-9492
                                                                                   e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    she provide the article, so the Doctor can look at

2    it.  I'm not sure it goes to the Daubert issue.

3    Maybe this is cross-examination.  But I think, as a

4    courtesy, she should give him the article.

5              THE COURT:  Well, I'll let Ms. Neda conduct

6    her cross-examination the way she wants.

7              Overruled.  Ms. Neda?

8              MS. NEDA:  At this point it's voir dire.

9         Q.   And so, you were trying to answer the

10   question, and I'm sorry you were interrupted.  Go

11   ahead and answer the question.

12        A.   I would be glad to evaluate the piece of

13   literature that you talk about.  But

14   spectrophotometry would have very little to do with

15   the clinical practice of plastic surgery.  One

16   isolated article, in other words, is what I'm talking

17   about.  If I'm making the point you want.  I'm not

18   sure.

19        Q.   I understand what you're saying.  But it

20   has everything to do with examining the optics of the

21   skin, doesn't it?

22        A.   You know, I guess it could.  I don't know

23   much about spectrophotometry, whatever.

24   Spectrophotometry.

25        Q.   I have a hard time with that word, too.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1           Are you familiar with the "Journal of

2    Forensic and Legal Medicine"?

3           A.    No.

4           Q.    Do you know Doctors M.L. Pilling, P.

5    Vanezis, V-A-N-E-Z-I-S -- I may not be pronouncing

6    that correctly -- D. Perrett, P-E-R-R-E-T-T, and A.

7    Johnston, with a T.  Do you know them?

8           A.    No, I don't know them.

9           Q.    Do you know that in April 2010, they

10   conducted an experiment to determine if you could age

11   bruising by looking at photographs?

12          A.    I'm not familiar with the article.

13          Q.    Would you quibble with their conclusion

14   that bruising is not reliably determined from

15   photographs?

16          A.    No, not necessarily.

17          Q.    Okay.

18          A.    This patient is a good example.  I couldn't

19   pick up probably 60, 70 percent of any bruising which

20   would be on the left side of the patient's face, and

21   this is because of the lighting.

22          Q.    I understand.

23          A.    In other words, there are so many variables

24   there that you're trying to equate.  So I would not

25   agree with that statement.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Are you familiar with the work published in

2  the forensic -- well, first off, are you familiar

3  with the "Forensic Science International" journal?

4    A.   Oh, no, ma'am.

5    Q.   Because forensics isn't your field, right?

6    A.   Forensics is not my field.

7         Now, if you ask me about the American

8  Society Plastic Reconstructive Surgery Journal, as of

9  13 years ago I could have probably quoted you quite a

10 bit from that.  I can quote you some from the Journal

11 of American Medical Association today.  I could quote

12 you quite a few articles from the New England

13 Journal, if you want to hear that.  But so far, you

14 haven't hit me with any.

15        These are very esoteric journals that

16 you're talking about.  And I want to say --

17   Q.   I have to go through them, though, because

18 they are forensically -- what they're doing is

19 determining whether or not you can age bruising, and

20 you're testifying about aging bruising.  So I'm kind

21 of required to do that on my part.

22   A.   I understand.

23   Q.   Okay.  So I don't mean to --

24   A.   No, I understand you totally.

25   Q.   Thank you, sir.  Thank you.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          Doctor, I do have -- well, actually a

2    couple more to ask you about.

3          Now, you indicated you're not familiar with

4    the "Forensic Science International" journal.  But

5    there is an article called, "The use of photographs

6    to record variation in bruising response in humans."

7    Would you disagree that they indicate that

8    photography is not sufficiently reliable for

9    determining the age of bruising?

10        A.   If you could repeat the last phrase.

11        Q.   Yes, sir.  And I didn't name these doctors.

12   So let me do that, just in case they do ring a bell.

13   M.M. Lecomte, T. Holmes, D.P. Kay, J.L. Simons, and

14   S.K. Vintiner.

15        I just wanted to indicate the authors of

16   this particular article.  And the conclusion was that

17   "Photography is not sufficiently reliable for

18   determining the age of bruise."  Do you agree with

19   that?

20        A.   With the age of bruise, yes, I'd agree with

21   that, as my last statement implied.  If the

22   photography -- if the lighting is not correct, if the

23   patient's head is canted or swiveled from the

24   perpendicular, you can always have shadows, and it

25   may not be reliable at all --

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 820-6349                                                   FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

1    Q.   All right.

2    A.   -- as evidenced by this photograph.

3    Q.   And so you don't have sufficient evidence

4  to testify about the aging of the bruise?

5    A.   No, what I'm saying is that you don't have

6  sufficient lighting on the patient's left to

7  determine whether there is or is not bruising.

8    Q.   Right.

9    A.   In other words, I would not give you an

10  opinion on whether the face was bruised on the left

11  side, because there is no lighting on the patient's

12  left side.

13    Q.   But on the right side there is sufficient

14  lighting?

15    A.   There is sufficient lighting that you could

16  tell red from red, blue from blue, yep.

17    Q.   And you see red; you just don't know its

18  source?

19    A.   That's exactly right.  I see -- to go

20  further, I see redness without swelling -- or you

21  called it puffiness a while ago.

22    Q.   Um-hum.  And then, gosh, there is a few

23  more, but I'm just going to hit one more:  "Medicine,

24  Science and the Law," the journal, are you familiar

25  with that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1           A.    I don't think so.

2           Q.    Okay.  The title of the article is, "Can we

3     assess the age of bruises?  An Attempt to Develop an

4     objective technique" -- an objective technique.  The

5     authors are Sophie Grossman, G-R-O-S-S-M-A-N.  A.

6     Johnston -- looks like he authored that other article

7     I mentioned -- P. Vanezis, and D. Perrett.

8                 And they, too, conclude -- and I'm asking

9     you if you agree or disagree -- that "Visual

10    assessment of bruises is unreliable, and the accuracy

11    of aging has not been improved by the degree of

12    forensic experience."

13                So, in other words -- and this is, by the

14    way, called "Medicine Science of Law."  But it's in

15    the "Royal Society of Medicine Journal."  Are you

16    familiar with that journal?

17          A.    No, not offhand.

18          Q.    Okay.  Would you agree that the visual

19    assessment of bruises is unreliable?

20          A.    No --

21          Q.    Okay.

22          A.    -- again, for the reasons I've already

23    stated.

24          Q.    Okay, sir.

25          A.    If I may interject this:  As a practicing

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 820-6349                                   FAX (505) 843-9492
                                                        1-800-669-9492
                                              e-mail: info@litsupport.com



1    plastic surgeon -- or let's say facial traumatic

2    surgeon, okay -- that's a better word -- the best you

3    have to rely on is a good photograph.  Past that,

4    there may be other things, but they're not on the

5    market yet.  If you have a good photograph, with good

6    lighting, you can tell virtually just about anything

7    you want to say about that individual, with emotions

8    and physical trauma.

9         Q.   And is this a good photograph that you're

10   basing your opinion on today?

11        A.   I'm giving you that opinion.  But again,

12   this photograph lacks the lighting on the patient's

13   left, which makes me -- I question the redness.  I

14   question -- it could even be heat from the light on

15   the right, if you follow me.  The heat source is

16   coming from the patient's right.  It comes down.

17   Some lights are hotter than others.

18        Q.   Sure.

19        A.   I think it's about four feet from the

20   patient.  But it could be two feet.  I'm not sure.  I

21   can tell there is no swelling.  And I can go into

22   that, if you want me to.

23             But the nasolabial folds are totally

24   normal.  I can tell that.  There is not any swelling

25   in the lower part of the face, which for this, a hard

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    lick, you would expect after five hours.

2           But still and all, the best you have is a

3    photograph with good lighting.

4           MS. NEDA:  Thank you so much, sir.

5           That's all I have.  Thank you, Judge.

6           THE COURT:  Thank you, Ms. Neda.

7           Mr. Gorence, you have no redirect of

8    Dr. Sanders?

9                  REDIRECT EXAMINATION

10   BY MR. GORENCE:

11        Q.   Doctor, I want to make sure that the Court

12   understands your opinion.  And I believe the

13   articles -- because I've looked at some from Ms.

14   Neda -- is where you have a bruise identified in a

15   photograph or a patient, and then you attempt to go

16   backwards and date or time how long -- you know, when

17   was the bruising occurring, you're not offering an

18   opinion to that nature at all?

19        A.   No, that's correct.

20        Q.   Because, if I understand, you're saying

21   there is no bruise to begin with, so we're not

22   attempting to do what Ms. Neda's literature -- and

23   I'm going to pull them all --

24        A.   That's correct.

25        Q.   -- but you're not trying to date a bruise,

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                             201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 820-6349                                     FAX (505) 843-9492
                                                        1-800-669-9492
                                                  e-mail: info@litsupport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   or say when it occurred, because your opinion, there
 2   is no bruise, as you can see it on this photograph?
 3        A.   That's correct.
 4        Q.   Given that, with your opinion, would it
 5   make any difference -- the literature Ms. Neda is
 6   questioning you -- and we'll look at it before trial,
 7   depending upon how the Court rules -- but you're not
 8   trying to date a -- or time how long somebody had a
 9   bruise, or when it occurred, because you don't see
10   one in the first instance; do I have that correct?
11        A.   That's correct.
12             MR. GORENCE:  I have nothing further, Your
13   Honor.
14             THE COURT:  Thank you, Mr. Gorence.  All
15   right.  Anything else you want to present?
16             Dr. Sanders, you may step down.  Thank you
17   for your testimony.
18             THE WITNESS:  Thank you.
19             THE COURT:  Is there anything else you want
20   to present on Dr. Sanders' testimony?
21             MR. GORENCE:  No, Your Honor.
22             THE COURT:  Anything else you want to
23   present evidentiary-wise, Ms. Neda, on Dr. Sanders'
24   testimony?
25             MS. NEDA:  No, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1           THE COURT:  All right.  You want to argue

2     it, Mr. Gorence?

3           MR. GORENCE:  Your Honor, I'm not going to,

4     unless the Court has questions.  We've got a factual

5     record.  The Court, I know, is very familiar with

6     Daubert; it's had these issues all the time.  In

7     essence, as I said, when the Supreme Court on that

8     opinion, the same with Kumho Tire really talks about

9     junk science.  This is someone who has the experience

10    and background in dealing with exactly this type of

11    issue, using photographs as exact -- it's not a

12    perfect photograph -- some of that goes to the

13    weight.

14          The issues in this case, and the Court will

15    hear, is that Mr. Tafoya complained of an injury to

16    the side of his face that's illuminated.  And that

17    will all come out at trial.  And in this case, the

18    central issue is -- well, one of them will be -- and

19    the jury will have to find:  Was there a physical

20    injury.  This testimony will assist the jury in

21    making that determination.  It also -- and I don't

22    know if they're going to offer it, and maybe they lay

23    a foundation -- but the Court can see paragraph 63 of

24    the affidavit by Agent Howard, he opines that there

25    is a physical injury.  And I can read it.  I don't

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    know if that could come in.  He's on the witness
2    list, and I don't know what his testimony is going to
3    be.
4              THE COURT:  How did he determine that there
5    was a facial injury?  Did he observe Mr. Tafoya at
6    some point, or did he get that from somebody else?
7              MR. GORENCE:  He, according to paragraph
8    63 -- and I'll read it, Your Honor.  This was to
9    Judge Molzen.  He says, "I reviewed Tafoya's booking
10   photograph, which shows a reddish swollen area under
11   his right eye.  This is consistent with Tafoya's
12   statement that Sheriff Rodella hit him in the face
13   with his badge, and then ground the badge in his
14   right eye and against the cheek."  That's what the
15   agent opined as part of the probable cause for the
16   warrant.  So as I said, it's one of the central
17   issues the jury will have to find:  Is there injury?
18   This is -- and Mr. Tafoya did not make his complaint
19   to the State Police.  It wasn't gone back, so this is
20   really the only evidence we have is this booking
21   photograph.  But it is important, and the doctor did
22   opine, not -- and I think it was his last
23   testimony -- is that there is no bruise to begin
24   with.
25              And the literature -- and I'll pull it,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   because I did look at it -- there is a body of

2   literature.  We are trying to go back, saying you

3   have this trauma, when did it occur?  It's the

4   same -- and I can remember, as a prosecutor, when

5   they find a body, and you try to date the time of

6   death, it's the same concept, only different

7   manifestation of trauma.  That's not what his opinion

8   is.

9           THE COURT:  He talked about this experiment

10  he did with his arms.  Do you want to bring that out?

11  Is that something you want to bring out in your

12  examination of him?

13          MR. GORENCE:  I will, Your Honor, in

14  terms --

15          THE COURT:  How does that help you?

16          MR. GORENCE:  Well, I want to do everything

17  that he did in terms of:  Here's the badge.  And he

18  said it's a different thing, because you can see --

19  the doctor was not provided with all Mr. Tafoya's

20  statements.  And all he did -- as I said, is Agent

21  Howard said, part of Tafoya's statement was that he

22  was, quote, hit in the face with his badge, and then

23  ground the badge in his right eye and against the

24  cheek.  So I will be asking questions, when we have a

25  copy -- we'll have the actual badge.  It's got points

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    on it.  And he didn't do that as part of his

2    experiment.  But I'm saying, if Mr. Tafoya said it

3    wasn't just slammed against his cheek, but you're now

4    taking a badge that has the potential for laceration,

5    I'll be asking those questions.

6              I should point out, Your Honor, that -- and

7    this will come up with the next witness -- the FBI

8    did seek to interview our traffic reconstruction

9    expert, Mr. O'Brien.  He started answering, and said

10   "I'd like to have Mr. Gorence present," and then

11   Agent Howard -- and I'll get the e-mail that I sent

12   to Ms. Neda -- I said, "I have no problem with the

13   Government conducting a pretrial interview.  I don't

14   have a problem if it's recorded, as long as I'm

15   there."  I gave them full access to both of these

16   experts, provided of course, that I could have the

17   same pretrial opportunity to talk to Mr. Overby,

18   their tendered expert.  That e-mail went off, I

19   think, on Monday or Tuesday.  It would have been

20   after our expert designation.  And the Government --

21   I never got a response.  So they didn't offer -- they

22   didn't want to take me up on that opportunity to

23   actually sit down and have an in-depth interview with

24   either of these experts.

25              Your Honor, I'm not going to repeat the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

264

```
 1    law.  It's all stated in the brief.  I think that
 2    this is an issue that is directly -- in fact, the
 3    jury instructions -- it is the Government's burden to
 4    prove beyond a reasonable doubt that Mr. Tafoya
 5    suffered a physical injury.  And we have a photograph
 6    and a doctor with the background and qualifications
 7    to address that.
 8              THE COURT:  All right.  Thank you, Mr.
 9    Gorence.
10              Ms. Neda, do you want to argue your motion
11    or your objection?
12              MS. NEDA:  This is an exhibit the United
13    States intends to offer at trial.  One is the
14    driver's license photograph of the defendant, of the
15    victim.  And you'll see the victim, of course, at
16    trial.  And the other is the booking photograph to
17    which Dr. Sanders proposes to testify.  If we could
18    eliminate those.  Thank you.  I think that it's one
19    photograph.  It's a grainy photograph.  It does show
20    pink on the right.  In my assessment it shows
21    puffiness as well.  And that's for the jury to
22    decide.  Because Dr. Sanders, although appears to be
23    an experienced surgeon from years gone by, has never
24    testified like this before.  He's asking -- he's been
25    asked to really stretch.  He cannot testify to any
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   methodology other than looking at the photograph.

2           His test sample is two arms, same subject.

3   There is just no basis for this testimony.  He's

4   looking at a photograph.  That's what the jury can

5   do.  I've argued in my objection that Dr. Sanders'

6   proposed testimony simply usurps the ability of the

7   jury to make its own assessment on this photograph.

8   And that's our objection.

9           THE COURT:  All right.  Anything else, Mr.

10  Gorence?

11          MR. GORENCE:  No, Your Honor.  I can see

12  that actually -- that photograph looks enhanced.  We

13  received one.  I don't know if they'll lay a

14  foundation for that.  And I can see it now it

15  actually has more light than the other one.  So I

16  don't know how the Government got that, or if that

17  was enhanced in some way.  But I'm going to show that

18  to the doctor as well.  And he can -- this is a

19  question, is:  Does he have a basis to give an

20  opinion that would assist the jury?

21          Ultimately, obviously, it's the jury's

22  call.  But the question is should they do that

23  without any methodology?  And you heard the doctor

24  talk about the issues in terms of looking at the face

25  from one side, comparing to the other.  There is a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



 1    whole procedure to identify trauma.  And he went over

 2    in great detail what that would be.  That is

 3    something that is not within the normal experience of

 4    a juror comparing from baseline to midline, bisecting

 5    a photograph, comparing one side to see if it's

 6    swollen, vis-a-vis the other.

 7            But anyway, that was part of his

 8    methodology.  It's far more than what Ms. Neda is

 9    talking about in terms of just seeing what this badge

10    does when hit forcefully against the forearm.  That

11    was really -- and we'll get in more detail to see if

12    the badge alone, with that type of strike, would

13    create some sort of a laceration.

14            Obviously, I'll ask different questions at

15    trial in terms of Mr. Tafoya's statement.  If you

16    took this badge and now rubbed it, as Mr. Tafoya has

17    alleged, on -- near an eye socket, and in the eye --

18    and there will be other opinions based on that.

19            But, Your Honor, I don't have anything to

20    add, other than what I've said.

21            THE COURT:  Well, I don't think I'm going

22    to allow Dr. Sanders to testify about what he sees on

23    the photograph.  So I think that's for the jury.  The

24    photograph is not a great one.  He admitted that.

25    Y'all each are seeing things that I'm having a little

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   trouble seeing or not seeing.  And I think that's for

2   the jury to determine.  I'm not sure that having a

3   doctor come in and testify about what he sees in the

4   picture necessarily helps the jury.  So I'm not going

5   to allow Dr. Sanders to testify about what he sees in

6   the picture.  I'm not sure his expertise is any

7   greater, or less, about seeing bruises or lacerations

8   on the face.

9          I am inclined to allow him to testify about

10  the length of time that object hitting into an eye

11  socket would take to bruise.  It seems to me that is

12  something that a medical doctor with his expertise

13  would have some knowledge of, whether it be 30

14  minutes, or an hour, five hours.

15         I will ask you, Ms. Neda, to give me the

16  articles, four or five articles that you referred to.

17  If I determine, after reading those articles, that

18  there is no sound basis for it, then I may exclude

19  that testimony.  But at the present time, it seems to

20  me that -- his CV was rather short in supporting his

21  ability to testify here.  But I thought there was

22  sufficient testimony today for him to be qualified to

23  testify that if this injury occurred, bruising would

24  show up in 30 minutes.  That seems to be different

25  than what -- the literature you're referring to,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    which is trying to say:  There is a bruise, when did
 2    the injury occur?  But I want to read your literature
 3    and make sure that I'm not characterizing it in a way
 4    that I shouldn't, since I haven't read the
 5    literature.  But that's my thoughts on what
 6    Dr. Sanders should be able to testify to.
 7              All right.  Do we want to go to the
 8    Government's expert?  It's nationally -- I guess,
 9    Dr. Manuel Overby; do you want to go to him?  Since
10    you're the proponent, do you want to put him on or
11    anything, Mr. Pena?
12              MR. PENA:  Sure, Your Honor.
13              THE COURT:  Is he here today?
14              MR. PENA:  No, he's not, Your Honor.  I did
15    not interpret the defense motion to strike the
16    testimony of Manuel Overby as a motion that was based
17    on Daubert.  That wasn't a citation that they had.
18    It did not appear to be on his qualifications, nor on
19    methodology, nor helpfulness to the jury, but rather
20    the argument that the defense made in Doc 50.
21    Defendant's motion to strike expert testimony was
22    entirely based on the use of SOPs and training at
23    trial.  And, of course, that is an issue that comes
24    up in varying ways throughout the course of this
25    litigation.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          And the way that Mr. Overby's expert

2    opinion was developed -- if Your Honor also has in

3    reference Document 34-2, which is the opinions that

4    Mr. Overby provided in this case, those refer

5    exclusively to nationally accepted police practices.

6          There is a distinction between expert

7    testimony regarding why police do what they do as a

8    national best practices, or accepted practices basis,

9    versus testimony regarding standard operating

10   procedures.

11          And so in the United States' response, we

12   make efforts to distinguish the case law that, of

13   course, the defense has cited in the motion to

14   strike.  All of the cases -- and, of course, Your

15   Honor is the author of many of these varying opinions

16   interpreting Tanberg versus Sholtis.  But I think

17   that the issue has never --

18          THE COURT:  Have I ever dealt with

19   nationally -- the way he puts it, "nationally

20   accepted procedures in the field of law enforcement"?

21   Have I ever dealt with that issue?

22          MR. PENA:  Yes, Your Honor.  And, in

23   candor, that is in Vondrak.

24          THE COURT:  That's pretty early.

25          MR. PENA:  It's a 2009 case, I believe,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    Your Honor.  And I don't think that it was squarely

 2    before the Court.  The distinction that the United

 3    States is drawing, and the basis --

 4              THE COURT:  What did I do in Vondrak?

 5              MR. PENA:  You did not find a distinction

 6    between nationally accepted practices and standard

 7    operating procedures.  But, you know, I, of course,

 8    have not reviewed the submissions that the parties

 9    made in that particular case.  The decision did not

10    reference Zuchel, which is, of course, controlling

11    Tenth Circuit law, which --

12              THE COURT:  You got that case which

13    affirmed the district court allowing in the

14    nationally accepted law enforcement procedures, and

15    then you have Marquez, which affirmed the district

16    court excluding nationally accepted procedures.  It

17    seems to me that the Tenth Circuit is leaving this

18    area to the discretion of the trial court more than

19    the SOP area.  Would that be a fair sort of

20    conclusion?

21              MR. PENA:  I think that is fair, sir.

22              THE COURT:  All right.  Give me the

23    rationale you think -- it would seem to me that --

24    well, let me ask you, and let you talk:  What do you

25    think -- why do you think that I should allow

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  nationally accepted procedures in, given the sort of

2  recent hostility by the Tenth Circuit to allowing

3  SOPs?

4            MR. PENA:  Well, I think that, of course,

5  the rationales that appear in Tanberg versus Sholtis

6  are so important.  And I think the fidelity to the

7  principles that brought the Tenth Circuit to its

8  decision there actually lead to a distinction between

9  nationally accepted practices and standard operating

10 procedures.

11           The reason is that in Tanberg versus

12 Shultis, the Tenth Circuit's concerns were primarily

13 two-fold.  First, a lack of uniformity.  The concern

14 was that, if either plaintiffs, or I suppose, in this

15 case prosecutors, were to claim that standard

16 operating procedure violations could constitute a

17 constitutional violation in themselves, then, of

18 course, the Constitution would effectively be varying

19 from jurisdiction to jurisdiction, depending on the

20 police agency that had enacted its procedures.

21           Now, that uniformity concern does not apply

22 when we have expert testimony regarding nationally

23 accepted police practices.  That is a national

24 standard.  It is uniform throughout the United

25 States.  And so it is -- the uniformity concern just

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    does not exist when the testimony is on that basis.

2         THE COURT:  Where does -- where did these

3    nationally accepted procedures come from?  I mean, is

4    there some book out there that Mr. Overby is going to

5    point to?  Are they just his opinion?  Where do these

6    procedures, these nationally accepted procedures come

7    from?

8         MR. PENA:  Your Honor, I believe that they

9    come from a consensus of police trainers throughout

10   the country.  I don't believe that there is a

11   particular source book.  But I do believe that it is

12   the tradition, the practice -- the standard

13   traditions and practices that are common to police

14   departments all across the country.

15        THE COURT:  And what are you going to argue

16   to the jury?  What are you going to turn to the

17   jury -- after Overby testifies, what are you going to

18   tell them about his testimony when he testifies that

19   common practice for off-duty police officers is to

20   report the license plate number and description to

21   the local dispatch?  Are you going to tell them about

22   that?  How do you link that up with the elements that

23   you have to prove in this case?

24        MR. PENA:  In this case, Your Honor, the

25   ultimate element is whether the defendant's conduct

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    was reasonable under the Fourth Amendment.  And that

2    is the jury issue that the jury will decide.  And it

3    is certainly relevant to the reasonableness that,

4    basically, no officer would do this.  Nationally,

5    officers are all trained.  Nationally, the accepted

6    practice is, if you are off duty, if you are in a

7    private vehicle, you see a traffic violation, every

8    officer that you speak to will say, "I'm going to

9    write the plate down.  I'm going to call dispatch.

10   And I'm going to let it go."

11            THE COURT:  But couldn't you make that same

12   argument with SOPs?

13            MR. PENA:  Couldn't --

14            THE COURT:  That would be the identical

15   argument you would make to the jury if I let you

16   bring in SOPs.

17            MR. PENA:  Well, it's very, very similar,

18   certainly.  But the SOPs, of course, are a local

19   standard.  And the testimony would be that

20   nationwide -- New Mexico is not an outlier in this

21   particular practice.  Rio Arriba is not an outlier in

22   this particular practice.  The national standard

23   would be that an officer --

24            THE COURT:  But just because -- let's say

25   Rio Arriba had a practice for off-duty police

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   officers to do something different than just report

2   it to the dispatch.  Would that in any way tell us

3   what the constitutional standard is in this case?

4           MR. PENA:  I think the standard operating

5   procedures really only inform us as to the

6   defendant's state of mind.  And so we don't hold

7   those out as applying to the constitutionality.

8           THE COURT:  What evidence do we have -- and

9   since we don't know whether Mr. Rodella is going to

10  testify, what evidence are we going to have that Mr.

11  Rodella is familiar in any way with nationally

12  accepted procedures?

13          MR. PENA:  Well, we will, I'm sure, hear a

14  certain amount of his professional background.  He

15  was a State Police Officer prior to becoming Sheriff,

16  prior to his experience as a magistrate judge.  He

17  was a magistrate judge for a certain number of years

18  as well.  And we will hear testimony from at least

19  two of his instructors during his law enforcement

20  recertification.

21          THE COURT:  What does Overby really give

22  you that the training stuff I gave you yesterday

23  doesn't give you in much greater quantity?  I mean,

24  it's very specific as to his training, what he knew.

25  And it seems to me that's much more relevant to the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    scienter than some expert coming in and talking about

2    nationally accepted standards about pulling over a

3    vehicle and approaching a vehicle.

4              Here's my concern -- well, let me ask a

5    question, then I'll give you another question about

6    my concern.

7              MR. PENA:  Sure, Your Honor.  Yes, I do

8    think that the SOPs and the particular training

9    witnesses, those bear on the defendant's scienter.

10             Overby's testimony is to help the jury

11   understand what police practices are reasonable, and

12   help the jury understand when a reasonable officer is

13   confronted with particular circumstances, what

14   factors are they considering, and what risks should

15   they be considering, and what is accepted police

16   practice as far as the objective actions that the

17   defendant took.

18             So I suppose, if you wanted to draw that

19   distinction, SOPs and training are relevant to the

20   defendant's subjective understanding.  And Overby's

21   testimony will help the jury assess his objective

22   behavior.

23             THE COURT:  My concern, the way the expert

24   report is laid out is that you first have Overby

25   assume Mr. Tafoya's version of events, and then he

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    comments on that.  And then Mr. Overby then assumes

2    Mr. Rodella's version of events, and then Overb

3    comments on that.  It strikes me as kind of one of

4    these wind-up witnesses at the end of a trial, where

5    we use the expert to summarize our case.  I'm

6    wondering if that's really an appropriate use of an

7    expert.

8           MR. PENA:  Well, that's certainly not the

9    intent.  And yes, Your Honor, we have laid it out in

10   that way.  Of course, in order to render opinions,

11   then, he's got to have some sort of springboard.

12          And so, if Your Honor -- if the rule is

13   that the United States shouldn't say:  Assuming the

14   truth of such-and-such a witness' testimony, but

15   rather should say:  Assuming the hypothetical that

16   this happened, and that way ask our questions so they

17   are not recitations of previous testimony, but are

18   elicitations of hypothetical opinions, which is the

19   core of expert testimony, of course, we'd be happy to

20   comply with the Court's order on that.

21          THE COURT:  All right.  Anything else, Mr.

22   Pena?

23          MR. PENA:  No, sir.

24          THE COURT:  All right.  Let me hear from

25   Mr. Gorence, and I may have more questions of you.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

277

