# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                             No. CR 14-2783 JB

THOMAS R. RODELLA and
THOMAS R. RODELLA, JR.,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Second Motion for a New Trial, filed January 15, 2015 (Doc. 160)("Motion").  The Court held an evidentiary hearing on January 20, 2015.  The primary issues are: (i) whether rule 16 of the Federal Rules of Criminal Procedure required Plaintiff United States of America to produce Thomas R. Rodella, Jr.'s medical records to Defendant Thomas R. Rodella before trial; (ii) whether Rodella's failure to obtain the medical records before trial was because of his lack of diligence; (iii) whether the medical records are impeachment material; (iv) whether the medical records are material to a principal issue in the case; and (v) whether the result at trial would probably have been an acquittal if the United States had produced the medical records; and (vi) whether the United States had an obligation under Brady v. Maryland, 373 U.S. 83 (1963)("Brady"), to produce the medical records to Rodella; (vii) whether the United States had an obligation under Giglio v. United States, 405 U.S. 150, 154 (1972)("Giglio"), to produce the medical records to Rodella; (viii) whether the Jencks Act, 18 U.S.C. § 3500, required the United States to produce the medical records to Rodella.  Because the United States used the medical records to impeach Rodella's witness, rule 16 did not require the United States to produce them.  Rodella knew about the medical records

before trial and should have known of their importance.  As such, his failure to obtain them before trial was due to his lack of diligence.  The United States Court of Appeals for the Tenth Circuit treats rehabilitation material like impeachment material, which means the medical records are impeachment material.  Because the medical records go solely to Rodella, Jr.'s credibility, they are not material to a principal issue in the case.  Finally, Rodella, Jr. was impeached on a number of issues outside of his medical records, and, even if Rodella had possession of the medical records, he would not have understood their importance.  Accordingly, the result at trial would not have been different.  Similarly, because the medical records would not have changed the result at trial, they were not exculpatory material for Brady purposes, and the United States did not have an obligation to produce them.  Giglio only applies to material that could impeach a United States' witness, and, because the medical records were used only to impeach Rodella's witness the United States was not required to produce the medical records under Giglio.  Finally, the Jencks Act applies only to statements by United States' witnesses and not defense witnesses.  The United States was, thus, not required to produce the medical records under the Jencks Act, because they did not contain statements by any United States' witness.  For these reasons, the Court will deny the Motion without prejudice to renew if Rodella finds other evidence.

## FACTUAL BACKGROUND

The Superseding Indictment, filed September 9, 2014 (Doc. 55)("Indictment"), alleges that, on March 11, 2014, in Rio Arriba County, New Mexico, Rodella, while acting under color of state law, subjected a person -- Michael Tafoya -- to "unreasonable seizure by a law enforcement officer."  Indictment at 1.  Specifically, Rodella allegedly used unreasonable force and caused an "unlawful arrest by deputies of the Rio Arriba County Sheriff's Office."

Indictment at 1.  "This offense resulted in bodily injury" to a person, and included the "use and threatened use of a dangerous weapon."   Indictment at 1.  The Indictment further alleges that Rodella carried and brandished a firearm "during and in relation to a crime of violence for which the defendant may be prosecuted in a court of the United States," and that, "in furtherance of such crime, possessed and brandished said firearm."  Indictment at 1-2.

## PROCEDURAL BACKGROUND

The original indictment charged Rodella and Rodella, Jr.  See Indictment, filed August 12, 2014 (Doc. 2).  At the initial scheduling conference, the United States requested the Court to sign a subpoena ordering the Veterans Affairs Hospital in Albuquerque, New Mexico, to release Rodella, Jr.'s medical records.  See Transcript from Hearing at 38:22-42:25 (Neda, Bowles, Court)("Scheduling Tr.").  Assistant United States Attorney, Tara Neda, noted that she was concerned that Rodella, Jr. could not form the requisite specific intent to commit the charged crimes, because he had suffered a traumatic brain injury, suffers from Post-Traumatic Stress Disorder, takes at least three medications for his brain injury, and is constantly under VA Hospital's care.  See Scheduling Tr. at 41:22-42:4 (Neda).  Ms. Neda stated that, when she received the medical records, she would provide Rodella, Jr.'s attorney, Jason Bowles, with a copy, and Mr. Bowles stated that he did not object to the VA Hospital releasing the records.  See Scheduling Tr. at 42:18-25 (Neda, Bowles, Court).  On August 27, 2014, the United States moved to dismiss all of the charges against Rodella, Jr.  See United States' Unopposed Motion to Dismiss All Counts of the Indictment as to Defendant Thomas Rodella, Jr. Only, filed August 27, 2014 (Doc. 30)("Motion to Dismiss").  The United States stated that, based on information that it received, Rodella, Jr. "may have certain medical conditions that could negatively affect his cognitive abilities."  Motion to Dismiss ¶ 6, at 2.  The United States noted that, based on Rodella,

Jr.'s medical records, "there is a question as to whether [Rodella, Jr.] was capable of forming the level of specific intent" that is required to violate the charged crimes.  Motion to Dismiss ¶ 8, at 2.  Before trial, the United States moved to exclude certain evidence concerning psychological conditions of a potential witness.  See United States' Sealed Motion *In Limine* to Exclude Certain Cross-Examination, filed September 9, 2014 (Doc. 48)("MIL").  The United States stated: "Evidence that a witness was under the influence of medications or suffering from a mental condition that affect his ability to perceive or recall are admissible only when said factors were present near or at the time of the incident or trial."  MIL ¶ 4, at 1 (citing United States v. Robinson, 583 F.3d 1265, 1274-76 (10th Cir. 2009)).

After a five-day jury trial, Rodella was convicted of violating Tafoya's constitutional rights and of using a firearm during a crime of violence.  See Verdict, filed September 26, 2014 (Doc. 127)("Verdict").  During the trial, Rodella, Jr. testified for Rodella.  See Transcript of Trial at 40:5-71:4 (taken September 25, 2014)(Neda, Gorence, Wilde, Court)("Trial Tr.");[1] id. at 77:8-97:2 (Gorence, Court).  On cross-examination, the United States impeached Rodella, Jr. on a number of issues.  Rodella, Jr. testified that he was "110 percent sure" that Rodella did not draw his firearm during the March 11, 2014, incident.  Trial Tr. at 97:18-20 (Neda, Rodella, Jr.).  Almost immediately afterwards, he testified that he had previously stated that Rodella had his firearm drawn.  See Trial Tr. at 97:21-98:2 (Neda, Rodella, Jr.).  Rodella, Jr. testified that he did not have a firearm with him on March 11, 2014, despite another witness testifying that Rodella, Jr. was carrying a firearm.  See Trial Tr. at 102:16-103:20 (Neda, Gorence, Rodella, Jr., Court).  Rodella, Jr. testified that, while in the military, he was in sixty air assaults and was under

---

[1]The Court's citations to the transcripts of the hearings or trial refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

enemy fire, even though he was stationed in Kosovo during his deployment in 2011.  See Trial Tr. at 112:25-113:10 (Neda, Rodella, Jr.); id. at 116:8-117:1 (Neda, Rodella, Jr.).

The United States also used Rodella, Jr.'s statements from his medical records during the cross examination.  See Trial Tr. at 117:14-118:23 (Neda, Rodella, Jr.).  The United States noted that Rodella, Jr. stated that he suffered from memory problems, which he denied.  See Trial Tr. at 118:18-23 (Neda, Rodella, Jr.).  From the medical records, Rodella, Jr. admitted that he indicated to physicians that he has poor concentration, difficulty getting along with other people, and severe irritability.  See Trial Tr. at 149:3-150:3 (Neda, Rodella, Jr.); id. at 162:2-15 (Neda, Rodella, Jr.).  At trial, Rodella contended that he had never received a copy of the medical records.  See Trial Tr. at 118:25-119:9 (Neda, Gorence, Court).  Ms. Neda, stated that she provided Mr. Bowles with a copy of the medical records and that she told Mr. Bowles to provide Robert Gorence, Rodella's attorney, with a copy of the medical records.  See Trial Tr. at 119:10-18 (Neda).  Mr. Bowles, who was there for Rodella, Jr.'s testimony, agreed to send an electronic mail transmission of the medial records to the Courtroom's Courtroom Deputy Clerk for the CDR to print out and to give Rodella.  See Trial Tr. at 121:4-123:4 (Neda, Gorence, Bowles, Court).  Rodella was provided a copy of the medical records right before the day's lunch break.  See Trial Tr. at 146:16-19 (Court).  Rodella never objected to the United States' use of the medical records, requested a continuance, or asked for more time to review them.  After the United States finished its cross examination of Rodella, Jr., Rodella moved to admit all of the medical records into evidence.  See Trial Tr. at 163:17-164:6 (Gorence, Rodella, Jr.).  The United States objected to the medical records' admission, and the Court sustained the objection. See Trial Tr. at 164:12-165:25 (Neda, Gorence, Court).

The United States also requested the Court to take judicial notice of a fact from the Physicians' Desk Reference[2] ("PDR") that Rodella, Jr.'s medications may cause certain side effects, including severe depression, but the parties eventually agreed to introduce the PDR text as an exhibit.  See 155:9-157:8 (Neda, Gorence, Court).  During its closing argument, the United States discussed Rodella, Jr.'s mental conditions and the fact that it had moved to dismiss the charges against Rodella, Jr., "because of his mental impairment."  Transcript of Trial at 81:16-82:18 (taken September 25, 2014)(Neda)("Closing Tr.").  The United States also stated that Rodella, Jr. takes psychiatric drugs for his medical condition.  See Closing Tr. at 82:19-83:6 (Neda).

On October 17, 2014, Rodella moved for a new trial.  See Motion for New Trial, filed October 17, 2014 (Doc. 133)("1st New Trial Motion").  The 1st New Trial Motion concerned potential impeachment materials of Tafoya and of the United States' witness, Renee Dominguez.  See 1st New Trial Motion *passim*.  In the United States' Response to Defendant's Motion for New Trial (Doc. 133), filed October 31, 2014 (Doc. 134)("1st New Trial Response"), the United States effectively refuted many of the allegations that Rodella made about Tafoya and Dominguez.  See 1st New Trial Response at 1-8.  In the Defendant's Reply to United States

_____

[2]The Physicians' Desk Reference is:

[A] commercially published compilation of manufacturers' prescribing information (package insert) on prescription drugs, updated annually.  While designed to provide physicians with the full legally mandated information relevant to writing prescriptions (just as its name suggests), it is widely available in libraries and bookstores, widely used by other medical specialists, and sometimes valuable to the layman.  The compilation is financially supported in part by pharmaceutical manufacturing corporations which create drugs listed within its pages.

Physicians' Desk Reference, Wikipedia.org, http://en.wikipedia.org/wiki/Physicians%27_Desk_Reference (last visited Jan. 27, 2015).

Response to Defendant's Motion for New Trial [Doc. 134], filed November 6, 2014 (Doc. 136)("1st New Trial Reply"), Rodella brought up the issue about the VA's medical records, and attached an October 28, 2014, letter from Elizabeth Davidson, M.D.  See Letter From Elizabeth Davidson, MD, filed January November 6, 2014 (Doc. 136-1).  In the 1st New Trial Reply, Rodella states:

> Although not raised in his initial motion, Mr. Rodella will supplement his Motion for a New Trial with regard to the cross-examination of Tommy Rodella, Jr.  As the Court will recall, Ms. Neda never provided Mr. Rodella, Jr.'s medical records to counsel for Mr. Rodella at any time prior to trial.  The documents were copied and provided shortly after the cross-examination of Mr. Rodella, Jr.   The documents numbered over 400 pages and counsel read them speedily over the lunch hour.  Attached as Exhibit A is a letter from Mr. Rodella, Jr.'s treating VA psychiatrist, Dr. Elizabeth Davidson.  The testimony of Dr. Davidson could not have been produced on the notice with which counsel received the medical records.  As such, counsel for Mr. Rodella never had the opportunity to rebut Ms. Neda's cross-examination of Mr. Rodella, Jr. and her argument that he had mental problems and cognitive deficiencies which affected his credibility. Mr. Rodella, Jr. was a critical witness and the government's late production of his medical records, when used in an egregiously misleading way and without a good faith basis because she never talked to Dr. Davidson, helped cause a miscarriage of justice.

1st New Trial Reply at 2-3.  The letter states:

> Mr. Rodella has been under care for PTSD at the Albuquerque VA since June of 2012, where he has received medication by a psychiatrist and therapy for PTSD.  I have been caring for him since March of 2013.  He has had no psychiatric hospitalizations, and has never been considered a threat to himself or anyone else. At no time has he had any psychotic symptoms, such as being out of touch with reality, having hallucinations (seeing or hearing things that are not present) or delusions (fixed, false beliefs).  At no time has he been considered incompetent or less than fully able to participate in general life activities.  The medications he has taken and is taking are customary for PTSD treatment, and do not cause psychotic symptoms or lessen one's ability to be fully present in life.  Mr. Rodella has not, and is not, impaired in any manner by his medications.

See Letter From Elizabeth Davidson, MD, filed January November 6, 2014 (Doc. 136-1).

The Court held an evidentiary hearing on November 14, 2014.  During the hearing, the evidence did not pan out on Tafoya and Dominguez as Rodella expected or wanted, and he then

discussed withdrawing the 1st Motion to Dismiss and filing another.  As to the VA medical records, the Court said that, because Rodella raised the issue in the 1st New Trial Reply, it was concerned about whether the medical record issue was part of the 1st New Trial Motion.  See Transcript of Hearing at 99:6-8 (taken November 13, 2014)(Court)("1st New Trial Tr.").  Rodella repeatedly promised to file another motion for a new trial.  See 1st New Trial Tr. at 99:19-101:5 (Gorence)("So what I would like to do is withdraw that from the reply and make that the subject, and do it as it should be, of a motion for a new trial based on that.").  Rodella withdrew the 1st New Trial Motion on December 1, 2014.  See Notice of Withdrawal of Defendant's Motion for New Trial (Doc. 133), filed December 1, 2014 (Doc. 152)("Notice of Withdrawal").  In the Notice of Withdrawal, Rodella promised to file another motion for a new trial based on Dr. Davidson's letter.  See Notice of Withdrawal at 1 ("Therefore, Mr. Rodella withdraws his Motion for New Trial (Doc. 133) and he will file a second motion for new trial, as previously noted to the Court, based on the testimony of Dr. Elizabeth Davidson.").  Yet the rest of November, all of December, and half of January passed with no new motion for new trial being filed.  On December 15, 2014, the Court set the sentencing for 9:00 a.m. Wednesday, January 21, 2015.  See Minute Order, filed December 15, 2014 (Doc. 156).  On Thursday, January 15, 2015 -- two business days before Rodella was to be sentenced[3] -- at 5:05 p.m., Rodella filed his second new-trial motion.  See Motion at 1.

    **1.**    **The Motion.**

Rodella requests that the Court grant him a new trial, because the United States did not disclose to him medical records of Rodella, Jr. -- Rodella's son -- before trial and because of newly discovered evidence.  See Motion *passim*.  Rodella contends that, at trial, only two

---

[3]Monday, January 19, 2015, was Martin Luther King, Jr. Day, a federal holiday.

eyewitnesses -- Tafoya and Rodella, Jr. -- testified to the events that the Indictment alleges.  See Motion at 1.  Rodella argues that, because Tafoya and Rodella, Jr. gave contradictory testimony, the jury had to resolve credibility and competency issues regarding Tafoya and Rodella, Jr.  See Motion at 1.  He asserts that, on cross-examination of Rodella, Jr., the United States focused on a traumatic brain injury that Rodella, Jr. suffered while on active duty with the New Mexico National Guard, and that, during Rodella, Jr.'s cross-examination, the United States used Rodella, Jr.'s VA medical records that the United States had not produced to Rodella.  See Motion at 1.

Rodella contends that, while the United States disclosed the medical records to Mr. Bowles, Mr. Bowles did not have a duty to disclose them to Rodella.  See Motion at 2. Rodella asserts that he does not work with Mr. Bowles; rather, they work at separate law firms. See Motion at 3-4.  Rodella asserts that, at trial, the United States provided him with 417 pages of medical records to review over the lunch hour, which, he contends, was not sufficient time for his counsel, who "is not trained in psychology or psychiatry," to prepare for the re-direct or to retain an expert witness who could rebut the United States' cross-examination on Rodella, Jr.'s mental capacity.  See Motion at 2-3.