```
 1              Mr. Gorence.

 2              MR. GORENCE:  Yes.

 3              THE COURT:  Mr. Gorence, you've got an

 4    expert in the wings.  They've got their expert.  The

 5    Tenth Circuit has affirmed letting these in, keeping

 6    them out.  Why not let it in, and both sides inform

 7    the jury if they're going to make a determination

 8    about what is reasonable under the Constitution, have

 9    as much information as they can.

10              MR. GORENCE:  To answer that, let me go

11    back to what I think was your first question of Mr.

12    Pena.  You will see -- this is in Document 34 of

13    their notice, Your Honor, you've seen this report of

14    Mr. Overby.  The first part he says "nationally

15    accepted police practices," but he doesn't delineate

16    where that comes from.  He doesn't say who has

17    adopted it.  He doesn't say that's part of the

18    materials that he's reviewed.  He hasn't given a cite

19    to where they exist.  He doesn't say they've been

20    adopted by either -- any jurisdiction.

21              THE COURT:  Let's say -- and I don't --

22    let's say Mr. Overby comes in and says, I've trained

23    officers in all 50 states, and I'm familiar with the

24    training given of all police officers in all 50

25    states; I've trained FBI agents, DEA agents.  Then we
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    have someone that's gone all across the country.

2    What do you think then?  He's not referring to a book

3    or any sort of pamphlet.  He's just referring to his

4    experience of going all around the country and

5    meeting and training police officers.

6              MR. GORENCE:  Well, that would be an

7    opinion without any basis of foundation.  His own --

8    what should happen.  He's articulating this to,

9    quote, "a nationally accepted police practice."

10             THE COURT:  But how do you get nationally

11   accepted police practices?  How would you have them?

12             MR. GORENCE:  Well, I'm assuming it would

13   be much like in the Bar, when there are model rules;

14   there are committees that are promulgated.

15             THE COURT:  We know that.  They don't exist

16   here.  I mean, so I hate to put up a phantom issue,

17   and require him to do something that we know doesn't

18   exist.  The question is:  From his experience, is

19   that enough to come in and say these are nationally

20   accepted procedures?

21             MR. GORENCE:  Off this report -- we don't

22   even know what that is, Your Honor -- and I don't

23   think if they wanted to bring in --

24             THE COURT:  He's telling us what they are.

25             MR. GORENCE:  No.  He hasn't given a cite

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    to where they come from.
2              THE COURT:  No, but there is no cite to
3    give.
4              MR. GORENCE:  But he just said this is
5    nationally accepted.  And, Your Honor, in our
6    challenge, part of this is that we have no idea what
7    he's talking about.  He hasn't even said -- if it's
8    just his opinion what's nationally accepted police
9    practices --
10             THE COURT:  I think we have to assume that,
11   because there is not a book you can go to that says
12   "nationally accepted police procedures."
13             MR. GORENCE:  Well, I --
14             THE COURT:  I think it is his opinion as to
15   what is nationally accepted.  Am I correct, Mr. Pena?
16             MR. PENA:  Yes, sir.
17             THE COURT:  Okay.
18             MR. GORENCE:  So it's just his opinion of
19   what's nationally accepted.  And they'll lay a
20   foundation that these are, in my opinion, what 50
21   states -- and I know he had been a Game and Fish
22   Officer in New Mexico.  He's never been a federal law
23   enforcement officer.
24             Your Honor, the question is, is that there
25   has to be a foundational basis for the opinion.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    That's a methodology question.  His methodology

2    doesn't say how he came up with his opinion to say

3    what is nationally accepted.  It's nowhere in here.

4    And he doesn't -- in the materials that he's

5    reviewed -- doesn't say there is a body anywhere

6    comparing jurisdictions around the country, model

7    rules.  And I do believe they exist.  FBI model

8    training, use of force.  There are use of force

9    continuums that come up all the time in the --

10             THE COURT:  But you'd be objecting if they

11   tried to bring those in, saying those are close to an

12   SOP.

13             MR. GORENCE:  Well, I understand.  But they

14   are articulated in police manuals to say you have

15   continuum models.  There is a basis.

16             Here, we have nothing whatsoever.

17             Next -- and I do want to touch on this in

18   terms of how ultimately this opinion would unfold --

19   because you raised an interesting point, whether or

20   not Mr. Rodella testifies.  If you let this in, I

21   think -- I'm going to be telling you right now, I

22   want the transcripts of all of his underlying

23   material to come in as exhibits.

24             On one hand, Ms. Neda says, We don't want

25   recorded interviews of Mr. Crespin, Officer Sanchez,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   tape-recorded.  All of these have to come in --
2   particularly the Sheriff's statements -- in their
3   entirety.  So that -- because then he has this
4   hypothetical, assuming one to be true, assuming the
5   other.
6           Next, he cannot opine on statements which
7   are purely hearsay, not under oath, from -- I've
8   never seen an opinion like this from Mr. Tafoya.  If
9   he wants to watch sworn testimony, and base opinions
10  off of that, that's a different foundation.  But
11  this -- to be candid, I've never seen an expert
12  report in a criminal case like this.  Because I'm
13  certainly entitled to bring in every one as exhibits
14  so I can cross-examine him on what he reviewed,
15  including what Ms. Neda would say would be the
16  hearsay statements.  Because they're not hearsay
17  then, because he's relying on them.  I'm going to go
18  through and mark everything that he's reviewed in
19  their entirety so that I can go through all of it.
20          Next:  Anything with Mr. Tafoya is
21  clearly -- he said I'm assuming the truth -- they're
22  all hearsay.  It's not his in-court statements under
23  oath, which he'd have to watch to render an opinion.
24          Finally -- and we've laid this out, Your
25  Honor, and I just want to make the record again -- we

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   have now not found a single case in the United States

2   of America in a 242 action that allows this.

3            I understand -- and I want to articulate

4   this, because this goes to the SOPs and practices in

5   the 1983 action where -- the rule is, and it couldn't

6   be, whether it's Tanberg, or Marquez or all of

7   them -- I think it's even quoting two of your

8   opinions -- whether it was Solis Maruffo or the

9   Montoya case that Ms. Oliveros and Tim Padilla tried

10  with you -- "evidence of SOPs is irrelevant to

11  whether a defendant acted objectively reasonable."

12  They're irrelevant.

13           Now, this question on state of mind, where

14  the definition of willfulness -- the willfulness is a

15  specific intent crime.  A specific intent to violate

16  the law.  That's the problem here.  Because in the

17  civil context, the Court has allowed that testimony.

18  In Montoya, it was for impeachment, when the officer

19  said, We did everything appropriately, and they could

20  be impeached then, based on that testimony with their

21  training, limiting instruction.

22           Here, the problem that the Court is

23  venturing into is that this testimony invades the

24  very idea which you're going to be giving a limiting

25  instruction on, because you're going to say:  You did

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    this willfully.  And willfully, means that you had an

2    intent to violate the law; the law being the

3    Constitution.  That's the problem with this bootstrap

4    in the criminal case.

5           Civilly, you can see it's coming in on

6    training may be relevant, particularly when there

7    is -- and I can see -- it was I think Solis

8    Maruffo -- it comes in on claims -- civil claims

9    having to do with adequate supervision and training

10   as a cause of action.

11          Here, there is only one issue.  And Mr.

12   Pena -- really, the jury instruction is not whether

13   Mr. Rodella acted reasonably.  It's whether "Mr.

14   Rodella deprived Mr. Tafoya of his right to be free

15   from excessive force and unlawful arrest, as defined

16   by the Constitution of the United States."  It goes

17   on -- and you can see -- very specific in our

18   proposed Instruction No. 3 what that requires.

19          And the specific -- this willful idea, Your

20   Honor, it's willful in terms of a specific intent to

21   violate the law.  And inevitably, what will happen,

22   if the Court were to admit SOPs, other things under

23   this idea of willfulness -- even training -- you're

24   saying it's relevant to show he violated the

25   constitution.  The very -- the antithesis of what

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Judge McConnell writes -- it's irrelevant for any

2    purpose -- and you've written -- in terms of whether

3    or not to view a violation of an SOP training manual,

4    or anything, is irrelevant to the question of whether

5    or not someone acted objectively reasonable; i.e.,

6    the Constitution was violated.

7           If that is the case, Your Honor --

8           THE COURT:  But it seems the Tenth Circuit

9    has backed off a little bit on the training issues.

10   And I have, too.  But -- so I guess that's then the

11   question:  What do we do -- is the Tenth Circuit

12   creating a little pocket for SOPs?  And I can think

13   of some arguments why the local versus national, that

14   you would want to keep those out.  And there was also

15   the additional justification that you want to

16   encourage local police districts to have SOPs and not

17   then punish them in court.  Whereas, national

18   standards don't have that problem.

19          What's, then, the problem with letting

20   training materials in now, but not nationally

21   accredited?  Why draw that distinction?

22          MR. GORENCE:  Well, again, Your Honor, even

23   if there was a violation, it's irrelevant to the

24   question as to whether or not the violation of a SOP

25   or a national standard.  That does not mean the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Constitution was violated.  That's the holding of

2    Tanberg and every other case.  In your cases, it is

3    irrelevant in that determination.

4           The slight opening on training, only in a

5    civil case, is usually based -- and I can see it from

6    your Montoya opinion -- when an officer, in a 1983

7    action says, Everything I did was appropriate, well,

8    then you can impeach that testimony with training;

9    maybe even an SOP, if that's the testimony that the

10   defendant in their case opens up, again, with a

11   limiting instruction.  But it requires that.

12          Secondly, in a criminal case -- and again,

13   why this hasn't come up, and the Government hasn't

14   cited one, so their research must be the same as

15   mine -- it has never come up in the United States of

16   America that this has occurred, at least in a

17   published opinion in a 242 case.  We haven't found

18   one.  We started with the Tenth Circuit, of course --

19   and I actually went circuit by circuit on our

20   stuff -- and we just haven't found it.  The

21   Government hasn't cited one.

22          The point being is you can see the problem

23   here is that if you admit it under their theory of

24   willfulness, it's willful to violate the

25   Constitution.  So you're going to show a violation of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that, but actually back door.  The very thing that

2    Judge McConnell says is the evil.  Even if you do

3    one, does not mean you violated the Constitution.

4              And that's our argument, Your Honor.

5              In terms of the testimony, as I said, this

6    report is so flawed, it doesn't delineate what is a

7    nationally accepted practice; doesn't say where that

8    comes from, remotely.

9              Two, I will be -- if he is allowed to

10   testify, then clearly everything but Mr. Montoya's

11   (sic) statements have to be admitted so that I can

12   completely cross-examine -- the jury can see what he

13   reviewed.  And I want Ms. Neda -- because I want to

14   make that argument -- as well as the statements of

15   Mr. Rodella, Sr., in their entirety.  It says

16   transcript of a recorded statement that he had.  And

17   they all come in.  Because, otherwise, the Government

18   is going to say, Well, these are -- you know, they

19   can't come in because they're not offered by a party

20   opponent.  They have to, if this gentlemen is going

21   to testify pursuant to his opinion.  And as I said,

22   he'd have to watch the sworn testimony of Mr. Tafoya.

23   Otherwise, it's rank hearsay; may not correspond

24   remotely with what his sworn testimony would be.

25   That's why this report is really utterly flawed.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          THE COURT:  All right.  Thank you, Mr.

2     Gorence.

3          Mr. Pena.  Can you address that final point

4     about the hearsay problems.  As the proponent of the

5     witness, you can't use him as a conduit to get in

6     hearsay statements.  And my concern is that, for him

7     to tell his story, he's going to basically -- he

8     can't just -- I don't see a way for him to just give

9     his conclusion.  And then, Mr. Gorence, in

10    cross-examination, to say:  What did you rely upon?

11         You almost have to bring out hearsay

12    statements as the proponent for his conclusions to

13    make sense.  For example, he states -- let me see if

14    I can find one -- "Following the initial encounter,

15    Sheriff Rodella continued to pursue MT."  How do you

16    get that in without there being -- without him being

17    a conduit for some hearsay statement?

18         MR. PENA:  Well, for one thing, Your

19    Honor -- and of course, I'd be referring to Federal

20    Rule of Evidence 703, bases of an expert opinion.

21    And that rule tells us that "an expert may base an

22    opinion on facts or data in the case that the expert

23    has been made aware of, or personally observed.  If

24    experts in a particular field would reasonably rely

25    on those kinds of facts or data in forming an opinion

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 820-6349                                               FAX (505) 843-9492
                                                                       1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                    e-mail: info@litsupport.com

288

1    on the subject, they need not be admissible for the

2    opinion to be admitted."

3            THE COURT:  I don't have any problem with

4    what he's relying on.  But how is he going to testify

5    to his opinion without going ahead and testifying as

6    to the hearsay itself?

7            MR. PENA:  There are two answers to that.

8    First, that he could be present in court, as has been

9    discussed, and hearing the live testimony from the

10   opinions -- well, I'm sorry, from the witnesses

11   throughout the course of trial.  And second, if for

12   some reason that's not logistically feasible, then he

13   can be asked hypothetical questions, and it can be

14   explicitly left to the jury whether the hypothetical

15   even applies to the case.  And that is what expert

16   testimony is all about.

17           THE COURT:  Well, you're familiar with the

18   rule -- I'm looking for it now -- help me out, if you

19   can find it -- it says, "If the facts or data would

20   otherwise be inadmissible, the proponent of the

21   opinion may disclose them to the jury only if their

22   probative value in helping the jury evaluate the

23   opinion substantially outweighs their prejudicial

24   effect," which I probably wouldn't find in this case,

25   that somebody may offer this is essential to the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    jury's determination.  So you're not going to be able

2    to bring out those facts through him.

3              Basically, you can put him on the stand and

4    say -- you know, you can say what he's reviewed.  But

5    in the end, isn't he just going to be able to turn to

6    the jury and say, I think he's violated nationally

7    accepted procedures in his stop, and whether you look

8    at his version or MT's version?  That's about all you

9    can do.  You can't walk him through and have him

10   testify about where he got any of this information,

11   and then tell the jury that -- for example, Rodella's

12   act of jumping through the car window with this

13   firearm.  How is he going to testify about that

14   without that being -- you offering hearsay testimony?

15             MR. PENA:  I could ask a hypothetical, sir.

16             Now, I do want to clarify, we do not intend

17   to use Mr. Overby as a vehicle for admission of

18   otherwise inadmissible hearsay whatsoever.  That is

19   simply not anything to do with what Mr. Overby --

20             THE COURT:  How is this different than --

21   let's say we had a video of the incident, we had a

22   video.  And he sat there on the stand, and while the

23   jury watched the video, and I watched it, and

24   everybody watched the video, he commented on it as he

25   walked through and said, That violates nationally

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 820-6349                                           FAX (505) 843-9492
                                                                 1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                               e-mail: info@litsupport.com

1   accepted procedures; that violates nationally

2   accepted procedures?  Would you think that's a good

3   idea for an expert to watch with the jury a video,

4   and sort of give a running commentary, like at a

5   football game, whether that's acceptable or not?

6   Would you want an expert to do that?

7        MR. PENA:  I think that I'd want an expert

8   to be aware of additional surrounding circumstances.

9   But assuming that the expert is apprised of all the

10  known circumstances in that video, yes, I think

11  that -- I mean -- and of course, that is the expert

12  testimony in the Rodney King trial, is the expert

13  walked the jurors, almost frame by frame, through

14  that particular incident.  So, yes, I do think that

15  that would be acceptable testimony.

16        And I would also like to address something

17  on that point.  We have cited several cases that have

18  indicated that it is a nationwide practice to admit

19  the type of testimony about nationwide standards in

20  law enforcement.

21        In addition to Zuchel, which is the Tenth

22  Circuit case, we've also cited Champion versus

23  Outlook National, which is a Sixth Circuit case from

24  2004.  And we've cited Samples versus City of

25  Atlanta, which is an Eleventh Circuit case from 1990.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    There is another --

2              THE COURT:  Do you know what those two

3    circuits do with SOPs?  Because I know -- my

4    impression is the Tenth Circuit has been more

5    restrictive with SOPs than other circuits.  Would you

6    agree?

7              MR. PENA:  I would agree with that, sir.  I

8    don't know how these other circuits treat SOPs,

9    because I do think that we've all had the same

10   experience of not finding a lot of national case law

11   regarding SOPs.  The Tenth Circuit has certainly made

12   it a point.  But the background assumption seems to

13   be that nationally accepted police practices are

14   legitimate expert testimony.

15             THE COURT:  There is a lot of stuff in his

16   report.  Do you really want him to testify to all

17   this stuff?

18             MR. PENA:  He may not offer all of those

19   opinions, no, sir.