Rodella contends that five factors must be met to grant a new trial.  See Motion at 3.

(1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

Motion at 3 (quoting United States v. Sinclair, 109 F.3d 1527, 1531 (10th Cir. 1997)("Sinclair")).[4]  Rodella asserts that the first factor is met, because he did not discover

---

[4]Sinclair is the only case that Rodella cites in the Motion.  See Motion at 1-6.

Dr. Samuel Roll's report, which discusses the medical records and the United States' use of them during cross-examination, until after trial.  See Motion at 3.  Rodella attached Dr. Roll's report to the Motion.  See Psychological Report by Samuel Roll, Ph.D., P.A., filed January 15, 2015 (Doc. 160-2)("Roll Report").  Dr. Roll's Report states in full:

> At the request of Mr. Robert Gorence, I have reviewed the V.A. Medical Records (Records) of Thomas Rodella, Jr. (Bates 66-482).  I have also reviewed the Excerpted testimony of Mr. Thomas Rodella, Jr. before the Honorable James O. Browning, United States District Judge, Albuquerque [sic] Bernalillo County, New Mexico, on September 25, 2014.
>
> After reviewing the material, it is my opinion that, from the psychological perspective, there are a number of serious problems about the way the Records and the Physician's Desk Reference (PDR) were used in the cross-examination of Mr. Rodella, Jr.
>
> The concerns involve the use of the Records and the PDR, without expert testimony for clarification and in a way that violates the standard and customary use of these sources of information.  The questioning of Mr. Rodella, Jr. about these materials presented what would seem like reliable information about the mental health of Mr. Rodella, Jr. that would raise issues about his competence and credibility.  The use of the Records and the PDR was done in a manner that is inconsistent with the reliable and valid use of such material.
>
> A major problem is that the cross-examination used Mr. Rodella, Jr.'s history of subjective complaints to suggest a reliable picture of his psychological status.  His subjective complaints were used instead of, and independent of, the contradictory objective data already available through Mr. Rodella, Jr.'s psychological testing.  The questioning inferred that Mr. Rodella, Jr.'s mental status was impaired by poor concentration, impaired sensorium and loss of memory.  It would be the equivalent of using a patient's report that he has a high fever as definitive instead of the readings taken from a thermometer.
>
> A patient's account is not the most valid and reliable source of information and is to be used to guide an objective evaluation and not as a conclusion.  Certainly, it would be less than appropriate to come to a diagnosis, prescribe medication or conduct surgery based on such limited data.  An expert's use of the patient's complaints, together with the objective data, should be the basis of determining whether or not Mr. Rodella, Jr. actually had poor concentration, impaired sensorium and loss of memory.  Such data were available in this case but were not used.

In a similar manner, cross-examination made use of the PDR to suggest that Mr. Rodella, Jr. was suffering from confusion, delusions, and hallucinations as side effects of the medications Mr. Rodella, Jr. was prescribed.  Certainly, those mental symptoms would raise serious concerns about his ability to perceive, remember and report reality correctly.

This use of the PDR poses a number of problems.  First of all, Mr. Rodella, Jr.'s records about his mental status do not contain any references to severe mental malfunctioning.  Had serious side effect had resulted, Mr. Rodella, Jr.'s medical professionals would have noted them.

Secondly, if Mr. Rodella, Jr. had developed such severe side effects, which are decidedly more impairing than the condition for which Mr. Rodella, Jr. was being treated, the medications assuredly would have been discontinued.  His own physicians or an expert could have clarified that issue and reduced probable errors in concerns about Mr. Rodella's competence and the correctness of his observations.

Thirdly, suggesting via questioning, without clarification from research or expert testimony, risks leaving the impression that rarely appearing side effects of the medications are more common than is actually the case.

To the extent that Mr. Rodella, Jr.'s competence or credibility or both were important considerations, the limited and potential distorting use of Mr. Rodella's Record and the PDR would have likely lead to serious errors in determining such factors.

More appropriate use and interpretation of Mr. Rodella, Jr.'s Records were available.  Psychological test data about his conditions were available.  Expert testimony about the presence or absence of the side effects of hallucinations, delusions and confusion were available.  Professional and expert testimony about the PDR and its relevance to Mr. Rodella, Jr. and his competence were also available.

In summary, it is my opinion that, from the psychological perspective, incomplete and potentially distorting use was made of the Records and the PDR in the cross-examination of Mr. Rodella, Jr.  The way the Records and the PDR were used is neither standard nor customary and had a high risk of leading to erroneous impressions about Mr. Rodella, Jr.'s ability to perceive, remember and report his experiences in a reliable and competent manner.

Roll Report at 1-3.

To the second factor, Rodella contends that he did not discover the medical records until after trial, because the United States did not disclose them under rule 16.  See Motion at 3.  He

contends that he could not have known about the substance and importance of Dr. Roll's opinion until the last day of trial.  See Motion at 4.  Rodella asserts that his counsel needed to consult with an expert witness concerning the medical records and that there was insufficient time to consult when the records were produced at trial.  See Motion at 4.  Rodella argues that the United States had a duty under rule 16(a) to produce the medical records before trial.  See Motion at 4.

Rodella contends that the third factor is met, because the United States was successful in undermining Rodella, Jr.'s credibility by using his medical records and psychiatric testimony. See Motion at 4.  He argues that Dr. Roll's report is not merely impeachment evidence, but also goes to Rodella, Jr.'s competence and credibility.  See Motion at 4.  For the fourth factor, Rodella contends that Dr. Roll's report is material to a principal issue in the case, because it would have been important "to address the credibility of an eyewitness with regard to the interaction between Mr. Rodella and Mr. Tafoya."  Motion at 4.  Further, Rodella argues that Rodella, Jr.'s testimony is not cumulative, because he directly contradicted Tafoya's testimony. See Motion at 4.  Rodella contends that the fifth factor is also met, because, if Dr. Roll's report were presented to the jury, it probably would have produced an acquittal.  See Motion at 4-5. Rodella argues that the jury did not find Tafoya completely credible, because it did not find that Tafoya was injured, and that, if Dr. Roll's testimony had been presented at trial, the jury probably would have completely disregarded Tafoya's testimony.  See Motion at 5.

Rodella attached to the Motion portions of the transcript from trial in which the United States stated that it provided the medical records to Mr. Bowles and that it requested Mr. Bowles to provide Rodella with the records.  See Trial Tr. at 119:6-120:17 (Neda, Gorence).  The attached transcript also contains a portion in which the United States stated that it was not required to give Rodella a copy of the medical records.  See Trial Tr. at 121:21-25 (Neda).

Finally, Rodella again attached the October 28, 2014, letter from Dr. Davidson that he attached to his Reply to the 1st Motion for New Trial.  See Letter From Elizabeth Davidson, MD, filed January 15, 2015 (Doc. 160-3)("Davidson Letter").  Rodella requests that the Court hold an evidentiary hearing, so that Dr. Roll can testify and be cross examined about his report.  See Motion at 5.  Rodella also states that he will call Dr. Davidson to testify.  See Motion at 6.

Rodella filed an affidavit by Mr. Gorence.  See Declaration of Robert J. Gorence in Support of Defendant's Second Motion for New Trial, filed January 16, 2015 (Doc. 163)("Gorence Aff.").  Mr. Gorence states that he did not receive Rodella, Jr.'s medical records before the trial.  See Gorence Aff. ¶ 3, at 1.  He states that he did not think that the United States would cross examine Rodella, Jr. with the medical records, and that he believed that the United States dismissed the charges against Rodella, Jr. because Rodella, Jr. had received a traumatic brain injury while serving his country.  See Gorence Aff. ¶ 3, at 1-2.  Mr. Gorence states that, if he had received Rodella, Jr.'s medical records, he would have retained an expert witness to evaluate them and to determine their significance.   See Gorence Aff. ¶ 4, at 2.  Mr. Gorence further states that he did not have sufficient time at trial to review the records, to understand their importance, or to consult with an expert.  See Gorence Aff. ¶ 5, at 2.

        2.      **The Response**.

The United States responded to the Motion on Friday, January 16, 2015 -- one day after Rodella filed the Motion.  See United States' Response to Defendant's Second Motion for a New Trial (Doc. 160), filed January 16, 2015 (Doc. 165)("Response").  The United States argues that a "motion for new trial 'is not favorably regarded and should be granted only under great caution.'"  Response at 1 (quoting United States v. Orr, 692 F.3d 1079, 1099 (10th Cir. 2012)).  It contends that Dr. Roll's Report and the medical records are inadmissible evidence.   See

Response at 2.  The United States asserts that "[n]ewly discovered evidence that is inadmissible or incorrect cannot support a motion for new trial."  Response at 2 (citing United States v. Redcorn, 528 F.3d 727, 744-45 (10th Cir. 2008)).  The United States argues that Dr. Roll's report is not admissible, because it is commentary on cross-examination; because Dr. Roll did not evaluate Rodella, Jr., but only reviewed the medical records and transcripts from trial; and because Dr. Roll's opinions concern Rodella, Jr.'s competency and credibility.  See Response at 2 (citing United States v. Adams, 271 F.3d 1236 (10th Cir. 2001)).  The United States further contends that commissioning an expert to draft a report after trial does not constitute newly discovered evidence, otherwise "all defendants would simply order new expert reports following convictions."  Response at 3.

The United States argues that Rodella had knowledge of Rodella, Jr.'s medical issues before trial, because the United States noted that it had concerns about Rodella, Jr.'s cognitive abilities when it dismissed the charges against Rodella, Jr. on August 27, 2014.  See Response at 3.  The United States asserts that it identified Rodella, Jr.'s medical records as the source of its concerns about Rodella, Jr.'s cognitive abilities, which gave Rodella notice that, if he intended to offer Rodella, Jr.'s testimony at trial, the United States would cross examine him about his cognitive abilities with his medical records.  See Response at 3.  The United States contends that this case is similar to United States v. Perez, 503 F. App'x 688 (11th Cir. 2013)(unpublished), where, according to the United States, the United States Court of Appeals for the Eleventh Circuit affirmed the district court's denial of a motion for new trial.  See Response at 3.  There, the United States argues, after trial, the defendant obtained a new expert report opining that the voice on an incriminating telephone call was not the defendant's, but that, because the defendant had notice that the identity of the speaker's voice would be an issue at trial, the defendant's

decision to not retain a voice expert before trial did not cause the subsequently created report to be new evidence that the defendant could not have discovered with due care.  See Response at 3.

The United States argues that Rodella did not ask anyone -- including Rodella, Jr., Mr. Bowles, or the United States -- for the medical records.  See Response at 3-4.  The United States contends that Rodella could have subpoenaed the records or compelled the United States to produce them, but that Rodella did not take any of these steps.  See Response at 4.  It argues that it was not required to turn over the medical records, because they are evidence that impeached a defense witness.  See Response at 4.

The United States asserts that Rodella cannot satisfy the third Sinclair factor, because the medical records go solely to Rodella, Jr.'s credibility and that they were used to impeach Rodella, Jr.  See Response at 5.  It asserts that Rodella wishes to use Dr. Roll's report to rehabilitate Rodella, Jr. and that the Tenth Circuit does not distinguish between impeachment and rehabilitation evidence.  See Response at 5 (citing United States v. Gwathney, 465 F.3d 1133, 1144 (10th Cir. 2006)).  The United States maintains that Dr. Roll's report was "at best merely to rebut impeachment, which is even more peripheral" than rehabilitation evidence. Response at 5.  It argues that Sinclair's reference to impeachment material encompasses all evidence that goes solely to a witness' credibility.  See Response at 5.

Finally, the United States argues that Dr. Roll's report would not produce an acquittal, because most of the damage to Rodella, Jr.'s credibility came from his other testimony that was not related to Dr. Roll's report.  See Response at 5.  The United States asserts that Rodella, Jr.'s credibility was impeached when he testified that Rodella did not draw a firearm during the March 11, 2014, incident, but then admitted that he previously stated that Rodella had drawn his firearm; when Rodella, Jr. testified that he did not have a firearm with him on March 11, 2014,

but then Tafoya's testimony and Lieutenant Randy Sanches' testimony contradicted Rodella, Jr.'s testimony about the firearm; when Rodella, Jr. testified that he was in sixty air assaults and was repeatedly under enemy fire while stationed in Kosovo; and when he testified that he lives on $300.00 a month and receives no support from Rodella.  See Response at 5.  The United States maintains that the most significant impeachment concerning Rodella, Jr.'s cognitive impairments came from his own testimony about sleeping with a gun at night, having concentration and irritability problems, and being prone to extreme angry outbursts without provocation.  See Response at 6.  The United States also contends that Rodella, Jr.'s testimony is more problematic in that his testimony was biased, he came across as a witness who was so extensively coached that his testimony was no longer his own, and his testimony was inconsistent with known facts and common sense.  See Response at 6.

The United States further argues that Rodella, Jr.'s credibility was not the only issue at trial.  See Response at 6.  The United States contends that, if the jury believed that Tafoya was lying, they would have acquitted Rodella.  See Response at 6.  Additionally, the United States contends that there was additional evidence that Rodella's behavior was inconsistent with his training and that he mistreated three other individuals.  See Response at 6.  It maintains that an evidentiary hearing is not required, because, as a matter of law, Rodella cannot satisfy the Sinclair standard.  See Response at 7.

### 3.      Motion to Continue Sentencing.

The day after filing the Motion, Rodella filed the Motion for Continuance of Sentencing, filed January 16, 2015 (Doc. 161)("Motion to Continue").  Rodella requested that the Court permit him to fully brief the Motion for a new trial and hold an evidentiary hearing on the Motion before sentencing him.  See Motion to Continue ¶ 2, at 1.  He asserts that continuing his

sentencing will conserve government resources, because he will not have to be transferred from a federal correctional institution if the Court held an evidentiary hearing on his Motion for a new trail.  See Motion to Continue ¶ 3, at 1.

The United States responded to the Motion to Continue by arguing that the Motion for a new trial addresses an issue that he already raised in the 1st New Trial Reply.  See United States' Response to Defendant's Motion for Continuance of Sentencing (Doc. 161) ¶ 2, at 1, filed January 16, 2015 (Doc. 164)("Motion to Continue Response").  The United States asserts that the Motion for a new trial "is entirely meritless."  Motion to Continue Response ¶ 3, at 1-2.  It contends that Rodella has known since December 15, 2014, that his sentencing was scheduled for January 21, 2015, yet he filed the Motion to Continue a few days before the sentencing hearing and his Motion for a new trial is based on an issue that was raised over two months ago. See Motion to Continue Response ¶ 4, at 2.  It asserts that Rodella was delinquent in filing the Motion for a new trial, and that, because Motion for a new trial is meritless and untimely, the Court should deny the Motion to Continue.  See Motion to Continue Response ¶ 4, at 2.

4.      **The January 20, 2015, Hearing.**

The Court held a hearing on January 20, 2015.  See Transcript of Hearing (taken January 21, 2015)("Tr.").  Rodella asked the Court to continue the hearing so that he could subpoena Dr. Davidson, call Dr. Roll as a witness, and reply to the United States' Response.  See Tr. at 10:4-15 (Gorence).  At the hearing, Rodella stated that Dr. Davidson would not testify unless subpoenaed and that he did not have time to subpoena Dr. Davidson, because he received the notice about the hearing on Friday, January 16, 2015 -- four days before the hearing and the following Monday was a holiday.  See Tr. at 3:3-20 (Gorence).  Rodella stated that he tried to contact Dr. Roll after receiving notice about the hearing, but that Dr. Roll had not responded to

his calls or his letter.  <u>See</u> Tr. at 3:21-25 (Gorence).  Rodella stated that, other than what is in Dr. Roll's report, Dr. Roll would discuss each of the United States' questions at trial line by line.  <u>See</u> Tr. at 35:23-36:9 (Gorence, Court).  Rodella noted that, because Dr. Davidson would not testify without being subpoenaed, he does not know about what else Dr. Davidson would testify other than what is in the letter.  <u>See</u> Tr. at 38:21-39:21 (Gorence, Court).  Rodella asserted that he should be able to reply to the United States' response and that Dr. Roll should be able to testify at the hearing to show that the United States' use of the medical records was false, because no one could have known that the United States would use the medical records in a misleading manner.  <u>See</u> Tr. at 7:10-20 (Gorence).  He also contended that the medical records are more than impeachment material.  <u>See</u> Tr. at 7:22-23 (Gorence).  Rodella stated that, when he reviewed the medical records during the lunch hour at trial, he did not see the importance to the United States' cross-examination and that he did not have time to solicit an expert witness.  <u>See</u> Tr. at 8:12-16 (Gorence).  Rodella again argued that he was not dilatory in filing the Motion. <u>See</u> Tr. at 24:11-28:1 (Gorence).  He argued that, if the Court refuses to allow him to file a reply, he will file a motion to reconsider.  <u>See</u> Tr. at 30:17-20 (Gorence).  Rodella argued that he has a due-process right to file a reply brief.  <u>See</u> Tr. at 31:1-19 (Gorence).