20             THE COURT:  Because it makes it difficult

21   for the Court to figure out what you really want to

22   do with him here, because some of this stuff, it just

23   seems to me -- like, for example, he says, "It's

24   equally unacceptable for a police officer to make

25   threatening statements, such as 'It's too late,' when

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

292

```
1    a suspect begs for his or her life."  Do we really
2    need Mr. Overby to come in and say that?
3              MR. PENA:  Well, no.  But certainly if
4    there is testimony --
5              THE COURT:  What does he mean by "equally
6    unacceptable."  Unacceptable to who?
7              MR. PENA:  I agree that that particular
8    statement might be a little too vague.  But he would
9    clarify exactly what he's referring to as a national
10   standard.  And --
11             THE COURT:  But is it really a national
12   standard on whether a police officer should make a
13   threatening statement such as, "It's too late," when
14   a suspect begs for his or her life?  I mean, is that
15   really a national standard out there?
16             MR. PENA:  I think we'd need to hear from
17   him whether there is --
18             THE COURT:  Well, but I have to decide
19   today in my gate-keeping function whether we should
20   hear from him at all.  So are you wanting him to say
21   that?
22             MR. PENA:  I don't need him to say that
23   particular thing.  But as far as, is there a national
24   protocol for what types of communications you have
25   with people as you're trying to effect an arrest,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
**1-800-669-9492**
e-mail: info@litsupport.com

1    absolutely.  I think I would want him to testify

2    about a national protocol for the types of

3    communication that are appropriate.

4            So I agree that -- it's poorly phrased in

5    the particular disclosure.  But I do think that it

6    would be, when properly phrased, the proper subject

7    of expert testimony.

8            THE COURT:  But I can keep going.  "Sheriff

9    Rodella violated nationally accepted law enforcement

10   procedures when he said, 'Do you want to see my

11   badge, motherfucker?  Here's my badge.'" Do I -- is

12   there really a national standard on that?

13           MR. PENA:  I'm sure that the national

14   standard doesn't -- isn't so specific as to words.

15   But yes, I do think that there would be a national

16   standard about the types of communication, the ways

17   in which an officer should communicate with a

18   suspect.  And for sure, at some point particular

19   words are a judgment call, and he would be offering

20   his opinions.

21           THE COURT:  All right.  Anything else, Mr.

22   Pena?

23           MR. PENA:  I would just like to sum up by

24   reemphasizing that Mr. Overby would be offering

25   opinions regarding the reasonableness of the conduct.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

294

1    And the ultimate touchstone in this case is the

2    Fourth Amendment, unreasonable seizure.  Although we

3    have a lot of additional elaborations that the courts

4    have provided to us about what we mean by

5    reasonability over the course of years, the ultimate

6    constitutional standard is, is the seizure

7    unreasonable.  He will be there to offer comments,

8    opinions on that.

9             THE COURT:  All right.  Thank you, Mr.

10   Pena.

11            Well, I am troubled by Zuchel, and the

12   Tenth Circuit affirming the allowance in, in 1983.

13   But I also have the Marquez case in which they've

14   excluded this testimony.  Also, while I can think of

15   some distinctions between SOPs and nationally

16   accepted standards, I'm not sure that those

17   distinctions are very persuasive, given what

18   McConnell and the Tenth Circuit has recently held

19   about SOPs, and how strongly they have disfavored

20   those in 1983 cases.

21            I'm sympathetic to the Government's

22   requirement here.  It has a heightened burden in this

23   criminal case of proving scienter.  But much of

24   Overby's testimony seems to me to be not very helpful

25   to the jury.  Statements such as, "Police officers

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    should anticipate that when he or she is dressed in

2    plainclothes and driving unmarked private vehicles,

3    members of the public might have difficulty

4    identifying him or her as an officer."  I'm not sure

5    that we need an expert to testify about some of those

6    issues.  And he has a number of those in here.

7          I am concerned about the Government's

8    ability to get his conclusions in without being

9    accompanied by hearsay statements.  I'm also

10   concerned about where these nationally accepted

11   procedures come from.

12         I think there are certain statements that

13   he makes in his opinion that probably can come in.

14   But I'm not sure that they necessarily can come in

15   only through him.  And they may be better coming from

16   others.  For example, he states that "Off duty

17   officers have no requirement to act when faced with

18   petty misdemeanor or misdemeanor traffic violations

19   that occur in their presence."  I think that's

20   probably something the jury needs to be told, but --

21   if in fact, that's the law -- but I'm not sure that

22   he in any way tells me with his report where he

23   reaches that conclusion and how he does it; whether

24   there is something in New Mexico law, or otherwise.

25         Another statement, "Sheriff Rodella made no

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    mention of searching MT after he was subdued."  Well,

2    I think that's a fact that needs to be pointed out,

3    if that's, in fact, the truth, or that's the

4    Government's contention.  But do we need an expert to

5    be testifying about those facts?  So much of what he

6    is doing here is he's testifying as to facts.  I

7    think those will come in otherwise.  Some of it is

8    not the subject, I think, of really expert opinion.

9    Some of it I have doubts as to whether there is

10   really a nationally accepted practice on the

11   particular facts that he's getting at.

12          And so I have concerns about the -- him

13   doing little more than just commenting upon the

14   reasonableness or unreasonableness, in his opinion,

15   as to the different versions of the case.

16          I think that I'm going to have to choose

17   between whether I follow Zuchel, and find no abuse of

18   discretion in admitting these, or Marquez and the SOP

19   cases, which found no abuse of discretion in denying

20   these.  And I'm inclined to think that these more

21   recent cases and the difficulty of distinguishing

22   SOPs from nationally accepted practice, while I

23   understand the arguments why there could be, in some

24   ways you could think of SOPs and being a stronger

25   case for putting the sheriff on notice of what is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    required of him.

2          And that's the reason I'm inclined to allow

3    the limited training and the material yesterday,

4    which is informed by the SOPs, but not allow

5    Mr. Overby to come in and testify about violations of

6    nationally accepted practice.

7          If there is still something he can say,

8    such as defining terms in his field, I'm not

9    excluding him entirely.  But as far as educating the

10   jury regarding nationally accepted law enforcement

11   procedures and practice, I'm inclined to keep that

12   out.  And then presenting opinions, applying those

13   procedures and practices to the facts of this case,

14   I'm inclined to keep that out as well.

15         All right.  Let's go to the accident

16   reconstructionist.  Did you have another expert?

17         MS. NEDA:  Well, it wasn't challenged.

18   It's a DNA analyst.

19         THE COURT:  So that wasn't challenged.  So

20   it's just -- we just got the expert then on the

21   reconstruction?  I'm sorry, Ms. Neda.

22         MS. NEDA:  I was going to say that with

23   respect to this next witness, in the interests of

24   efficiency, the United States is not asking for a

25   lengthy voir dire, because we do not contest his

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  qualifications.

2          THE COURT:  All right.  Let me ask this,

3  maybe I can -- here's the problems I'm having with

4  the accident reconstructionist, or the issues I'm

5  having with him.  It seems to me that he can testify

6  about the acceleration of a Jeep, the acceleration of

7  a Mazda, and make comparisons between those two.  But

8  is he really in a position to do anything more than

9  that?  He seems to me that he can provide that basic

10 information to the jury about the differential in

11 accelerations between the two vehicles.  But I guess

12 I get concerned when he tries to do any more than

13 that.  So those are my issues of concern, if that

14 helps cut down on what you want to bring out.

15         MR. GORENCE:  Your Honor -- and I see, that

16 would be on page 4 of his report.  So he could talk

17 about the Mazda acceleration, the Jeep's

18 acceleration.  There will be testimony in terms --

19 the Government has listed a Google map.  We have a

20 three-mile period of time at speeds in which --

21 because the Government calls this a chase, and we

22 dispute that.  We think it's flight, trying to get

23 away, in a much faster car.

24         I would not -- and again, this opinion, if

25 you look at page 4 of Document 42-3 on his report,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Your Honor, I would not be eliciting -- I know he put
 2    this in a report, and we had to move pretty quickly
 3    to get experts -- I can't say it's consistent with
 4    information that Mr. Rodella, Jr. gave about the
 5    manner in which Mr. Tafoya was operating the vehicle
 6    unless he sat in.  I have the same concerns.  He
 7    can't base that on a hearsay statement.  He'd have to
 8    listen to Mr. Rodella, Jr.'s testimony about what
 9    transpired.
10            And then, the important part, Your Honor,
11    is the photographs that will be admitted in this
12    case.  You've seen the one of the car when it's
13    high-ended on a pole.  And then there is photographs
14    of that Mazda, which roughly what happened -- you can
15    see the circular marks.  And that's what I want -- I
16    want to have him describe photographs, and in terms
17    of how could this happen.  And it's very important.
18    If you are trying to continue your flight in a way
19    with a vehicle -- and he can explain this -- with
20    front-wheel drive, the tire marks -- we'll need
21    assistance of a traffic reconstructionist to show
22    that, as he's in reverse, it is spinning around.  And
23    you can even see the tire mark of when he's
24    high-centered.  There is a huge divot.
25            THE COURT:  If you want to go ahead and put
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   him on, go ahead.

2           MR. GORENCE:  That's what I want to do.

3           THE COURT:  I was just telling you my

4   concerns.  I felt like the capabilities of the Jeep

5   and the Mazda were fair game.  But it's the

6   photograph area that I need help on.

7           MR. GORENCE:  I didn't mean to leave, Your

8   Honor.  I'm going to go get him.

9           THE COURT:  Mr. O'Brien, if you'll come up

10  and stand next to the witness box, before you're

11  seated, Ms. Wild, my courtroom deputy, will swear you

12  in.

13                  DENNIS O'BRIEN,

14      after having been first duly sworn under oath,

15      was questioned and testified as follows:

16                  DIRECT EXAMINATION

17  BY MR. GORENCE:

18          THE CLERK:  Please be seated.  State your

19  name for the record, please.

20          THE WITNESS:  Dennis O'Brien.

21          THE COURT:  Mr. O'Brien, Mr. Gorence.

22  Let's talk a second about scheduling.  We've gone --

23  I need to probably give Ms. Bean a break.  Maybe what

24  we could do is take a break, then we could go and

25  finish this witness, and argument on this, and then

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    break for lunch.  What do you think?

2              MR. GORENCE:  Whatever the Court's

3    preference.

4              THE COURT:  I need to give Ms. Bean a

5    break.  We've been going about an hour and a half.

6    Then we'll come back and I'll let you put on

7    Mr. O'Brien.

8              (The Court stood in recess.)

9              THE COURT:  Mr. O'Brien, I'll remind you

10   you're still under oath.

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Mr. Gorence, if you wish to

13   conduct your direct examination.

14             MR. GORENCE:  Thank you, Your Honor.

15             THE COURT:  Mr. Gorence.

16                   DENNIS O'BRIEN,

17        after having been first duly sworn under oath,

18        was questioned and testified as follows:

19                   DIRECT EXAMINATION

20   BY MR. GORENCE:

21        Q.   Mr. O'Brien, I want to go through a very

22   brief background.  You've submitted a CV to the

23   Court; is that accurate?

24        A.   Yes, sir.

25        Q.   How long have you been in the field of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    traffic reconstruction?

 2         A.   Since 1996.

 3         Q.   Have you been accepted as an expert and

 4    testified as an expert in the courts of New Mexico?

 5         A.   Yes, sir.

 6         Q.   In fact, have you actually been retained by

 7    the U.S. Attorney's Office as an expert on their

 8    behalf?

 9         A.   Yes, sir.

10         Q.   Would you tell the Court about that?

11         A.   I testified as an expert in U.S. versus

12    Linda Diaz, a federal vehicular homicide case from

13    Pojoaque Pueblo.

14         Q.   And in that case, that's a criminal case,

15    you were actually retained by the U.S. Attorney's

16    Office?

17         A.   Yes, sir.

18         Q.   Who was that case prosecuted by?

19         A.   Mr. Jack Burkhead.

20         Q.   Did you actually testify in court?

21         A.   Yes, I did.

22         Q.   Who was the judge?

23         A.   I do not recall.

24         Q.   In this case, did you author a report, a

25    four-page report?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Yes, I did.

2      Q.   Do you have any changes to that report in

3   terms of any typographical errors, anything of that

4   nature?

5      A.   Yes, I do.

6      Q.   What are those?  Let's start with that.

7      A.   On the cover page, I incorrectly listed the

8   date of the incident and the time.

9      Q.   Those typos -- so you've marked down as

10   March 11, at approximately what time?

11      A.   Can I refer to my report?

12      Q.   Yes.

13      A.   I indicated in my report that the date of

14   incident was March 26, 2014 at approximately 4:00

15   p.m., when in actuality, it occurred on March 11,

16   2014, at approximately 5:15 p.m.

17      Q.   I want to get to your opinions.

18           MR. GORENCE:  And Your Honor, in a matter

19   of brevity, if the Court is not concerned, as I heard

20   earlier, I'm not going to go into the methodology of

21   opinions expressed by the vehicle capabilities

22   between the Mazda 3 and the Jeep owned by Mr.

23   Rodella, unless the Court wants to hear --

24           THE COURT:  Let me just ask, are you doing

25   this, Ms. Neda?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              MS. NEDA:  Yes.
2              THE COURT:  What do you think about that?
3    Do you have any problem with that aspect of his
4    report, just the capabilities of Jeep versus Mazda?
5              MS. NEDA:  I have no problem with the basis
6    for the witness' statement as to the acceleration
7    capability of these two vehicles.  I don't see the
8    relevance without more, and therefore, my objection
9    is not based on the methodology of learning how each
10   of these engines function, but on this particular day
11   how those engines were put in force and applied, the
12   acceleration rate was applied.
13             THE COURT:  That's probably about the same
14   line I have.
15             MR. GORENCE:  That's a legal argument.  I
16   understand --
17             THE COURT:  The relevancy is, yes, I agree.
18   I agree that that's a legal argument.
19             MR. GORENCE:  And I'll address that later
20   then.
21        Q.   In addition to the capabilities, were you
22   able to determine if the Mazda is a front-wheel drive
23   vehicle?
24        A.   Yes, it is a front-wheel drive vehicle.
25        Q.   Does that have significance for you in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    terms of analyzing the photographs in this case?

2         A.   Yes, sir.

3         Q.   I want to talk about the photographs.  Did

4    you receive copies of the photographs that were taken

5    on the day of the incident, Mr. O'Brien?

6         A.   Yes, sir.

7              MR. GORENCE:  I want to start -- and these

8    are marked, Your Honor, in my exhibit package that

9    was tendered to the Court as B.  I haven't

10   individually marked them.  I guess I should do that.

11   This would be B-1, B-2.

12        Q.   Let me first -- have you seen this

13   photograph, Mr. O'Brien?

14        A.   Yes, I have.

15        Q.   Then I've marked that as B-2.  This is B-3.

16   Have you seen that photograph?

17        A.   Yes, sir.

18        Q.   Do you have the photographs that you looked

19   at with you?

20        A.   Yes, sir.

21        Q.   Would you take them out?

22        A.   Yes, sir.

23        Q.   I'm going to use your photographs because I

24   want to make sure that these are the ones -- I think

25   you've reviewed them all.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MR. GORENCE:  But I will mark these for
 2   this hearing, Your Honor, as I think we're on
 3   exhibit -- I think it was D -- and I'll mark all of
 4   these as D.  Let me ask you, on these photographs of
 5   where the vehicles ended up, I want to put this up,
 6   and I'll mark this -- do you mind if I write on this
 7   as D-1.  I'm changing from my trial exhibits to his
 8   exhibits for this hearing with the Court's
 9   indulgence.
10        Q.   Now, on D-1, what does this depict?
11        A.   It shows a view of the Mazda 3 up against
12   the pipe.  You can't see the pipe in this image, but
13   the other images tie that in together.  It shows the
14   Mazda would be facing in the easterly direction.
15        Q.   Okay.  Is there anything significant -- and
16   I say this is the final resting point for the Mazda,
17   is it not?
18        A.   Yes, it is, up against the pipe.
19        Q.   And when you see the left front tire, is
20   there anything significant about that as it relates
21   to your opinions?
22        A.   It does.  I do see that the tire is turned
23   to the right, but there appears to also be a furrow
24   generated in the dirt, which extends from the bottom
25   left of the photograph towards the tire at its final
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    rest position.

2         Q.   Now, you can actually mark that.  Would you

3    mark what you mean by a furrow.  A furrow meaning the

4    tire has dug into the dirt?  Is that what you mean by

5    that?

6         A.   Yes, sir.

7         Q.   Using your finger, okay.  And what's the

8    significance of that with a front-wheel drive

9    vehicle?  Where you now have a furrow, what does that

10   mean to you as a traffic reconstructionist?

11        A.   Well, tying -- using this photograph, along

12   with other photographs that you have present with

13   you, it's consistent with my opinion that the vehicle

14   spun around violently in a clockwise direction, as

15   the vehicle spun in an aggressive manner in that

16   dirt.

17        Q.   Well, I don't want to talk about

18   aggressive.  The fact that it's actually digging,

19   it's being embedded at this point indicates that it's

20   not spinning and just sinking down there as

21   acceleration is being applied to the front-wheel

22   drive?

23        A.   What this shows me is the end of the path

24   of the vehicle as the tires are sliding sideways, so

25   that sideward motion of the tires are creating that

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                       201 Third NW, Suite 1630
Santa Fe, NM 87501                               Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 820-6349                                   FAX (505) 843-9492
                                                                    1-800-669-9492




1    divot, that furrow in the dirt.

2         Q.   Now, you say a furrow in the dirt -- and

3    correct me, maybe I should have you analyze -- you

4    can touch your screen and take that off.

5              In fact, let me start with the overview

6    first.  What does that picture depict?

7         A.   This picture depicts the front tires of the

8    Mazda as the vehicle was spinning backwards 180

9    degrees, generating the marks that are generated here

10   in the dirt, which are acceleration marks, as the

11   front end is swinging around.

12        Q.   And what's the significance -- so you're

13   saying prior to being -- let me ask this:  Prior to

14   being embedded on the pipe, it's actually spinning,

15   you indicated, in a counter-clockwise way?

16        A.   Yes, sir, rotated in a clockwise direction

17   as it was moving backwards; then the front end swung

18   around.

19        Q.   Tell me the methodology that you utilized

20   to come up with that opinion that it's actually

21   spinning, digging these tracks -- not a road, but a

22   dirt -- a dirt surface.

23        A.   Well, the marks begin wide out in this

24   area.  And they gradually arc down, and they become

25   narrow where they eventually will come over the top

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 820-6349                                     FAX (505) 843-9492
                                                            1-800-669-9492
                                                   e-mail: info@litsupport.com




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    of each other in this fashion.  Down at the bottom of

2    the screen is where the tires would side swipe coming

3    to that position facing eastbound.

4              These marks -- what these show also is that

5    there is some side slipping involved with the pattern

6    that the dirt is kicked outwards in this direction,

7    some oblique marks, which indicate the tires are

8    spinning, they're rotating while they're side

9    slipping as the tires are moving sideways, with the

10   tires rotating.

11        Q.   Is that further depicted in this

12   photograph?

13        A.   Yes, sir, you can see the oblique

14   striations right in this area.

15        Q.   And what would cause that?

16        A.   The tires rotating while they're side

17   slipping.  So the vehicle is under acceleration.

18        Q.   Okay.  As they're rotating -- you're saying

19   the driver of the vehicle is applying gas, trying --

20   and not gaining traction, so what's happening?

21        A.   Correct.  The tires are side slipping as

22   they're under hard acceleration.

23        Q.   Okay.  And that's what I want to get to,

24   the hard acceleration.  How can you say that by

25   virtue of looking at these photographs?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.   Because these tire marks are clearly

2    evident of the vehicle rotating, as taught in the

3    field of traffic crash reconstruction.  They are

4    consistent with, more similar in appearance to yaw

5    marks, which are generated by a side slipping tire as

6    the vehicle is moving out in its path, its

7    trajectory, with the tire tracking outside -- the

8    rear tire tracking outside the front tire.

9             In this case, it's obvious to me from my

10   training, experience, and knowledge of crash

11   reconstruction, that that is from a laterally

12   slipping and accelerating rotating tire.

13       Q.   And you used the word "hard acceleration."

14   Why would that be?  And what's the methodology that

15   you used to get to not just that it's accelerating

16   but a hard acceleration to cause marks like this?

17       A.   Well, the tire marks -- the tires have to

18   be breaking the traction threshold for standard

19   travel.  If the tires were turned and the vehicle is

20   backing up, you wouldn't leave this kind of marks,

21   you'd have tire tread.  But the tires are spinning,

22   in that they're breaking contact with the dirt,

23   displacing the dirt.  And they are also sideways,

24   they're lateral, which means that it would take a

25   hard acceleration and rotational force to cause the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    vehicle to swing around and generate those marks.

2        Q.    And what caused the rotational force?  So

3    you've got acceleration, hard; and a rotational

4    source.  What caused that?

5        A.    The rotational force is brought about from

6    the driver turning the wheel and accelerating hard as

7    the vehicle is moving backwards.

8        Q.    This photograph, does that further amplify

9    your opinion?

10       A.    This goes along with my opinion.  It

11   appears that the sun is washing out some of the

12   marks, the oblique marks.  But the deep furrows are

13   visible right in here.

14       Q.    Now, in your report you used the words that

15   these photographs -- is there any other ones that you

16   want to highlight?  If so, I'll show them to you in

17   the packet.  If there is anything else you want to

18   really use?  I've shown some, but I don't want to go

19   through every one of them.  If there is, I'll put it

20   up so you can describe that for Judge Browning.

21       A.    This photograph provides a good overall

22   view of the tire marks as they come together near the

23   bottom left of the image.

24       Q.    I thought we had --

25       A.    It wasn't marked, as the other ones are.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Again, if you want to correct me if I'm

2    wrong, I thought you did, but tell me what's

3    significant on this photograph.

4        A.   These also show the path of the tires as

5    they travel through the furrows in this direction.

6    And they come together and appear to unify down on

7    the bottom.

8        Q.   Now, in your opinion, as articulated on

9    page 4, Mr. O'Brien, you said, "These are consistent

10   with an aggressive maneuver, where the driver

11   accelerated backwards and cut the tires to the right,

12   followed by braking, to swing the front end of the

13   Mazda around roughly 180 degrees from west to east."

14           The first part I want to talk -- the

15   opinion about aggressive maneuver.  Before I get to

16   that, what was your methodology to show that this

17   driver accelerated backwards, cut the tires to the

18   right, followed by braking, to swing the front end of

19   the Mazda around roughly to a 180 degree angle from

20   west to east?

21       A.   As indicated in my report, I did interview

22   T.J. Rodella out at the scene.  And in speaking with

23   him in his description of what the vehicle did, I

24   took that into account as to how these tire marks

25   could have been generated.  I do see from these

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    photographs that the dirt out there is soft, it's

2    very sandy.  As can be seen in these images, that

3    there is boot tread over the top of these tire marks

4    that indicate they're fresh, as a result of the

5    culmination of this incident.

6              So looking at all the photographs here,

7    taking into account what T.J. Rodella described the

8    movement of the vehicle did upon his observation, and

9    also the police report, and the fact that the vehicle

10   was facing the opposite direction and then backed up

11   into the pipe, these tire marks are totally

12   consistent with the vehicle initiating that maneuver

13   as indicated by deputy -- by T.J. Rodella.

14        Q.   Now, if the Judge were to find that you

15   possess testimony that would assist the jury in this

16   case, meeting the standard under Daubert, you

17   understand that you would be listening to the

18   testimony of Mr. Tommy Rodella, Jr., as he testified

19   under oath.  And I would want to ask you a question,

20   assuming -- and I'm saying, if you're allowed, you

21   will be watching and listening to that testimony to

22   form your opinions.  Do you understand that?

23        A.   Yes, sir.

24        Q.   Okay.  If he testified consistent under

25   oath, as well as the cross-examination, with what he

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 820-6349                                          FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1   told you at the scene, would your opinions in any

2   way -- they wouldn't change, would they?

3       A.   No, sir.

4       Q.   The photograph pertaining to when the

5   vehicle ultimately got high-ended in the rear on the

6   pipe, this photograph -- and there was a close-up of

7   this photograph -- we started marking those D-2 and

8   D-3, do you have an opinion as to the amount of force

9   it would take for the vehicle to become lodged on

10  that pipe?

11      A.   No, sir.  I wouldn't be able to provide

12  that.

13      Q.   Finally, then, you say that this was an

14  aggressive maneuver based on your training and

15  experience.  Why do you say that?

16      A.   Because it would take a lot of acceleration

17  and force to cause the vehicle to initiate a 180

18  degree rotation while moving backwards.

19      Q.   And when you characterize it as aggressive,

20  that's -- what do you mean by that?  That's because

21  of the amount of force, meaning how fast the vehicle

22  had to be accelerated to do that?

23      A.   Correct.  The amount of rotational

24  acceleration through the power train, through the

25  front tires, aggressive spinning of the tires as the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    vehicle is moving backwards and spinning around.  The

2    force had to be strong enough to cause that vehicle

3    to do a 180 degree rotation in the dirt.

4              MR. GORENCE:  I have no further questions.

5              THE COURT:  Thank you, Mr. Gorence.

6              Ms. Neda, do you have cross-examination of

7    Mr. O'Brien?

8              MS. NEDA:  Your Honor, if we could go to

9    Chief Kassetas, I will cross him later.  And the

10   reason is, as you know, Chief Kassetas, Captain

11   Thornton, and Lieutenant Skinner have all been

12   subpoenaed.  But they were subpoenaed last night, and

13   but they still agreed to come.

14             Now, Chief Kassetas has an appointment at

15   1:00.  They're picking a new Chief Medical Examiner.

16   So if he could be on the witness stand now -- quite

17   frankly, as the Court knows, actually with all the

18   experience the Court has, to be subpoenaed the night

19   before ordinarily doesn't even require compliance.