The Court denied Rodella's request to continue the hearing.  <u>See</u> Tr. at 32:2-19 (Court). The Court noted that it was not denying Rodella the opportunity to present evidence or make arguments, because it had already given Rodella two evidentiary hearings on new trial motions. <u>See</u> Tr. at 77:12-17 (Court).  The Court stated that, because of the timing of the Motion, which was filed less than a week before Rodella was set to be sentenced, it would rule on the Motion. <u>See</u> Tr. at 78:8-12 (Court).

Mr. Bowles testified at the hearing.  <u>See</u> Tr. at 54:6-66:8 (Neda, Gorence, Bowles, Court).  Mr. Bowles testified that, before the charges against Rodella, Jr. were dismissed, the United States requested that the VA Hospital release Rodella, Jr.'s medical records to the United States.  <u>See</u> Tr. at 56:15-57:13 (Gorence, Bowles).  Mr. Bowles testified that the United States received a copy of the medical records, but that he did not know whether the United States ever provided Rodella with a copy.  <u>See</u> Tr. at 57:14-22 (Gorence, Bowles).  He testified that Ms. Neda told him that the United States would not provide Rodella with a copy of the medical records and that Mr. Bowles could do what he wanted with the records.  <u>See</u> Tr. at 58:5-15 (Gorence, Bowles).  Mr. Bowles testified that he did not remember the United States telling him to provide Rodella with the records and that he believed that he had a duty to Rodella, Jr. to keep his medical records confidential.  <u>See</u> Tr. at 16-59:4 (Gorence, Bowles).  Mr. Bowles testified that he did not think that Rodella, Jr. suffered from a medical condition that would affect his ability to perceive or recall the events from March 11, 2014, and that the United States' use of the medical records distorted Rodella, Jr.'s condition.  <u>See</u> Tr. at 59:23-60:19 (Gorence, Bowles); <u>id.</u> at 61:22-62:13 (Gorence, Bowles).  Mr. Bowles testified:

> I did not think that he suffered from any kind of mental defect to that extent. . . . I did see that there were times he indicated he had memory issues and which are pretty standard as far as PTSD from what I know of it.  But it did indicate in other parts he was medicating . . . he was doing well, I thought, it seemed to me the trial the way they were used in trial was a distortion to me of what his condition actually was.

Tr. at 60:10-19 (Bowles).  He testified that he did not think that the medical records contained any potential cross-examination materials and that he never informed Rodella that the medical records contained potential cross-examination materials:

> Q.    Did you ever interpret that there would be potential cross-examination on that testing data?

A.     In my experience, I would not, I mean I couldn't read the mind of the U.S. Attorney's.  I would think they would be presented through a doctor or an expert.  Those records themselves are hearsay, and from what I recall during the cross-examination the prosecutor was reading at times from the records which I thought was, did I didn't think would occur in trial and I would think they would be presented through an expert.

Tr. at 61:4-14 (Gorence, Bowles).  Mr. Bowles testified that he worked with Mr. Gorence in this case.  <u>See</u> Tr. at 63:7-13 (Neda, Bowles).  He also testified that he does not remember if Mr. Gorence ever asked him for Rodella, Jr.'s medical records.  <u>See</u> Tr. at 64:14-16 (Neda, Bowles).  Mr. Bowles concluded that Rodella, Jr. made statements to healthcare providers about being confused, and that his confusion is severe and affects him on a daily basis.  <u>See</u> Tr. at 64:21-65:8 (Neda, Bowles).

Rodella maintained that the United States never told Mr. Bowles to provide him with Rodella, Jr.'s medical records.  <u>See</u> Tr. at 5:5-12 (Gorence).  Rodella asserted that, after reviewing the medical records, Mr. Bowles did not see the importance of the records or how they concerned Rodella, Jr.'s mental competency.  <u>See</u> Tr. at 5:15-19 (Gorence).  Rodella argued that the United States had a duty to provide him with the medical records and that he wants an opportunity to brief the issue whether rule 16 required the United States to produce them.  <u>See</u> Tr. at 5:20-6:3 (Gorence).  He argued that the United States' use of the medical records was an ambush against him and was misleading.  <u>See</u> Tr. at 6:6-10 (Gorence).

When the Court asked why the United States had an obligation to produce the medical records, Rodella said that he had not done any research and wants to state why the United States had an obligation to produce the medical records in a reply brief.  <u>See</u> Tr. at 40:25-41:9 (Gorence, Court).  The Court asked if the medical records had to be produced under <u>Brady</u>, and Rodella said that they did, but admitted that he did not see anything in the medical records that were exculpatory to him.  <u>See</u> Tr. at 41:20-42:16 (Gorence, Court).  Rodella asserted that <u>Brady</u>

applies, because the medical records concern impeachment material, and because the United States used them in an attempt to show that Rodella, Jr. is mentally deficient.  See Tr. at 42:17-21 (Gorence, Court).  He further argued that the medical records corroborate the testimony of a key witness.  See Tr. at 45:19-46:7 (Gorence).  When asked if the medical records were discoverable under the Jencks Act,[5] Rodella refused to say without having the opportunity to conduct further research.  See Tr. at 42:25-43:25 (Gorence, Court).  The Court told Rodella that the Motion was briefed only on Sinclair and rule 16, and, during the hearing, he was trying to transform the Motion into a Brady and Jencks motion.  See Tr. at 51:10-18 (Court).  Rodella responded by discussing a different case that Mr. Gorence  had to argue that, if the United States had a duty to produce the medical records, Rodella's failure to discover the evidence before trial was not because of a lack of due diligence on his part.  See Tr. at 51:19-53:13 (Gorence)(citing United States v. Reese, No. CR 11-2294 RB, 2013 WL 6916833 (D.N.M. Feb. 1, 2013)(Browning, J.), rev'd by 745 F.3d 1075 (10th Cir. 2014)).

Rodella argued that, because the medical records were reports and examinations, they had to be disclosed under rule 16.  See Tr. at 45:6-14 (Gorence).  He argued that the medical records were testing data that the United States used in a fraudulent fashion and that the United States made no attempt to justify its cross-examination questions with expert testimony.  See Tr. at 49:7-19 (Gorence).  Rodella also asserted that rules 16(a)(1)(E) and 16(a)(1)(F) required the United States to disclose the medical records.  See Tr. at 68:15-70:11 (Gorence, Court).  He argued that, because he did not see the medical records, and because Mr. Bowles did not think

---

[5]In Jencks v. United States, the Supreme Court of the United States of America held that a criminal defendant in a federal prosecution has the right to any "relevant statements or reports" in the United States' possession relating to its witnesses and "touching the subject matter of their testimony at trial."  353 U.S. at 671-72.  This holding was codified in 18 U.S.C. § 3500, which provides that the United States does not have to produce the statements or reports until after a witness testifies at trial.  See 18 U.S.C. §§ 3500(a), (b).

they could be used in the manner that the United States used them, there was no way he could have prepared for the United States' cross-examination.  See Tr. at 73:13-74:1 (Gorence). Rodella argues that the jury did not completely believe Tafoya's testimony and that, without the medical records, the jury would have found Rodella, Jr. credible if they heard Dr. Davidson or someone else testify.  See Tr. at 75:1-18 (Gorence).

The United States responded by arguing that Dr. Roll's report is mainly a disapproval of the United States' cross-examination.  See Tr. at 13:14-16 (Neda).  It contended that the majority of its cross-examination consisted of statements that Rodella, Jr. made to his psychiatrists.  See Tr. at 13:18-14:12 (Neda).  The United States maintained that the cross-examination did not surprise Rodella, because the United States dismissed the indictment against Rodella, Jr., based on information in the medical records.  See Tr. at 14:24-15:4 (Neda).  The United States contended that Rodella could have easily obtained the medical records from Mr. Bowles or Rodella, Jr.  See Tr. at 15:7-13 (Neda).  It repeated its arguments that Rodella did not seek the records from the VA Hospital through a subpoena or from the United States through a motion to compel.  See Tr. at 15:15-18 (Neda).  The United States argued that the medical records would have given Rodella notice of its cross-examination materials, because they contained Rodella Jr.'s statements that he was confused, and because they show that Rodella, Jr. was taking medication near the time of the March 11, 2014, incident.  See Tr. at 16:3-8 (Neda).  It argued that Rodella was aware of the case law concerning the admissibility of medical records, psychiatric or psychological ailments, and of prescription drugs, because of a sealed document concerning the admissibility of similar evidence concerning another witness.  See Tr. at 16:9-17:9 (Neda, Court)(referring to the MIL).  The United States argued that it had a burden to produce evidence that it used in its case-in-chief, and that rule 16 does not require it to produce

impeachment materials.  See Tr. at 17:25-18:6 (Neda).  It maintained that, even if the Court accepts Dr. Davidson's letter as true, Rodella fails to meet the Sinclair standard for a new trial. See Tr. at 19:8-22 (Neda).  The United States argued that the Rodella knew about Dr. Davidson and the medical records before trial, but made no effort to obtain either of them.  See Tr. at 19:23-20:1 (Neda).

The Court stated that Rodella failed to establish four of the five Sinclair factors and that it would deny the Motion.  See Tr. at 86:19-24 (Court).  The Court noted that, in the Motion, Rodella did not argue that the medical records were Brady material, but stated that, if Rodella was considering filing a new motion arguing a Brady violation, the Court was inclined to think that Brady did not cover the records.  See Tr. at 87:4-22 (Court).  After the Court denied the Motion, Rodella conceded that there was no reason to continue the sentencing.  See Tr. at 89:7-10 (Gorence, Court).  The Court stated that, based on the record, the United States did not have a duty to turn over the medical records to Rodella.  See Tr. at 90:10-18 (Gorence, Court). The Court also made a finding that Mr. Bowles' testimony was credible.  See Tr. at 92:17-93:2 (Gorence, Court).

## LAW REGARDING RULE 16

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

**(E)    Documents and Objects.**  Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

  **(i)**    the item is material to preparing the defense;

  **(ii)**    the government intends to use the item it its case-in-chief at trial; or

  **(iii)**    the item was obtained from or belongs to the defendant.

- 23 -

Fed. R. Crim. P. 16(a)(1)(E).  Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition."  United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing Jencks v. United States, 353 U.S. at 667).  Rule 16 also does not obligate the United States to "take action to discover information which it does not possess."  United States v. Badonie, No. CR 03-2062 JB, 2005 WL 2312480, at *2 (D.N.M. Aug. 29, 2005)(Browning, J.)(quoting United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991))(internal quotation marks omitted).  Nor is the United States required to secure information from third parties.  See United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal."  United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(internal quotation marks omitted)(quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993))(internal quotation marks omitted).  "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor."  United States v. Graham, 83 F.3d at 1474 (alterations omitted)(citations omitted)(internal quotation marks omitted).

Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" Rule 16.  United States v. Wicker, 848 F.2d 1059, 1060 (10th Cir. 1988).

      **(2)**    **Failure to Comply.**  If a party fails to comply with this rule, the court may:

          **(A)**    order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;

          **(B)**    grant a continuance;

          **(C)**    prohibit that party from introducing the undisclosed evidence; or

          **(D)**    enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2). "In selecting a proper sanction, a court should typically consider (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance." United States v. Charley, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks omitted)(quoting United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999)).

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES

      The Due Process Clause of the Constitution of the United States of America requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87.  The Supreme Court of the United State of America has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See Giglio, 405 U.S. 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'"  (quoting United States v. Bagley,

473 U.S. 667, 676 (1985)); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence."). Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence: "Regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government." Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682). See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

1.       **Material Exculpatory Evidence Under Brady.**

"The Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995). Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." Brady, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994). The Tenth Circuit has also stated that evidence is material

if it "might meaningfully alter a defendant's choices before and during trial . . . including whether the defendant should testify." Case v. Hatch, 731 F.3d 1015 (10th Cir. 2013)(quoting United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009))(internal quotation marks omitted).

"To be material under Brady, undisclosed information or evidence acquired through that information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(quoting United States v. Kennedy, 890 F.2d at 1059). The Supreme Court, in Cone v. Bell, 556 U.S. 449 (2009), noted:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by Brady, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations. See Kyles, 514 U.S. at 437 ("[T]he rule in Bagley (and, hence, in Brady) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)"). See also ABA Model Rules of Professional Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; defendants have no obligation to first point out that such materials exist. See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached."); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses),

overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United

States v. Padilla, No. CR 09-3598 JB, 2011 WL 1103876, at *6 (D.N.M. Mar. 14,

2011)(Browning, J.).  This obligation means that the United States must "volunteer exculpatory

evidence never requested, or requested only in a general way."  Kyles v. Whitley, 514 U.S. at

433 (internal quotation marks omitted).  Additionally, "[u]nder Brady, the good or bad faith of

government agents is irrelevant."  United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982).

"This means, naturally, that a prosecutor anxious about tacking too close to the wind will

disclose a favorable piece of evidence."  Kyles v. Whitley, 514 U.S. at 439.

      2.      **Timing of the Disclosure Under Brady.**

"The obligation of the prosecution to disclose evidence under Brady can vary depending

on the phase of the criminal proceedings and the evidence at issue."  United States v. Harmon,

871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.).  As a general matter, "[s]ome

limitation on disclosure delay is necessary to protect the principles articulated in Brady v.

Maryland."  United States v. Burke, 571 F.3d at 1054.  The Tenth Circuit has recognized,

however, that "[i]t would eviscerate the purpose of the Brady rule and encourage gamesmanship

were we to allow the government to postpone disclosures to the last minute, during trial."  United

States v. Burke, 571 F.3d at 1054.  "[T]he belated disclosure of impeachment or exculpatory

information favorable to the accused violates due process when an 'earlier disclosure would have

created a reasonable doubt of guilt.'"  United States v. Burke, 571 F.3d at 1054.  As the Tenth

Circuit has stated:

> Where the district court concludes that the government was dilatory in its
> compliance with Brady, to the prejudice of the defendant, the district court has
> discretion to determine an appropriate remedy, whether it be exclusion of the
> witness, limitations on the scope of permitted testimony, instructions to the jury,
> or even mistrial.

United States v. Burke, 571 F.3d at 1054.  Notably, "not every delay in disclosure of Brady material is necessarily prejudicial to the defense."  United States v. Burke, 571 F.3d at 1056. "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial."  United States v. Burke, 571 F.3d at 1056.

Once a prosecutor's obligations under Brady have been triggered, however, they "continue[] throughout the judicial process."  Douglas v. Workman, 560 F.3d at 1173.  For instance, the prosecutor's obligation to disclose Brady material can arise during trial.  See United States v. Headman, 594 F.3d at 1183 (10th Cir. 2010)("Although Brady claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until trial is underway.").  The disclosure obligation continues even while a case is on direct appeal. See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir. 1997)(applying Brady to a claim that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of impeachment information."  United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not.").  The Supreme Court recognized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." United States v. Ruiz, 536 U.S. at 632 (emphasis in original).  The Supreme Court acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but

concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632. The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630. The Supreme Court explained that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice." United States v. Ruiz, 536 U.S. at 630. The Tenth Circuit has reiterated these principles from United States v. Ruiz:

> Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence. The Supreme Court, however, foreclosed this exact argument in United States v. Ruiz, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement. Ruiz emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances -- even though the defendant may not know the specific detailed consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished)(quoting United States v. Ruiz, 546 U.S. at 630).[6]

_____

[6]United States v. Johnson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

The Tenth Circuit has held, however, that <u>United States v. Ruiz</u> does not apply to exculpatory evidence but rather applies only to impeachment evidence:

> <u>Ruiz</u> is distinguishable in at least two significant respects.  First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence.  Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea.  Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in <u>Ruiz</u> that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a <u>Brady</u> violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

<u>United States v. Ohiri</u>, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished).  The Tenth Circuit qualified its holding in <u>United States v. Ohiri</u>, however, stating that the case presented "unusual circumstances."  133 F. App'x at 562.