20   This is not really giving them reasonable notice.

21   And he is the Chief of NMSP.  So I'm going to ask

22   that Chief of Police Kassetas be able to testify

23   right now.

24             And the other thing, Your Honor, is that

25   the purpose of his testimony would be -- should be

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 820-6349                                           FAX (505) 843-9492
                                                             1-800-669-9492
                                                             e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  relevance -- and the Court knows under the Rules of

2  Evidence that relevance does apply -- is that whether

3  or not the United States, either the FBI or the U.S.

4  Attorney's Office, had any influence on the changing

5  of these New Mexico State Police reports.  I know the

6  answer is going to be no.  I know it's going to be no

7  for Mr. Kassetas, Mr. Skinner, and Thornton.  And if

8  that question is asked first, everything after that

9  is not relevant, and we could save a lot of time.

10 Because what's at issue here is whether the federal

11 government, according to Mr. Gorence's own belief,

12 whether the federal government tried to get the NMSP

13 to change recommended charges or the narrative in

14 their reports against Mr. Rodella.

15          THE COURT:  Do you have any objection to

16 taking the Chief right now?

17          MR. GORENCE:  No, Your Honor.

18          THE COURT:  All right.  So let's go ahead

19 and bring him in.  And you're calling him; correct,

20 Mr. Gorence?

21          MR. GORENCE:  That's correct, Your Honor.

22          THE COURT:  If you want to get him.

23 Mr. O'Brien, if you'll step down.  Thank you, and

24 we'll resume you in a moment here.

25          All right.  Now that we're switching back

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to motion to disqualify, everybody wanted to invoke

2    the rule, or does anybody care.  Ms. Neda?

3            MS. NEDA:  I'm sorry, Your Honor?

4            THE COURT:  Do y'all want to invoke the

5    rule at this point?

6            MS. NEDA:  No, Your Honor.  Again, as I was

7    indicating -- this is Mr. Pena's response to Mr.

8    Gorence's motion -- but as I was indicating, the

9    machinations and the procedures of NMSP are not at

10   issue, as long as the United States didn't have

11   anything to do with it.  So if that question could be

12   asked up front, Chief Kassetas could be free.

13           THE COURT:  Well, I'll let Mr. Gorence

14   conduct his examination.  But I don't hear anybody

15   wanting to invoke the rule.

16           MS. NEDA:  No, sir.

17           THE COURT:  Chief, if you'll raise your

18   right hand.  Before you're seated, Miss Wild, my

19   Courtroom Deputy, will swear you in.

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                         PETE KASSETAS,
 2          after having been first duly sworn under oath,
 3          was questioned and testified as follows:
 4                     DIRECT EXAMINATION
 5              THE CLERK:  Please be seated and state your
 6      name for the record, please.
 7              THE WITNESS:  Pete Kassetas.
 8              THE COURT:  Mr. Kassetas, Mr. Gorence.
 9              MR. GORENCE:  Thank you, Your Honor.
10      BY MR. GORENCE:
11          Q.   Mr. Kassetas, you are the Chief of New
12      Mexico State Police?
13          A.   Yes, I am.
14          Q.   You received a subpoena yesterday,
15      including one duces tecum, indicating whether or not
16      you had any records pertaining to a report or reports
17      that were filed by the New Mexico State Police
18      pertaining to Michael Tafoya; you received that, did
19      you not?
20          A.   Yes, I did.
21          Q.   Tell me what you did to search to see
22      whether or not you had any responsive documents?
23          A.   I looked through my e-mails to see if I had
24      anything saved, and asked one of my Majors that I
25      knew I had communicated with, to see if he had had
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    any e-mails with attached reports.

2        Q.   Do you have anything?

3        A.   I do.

4        Q.   Can I see that?

5        A.   Sure.   This is a copy of a report, with

6    corrections made by me.

7        Q.   Let me see everything you brought pursuant

8    to the subpoena.   Chief, I'll just mark this as

9    Exhibit E.   Because I have some questions on

10   everything here that is paginated, and I don't want

11   to write on it.   Let me ask you if I can make a copy.

12   So I see -- I'll put this up, the first page -- it

13   appears to be something with a time line?

14       A.   Yes.

15       Q.   Who prepared this?

16       A.   I did.

17       Q.   When did you prepare it?

18       A.   This morning.

19       Q.   You red-lined out something that says

20   "Approved by OS, by Sergeant Olson."   What's that?

21       A.   I believe I made an entry or indicated that

22   the report was approved by Officer Sanchez by

23   Sergeant Olson, but it wasn't on that date.   And we

24   can look at the report to actually see the date.

25       Q.   Okay.   When you say "Incident occurs," what

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  do you mean by that?

2       A.   It looks like that's the day it was

3  reported to us.

4       Q.   To the State Police?

5       A.   Yes, sir.

6       Q.   The underlying incident, you know, was

7  earlier than that?

8       A.   I'm not sure.  I was looking at the report.

9       Q.   The next thing you've handed me appears to

10 be a document of seven pages.  It's not signed by

11 anyone at the back.  It has dates, and it has

12 handwriting on it.  This indicates that this

13 report -- first of all, what report is this?

14      A.   This is the same report.  And this is the

15 version that either the lieutenant or captain -- I

16 don't know -- or someone in the chain of command

17 corrected.  So I have the -- it's a little bit out of

18 progression.  The copy with the red markings is mine,

19 and that was the catalyst for starting the

20 corrections on the report.

21      Q.   You're saying red marks.  Is there a

22 different report?

23      A.   There is.  There is a second one.  If you

24 keep looking, there is the same report with red pen

25 marks about three pages in.  No, that's the wrong



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   one.  There is another packet, sir.  No.
 2         Q.   Not this one?
 3         A.   No.  That's the original final version.
 4   There is another draft.  That was the one that I
 5   discovered in reading the incident report.
 6         Q.   This report?
 7         A.   Yes.
 8         Q.   Okay.  Again, this indicates that the
 9   offense was a simple assault.  And you're indicating
10   that you received this and made changes yourself?
11         A.   If you look at that -- as you're showing me
12   the first page of the narrative -- I had made
13   corrections after reading the report, grammatical, in
14   spelling, in sentence structure, to the point where I
15   had just kicked it back to the supervisors to fix,
16   because --
17         Q.   When did you do this?
18         A.   If you give me my time line back -- but I
19   believe after the 5th or 6th of June.
20         Q.   After the search warrant was served by the
21   FBI?
22         A.   Yes, I'd seen it on the news.  And I knew
23   we had done an investigative report.  And I'd asked
24   to review that report.  And when I did, I immediately
25   noticed there were several problems with the report
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    that the officer did.

2         Q.   So this was -- and I see from your time

3    line -- it would have been after June 4th.  So when

4    did you go back, and as you said --

5         A.   June 5th I had the report sent to me in a

6    PDF.  My Public Information Officer sent it to me.  I

7    asked if he could find a copy of the report.  And

8    after reading it, I had -- there is a series of

9    e-mails there, where you'll follow my train of

10   thought.  I had sent it back to the district to say,

11   "This needs to be fixed," as any supervisor would

12   probably do.

13        Q.   Had this already been submitted and signed

14   by Mr. Sanchez and -- Officer Sanchez -- and his

15   Sergeant Olson?

16        A.   No.  If you turn to the back page where

17   it's called the "status."

18        Q.   The back page of this report?

19        A.   Yes, sir.  Keep turning to right there.

20   Let's take a look up at the end there.  Right there

21   where that circle is, where it says Kenneth Olson,

22   Sergeant.  Normally, when you have an approved

23   report, there will be a date associated with that

24   box.  So what that tells -- when I look at it is

25   Orlando Sanchez, the patrolman, dated it as a

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 820-6349                                  FAX (505) 843-9492
                                                          1-800-669-9492
                                                    e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   completed report, but the Sergeant hadn't signed off

2   on it yet.  And if it occurred in March -- the report

3   was entered two months later -- it very well should

4   have been approved.

5        Q.   Now, in this copy with your corrections --

6   and you can see -- we can go through it in terms of

7   what was changed to -- marked on the 5th, you didn't

8   change anything with regard to how this was going to

9   be described as a simple assault?

10       A.   No, I didn't indicate anything there.  I

11  looked more at the narrative, to read it to ensure or

12  get an idea of exactly what we were submitting.

13       Q.   Then I see this copy again indicating a

14  "simple assault."  Now it's got blue writing?

15       A.   Yes, sir.

16       Q.   Did you write that?

17       A.   No, I did not.

18       Q.   Do you know who did?

19       A.   I do not.  I do not know who did that.

20       Q.   Okay.  On this copy now, you can see from

21  the top, it appears that -- and you know this, simple

22  assault is a petty misdemeanor?

23       A.   Yes, sir.

24       Q.   And now someone has written in "aggravated

25  assault with a weapon, false imprisonment, and

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                           (505) 843-9494
FAX (505) 820-6349                                                   FAX (505) 843-9492
                                                                    1-800-669-9492
                                                                e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    battery," two felonies and one full misdemeanor;

2    correct?

3         A.    Correct.  Yeah, if you look to the right,

4    you'll see "Weapon," it says "none."  And in reality,

5    I believe the investigation revealed there might have

6    been a handgun involved.  So I would assume that's

7    why it was changed.

8         Q.    Well -- and do you know when this changed

9    or who changed it?

10        A.    I don't, I don't.

11        Q.    The other blue writing on this report, do

12   you know whose this is?

13        A.    No.

14        Q.    How did it get to your file?

15        A.    This morning I was handed a copy by the

16   Major, when I was looking for the copy that I had

17   corrected.  And I said, "This isn't the copy that I

18   did, it must have been done in district," so --

19        Q.    So who was the Major that actually handed

20   this to you?

21        A.    Daniel Lovato.

22        Q.    Is it his changes then?

23        A.    I don't think so, sir.  I think it's the

24   gentleman outside the door, the lieutenant and

25   captain you have here, one of the two, and/or the

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 820-6349                                                    FAX (505) 843-9492
                                                                          1-800-669-9492
                                                              e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   sergeant.

2        Q.   Okay.  Now, this is clipped together.  You

3   have Captain Thornton sending you an e-mail on June

4   10th.  And it's copied -- who is Jimmy Glasscock?

5        A.   The Deputy Chief.  That's the chain of

6   command.

7        Q.   Joseph Lovato?

8        A.   Major.

9        Q.   Mr. Skinner is a Lieutenant?

10       A.   Yes, sir.

11       Q.   And you have Sergeant Olson?

12       A.   Yes, sir.

13       Q.   "Rodella report.  Chief, I've attached a

14   report for Sheriff Rodella with the attachments,"

15   from Mr. Thornton.  This handwriting here, is this

16   yours?

17       A.   Yes.

18       Q.   And this says, "At 6/10/14," it's a final

19   report?

20       A.   Yes, that's the final version, approved

21   version.

22       Q.   This final report, then, indicates what

23   we've seen:  The alleged offense conduct has changed.

24   And here, it bears signatures.  If this was done on

25   June 10th, you have Orlando Sanchez and Kenneth

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   Olson.  What would the procedure be to have the

2   reporting officer sign it, and his approving officer,

3   if it was revised?

4        A.   Well, once the -- the draft reports aren't

5   signed.  It's the final report that's signed.  And

6   many times -- I think there is two different ways to

7   do it.  Officers commonly -- in the system it doesn't

8   allow for a physical signature, from what I recall.

9   It's been quite some time since I've done a report.

10  But they enter the date into that report.  And then

11  it's locked or closed.  It looks to me like someone

12  had ultimately printed this out, and it looks like

13  Ken Olson, the Sergeant, signed for Orlando Sanchez,

14  approving it.

15       Q.   Is that permissible?

16       A.   Yes, it is.

17       Q.   Yesterday we had marked as Exhibit C the

18  original report indicating a simple assault in this

19  case, unlike the one that you have.  It appears

20  that -- we had testimony that Mr. Olson signed that,

21  as well as Orlando Sanchez.  And this was actually

22  disseminated on an IPRA to -- and we'll call this to

23  the media -- as a final report.

24            My question is, given that it was changed

25  on June 10th, how is it that you have a different

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    report --

2         MR. PENA:  Objection to the

3    characterizations of the testimony here, Your Honor.

4         THE COURT:  Well, I'll let you clean that

5    up, if it's necessary, on cross.  But if Mr. Kassetas

6    needs to change something, he can.

7         MR. GORENCE:  Let me ask -- I'll have to

8    start all over, since now I don't have the question I

9    was going to ask.

10        Q.   You can see that this, Chief, was the

11   simple assault, uncorrected, signed off.  And there

12   was testimony yesterday from Mr. Olson that he signed

13   off, and he concurred with this report.  He concurred

14   in its finding that there was a simple assault at

15   stake here.  That's why he signed it.  Did you ever

16   receive this?

17        A.   No.

18        Q.   Were you ever informed that the sergeant

19   reviewed the work of the reporting Officer, Orlando

20   Sanchez; concurred with it; and signed both of these

21   documents -- he wasn't sure of the exact date -- but

22   we have a situation where he signed this, and signed

23   for Orlando first, and considered it a finalized

24   report.  Were you aware of that?

25        A.   No, he signed -- it looks like he signed it

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   after I had questioned it and reviewed it; when I

2   determined or discovered that the date block was not

3   completed.

4            So in my mind, on the 5th, when I read it,

5   it was not an approved report.  So someone must have

6   talked to him, and he went in the system and signed

7   off on it right away without reading it.

8       Q.   So he said he reviewed it and approved it,

9   and then had instructions to change it after that.

10  What's the procedure for that?

11      A.   Anytime a supervisor reads a report, and it

12  has issues, be it either inaccurate or spelling or

13  grammar errors, they can go in and instruct the

14  patrolman to fix those errors.  So that's probably

15  what had happened.

16      Q.   And you're saying this only occurred after

17  the matter was brought to your attention by virtue of

18  an FBI search warrant?

19      A.   I believe the matter was brought to my

20  attention by virtue of a news report that prompted me

21  to ask for the report.

22      Q.   Have you had any conversations with the FBI

23  in this case?

24      A.   A couple.

25      Q.   Let's tell -- what conversations have you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    had?

2         A.   Mostly about my personnel being involved in

3    the investigation -- or testimony, subpoenas for a

4    reconstructionist.  As a matter of fact, they didn't

5    contact me, I was told by my staff that they'd use

6    one of my reconstructionists.  That was about it.

7         Q.   Well, let me go back.  Who at the FBI did

8    you converse with?

9         A.   I talked to -- I was at a meeting at the

10   FBI office about a week ago, and I spoke to -- I

11   believe, the agent in charge of the case indicated

12   that I may be subpoenaed.  And that was really the

13   extent of the conversation.

14        Q.   Have you ever talked to the case agent in

15   this case, Mr. Howard?

16        A.   I believe that's who I talked to a couple

17   weeks ago, yes.

18        Q.   Let me go back.  Did you ever talk to

19   anybody from the FBI, prior to these reports being,

20   as you said, fixed or amended, by a supervisor?

21        A.   No, not before, no.

22        Q.   Did you have any e-mail conversation with

23   anybody from the FBI?

24        A.   No.  I believe we had -- my intention was

25   after I read the report, knowing that the FBI was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    going to want the case file, and/or it would be

2    IPRA'd to deliver a packet to the FBI to ensure they

3    had all of the material that they may need.  And I'm

4    the one that reached out to them, and that was after

5    the fact.

6         Q.   Now, your boss is the Secretary, Mr.

7    Fouratt; correct?

8         A.   Yes.

9         Q.   Did you talk to Mr. Fouratt about this

10   case?

11        A.   No.

12        Q.   Now, as I understand it, the e-mails -- and

13   this also comes from your report.  And if I'm looking

14   at this chain, I should start at the back.  The first

15   is an e-mail from DPS to you, "Copy of the report you

16   requested.  Boss, attached is the Michael Tafoya

17   report."  That's the 5th?

18        A.   Yes.

19        Q.   And then you have one from Thornton to you,

20   copied, "Sir, we will get it fixed.  Sergeant Olson

21   is reviewing it.  I will ensure it is a quality

22   product before it's disseminated."

23             And then yours back right after that to

24   Mr. Thornton, it says, "This is a big deal as far as

25   the investigation goes."  What do you mean by that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Well, it's a high profile case.  Any case

2   that the State Police works on a sitting sheriff, or

3   a chief of police, is going to garner attention.  So

4   I wanted to ensure that we did the best job we could

5   possibly do, and produce the best product.

6      Q.   It ends, "You have an IPRA request on this,

7   and I know the FBI wants to see it, so let's get it

8   done."  How do you know that the FBI wanted these

9   reports?

10      A.   I had called and asked them:  Do you have

11   our case file?  They indicated no.  I said, "Well,

12   we'll get them to you once everything is complete."

13      Q.   So if I understand this correctly, is that

14   you first did your review as you indicated on your

15   time line, the day afterwards, the 5th.  And in your

16   review, as the Chief, you marked areas in red -- make

17   sure I get this right here.  One where you marked in

18   red, but you didn't see fit to change anything with

19   regard to the fact that it was a simple assault.

20   When you made your reviews, you didn't think that was

21   appropriate?

22      A.   I hadn't got that far.  There is another

23   e-mail where I say, I basically give up.  "Fix this."

24   I quit reading about three quarters of the way into

25   it, because of the quality of the report.  I just

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    simply kicked it back to the supervisors and said,

2    "You need to address this."

3        Q.   Well, actually, on your red pages you've

4    got the first sheet, and then every sheet after that

5    goes through with red pen and marks your changes?

6        A.   Yes.

7        Q.   I assume you read the whole thing when you

8    read it?

9        A.   I did read the whole thing, yeah.

10        Q.   And that would have included the front

11    part, where it says, "Here's the type of offense"?

12        A.   Yes.

13        Q.   And all I'm saying is -- at least you as

14    the Chief didn't see, when you were making your

15    changes looking at it for quality control, you never

16    thought the front had to be changed to reflect that

17    actually there was a potential felony involved?  That

18    might be your opinion, but you didn't change it?

19        A.   I didn't change it.  You're right.  That's

20    a fact.  You can see it right there.

21        Q.   So after you decided there wasn't the

22    potential for a felony referral to the DA's Office,

23    you're saying someone else ultimately decided that

24    may be important and they changed it, even though you

25    didn't think it was appropriate?

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                                   Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 820-6349                                                   FAX (505) 843-9492
                                                                     1-800-669-9492
                                                                     e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        A.   I did not say that.  I did not make any

2   discussion or any decision on whether it should be a

3   felony referred to the District Attorney's Office.  I

4   looked at the narrative -- I looked at the entire

5   report.  I focused on the narrative, and left it up

6   to the district supervisors to work with the officer

7   to address any deficiencies in the report.

8        Q.   I understand.  But I'm saying, as you were

9   red penning it, you didn't think anything was

10  improper on the cover sheet?

11       A.   No, I didn't make any note of any notices

12  or notations, correct.

13       Q.   You have handed me something called a

14  "Dissemination Log"?

15       A.   Yes.

16       Q.   Generated today.  What is that?

17       A.   I asked our records people to give me a log

18  of the people that had printed or viewed that report

19  in a PDF format.

20       Q.   So prior to June 4, only Officer Sanchez

21  had looked at it?

22       A.   Yes.

23       Q.   This Gutierrez PIO.  What is that?

24       A.   That's the Public Information Officer for

25  State Police.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1          Q.   Okay.  And then you have Officer Sanchez
 2     again would have reviewed it.  And I guess this is an
 3     electronic method of keeping track of who goes into a
 4     report?
 5          A.   Yes, sir.
 6          Q.   Then on the 6th, who is K Olson Maes?
 7          A.   K Olson is the sergeant you've subpoenaed.
 8          Q.   Okay.  K Olson.  And Maes?
 9          A.   She's an administrative support person.
10          Q.   So the first time it would have been seen
11     by Sergeant Olson was on the 6th, when it actually
12     says it's dated that he reviewed it and approved it?
13          A.   I would say that the first time he went in
14     the system and looked at it.  He may have seen it
15     before, if it was printed out and provided to him.  I
16     don't know.
17          Q.   Then you indicated Maes is who?
18          A.   Judy Maes is the secretary.
19          Q.   And Ms. Maes, Mr. Olson, Sanchez.  Then at
20     the end, actually July 1st and the 7th you have W
21     Shelton and C Valdez.  Who is that?
22          A.   Those are two investigations guys.
23          Q.   Now, it doesn't appear that your name shows
24     up as ever accessing the document?
25          A.   No.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And it doesn't show that the Captain
 2   Thornton nor Detective Skinner ever accessed the
 3   document?
 4        A.   Probably because Judy Maes, the secretary,
 5   was asked to go in and get it.  And I asked Manuel
 6   Gutierrez to provide it, as the e-mail --
 7        Q.   Okay.  I see.  So now I understand it.  So
 8   Mr. Gutierrez reports to you as the Public
 9   Information Officer?
10        A.   He does.
11        Q.   And he pulled it for you.  And then
12   Ms. Maes, she's the Secretary in District 7?
13        A.   Yes, sir.
14        Q.   Now, this is the e-mail you're talking
15   about.  You sent this out on June 6.  "Please tell me
16   this report has not gone out.  It's horrible.  I
17   stopped looking at it after the last three
18   paragraphs.  Captain, please get this fixed."
19        A.   Yes.
20        Q.   And then what is this part?  "This has not
21   been released.  We should all discuss exactly what
22   we'll be releasing and what is a part of the case.
23   Talk about it next week."  That's from Regina Chacon.
24   Who is she?
25        A.   She's the Bureau Chief for the records
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  department, who receives all the IPRAs.  And she's

2  ultimately the one that releases any of the reports

3  after they're redacted.  So she's discussing with the

4  group how -- what should be released.

5       Q.   Finally, I think the last thing you handed

6  me is another e-mail chain between you and

7  Mr. Thornton.  Correct me if I'm wrong, but the

8  timing starts at the bottom from you, speaks for

9  itself.  "I want the report and all related documents

10 PDF to me today.  Need all copies."

11          Mr. Thornton addresses you as, "Chief,

12 we're making more corrections to the report."  It

13 indicates that Officer Sanchez did not have audio

14 recordings but had written statements.

15          And the last one from you, "As discussed is

16 recoding and policy."  What did that mean?

17      A.   I misspelled, "As discussed in the

18 recording policy."  I'm talking about our recording

19 policy, and how we interact with the public.

20      Q.   What is the recording policy?

21      A.   We have a policy that when we're

22 recording -- or interacting with the public, that we

23 should use our digital recorders to record

24 interactions.  And I had questioned why there were no

25 audio recordings of the interviews that Officer

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 820-6349                                                FAX (505) 843-9492
                                                                        1-800-669-9492
                                                          e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  Sanchez had done.  He felt it was sufficient to use

2  written statements, which will work.

3       Q.   So it's not mandatory to record?

4       A.   It is mandatory to record when we have

5  interaction with the public, especially when it's a

6  negative type of incident.  But in an investigation,

7  it's sometimes left up to the investigator.  They

8  don't have to every time.

9       Q.   What I'm saying is Officer Sanchez was

10  acting pursuant to his instructions; he didn't have

11  to record this at that time?

12       A.   I believe so, yes.

13       Q.   If Officer Sanchez testified yesterday that

14  he refused to sign the second amended report because

15  he didn't agree with the changes, is that something

16  that can be done by an officer, when he sees that

17  it's amended later on?

18       A.   Yeah.  I believe the officer can dispute

19  the changes made by a supervisor, if he doesn't agree

20  with them.

21       Q.   What's the procedure for that?

22       A.   Usually, it's taken up to the next level.

23  The lieutenant or captain gets involved.  And

24  ultimately, if it's a factual report, and it's an

25  argument over grammatical issues or spelling, or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    whatever else, it can be resolved.

 2            If there is a change that totally affects

 3    the investigation, and the officer doesn't agree --

 4    which I haven't seen, it's pretty rare -- I believe

 5    we end up working it out internally.  We fix the

 6    problem, find out why.

 7        Q.   But in this case -- and I think you've

 8    answered it with your e-mail -- there was no FBI,

 9    U.S. Attorney involvement in terms of amending this

10    complaint?

11        A.   No, there was not.  And sir, you say

12    complaint.  Are you referring to the report?  Because

13    the complaint in my world is different.

14        Q.   Yeah.  Thank you for that.  The report, I

15    should call it that?

16        A.   The report, yes.

17            MR. GORENCE:  I pass the witness, Your

18    Honor.

19            THE COURT:  Thank you, Mr. Gorence.

20            MR. GORENCE:  I would like to get these

21    copied.  Do you need these back, Chief?

22            THE WITNESS:  I'd like them back.  But if

23    not, I can live with it.

24            MR. GORENCE:  I'm sure at the end of the

25    hearing.  I might need these to talk to or question

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Captain Thornton.

2             THE WITNESS:  Oh, sure keep them.

3             MR. GORENCE:  I'll leave them here.

4             THE COURT:  Thank you, Mr. Gorence.

5             Mr. Pena, you have cross-examination of Mr.

6    Kassetas?

7             MR. PENA:  No, Your Honor, no questions.

8             THE COURT:  Mr. Kassetas, you may step

9    down.  Thank you for your testimony.  Is there any

10   reason Mr. Kassetas cannot be excused?

11            MR. GORENCE:  He should be, Your Honor.

12            THE COURT:  Is it all right to excuse him?

13            MR. PENA:  Yes, Your Honor.

14            THE COURT:  All right.  You're excused from

15   the proceedings.  Thank you for your testimony.

16            Where do you want to go now, Ms. Neda?  Do

17   you want another witness to get done quickly, or can

18   we take a lunch break?  What do you want to do?

19            MS. NEDA:  These are Mr. Gorence's

20   witnesses, Your Honor.  And there is a Captain and a

21   Lieutenant.  But you know what, Mr. O'Brien is still

22   here.  And my cross of him is like five minutes.  And

23   I hate to keep him waiting.  It's just that Chief

24   Kassetas had a 1:00 appointment to select the medical

25   chief.  So that's why I was asking.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

340