The United States Courts of Appeals "have split on the issue whether <u>Brady v. Maryland</u>'s restrictions apply to suppression hearings."  <u>United States v. Harmon</u>, 871 F. Supp. 2d at 1151.  In an unpublished opinion, the Tenth Circuit, without discussing whether <u>Brady</u> applies to a suppression hearing, rejected a defendant's argument that the prosecution violated

---

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that <u>United States v. Johnson</u>, <u>United States v. Ohiri</u>, 133 F. App'x 555 (10th Cir. 2005)(unpublished), <u>Ortlieb v. Howery</u>, 74 F. App'x 853 (10th Cir. 2003)(unpublished), <u>United States v. Johnson</u>, 117 F.3d 1429, 1997 WL 381926 (10th Cir. 1997)(unpublished table decision), and <u>United States v. Shayesteh</u>, 161 F.3d 19 (10th Cir. Oct. 6, 1998)(table opinion)(unpublished), have persuasive value with respect to a material issue, and will assist the court in its disposition of this Memorandum Opinion and Order.

Brady by failing to disclose impeachment evidence before a suppression hearing on the basis that

the evidence was not impeachment evidence and not material.  See United States v. Johnson, 117

F.3d 1429, 1997 WL 381926, at *3 (10th Cir. 1997)(unpublished table decision).  Specifically,

the Tenth Circuit found:

> [D]isclosure of the evidence existing at the time of the hearing, even if
> impeaching, would not establish a reasonable probability that the outcome of the
> suppression hearing would have been different.  First, we question whether the
> evidence in question would have been admitted at the suppression hearing.  Even
> if it had been admitted, however, in light of [the defendant's] lack of truthfulness,
> our confidence in the result of the hearing has not been undermined.  Therefore,
> we hold that the evidence was not material, and that its nondisclosure by the
> prosecution does not constitute a Brady violation.

United States v. Johnson, 1997 WL 381926, at *3 (citation omitted).

The United States Court of Appeals for the District of Columbia Circuit has recognized

that "it is hardly clear that the Brady line of Supreme Court cases applies to suppression

hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment,

yet Brady rests on the idea that due process is violated when the withheld evidence is 'material

either to guilt or to punishment.'"   United States v. Bowie, 198 F.3d 905, 912 (D.C. Cir.

1999)(citation omitted).  Without deciding the issue and in an unpublished opinion, the United

States Court of Appeals for the Sixth Circuit quoted with approval this language from United

States v. Bowie.   See United States v. Bullock, 130 F. App'x 706, 723 (6th Cir.

2005)(unpublished)("Whether the suppression hearing might have come out the other way,

however, is of questionable relevance to the Brady issues at stake here.").

The Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held,

before the Supreme Court issued its United States v. Ruiz decision, that Brady applies to

suppression hearings.  See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e

hold that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965-66 (5th Cir. 1990)("Timing is critical to proper Brady disclosure, and objections may be made under Brady to the state's failure to disclose material evidence prior to a suppression hearing."), vacated on other grounds, 503 U.S. 930 (1992).   The United States Court of Appeals for the Seventh Circuit held that, under its precedent and the law from other circuits, it was not "obvious" for clear-error purposes that "Brady disclosures are required prior to suppression hearings."   United States v. Stott, 245 F.3d 890, 902 (7th Cir. 2001).   The Court has previously observed that, although the United States Courts of Appeals have split on whether Brady applies to suppression hearings, "it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea."   United States v. Harmon, 871 F. Supp. 2d at 1151.

## LAW REGARDING THE JENCKS ACT

In Jencks v. United States, 353 U.S. 657, 667 (1957), the Supreme Court held that a "criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial."   353 U.S. at 672.   In so holding, the Supreme Court recognized that the

> rational of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

353 U.S. at 671.   The holding of Jencks v. United States was later codified into 18 U.S.C. § 3500.   See United States v. Kimoto, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that, "the Jencks Act, 18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in Jencks v. United States, 353 U.S. 657 . . . ").

Section 3500 of Title 18 of the United States Code provides:

**(a)**     In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)**     After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.   If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §§ 3500(a)-(b).   "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified." United States v. Lujan, 530 F. Supp. 2d at 1232 (quoting 18 U.S.C. §§ 3500(a) & (b)).   The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment." Palermo v. United States, 360 U.S. 343, 349 (1959). The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants materials usable for the purposes of impeachment." United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo v. United States, 360 U.S. at 352).

The Jencks Act defines statements as:

**(1)**     a written statement made by said witness and signed or otherwise adopted or approved by him;

**(2)**    a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

**(3)**    a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

The Tenth Circuit has held: "Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim." United States v. Smith, 984 F.2d 1084, 1086 (10th Cir. 1993). At least one district court within the Tenth circuit has distinguished interview notes from reports that "embody only the agent's epitomization, interpretation, or impression of an interview," finding that the latter are not producible under the Jencks Act. United States v. Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.). In United States v. Lujan, the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, explained that rough interview notes may be discoverable under the Jencks Act, when a defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes contained exculpatory evidence not included in any formal interview report provided to the defense." 530 F. Supp. 2d at 1266. Judge Brack went on to hold that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500. 530 F. Supp. 2d at 1267. See United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy.  See United States v. Smaldone, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness.").  To satisfy this burden, the defendant need not prove that particular materials are within the scope of the Jencks Act, as the documents are not in the defendant's possession, but rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry."  United States v. Smith, 984 F.2d at 1086 (quoting Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962)).  The defendant's demand for documents under the Jencks Act must be sufficiently precise for a court to identify the requested statements.  See United States v. Smith, 984 F.2d at 1086.  For example, in United States v. Smith, the Tenth Circuit found that a defendant had met his burden and made a prima facie showing that a statement of a witness existed which may be producible under the Jencks Act when a government witness testified during the United States' case-in-chief that she had been interviewed by a government agent before testifying, and the defense counsel moved for production of the notes.  See 984 F.2d at 1085-86.  Once the defendant makes a prima facie showing that a witness statement exists that may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement.  See 984 F.2d at 1086.

In United States v. Fred, No. CR 05-801 JB, the Court ordered the United States to produce "any personal notes or investigative materials that Federal Bureau of Investigation" agents "may have created regarding an interview" with the defendant.  No. CR 05-801 JB, Order at 1, filed November 8, 2006 (Doc. 86).  The Court required the United States to disclose the notes and investigative materials in a timely manner, so that the defendant could properly

prepare for cross-examination of the FBI agent who conducted the interview at trial.  See No. CR 05-801 JB, Order at 1-2.  The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes, generated from interviews with defendants, holding that the notes must be turned over to the defendants after the agents testify at trial.  See United States v. Goxcon-Chagal, No. CR 11-2002 JB, 2012 WL 3249473, at *2, *6 (D.N.M. Aug. 4, 2012)(Browning, J.).  In United States v. Tarango, 760 F. Supp. 2d 1163 (D.N.M. 2009)(Browning, J.), the Court, applying 18 U.S.C. § 3500, held that the United States must produce Federal Bureau of Investigation ("FBI") agents' 302s, after the United States' witnesses testified at trial, to the extent those reports contained statements from witnesses who testified at trial.  See 760 F. Supp. 2d at 1164, 1167.

## LAW REGARDING MOTIONS FOR A NEW TRIAL

The Federal Rules of Civil Procedure and case law governs motions for new trial.  "A motion for a new trial is not regarded with favor and should only be granted with great caution."  Sinclair, 109 F.3d at 1531 (citing United States v. Chatman, 994 F.2d 1510, 1518 (10th Cir. 1997)).

**1.    Rule 33.**

Rule 33 of the Federal Rules of Criminal Procedure provides:

**(a)    Defendant's Motion.**  Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.  If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

**(b)    Time to File.**

**(1)    Newly Discovered Evidence.**  Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty.  If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

> **(2)**     **Other Grounds.** Any motion for a new trial grounded on
> any reason other than newly discovered evidence must be
> filed within 7 days after the verdict or finding of guilty.

Fed. R. Crim. P. 33 (bolded in original).   Any motion for a new trial grounded on newly

discovered evidence is timely if filed within three years after the verdict.   <u>See</u> Fed. R. Crim. P.

33(b)(1).   Under rule 33, the district court has discretion to grant a new trial if the interests of

justice require one.   <u>See</u> Fed. R. Crim. P. 33(a).

### 2.     <u>Motion for a New Trial Based on Alleged <u>Sinclair</u> Claims</u>.

Rule 33 permits a defendant to move for a new trial in the event of newly discovered

evidence so long as that motion is presented within three years of the verdict of guilt.   <u>See</u> Fed.

R. Crim. P. 33(b)(1).   Ordinarily, a defendant seeking a new trial under rule 33(b)(1) must satisfy

a five-part test for newly discovered evidence that the Tenth Circuit outlined in <u>United States v.

Sinclair</u>.   <u>See</u> 109 F.3d at 1531.   When a rule 33 movant presents such evidence, the court must

determine whether he or she has met a five-part test; specifically, the defendant must show that:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence
> was not caused by his own lack of diligence; (3) the new evidence is not merely
> impeaching; (4) the new evidence is material to the principal issues involved; and
> (5) the new evidence is of such a nature that in a new trial it would probably
> produce an acquittal.

<u>United States v. Sinclair</u>, 109 F.3d at 1531 (internal quotations omitted).   <u>See</u> <u>United States v.

Quintanilla</u>, 193 F.3d 1139, 1147 (10th Cir. 1999)(discussing the rule 33 test set forth in <u>United

States v. Sinclair</u>, 109 F.3d at 1531).

### 3.     <u>Law Regarding Motions for a New Trial Based on Alleged <u>Brady</u> Violations</u>.

When the United States withholds evidence on demand of a defendant that, if made

available, would tend to exculpate him, such suppression of evidence can violate the defendant's

due-process rights.   <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. at 87.   Upon the defendant's motion, the

court may vacate any judgment and grant a new trial if the interest of justice so requires.  See Fed. R. Crim. P. 33(a).

A defendant seeking a new trial based on an alleged Brady violation has the burden to demonstrate that: "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material."  United States v. Velarde, 485 F.3d 553, 558 (10th Cir. 2007).  "An open file policy is neither mandated by the Constitution . . . nor is it ipso facto constitutionally sufficient."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 828 (citations omitted)(internal quotation marks omitted).  "While an open file policy may suffice to discharge the prosecution's Brady obligations in a particular case, it often will not be dispositive of the issue."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 828 (internal quotation marks omitted).

> On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more.  But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached.  This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.  But whether the prosecutor succeeds or fails in meeting this obligation . . . the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

Kyles v. Whitley, 514 U.S. 419, 438 (1995)(internal citations omitted).

The United States' good faith or bad faith is irrelevant.  See Brady v. Maryland, 373 U.S. at 87.  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."  Kyles v. Whitley, 514 U.S. at 439.  The United States has an obligation to "volunteer exculpatory evidence never requested, or requested only in a general way," although the obligation only exists "when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair trial."  Kyles v.

Whitley, 514 U.S. at 433 (internal quotation marks omitted).  On the other hand, "[t]he Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 823.  "'[T]he government typically is the sole judge of what evidence in its possession is subject to disclosure' and it acts at its own peril by failing to comply adequately with an order requiring disclosure of Brady material."  United States v. Lujan, 530 F. Supp. 2d 1224, 1230 (D.N.M. 2008)(Brack, J.)(quoting United States v. Presser, 844 F.2d 1275, 1281 (6th Cir. 1988)).

Under Brady, the Supreme Court has held that an "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  Kyles v. Whitley, 514 U.S. at 437.  "There is no Brady violation where the defendant knew or should have known of the material, exculpatory information or where the information was available to him from another source."  United States v. Lujan, 530 F. Supp. 2d at 1230 (citing United States v. Graham, 484 F.3d 413, 417 (6th Cir. 2007)("Further, there is no Brady violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source."  (citation omitted)(internal quotation marks omitted)).

Impeachment evidence falls under Brady when the reliability of a given witness may be determinative of a defendant's guilt or innocence.  See Giglio, 405 U.S. at 154.  Brady obligates the prosecution to disclose "evidence affecting credibility."  Giglio, 405 U.S. at 154.

       **a.**      **Suppression.**

The Tenth Circuit explained in Smith v. Secretary of New Mexico Department of Corrections that, "while proof the prosecutor had actual knowledge of the existence of the

evidence at issue would be sufficient to establish the suppression element of a <u>Brady</u> claim, such proof is by no means necessary."  50 F.3d at 824.  In <u>United States v. Hernandez-Muniz</u>, 170 F.3d 1007 (10th Cir. 1999), the Tenth Circuit found that the United States did not suppress information when it did not provide the defendant with his own statement made to an agent through discovery, but instead provided the defendant with the agent's statements at a preliminary hearing.  <u>See</u> 170 F.3d at 1010.  The Tenth Circuit held that the United States did not suppress the defendant's statement, because it "provided the allegedly exculpatory information at the preliminary hearing" and "due process does not necessarily require disclosure in a specific form or manner."  <u>United States v. Hernandez-Muniz</u>, 170 F.3d at 1011.

Under <u>Kyles v. Whitley</u>, the prosecution's actual possession of the information is irrelevant.  Every federal prosecutor "has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case."  <u>Kyles v. Whitley</u>, 514 U.S. at 437.  The "prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request."  <u>United States v. Summers</u>, 414 F.3d at 1304 (citing <u>Scott v. Mullin</u>, 303 F.3d 1222, 1228 n.2 (10th Cir. 2002)).

The Constitution of the United States of America, however, "does not grant criminal defendants the right to embark on a 'broad or blind fishing expedition among documents possessed by the Government.'"  <u>United States v. Mayes</u>, 917 F.2d 457, 461 (10th Cir. 1990)(quoting <u>Jencks v. United States</u>, 353 U.S. 657, 667 (1957)).   A defendant's mere allegation that the requested information might be material does not entitle him to an unsupervised search of the government's files.  <u>See</u> <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39 (1987).  The <u>Brady</u> rule is not an evidentiary rule that grants broad discovery powers to a defendant, because there "is no general constitutional right to discovery in a criminal case."  <u>Weatherford v.</u>

Bursey, 429 U.S. 545, 559 (1977).   See Downs v. Hoyt, 232 F.3d 1031, 1037 (9th Cir.

2000)("Brady does not require a prosecutor to turn over files reflecting leads and ongoing

investigations where no exonerating or impeaching evidence has turned up.").

> [T]here is no constitutional requirement that the prosecution make a complete and
> detailed accounting to the defense of all police investigatory work on a case . . . .
> The mere possibility that an item of undisclosed information might have helped
> the defense, or might have affected the outcome of the trial, does not establish
> materiality in the constitutional sense.

United States v. Agurs, 427 U.S. 97, 109-10 (1976)(citations omitted)(internal quotation marks

omitted)), overruled on other grounds by United States v. Bagley, 473 U.S. at 667.

Brady requires disclosure of information only in the government's possession or

knowledge, whether actual or constructive.   See United States v. Beers, 189 F.3d 1297, 1304

(10th Cir. 1999); Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 825 n. 36 (noting that,

because district attorney's office had actual knowledge that there was a separate investigation by

authorities in a separate county, it was reasonable to impute knowledge possessed by the separate

county to prosecution).   "While a prosecutor cannot avoid his Brady obligations by keeping

himself in ignorance or compartmentalizing information . . . neither does the government have an

affirmative duty under Brady to seek out information that is not in its or its agents' possession."

United States v. Lujan, 530 F. Supp. 2d at 1231 (citing United States v. Graham, 484 F.3d

at 415-18 (stating that there is no affirmative duty to discover information in possession of

independent, cooperating witness and not in government's possession))(citation omitted).   See

United States v. Moore, 25 F.3d 563, 569 (7th Cir. 1994)(concluding Brady was not violated

where both parties learned after trial that government witness had previous conviction for

obstruction of justice and government did not possess knowledge of this information until after

trial); United States v. Baker, 1 F.3d 596, 598 (7th Cir. 1993)("Certainly, Brady does not require

the government to conduct discovery on behalf of the defendant."); United States v. Flores, 540 F.2d 432, 437 (9th Cir. 1976)(noting that government has no duty to fish through public records equally accessible to defense to collate information).