```
 1            THE COURT:  All right.  Do you want to
 2    finish up Mr. O'Brien?
 3            MR. GORENCE:  If I could weigh in.  I'd
 4    like that.  He's obviously hourly.  He's on a
 5    retainer.  I'd like to make sure he can get on his
 6    way, and then maybe we can have lunch and argue
 7    what's applicable later.
 8            THE COURT:  All right.  Mr. O'Brien, if
 9    you'll come up and resume your place in the witness
10    box, and I'll remind you that you're still under
11    oath.
12            THE WITNESS:  Yes, sir.
13            THE COURT:  Ms. Neda, if you wish to
14    cross-examine Mr. O'Brien.
15                     CROSS-EXAMINATION
16    BY MS. NEDA:
17        Q.  I just have one area of inquiry, because I
18    understand the Court's ruling regarding statements
19    Junior made to you, and so we're limiting your
20    opinion.  And that is --
21            THE COURT:  What ruling have I made
22    regarding --
23            MS. NEDA:  I thought you indicated with
24    respect to the acceleration that he can't got beyond
25    that.  The capability -- there are two parts to this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   witness' testimony.
 2          THE COURT:  Well, I haven't made any
 3   rulings.  So don't let me mislead you in any way.  I
 4   just -- everybody was trying to abbreviate the stuff.
 5   And I just was pointing out that I had less problems
 6   with the acceleration between the Jeep and the Mazda,
 7   the differentials there; that didn't seem to me to be
 8   a big area of dispute, or I didn't really have a
 9   problem with it.
10          MS. NEDA:  All right.
11          THE COURT:  But it's all fair game.  You're
12   welcome to argue and try to exclude as much or any.
13   I'm not trying to cut off your argument in any way.
14          MS. NEDA:  No, Your Honor.  The question I
15   simply had with respect to this witness on the first
16   one, the first point -- there are two points -- there
17   are two areas in which this expert gives opinions.
18   One is he gives an opinion -- actually, it's not an
19   opinion.  He reports to us from a proper factual
20   source, I assume, the acceleration capabilities of
21   two vehicles involved in this case.  That is very
22   benign.  The United States doesn't have a problem
23   with that.  Although we may discuss its relevancy at
24   a later date or a later time.
25          But the other part of that first part is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that the expert witness went forward with that

2    information, knowing the acceleration capabilities of

3    these two vehicles, and started describing how these

4    cars would have traveled, and whether there would

5    have been a gap, and so forth.  And he bases that

6    solely on Rodella, Jr.'s information to him.  He has

7    no other facts.

8           It is that latter part that the Court also

9    expressed concern about that I took the Court to say

10   that he would not be testifying about that.  And that

11   was how I would cross-examine this witness about that

12   anyhow, because all he's doing is listening to the

13   defendant's son tell him how these cars traveled.

14   That is not a proper basis.  It's very self-serving.

15   And until and unless Mr. Rodella, Sr. or Mr. Rodella,

16   Jr. testifies, I would object to that portion of the

17   opinion.

18           The second part of the opinion -- and so

19   there is nothing to cross-examine the witness on with

20   respect to that.

21           The second part of his opinion has to do

22   with the vehicle's movement on that dead-end road.

23   BY MS. NEDA:

24        Q.   Right, Mr. O'Brien?

25        A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  And so with respect to that, we may

2   have arguments regarding relevancy or helpfulness to

3   the jury.  But with respect to his opinion, the only

4   cross-examination I have is, you used the word

5   "aggressively."  And my experience has been that's

6   not a word often used by accident reconstructionists.

7   So my question to you is when you were describing the

8   movements of this vehicle, you weren't using

9   scientific or more technical terms to describe the

10  motion of this car.  You used an adjective,

11  "aggressively."  Mr. Gorence repeated it four times.

12  My question to you is, did someone suggest to you

13  that you use that word "aggressively" in your report

14  to describe the vehicle's motion?

15      A.   No, ma'am.  I was going to use "violently,"

16  and I chose to go with the lesser word of aggressive.

17      Q.   All right.  Now, let me ask you, is that a

18  word you commonly use when you are describing a

19  forceful movement of a car?

20      A.   It is a word that I use describing this

21  type of performance of the vehicle.

22      Q.   And can you give me an example, any

23  particular case come to mind where you have described

24  a vehicle's motion, as an accident reconstruction, as

25  aggressive?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 820-6349                                            FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Repeat your question.

 2        Q.    Surely.  Can you cite to any case where you

 3   have rendered an opinion involving the forceful

 4   moving of a vehicle, and you used the word

 5   "aggressive" to describe the movement of that

 6   vehicle, as an expert witness?

 7        A.    I've used it many times over my career, but

 8   I don't recall a specific case right now.

 9        Q.    But it is your testimony you usually do use

10   the word "aggressive"?

11        A.    When it applies --

12        Q.    Okay.

13        A.    -- I do use it.

14        Q.    In that case --

15        A.    I will tell you, ma'am, that it's not very

16   often that I see vehicles do this type of maneuver,

17   where a driver will accelerate in this fashion, such

18   a violent maneuver, with enough force to swing the

19   vehicle around 180 degrees.  That doesn't happen very

20   often.  So it is rare when I have to use those type

21   of terminology.  But it does apply in this case, in

22   my opinion.

23        Q.    Are you certain of your opinion to a

24   reasonable degree?

25        A.    Yes, ma'am.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

**BEAN & ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1        Q.    Okay.  And there weren't that many

 2    photographs in this case; right?

 3        A.    There is actually plenty that provide

 4    different vantage points of the tire mark evidence in

 5    the dirt, which easily allow me to make the opinion.

 6        Q.    So you see those photographs as having

 7    forensic value?

 8        A.    Yes, I do.

 9        Q.    Do you know who took these photographs and

10    under what circumstances?

11        A.    I believe it was one of the deputies, as a

12    result of the culmination of the event and

13    photographing to document the position of the road --

14    the drive in the dirt, the scene, if you will --

15    right after the event.

16        Q.    Someone trained in taking photographs of an

17    accident scene?

18        A.    A police officer with some type of

19    training, I would hope so, yes, since he was in

20    possession of a camera, taking pictures.

21        Q.    Is that your information?

22        A.    Yes.

23        Q.    That this person was trained in taking

24    photographs, the degrees, the number of photographs,

25    the 360 around the vehicle --

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   No, ma'am.

2      Q.   -- the degree to the perpendicular plane,

3   these kinds of things, you're confident that the

4   person that took the photographs took all of those

5   into consideration?

6      A.   No, ma'am.  I'm simply stating that the

7   police officer took photographs at the scene.

8           I know from the Police Academy, they do

9   teach officers how to take basic photography.  So

10   that is what my opinion is, likely, the training

11   level of anyone that takes photographs as a police

12   officer on scene.  I'm not saying that the officer

13   had advanced techniques or advanced training in

14   photography, just simply that the officer did take

15   photographs at the scene, which did assist me in this

16   case in looking at the evidence in the dirt --

17      Q.   Okay.

18      A.   -- and the vehicle's position.

19      Q.   He took photographs?

20      A.   Yes, ma'am.

21      Q.   And they had a forensic value, as opposed

22   to other photographs, because why?  If I took a

23   photograph of something of that scene, would you find

24   that to have forensic value?

25      A.   Well, it depends what's contained therein,

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                                        Albuquerque, NM 87102
(505) 989-4949                                                                       (505) 843-9494
FAX (505) 820-6349                                                            FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

PROFESSIONAL COURT
REPORTING SERVICE

1    in the photograph.

2         Q.    Okay.

3         A.    If it captures evidence in the scene, then

4    it's forensically valuable.

5         Q.    All right.  And in your opinion, there was

6    sufficient number of photographs and of sufficient

7    forensic value for you to render this opinion?

8         A.    Yes.

9              MS. NEDA:  Okay.  Thank you.

10             THE COURT:  Thank you, Ms. Neda.

11             Mr. Gorence, do you have any redirect?

12             MR. GORENCE:  I have no other questions,

13   Your Honor.

14             But I did want to make it clear to Ms. Neda

15   that the same concerns that I articulated about

16   Overby, he will -- if the Court finds that he has the

17   requisite qualifications on issues that are relevant

18   in this case, I concur with Ms. Neda that I don't

19   believe I could bootstrap, for the very same concerns

20   I had about Mr. Overby.  He will have to listen to

21   the testimony of Mr. Rodella, Jr., and potentially

22   Mr. Rodella, which he didn't talk to, in forming his

23   opinions.  That would be based on sworn testimony,

24   any expert can do.

25             The basis of the report -- and he can

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    modify those opinions, if in fact, Mr. Rodella,

2    Jr. -- theoretically the Sheriff -- Mr. Rodella,

3    Sr. -- gave contrary opinions.  But the point, as I

4    understand the 16(b) disclosure, here's what he has

5    based on these assumptions.  And of course, if Mr.

6    Rodella contradicted, in all respects, what he told

7    Mr. O'Brien, then obviously Mr. O'Brien would have to

8    modify his opinion.  I can't do that until he

9    testifies.  And I'm not trying to bootstrap

10   information that I believe would be hearsay.

11          So I want to make it clear this is an

12   opinion based on proposed testimony that would be in

13   all respects similar, in which Mr. O'Brien would have

14   to listen, and if required, modify an opinion, if Mr.

15   Rodella said something differently.  And I think that

16   accommodates what Ms. Neda was talking about.

17          THE COURT:  All right.  Mr. O'Brien, you

18   may step down.  Thank you for your testimony.

19          THE WITNESS:  Thank you, sir.

20          THE COURT:  All right.  We'll take our

21   lunch break.  See y'all at about a quarter till 2:00.

22   And we'll try to conclude the matters this afternoon.

23          (The lunch recess was held.)

24          THE COURT:  All right.  Mr. Gorence, do you

25   want to argue your -- in support of Mr. O'Brien?

SANTA FE OFFICE                                                                          MAIN OFFICE
119 East Marcy, Suite 110                                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                Albuquerque, NM 87102
(505) 989-4949                                                                              (505) 843-9494
FAX (505) 820-6349                                                                    FAX (505) 843-9492
                                                                                        1-800-669-9492
BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                                            e-mail: info@litsupport.com