The Brady doctrine is nonetheless interpreted broadly to encourage prosecutors to carry out their "'duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" United States v. Combs, 267 F.3d 1167, 1174-75 (10th Cir. 2001)(quoting Kyles v. Whitley, 514 U.S. at 437-38). "Information possessed by other branches of the federal government, including investigating officers, is typically imputed to the prosecutors of the case." United States v. Beers, 189 F.3d at 1304. The Tenth Circuit in United States v. Beers held, however, that the state's knowledge and possession of potential impeachment evidence cannot be imputed to a federal prosecutor for purposes of Brady where there is no joint investigation by federal and state officials. See 189 F.3d at 1304. See also United States v. Romo, 914 F.2d 889, 899 (7th Cir. 1990)(holding that court did not err in denying request to compel prosecutors to make various inquires of local police in absence of showing by defendant that specific material, exculpatory information existed of which government knew). The Tenth Circuit in United States v. Beers, left open, however, the question whether knowledge possessed by state officials would be imputed to the federal prosecutor where the federal government participated in a joint investigation with state officials. See 189 F.3d at 1304 n.2.

At least one court has held that a duty to search files maintained by governmental agencies closely aligned with the prosecution may be triggered when there is a reasonable prospect or notice of finding exculpatory evidence. See United States v. Brooks, 966 F.2d 1500, 1502-04 (D.C. Cir. 1992). The Tenth Circuit quoted this holding from United States v. Brooks

and indicated its approval, but ultimately declined to definitively resolve the issue. See United States v. Combs, 267 F.3d at 1175. It is therefore an open question in this Circuit as to the extent of the government's duty to investigate files of state agencies participating in a joint investigation with federal officials.

The Sixth Circuit has held

> Brady and its progeny have recognized a duty on the part of the prosecutor to disclose material evidence that is favorable to the defendant over which the prosecution team has control. "But Brady clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess."

United States v. Graham, 484 F.3d 413, 417 (6th Cir. 2006)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975))(emphasis added). In United States v. Graham, a witness cooperating with the United States failed to disclose fifteen boxes of records that he possessed. See 484 F.3d at 417. The Sixth Circuit held that the government did not suppress the records, because they were not in the government's possession, even though the witness was cooperating and even though the government knew of the existence of the boxes in the witness' possession. See United States v. Graham, 484 F.3d at 417. The Sixth Circuit stated that "'Brady is concerned only with cases in which the government possesses information which the defendant does not.'" United States v. Graham, 484 F.3d at 417 (quoting United States v. Mullins, 22 F.3d 1365, 1371 (1994)). The Sixth Circuit stated: "Further, there is no Brady violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." United States v. Graham, 484 F.3d at 417.

b.     **Favorability.**

The evidence in question must be exculpatory or favorable to the defendant.  See  Smith

v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 825; United States v. Gray, 52 F. App'x. 945, 947

(9th Cir. 2002)(unpublished)(holding that medical records of the alleged victim containing

extensive impeaching evidence bearing on her ability and inclination to accurately and truthfully

perceive, remember, and relate what occurred were favorable to the defendant because they were

impeachment material).  "It is precisely because defense counsel does not, and cannot, know

what potentially exculpatory evidence the prosecutor possesses that there cannot realistically be

any meaningful distinction between the prosecutor's obligation under Brady in a general request

case and its obligation in a no request case."  Smith v. Sec'y Dep't of Corr., 50 F.3d at 826-27

(internal quotations omitted).   The prosecution has an obligation to disclose obviously

exculpatory evidence regardless whether the defense has requested it.  See Smith v. Sec'y Dep't

of Corr., 50 F.3d at 827 (emphasis in original).

c.     **Materiality.**

"To make the materiality determination, [the court] view[s] the evidence's significance in

relation to the record as a whole."  United States v. Hughes, 33 F.3d 1248, 1252 (10th Cir. 1994).

Evidence is "material" for purposes of granting a new trial on an alleged Brady violation "only if

there is a reasonable probability that, had the evidence been disclosed to the defense, the result of

the proceeding would have been different."  United States v. Velarde, 485 F.3d at 559 (internal

quotations omitted).   "A reasonable probability is a probability sufficient to undermine

confidence in the outcome."  United States v. Velarde, 485 F.3d at 559 (quotations and citations

omitted).

"One does not show a <u>Brady</u> violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Kyles v. Whitley</u>, 514 U.S. at 435.  In evaluating materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Kyles v. Whitley</u>, 514 U.S. at 434.  The Tenth Circuit notes:

> Under this more flexible, sliding scale approach to assessing the materiality <u>vel non</u> of the evidence in question, the specificity of the request is inversely related to the prosecution's disclosure obligation.  As the specificity of the defendant's request increases, a lesser showing of materiality will suffice to establish a violation.  Conversely, as the defendant's request becomes more general or even nonexistent, a greater showing of materiality is required to establish a <u>Brady</u> violation.

<u>Smith v. Sec'y Dep't of Corr.</u>, 50 F.3d at 827.

Failure to disclose a specifically requested report is "seldom, if ever excusable." <u>Smith v. Sec'y Dep't of Corr.</u>, 50 F.3d at 830 (internal quotations omitted).  "A showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." <u>Scott v. Mullin</u>, 303 F.3d 1222, 1230-31 (10th Cir. 2002)(internal quotation marks omitted).

When the subject matter on which a witness' credibility will be attacked is directly related to the central issue presented by the trial, the United States' theory of the case can be severely undermined. <u>See United States v. Gurrola</u>, No. 02-20044-01 CM, 2002 WL 31941469, at *4 (D. Kan. Dec. 16, 2002)(Murguia, J.)(granting a new trial when the United States suppressed impeachment evidence addressing the credibility of a key government witness).

When the issue at trial is the veracity of the allegation of sexual abuse, the United States Court of Appeals for the First Circuit has characterized the evidentiary value of suppressed false allegations as "very powerful" and "far more potent than a random unrelated episode of untruthfulness." Ellsworth v. Warden, 333 F.3d 1, 6 (1st Cir. 2003)(en banc)(granting a new trial if the evidence of false allegations was admissible under state law); State v. Long, 140 S.W.3d 27, 28, 31 (Mo. 2004)(granting a new trial when the court excluded evidence of the alleged victim's false allegations, because the witness' credibility was "the key factor in determining guilt or acquittal," and holding that the "defendant's constitutional right to present a full defense" must be honored). The Sixth Circuit, in granting a new trial has held that, when "there is no physical evidence supporting the prosecution's case, the truthfulness or lack of truthfulness of the complainant is a matter of crucial importance." Mathis v. Berghuis, 90 F. App'x 101, 107 (6th Cir. 2004)(unpublished)(granting a new trial because evidence of the alleged victim's false allegations had been suppressed).

**LAW REGARDING THE RIGHT TO PRIVACY IN MEDICAL RECORDS**

The Due Process Clause of the Fourteenth Amendment protects the right of privacy. See Flanagan v. Munger, 890 F.2d 1557, 1570 n.15 (10th Cir. 1989); Mangels v. Pena, 789 F.2d 836, 839 (10th Cir. 1986). The Tenth Circuit has recognized that the right to privacy protects government employees from their employers improperly attempting to obtain the private medical history or records. See Lankford v. City of Hobart, 27 F.3d 477, 479 (10th Cir. 1994). Although the Tenth Circuit in Lankford v. City of Hobart found a violation of the right of privacy under the facts in that case, it did not discuss the manner in which a court should determine generally when a violation of the privacy right occurs. See 27 F.3d at 479-80. Flanagan v. Munger provides some instruction on this point. In Flanagan v. Munger, the Tenth Circuit employed a

balancing test to determine when disclosure by the government of private information amounts to violation of the right to privacy.  See Flanagan v. Munger, 890 F.2d at 1570.  Specifically, a court must inquire: "(1) if the party asserting the right has a legitimate expectation of privacy; (2) if disclosure serves a compelling state interest; and (3) if disclosure can be made in the least intrusive manner."  890 F.2d at 1570.  The Tenth Circuit held that the plaintiffs, police officers who owned an adult video store, did not suffer a violation of their privacy rights when their ownership was disclosed, noting that "only highly personal information is protected."  890 F.2d at 1570.  See Mangels v. Pena, 789 F.2d at 839 ("The legitimacy of an individual's expectations depends, at least in part, upon the intimate or otherwise personal nature of the material . . . .").  In Ortlieb v. Howery, 74 F. App'x 853 (10th Cir. 2003)(unpublished), the Tenth Circuit applied the balancing test set forth in Flanagan v. Munger and held that the plaintiff did not have a reasonable expectation of confidentiality in her X-ray.  See 74 F. App'x at 857.  In reaching its conclusion, the Tenth Circuit in Ortlieb v. Howery noted that the plaintiff's broken leg was not confidential information, because the plaintiff had contacted her employer seeking extended medical leave given the severity of her injury, and the injury was "well-known and publicized with no intrusion into her personal affairs."  74 F. App'x at 857.  The Tenth Circuit also observed that, because the plaintiff had "supported her request for an indefinite extension of medical benefits with her doctor's report stating that his opinion of continuing disability was corroborated with her x-rays, she had no reasonable expectation that the x-rays themselves would be confidential or protected from her supervisor's reach or purview."  74 F. App'x at 857.  Finally, the Tenth Circuit noted that "the x-rays, unlike written medical records, contained no facts or information of an intimate or personal nature about which Ms. Ortlieb could form a

legitimate or reasonable expectation of confidentiality notwithstanding her claim for benefits."
74 F. App'x at 857.

In Kerns v. Board of Commissioners, 707 F. Supp. 2d 1190 (D.N.M. 2010)
(Browning, J.), rev'd by 663 F.3d 1173 (2011), the Court used the Tenth Circuit's balancing test
from Flanagan v. Munger to determine whether a sheriff who obtained the plaintiff's medical
records violated the plaintiff's privacy right under the Fourteenth Amendment, finding that
(i) the plaintiff had a legitimate expectation of privacy in his medical and psychiatric records,
because he believed that the medical and mental health records were confidential and private;
(ii) the sheriff's department had a compelling state interest in the records, because of its interest
in enforcing 18 U.S.C. § 922(g)(4), which makes it unlawful for a person who has been
"adjudicated as a mental defective" or who has been "committed to a mental institution" to
possess firearms, and ensuring that the plaintiff did not fit that category; and (iii) the state could
have achieved its objectives in a less intrusive manner by making a more particularized request
for records, rather than requesting to "review all records."   707 F. Supp. 2d at 1256-57.
Balancing these factors, the Court concluded that the plaintiff met its burden on summary
judgment to demonstrate that the sheriff violated his constitutionally protected right to privacy.
See 707 F. Supp. 2d at 1257.  The Court noted that the sheriff had not relied on HIPAA when he
requested the records; the law-enforcement exception in HIPAA allows HIPAA-covered entities
to disclose protected healthcare information in six circumstances:

> (i) as required by law-court orders, subpoenas, warrants; (ii) to identify or locate a
> suspect, fugitive, material witness, or missing person; (iii) in response to a
> law-enforcement official's request for information about a victim or suspected
> victim of a crime; (iv) to alert law enforcement of a person's death, if the covered
> entity suspects that criminal activity caused the death; (v) when a covered entity
> believes that protected health information is evidence of a crime that occurred on
> its premises; and (vi) by a covered health-care provider in a medical emergency
> not occurring on its premises, when necessary to inform law enforcement about

the commission and nature of a crime, the location of the crime or crime victims,
and the perpetrator of the crime.

707 F. Supp. 2d at 1259 (citing 45 C.F.R. § 164.512).  The Court said that "HIPAA restrains the

'health plan, health care clearinghouse, or healthcare provider' from disclosing protected medical

information, and does not restrain law-enforcement directly."  707 F. Supp. 2d at 1259 (quoting

45 C.F.R. § 164.104).  The Court also concluded that the plaintiff established that his right to

privacy in his medical records was clearly established at the time, precluding the sheriff from

qualified immunity.  See 707 F. Supp. 2d at 1259-61.

The majority in the Tenth Circuit did not agree with the Court that the plaintiff's

Fourteenth Amendment rights were clearly established and reversed the Court without analyzing

whether the sheriff had violated the plaintiff's constitutional rights.  See Kerns v. Bader,

663 F.3d 1173, 1183-84 (10th Cir. 2011).  Although the plaintiff cited several cases in which the

Tenth Circuit "held that government officials violated plaintiffs' substantive due process privacy

rights by accessing their records without public disclosure," the Tenth Circuit explained that

those cases "involved another element not present here: the government officials involved

accessed the plaintiffs' confidential information as part of an unlawful campaign of sexual

harassment."  663 F.3d at 1186.  The Tenth Circuit ordered the Court to enter summary judgment

in favor of the sheriff, "only because [the plaintiff] has failed to identify clearly established law

rendering beyond debate that the Sheriff's conduct was unlawful as of 2005."  663 F.3d at 1187.

Judge Holloway dissented, agreeing instead with the Court that the officer violated the plaintiff's

"clearly established right to have his highly personal medical information protected from a law

enforcement officer whose access to that information was supported only by a generalized

interest in whether a crime *might* have occurred."   663 F.3d at 1197-98 (Holloway, J.,

dissenting)(emphasis in original).

## ANALYSIS

Rodella filed a written motion that cited only <u>Sinclair</u> and rule 16.  <u>See</u> Motion at 1. When that Motion ran into problems after the United States responded to it at the hearing, Rodella began to describe what he would put in his reply, do at another hearing, and invoke <u>Brady</u>, <u>Giglio</u>, and probably <u>Jencks</u>.  The Court will first discuss the written motion that Rodella filed, and the new arguments Rodella raised at the hearing and promised to raise in his reply and at another hearing.

I.      **Rodella's Written Motion Does Not Satisfy the <u>Sinclair</u> Standard.**

The Court will deny the Motion without prejudice to Rodella's opportunity to file another motion for a new trial if he finds other evidence.  Rodella has failed to satisfy four of the five <u>Sinclair</u> factors.  Rodella's failure to discover or secure the medical records, Dr. Davidson's letter, and Dr. Roll's report were a result of his lack of diligence.  The medical records are the equivalent to impeachment material.  The medical records are not material to a principal issue in the case.  Moreover, the medical records, Dr. Davidson's letter, and Dr. Roll's report would not have probably produced an acquittal.

A.      **RODELLA'S FAILURE TO DISCOVER THE MEDICAL RECORDS WERE A RESULT OF HIS LACK OF DILIGENCE.**

Rodella's failure to discover the medical records -- and more specifically Dr. Roll's report and Dr. Davidson's letter -- was because of his lack of diligence.  Rodella argues that he did not discover the medical records, and more precisely, Dr. Roll's report or Dr. Davidson's letter, because the United States did not produce the medical records pretrial even though it was obligated to do so under rule 16.  <u>See</u> Motion at 3-4.  Rodella's argument fails for two reasons: (i) the United States was not obligated under rule 16 to produce the medical records; and (ii) Rodella knew about the medical records and their importance before trial.

1.     __The New Relevant Evidence Is the Medical Records__.

Before addressing Rodella's lack of diligence, the Court must determine whether the newly discovered evidence for the purposes of the Motion is the medical records or Dr. Roll's report and Dr. Davidson's letter.  The new relevant evidence is the medical records and not Dr. Davidson's letter or Dr. Roll's report.  Rodella states that he discovered Dr. Roll's report after trial.  See Motion at 3.  The new relevant evidence, however, is the evidence upon which Dr. Roll relied and not on Dr. Roll's report.