349

```
 1            MR. GORENCE:  Yes, Your Honor.
 2            Your Honor, we aren't at that stage yet
 3   where we're looking at jury instructions.  But
 4   obviously the Court understands that the quantum of
 5   force with a Sheriff, who is on duty 24/7, there
 6   is -- we submitted jury instructions that it depends
 7   on the situation with which he's confronted.
 8            In this situation, we have physical
 9   evidence, and we have an expert, someone so well
10   qualified that he gets retained by the U.S.
11   Attorney's Office.  And I'm only arguing now on the
12   first part, because I don't think the Government is
13   conceding, as they said, his qualifications to render
14   an expert opinion.  So we're really not in a typical
15   Daubert scenario, which is the junk science.  So we
16   have someone who is admittedly qualified to render
17   what he has said he would testify to today, number
18   one.
19            The Government keeps calling this situation
20   a high-speed pursuit.  Now, the Court doesn't know
21   the evidence, and we'll see how that unfolds.  But if
22   that is the case, it is relevant to show -- and maybe
23   Mr. Tafoya perceived that.  But that's not really the
24   testimony -- and I'm going to proffer from Mr.
25   Rodella, and Mr. Rodella, Jr.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              And the idea of a high-speed pursuit, where

 2    one vehicle can keep up with another that's trying to

 3    get away, is important in this case to show that

 4    that's not really what happened nor transpired.

 5              Two, the photographs, particularly with the

 6    other vehicle's specifications about the front-wheel

 7    drive, that's the whole -- that's the issue here.

 8    What was confronted by a law enforcement officer.

 9    And again, this testimony will be after he almost

10    caused an accident, when he entered onto Highway

11    399 -- this is Mr. Tafoya -- almost caused a second

12    accident, when he tried to overtake a vehicle making

13    a left turn off of 399.  He then stopped.  As he

14    skidded out on the gravel, he clearly -- and I think

15    even the Government now is going to concede -- I

16    don't know what they're going to concede, I shouldn't

17    say that -- that he's driving on a plate that is not

18    licensed in the State of New Mexico.  It's expired.

19    And he -- maybe they'll persist in this.  And I

20    think, again, that will be an issue for the jury.

21    And as he takes off, it is highly relevant what

22    transpires when Mr. Tafoya -- he had numerous places

23    during daylight to pull in, if he was scared of

24    someone pursuing him and wanted a witness.  We'll

25    show that there is approximately -- there is over 100
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   places he could have stopped to pull into houses in

2   which there were people, you know, there, out, all

3   the rest of it.  Because it's an evening where -- and

4   it's not dark yet.

5           He chooses not to do that.  And he

6   ultimately -- and again, I'm proffering -- the route

7   as it dead-ends before he hits Santa Clara Pueblo,

8   there is three ways to go.  In his zeal to flee, he

9   chooses a route, and then engages in highly

10  aggressive driving, to the point where the Sheriff --

11  and there will be testimony, and this is what's so

12  critical, because the use of force is an element in

13  this case.  And a law enforcement officer can respond

14  to a perception of, if deadly force is being applied,

15  they can use deadly force in response.

16          In this case, that is the quintessential --

17  it will be one of them -- we have a Fourth Amendment

18  claim, the Government will have to cross that

19  threshold first.  Then we get into the use of force.

20  Well, the only way you can evaluate that is by what

21  Sheriff Rodella confronted at that time.

22          Mr. O'Brien's testimony is critical.  And

23  again, someone who the Government, as I said -- and I

24  didn't even know this when he was retained -- I did

25  not know that he'd been an expert for the United

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    States Attorney's Office.  And we have photographs

2    that are completely relevant to what happened at the

3    scene.  And you've heard the testimony that's been

4    proffered.

5           Your Honor, this is what traffic

6    reconstructionists do day in and day out, and analyze

7    photographs, accident or other scenes, to see how did

8    this occur.  Because without this testimony, we'll

9    have all these photographs depicting circular tire

10   marks.  And Mr. O'Brien has described how they

11   occurred, Your Honor.  And we won't know how they

12   occurred.  How do we get a circle that goes around

13   180 degrees?  How does he end up high-centered on

14   this pole?  And this will dovetail to testimony in

15   the case.

16          But I'm saying that's -- it will be the

17   issue that the jury will confront, which was what did

18   Sheriff Rodella confront when a car is driving in an

19   aggressive -- and in fact, you heard his testimony.

20   He tempered this.  He was going to say violent, but

21   notched it down a stage, in terms that he uses day in

22   and day out.

23          So as I understand it, just to summarize,

24   we do not have a challenge on Mr. O'Brien's

25   qualifications; that he is a bona fide traffic

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   reconstructionist.  We only have an issue with regard

2   to his analysis of scene photographs.  Without the

3   benefit of an expert, the jury will be left without

4   the basis to understand how these tire marks

5   occurred.

6             Again, Your Honor, we had an open -- we had

7   an expert deadline.  This is so important that I

8   offered the opportunity for the Government -- and let

9   me pull the date that I -- I should probably read

10  this into the record, because I thought it was so

11  important.  It's dated September 10th, this

12  Wednesday, Your Honor, last Wednesday.  When I

13  offered -- because this is a question, if the

14  Government wanted to respond with another comparable

15  expert, they had the opportunity.

16            I have no problem, and I'm reading from

17  what I sent.  And I want to put this into the record.

18  It was sent at 1:42 p.m. to Ms. Neda and Mr. Pena.

19  Dear Ms. Neda and Mr. Pena, I received a call from

20  Dennis O'Brien, the traffic reconstruction expert

21  retained in this matter, concerning a phone call he

22  had today with Agent Howard.  As I understand it,

23  after answering a question regarding photographs that

24  he was provided with, Mr. O'Brien declined to answer

25  any further questions until I was made a part of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    conversation.  I have no problem with you and/or
 2    Agent Howard interviewing Mr. O'Brien, provided that
 3    I am present, and as long as I'm afforded the same
 4    opportunity to interview your expert Manuel Overby.
 5    I have no problem with you tape-recording the
 6    conversation with Mr. O'Brien, as long as I can do
 7    likewise with Mr. Overby."  And it goes on.  "If you
 8    don't want tape-recordings, I will bring my
 9    investigator, as you will bring yours.  Please let me
10    know what you'd like to do as soon as possible."
11              I received no response to that.  So, Your
12    Honor, this is an issue where I feel like the
13    Government had the opportunity to interview, and if
14    need be, file a late notice as another expert.  If
15    they wanted to get a traffic reconstructionist who
16    had a contrary view, they certainly had that
17    opportunity.
18              But it goes to the quintessential issues in
19    this case.  And we're now largely really relevance
20    under 401 -- I should say relevance and probative
21    value under 401 and 402.  This is not a Daubert
22    issue.  Does it touch on issues that will be
23    presented to the jury, and does the expert opinion
24    aid the jury in their determination?
25              And to be frank, Your Honor, it is the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    issue, which was what was the Sheriff confronted

2    with, with a driver engaging in the conduct that

3    Mr. Tafoya engaged in.

4            If you have any questions, the rest of it

5    is contained --

6            THE COURT:  Not at the present time.  Let

7    me see what Ms. Neda says.  Thank you, Mr. Gorence.

8            Ms. Neda.

9            MS. NEDA:  What we have, Your Honor, is

10   relevance here.  Without knowing where Mr. Rodella

11   was during a circle made by a Mazda, why is this

12   relevant?  We both know, we both concede that one car

13   was in front of the other.  The eyewitness saw the

14   defendant chasing the Mazda on this dirt lane.  So

15   the question isn't whether or not the victim had to

16   turn abruptly to avoid him.  We concede he was trying

17   to get away from the people that were following him,

18   as he knew, just two men in an unmarked vehicle, in

19   plainclothes.

20           So the only way it would be relevance,

21   because right now I'm understanding Mr. Gorence to

22   say that the relevance is that this abrupt movement

23   to get away from Mr. Rodella was evidence of some

24   assault on Mr. Rodella.  That would be relevant if

25   Mr. Rodella testifies he was standing somewhere next

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to the car and it was coming at him.

2            So I don't see how, without the evidence as

3    to when the circle was made, and who was nearby, why

4    it bears on anything regarding the reasonable force

5    employed by Mr. Rodella.

6            Indeed, the testimony will be from the

7    victim that the defendant got out of the passenger

8    car, jumped out, came running at him with a gun in

9    his hand before he made that abrupt movement.

10           Mr. O'Brien, he doesn't know that, or he

11   wasn't probably told that.  But with that version,

12   why is the abrupt movement relevant to this case?

13           The gun was already in the hand of the

14   defendant before the evasive action was taken by

15   Mr. Tafoya, who found himself in a dead-end road.

16           If there is somebody that's going to

17   testify differently -- if Junior or the defendant

18   takes the stand and says, I was standing right there

19   and he aimed at me on purpose, well, then perhaps,

20   the witness -- the expert witness can come after that

21   and say, Well, there were these very abrupt

22   movements.

23           The United States is not contesting that

24   the victim was trying to get away from these two men.

25   Clearly, he wasn't driving on a Sunday afternoon.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 820-6349                                                 FAX (505) 843-9492
                                                                   1-800-669-9492
                                                                   e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1              Again, the relevance would be in what
 2    context was this maneuver made.  And Mr. O'Brien
 3    doesn't know that.  And without knowing that -- also,
 4    quite frankly, he relies on very few photographs
 5    taken by someone not shown to be schooled in taking
 6    accident scene photographs, which is a matter for
 7    cross-examination later.
 8              But quite frankly, without him putting it
 9    into context, it isn't relevant.
10              THE COURT:  All right.  Thank you, Ms.
11    Neda.
12              What issue in dispute does this go to?
13              MR. GORENCE:  The issue in dispute, Your
14    Honor --
15              THE COURT:  What do you expect the
16    Government to dispute about your version of events
17    that Mr. O'Brien is going to help you with?
18              MR. GORENCE:  Well, Your Honor --
19              THE COURT:  If they're not disputing that
20    he was running away from Mr. Rodella and driving
21    fast -- you don't have to put it in terms of
22    aggressively or violently -- but driving fast to get
23    away, what does Mr. O'Brien give you?
24              MR. GORENCE:  Your Honor, there will be,
25    obviously, an issue in this case as to the Sheriff
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   identifying himself as the Sheriff, who we've

2   indicated, again, was on duty 24/7.

3          THE COURT:  But Mr. O'Brien --

4          MR. GORENCE:  He was not a fact witness,

5   Your Honor.  And I concede that.  But the issue -- I

6   mean, it will be contested that even the neutral

7   witness, the person where this car ultimately

8   stopped -- his name is Mark Thompson, he's on the

9   Government's list, he's on our witness list -- he was

10   interviewed initially, and then he was even

11   interviewed by Mr. Sanchez.

12          And the Court can look at Exhibit C, where

13   we have the first report, or even the second report,

14   where Mr. Thompson describes -- and I'm going to read

15   this -- that the Sheriff -- Mr. Thompson said the

16   Jeep that was doing the chasing approached him.  And

17   the passenger -- that's Mr. Rodella, because he

18   clearly wasn't driving -- immediately identified

19   himself as the County Sheriff by showing him his

20   badge.

21          So we have -- I just want to let -- at

22   least the neutral witness, in terms of what he told

23   Mr. Sanchez -- and we've got other reports -- he

24   identifies himself as the Sheriff.  Mr. Thompson

25   said, "He got out of the way and told the Sheriff to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    proceed.  Mr. Thompson said the small car was driving

2    aggressively."  So this is the independent -- I'm

3    reading from -- this is now page 5 of the first New

4    Mexico State Police report.  And it would be on the

5    second report --

6              THE COURT:  Well, is that your point, is

7    that you think Mr. O'Brien helps you go from driving

8    fast to driving aggressively, or as he first said,

9    violently?  It's the gradations that you think

10   Mr. O'Brien gives you?

11             MR. GORENCE:  Exactly, Your Honor.  Because

12   he's going to corroborate the neutral witness as to

13   the who -- the small car was driving aggressively and

14   came to the road and dead-ends at the house.

15             "Mr. Thompson said the Sheriff in the Jeep

16   stopped and attempted to approach the car.  But the

17   driver of the car avoided the Sheriff."  This is

18   again from the State Police report.

19             I have talked to Mr. Thompson -- our

20   investigator -- avoiding the Sheriff was exactly what

21   Mr. O'Brien is going to talk about, in that he is --

22   and there is going to be a dispute because his badge

23   is out; he is identifying himself as the Sheriff,

24   again with someone with a motive to flee, and

25   engaging in this kind of -- almost two deadly

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    accidents.  And the Sheriff identifying himself.  So,

2    as I said, only an independent witness says that

3    here's what happened with the Sheriff showing his

4    badge, his badge out.

5              Then, I want to proceed -- because this is

6    what's so important, Your Honor -- "Mr. Thompson said

7    the small car hit the steel pipe where it stopped."

8    This is at page 5 now of the report.  Again, we've

9    got various versions, but it's in both the first and

10   the second.  Mr. Thompson said, "The driver of the

11   small car -- the driver of the car tried to drive

12   over the pipe, but was unable to.  Mr. Thompson said

13   the Sheriff identified himself to the driver."  So

14   this is our neutral witness, according to the State

15   Police report given by Mr. Sanchez, when he

16   interviewed him.  So we have a Sheriff identifying

17   himself, under color of law, as the Sheriff.  "And

18   pulled him out of the car.  Mr. Thompson said he saw

19   it clearly."

20             And this aggressive driving on his part, as

21   the Sheriff is approaching -- the Government said he

22   pulled his gun out.  There is going to be testimony

23   that his gun was out.  They didn't test the gun for

24   DNA.  They tested the badge.  But this is the issue

25   in the case, that if a Sheriff -- and we've got all

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   of our jury instructions -- he's confronted with

2   deadly force.  And there is New Mexico case law that

3   we'll be submitting as additional, that a car can be

4   a deadly weapon.  Mr. Tafoya was using this car as a

5   deadly weapon.  And the testimony of an accident

6   reconstructionist, as he looks at the scene

7   afterwards, supplies that factual basis.

8           Because the reality is, the Sheriff, it's

9   our position, could have used deadly force at that

10  point, when Mr. Tafoya tries to run him over, after

11  he has identified himself as a law enforcement

12  officer.  That's the basis for it.

13          Now, the Government's concern by Ms.

14  Neda -- I actually concur, and I have to tell you

15  that Mr. O'Brien will be here additionally -- maybe

16  he's going to sit here for the whole trial -- but

17  he's going to hear the testimony of Mark Thompson,

18  the person who I've just read.  Because it kind of

19  relates, and I want to get his perspective as well on

20  some of that.  Now, I don't have -- I haven't

21  provided every statement of Mr. Thompson's.  But I

22  want to hear the under oath statement, so that

23  Mr. O'Brien can factor that in, as well as the

24  Sheriff's testimony, and as well as his son, Mr.

25  Rodella, the eyewitnesses here, of which there is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    three.  There is actually four.  Mr. Thompson's son,

2    David, who is 13, called 911.  He's not on our list.

3    He's not on the Government's list, so he obviously

4    won't be called.  But he was a distant eyewitness.

5         But that's the issue, Your Honor.  And if

6    the Government, as I hear it now -- this is now --

7    they're not claiming that he doesn't have

8    qualifications.  They're not claiming that it might

9    not be relevant.  They're claiming that it's based on

10   hearsay, which is why he will be here to hear the

11   under oath sworn testimony minimally -- well, of

12   every eyewitness, of which there is only three:  Mr.

13   Thompson, Sheriff Rodella and his son.

14        THE COURT:  But the key word -- the key

15   thing you're getting out of Mr. O'Brien is when he

16   says the word "aggressively."  That's the big thing

17   that's disputed here is -- because they're conceding

18   he's driving fast.

19        MR. GORENCE:  No, but see, fast is the

20   three miles from where the interaction first started,

21   Your Honor, to where it ended.  Mr. Thompson, who

22   uses the word "aggressive," as well -- but, of course

23   he's not -- he can describe that, but he's not an

24   accident reconstructionist.  What we need to describe

25   is what happened at the dead-end when Mr. Tafoya ran

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    out of road.

2              I'm going to wait, because I can't actually

3    talk.  I'll wait.  Are you done?

4              MS. NEDA:  Well, I --

5              THE COURT:  Mr. Gorence.  No, no.  You

6    direct your comments to the Court, not to Ms. Neda.

7    If you have a complaint, you can raise it with me.  I

8    don't think they're speaking too loudly.  So be

9    careful about appealing to the Court too much on

10   that.

11             MR. GORENCE:  I'm not -- I'm sorry, Your

12   Honor, I'm having a hard time concentrating when I

13   hear this kind of background noise.

14             No, Your Honor, the issue -- Mr. Thompson,

15   as a lay witness, will talk about aggressive driving.

16   And I'm not talking in the course of the three mile

17   pursuit.  I'm talking about what transpired at the

18   dead end of Mr. Thompson's property.  Because there

19   will be a lot of testimony about -- and there is

20   another thing.  The Sheriff did not follow all the

21   way in what Mr. Thompson is now trying to escape --

22   excuse me, Mr. Tafoya is trying to escape.  The

23   Sheriff got out of his car.  There will be testimony

24   about the distances.  Because the only tire marks are

25   those left by Mr. Tafoya.  And as he approached the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   Tafoya vehicle, you've heard what happened is that he

2   is gunning it in reverse, spinning 180 degrees.  And

3   there will be testimony that it almost strikes the

4   Sheriff, as this vehicle is trying to hit him.  And

5   what transpired then.

6          What is critical is that the 180 degree in

7   the tire marks; that -- he can say, I'm trying to get

8   away, and I guess if he doesn't know that this is the

9   Sheriff, and he's entitled to hit a pedestrian who is

10  after him, I mean, I guess that's their testimony --

11  but the Fourth Amendment inquiry is that a person who

12  is on duty who sees two near accidents, and is

13  pursuing that, and then approaches a vehicle with --

14  the testimony will be with the badge out, after

15  having identified himself, and the driver then tries

16  to run him over by this aggressive driving -- and the

17  question then is for the jury:  What's the reasonable

18  amount of force that can be used?  That's the --

19  after you get past the Fourth Amendment, the stop,

20  you have the question about the quantum of force.

21          And we've -- again, this isn't a jury

22  instruction, but that's what Mr. O'Brien's testimony

23  relates to as he analyzed those photographs.

24          Otherwise, Your Honor, without that, we

25  have the testimony of either the Sheriff or his son.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    I'm sure the Government will attempt to impeach that.

2    I feel like I will attempt to impeach Mr. Tafoya.

3           But we don't have someone objective who can

4    say:  Here is how they are created with a front-wheel

5    drive vehicle.  We won't have someone to testify that

6    you can see the last photograph, the wheel is

7    embedded in the ground by trying to get away with --

8    he called it the aggressiveness, or the violence of

9    trying to get away.  All of that is relevant to the

10   jury's determination in that situation, with a law

11   enforcement officer.  What's the quantum of force

12   that can be used to stop someone engaged in that kind

13   of conduct?

14           THE COURT:  All right.

15           MR. GORENCE:  Thank you, Your Honor.

16           THE COURT:  Thank you, Mr. Gorence.

17           Well, it seems to me that this isn't really

18   a Daubert issue.  This seems to me to be pretty

19   run-of-the-mill accident reconstruction.  Different

20   people put different value on the art and science.

21   But it seems to, by and large, survive Daubert

22   challenges.  And this one doesn't seem to raise

23   anything unusual.

24           I think that it's marginal what it adds to

25   the case.  But the photographs will be in evidence,

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                 Albuquerque, NM 87102
(505) 989-4949                                                                     (505) 843-9494
FAX (505) 820-6349                                                                 FAX (505) 843-9492
                                                                                   1-800-669-9492
                         BEAN & ASSOCIATES, Inc.                                   e-mail: info@litsupport.com
                         PROFESSIONAL COURT
                         REPORTING SERVICE

1    and if it assists the defendant in some way to have

2    him testify that these tracks were not made by

3    somebody just driving fast, but driving aggressively,

4    then that may provide some marginal factor in the

5    calculus of what force is reasonable.  So I'm not

6    going to exclude Mr. O'Brien or his testimony, but

7    we'll take his testimony the same way that we talked

8    about, that he'll come after either both Rodellas

9    testifying, or at least Rodella, Jr.

10           Now, the way I look at things, we have

11   dealt with everything other than the objections to

12   the United States' requested jury instructions and

13   finishing up on the motion to disqualify.  Is there

14   anything else that's out there that we need to deal

15   with, Ms. Neda?  Mr. Pena?

16           MS. NEDA:  Yes, Your Honor.  Just one

17   thing.  But the United States also filed a Rule

18   404(b) -- sort of reverse 404(b) -- requesting

19   that -- just out of extra caution -- requesting

20   permission to ask to introduce into evidence that

21   this victim had a valid driver's license, was a

22   United States citizen.  His car was registered

23   lawfully, it was lawfully insured.  There were no

24   pending arrest warrants.  And he has no criminal

25   history.  All of these things go into his lack of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    motive to flee from a law enforcement officer, had he

2    known it was a law enforcement officer.  This is more

3    like res gestae, now that the Court has mentioned

4    this as of yesterday, because the state of -- his

5    status at that time is evidence, but part of the

6    motive for him to plea part of this particular case.

7    That motion came under, as I said, a reverse 404(b)

8    motion.  Do you know what docket number that is?  I

9    can't think right now what the docket number is.  But

10   I think it probably is moot in that it truly is a res

11   gestae matter.  Allow me to find --

12           MR. GORENCE:  I don't object to any of it.

13           THE COURT:  Well, yeah, given that you're

14   going to go after him about what he was thinking, I

15   think those are fair game.

16           MS. NEDA:  All right.

17           THE COURT:  So we'll just -- I'll grant

18   your motion, and you can go into those areas.

19           MS. NEDA:  All right.  The only other thing

20   pending was -- not really pending -- but when we were

21   talking about 404(b) that is part of the defense

22   motion under 404(b) to permit evidence into the trial

23   about registration, we don't, of course, object to --

24   as the Court knows -- res gestae information.  That

25   is the time, whether or not he was lawfully

SANTA FE OFFICE                                                                          MAIN OFFICE
119 East Marcy, Suite 110                                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                                              Albuquerque, NM 87102
(505) 989-4949                                                                              (505) 843-9494
FAX (505) 820-6349                                                                    FAX (505) 843-9492
                                                                                          1-800-669-9492
                                                                          e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    registered, the car was lawfully registered, and
 2    insured.  However, Mr. Gorence also mentioned three
 3    prior occasions.  And in his motion -- I believe it
 4    may have been a notice -- but in any event in the
 5    pleading it states that the victim has driven at
 6    least on three occasions -- has been caught driving
 7    at least on three other occasions with an
 8    unregistered car.  That is not correct, number one.
 9    He's only been caught once doing that.  The other
10    time was he just didn't have the paper, and it was
11    dismissed.  So twice he's had dismissals, because he
12    was lawfully registered.  Another time he paid the
13    fine for not having a lawfully registered vehicle.  I
14    think that was back in 2010.
15            Here's my point:  Those three instances
16    would be other acts evidence.  And they prove
17    nothing, because it didn't involve flight.  It didn't
18    involve any punishment on the two occasions when he
19    lawfully was registered.  And in this case, we can
20    prove he was lawfully registered.  And the one time
21    that he truly was deserving of a citation -- and he
22    got a citation, and he paid a $200 fine, I believe --
23    was a time that he did not flee.  So it doesn't have
24    any relevance.
25            And under the 403 balancing, I think what
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    it merely does is inject some prior bad acts of the
2    victim, when there is so few instances that the
3    defense obviously can find that are bad acts of this
4    victim.  So I would ask that, although Mr. Gorence
5    obviously should be permitted to ask about the
6    current status of the car or the status of the car on
7    the day of March 11, that back in 2010 or 2011, he'd
8    be disallowed, because that truly would be 404(b).
9    And I see no valid purpose to introduce it into
10   evidence.
11           THE COURT:  Mr. Gorence?
12           MR. GORENCE:  Your Honor, as the Government
13   has conceded, there will be a big issue about his
14   invalid tags here.  Maybe they're backing off with
15   the idea that he really had one, now that they've
16   looked at the dispatch and realized how the tow
17   records -- this is classic.  This shows his intent to
18   flee.  This shows that he has been charged -- doesn't
19   matter, as we talked about yesterday, the fact that
20   on the Government's 404(b) that no one made any
21   complaints at the time, that there were no citations
22   issued, that nobody was convicted.
23           In this case, Mr. Tafoya was charged three
24   times with the very same thing that occurred here,
25   which is he doesn't have a valid tag on a vehicle to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   be driven.  That -- I mean, the jury will weigh, one,
 2   if that's true; two, that's his basis to get out of
 3   dodge in a fast car; and three, the fact that this is
 4   his motive, his intent to flee is based on this is a
 5   fairly common occurrence.  It doesn't matter that
 6   he's been convicted.  He's been charged three times
 7   with the same offense.  And I certainly intend to
 8   cross-examine Mr. Tafoya about that, because
 9   otherwise, the jury doesn't really understand why he
10   was so -- I don't want to use hell-bent -- why he was
11   so steadfast in fleeing from someone identifying
12   himself as law enforcement.
13           That's one of the issues in the case.  I
14   mean, they can call it a chase.  And I think the
15   evidence will be that he was engaging in flight,
16   after nearly causing two accidents, deadly accidents.
17           And once there was a person who -- and I
18   need to put this in context, Your Honor -- see, the
19   testimony will be that after he -- the second near
20   accident, when he almost wiped out, Sheriff Rodella
21   got out and walked towards the car with his badge
22   out.  This doesn't end up with a badge at Mr.
23   Thompson's property.  It's further, 3.1 miles up on
24   399, after witnessing two near deadly crashes, the
25   Sheriff approaches -- or the jury will hear evidence
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    of this -- you're not the fact finder, but the jury

2    will hear that, as he approached with his badge out,

3    and got very close to the car, is when Mr. Tafoya

4    decided to peel out again and start his flight.

5           The evidence is that he then realized there

6    was a law enforcement officer; that he's going to be

7    cited for his near deadly accidents.  And yet again,

8    the basis for the flight, in addition to how he's

9    driving, is that he doesn't have a tag on.  And

10   something that has happened in the past.

11          So that's the relevance.  And specifically,

12   I want to articulate the Huddleston factors.  It

13   clearly goes to motive for his flight, the fact that

14   this has happened before.  He understands the

15   consequences of having to pay $200.  Maybe sometimes

16   he gets lucky, the officer doesn't show up.  But he

17   understands what happens by his continual practice of

18   not registering a vehicle lawfully in our state.

19          MS. NEDA:  If I may address again, Your

20   Honor --

21          THE COURT:  Yes.

22          MS. NEDA:  -- I can demonstrate to the

23   Court that he only drove once with an unregistered

24   vehicle.  And so the problem is Mr. Gorence is

25   premising his argument on false facts.  And I have a

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 820-6349                                          FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    problem with that.  I know for a fact -- and I have

2    the court records -- twice he was lawfully

3    registered, and as soon as they realized that, they

4    dismissed it.  The third time -- not the third time,

5    I think this is back in 2010 -- he was driving a car

6    that was not registered.  Now, had he fled, maybe

7    there would be some value.  But just because he drove

8    a car that wasn't registered three years ago,

9    certainly has no probative value to his motive in

10   March of 2014.

11          Mr. Gorence is not going to be prejudiced

12   by not bringing in that confusing and irrelevant

13   testimony.  He can challenge whether or not, at the

14   time of this -- because he insists it wasn't lawfully

15   registered -- he can cross-examine him on that.  You

16   weren't lawfully registered on March 11, and that's

17   why you fled, isn't it?

18          To bring up three years ago, that once --

19   only once -- did he drive a car that was not

20   registered, is just not relevant.  It's confusing.

21   It adds nothing to the case other than confusion, or

22   insertion of bad acts.  And he hasn't argued to the

23   Court really why 404(b) is applicable here.  Because

24   he didn't flee, and he's not -- and three years

25   ago -- and he paid the fine.  He knows he has to do

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    what he has to do as a law-abiding citizen.

2              THE COURT:  Well, I think the 404(b)

3    analysis -- and I've got some opinions on this -- as

4    it relates to the victim -- the alleged victim in a

5    case -- is a little different for witnesses and

6    things than it is for the defendant.  I agree 404(b)

7    applies to witnesses, and people other than the

8    defendants; can apply to the plaintiff as well.

9              But I think that, given the standard I've

10   used for the Government's 404(b) evidence, I think

11   this evidence does go to the victim's motive, perhaps

12   in a stronger way than even the three incidents I've

13   allowed in.  And so I'm going to overrule the

14   objection to this evidence and allow it.  I do think

15   it's 404(b).  So if the Government wants a limiting

16   instruction, it can have it.  Same way the defendant

17   can have it for the three incidents that I'm allowing

18   in -- of Ms. Maes, Gonzales, and Ledesma, I think are

19   the three other people.

20             All right.  Anything else other than motion

21   to disqualify and jury instructions?  Have I covered

22   everything, Ms. Neda?

23             MS. NEDA:  I think so, Your Honor, yes.

24             THE COURT:  How about you, Mr. Gorence?

25             MR. GORENCE:  Yes, Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          THE COURT:  So do you want to go to
 2  finishing up your motion to disqualify?
 3          MR. GORENCE:  I would, Your Honor.  And I
 4  know there are two witnesses here that we've
 5  subpoenaed.  And I think they will be brief.  I
 6  thought the Chief was illuminating, and it's very
 7  helpful to have this.  I might not call Mr. Skinner
 8  after I talk to Captain Thornton.  And I do just want
 9  to call the other two witnesses to see.  Well,
10  actually, what I'd like to do is call Mr. Sanchez
11  first, just to see his e-mails.  I haven't seen them
12  yet.  I should say re-call.  But this could be brief.
13  I thought the Chief -- you know, I want to be candid
14  with the Court -- I don't see any FBI involvement,
15  from his testimony, not on this.  I had a duty to
16  discern that.  But I haven't seen it so far.  So I
17  see that from the Chief's testimony.  But I'll be
18  brief.
19          THE COURT:  So you want to call Mr. Sanchez
20  first?
21          MR. GORENCE:  I do.
22          THE COURT:  Mr. Sanchez, if you'll come up
23  and resume your place in the witness box.  Mr.
24  Sanchez, I'll remind you that you're still under
25  oath.  You can be seated.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            Mr. Sanchez, Mr. Gorence.

 2            MR. GORENCE:  Thank you, Your Honor.

 3                   ORLANDO SANCHEZ,

 4       after having been previously sworn under oath,

 5       was questioned and testified further as follows:

 6                      EXAMINATION

 7  BY MR. GORENCE:

 8       Q.   Officer Sanchez, yesterday you said you

 9  were going to retrieve some records, an e-mail, and

10  your phone.  Did you do that?

11       A.   Yes, sir, I did.

12       Q.   Can I see the --

13       A.   Sure.

14       Q.   -- the e-mail?  Let me start with that.  Is

15  this my copy, sir?

16       A.   I have two copies.

17            MR. GORENCE:  So I'll take this one, and

18  I'll mark this as F, Your Honor, for the hearing.

19       Q.   Officer Sanchez, you said yesterday that

20  you authored an e-mail.  Is this the e-mail that you

21  sent to your Sergeant, Mr. Olson?

22       A.   Yeah, Sergeant Olson sent me this e-mail.

23       Q.   He sent it to you:  "Orlando, I need you to

24  make some more changes to this report.  You need to

25  change the offense to a battery and put vehicle info
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    in the report, and some changes to the narrative."

2         You received that on June 7?

3         A.   Yeah, I received that on my department

4    e-mail.

5         Q.   And then, in response to this, did you make

6    those changes?

7         A.   Yes, I did.  At the time that I got the

8    e-mail I was already on my RDOs, my regular days off.

9    So I text Officer -- or Sergeant Olson on my

10   cellphone, and I said, "I don't have cellphone where

11   I live.  So send me a text."  So he sent me another

12   text.  So I asked Sergeant Olson as to what changes

13   did you make on my narrative?  So I have -- also have

14   that.

15        Q.   Well, pull up your phone.  I'm not going to

16   put it on, but you might have to read it.  So what I

17   want to get to is the June 9th, when you refused to

18   sign a new statement.  Do you recall that testimony

19   yesterday --

20        A.   Yes.

21        Q.   -- the day before you went to Roswell?  And

22   you said you called up Captain Thornton.

23        A.   On that same day?

24        Q.   I don't know if it was the same day.  I

25   thought you said -- let me ask the question.  At some

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   point your uneasiness and your concern with your

2   report being changed --

3          A.   Yes, on the 9th.  On the 9th, right before

4   I went to Roswell, I went in and I spoke to Captain

5   Thornton.

6          Q.   And what did you tell Captain Thornton?

7          A.   I told Captain Thornton, I thought when me

8   and you had talked about this case, we had said:

9   Just do an information report on it and send it up to

10  the DA's, and let the DA figure out what they were

11  going to do.

12         So me and Captain Thornton talked about

13  that numerous times.  So I still -- when I send in my

14  report, I send it in as an assault case.  So a little

15  bit after, I get the e-mail from Sergeant Olson

16  saying, Change the report to the battery.  It says, I

17  need you to make more changes to this report.  You

18  need to change the offense to battery and put the

19  vehicle into the report.  And I made some changes to

20  your narrative.

21         So at that point, me and another officer

22  were already outside, me and an officer were

23  talking -- not about this case, but we were

24  talking -- Sergeant Olson comes outside and he tells

25  me, "Before you leave to Roswell tonight, you need to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

378

```
 1    make those changes to that report."
 2            And I said, "Well, I don't know, Serg," I
 3    said, "we had already discussed that, and we labeled
 4    that as an assault case."
 5            He says, "Yeah, you need to change that.
 6    So don't leave to Roswell until you make the
 7    changes."
 8        Q.   What you told us about yesterday -- so what
 9    I want to ask is -- and I think the Court heard that
10    testimony.  Did you have some communications that are
11    stored electronically on your phone?
12        A.   I didn't understand your question.
13        Q.   Well, do you have --
14        A.   I get a lot of echo in here with my --
15        Q.   Do you have texts on your phone reflecting
16    communication with -- whether it's --
17        A.   Yes, I got a text on my phone.  And I
18    called back the office, or I called back Sergeant
19    Olson.  I said, "Sergeant Olson, I don't have cell
20    service where I live in Osarco."  So he sends me a
21    text.
22        Q.   What does the text say?
23        A.   The text says -- I put there, "I'm in
24    Osarco, no cell service.  Call me or text me.  Which
25    car did you want me to add?"  Because I didn't see
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   him that night -- I didn't see him the night before.