In United States v. Metropolitan St. Louis Sewer District, 440 F.3d 930 (8th Cir. 2003), the United States Court of Appeals for the Eighth Circuit held that an expert report that was prepared after the entry of a consent decree did not constitute new evidence, because the evidence upon which the expert relied was already in the party's possession.  See 440 F.3d at 934-35.  There, the Environmental Protection Agency and the Metropolitan St. Louis Sewer District entered into a consent decree concerning a contribution action under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601-9662, concerning the cleanup of a hazardous-substance site.  See 440 F.3d at 931.  The consent decree stated, among other things, that the Sewer District would be responsible for 4% of the cleanup costs, even though approximately 26% of contaminated soil came from land the Sewer District owned, because the Sewer District was only a passive landowner that did not participate in or profit from the contamination.  See 440 F.3d at 932.  After the district court entered the consent decree, an intervenor in the case obtained an expert report, which stated that the Sewer District actively participated in contaminating the site, and the intervenor moved for the district court to set aside the consent decree based on the new evidence in the expert report.  See 440 F.3d at 932-33.  The district court denied the motion to set aside the consent decree, reasoning that the expert report

was not new evidence, because, before the consent decree was entered, the intervenor had in its possession the information upon which the expert relied.  See 44 F.3 at 934.  The Eight Circuit, in an opinion that the Honorable Lavenski R. Smith authored, and Judges Heaney and Benton joined, affirmed the district court's decision by holding that, because the intervenor already had in its possession all of the evidence upon which the expert relied, the expert's "report is merely a newly created opinion based on facts known to or accessible by" the intervenor.  440 F.3d 935.

In the same way, Dr. Roll's report constitutes only an opinion about the medical records and how the United States used them at trial.  See Dr. Roll's Report at 1.  The medical records, and not really the report, is the evidence upon which Rodella's Sinclair motion must be based. The reasoning for this distinction is clear when considering the implications of permitting newly created expert reports to constitute new evidence.  There are numerous potential experts who are willing to give opinions about a number of subjects.  If the retention of an expert and creation of a report after trial constituted new evidence, after every criminal conviction, the defendant would retain a new expert to give an opinion about the evidence presented at trial in an attempt to create new evidence to support a Sinclair motion and potentially get another shot at trial.  This manufacturing of expert reports after trial would create the potential for endless litigation and numerous new trial motions for every case.  If a defendant could retain an expert after trial to create new evidence, a defendant may choose to forego retaining an expert at trial, see if he or she is acquitted, and, if convicted, retain an expert and request a new trial.  While this tactic would be unwise, because the defendant may not satisfy the other Sinclair factors, such a situation should not be a possibility.  Accordingly, the relevant evidence for a Sinclair motion is the evidence upon which an expert relied in creating his or her report, which in this case is Rodella, Jr.'s medical records.

2.      **Rodella's Failure to Discover the Medical Records, Dr. Roll's Report, and Dr. Davidson's Letter Was a Result of His Lack of Diligence.**

Rodella's failure to discover the medical records, Dr. Roll's report, and Dr. Davidson's letter was a result of his lack of diligence. "A defendant requesting a new trial based on newly discovered evidence must have been diligent in seeking the evidence before the verdict was rendered."  United States v. Silva-Arzeta, 602 F.3d 1208, 1219 (10th Cir. 2010).  "Due diligence does not require that a defendant exercise the highest degree of diligence possible to locate evidence prior to trial; only reasonable diligence is required.   This requirement prevents defendants from keeping an evidentiary trump card in the event of a conviction."  United States v. LaVallee, 439 F.3d 670, 701 (10th Cir. 2006)(citations omitted)(internal quotation marks omitted).  Moreover, misconduct on the government's part does not lower the diligence standard that a defendant must exercise.  See United States v. LaVallee, 439 F.3d at 701.  In United States v. LaVallee, the Tenth Circuit, in an opinion that the Honorable Deanell R. Tacha, then-United States Chief Circuit Judge for the Tenth Circuit, authored, and Judges Briscoe and Lucero joined, rejected the defendant's argument that the government's conduct in "knowingly, recklessly, or negligently offer[ing] misleading documents" did not "lessen his due diligence requirement," by holding that "reasonable diligence adequately accounts for any misconduct by the Government." 439 F.3d at 701 (internal quotation marks omitted).

A defendant fails to exercise due diligence if he or she knew of facts upon which a motion for new trial is based, but did not pursue them before the verdict.  See United States v. Silva-Arzeta, 602 F.3d 1208, 1219 (10th Cir. 2010).  In United States v. Silva-Arzeta, the defendant suspected that someone tampered with evidence between his first and second trials.  See 602 F.3d at 1218.  After he was convicted, the defendant moved for post-verdict discovery to support a motion for a new trial, and the district court denied the request.  See 602 F.3d at 1218.

The Tenth Circuit, in an opinion that the Honorable Harris L. Hartz, United States Circuit Judge for the Tenth Circuit, authored, and Judges Holloway and Briscoe joined, affirmed the district court's decision, by holding that, because the defendant "had known the facts underlying his motive even before the jury was empaneled," yet he did not attempt to obtain evidence of tampering before the verdict, the defendant was not "diligent in seeking evidence before the verdict was rendered."   602 F.3d at 1219.   Similarly, in United States v. LaVallee, the Tenth Circuit held that the defendant was not diligent when he failed to discover that the victim in a prison beating did not name the defendant as one of the assailants, because the defendant never attempted to interview the victim about the abuse allegations.  See 439 F.3d at 699.

Here, Rodella knew about the medical records before trial and should have known about their importance.  First, Rodella, Jr. is Rodella's son.  Rodella likely knew about Rodella, Jr.'s head injury and subsequent treatments.  Second, the United States stated that information in Rodella, Jr.'s medical records led them to believe that he had medical conditions that negatively affected his cognitive abilities.  See Motion to Dismiss ¶¶ 6-8, at 2.  In the Motion to Dismiss the charges against Rodella, Jr., the United States states:

> 6.     In the course of the detention hearing as to Defendant Rodella, Jr., the United States was provided information suggesting that the Defendant Rodella, Jr. may have certain medical conditions that could negatively affect his cognitive abilities.

> 7.     The United States subsequently obtained medical records of Defendant Rodella, Jr. to ascertain the extent of the medical condition and the medications prescribed for said condition.

> 8.     Based on its review of these records, the United States has concluded that there is a question as to whether the defendant was capable of forming the level of specific intent that is an element of 18 U.S.C. §§241 and 242.

> 9.     In the interest of the defendant's privacy, the United States will not provide additional details regarding the diagnosis, medical observations and prescribed medications in this motion.  However, should the Court

deem it necessary, the medical records are available for its *in camera* review.

Motion to Dismiss ¶¶ 6-8, at 2.  Rodella, thus, knew that the medical records -- at least in the United States' view -- contained information that showed the "Rodella, Jr. may have certain medical conditions that could negatively affect his cognitive abilities."  Motion to Dismiss ¶ 6, at 2.

Rodella, Jr. was Rodella's only witness that could provide direct testimony concerning the events of March 11, 2014.  Rodella should have been aware that the trial could come down to the jury deciding between Rodella, Jr.'s word and Tafoya's word.  Rodella was also aware that the United States believed that Rodella, Jr.'s medical records might show that he suffered from cognitive impairments.  See Motion to Dismiss ¶¶ 6-8, at 2.  Consequently, Rodella was aware that the medical records contained information that could have potentially impeached his key witness.  Yet, Rodella did not take any steps to try to obtain the medical records.  If Rodella had exercised due diligence, he would have at least attempted to obtain Rodella, Jr.'s medical records, but he did not.  His failure to obtain the medical records results from his lack of diligence.

In the same way, Rodella's failure to obtain Dr. Davidson's letter or learn about Dr. Davidson was because of his lack of diligence.[7]  Rodella knew that the United States dismissed Rodella, Jr.'s charges, because it believed that Rodella, Jr. suffered from cognitive

---

[7]At the hearing Rodella asserted that he would offer testimony by Dr. Davidson or someone else to say that Rodella, Jr. did not suffer from cognitive disabilities.  See Tr. at 75:11-16 (Gorence).  The Motion is based on newly discovered evidence.  See Motion at 1. Rodella has not presented any evidence of another expert's or doctor's opinion concerning Rodella, Jr.'s cognitive abilities.  Rodella has not established that he has discovered new evidence, outside Dr. Davidson's letter, concerning Rodella, Jr.'s cognitive abilities.  The Court will not guess what evidence this other person might present to the Court, but instead, will rely on the medical records, Dr. Roll's report, and Dr. Davidson's letter in ruling on the Motion.

disabilities.  Being Rodella, Jr.'s father, Rodella likely knew that Dr. Davidson was Rodella, Jr.'s treating physician at the VA Hospital.  Rodella does not allege, however, that, before trial, he attempted to contact or subpoena Dr. Davidson.  If he had done so, he would have likely learned that Rodella, Jr. does not suffer from any psychotic symptoms.  Because Rodella's "failure to learn of the" medical records or of Dr. Davidson's letter was "caused by his own lack of diligence," Sinclair, 109 F.3d at 1531, Rodella fails the second Sinclair factor.[8]

### B.    THE MEDICAL RECORDS ARE EQUIVALENT TO IMPEACHMENT MATERIAL.

The medical records are equivalent to impeachment material.  Under Sinclair, a court cannot grant a new trial on the discovery of new impeachment evidence.  See Sinclair, 109 F.3d at 1531.  In United States v. Gwathney, the defendant testified that the $14,000.00 in cash that he was carrying came from a wire transfer that "Solomon Shaw" sent via Western Union.  465 F.3d at 1138.  To rebut this testimony, the United States introduced at trial Western Union's response to a subpoena, stating that it could not find any record of the wire transfer.  See 465 F.3d at 1138.  After trial, the defendant filed a motion for a new trial based on the discovery of a wire transfer receipt of $921.00 from Solomon Shaw to the defendant.  See 465 F.3d at 1138.  The district court found that the defendant failed the third Sinclair factor, because the receipt was impeachment in nature.  See 465 F.3d at 1144.  The Tenth Circuit, in an opinion, that the Honorable Terrence L. O'Brien, United States Circuit Judge for the Tenth Circuit, authored, and Judges McWilliams and McConnell joined, affirmed the district court's conclusion.  See 456 F.3d at 1144.

---

[8]Even if Dr. Roll's report were relevant new evidence for a motion for new trial, the Court would still conclude that Rodella's failure to obtain the report was because of his lack of diligence.  Rodella needed to procure the medical records to obtain an expert report from Dr. Roll.  Because Rodella was not diligent in attempting to obtain the medical records, he was also not diligent in attempting to obtain Dr. Roll's report.

The district court also found the new evidence to be of an impeaching nature thus failing <u>Sinclair</u>'s third factor.  We agree.  Impeachment evidence is evidence that undermines the credibility of a witness.  Gwathney concedes he presented the new-found Western Union receipt "in the form of impeachment evidence," but argues its effect "was to rehabilitate Defendant's credibility."  We are not persuaded by this distinction.  Impeachment evidence offered by a defendant will almost always have the effect of rehabilitating his credibility, or at least bolstering his theory of the case.

465 F.3d at 1144.

In the same way, the medical records, Dr. Davidson's letter, and Dr. Roll's report are all rehabilitation or accreditation evidence.  Their only potential use is to rehabilitate Rodella, Jr.'s credibility after the United States' impeachment of Rodella, Jr.  All of Rodella's new evidence goes solely to Rodella, Jr.'s credibility.  It is thus impeachment in nature.  As such, Rodella fails the third <u>Sinclair</u> factor.

Even as rehabilitation evidence, Dr. Davidson's letter would not have been very effective.  The medical records were used to show that Rodella, Jr. suffered from concentration, irritability, anger, and frustration problems.  <u>See</u> Tr. at 117:21-118:17 (Neda, Rodella, Jr.); <u>id.</u> at 149:3-150:3 (Neda, Rodella, Jr.); <u>id.</u> at 152:1-153:16 (Neda, Rodella, Jr.); <u>id.</u> at 162:7-15 (Neda, Rodella, Jr.); <u>id.</u> at 176:17-177:12 (Neda, Rodella, Jr.).  The United States also attempted to show that Rodella, Jr. had memory problems, but Rodella, Jr. handled the memory questions well by testifying that his doctors tested his memory and determined that there was nothing wrong with it.  <u>See</u> Tr. at 118:18-23 (Neda, Rodella, Jr.)("Q.   Okay.  And then you have problems with your memory. . . .  Both short- and long-term and you have reported that, didn't you?  A.  Not that I recall, no."); <u>id.</u> at 150:4-151:25 (Neda, Gorence, Rodella, Jr., Court)("Q. Are you sure they did not find an impairment of short- and long-term memory?  A.  Not to my recollection, ma'am.  He said there was nothing wrong with my memory. . . .  [A]fter the test I remember them saying nothing was wrong with my memory.").  Dr. Davidson's letter does not

address any of these issues.  Dr. Davidson's letter states that Rodella Jr. "has had no psychiatric hospitalizations"; "has never been considered a threat to himself or anyone else"; and has never "had any psychotic symptoms, such as being out of touch with reality, having hallucinations . . . or delusions."  Davidson Letter at 1.  She also writes that Rodella, Jr.'s medications had not impaired him.  See Davidson Letter at 1.  Dr. Davidson does not address any of the issues on which Rodella, Jr.'s medical records were used to impeach him.  Dr. Davidson's letter or opinion, or another expert offering the same opinion would thus likely be ineffective in rehabilitating Rodella, Jr. after the United States' cross-examination.  Indeed, the additional testimony about Rodella, Jr.'s cognitive problems might have just underscored and highlighted Rodella, Jr.'s performance and answers on cross.  In any case, because the Dr. Davidson's letter, the medical records, and Dr. Roll's report are impeachment in nature, Rodella fails the third Sinclair factor.

### C.    The Medical Records Are Not Material to a Principal Issue.

The medical records are not material to a principal issue.  Sinclair requires the new evidence to be "material to the principal issues involved."  Sinclair, 109 F.3d at 1531.  In determining if this factor is met, the Tenth Circuit considers the third and fifth factors -- whether the evidence is merely impeaching and whether the evidence would probably have caused an acquittal.  If evidence is impeachment material or if it would not have probably caused a different result, then it is not material to a principal issue.  See United States v. Shayesteh, 161 F.3d 19, at *6 (10th Cir. Oct. 6, 1998)(table opinion)(unpublished)(noting that, because evidence would not have caused a different result, it was not material to a principal issue); United States v. Quintanilla, 193 F.3d at 1148 (noting that new evidence was not material to a principal issue when it was merely impeachment evidence).  The Tenth Circuit has held that evidence

concerning a tangential issue is not material to a principal issue in the case.  See United States v. Gwathney, 465 F.3d at 1144-45.  In United States v. Gwathney, the Tenth Circuit stated that "[a]bstract bolstering of credibility does not bear directly on the principal issue of the case."  465 F.3d at 1144-45.

Here, the medical records, Dr. Davidson's letter, and Dr. Roll's report are all concern a tangential issue and not a principal issue in the case.  See United States v. Gwathney, 465 F.3d at 1144-45.  As the Court has already concluded, Rodella's new evidence is all impeachment or rehabilitative in nature.  It is thus not material to a principal issue.  See United States v. Quintanilla, 193 F.3d at 1148; United States v. Chadwick, No. CR 12-0345 CMA, 2013 WL 3010823, at *8 (D. Colo. June 17, 2013)(Arguello, J.)("Putting aside that this argument again shows the evidence is admissible only for impeachment purposes, this evidence is too tangential to be material to this principal issue.").  Additionally, as the Court will explain in more detail, Rodella's new evidence would not have probably caused a different result at trial.  See United States v. Shayesteh, 161 F.3d 19, at *6.  The main issue in the case was whether Rodella violated Tafoya's constitutional rights and whether Rodella used a firearm.  Rodella's new evidence concerns only Rodella, Jr.'s credibility and competency.  This "[a]bstract bolstering of credibility does not bear directly on the principal issue of the case."  United States v. Gwathney, 465 F.3d at 1144-45.  Accordingly, the records are not material to a principal issue in the case, and Rodella fails the fourth Sinclair factor.

### D.    THE NEW EVIDENCE WOULD PROBABLY NOT HAVE PRODUCED AN ACQUITTAL.

The new evidence would probably not have produced an acquittal, for at least three reasons.  First, the Court is not convinced that it would have permitted Dr. Roll to testify about everything he says in his report.  Second, the United States impeached Rodella, Jr. on a number

of issues outside the medical records.  Third, even if the United States produced the medical records before trial, Rodella would not have been prepared for the United States' cross-examination of Rodella, Jr.