2   I said, I will change -- "I will change to battery.

3   What changes did you make to my report," is what I

4   asked him on the text.  But he didn't make -- he

5   didn't respond back to that.

6           Q.   So is that your last involvement in this,

7   is that you wouldn't sign it; asked for changes?  Did

8   you have any other involvement, Officer Sanchez?

9           A.   Well, I didn't understand.  I wanted to

10  know what changes he had made to my narrative.

11  Because I hadn't seen Sergeant Olson before that

12  anymore, other than the text that he said when he

13  sent me the e-mail, that he had made changes to the

14  narrative.  So I wanted to know what changes he had

15  made.

16          Q.   And he never responded, which you've told

17  us about?

18          A.   He never responded.

19          Q.   Did you have any other involvement with

20  either Sergeant Olson or anyone else in this case --

21          A.   No.

22          Q.   -- about Mr. Tafoya?  That was done?

23          A.   That was it.

24          Q.   Were you ever criticized by anyone with

25  regard to your report, whether it be the Chief or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Sergeant Thornton?  Did anybody say it was
 2   insufficient?
 3        A.   The only thing that Sergeant Olson had told
 4   me, that according to -- I don't remember if he said
 5   the Chief or the Captain -- that the report wasn't
 6   what I had written, or something to that effect.
 7        Q.   No other involvement?  And thanks for
 8   bringing this.  That's it.
 9        A.   No.
10        Q.   Okay.  Thank you.
11             THE COURT:  Thank you, Mr. Gorence.
12             Mr. Pena, any further questions of Mr.
13   Sanchez?
14             MR. PENA:  No, Your Honor.
15             THE COURT:  All right.  Mr. Sanchez, you
16   may step down.  Thank you for your testimony.
17             THE WITNESS:  Thank you, Your Honor.
18             THE COURT:  May Mr. Sanchez be excused from
19   the proceedings, Mr. Pena?
20             MR. PENA:  No, sir.
21             THE COURT:  Can he be excused?
22             MR. PENA:  Oh, yes, sir.
23             THE COURT:  All right.  You're excused from
24   the proceedings.  Thank you for your testimony.
25             THE WITNESS:  Thank you.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1          THE COURT:  All right.  Mr. Gorence.

2          MR. GORENCE:  Yes, Your Honor.  Captain

3   Thornton.

4          THE COURT:  Mr. Thornton, if you'll come up

5   and stand next to the witness box over here on my

6   right, your left.  Before you're seated, Ms. Wild, my

7   Courtroom Deputy, will swear you in.

8                    ROBERT THORNTON,

9      after having been first duly sworn under oath,

10     was questioned and testified as follows:

11                  DIRECT EXAMINATION

12         THE CLERK:  State your name for the record,

13   please.

14         THE WITNESS:  My name is Robert Thornton.

15         THE COURT:  Mr. Thornton, Mr. Gorence.

16         MR. GORENCE:  Thank you, Your Honor.

17   BY MR. GORENCE:

18     Q.   Sir, you are a Captain with the New Mexico

19   State Police?

20     A.   Yes, sir, I am.

21     Q.   Did you have any involvement in the report

22   writing, as it pertained to an allegation made by

23   Michael Tafoya, regarding an incident on March 11,

24   2014?

25     A.   Yes, sir.  We made corrections to the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    report as far as grammatical errors that were on that
 2    report.
 3         Q.   Well, let me go back.  When did you get
 4    involved in making changes to a report?
 5         A.   It was later on at the tail-end of the
 6    report.  It was brought to my attention that there
 7    was errors in the report.  And after that report had
 8    been looked at by Sergeant Olson, we reviewed it
 9    again.  And based off of the report and the
10    narrative, corrections were made to ensure that the
11    report flowed properly.
12         Q.   Your subpoena that was served last night
13    requested that you bring documents, whether it was
14    e-mails or any other memos, any documents that
15    pertain to this report.  Do you have anything that's
16    responsive to that subpoena, sir?
17         A.   Yes, sir, I do.
18         Q.   What do you have?
19         A.   Okay.  What I have here is correspondence,
20    my e-mail correspondence from Chief Kassetas to me in
21    reference to the report, and CC'd on it are
22    Lieutenant Skinner, Kenneth Olson, and Major Lovato.
23         Q.   Anything else?
24         A.   Yes, sir.  There is a report, or an e-mail
25    correspondence with an attached report, of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

383

1   corrections that were made from Lieutenant Skinner to

2   Sergeant Olson.

3       Q.   Is that it?

4       A.   No, sir.  And hold on a second.  This here

5   is an e-mail correspondence from Major Lovato and --

6   to me and also Chief Pete Kassetas.  And here is the

7   report, finalized report, that was approved.  Here is

8   all the documentation.

9       Q.   Have you had any communication with the FBI

10  in this case?

11      A.   No, sir, I have not.

12      Q.   Anyone from the U.S. Attorney's Office?

13      A.   No, sir, I have not.

14      Q.   Have you communicated with Officer Sanchez

15  on this case?

16      A.   Yes, sir, I have.

17      Q.   When, and what was discussed?

18      A.   I don't have a specific date, as far as

19  when that was discussed, but I did have a discussion

20  with Officer Sanchez in reference to the corrections

21  that were made on the report.  And that was conducted

22  in my office.

23      Q.   Did he express concerns about his report

24  being changed to you?

25      A.   He had made mention that he didn't feel



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  that the allegations were an assault.  And it was

2  explained to him that based off of the statement

3  given from the victim, Mr. Tafoya, that the elements

4  of the report allegations didn't meet a simple

5  assault.  It was indicated to him that they were a

6  battery, a false imprisonment, and an aggravated

7  assault with a deadly weapon, as the allegations.

8      Q.  And that's -- the revised report indicated

9  those felony offenses; correct?

10     A.  Yes, sir.

11     Q.  Who made that call that the report should

12 be changed from a simple misdemeanor to these felony

13 charges?

14     A.  That was determined based off of the

15 narrative and what the statement was given by the

16 victim in the case.  Reviewing the report, those --

17 those actual allegations that were made, and the

18 initial one of assault, did not fit -- or wasn't

19 consistent with what was initially reported by

20 Officer Sanchez.  So as a supervisor, he was

21 explained that, and he was in agreement with what

22 needed to be amended in the report.

23     Q.  My question -- I understand that.  My

24 question is who made the decision to change a petty

25 misdemeanor to felonies?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   That decision was made by me.  That

2  discussion was talked with, and we had -- myself and

3  Lieutenant Skinner were present, as well as Officer

4  Sanchez.  And it was explained to him that the simple

5  assault charge that was initially on the report was

6  not accurate to the elements of what was reported.

7  So that decision was made by me.

8      Q.   When did you make that decision?

9      A.   I don't have an accurate date, but during

10  that discussion.  And he was aware of it, and he was

11  advised to amend the report.

12      Q.   And did he do that?

13      A.   Yes, he did.

14      Q.   Did he sign the report?

15      A.   I did not observe him sign the report at

16  that time, because corrections had to be made.  And

17  from that point, corrections were made, submitted to

18  his sergeant, and for another review.

19      Q.   Now, the Chief said -- you've had

20  communications, and I see we have e-mails from the

21  Chief and you.  You know the Chief looked at the

22  report, don't you?

23      A.   Yes, sir, I do.

24      Q.   And the Chief made handwritten notations to

25  the report?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          A.    Yes.

2          Q.    The Chief didn't think the charges had to

3     be changed on the cover sheet, did he?

4          A.    That's something he'll have to be specific

5     with.  But no, I did not get that correspondence from

6     the Chief.

7          Q.    Well, you had correspondence from the

8     Chief, in fact --

9          A.    As far as changing those charges, no, that

10    was not indicated from the Chief.

11         Q.    Well, you know the Chief made changes to

12    the narrative and handwrote them, didn't he?

13         A.    He did indicate in his e-mail as far as the

14    changes, and the things that he noted, he documented,

15    as far as his concerns, or how the report was

16    written, yes.

17         Q.    And you received the Chief's handwritten

18    notations changing the narrative; correct?

19         A.    Yes.

20         Q.    And you incorporated that into the changes

21    into the report, didn't you?

22         A.    That was reviewed.  And the changes that

23    were made to the report were done by Officer Sanchez.

24    But those were reviewed and they were looked at.  But

25    as far as his specific changes, I don't know if that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    was done.  I know we made our own changes as well,

2    which is that other report that you have.

3         Q.   Well, I want to ask you, I take it -- and

4    this is Government C -- the original report, talking

5    about a simple assault --

6         A.   Yes.

7         Q.   -- this was actually -- I take it you've

8    seen -- this signature was signed by Sergeant Olson.

9    And he's testified he signed here --

10        A.   Okay.

11        Q.   -- and dated it.  So this was actually

12   finalized on or about June 6.  You know that, don't

13   you?

14        A.   I'm aware of it, yes, sir.

15        Q.   And you've seen that this was -- as a final

16   report, once it's been approved by a sergeant as a

17   reviewing officer, what's the procedure, then, to

18   lock that, to make sure it doesn't get changed for --

19   for whatever reason, actually?

20        A.   There is a mechanism within our system,

21   which it's manually locked into the system.  And then

22   once that's done, that's forwarded to the Records

23   Bureau, and the Records Bureau maintains a copy of

24   that report.

25        Q.   So that would happen -- that would be

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    locked once Sergeant Olson signed off and approved

 2    it; correct?

 3        A.   Not necessarily.  If there are corrections

 4    that need to be made -- which in this case we were

 5    reviewing that report, although it could indicate the

 6    date here -- until it's locked, changes cannot be

 7    made to the report.

 8        Q.   Well, are you aware that there were Public

 9    Record Inspection Act requests made for this report?

10    Are you aware of that?

11        A.   No, sir, I was not.

12        Q.   Are you aware that this report, marked as

13    C, was disseminated as a final report to New Mexico

14    media outlets, alleging simple assault?

15        A.   Which report would this be, sir?

16        Q.   I'm talking about this report -- I'll hand

17    it to you -- where it was alleged to be, quote,

18    simple assault --

19        A.   Okay.

20        Q.   -- bearing signatures -- we know -- and

21    I'll just tell you -- this -- Sergeant Olson said he

22    signed it and approved it; thought that that was the

23    accurate reflection of what should be charged.  And

24    he signed Mr. Sanchez's name.

25        A.   Okay.

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                           (505) 843-9494
FAX (505) 820-6349                                  FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And that this was then disseminated

2  widely -- it may come out at trial -- but widely to

3  every media outlet, as the report of this incident.

4  In fact, the date of this dissemination -- we can

5  pull it -- was on June 6th or 7th.  I don't know the

6  exact date.  But it was after the search warrant,

7  before you changed it?

8      A.   Okay.

9      Q.   So my question is, how is it that when the

10 State Police has disseminated a final report, that

11 you go back in and change it later on?

12     A.   That's inaccurate, as far as what you're

13 indicating.  Because that signed report is the report

14 that you're indicating was disseminated.  As far as

15 the signatures, that's not the same cover sheet that

16 you're showing.  You're mixing up the reports at some

17 point.  Because the one that was signed actually is

18 the one that indicates the felony charges on it.

19     Q.   Well, I understand it's signed as well.  I

20 can show you that.

21     A.   Right.  So --

22     Q.   I'm saying there is an earlier signed

23 report for simple assault.  And there has been

24 testimony that Sergeant Olson signed it and agreed

25 with it.  I want you to assume that.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN &
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.    Okay.

2      Q.    That's what transpired yesterday.

3      A.    Okay.

4      Q.    So my question is, when you have something

5  approved as a report, disseminated to the media, how

6  is it that you go back and change it?

7      A.    Because that's not a locked report, and we

8  were still reviewing the report.  As far as that

9  report being a final report, that's not -- that's an

10  unapproved report.  Although he may have put a date

11  on there, it was not locked, and it needed to be

12  changed.

13     Q.    And you say "needed to be changed."  This

14  was in response to the fact that there had been --

15  why did it need to be changed?

16     A.    Because it was not accurate.  And our job

17  and our policy calls that we be accurate, as

18  supervisors, and that we -- whatever is disseminated,

19  that it needs be comprehensive, and it needs to be an

20  accurate report to what is alleged.  That was not

21  what was alleged is a simple assault.

22          What was alleged by the victim pertained to

23  a false imprisonment, an aggravated assault with a

24  deadly weapon, and a battery.  So by policy, us as

25  supervisors, we have to ensure that that final

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   product that goes out indicates a comprehensive and

2   accurate report.  And that was not accurate.

3       Q.   So you're saying Officer Sanchez made a

4   mistake and Sergeant Olson made a mistake early on

5   when they submitted to that, and you all didn't look

6   at it until there was media attention following the

7   execution of a federal warrant?  Well, that's the way

8   it kind of comes out.

9       A.   That's not my statement.  What I'm saying

10  is our policy calls that we are to ensure, as

11  supervisors, that that report is accurate when it

12  goes out.  And that was what was done.  And

13  corrections needed to be made, as far as grammatical

14  errors, and so on and so forth.  And this is no

15  different from any basic report that we check.

16  You're going to have amendments and you're going to

17  find changes on any report that you do.

18      Q.   And you're saying there was no involvement

19  from any other outside agency other than the State

20  Police?

21      A.   No, sir, there was not.

22           MR. GORENCE:  I have nothing further, Your

23  Honor.

24           THE COURT:  Thank you, Mr. Gorence.

25           Mr. Pena, do you have cross-examination of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Mr. Thornton?

2            MR. PENA:  No, sir.

3            THE COURT:  Mr. Thornton, you may step

4    down.  Is there any reason Mr. Thornton may not be

5    excused from the proceedings?

6            MR. GORENCE:  No, Your Honor.

7            MR. PENA:  No, Your Honor.

8            THE COURT:  You're excused from the

9    proceedings.  Thank you.

10           MR. GORENCE:  I'm not going to call

11   Lieutenant Skinner.  The record is developed.

12           THE COURT:  Do you have any further

13   witnesses or evidence you want to present on this

14   motion to disqualify?

15           MR. GORENCE:  No, I don't.  But I will say

16   that on this record -- and I appreciate the Court's

17   indulgence, and of course, not knowing when I'm

18   confronted with discovery that's different than

19   another report.  But I don't have evidence that

20   this -- and I appreciate the Government's candor, but

21   you never know until you start asking people under

22   oath.  But I withdraw that part of the allegations

23   early on, that this would have -- at least my

24   argument to the Court that I thought this was changed

25   at the behest of the FBI and/or the U.S. Attorney's

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Office.  On this record, I can see that's not the

2    case.

3            THE COURT:  Let me just ask the Government:

4    Do you have any witnesses or evidence you want to

5    present on the motion to disqualify?

6            MR. PENA:  No, sir.

7            THE COURT:  All right.  Mr. Gorence, do you

8    want to argue your motion?

9            MR. GORENCE:  Your Honor, my motion is set

10   forth completely in the pleadings.  Notwithstanding

11   the fact -- and again, we have a different issue,

12   that Officer Sanchez will obviously be a witness at

13   trial.  He interviewed Mr. Tafoya.  He observed him

14   two weeks later.  And all of that will come out.

15           We have a different issue about the report,

16   but on this disqualification motion, we're still left

17   now only with what transpired on May 7.  That is

18   unrebutted by the Government.  There are threats to

19   arrest and/or prosecute the Sheriff.

20           Now, again, I'm saying that that is

21   something that is -- Your Honor, whether it's

22   sufficient to disqualify a prosecutor -- because the

23   case law says prosecutors don't have to like

24   defendants.  There is natural animosity in this very

25   competitive environment in which we work.  I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    understand that.

2            This is a little different in terms of a

3    law enforcement official, like the U.S. Attorney,

4    threatening arrest and prosecution.  And I understand

5    you can say -- the question here is, if you interfere

6    with a Forest Service official -- well, as Mr. Arnold

7    said, really depends on what are they doing?

8    Clearly, there is a federal statute that makes it a

9    federal crime to interfere with an agent in the

10   course and scope of their legitimate duties.  But

11   that doesn't mean that everything that a federal law

12   enforcement agent does is immunized with the idea

13   that if you interfere with that, that you're

14   committing a crime.

15           You could have an FBI agent go in and -- in

16   fact, I know this from firsthand experience -- when I

17   was a brand-new assistant, someone went in to buy a

18   mattress, who was an FBI agent, and got upset with

19   the salesperson and drew a gun.  Well, that clearly

20   wouldn't be covered.

21           And in this case, there is a legitimate

22   issue:  Can the Forest Service cite people for pure

23   state law infractions if they're not deputized?  This

24   is a huge -- you know it's an issue.  And when

25   someone is threatened with arrest, and shortly after

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that, Mr. Rodella is indicted on these charges --
 2    well, obviously there is an appearance -- and I'm not
 3    saying an appearance of a conflict is sufficient to
 4    recuse the U.S. Attorney -- but here is more.  This
 5    isn't -- we'll litigate this.  The U.S. Attorney --
 6    you know, to be honest, having once been an acting
 7    U.S. Attorney, and say, You know, we can litigate
 8    this; we can file a civil suit seeking declarative
 9    relief from a court, in terms of the scope of
10    appropriate federal power in controlling our national
11    forests, and what their law enforcement officers can
12    do.  I mean, at least when I was there, would have
13    been kind of contemplated and on the table, rather
14    than threatening someone with arrest and prosecution
15    if you dare do anything other than what we say.  And
16    that's really the context Mr. Arnold talked about.
17          So, Your Honor, I'm not going to belabor
18    the law.  But this is, I believe, a political trial.
19    And there will be evidence to that effect.  Whether I
20    seek to call -- and again, if the Court rules against
21    me, I'll make my offer of proof that we would call
22    and go through the Touhy to call Damon Martinez --
23    he's the declarant -- to say yes, I made this threat
24    not to go through what would be the ordinary process
25    of officials in a democracy, to say, you know, we
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    have a dispute here about what federal officials can

2    do, vis-a-vis elected state counterparts.  We don't

3    agree, so let's take it to a federal judge and get

4    declaratory relief.

5              No, that's not done.  Instead, the

6    uncontroverted testimony -- it's really telling -- is

7    the Government doesn't bring anybody from the U.S.

8    Attorney's Office or any of the Forest Service

9    officials to deny the threat.  So, obviously, it was

10   made.  That's the only -- because I thought maybe

11   there would be testimony that would come before the

12   Court saying, Y'all got it wrong.  I didn't say it.

13   I'm talking about Damon Martinez.  I didn't act in

14   this kind of way, with a federal iron fist, to say

15   it's my way, not the highway -- because of that would

16   be charitable -- it's my way or the jail.  And that's

17   really the context of what we have here.

18             And given that, Your Honor, given the other

19   alternatives to how really I'm suggesting usually

20   these kind of differences are resolved, that's the

21   basis upon which there is a political trial.  Because

22   shortly after a May 7 meeting, an allegation that was

23   made by Mr. Tafoya to the State Police in March; we

24   have a search warrant that is less than three weeks

25   after that, on June 4th; then an indictment.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              So the law is all contained.  If he's a
 2    witness -- and we intend to bring all of this out at
 3    trial -- he can't both prosecute and be a witness in
 4    the case, Your Honor.
 5              THE COURT:  All right.  Thank you, Mr.
 6    Gorence.
 7              Mr. Pena?
 8              MR. PENA:  Your Honor, the gulf between
 9    what the defense refers to happening at this meeting
10    and what the defense witnesses refer to happening at
11    the meeting is enormous, and enormously significant.
12    What the witness testified to is exactly what he put
13    in his affidavit, which is a statement of law that if
14    you try to arrest a Forest Service person while
15    they're trying to do Forest Service business, that's
16    a federal crime, and that will be subject to arrest
17    and prosecution itself.  That is in one category.
18              What the defense has argued is totally
19    inconsistent with that.  And, of course, in
20    cross-examination, when I asked Mr. Arnold, and when
21    I quoted directly from defendant's brief on the
22    subject, he disavowed the defendant's version of
23    events.  And the legal difference is incredible.
24    Because if this were the way that it's been
25    represented by the defense just now:  Do anything we
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    say, or I'm going to arrest you, my way or the

2    highway, any of those phrases that were just used,

3    that, in itself, would be a federal crime, extortion;

4    it could be characterized as any number of different

5    crimes.  But that's not what the testimony ever has

6    been, and it's utterly inconsistent with the

7    affidavit and the defense's own witnesses.