First, new evidence must be admissible to support a motion for new trial.  See United States v. Hill, 737 F.3d 683 (10th Cir. 2013)("Implicit in a claim of newly discovered evidence is that there is new evidence -- that is, material that is admissible at trial."  (emphasis omitted)); United States v. Velarde, No. CR 98-0391 JB, 2008 WL 5993210, at *37 (D.N.M. May 16, 2008)(Browning, J.).  An expert witness must be qualified to testify.  See United States v. Chapman, No. CR 14-1065, 2014 WL 6065638, at *11 (D.N.M. Oct. 27, 2014)(Browning, J.). Dr. Roll is a licensed clinical psychologist.  See Roll Report at 1.  It does not appear that he has any training, experience, or expertise in law, or in proper cross-examination techniques.  Despite this lack of qualifications, Dr. Roll spends a substantial portion of his report criticizing the manner in which the United States cross examined Rodella Jr.  See Roll Report at 1 ("[T]here are a number of serious problems about the way the Records and the Physician's Desk Reference (PDR) were used in cross-examination of Mr. Rodella Jr."); id. at 1 ("A major problem is that the cross-examination used Mr. Rodella Jr.'s history of subjective complaints to suggest a reliable picture of his psychological status."); id. at 2 ("[C]ross-examination made use of the PDR to suggest that Mr. Rodella Jr. was suffering from confusion, delusions, and hallucinations as side effects of the medications Mr. Rodella Jr. was prescribed."); id. at 2 ("[S]uggesting via questioning, without clarification from research or expert testimony, risks leaving the impression that rarely appearing side effects of the medications are more common than is actually the case."); id. at 3 ("[I]t is my opinion that, from the psychological perspective, incomplete and potentially distorting use was made of the Records and the PDR in cross-examination of

Mr. Rodella Jr.  The way the Records and the PDR were used is neither standard nor customary . . . .").

It is unclear how Dr. Roll's expertise in psychology gives him the credentials to criticize, by expert opinion, an attorney's cross-examination.[9]  Dr. Roll may be correct that a person's statements that he or she suffers from confusion and evidence that a person's medications may cause hallucinations or depression is not the best evidence whether the person suffers from confusion, hallucinations, or depression.  Presenting that evidence -- the witness' own statements about his or her mental abilities -- on cross-examination in an attempt to shake the juror's confidence in the witness, however, is a perfectly acceptable trial strategy that many attorneys use.  Dr. Roll's ignorance of standard and customary cross-examination strategies highlights his lack of qualification to critique at trial Ms. Neda's cross-examination techniques.  Additionally, even if Dr. Roll were qualified to opine on proper cross-examination techniques, such testimony would still likely be inadmissible.  Dr. Roll does not opine that Rodella, Jr. did not suffer from confusion, memory loss, or poor concentration; instead, he merely criticizes the United States' characterization and use of Rodella Jr.'s medical records.  See Roll Report at 1-3.  Criticizing the manner in which a party conducts cross-examination is best left for closing arguments and not for expert testimony.  The best antidote for a good cross is usually a good re-direct or calling another witness.  Expert testimony should focus on facts and not the other party's trial strategy.

---

[9]Dr. Roll frequently appears in court in the District of New Mexico.  The Court has previously discussed all of the District of New Mexico cases in which Dr. Roll testified, or attempted to testify, noting whether the court admitted or excluded his testimony.  See United States v. Harry, 20 F. Supp. 3d 1196, 1226-29 (D.N.M. 2014)(Browning, J.).

The Court would likely not permit Dr. Roll to testify to all of the content of his report,[10] because it is not appropriate expert testimony.

Second, the United States impeached Rodella, Jr. on a number of issues outside the medical records. Rodella, Jr. testified that he was "110 percent sure" that Rodella did not draw his firearm during the March 11, 2014, incident. See Trial Tr. at 97:18-20 (Neda, Rodella, Jr.). Almost immediately afterwards, he testified that he had previously stated that his father had his firearm drawn. See Trial Tr. at 97:21-98:2 (Neda, Rodella, Jr.). Rodella, Jr. testified that he did not have a firearm with him on March 11, 2014, despite another witness testifying that Rodella, Jr. was carrying a firearm. See Trial Tr. at 102:16-103:20 (Neda, Gorence, Rodella, Jr., Court). Rodella, Jr. testified that, while in the military, he was in sixty air assaults and was under enemy fire, even though he was stationed in Kosovo during his deployment in 2011. See Trial Tr. at 112:25-113:10 (Neda, Rodella, Jr.); id. at 116:8-117:1 (Neda, Rodella, Jr.).

Rodella's new evidence goes only to Rodella, Jr.'s credibility. While the United States used the medical records to attack Rodella, Jr.'s cognitive abilities, and thus his credibility, Rodella, Jr.'s credibility suffered more damage from the rest of the United States' cross-examination than from the United States' use of his medical records. If the United States did not use the medical records, or if Rodella introduced Dr. Roll's report or Dr. Davidson's letter to rebut the United States' use of the medical records, the outcome of the trial would

---

[10]Some of Dr. Roll's report may be admissible. Dr. Roll states that a patient's complaints of his or her conditions are not the most reliable source of information, and that objective testing data is more reliable. See Roll Report at 1-2. He also states that more reliable objective data and test results concerning Rodella, Jr.'s condition was available. See Roll Report at 2. Dr. Roll further states that, if Rodella, Jr.'s medications caused side effects, his doctors would have noted the side effects and discontinued the medications. See Roll Report at 2. This testimony may be admissible at trial, if Rodella could first establish the reliability of Dr. Roll's opinions. The vast majority of Dr. Roll's opinion about the United States' cross-examination, however, is inadmissible.

probably not have been different, especially in light of the other evidence presented at trial, including Tafoya's testimony, the testimony of the jogger who saw the car chase, Lieutenant Sanches' testimony, and the three other incidents in which Rodella harassed motorists.

Third, if Rodella had received the medical records before trial, he likely would not have understood their significance to the United States' cross-examination.   At the hearing, Mr. Bowles testified that, after reviewing the medical records, he did not see their importance for cross-examination purposes.   See Tr. at 61:4-21 (Gorence, Bowles).   Mr. Bowles said that he reviewed every one of the 417 pages.   Mr. Bowles is a smart attorney, and if he did not see cross-examination materials, Mr. Gorence likely would not have seen them either.   Mr. Gorence and Mr. Bowles often work closely together on cases; if there was anything in the medical reports that supported cross-examination, he would have told Mr. Gorence.   Mr. Gorence also is unlikely to have seen the medical records as cross-examination material.   Rodella stated that, when he reviewed the medical records over the lunch break during trial, he did not see the importance of the medical records to the United States' cross-examination.   See Tr. at 8:12-16 (Gorence).   He even went so far as to say that "no one would have seen" that the United States would use the medical records to cross examine Rodella, Jr. in the manner that it did.   Tr. at 7:16-20 (Gorence).   By Rodella's own admission, even if the United States had produced the medical records, neither he nor any expert he hired would have anticipated the United States' use of the medical records on cross-examination.   Rodella would thus not have hired Dr. Roll or subpoenaed Dr. Davidson to rebut an unanticipated line of cross-examination questions.   Even when the documents were provided at trial, he did no more than ask to enter all of the medical records, asked that the Court admit the entire PRD material, did not ask for a continuance, did not call Dr. Roll, and did not try to subpoena Dr. Davidson.   What Rodella is really arguing is

that he should have had an opportunity to review each question that the United States would ask Rodella, Jr. before trial. Only in that situation would Rodella have thought to hire Dr. Roll and subpoena Dr. Davidson. Possession of the medical records without knowledge of the United States' trial strategies makes them essentially useless, and Rodella would have been left in the same position -- unable to adequately rebut the United States' cross-examination -- because he was unable to anticipate it. Accordingly, the result at trial would not be different, and Rodella fails the fifth <u>Sinclair</u> factor.

In the end, the United States used Rodella, Jr.'s own statements to healthcare providers against him. If they had carefully read the medical records, they would have anticipated some of Ms. Neda's questions, but Mr. Gorence and Mr. Bowles are two of the very best criminal defense attorneys in district and often do cases outside of the district. They did not realize, and would not have anticipated her questions. In a very real sense, the new evidence the evidence that they want is Ms. Neda's notebook of questions based on the medical records or her outline of the cross-examination. Rodella is not entitled to that work product. He is similarly not entitled to a new trial.

## II.   RULE 16 DID NOT REQUIRE THE UNITED STATES TO PRODUCE THE MEDICAL RECORDS.

Rule 16 did not require the United States to produce the medical records. Rodella argues that two rule 16 provisions created an obligation for the United States' to disclose the medical records: rules 16(a)(1)(E) and 16(a)(1)(F). <u>See</u> Tr. at 68:15-70:11 (Gorence, Court). Neither of these provisions, however, created any such obligation.

Rule 16(a)(1)(E) provides:

> **(E)   Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or

places, or copies or portions of any of these items, if the item is within the
government's possession, custody, or control and:

    **(i)**    the item is material to preparing the defense;

    **(ii)**    the government intends to use the item in its case-in-chief
at trial; or

    **(iii)**    the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).  Rule 16(a)(1)(F) provides:

    **(F)**    **Reports of Examinations and Tests.**  Upon a defendant's request, the
government must permit a defendant to inspect and to copy or photograph
the results or reports of any physical or mental examination and of any
scientific test or experiment if:

    **(i)**    the item is within the government's possession, custody, or
control;

    **(ii)**    the attorney for the government knows -- or through due
diligence could know -- that the item exists; and

    **(iii)**    the item is material to preparing the defense or the
government intends to use the item in its case-in-chief at
trial.

Fed. R. Crim. P. 16(a)(1)(F).  In this case, as the Honorable Lorenzo F. Garcia, United States

Magistrate Judge for the District of New Mexico, entered a rule 16 discovery order in this case.

See Order, filed August 15, 2014 (Doc. 8)("Discovery Order").  In the relevant part, Judge

Garcia states:

    **1.  DEFENDANT IS DEEMED TO REQUEST DISCOVERY
UNLESS WAIVER IS FILED:** The defendant is on notice that unless he or she
files with the Court no later than seven (7) days from the entry of this Order a
waiver of request for discovery from the Government signed by the defendant, the
Court will deem the defendant to have requested discovery and be subject to the
reciprocal discovery obligations of Rule 16 of the Federal Rules of Criminal
Procedure.

Discovery Order at 1 (citing Fed. R. Crim. P. 16(b)(1)).  In effect, Judge Garcia's order

eliminated the request requirement.

Each provision applies if the United States intends to use the evidence in its case-in-chief or if the evidence "is material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E); Fed. R. Crim. P. 16(a)(1)(F).  Because the United States did not use the medical records in its case-in-chief, see United States v. Harry, No. CR 10-1915 JB, 2014 WL 6065705, at *6 (D.N.M. Oct. 4, 2014)(Browning, J.)(defining case-in-chief for rule 16 purposes to mean the "'part of a trial in which a party presents evidence to support the claim or defense'" (quoting Black's Law Dictionary 244 (9th ed. 2009)), the medical records were discoverable under rule 16 only if they were material to Rodella's defense, which they were not.[11]

Material means that "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal."  United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996).  The Supreme Court has held that "in the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief."  United States v. Armstrong, 517 U.S. 456, 462 (1996).  The United States did not use the medical records in its case-in-chief, and Rodella has not indicated that they would have assisted him in any way in responding to the United States' case-in-chief.  Instead, the United States used the medical records to impeach one of Rodella's witnesses.  A number of courts have concluded that evidence used to impeach a defense witness is not discoverable under rule 16.   See United States v. Weiss, 914 F.2d 1514, 1525 (2d Cir. 1990)(permitting United States to use undisclosed document to impeach defendant's witness);

---

[11]At the hearing, the Court stated that, based on Rule 16's Committee Notes, it appeared that rule 16(a)(1)(F) applied only if the report or test was made "in connection with a particular case."  Tr. at 87:23-88:9 (Court)(citing Fed. R. Crim. P. 16, advisory committee notes, 1966 amendment).  It appears, however, that, in 1993, rule 16(a)(1)(F) -- then rule 16(a)(1)(E) -- was expanded to include reports or tests that were not made in connection with a particular case.  See Fed. R. Crim. P. 16, advisory committee notes, 1993 amendment.  Whether the United States was required to disclose the medical records under rule 16, thus, is not affected by the fact that the medical records were not prepared for a particular case.

United States v. Brandon, No. CR 12-0253, 2014 WL 5364205, at *7 (S.D. Ga. Oct. 21, 2014)(Hall, J.)(concluding that United States was not required to disclose statement that it used solely for impeachment purposes); United States v. Kaur, No. CR 08--428 KAM, 2009 WL 1296612, at *10 (E.D.N.Y. May 7, 2009)(Matsumoto, J.)("[E]vidence 'is material if it could be used to counter the government's case or to bolster a defense,' not 'merely because the government may be able to use it to rebut a defense position' or 'because it would have dissuaded the defendant from proffering easily impeached testimony.'" (quoting United States v. Stevens, 985 F.2d 1175, 1180 (2d Cir. 1993)).   Rodella has not cited any cases that say the United States must produce documents that it used solely to impeach a defense witness and the Court's independent research has not uncovered a case so holding.

Here, the United States used the medical records solely for the purpose of impeaching Rodella, Jr.   As such, they are not material to Rodella's defense, because they could not have helped him respond to or rebut the United States' case-in-chief.   He has not pointed to any statement in the medical records that he would use in his case-in-chief.   Because the medical records are not material to Rodella's defense, and because they were not used in the United States' case-in-chief, the United States did not have a duty to disclose them under rule 16.[12]

---

[12]While the United States' Attorneys from the United States Attorney's Office for the District of New Mexico have consistently represented that they maintain an "open file" policy, their conduct before the Court suggests otherwise.   These attorneys have at times shown that they are willing to disclose to criminal defendants only the bare minimum that the law requires and nothing more.   In United States v. Roybal, No. CR 12-3182 JB, 2014 WL 4748136 (D.N.M. Sept. 4, 2014)(Browning, J.), the United States refused to produce certain raw wiretap data and progress reports they made concerning wiretaps.   See 2014 WL 4748136, at *1.   The United States did not give a reason for denying the defendants' request for the information, other than the law did not require it to produce the documents.   See 2014 WL 4748136, at *4.   Again in United States v. Folse, the United States refused to disclose reports related to a shooting between a co-defendant and a Federal Bureau of Investigation agent for a similar reason: the law did not require it to disclose the information.   See United States v. Folse, No. CR 14-2354, Unsealed Memorandum Opinion and Order, filed January 26, 2015 (Doc. 75).   Here, it appears that the

### III.    THE MEDICAL RECORDS ARE NOT BRADY MATERIAL.

Rodella did not argue in the written Motion that the United States was required to

disclose the medical records under Brady.  See Motion at 1-6.  At the hearing, he did not argue

_____

United States did not produce Rodella Jr.'s medical records for the same reason: rule 16 did not require it.  The Court has often emphasized that the appearance of justice is as important as actually dispensing justice.  See United States v. Rodella, No. CR 14-2783 JB, 2014 WL 4792598, at *9 (D.N.M. Sept. 15, 2014)(Browning, J.)("After all, the appearance of justice is as important in a criminal trial as getting the science of the law right."); Young v. City of Albuquerque, No. CIV 13-1046 JB/RHS, 2014 WL 7473806, at *29 n.7 (D.N.M. Dec. 24, 2014)(Browning, J.)("The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way."  (quoting Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1222 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in  Ysasi v. Brown, 3 F. Supp. 3d 1088, 1157 n.24 (D.N.M. 2014)(Browning, J.)).  By its very name -- the Department of Justice -- the United States is also interested in the pursuit of justice.  In refusing to disclose evidence, documents, and materials unless the law requires it to produce the items, the United States may be undermining the appearance of justice.  Defendants are often left in the dark, not knowing what information the United States has in its possession.  While Courts and Congress have placed requirements on what information the United States must disclose, these requirements are a bare minimum and not a recommendation.  Criminal defendants are already at a disadvantage, because of the United States' resources and because the United States gets a head start in every case by being able to investigate before bringing an indictment.  The United States need not compound this disadvantage by refusing to give over any evidence unless it is absolutely required.  After the United States secures a conviction, the criminal defendant, and the public at large, should feel that the conviction was based on a fair trial in which there was nothing else the defendant could have done to obtain a different result -- i.e. the appearance of justice.  The nation may not be well served when a defendant is left wondering whether things would have been different if the United States had disclosed all of the information that it possessed.  By refusing to disclose all available information, the United States may create the perception that it obtained a conviction through gamesmanship and concealment, i.e., through sharp practices, and not through the pursuit of truth and justice.  This perception undermines the pillars of our criminal justice system.  The Court will continue to faithfully follow the law and will not require the United States to disclose any information which the law does not require it to disclose.  The Court, however, cautions the United States that, if it continues its pattern of refusing to disclose available information to criminal defendants, it is undermining the representation that it routinely makes that it has an open file policy and that the Court will take that purported policy with a grain of salt.  That representation, which is not completely accurate, and the unclear practices of the Assistant United States Attorneys undermine the administration of justice and the public's perception of the justice system.  It also puts its convictions unnecessarily at risk, if the Court is wrong that the United States did not have to produce the documents.  The United States is a key player in the adversarial system; as the people's representative, it too plays a fundamental role in ensuring the appearance of justice.

that the United States was required to disclose the medical records under <u>Brady</u> until the Court asked him whether <u>Brady</u> applied; the only arguments concerning <u>Brady</u> occurred during a short exchange at the hearing.  The United States did not address <u>Brady</u> during the hearing or in its Response -- likely because the Motion is based solely on <u>Sinclair</u> and rule 16.  In any case, the Court concludes that the United States was not required to disclose the medical records under <u>Brady</u>.  To obtain a new trial based on a <u>Brady</u> violation, Rodella must show: "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material." <u>United States v. Velarde</u>, 485 F.3d at 558.  Here, Rodella fails this test for substantially similar reasons that he fails to satisfy the <u>Sinclair</u> standard.