8           Instead, what Your Honor is left with is,

9    essentially, a normal meeting in which two agencies

10   did not see eye to eye.  But it was not any more

11   significant than any other meeting in which two

12   agencies disagree.

13          And then, Your Honor needs to look at the

14   overall context of an attempt to disqualify a U.S.

15   Attorney, a federal prosecutor.  And in the response

16   we've cited several cases, several Supreme Court

17   cases, that refer to the enormously high threshold

18   for something like that to take place, the huge

19   number of factors that make courts reluctant to

20   second-guess prosecutorial motives.

21          Your Honor has indulged the defense in a

22   lengthy exploration that came to precisely zero in an

23   attempt -- another defense attempt to try to meet

24   that enormous threshold.

25          Your Honor, at this point, there has been

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    no fact presented by any witness that would warrant

 2    any further inquiry into this matter whatsoever.  And

 3    of course, made any number of additional arguments in

 4    the motion regarding the availability of other

 5    witnesses, if Your Honor wishes to assume the truth

 6    of the defense representation of their own witnesses,

 7    which is inconsistent with those witnesses.

 8              And I'd be happy to answer whatever

 9    questions Your Honor has.  But there is simply not

10    enough here to warrant further inquiry.

11              THE COURT:  Thank you, Mr. Pena.

12              Mr. Gorence, you have the last word on the

13    motion.

14              MR. GORENCE:  Your Honor, the redirect --

15    and I don't know if Mr. Pena -- he obviously was

16    here -- of Mr. Arnold, the question had to do with --

17    and I understand where they're going, because I made

18    an assertion in the brief based on my conversations

19    with Mr. Arnold.  And that's exactly what he said on

20    redirect, which was:  This was a very -- he called it

21    a normal meeting.  That clearly wasn't what

22    Mr. Arnold -- he calls it an amicable meeting.  I

23    don't think that's exactly a correct characterization

24    of the testimony.

25              But that's not how this motion would turn
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    out, obviously.  The issue that Mr. Arnold said was

2    that there was a divide over the issue of

3    deputization.  And that's really the clear point of

4    confrontation.  Because if they are deputized as Rio

5    Arriba Deputy County Sheriffs, then they can arrest

6    for anything that a state law enforcement officer

7    could, including cracked windshields, or whatever.

8    And that's really the crux of the matter here.

9              And, as Mr. Arnold said, that this meeting

10   never got to the agenda because it disintegrated at

11   that point; that when the Sheriff was steadfast that,

12   I am not going to give federal law enforcement,

13   outside of the context of a manhunt for a killer, the

14   ability to stop citizens in Rio Arriba for their

15   cracked windshields; not happening.  Now, maybe

16   different sheriffs elected by the county will see it

17   differently.  But this one said:  No mas, that's not

18   on my watch.

19             That's when the meeting disintegrated.  And

20   I think that was the term that Mr. Arnold used.  And

21   it was at that point that Mr. Martinez, the U.S.

22   Attorney, issued a threat.  It is no more or no less

23   than a threat to be arrested and prosecuted.  And

24   unlike what Mr. Pena just mischaracterized, there is

25   no testimony that says, We'll arrest you if you

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 820-6349                                                   FAX (505) 843-9492
                                                                         1-800-669-9492
                                                               e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    arrest our Forest Service agents.  The question was,

2    If you remotely interfere with the way we see it, you

3    will be arrested.

4              And the Sheriff said, Well, you're not

5    being deputized.  And sure enough, we have an arrest

6    three weeks later.  That constitutes a political

7    trial, a political witch hunt.  And it will be front

8    and center in front of the jury.  And I intend to ask

9    Mr. Martinez about his threat, one in which we

10   know -- I think this is critical in the motion, Your

11   Honor, the only thing we really have is if it was

12   disputed, someone -- it need not even be

13   Mr. Martinez -- create an issue of fact that it

14   didn't happen at all, well, then I think it would be

15   different.

16             The Government is conceding that a threat

17   from one appointed official by the president to a

18   state official elected by the citizens of his county

19   said, You're going to jail for the way you exercise

20   your authority as Sheriff.  Your Honor, that is, as I

21   said, one, it's astounding; but two, it provides the

22   basis and context for this political trial.  And I

23   think that's sufficient, that alone, to require

24   recusal.

25             THE COURT:  Thank you, Mr. Gorence.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          Let me start maybe a little bit at the end

2     of the analysis rather than the beginning.  This is a

3     motion to disqualify the United States Attorney's

4     Office for the District of New Mexico, which is

5     prosecuting this case, because Mr. Martinez will be a

6     witness.

7          Let me first address the law regarding

8     disqualification of Government attorneys.  From the

9     Tenth Circuit's Bolden case, it makes it clear that

10    "the disqualification of Government counsel is a

11    drastic measure, and the court should hesitate to

12    impose it, except where necessary.  Courts that have

13    allowed for the disqualification of Government

14    attorneys do so only in limited circumstances."  And

15    perhaps most chilling is that "Every circuit court

16    that has considered the disqualification of an entire

17    United States Attorney's Office has reversed the

18    disqualification."

19         When we look at a private attorney's

20    conflicts, they may require disqualification of that

21    attorney's law firm in certain circumstances.  The

22    circuit courts have indicated that such an approach

23    is not favored, when it comes to the Office of the

24    United States Attorney or Department of Justice.

25         And when you look at the cases that have

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  dealt with this, some of the situations have been

2  rather stark.  The Attorney General of the United

3  States, for example, being a district judge and

4  presiding over cases that now his office, Department

5  of Justice, is appealing and still involved in.

6  Attorney General can recuse himself, and yet the

7  Department of Justice has continued to operate those

8  cases.

9           One of the reasons that the standard is so

10 high is because it implicates separation of powers

11 issues.  And the generally accepted remedy is to

12 disqualify a specific -- generally it's an assistant

13 United States Attorney.  But I think it would apply

14 as well to the United States Attorney, and not all

15 the attorneys in the office.  And indeed, if the

16 disqualification is one government attorney, that

17 could serve as the predicate for the disqualification

18 of the entirety of the United States Attorney's

19 Office, it would be hard to get things done in our

20 criminal justice system.

21          And the United States Court of Appeals for

22 the Tenth Circuit said it can, quote, "Only rarely,

23 if ever, imagine a scenario in which a district court

24 could properly disqualify an entire United States

25 Attorney's Office.  Disqualifying an entire United

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    States Attorney's Office is almost always reversible

2    error, regardless of the underlying merits of the

3    case."

4              And the Tenth Circuit has refused to

5    disqualify an entire United States Attorney's Office,

6    even in light of fairly extreme circumstances.  In

7    the Morris case, the United States Attorney for that

8    district had previously served as private counsel in

9    a civil case that accompanied the criminal case.  And

10   the Tenth Circuit noted that the United States

11   Attorney did not participate in the criminal case,

12   but instead, two other attorneys from his office who

13   were not connected with the civil case prosecuted the

14   criminal case.

15             The Sixth Circuit has held that a defense

16   counsel was not ineffective when he did not file a

17   motion to disqualify the U.S. Attorney's Office in

18   Kentucky, where defendant was charged with attempting

19   to murder the Assistant United States Attorney, who

20   served in the U.S. Attorney's Office.  And the Sixth

21   Circuit held that because the AUSA against whom the

22   murder attempt was orchestrated did not participate

23   in the prosecution, and because of a strong

24   preference not to exclude an entire United States

25   office from a case, failing to file a motion to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    disqualify was not objectively unreasonable.

2              So I think that mounting the attack of

3    trying to get the entire office disqualified is

4    fairly difficult.  And I don't see the circumstances

5    justifying an exception from the general rule in this

6    case.

7              I did carefully read Mr. Arnold's affidavit

8    in preparation for the hearing yesterday, and also

9    reviewed it yesterday and today, and of course, heard

10   from him.  And his facts are not that Mr. Martinez

11   threatened to arrest Mr. Rodella if he did not

12   deputize or go along with what he wanted as far as

13   law enforcement, but in fact, was that the law

14   enforcement should not interfere, and that such would

15   be a crime.  So I think Mr. Martinez walked the line

16   properly in the record that's before the Court.

17             When I look at the Troutman case and the

18   Prantil case, the Troutman case from the Tenth

19   Circuit, of course, in those situations the Attorney

20   General and U.S. Attorney were involved in the

21   allegations that were part of the case.  Prantil

22   involved a fugitive case in which it dealt with the

23   Assistant U.S. Attorneys.  So those attorneys

24   involved in the case were removed.

25             The incident that occurred over the Forest

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Service is a separate incident from the facts that

2    underlie this case.  And I point out that in Troutman

3    and Prantil, still the Ninth Circuit and the Tenth

4    Circuit still did not order disqualification.

5           So it seems to me in the case that we are

6    about to try on Monday, Mr. Martinez, even if he were

7    going to be a witness, it would not disqualify the

8    entire office.  But I also conclude that Mr. Martinez

9    will not be a witness in the case.  He is not

10   competent to testify on any of the events that are at

11   issue in this trial.  And his feelings toward Mr.

12   Rodella, at least on the records before the Court,

13   seem to be appropriate in his job as a law

14   enforcement person.  But even if he had the personal

15   animosity or ill will toward Mr. Rodella, as a

16   prosecutor, I do not think that would disqualify him.

17          So I don't think Mr. Martinez is going to

18   be a witness in the case.  So the predicate for the

19   motion to disqualify is not present.  So the Court

20   will deny the motion to disqualify the U.S.

21   Attorney's Office, because I don't see that

22   Mr. Martinez is going to be a witness.  But even if

23   he were, I don't think it would form a predicate for

24   disqualifying the entire office.

25          All right.  What else do we need to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   discuss?  I know you've got your flight.

2            MR. GORENCE:  I appreciate that, Your

3   Honor.  I haven't met this Judge in St. Louis.  I

4   prefer not to make a bad impression on the first

5   go-round.

6            I understand the Court's ruling clearly,

7   and I do understand, particularly the way you've

8   articulated the predicate, because that is the

9   issue -- and I think we cited all these about how

10  hard the standard is and how high, in our brief.  And

11  I realize that.  My question is -- and I was even at

12  one point, if Mr. Martinez was going to be a witness,

13  there is a procedure to have an acting U.S. Attorney,

14  where he has no involvement.  That takes care of what

15  we talked about as the supervision.  But I have a

16  question on appeal -- on preservation on this.  And I

17  would actually like to preserve this issue,

18  theoretically, for appeal.

19           If it's acceptable with the Government, I

20  can use this record and not go through and actually

21  get a subpoena for Mr. Martinez, go through the Touhy

22  regs and make a proffer with his testimony, if that's

23  acceptable with the Government.  Because, Your Honor,

24  I understand that if this were to go up, the

25  Government would say, Well, you didn't subpoena him,

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 820-6349                                                  FAX (505) 843-9492
                                                                          1-800-669-9492
                                                              e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1  you didn't make a record.  And the Court said, "even
 2  if he was" -- I don't have the transcript, but even
 3  if he was a witness, it wouldn't require
 4  disqualification.  I understand that.
 5            But at this point, I also heard the Court
 6  saying he will not be a witness, it's not relevant.
 7  I need to preserve both of those.  And what I'd like
 8  to do, if it's acceptable with the Government is, I
 9  think this hiring with Mr. Arnold and his testimony,
10  and the argument actually preserve what I would be
11  eliciting.  And that proffer would be:  You had this
12  meeting, you made this threat, and here's what you
13  said.  And it would be along the lines of what
14  Mr. Arnold said, as well as my proffer to the Court
15  on behalf of Representative Rodella and Former County
16  Commissioner Martinez.  If that's acceptable to the
17  Government.
18            THE COURT:  Let me ask Ms. Neda.  Does Mr.
19  Gorence need to go through the steps of attempting to
20  subpoena Mr. Martinez to preserve this issue?
21            MS. NEDA:  Your Honor, the Court has
22  already ruled on this issue.  Mr. Gorence never
23  subpoenaed Mr. Martinez, when he could have for this
24  issue.  So I think the request is untimely, and
25  unnecessarily prolonging something that was quite
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    obvious all along.  And that is this:  The U.S.

2    Attorneys and the FBI had no involvement with the

3    preparation of the NMSP report --

4              THE COURT:  Let me phrase it maybe this

5    way, maybe this will cut through where everybody

6    needs to be.  Sometimes in these cases, the trial

7    attorneys are already consulting the appellate

8    lawyers on jury instructions and things of that

9    nature.  I don't know if that's the case here -- and

10   you don't need to tell me -- but could you maybe talk

11   to the appellate lawyers, and see if they'd be

12   willing not to raise the issue that -- the issue that

13   Mr. Gorence wants to advance to the Tenth Circuit,

14   they will not raise the issue that Mr. Martinez was

15   not subpoenaed in this matter?

16             MS. NEDA:  But he wasn't.

17             THE COURT:  I know.  But they'll not raise

18   that as saying that Mr. Gorence has waived the issue

19   here below.

20             MS. NEDA:  But he has.

21             MR. GORENCE:  Well, Your Honor --

22             MS. NEDA:  I can ask the appellate --

23             THE COURT:  I think you're getting the

24   answer.

25             MR. GORENCE:  I get the answer.  I didn't

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    need him for this hearing.  That's not what he's

2    going to be subpoenaed for.

3              THE COURT:  But you will for the trial.

4              MR. GORENCE:  I will issue a trial

5    subpoena.

6              THE COURT:  So we're going to have to go

7    through those motions to -- probably me quashing it.

8    But is that necessary, if I just indicate today that

9    he will not testify?  Could you maybe talk to your

10   appellate lawyers, and see if they could just agree

11   that they're not going to raise the argument that

12   because Mr. Martinez is not subpoenaed for trial --

13             MS. NEDA:  For trial.  Excuse me.  Yes, I

14   will talk to them about that.

15             MR. GORENCE:  And here's the thing, Your

16   Honor, because I need to get that off, and that has

17   to be served.  It's got very different service

18   requirements.  So if they want me to go through that,

19   I'll gladly do it.  And I understand it's only

20   preservation.  And I think it's required, because

21   otherwise, they're going to have to say, Well, you

22   wanted to call someone but didn't subpoena him, he's

23   on your list.  And I would -- you know, the proffer

24   of that, we can either -- I don't think you want to

25   bring the U.S. Attorney to go over that, but I could

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    do it, if that's what the Government wants, in terms

2    of my Q and A.

3              THE COURT:  Maybe you could just let --

4    when are you going to be back in pocket?

5              MR. GORENCE:  I don't get back until -- I

6    couldn't get a flight back, because we have an all

7    day hearing and it starts in the afternoon in St.

8    Louis, so I'll be back on Thursday.  I have a

9    deposition in Palm Springs on Friday.  But I'm not

10   sure I'll be doing that.

11             THE COURT:  Say 10:00 on Thursday, could

12   you let Mr. Gorence know?  Because if he doesn't hear

13   from you, then he'll need to go ahead and subpoena

14   Mr. Martinez for trial.

15             MS. NEDA:  I won't be here either, but Mr.

16   Pena will alert the appellate people.  We're trying

17   to articulate the question.  I think the question is

18   that if he doesn't subpoena Mr. Martinez for trial,

19   given the fact that it will be futile efforts, as the

20   Court has already said he may not be a witness, will

21   he have waived his right?  And we will ask the

22   appellate section and the DOJ about that question.

23             MR. GORENCE:  The Court's actually right.

24   If he's not a witness, my whole motion falls away.

25   The Court would say, Well, you didn't subpoena him,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    nor is he here.  So there is no basis for this

 2    motion.  So I think Ms. Neda is right.  If I get that

 3    response, great.  And if not, if they say no and

 4    subpoena him, then we can talk whether it's real

 5    testimony or a proffer.

 6              I appreciate that, Your Honor.  Other than

 7    that, I have nothing further.

 8              THE COURT:  How about you, Ms. Neda,

 9    anything further?  Do you want to tackle jury

10    instructions, or do you want to see my first set, and

11    see what I do first before anybody argues those?

12              MS. NEDA:  I actually have an appointment,

13    so if we conclude now, I would greatly appreciate it.

14              THE COURT:  All right.  Let me go over a

15    few things with you before you leave.  I do have now

16    all the exhibits.  I do have the defendant's and I

17    have the plaintiff's.  I do want your articles so

18    that I can make that determination on that one point

19    that Dr. Sanders -- whether I'm going to allow him to

20    testify on that.  I need your PowerPoint.  I still

21    haven't seen the PowerPoint.  All right.  I'll work

22    with Ms. Wild.  But I may need to see that, and I

23    think that's it.

24              All right.  So I will see you 8:30 on

25    Monday morning.  If anything else comes up, give us a

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 820-6349                                            FAX (505) 843-9492
                                                                  1-800-669-9492
                                                          e-mail: info@litsupport.com



```
1    call.
2              Oh, this is the one other thing I was going
3    to ask you.  Obviously, I have lots of orders and
4    opinions to get out.  Is there anything the
5    Government would like to be at the top of the list
6    for me to work on before I see you?
7              MS. NEDA:  I don't believe so, Your Honor,
8    as long as it's consistent with what we've done here.
9    I think we understand where you're going.
10             THE COURT:  How about you, Mr. Gorence?
11             MR. GORENCE:  I concur, Your Honor.
12             THE COURT:  So I'll just pick the ones I
13   think I need to work on to satisfy myself that the
14   rules I've given you are correct.  Otherwise, I'll
15   see you at 8:30 on Monday morning.
16             If y'all let me just ask one other
17   question.  Do you have any better estimate now, with
18   the rules that you've received today, as to how long
19   you think this trial will last, or what you want me
20   to tell the jury?  Ms. Neda?
21             MS. NEDA:  Your Honor, that portion was the
22   defense.  So perhaps, the better question would be
23   posed to --
24             THE COURT:  What about you, Mr. Gorence?
25             MR. GORENCE:  That's fair.  I think with
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Mr. Overby -- and I want to see, obviously, the

2    Court's opinions, because -- and I think the Court's

3    ruling on Dr. Sanders will -- he wasn't going to be

4    long anyway -- the 404(b), I think we'll finish.  If

5    the Government finishes their case by Thursday early

6    in the morning -- I have one day, and I think I'll

7    put our case on within a day, assuming -- but, again,

8    if they don't call people on their list -- for

9    instance, there are Rio Arriba Officers Randy

10   Sanchez, Officer Gutierrez -- if for some reason they

11   don't call those people, then I will be calling them.

12   And they've listed Officer Turrieta, who was the

13   Santa Clara officer who came later.  He's on their

14   list, but if he isn't called, and done within their

15   two-and-a-half day estimate.

16          But having said that, Your Honor, you know,

17   that this was -- I think actually the phone records

18   will indicate a seven-minute interaction.  And to be

19   candid -- and I'm being -- actually, I don't mean to

20   be facetious with the Court, if we can't try a

21   seven-minute case in a week, then something seems a

22   little amiss.  So I am guardedly optimistic that

23   we'll do this.

24          THE COURT:  Let me ask Ms. Neda, do you

25   think it would be a good bet that you'll be done by

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    midday on Thursday?

2              MS. NEDA:  Yes, Your Honor.

3              THE COURT:  Okay.

4              MS. NEDA:  Your Honor, if I may continue.

5    It would be quicker if we don't have to bring chain

6    of custody witnesses.  And I'm not certain whether or

7    not the defense has stipulated to chain of custody.

8    The only ones I can think of -- we're good on the

9    Verizon, the telephone records, so there is no issue

10   there.

11             But I'm thinking of the firearm, and the

12   badges that were seized during the execution of the

13   search warrant.  If we have to bring those into

14   evidence, then there is a chain of custody that would

15   require several FBI agents.  One of the badges was --

16   well, all the badges were tested, and sent to the DNA

17   lab at the FBI in Washington.  And so there would be

18   an extra chain of custody individual to say, I put

19   that in the proper mail service and received it back.

20   So you're talking about maybe at least two, maybe

21   three extra witnesses, that unless there is an issue

22   about chain of custody, I think we should probably

23   dispense with those to save the Court's time, if Mr.

24   Gorence agrees.

25             MR. GORENCE:  Your Honor, I haven't seen

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   the badges yet, and so I, obviously, can't stipulate

2   to something until they're actually produced.  And

3   I've been asking -- and I guess they are on their way

4   back from Quantico.  And I'm assuming, you know, when

5   I do that, that's a possibility.

6           The other problem is they did have the

7   firearm with the safety lock that, obviously, the

8   Court Security requires.  My problem is, is that it

9   was provided to me, but I can't talk to my client

10  because the Government is insisting that they

11  maintain a line of sight, as well as with an FBI

12  agent.  So I can't talk to my client.  And I'm not

13  about to do it with -- I can't talk to Mr. Rodella.

14  So I told them, whatever procedure they want, they

15  can bring an unloaded firearm with the safety lock,

16  and I don't think we need more than five minutes.

17  But if they insist that I cannot talk to Mr. Rodella

18  unless they are present, to make these determinations

19  about what it is, and then I'll have to -- then I

20  have no recourse given their rules.  Bring them all.

21  But if I could have five minutes to talk to him and

22  we could look at it, I think those stipulations would

23  be forthcoming.  But I will not try to have a group

24  junta with the Government before we make important

25  determinations about evidence.  That's not the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     adversarial process, and it's not the way I practice

2     law.

3                 THE COURT:  Well, let's do this:  I'll plan

4     on a five-day trial, and -- but let's listen to the

5     jurors.  If anybody has got a problem on Monday or

6     Tuesday, then we probably ought to put that in the

7     back of our head.

8                 As far as telling the jurors -- we'll tell

9     them that it's a five-day trial, and see if that will

10    just save any concerns about their schedules.

11                All right.  I appreciate your hard work

12    over the last two days.  I'll try to get these

13    opinions out to you.  And I'll see you on Monday

14    morning.

15                MS. NEDA:  Thank you, Your Honor.

16                THE COURT:  Y'all have a good evening.

17                (The Court stood in recess.)

18

19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

418

```
 1                    C-E-R-T-I-F-I-C-A-T-E

 2

 3   UNITED STATES OF AMERICA

 4   DISTRICT OF NEW MEXICO

 5

 6

 7        I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

 8   Official Court Reporter for the State of New Mexico,

 9   do hereby certify that the foregoing pages constitute

10   a true transcript of proceedings had before the said

11   Court, held in the District of New Mexico, in the

12   matter therein stated.

13        In testimony whereof, I have hereunto set my

14   hand on January 16, 2015.

15

16

17

18   _____
     Jennifer Bean, FAPR, RMR-RDR-CCR
19   Certified Realtime Reporter
     United States Court Reporter
20   NM CCR #94
     333 Lomas, Northwest
21   Albuquerque, New Mexico 87102
     Phone:  (505) 348-2283
22   Fax:    (505) 843-9492

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com