Evidence is "material" for purposes of granting a new trial on an alleged <u>Brady</u> violation "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>United States v. Velarde</u>, 485 F.3d at 559 (internal quotations omitted).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>United States v. Velarde</u>, 485 F.3d at 559 (quotations and citations omitted).  The Court has already concluded that, even if the United States had disclosed the medical records, the result at trial would have been the same.  Rodella's sole argument that the medical records are <u>Brady</u> material is that they would have shown that Rodella, Jr. is competent without any health defects.  <u>See</u> Tr. at 41:14-42:5 (Gorence, Court).  Rodella, Jr. was impeached on a number of issues outside the medical records, and Rodella would not have seen the importance of the medical records for impeachment purposes even if they had been disclosed. The medical records are, thus, not material for <u>Brady</u> purposes, and Rodella fails the third element for a new trial.  <u>See</u> <u>United States v. Velarde</u>, 485 F.3d at 558.

Additionally, Dr. Roll's report and Dr. Davidson's letter were not in the United States' possession. Brady requires disclosure of information only in the United States' possession or knowledge, whether actual or constructive. See United States v. Beers, 189 F.3d at 1304. There is no allegation that the United States knew of Dr. Roll's report or of Dr. Davidson's letter before Rodella brought them to the Court's attention after trial. Dr. Roll's report appears to have been prepared after trial, because Dr. Roll spends a substantial portion of his report discussing the United States' cross-examination of Rodella, Jr. See Dr. Roll's Report at 1-3. Dr. Davidson's letter is dated October 28, 2014, which is over a month after trial. See Davidson Letter at 1. Because the United States did not have possession or knowledge of the report or the letter before trial, the United States did not suppress them. Furthermore, as the Court has already concluded, even if Dr. Roll's report and Dr. Davidson's letter were introduced at trial, the result would probably not have been different. The report and letter merely go to rehabilitating Rodella, Jr. on one of the many issues on which he was impeached. They are, thus, not material. Accordingly, because the medical records, Dr. Roll's report, and Dr. Davidson's letter are not material, and because the United States did not suppress Dr. Roll's report or Dr. Davidson's letter, Rodella is not entitled to a new trial.

## IV.    THE MEDICAL RECORDS ARE NOT GIGLIO MATERIAL.

The medical records are not Giglio material. Similar to the Brady issue, in his written Motion, Rodella did not argue that the United States had an obligation to disclose the medical records under Giglio; at the hearing, Rodella did not argue that the medical records are Giglio material until the Court pressed him about whether Brady required the medical records to be disclosed. The only arguments made about Giglio occurred during a short exchange at the hearing; the United States never argued that the medical records were not Giglio material, either

in the Response or at the hearing.  In any case, the Court concludes that they are not Giglio

material.

In Giglio, the Supreme Court extended the United States' disclosure obligation under

Brady to evidence that is useful to the defense in impeaching United States' witnesses, even if

the evidence is not inherently exculpatory.  See 405 U.S. at 153 ("Brady v. Maryland . . .  held

that suppression of material evidence justifies a new trial irrespective of the good faith or bad

faith of the prosecution.  When the reliability of a given witness may well be determinative of

guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule."

(citations omitted)(internal quotation marks omitted)).  Rodella argued that the medical records

are Giglio material, because they concern impeachment, because they corroborate Tafoya's

testimony, and because of the way that the United States used the medical records in a fraudulent

manner.  See Tr. at 42:18-24 (Gorence, Court); id. at 45:19-46:7 (Gorence); id. at 50:7-11

(Gorence).  Rodella is mistaken, however, because the United States used the medical records

solely for the purpose of impeaching Tafoya.  The Tenth Circuit has held that Giglio applies only

to the impeachment of government witnesses.  See United States v. Green, 178 F.3d 1099, 1109

(10th Cir. 1999)("And, because . . . Giglio appl[ies] only to impeachment information relating to

a government witness, [Giglio is] inapplicable because the government did not ever call

McReynolds as a witness."  (citations omitted)).  Evidence impeaching a defense witness is not

discoverable under Giglio.   See United States v. Souffront, 338 F.3d 809, 824 (7th Cir.

2003)("Impeaching the testimony of their own witness is not favorable to the defense, and does

not raise the probability of a different verdict."  (citations omitted)); United States v. Presser, 844

F.2d 1275 (6th Cir. 1988)("[T]he government need not disclose impeaching material in its

possession relating to any potential defense witness where that impeaching material does not

meet the Brady test of being material and exculpatory."  (emphasis omitted)).

The United States Court of Appeals for the District of Columbia has explained why

Giglio applies to material that could impeach a United States' witnesses, but not a defense

witnesses.

> In the usual case there is a conceptual difference between the impeachment of a
> government witness and the impeachment of a defense witness.  Evidence that
> impeaches the former is almost invariably "favorable" to the accused, because by
> making the government's case less credible it enhances the defendant's chances
> of acquittal.  Evidence that impeaches a defense witness, by contrast, is not
> generally favorable to the accused; by reducing the credibility of the defendant's
> own witness, such impeachment reduces the probability that he will obtain a not
> guilty verdict.  It is ordinarily the prosecutor rather than defense counsel who
> wants to use the latter kind of evidence -- although she may prefer to delay its use
> (and disclosure) until after the witness testifies, both to prevent tailoring of the
> testimony in expectation of the cross-examination and to employ the element of
> surprise to expose the witness' mendacity.

In re Sealed Case No. 99-3096 (Brady Obligations), 185 F.3d 887, 893 (D.C. Cir. 1999).[13]  The

Sixth Circuit has provided additional reasoning for this rule:

> The following hypothetical illustrates why we conclude that this rule is necessary.
> A defendant may be prepared to produce two witnesses who would swear falsely
> that they were with the defendant at the time he is charged with committing a
> crime.  The government has knowledge of three people who can swear that they
> were with one of the defendant's alibi witnesses.  The government's knowledge
> of these people, and any statements it may possess from them, are "impeachment
> evidence" and thus could, in the view of the court below, tend "to negate guilt"
> because the government's evidence affects the defense's alibi.  However, if the
> government were required to disclose material concerning these potential
> impeachment witnesses before trial, the defense possibly could intimidate the

---

[13]While the District of Columbia Circuit held that, in usual cases, the United States is not required to disclose impeachment evidence of defense witnesses, the District of Columbia Circuit held that, in that case, the United States had an obligation to disclose the evidence, because the relevant witness was hostile to the defendant and testified favorably for United States, and because the evidence was not solely impeachment evidence, but was affirmative evidence of the defendant's innocence.  See In re Sealed Case No. 99-3096 (Brady Obligations), 185 F.3d at 893-94.  Here, however, Rodella, Jr. was not hostile to Rodella, and the medical records do not affirmatively show Rodella's innocence.

three witnesses.  The defense also would secure the tactical advantage of knowing
which of its potential witnesses is least subject to impeachment.

United States v. Presser, 844 F.2d at 1285.

The medical records were used only to impeach Rodella, Jr., who was Rodella's own

witness.  Because the medical records could not have been used to impeach a United States'

witness, Giglio does not apply.  See United States v. Green, 178 F.3d at 1109.  Furthermore,

Giglio, like Brady, applies only to evidence in the United States' possession.  See United States

v. Lujan, 530 F. Supp. at 1247 ("The United States certainly has a duty under Giglio to disclose

impeachment information of its witnesses from files in its possession or control . . . .").

Dr. Roll's report and Dr. Davidson's letter were both created after trial, and, as such, were not in

the United States' possession or control before trial.  Rodella has, thus, failed to establish a

Giglio violation.

## V.      THE UNITED STATES DID NOT VIOLATE THE JENCKS ACT.

The United States did not violate the Jencks Act.  Rodella has never directly argued that

the United States violated the Jencks Act.  At the hearing, Rodella refused to concede that the

United States did not violate the Jencks Act.  See Tr. at 42:25-43:11 (Gorence, Court).  Similar

to Brady and Giglio, neither Rodella nor the United States mention the Jencks Act in their

briefing, and the United States never addressed whether it violated the Jencks Act.  In any case,

the Court concludes that the United States did not violate the Jencks Act.  The Jencks Act applies

only to statements that United States witnesses make.  See 18 U.S.C. § 3500.  The Jencks Act

provides:

> After a witness called by the United States has testified on direct examination, the
> court shall, on motion of the defendant, order the United States to produce any
> statement (as hereinafter defined) of the witness in the possession of the United
> States which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500(b) (emphasis added).  The Jencks Act does not apply to statements that defense

witnesses make.  See United States v. Miller, 874 F.2d 1255, 1270 n.8 (9th Cir. 1989)("The

Jencks Act is not applicable because Svetlana was called as a defense witness."); United States v.

Wright, 489 F.2d 1181, 1190 (D.C. Cir. 1973)("By its express terms the Act has no application

whatever to defense witnesses . . . .  To the extent the trial court thought it was applying the

Jencks Act, it was simply wrong in saying it made no difference whether Reeves was a defense

o[r] a Government witness."); United States v. Curtis, 951 F.2d 350, No. 91-5189 (6th Cir. Dec.

19, 1991)(per curiam)(unpublished)(table opinion)("We have held in the past and reaffirm in our

decision today, that under the Jencks Act, the government is not required to disclose pre-trial,

impeachment material concerning defense witnesses even if the impeachment material is

exculpatory."  (citing United States v. Presser, 844 F.2d at 1283)).  The United States did not call

Rodella, Jr. as its witness.  Rodella called his son as a defense witness.  Accordingly, the Jencks

Act does not apply.[14]

## VI.  NOTHING THAT RODELLA WOULD PUT IN HIS REPLY BRIEF OR THAT HE WOULD RAISE AT ANOTHER HEARING WOULD JUSTIFY A NEW TRIAL.

Nothing that Rodella would put in his reply brief or that he would raise at another hearing

would justify a new trial.  Rodella argues that, in a reply brief, he would discuss the United

States' legal duty to produce the medical records.  See Tr. at 5:20-6:3 (Gorence); id. at

---

[14]At the hearing, the United States stated that it was unsure whether it could provide
Rodella with the medical records, because of the privacy interests involved.  See Tr. at 15:20-23
(Neda).  While the Health Insurance Portability and Accountability Act of 1996, Pub. L.
104-191, 110 Stat. 1936 ("HIPAA"), "prohibits a 'covered entity' from using or disclosing
protected health information," United States v. Yazzie, 998 F. Supp. 2d 1044, 1076
(2014)(Browning, J.)(quoting 45 C.F.R. § 164.502(a)), "'[l]aw enforcement agencies, including
the office of the prosecuting attorney, are not covered entities under HIPAA'" United States v.
Yazzie, 998 F. Supp. at 1076 (quoting United States v. Elliott, 676 F. Supp. 2d 431, 440 (D. Md.
2009)(DiGirolamo, J.).  Accordingly, HIPPA would not have prevented the United States from
disclosing Rodella, Jr.'s medical records to Rodella.

40:18-41:9 (Gorence, Court).  He asserts that he would also show how the United States used the medical records in a misleading manner during its closing argument.  See Tr. at 8:8-9:5 (Gorence).  Rodella contends that he would discuss why the United States cannot pass its disclosure obligations onto Mr. Bowles.  See Tr. at 46:8-17 (Gorence).  Rodella contends that, at another hearing, he would call Dr. Roll to testify and to go line-by-line through the United States' cross-examination of Rodella, Jr.  See Tr. at 6:3-14 (Gorence).  He also states that, if the Court scheduled a new hearing, he would be able to subpoena Dr. Davidson to testify or another to testify to what Dr. Davidson is likely to say.  See Tr. at 11:6-12 (Gorence).  There is nothing that Gorence could discuss about any of these topics that would justify a new trial.

The Court has concluded that the United States did not have a legal duty to produce the medical records.  The medical records were used solely for impeachment purposes and were not material to Rodella's defense.  All of the necessary information to make these determinations comes from the trial itself.  There is nothing that Rodella could say that would suddenly cause the medical records to be material or to not be impeachment evidence.  Similarly, it does not matter whether the United States can pass its disclosure obligations onto Mr. Bowles, because the United States did not have any obligation to disclose the medical records.[15]

As for Rodella's argument that the United States misused the medical records during closing arguments, Rodella's argument is too late.  He did not object at trial to Ms. Neda's use of the medial records in her closing, and rule 33 states that all motions for a new trial must be filed within seven days after the verdict, except for a motion based on newly discovered evidence.  See Fed. R. Crim. P. 33(b)("Any motion for a new trial grounded on any reason other than newly

---

[15]The Court agrees with Rodella, of course, that the United States cannot ask Mr. Bowles to do its duty; if the United States had an obligation to produce documents, it must produce the documents and not demand a co-defendant to do so.

discovered evidence must be filed within 14 days after the verdict or finding of guilty."). If Rodella wished to assert that the United States made an improper closing argument, he had to make such an argument before October 4, 2014, which he did not. <u>See</u> Verdict at 1 (stating that it was signed on September 26, 2014).

Concerning Dr. Roll's testimony, it is irrelevant to what Dr. Roll would testify. The relevant evidence for purposes of a motion for new trial is not an expert report, but is the evidence upon which the expert based his or her report. <u>See</u> <u>United States v. Metro. St. Louis Sewer Dist.</u>, 440 F.3d at 934-35. Dr. Roll's report is not newly discovered evidence; it is newly created evidence. The Court can already review the medical records, which is the relevant evidence for ruling on the Motion. And concerning subpoenaing Dr. Davidson, Rodella is merely requesting the Court to hold an additional hearing so that he can engage in discovery to try to uncover new evidence to support his Motion. At the hearing, Rodella stated that, outside Dr. Davidson's letter, he did not know about what Dr. Davidson would testify. <u>See</u> Tr. at 38:21-39:21 (Gorence, Court). Rodella calling Dr. Davidson as a witness would not be for the purpose of presenting newly discovered evidence to the Court. Instead, the only purpose that Rodella has in calling Dr. Davidson as a witness is to examine her in the hopes that he will uncover new evidence to support his Motion. An evidentiary hearing on a motion for a new trial should not be used to engage in discovery with the hopes of potentially uncovering evidence that can be used to support the motion. Rodella needs to first discover new evidence before bringing a motion based on the discovery of new evidence, rather than abusing the Court's subpoena power to do so.

Accordingly, because there are no arguments that Rodella could raise in a reply brief and no evidence that Rodella could present at another hearing that would affect the Court's ruling on

the Motion, the Court will not delay ruling on the Motion and postpone Rodella's sentencing just

so that he can file a reply brief.

       **IT IS ORDERED** that the Second Motion for a New Trial, filed January 15, 2015

(Doc. 160), is denied without prejudice to file a new motion for new trial if he discovers new

evidence.

                                               _____

                                               UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Tara C. Neda
Jeremy Peña
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Robert J. Gorence
Louren M. Oliveros
Gorence & Oliveros PC
Albuquerque, New Mexico

      *Attorneys for the Defendant*