**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

   Plaintiff,

vs.              No. CR 14-2783 JB

THOMAS R. RODELLA and
THOMAS R. RODELLA, JR.,

   Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

   **THIS MATTER** comes before the Court on the Defendant's Objections to the Presentence Report and Sentencing Memorandum, filed January 12, 2015 (Doc. 157)("Objections"). The Court held a sentencing hearing on January 21, 2015. The primary issues are: (i) whether the Aggravated Assault Guideline, U.S.S.G. § 2A2.2, applies; (ii) whether Defendant Thomas R. Rodella should be ordered to pay restitution to Michael Tafoya; (iii) whether Rodella physically restrained Tafoya to warrant an enhancement under U.S.S.G. § 3A1.3; (iv) whether Rodella was a leader under U.S.S.G. § 3B1.1; (v) whether Rodella obstructed justice to warrant an enhancement under U.S.S.G. § 3C1.1; (vi) whether the Court should depart downward to account for Rodella's medical condition; and (vii) whether the Court should vary downward. Because Tafoya suffered a serious bodily injury as a result of Rodella's assault against him, the Aggravated Assault Guideline applies. Rodella ordered Thomas R. Rodella, Jr. to restrain Tafoya and then ordered Sergeant Andy Gutierrez to handcuff Tafoya. Rodella thus physically restrained Tafoya, and U.S.S.G. § 3A1.3's enhancement applies. Because Rodella, Jr. could be convicted for the same crime as Rodella, because it is irrelevant that Rodella, Jr. was not convicted of an offense, and because it is irrelevant whether

Rodella, Jr. committed the same offense as Rodella, Rodella was a leader under U.S.S.G. § 3B1.1.  Rodella submitted a false report to the New Mexico State Police after the State Police began investigating him.  As such, Rodella obstructed justice, and U.S.S.G. § 3C1.1 applies. Because Rodella's medical condition does not place him outside the heartland of cases, the Court will not depart downward.  The Court will, however, vary downward the equivalent of 10 offense levels and sentence Rodella to 121-months imprisonment to better reflect the factors in 18 U.S.C. § 3553(a).  Additionally, the Court will impose a $200,000.00 fine and order Rodella to pay restitution.

## FACTUAL BACKGROUND

The Court takes its facts from the Revised Presentence Investigation Report, disclosed December 3, 2014, revised January 15, 2015 ("PSR"), that the United States Probation Office ("USPO") prepared.  On March 11, 2014, Michael Tafoya pulled out a driveway onto the road, while a green jeep was traveling down the same road.  See PSR ¶ 7, at 5.  Rodella, Jr., who was driving the jeep, began flashing the jeep's headlights and began tailgating Tafoya's vehicle for the next quarter mile.  See PSR ¶ 7, at 5; id. ¶ 14, at 6.  Tafoya slowed down his vehicle and pulled over to the side of the road to allow the jeep to pass.  See PSR ¶ 7, at 5.  Once stopped, Tafoya raised his hands and said: "What the hell?"  Id. ¶ 7, at 5.  The jeep passed Tafoya's vehicle, but then stopped in the middle of the road and backed up, until it parked about twenty-five feet in front of Tafoya's vehicle.  See PRS ¶ 7, at 5.  Rodella and Rodella, Jr. got out the jeep and began walking towards Tafoya's car while motioning for Tafoya to get out of his car and saying "come on."  PSR ¶ 7, at 5.  See id. ¶ 14, at 6.  Tafoya thought that Rodella and Rodella, Jr. wanted to fight, and he was afraid, because he did not know them.  See id. ¶¶ 7-8,

at 5.  Wanting to avoid a confrontation, Tafoya drove away, and Rodella and Rodella, Jr. got back into the jeep and began chasing Tafoya.  See PSR ¶ 8, at 5.

Tafoya sped up, and eventually turned onto a private dirt road to escape from Rodella and Rodella, Jr.  See PSR ¶ 8, at 5.  When Tafoya reached the end of the dirt road, he tried to turn his vehicle around while Rodella got out of the jeep with a gun in his hand.  See PSR ¶ 10, at 5.  Tafoya backed up his vehicle until it hit a pole behind him.  See id. ¶ 11, at 5.  Rodella opened the passenger door of Tafoya's vehicle and jumped in with his gun in his hand.  See id. ¶ 11, at 5.  Rodella attempted to point the gun at Tafoya's face while Tafoya begged for Rodella not to kill him and grabbed Rodella's wrist in an attempt to push the gun away from his face.  See id. ¶ 11, at 5.  While Tafoya was begging Rodella not to kill him, Rodella twice yelled: "It's too late."  Id. ¶ 11, at 5.  From the driver's side of the vehicle, Rodella, Jr. grabbed Tafoya by his arm and shirt, pulled him out of the vehicle, and threw him to the ground.  See id. ¶ 12, at 5-6.  Rodella, Jr. held Tafoya on the ground and told Tafoya that Rodella was the sheriff.  See PSR ¶ 12, at 6; id. ¶ 14, at 6.  Tafoya asked to see Rodella's badge, and Rodella pulled Tafoya's head up by his hair and said: "[Y]ou want to see my badge mother fucker?  Here's my badge."  PSR ¶ 13, at 6.  Rodella then struck Tafoya in his face with the badge.  See PSR ¶ 13, at 6.  Before being hit in the face with the badge, Tafoya did not see Rodella display a badge and did not know that he was the sheriff.  See PSR ¶ 17, at 6.  The Rio Arriba County Deputy Sheriffs arrived, and Tafoya was handcuffed and arrested.  See PSR ¶ 14, at 6.

Rodella falsified a police report concerning his account of the events from March 11, 2014.  See PSR ¶ 18, at 6.  Specifically, Rodella submitted a report to the State Police that was nearly identical to the report that Rodella, Jr. submitted and that differed from the evidence that was presented at trial.  See United States' Sentencing Memorandum at 7, filed November 18,

2014 (Doc. 148)("U.S. Sentencing Memo."); Rodella Supplemental -- Case No. SO-14-000310, filed November 18, 2014 (Doc. 148-6)("Rodella Report"); Rodella, Jr. Supplemental -- Case No. SO-14-000310, filed November 18, 2014 (Doc. 148-7).   During the incident, Tafoya's right thumb was injured.   See PSR ¶ 20, at 7.   Tafoya suffered a right thumb ulnar collateral ligament tear, which required surgery to repair.   See PSR ¶ 20, at 7.   After the surgery, Tafoya was required to wear a splint for three months, undergo occupational therapy for range and motion, and needed to protect his right thumb for six months.   See PSR ¶ 20, at 7.

## PROCEDURAL BACKGROUND

After a five-day jury trial, Rodella was convicted of violating Tafoya's constitutional rights -- in violation of 18 U.S.C. § 242 ("Count 1") -- and of using a firearm during a crime of violence -- in violation of 18 U.S.C. § 924(c)(1)(A)(ii) ("Count 2").   Verdict, filed September 26, 2014 (Doc. 127)("Verdict").   The PSR recommends a Sentencing Guidelines range of 108 to 120 months in addition to a seven year imprisonment term that must run consecutively, resulting in a total of 192 to 204 months.   PSR ¶¶ 94-95, at 20.   Rodella makes four legal objections and requests a variance or downward departure from the Sentencing Guideline range.   See Objections at 3-13.[1]

**1.       The PSR's Calculations.**

With regards to sentencing on Count 1, the PSR calculates a base offense level of 19, which corresponds to that for an aggravated assault that results in serious bodily injury under

---

[1]Rodella also makes a number of factual objections to the PSR.   See Objections at 1-3. The USPO responded to the factual objections by amending a number of the PSR's provisions. See Addendum to the Presentence Report, disclosed January 15, 2015.   At the sentencing hearing, Rodella stated that these amendments satisfied his factual objections.   See Transcript from Hearing at 2:10-13 (taken January 21, 2015)(Gorence, Court)(the Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version; any final transcript may contain slightly different page and/or line numbers).

U.S.S.G. § 2A2.2.  See PSR ¶ 27, at 8.  The PSR notes that the base offense level for U.S.S.G. § 2A2.2 is 14 and that, if the victim suffers a serious bodily injury, the base offense level is increased by 5 levels, resulting in an offense level of 19.  See PSR ¶ 27, at 8.  The PSR recommends an additional 6 offense levels under U.S.S.G. § 2H1.1(b)(1), because Rodella was a public official at the time of the offense.  See PSR ¶ 28, at 8.  The PSR recommends an additional 2 offense levels under U.S.S.G. § 3A1.3 for physically restraining Tafoya during the offense.  See PSR ¶ 29, at 9.  The PSR recommends another 2 levels pursuant to U.S.S.G. § 3B1.1(c) for being "an organizer, leader, manager, or supervisor."  PSR ¶ 30, at 9.  Finally, the PSR recommends an additional 2 levels under U.S.S.G. § 3C1.1 for obstructing justice.  See PSR ¶ 31, at 9.

The PSR states that Rodella has a criminal history score of zero, which establishes a criminal history category of I.  See PSR ¶ 39, at 9.  The PSR notes that the maximum term of imprisonment for Count 1 is ten years.  See PSR ¶ 74, at 16.  The PSR notes that, for Count 1, the recommended sentencing range for a criminal history category of I and offense level of 31 is 108 to 135 months.  See PSR ¶ 76, at 16.  For Count 2, the PSR notes that the minimum imprisonment term is seven years and the maximum is life, and that the imprisonment term must run consecutively with any other counts.  See PSR ¶¶ 74-75, at 16.  The PSR also recommends that, pursuant to 18 U.S.C. § 3663A, Rodella pay $7,135.88 in restitution to the State of New Mexico Victim's Reparation Commission for Tafoya's medical expenses that the commission paid.  See PSR ¶ 89, at 18.  The PSR notes that Tafoya is requesting $3,200.00 in restitution for lost wages.  See PSR ¶ 89, at 18.

2. **The Objections.**

Rodella filed his Objections on January 12, 2015.  See Objections at 1.  He objects to the restitution awards, by arguing that, because the jury did not find that Tafoya was injured, the Court should not order restitution for medical expenses, and by arguing that Tafoya's lost wages were the result of his choice to not work.  See Objections at 3.  He also argues that, because the jury did not find that Tafoya suffered a bodily injury, the PSR incorrectly added 5 offense level points under U.S.S.G. § 2A2.2(3).  See Objections at 3.  He contends that U.S.S.G. § 2A2.2 should not be applied, because Tafoya did not suffer a serious bodily injury and because Rodella did not use a dangerous weapon with the intent of causing bodily injury.  See Objections at 4. Rodella argues that, while the jury found that he used a firearm, it did not find that he intended to cause bodily injury.  See Objections at 4.  He contends that the extent of a victim's injury is an important consideration in determining whether to apply the aggravated assault guideline -- U.S.S.G. § 2A2.2 -- or the deprivation of civil rights guideline -- U.S.S.G. § 2H1.1.   See Objections at 4 (citing United States v. Cozzi, 613 F.3d 725 (7th Cir. 2010)(applying U.S.S.G. § 2A2.2 when an officer shackled a man to a wheelchair, and repeatedly hit him in the head and face)).

Rodella also argues that the 2-level adjustment under U.S.S.G. § 3A1.3 for physically restraining Tafoya should not be applied, by arguing that Rodella, Jr. restrained Tafoya after Tafoya struggled for Rodella's gun.  See Objections at 4-5.  Rodella argues that any civil rights violation had ended by the time Rodella, Jr. restrained Tafoya and that, because Rodella, Jr. restrained Tafoya for everyone's safety, Rodella, Jr. did not commit a crime by restraining him. See PSR at 5.  He asserts that Tafoya was handcuffed after the struggle was completed and as he was taken into custody.  See PSR at 5.  Rodella contends that in United States v. Checora, 175

F.3d 782 (10th Cir. 1999), the United States Court of Appeals for the Tenth Circuit held that the term forcible in U.S.S.G. § 3A1.3 means that "'the *defendant* must use physical force or another form of compulsion to achieve the restraint.'"  Objections at 5 (quoting United States v. Checora, 175 F.3d at 790)(emphasis in Objections but not in source).  Rodella argues that U.S.S.G. § 3A1.3 requires a defendant's conduct to hold the victim back from doing something, which did not occur here.  See Objections at 5.

Rodella maintains that he was not an organizer, leader, manager, or supervisor under U.S.S.G. § 3B1.1, because that Guidelines provision requires another criminal participant, and, in this case, the United States dismissed the charges against Rodella, Jr., because he lacked the ability to form the necessary criminal intent.  See Objections at 6.  Rodella asserts that, because the charges against Rodella, Jr. were dismissed, he is not a criminal participant.  See Objections at 6-7.  He contends that, for U.S.S.G. § 3B1.1 to apply, the "'offense of conviction itself must involve more than one participant.'"  Objections at 7 (quoting United States v. Williams, 891 F.2d 921 (D.C. Cir. 1989)).  Rodella contends that, because Rodella, Jr. is not a law enforcement officer, he could not participate with Rodella in depriving Tafoya of his constitutional rights to be free from unreasonable seizure by a law enforcement office.  See Objections at 7.  Rodella also asserts that Rodella, Jr. could not participate in brandishing a firearm during a crime of violence.  See Objections at 7-8.

Rodella argues that the obstruction of justice enhancement under to U.S.S.G. § 3C1.1 should not apply.  See Objections at 8.  He argues that he did not willfully obstruct or impede an investigation, but, instead, merely filed a police report in accordance with his law enforcement duties.  See Objections at 8.  Rodella maintains that the report contains his observations, and that merely because they conflict with another person's report does not mean that they were false or

that he obstructed justice.  See Objections at 8.  He contends that eyewitnesses perceive events differently, and that differing perceptions do not equate to an intent to hinder an investigation. See Objections at 8-9.

Rodella asks the Court to sentence him to one year for Count 1 and the mandatory seven years for Count 2, resulting in a total sentence of 96 months.  See Objections at 10.  He notes that he has submitted over three hundred letters from individuals attesting to his character, and that he submitted numerous certificates and letters of commendation related to his law enforcement activities.  See Objections at 10.  Rodella asserts that, during his law enforcement career, he did not have a history of excessive force.  See Objections at 10.  He also contends that he suffers from a serious blood disorder, hemochromatosis.[2]  See Objections at 10.  Rodella states that hemochromatosis may lead to cancer, heart arrhythmias, and cirrhosis.  See Objections at 10.  He also argues that the Guideline sentencing range is excessive considering Tafoya did not suffer bodily injury.  See Objections at 10-11.

Rodella notes that, in a number of other 18 U.S.C. § 242 cases, including some in which a victim was killed, defendants are sentenced to significantly less imprisonment time than sixteen to seventeen years, which is what the Guidelines recommend here.  See Objections at 10-13 (citing United States v. Livoti, 196 F.3d 322 (2d Cir. 1999)(upholding a ninety-month sentence after a trial when a defendant placed a man in a chokehold until dead); United States v. Brugman, 364 F.3d 613 (5th Cir. 2004)(upholding a twenty-seven-month sentence after a trial when a border patrol agent knocked two people to the ground and kicked them); United States v. Christian, 342 F.3d 744 (7th Cir. 2003)(upholding a thirty-three-month sentence after a plea

---

[2]"Hemochromatosis is an inherited blood disorder that causes the body to retain excessive amounts of iron.  This iron overload can lead to serious health consequences, most notably cirrhosis of the liver."  Hemochromatosis, The Free Dictionary, http://medical-dictionary. thefreedictionary.com/Hemochromatosis (last visited Jan. 30, 2015).

agreement when a defendant had a person pinned to a chair while he punched the person in the face); United States v. Mohr, 318 F.3d 613 (4th Cir. 2003)(upholding a one hundred and twenty-month sentence after a trial when a defendant released a police dog on two homeless men who had their hands in the air and were surrounded by police officers); United States v. Wilson, 344 F. App'x 134 (6th Cir. 2009)(unpublished)(upholding a thirty-three-month sentence after a trial when a defendant subjected a jail inmate to inhuman conditions); United States v. Frazier, No. CR 12-1572 JB, 2013 WL 499245 (D.N.M. Feb. 4, 2013)(Browning, J.)(sentencing a defendant to three years of probation pursuant to a plea agreement for striking a person in the head and neck with a flashlight)). Rodella argues that, in light of sentences from similar cases, a sixteen to seventeen year sentence is disproportionate, and that an eight-year sentence should be sufficient. See Objections at 13.

### 3.   **The Response**.

The United States responded to the Motion on January 14, 2015. See United States' Response to Defendant's Objections to the Presentence Report (Doc. 157), filed January 14, 2015 (Doc. 159)("Response"). The United States argues that Rodella construes U.S.S.G. § 2A2.2 too narrowly. See Response at 1. The United State contends that, because the jury found that Rodella acted with an intent to deprive Tafoya of his civil rights, U.S.S.G. § 2A2.2 applies. Response at 1-2. It also argues that the Court should order restitution, because Tafoya suffered a serious bodily injury. See Response at 2. The United States maintains that, even though the jury did not find a bodily injury, the Court can consider conduct of which a defendant was acquitted if it can be established by a preponderance of the evidence. See Response at 2 (citing United States v. Watts, 519 U.S. 148 (1997); United States v. Todd, 515 F.3d 1128 (10th Cir. 2008); United States v. McIntosh, 232 F. App'x 752 (10th Cir. 2007)(unpublished)).

The United States contends that Tafoya suffered a right thumb injury and that he reported it to the Rio Arriba Detention Center on the day of the incident.  See Response at 2.  The United States argues that, while Tafoya does not know whether he injured his thumb when he attempted to prevent Rodella from pointing a gun at his head or when Rodella, Jr. tackled him, there is sufficient evidence for the Court to find by a preponderance of the evidence that the injury resulted from Rodella's actions.  See Response at 2-3.  It asserts that the Guidelines define serious bodily injury as an "'injury involving extreme physical pain or the protracted impairment of a function of a bodily member,' or an injury that requires 'medical intervention such as surgery, hospitalization, or physical rehabilitation.'"  Response at 3 (quoting U.S.S.G. § 1B1.1, Application Note 1).  The United States argues that, because Tafoya underwent surgery and physical therapy to correct the injury, he suffered a serious bodily injury.  See Response at 3. The United States asserts that Tafoya is entitled to restitution, given that he was placed on unpaid administrative leave because of the investigation and to prepare for the trial, and that he was later prevented from returning to work, because of his thumb injury.  See Response at 3.

The United States contends that the physical restraint enhancement under U.S.S.G. § 3A1.3 applies, because Rodella instructed Rodella, Jr. to restrain Tafoya during the assault, and because Rodella instructed the deputies to handcuff and arrest Tafoya.  See Response at 4.  It also argues that the organizer, leader, manager, or supervisor enhancement is applicable, because the United States' dismissal of the charges against Rodella, Jr. does not equate to a legal finding that Rodella, Jr. was incompetent.  See Response at 4.  The United States maintains that, even though Rodella, Jr. was not a law enforcement officer, he could participate in the offense with Rodella.  See Response at 4 (citing United States v. Price, 383 U.S. 787 (1966)("Private persons jointly engaged with state officials in the prohibited action, are acting 'under color' of law for

purposes of [18 U.S.C. § 242].”); United States v. Causey, 185 F.3d 407 (5th Cir. 1999); United States v. Lester, 363 F.2d 68 (6th Cir. 1966)).

The United States asserts that the obstruction of justice enhancement is warranted, because Rodella produced two witness statements about the incident -- one by himself and the other by Rodella, Jr. -- which were almost identical and which contained a version of events that the jury rejected at trial.  See Response at 5.  The United States maintains that producing a false document during an official investigation constitutes obstruction of justice.  See Response at 5 (citing U.S.S.G. § 3C1.1, Application Note 4(C)).  It argues that the enhancement also applies, because Rodella failed to disclose all of his assets to the USPO.  See Response at 5 (citing U.S.S.G. § 5E1.2, Application Note 2)).

The United States argues that a departure or variance is not warranted.  See Response at 6-8.  The United States addresses the support letters that Rodella submitted, by arguing that the facts that it has laid out in the U.S. Sentencing Memo. show that Rodella’s sentence should not be lessened for good character.  See Response at 6.  The United States asserts that Rodella repeatedly abused his position while with the State Police; that he brutalized his former wife, using his service weapon to assault her and another relative; that he used his State Police vehicle to run his former wife off the road; that he directed subordinate officers to dismiss or mitigate traffic tickets in exchange for votes for his current wife; that he abused alcohol and marijuana; that he falsified leave records; that he violated tribal poaching laws and used his position to cover up the offense; that, as a magistrate, he showed favoritism, obstructed justice, and lied under oath; and that he bullied citizens who challenged his authority as sheriff.  See Response at 6.  The United States also argues that Rodella’s medical condition is not extraordinary, especially considering that it did not prevent him from physically attacking Tafoya and that the Bureau of

Prisons can adequately address his medical needs.  <u>See</u> Response at 7.  The United States asserts

that the proposed Guidelines range does not create sentencing disparities.  <u>See</u> Response at 7.  It

asserts that, because Rodella's gun does not have a safety mechanism, it could have discharged

during the incident.  <u>See</u> Response at 70.  The United States asserts that "[s]heer luck that the

gun did not discharge is hardly a basis for arguing lenient treatment."  Response at 8.

4.      <u>**PSR Addendums.**</u>

In response to the Objections, the USPO disclosed an addendum to the PSR on January

15, 2015.   <u>See</u> Addendum to the Presentence Report, disclosed January 15, 2015 ("1st

Addendum").  The USPO responds to Rodella's objection concerning restitution by stating that,

because of the incident, Tafoya suffered a thumb injury that required corrective surgery and is

required to wear a splint for three months.  <u>See</u> 1st Addendum at 1-2.  The USPO states that,

because of this injury, Tafoya is entitled to restitution for medical expenses and lost wages.  <u>See</u>

1st Addendum at 2.  Concerning Rodella's objection to the aggravated assault guideline, the

USPO responds by stating that it compared the aggravated assault guideline of U.S.S.G. § 2A2.2

and the deprivation of rights guideline of U.S.S.G. § 2H1.1, and determined that the aggravated

assault guideline results in a greater offense level.  <u>See</u> 1st Addendum at 2-3.  It again notes that

Tafoya suffered an injury that required corrective surgery and asserts that serious bodily injury

under the aggravated assault guideline defines serious bodily injury as an injury requiring

medical interventions, including surgery, hospitalization, and physical rehabilitation.  <u>See</u> 1st

Addendum at 3.  The USPO states that, for sentencing purposes, the Court can find a fact by a

preponderance of the evidence even if the jury acquitted a defendant of that conduct.  <u>See</u> 1st

Addendum at 3 (citing <u>United States v. Watts</u>, 519 U.S. 148 (1997)).

The USPO asserts that the physical restraint enhancement should apply, because Tafoya was restrained on the ground after being pulled out of his vehicle and then handcuffed.  See 1st Addendum at 3-4.  The USPO states that Tafoya was already handcuffed when the officers from the Rio Arriba Sheriff's Department arrived at the scene of the incident.  See 1st Addendum at 4.  The USPO further states that Rodella ordered Rodella, Jr. to pull Tafoya out of the vehicle, restrain him, and arrest him.  See 1st Addendum at 4.  For the organizer, leader, manager, or supervisor enhancement, the USPO states that Rodella instructed Rodella, Jr. to pull Tafoya out of the vehicle and restrain him.  See 1st Addendum at 4.  The USPO asserts that the obstruction-of-justice enhancement should apply, because Rodella falsified a report concerning the event after he heard that the State Police was investigating Tafoya's complaint about the incident.  See 1st Addendum at 4-5.  The USPO states that it instructed Rodella to produce information concerning his assets and his income, and that Rodella said he would produce the information at a later date but never did.  See 1st Addendum at 5.

On January 20, 2015, the USPO disclosed a second addendum to the PSR.  See Second Addendum to the Presentence Report, disclosed January 20, 2015 ("2d Addendum).  The USPO notes that, on January 16, 2015, Rodella submitted to the USPO information and documentation concerning his financial situation and assets.  See 2d Addendum at 1.

    **5.**     **The Hearing.**

The Court held a sentencing hearing on January 21, 2015.  See Transcript of Hearing (taken January 21, 2015)("Tr.").[3]  Rodella did not raise new arguments concerning most of his legal objections to the PSR, but instead relied on his brief.  See Tr. at 2:21-3:5 (Gorence); id. at

---

[3]The Court's citations to the transcripts of the hearing or trial refer to the court reporter's original, unedited version.  Any final transcripts may contain slightly different page and/or line numbers.

12:1-9 (Gorence).  Concerning the physical restraint enhancement, Rodella argued that Rodella, Jr. pulled Tafoya out of the vehicle and restrained him, and that Rodella cannot be vicariously responsible for the conduct of Rodella, Jr.  See Tr. 9:18-10:9 (Gorence).  Rodella argued that he did not conceal any assets from the USPO, because he produced information concerning his finances, which is reflected in the 2d Addendum.  See Tr. at 3:6-4:10 (Gorence).  Rodella further argued that the Indictment was originally based on filing a false police report, but the charge was dismissed and never presented to the jury, because there is not enough evidence to support it.  See Tr. at 14:17-15:5 (Court).

Rodella argued that the Court should depart or vary downward from the Guidelines range, because of Rodella's medical condition.  See Tr. at 21:11-22 (Gorence); id. at 25:21-26:2 (Gorence).  Rodella argued that the Court should also vary downward, because the jury did not find that Tafoya was injured, and because the Guidelines sentence is disproportionate with other more egregious cases.  See Tr. at 21:24-22:12 (Gorence).  Rodella focused on the United States Court of Appeals for the Second Circuit case of United States v. Livoti, where a law enforcement officer received a ninety-month sentence for putting a teenager into a choke hold and killing him.  See Tr. at 22:12-23:11 (Gorence).  Rodella argued that, because Tafoya suffered only a thumb injury, seventeen years imprisonment is excessive, compared to another officer receiving ninety months for killing someone.  See 23:19-24:1 (Gorence).

Concerning whether Tafoya suffered a bodily injury, the United States relied on the arguments from the Response and the 1st Addendum.  See Tr. at 4:23-5:2 (Neda).  For the physical restraint enhancement, the United States argued that Rodella ordered Rodella, Jr. to tackle Tafoya and then ordered the sheriff deputies to arrest Tafoya.  See Tr. at 10:10-18 (Neda, Court).  The United States relied on its Response concerning the organizer, leader, manager, or

- 14 -

supervisor enhancement.  See Tr. at 12:13-15 (Neda).  The United States argued that the Court should apply the obstruction of justice enhancement, because Rodella filed a false police report, and because he initially concealed his assets and then disclosed them right before the sentencing after the United States brought to the Court's attention the fact that Rodella refused to disclose his financial information.  See Tr. at 15:8-17:20 (Neda, Court).

The United States argued that the Court should not grant a downward departure, because Rodella's medical condition is not debilitating: Rodella was capable of pursuing Tafoya and assaulting him.  See Tr. at 26:13-25 (Neda).  The United States contended that, by running for reelection, Rodella announced to the public that he was physically capable of serving as sheriff for another four years.  See Tr. at 26:25-27:10 (Neda).  The United States asserted that the cases, which Rodella cited to support his variance request, are not relevant, because they did not involve a firearm being pointed at a person's head.  See 41:2-6 (Neda).  It argued that, if those cases involved a firearm, then the sentences would have had an additional seven years tacked onto them to reflect the mandatory seven years for using a firearm during a crime of violence. See Tr. at 41:6-12 (Neda).

The Court overruled Rodella's objection to U.S.S.G. § 2A2.2's application and to awarding restitution, by finding that Tafoya suffered a serious bodily injury.  See Tr. at 5:22-9:13 (Court).  The Court overruled Rodella's objection to the restraint enhancement, by finding that Rodella physically restrained Tafoya.  See Tr. at 10:23-11:22 (Court).  The Court overruled Rodella's objection concerning the organizer, leader, manager, or supervisor enhancement.  See Tr. at 12:18-13 (Court).  The Court overruled Rodella's objection to the obstruction of justice enhancement, because Rodella filed a false police report, but not because he concealed his assets. See 18:15-20:1 (Court).   The Court questioned Rodella about his assets to determine if his

disclosures accurately reflect his financial situation and whether he complied with the USPO's requests.  See Tr. at 32:14-37:21 (Gorence, Probation Officer, Court).  After the questioning, the Court found that Rodella substantially complied with the USPO's requests and that the information he disclosed provided a fairly accurate picture of his financial situation.  See Tr. at 37:22-38:11 (Court).  The Court sentenced Rodella to 121 months imprisonment with three years of supervised release.  See Tr. at 57:8-19 (Court).  The Court ordered Rodella to pay $7,135.88 in restitution to the New Mexico Victims Reparation Commission to compensate the commission for the money that it spent on Tafoya's medical bills and $3,200.00 in restitution to Tafoya for lost wages.  See Tr. at 58:21-59:1 (Court).  The Court also imposed a $200,000.00 fine.  See 59:24-60:1 (Court).

## LAW REGARDING THE UNITED STATES SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, thus making the Guidelines sentencing ranges effectively advisory. See 543 U.S. at 245.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines ranges are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines ranges are one of several factors enumerated in 18 U.S.C. § 3553(a), they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 525 U.S. 38 (2007), as recognized in United States v. White, 265 F. App'x 719, 728 n.8 (10th Cir. 2008)(unpublished).  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . .

[and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses." United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted). A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. 338, 349 (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008). This presumption, however, is an appellate presumption, and not one that the trial court can or should apply. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. 85, 90-91 (2007). Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[4] Guidelines sentence. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

---

[4]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the Guideline ranges are advisory. Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use

United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, No. CR 10-1919-002, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

these same departure factors in the <u>Booker</u> calculus, even if the court does not grant a downward departure.

<u>United States v. Apodaca-Leyva</u>, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.).  The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case."  <u>Kimbrough v. United States</u>, 552 U.S. at 89.  Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-enters the United States to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted.  <u>See</u> <u>United States v. Alemendares-Soto</u>, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010) (Browning, J.).  On the other hand, in <u>United States v. Jager</u>, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court found that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction."  2011 WL 831279, at *14.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute."  530 U.S. at 481.  The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and that the Sixth Amendment requires that, "[o]ther than the fact of a prior conviction, any fact that

increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi v. New Jersey, 530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."   542 U.S. at 303 (emphasis omitted)(citations omitted)(internal quotation marks omitted).  In United States v. Booker, the Supreme Court held that, because the sentencing guidelines are no longer mandatory, "Apprendi does not apply to the present advisory-Guidelines regime."  United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013).  See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges -- the statute falls outside the scope of Apprendi's requirement." (alterations omitted)(internal quotations marks omitted)).   The Supreme Court has recently held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence.  Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013).

        In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker had not changed the district court's enhancement-findings analysis.  See United States v. Magallanez, 408 F.3d at 684-85.  United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant, Magallanez, guilty of conspiracy to possess with intent to distribute and to distribute methamphetamine.  See 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing,

however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines. See United States v. Magallanez, 408 F.3d at 682.   The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months to 121 to 151 months.   See United States v. Magallanez, 408 F.3d at 682-83.   The Tenth Circuit stated that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict." United States v. Magallanez, 408 F.3d at 684.   Although United States v. Booker made the Guidelines "effectively advisory," the Tenth Circuit in United States v. Magallanez reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before." 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence out to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[5]   "[T]he application of an enhancement . . . does not

---

[5]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105).  See United States v. Olsen, 519 F.3d at 1105 (affirming the preponderance of the evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance

implicate the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *3 (D.N.M. June 26, 2012)(Browning, J.). The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v. Ray, 704 F.3d at 1314. A defendant may only assert an error under Apprendi v. New Jersey where the fact at issue increased his sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, No. 12-5016, 2014 WL 6679446, at *6 (10th Cir. Nov. 25, 2014)(unpublished)[6](holding that, after Alleyne v. United

---

warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation); United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance of the evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

[6]United States v. Hendickson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value

States, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence").  As the Court has noted:

> The Court explained that, although the decision of the Supreme Court of the United States in <u>Alleyne v. United States</u>, . . . 133 S. Ct. 2151 . . . (2013), expands the rule from <u>Apprendi v. New Jersey</u>, 530 U.S. 466 . . . (2000)(holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence.  <u>See</u> [<u>United States v. Sangiovanni</u>, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26[ (D.N.M. Aug. 29, 2014)(Browning, J.)].

<u>United States v. Cervantes-Chavez</u>, No. CR 14-0259 JB, 2014 WL 6065657, at *14 (D.N.M. Nov. 3, 2014)(Browning, J.).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1, Application Note 1(H).  In <u>United States v. Booker</u>, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment

---

with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that <u>United States v. Hendrickson</u>; <u>United States v. Powers</u>, 578 F. App'x 763 (10th Cir. 2014)(unpublished); <u>United States v. Schmidt</u>, 353 F. App'x 132 (10th Cir. 2009)(unpublished); <u>United States v. Leroy</u>, 298 F. App'x 711 (10th Cir. 2008)(unpublished); <u>United States v. Banda</u>, 168 F. App'x 284 (10th Cir. 2006)(unpublished); <u>United States v. Duncan</u>, 99 F. App'x 196 (10th Cir. 2004)(unpublished); <u>United States v. Hinshaw</u>, 166 F.3d 1222, 1999 WL 9762 (10th Cir. Jan. 12, 1999)(table opinion)(unpublished); and <u>United State v. Webster</u>, No. 94-3186, 68 F.3d 484 (10th Cir. Oct. 20, 1995)(table opinion)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

upon, the <u>real conduct</u> that underlies the crime of conviction.  That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's

reasoning in <u>United States v. Booker</u> suggests that the consideration of real conduct is necessary

to effectuate Congress' purpose in enacting the guidelines.

Section 1B1.3 provides that the base offense level under the guidelines "shall be

determined" based on the following:

**(1)**    **(A)**    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

        **(B)**    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

**(2)**    solely with respect to offenses of a character for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

**(3)**    all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

**(4)**    any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The court may consider, as relevant conduct, actions that have not

resulted in a conviction.  Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards

lower than beyond a reasonable doubt are permitted to show relevant conduct.  The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.). Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review.").  The evidence and information upon which the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct comes primarily from two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and in a 1991 attempt to import marijuana.  See 515 U.S. at 392-93.  In March 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's 1991 attempt to import narcotics.  See 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  See 515 U.S. at 392-93.  The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments, which the Double Jeopardy Clause of the Fifth Amendment to the Constitution provides.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals, including the Tenth Circuit, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and that "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S.

at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States' holding and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  In reaching its result in United States v. Watts, the Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  See 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis in United States v. Watts with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  See United States v. Watts, 519 U.S. at 151.  According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career offender enhancement

does not violate the Double Jeopardy Clause of the Fifth Amendment).   In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."   168 F. App'x at 290.   The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.   Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"   168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.   See 947 F.2d at 1428.   The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges.   See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429.  The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene handled the weapons at will; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  947 F.2d at 1429.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence rather than by a preponderance of the evidence.  See 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life.  See 11 F.3d at 1515.  The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required."  11 F.3d at 1515.  Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard."  11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).  See

United States v. Sangiovanni, No. CR 10-3239 JB, 2014 WL 4347131, at *22-26 (D.N.M. Aug. 29, 2014)(Browning, J.)(ruling that a sentencing court can cross reference from the Guidelines that corresponds to the defendant's crime of conviction to the guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime); United States v. Cervantes-Chavez, No. CR 14-0259 JB, 2014 WL 6065657, at *14-15 (D.N.M. Nov. 3, 2014)(Browning, J.)(cross referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession Guidelines after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

## LAW REGARDING U.S.S.G. § 2A2.2 AGGRAVATED ASSAULT

Section 2A2.2 defines aggravated assault as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony."  U.S.S.G. § 2A2.2, Application Note 1. The degree of bodily injury that a victim sustained can lead to an increased offense level.

> **(3)** If the victim sustained bodily injury, increase the offense level according to the seriousness of the injury:

| Degree of Bodily Injury | Increase in Level |
|---|---|
| **(A)**  Bodily Injury | add 3 |
| **(B)**  Serious Bodily Injury | add 5 |
| **(C)**  Permanent or Life-Threatening Bodily Injury | add 7 |
| **(D)**  If the degree of injury is between that specified in subdivisions (A) and (B), add 4 levels; or | |
| **(E)**  If the degree of injury is between that specified in subdivisions (B) and (C), add 6 levels. | |

U.S.S.G. § 2A2.2(b).

"'Bodily injury' means any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1, Application Note 1(B). "'Serious bodily injury' means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, Application Note 1(L). Serious bodily injury also can also occur "if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. 2241 or 2242 or any similar offense under state law." U.S.S.G. § 1B1.1, Application Note 1(L). "'Permanent or life-threatening bodily injury' means injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent." U.S.S.G. § 1B1.1, Application Note 1(L). "'Dangerous weapon' . . . includes any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such an instrument is involved in the offense with the intent to commit bodily injury." U.S.S.G. § 2A2.2, Application Note 1.

Courts have construed the intent to cause bodily injury as a low barrier, equating the danger of harm with the  intent to cause bodily injury. The United States Court of Appeals for the Tenth Circuit, in United States v. Hatch, 490 F. App'x 136 (10th Cir. 2012)(unpublished), held that kicking the victim in the head, because of the danger of harm associated with an injury to the head, demonstrated intent to cause bodily harm necessary to find that U.S.S.G. § 2A2.2 applied:

> And the fact that she is directing her kicks at his head demonstrates her intent. And it's not only an intent to commit bodily injury; this is an intent the Court believes to commit some type of serious bodily injury because, once again, Ms.

> Hatch is directing virtually all of her kicks and all of her punches to the victim's head, which is, of course, a part of the body that could most likely cause him some type of serious bodily injury.

490 F. App'x at 140.  Similarly, in United States v. Bassil, 932 F.2d 342, 345 (4th Cir. 1991), where the defendant threw a chair in the direction of corrections officers, the United States Court of Appeals for the Fourth Circuit held that the defendant acted with the requisite intent, because "the defendant's intent in throwing the chair was to cause harm to the officers rather than merely frighten them."  932 F.2d at 345.

In United States v. Cozzi, the United States Court of Appeals for the Seventh Circuit held that, in a civil rights action where a police officer was convicted of the use of excessive force for bludgeoning a citizen that he later arrested, the district court's calculation of the base offense level under U.S.S.G. § 2H1.1 using § 2A2.2 for aggravated assault was proper.  See 613 F.3d at 734.  The defendant argued that, because he was convicted only of 18 U.S.C. § 242, it was improper to apply the aggravated battery guidelines offense level, greatly increasing the offense level under § 2111.1.  The Seventh Circuit disagreed, however, stating:

> The fact that there is only one count in his indictment does not eliminate Cozzi's conduct -- he could only violate Miles's civil rights by doing something.  It is that something that constitutes the underlying offense for purposes of § 2111.1, regardless of how many substantive counts with which Cozzi was charged.

United States v. Cozzi, 613 F.3d at 734.  The Seventh Circuit noted that the sentencing guidelines commission, in allowing § 2111.1 to cross-reference an underlying offense with a greater offense level, intended to assure that similarly situated defendants receive similar punishments.  See 613 F.3d at 733 ("The sentencing guidelines recognize that in a situation, as here, where the defendant's conduct is more reprehensible than a civil rights violation that used a minor amount of force, the defendant's sentence should be on par with other defendants in

federal court who committed similar conduct under federal jurisdiction.")(citing <u>United States v.</u>
<u>Byrne</u>, 435 F.3d 16, 27 (1st Cir. 2006)).

### <u>LAW REGARDING U.S.S.G. § 3B1.1 AGGRAVATING ROLE ENHANCEMENTS</u>

Section 3B1.1 of the Sentencing Guidelines provides for enhancements to a defendant's
offense level based on a defendant having played an aggravating role in the offense.
Section 3B1.1 of the Sentencing Guidelines provides:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> **(a)**   If the defendant was an organizer or leader of a criminal activity
> that involved five or more participants or was otherwise extensive,
> increase by **4** levels.
>
> **(b)**   If the defendant was a manager or supervisor (but not an organizer
> or leader) and the criminal activity involved five or more
> participants or was otherwise extensive, increase by **3** levels.
>
> **(c)**   If the defendant was an organizer, leader, manager, or supervisor
> in any criminal activity other than described in (a) or (b), increase
> by **2** levels.

U.S.S.G. § 3B1.1.  "A 'participant' is a person who is criminally responsible for the commission
of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1 Application Note 1.

Among the factors a sentencing court should consider when weighing an aggravating role
enhancement are:

> [T]he exercise of decision making authority, the nature of participation in the
> commission of the offense, the recruitment of accomplices, the claimed right to a
> larger share of the fruits of the crime, the degree of participation in planning or
> organizing the offense, the nature and scope of the illegal activity, and the degree
> of control and authority exercised over others.  There can, of course, be more than
> one person who qualifies as a leader or organizer of a criminal association or
> conspiracy.

U.S.S.G. § 3B1.1 Application Note 4.  The Tenth Circuit has "elaborated that '[i]n considering
these factors, the sentencing court should remain conscious of the fact that the gravamen of this

enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures.'" United States v. Sallis, 533 F.3d 1218, 1223 (10th Cir. 2008)(quoting United States v. Torres, 53 F.3d 1129, 1142 (10th Cir. 1995)). See United States v. Vigil, 998 F. Supp. 2d 1121, 1155 (D.N.M. 2014)(Browning, J.)(refusing to find that nurse practitioner, who was illegally distributing controlled substances, was a leader or organizer even though she was essential to the success of the drug trafficking scheme). "'A defendant's participation in illegal but lower-level activities,' however, 'will not support application of the enhancement.'" United States v. Vigil, 998 F. Supp. 2d at 1144-45 (quoting United States v. Sallis, 533 F.3d at 1223). Nevertheless, "[a] defendant may be eligible for the leader or organizer enhancement if he leads or organizes even one other participant." United States v. Damato, 672 F.3d 832, 847 (10th Cir. 2012).

> The Tenth Circuit, in the context of conspiracies to distribute illegal drugs, has also
>
> identified several factors which might indicate that a defendant exercised the requisite control over others, including that: other sellers worked for him, were recruited by him, or had their activities controlled by him; "he paid others for their efforts on behalf of the conspiracy;" "he restricted the people to whom other coconspirators could sell their drugs;" and "he controlled the manner of sales, set prices, or claimed the right to a larger share of proceeds." United States v. Anderson, 189 F.3d 1201, 1212 (10th Cir. 1999); see also United States v. Massey, 48 F.3d 1560, 1572 (10th Cir. 1995)(listing similar factors).

United States v. Sallis, 533 F.3d at 1223. "[A] 'role as a supplier of drugs to others, standing alone, is not enough' to justify a leader enhancement" under § 3B1.1, nor is "supplying drugs on credit, or fronting, without more." United States v. Sallis, 533 F.3d at 1223-24 (quoting United States v. Anderson, 189 F.3d at 1212)(citing United States v. Owens, 70 F.3d 1118, 1129 (10th Cir. 1995)).

"A two-level adjustment under § 3B1.1(c) applies whenever 'the defendant was an organizer, leader, manager, or supervisor in any criminal activity [involving less than five

participants and that is not otherwise extensive].'" United States v. Wardell, 591 F.3d 1279, 1304 (10th Cir. 2009)(alterations in original)(quoting U.S.S.G. § 3B1.1(c)). See United States v. Tilga, 824 F. Supp. 2d 1295, 1319 n.12 (D.N.M. 2011)(Browning, J.)("Section 3B1.1(c) applies to leaders, organizers, managers, or supervisors of organizations with less than five persons. The only relevant difference between an organizer under § 3B1.1(a) and an organizer under § 3B1.1(c), it seems, is the size of the organization."). "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered." U.S.S.G. § 3B1.1 Application Note 3. "The [Sentencing] Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility." U.S.S.G. § 3B1.1, Background.

While there is overlap between the activities that would make a defendant a leader and those that would make a defendant an organizer, the two are distinct. "Functioning as a leader requires an element of control over underlings, particularly in the form of recruitment and direction. To qualify as an organizer, however, no control is necessary." United States v. Wardell, 591 F.3d at 1304 (citations omitted)(citing United States v. Cruz Camacho, 137 F.3d 1220, 1224-25 (10th Cir. 1998); United States v. Egbert, 562 F.3d 1092, 1103 (10th Cir. 2009)). The Tenth Circuit has recognized that, as a result of the Commission's inclusion of managers or supervisors along with organizers in § 3B1.1(c), "a defendant may be punished as an organizer under § 3B1.1(c) for devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." United States v. Valdez-Arieta, 127 F.3d 1267, 1272 (10th Cir. 1997). Thus, "'[t]he key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility.'"

United States v. Wardell, 591 F.3d at 1304 (quoting United States v. Tejada-Beltran, 50 F.3d 105, 112 (10th Cir. 1995)).

## RELEVANT LAW REGARDING U.S.S.G. § 3B1.3

Section 3B1.3 of the United States Sentencing Guidelines, entitled "Abuse of Position of Trust or Use of Special Skill," provides:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.  This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.  If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).

U.S.S.G. § 3B1.3. Section 3B1.3's "'primary concern . . . is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong.'"  United States v. Guidry, 199 F.3d 1150, 1159 (10th Cir. 1999)(quoting United States v. Koehn, 74 F.3d 199, 201 (10th Cir. 1996)).

### 1.      Abuse-of-Trust Enhancement.

To establish abuse of a position of trust for purposes of § 3B1.3's 2-level upward adjustment, the government must establish: (i) "the person occupies a position of trust," and (ii) "the position of trust was used to facilitate significantly the commission or concealment of the crime."  United States v. Spear, 491 F.3d 1150, 1153 (10th Cir. 2007)(citing, among other cases, United States v. Morris, 286 F.3d 1291, 1295 (11th Cir. 2002)).   The Sentencing Guidelines' Application Note 1 to § 3B1.3 provides the definition for a position of trust:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).  Persons holding such positions ordinarily are subject to significantly less supervision than employees whose

> responsibilities are primarily non-discretionary in nature.  For this adjustment to
> apply, the position of public or private trust must have contributed in some
> significant way to facilitating the commission or concealment of the offense (e.g.,
> by making the detection of the offense or the defendant's responsibility for the
> offense more difficult).

U.S.S.G. § 3B1.3, Application Note 1.  The Tenth Circuit has noted: "Our cases interpreting the

guideline make clear that the term 'position of trust' is a bit of a misnomer.  It actually has little

to do with <u>trustworthiness</u> and everything to do with <u>authority</u> and <u>discretion</u>."  <u>United States v.

Spear</u>, 491 F.3d at 1154 (emphases in original).

     The first prong of 3B1.3's abuse-of-trust enhancement test analyzes whether the person

occupies a position of trust in relation to the offense's victim.  The Tenth Circuit has noted that

"[t]he question of whether an individual occupied a position of trust is evaluated from the

victim's perspective."  <u>United States v. Guidry</u>, 199 F.3d at 1160.  Thus, "the position of trust

must be found in relation to the victim of the offense."  <u>United States v. Guidry</u>, 199 F.3d

at 1160.  The Tenth Circuit has stated:

> We have applied § 3B1.3 in two types of cases: "The first is where the defendant
> steals from his employer, using his position in the company to facilitate the
> offense," and the "second is where a 'fiduciary or personal trust relationship
> exists' with other entities [not the employer], and the defendant takes advantage
> of the relationship to perpetrate or conceal the offense."

<u>United States v. Guidry</u>, 199 F.3d at 1160 (alterations in <u>United States v. Guidry</u> but not in

source)(quoting <u>United States v. Brunson</u>, 54 F.3d 673, 677 (10th Cir. 1995)).  <u>See</u> <u>United States

v. Brunson</u>, 54 F.3d at 677  ("In the typical case where § 3B1.3 applies, the victim is a business

and the defendant is an employee who has taken advantage of the knowledge and responsibilities

acquired by virtue of his or her position within the company to embezzle or otherwise steal from

the company.").

The Tenth Circuit's decision in United States v. Queen, 4 F.3d 925 (10th Cir. 1993), is instructive on analyzing "whether an individual occupies a position of trust . . . from the perspective of the victim."  4 F.3d at 929.  In United States v. Queen, the defendant was the president of Queen Metals Exchange, Inc. ("QMX"), a corporation which mailed postcards to individuals advertising itself as a brokerage firm specializing in precious metal and currency accounts.  4 F.3d at 926.  When individuals would inquire about investing with QMX, a company representative would represent that investors' money would be used to purchase precious metals and currencies, that investors would receive a return between 43% and 89% annually, that they would not lose money the first year, and that QMX did not engage in futures and options trading.  See 4 F.3d at 926.  In reality, little of the investors' money was used to purchase metals and currencies; rather, "a majority of investors' funds were either dissipated in the commodity future's market or used for the defendant's own personal expenses."  4 F.3d at 926.  The defendant pled guilty to wire fraud, and, at the sentencing hearing, the district court rejected the government's suggested offense level and instead adopted the USPO's recommendation for a 2-level upward adjustment under U.S.S.G. § 3.B1.3 based on the defendant's abuse of a position of trust, "because of the existence of a fiduciary relationship between Mr. Queen and his investors."  4 F.3d at 927 (alterations omitted)(internal quotation marks omitted).  The defendant argued that he did not occupy a position of trust. He asserted that "§ 3B1.3 only applies to individuals who occupy real positions of employment within a business or organization that give rise to relationships of trust," and "that he did not occupy a real position of trust because his asserted status as an investment advisor/broker was part of the fraudulent misrepresentations he made to his victims."  United States v. Queen, 4 F.3d at 928.  The Tenth Circuit noted that "[t]here is no question that, had the defendant actually been an investment

advisor/broker as he represented to his victims, he would have occupied a position of trust under" the § 3B1.3 abuse-of-trust analysis at the time that the Tenth Circuit decided United States v. Queen, as it compared a defendant's duties with other employees.  4 F.3d at 929.  The test analyzed

> the extent to which the position provides the freedom to commit a difficult-to-detect wrong, and whether an abuse could be simply or readily noticed; defendant's  duties as compared to those of other employees; defendant's level of specialized knowledge; defendant's level of authority in the position; and the level of public trust.

4 F.3d at 928-29 (quoting United States v. Williams, 966 F.2d 555, 557 (10th Cir. 1992)).  The Tenth Circuit reasoned that, because United States v. Williams was concerned with "penalizing defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong," the focus should be on whether the victim believes that the defendant holds such a position, rather than whether the defendant is actually employed in the position:

> In Williams, we indicated that a primary concern of § 3B1.3 is with penalizing defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong.  See also, [United States v. ]Fox, 999 F.2d 483, 486 [(10th Cir. 1993)]; United States v. Lieberman, 971 F.2d 989, 993 (3rd Cir. 1992)("[T]he primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong.")(quoting United States v. Hill, 915 F.2d 502, 506 (9th Cir. 1990)).  This focus suggests that the question of whether an individual occupies a position of trust should be addressed from the perspective of the victim.  See United States v. Booth, 996 F.2d 1395, 1396 (2d Cir. 1993); United States v. Castagnet, 936 F.2d 57, 62 (2d Cir. 1991); United States v. Hill, 915 F.2d 502, 506 n.3 (9th Cir. 1990).  A defendant who convinces a third party that he occupies a formal position of trust may possess the same freedom to commit a difficult-to-detect crime as an individual who actually possesses such a position.  Indeed, in many situations the absence of any institutional constraints may provide a defendant who merely pretends to occupy a formal position of trust with even greater freedom to commit a difficult-to-detect wrong than his or her legitimate counterpart.

United States v. Queen, 4 F.3d at 929.

While United States v. Queen provides insight into how to analyze whether the defendant holds a position of trust from the victim's perspective, the Tenth Circuit has not defined the victim for § 3B1.3's purposes:  "The question of how broadly or narrowly the term 'victim' should be defined in relation to the position of trust held by the defendant was not raised at any point in this case.  Thus, we do not address the issue except to observe that it is a matter of dispute among the circuits."  United States v. Edwards, 325 F.3d 1184, 1188 n.1 (10th Cir. 2003)(citing United States v. Guidry, 199 F.3d at 1160 n.6 (discussing cases)). At the least, it applies to individuals, see e.g., United States v. Queen, 4 F.3d at 929, and to "entities" or businesses, e.g., United States v. Brunson, 54 F.3d at 677.

**2.     Special Skill Enhancement.**

To apply § 3B1.3's enhancement for use of a special skill: "(i) the defendant must possess a special skill . . . ; and (ii) the defendant must use that skill . . . to significantly facilitate the commission or concealment of the offense."  United States v. Tilga, 824 F. Supp. 2d 1295, 1335 (D.N.M. 2011)(Browning, J.)(citing United States v. Burt, 134 F.3d 997, 998-99 (10th Cir. 1998)).  See United States v. Gandy, 36 F.3d 912, 916 n.2 (10th Cir. 1994)(stating that, for § 3B1.3's application to apply based on use of a special skill, "it must be shown not only that Defendant possessed a special skill, but also that he employed that special skill to facilitate the commission of his offense").  Application Note 4 defines special skill as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."  U.S.S.G. § 3B1.3, Application Note 4.  The Tenth Circuit recognizes that a defendant need "not complete formal educational or licensing requirements in order to possess a special skill."  United States v. Hinshaw, 166 F.3d 1222, 1999 WL 9762, at * 3 (10th Cir. Jan.

12, 1999)(unpublished)(table opinion).  "A special skill may also come from experience or from self-teaching."  United States v. Tilga, 824 F. Supp. 2d at 1317 (citing United States v. Gandy, 36 F.3d at 914).  To apply a U.S.S.G. § 3B1.3 enhancement, the skill "'must be more than the mere ability to commit the offense. . . .  Nothing in the commentary suggests that § 3B1.3 applies to a criminal who . . . bones up on the tricks of his trade and becomes adept at committing a crime that the general public does not know how to commit.'"  United States v. Burt, 134 F.3d at 999 (quoting United States v. Young, 932 F.2d 1510, 1513 (D.C. Cir. 1991)).  Additionally, there must be a "connection between the crime and the Defendant's special knowledge."  United States v. Burt, 134 F.3d at 1000.

In United States v. Tilga, a husband and wife -- Tilga and Chandler -- pled guilty to conspiring to impede the tax laws' administration by using multiple overseas trusts, which they purchased at special instructional seminars, to manage the wife's internet business, the couple's homes, and their vehicles, and to evade reporting the family's income to the Internal Revenue Service.  See 824 F. Supp. 2d at 1299.  The Court noted that the presentence investigation report in that case "suggest[ed] that Tilga possessed two sets of special skills that she brought to bear in the commission of her offense: (i) business skills acquired in the course of her education; and (ii) skills related to [the use of the overseas trusts] acquired during . . . seminars."  824 F. Supp. 2d at 1335.  With regard to the business skills acquired during her education, including a bachelor's degree in Hotel Administration from Cornell University and a Master's in Business Administration from the Wharton Business School at the University of Pennsylvania, the Court concluded that there was an insufficient nexus between her business skills and the tax evasion: "The skills she acquired over the course of her education . . . were not tax specific, and related to marketing and collecting fees for services provided.  There is no evidence that Tilga used the

business and marketing skills that she acquired during her education to significantly facilitate the concealment of her crime." 824 F. Supp. 2d at 1335 (internal citations omitted). As to whether the skills acquired at the seminars were "special skills" within § 3B1.2's purview, the Court concluded that, "even if Tilga or Chandler possessed specialized skills, it does not appear that either used them to commit the crime," reasoning that the company which provided the instructional seminars "exercised its skills to create the means for their offenses, and Tilga and Chandler followed their program." 824 F. Supp. 2d at 1336. The Court noted that, "generally, attending a few seminars would not appear to be comparable to a skill requiring 'substantial education, training or licensing.'" 824 F. Supp. 2d at 1335 (emphasis in original)(quoting U.S.S.G. § 3B1.3, Application Note 4), and reasoned that the couple did not use any special skills beyond those that any member of the public attending these seminars and purchasing the trusts would have acquired:

> At the hearing, Chandler stated that "CTC held Tilga's hand throughout the time period" and was involved in the administration of Tilga's trusts.[7] Tilga also

---

[7]CTC is an abbreviation for the Commonwealth Trust Company. The Court explained in its decision: "The CTC was an organization that taught individuals how to purchase and manage Pure Trust Organizations ('PTOs')." United States v. Tilga, 824 F. Supp. 2d at 1300. With regard to PTOs, the Court noted:

> The PSR notes:

>> A Pure Trust Organization (PTO) has been defined as a common law contract in trust form. The Pure Trust is a contract at common-law in equity created in trust form. Unlike the Trust, the PTO receives the assets by exchange, meaning there is a full and adequate exchange for the assets. In other words each party gives something and receives something in return, and the agreement has a stipulated duty to perform that all parties must adhere to. The Exchanger exchanges the assets to the Trust for Trust Certificate Units ("TCU's"). The Creator appoints at least two Trustees to manage the trust. The Trustees can appoint a General Manager to oversee the day-to-day business activities of the Trust. The Exchanger has no control over the Trustees, the business of the

asserts that she accepted the representations of CTC's sales personnel, lawyers, and accountants, and did no more than purchase CTC products. CTC conducted seminars on a variety of topics, including the "use of trustee documents, privacy issues, offshore banking, certificate holder issues, how to wire transactions to offshore accounts and where to store documents." While these seminar topics conveyed specialized knowledge, there is no evidence that participants were taught specialized skills not possessed by members of the general public, as § 3B1.3 requires. More likely is that participants walked away from these seminars with a general understanding of the topic, which may be more than what the public knows, but which still does not rise to the level of a specialized skill. Although Tilga and Chandler used sophisticated programs, offshore accounts, and other entities, as discussed above in reference to the sophisticated-means enhancement, there is no evidence that Tilga or Chandler possessed any special skills related to the creation or operation of the PTOs. Furthermore, even if Tilga or Chandler possessed specialized skills, it does not appear that either used them to commit the crime, because CTC exercised its skills to create the means for their offenses, and Tilga and Chandler followed their program.

824 F. Supp. 2d at 1335-36 (internal references omitted).

The Tenth Circuit, in United States v. Gandy, remanded the case to the district court, concluding that the district court failed to adequately explain the nexus between the defendant doctor's special skill and how the special skill facilitated the offense -- fraudulently stating on Medicare forms that he performed surgery when, in reality, the services were routine foot care services. 36 F.3d at 912. The Tenth Circuit recognized that, "[i]f the government does not show that the defendant employed his skill to facilitate the commission of his offense, then the court may not properly enhance the defendant's sentence under § 3B1.3." 36 F.3d at 915. The Tenth Circuit "first note[d] that the fact that Defendant possessed a special skill -- podiatry -- is

---

Trust or the income stream. The Trustees are in total control and the Exchanger has no reversionary interest in the Trust. This entity has the substance of a contract and the form of a trust.

Tilga PSR ¶ 10, at 7–8. The IRS states that the term "pure trust" does not appear in the Internal Revenue Code and that "[w]hatever the name of the arrangement . . . the taxation of the entity must comply with the requirements of the Internal Revenue Code." Abusive Trust Tax Evasion Schemes—Special Types of Trusts, Internal Revenue Service . . . .

824 F. Supp. 2d at 1300 n.7.

undisputed."  36 F.3d at 915.  The Tenth Circuit also noted that the doctor "used his podiatric skill to defraud the United States.  If he hadn't had [this special skill of podiatry] no fraud could have been committed by him."  36 F.3d at 915 (quoting the trial record).  The Tenth Circuit concluded, however, that the district court's conclusion, without explaining how the "Defendant did in fact use his podiatric skill to facilitate the commission of his offense," was insufficient.  36 F.3d at 915.  Similar to the Court's conclusion in United States v. Tilga that there not a sufficient nexus between any specialized skills the defendant may have garnered through her education in marketing and the tax evasion scheme for which she was convicted, the Tenth Circuit noted: "[Nevertheless,] the court's finding [nor anything in the record] . . . specifically explain how Defendant used his podiatric skill -- i.e., such as if Defendant had used his diagnostic skills as a podiatrist in some way to falsify the claim forms and the operative reports."  United States v. Gandy, 36 F.3d at 916 (internal footnote omitted).  The Tenth Circuit pointed out that possession of a special skill without more is insufficient for § 3B1.3's enhancement:

> We note that the court's finding is problematic for another reason. The court's statement that "[i]f [Defendant] hadn't had [his skill] no fraud could have been committed by him," seems to suggest that because Defendant is a podiatrist, *a fortiori* he used his special skill in the commission of his offense. As we have already explained, however, it must be shown not only that Defendant possessed a special skill, but also that he employed that special skill to facilitate the commission of his offense.

United States v. Gandy, 36 F.3d at 916 n.2 (alterations in original).

## LAW REGARDING U.S.S.G. § 3C1.1

U.S.S.G. § 3C1.1 states:

If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.  The application notes state: "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."  U.S.S.G. § 3C1.1, Application Note 1.

The application notes to U.S.S.G. § 3C1.1 provides a non-exhaustive lists of conduct that warrants the upward adjustment.  See U.S.S.G. § 3C1.1, Application Note 4.

> **4.** **Examples of Covered Conduct. --** The following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies:
>
> **(A)** threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;
>
> **(B)** committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction;
>
> **(C)** producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding;
>
> **(D)** destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so . . .
>
> **(E)** escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding;
>
> **(F)** providing materially false information to a judge or magistrate judge;
>
> **(G)** providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense;

    **(H)**    providing materially false information to a probation officer in respect to a presentence or other investigation for the court;

    **(I)**    other conduct prohibited by obstruction of justice provisions under Title 18, United States Code (e.g., 18 U.S.C. §§ 1510, 1511);

    **(J)**    failing to comply with a restraining order or injunction issued pursuant to 21 U.S.C. 853(e) or with an order to repatriate property issued pursuant to 21 U.S.C. 853(p);

    **(K)**    threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction.

U.S.S.G. § 3C1.1, Application Note 4.  In United States v. Farnsworth, 92 F.3d 1001 (10th Cir.1996), the Tenth Circuit recognized that an attempt to influence a witness by instructing the witness to lie warrants an enhancement under U.S.S.G. § 3C1.1.  See 92 F.3d at 1011.  The Tenth Circuit remanded the case to the district court, however, because the district court did not make a specific finding as to the issue, instead doing no more than adopting "the analysis of the Probation Department as accurate and correct."  United States v. Farnsworth, 92 F.3d at 1011.  In United States v. Yuselew, No. CR 09-1035 JB, 2010 WL 3834418 (D.N.M. Aug. 5, 2010) (Browning, J.), the Court held that, "to warrant application of the § 3C1.1 enhancement, the defendant must have deliberately -- not accidentally, incidentally, or mistakenly -- done some act with the specific purpose of thwarting the investigation and prosecution."  2010 WL 3834418, at *12.  The Court also found that attempts to obstruct justice may be sufficient if the acts were of a kind that were likely to thwart the investigation and eventual prosecution.  See United States v. Yuselew, 2010 WL 3834418, at *13.

## LAW REGARDING U.S.S.G. § 3A1.3

U.S.S.G. § 3A1.3 states that "[i]f a victim was physically restrained in the course of the offense, increase [offense level] by **2** levels."  U.S.S.G. § 3A1.3.  "'Physically restrained' means the forcible restraint of the victim such as by being tied, bound, or locked up."  U.S.S.G. § 1B1.1, Application Note 1(K).  The examples of physical restraint in Guidelines are merely illustrative and not exhaustive.  See United States v. Checora, 175 F.3d at 790 (citing United States v. Roberts, 898 F.2d 1465, 1479 (10th Cir. 1990)).  The Tenth Circuit has held that the guideline applies when two defendants tackled a victim to the ground to prevent the victim from escaping.  See United States v. Checora, 175 F.3d at 791.  The restraint of the victim need not occur during the offense of conviction, as long as the restraining occurred as port of the relevant conduct.  See United States v. Holbert, 285 F.3d 1257, 1262-63 (10th Cir. 2002)("We hold that, for the purpose of applying § 3A1.3, the defendant must have physically restrained a victim in the course of the offense, and that the course of the offense includes any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).").

## LAW REGARDING DOWNWARD DEPARTURES

The Guidelines "place essentially no limit on the number of potential factors that may warrant a departure."  Koon v. United States, 518 U.S. 81, 106 (1996).  See United States v. Coleman, 188 F.3d 354, 358 (6th Cir.1999)(en banc)(stating that there are a "potentially infinite number of factors which may warrant a departure"); 18 U.S.C. § 3661 (stating that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence").  A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline."  Koon v. United

States, 518 U.S. at 92.   Accord United States v. Lewellen, No. CR 11-1524 JB, 2012 WL 2175769, at *5 (D.N.M. June 5, 2012)(Browning, J.).

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.  We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States district judge.

Koon v. United States, 518 U.S. at 113.

## ANALYSIS

The Court will overrule Rodella's Objections in part and sustain them in part, and will sentence Rodella to 121-months imprisonment.  Tafoya suffered a serious bodily injury, because of Rodella's assault against him, warranting the Aggravated Assault Guideline's application. Because Rodella ordered Rodella, Jr. and Gutierrez to handcuff Tafoya, Rodella physically restrained Tafoya to warrant U.S.S.G. § 3A1.3's application.  Rodella qualifies as a leader under U.S.S.G. § 3B1.1, even though Rodella, Jr. was not convicted of a crime.  Additionally, even though Rodella, Jr. could have been convicted of the same crime as Rodella, § 3B1.1 applies if Rodella, Jr. was a criminal participant in a different crime.  Rodella obstructed justice by submitting a false report to the State Police when it was investigating him, warranting U.S.S.G. § 3C1.1's application.  The Court will not depart downward, because Rodella's medical condition does not place him outside the heartland of cases.  The Court will, however, vary downward and sentence Rodella to 121-months imprisonment to better reflect the factors in 18 U.S.C. § 3553(a).  Additionally, the Court will impose a $200,000.00 fine.  The Court will also order Rodella to pay $7,135.88 in restitution to the New Mexico Victims Reparation Commission and $3,200.00 in restitution to Tafoya for lost wages.

## I.   THE   AGGRAVATED   ASSAULT   GUIDELINE   IS   THE   APPLICABLE GUIDELINE.

The Aggravated Assault Guideline is the applicable guideline.  Rodella argues that U.S.S.G. § 2A2.2 should not apply, because he did not intend to cause bodily injury, and because Tafoya did not suffer serious bodily injury.  See Objections at 3-4.  Rodella further argues that the jury did not find that Tafoya suffered a bodily injury.  See Objections at 4.  The United States argues that U.S.S.G. § 2A2.2 applies, because Tafoya suffered serious bodily injury, and because Rodella intended to violate Tafoya's civil rights.  See Objections at 1-2.  Because Tafoya suffered a serious bodily injury, U.S.S.G. § 2A2.2 applies, and the Court will overrule Rodella's objection.

"'Aggravated assault' means a felonious assault that involved . . . serious bodily injury." U.S.S.G. § 2A2.2, Application Note 1.  "'Serious bodily injury' means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  U.S.S.G. § 1B1.1, Application Note 1(L).  Here, as a result of Rodella's assault against Tafoya, Tafoya injured his thumb and was required to wear a splint for three months, undergo surgery to correct the injury, and undergo occupational therapy.  See PSR ¶ 20, at 7. Specifically, Tafoya suffered a "right thumb ulnar collateral ligament tear."  PSR ¶ 20, at 7. Tafoya's injury is a serious bodily injury.  His injury resulted in the "impairment of a function of a bodily member" and required "medical intervention" in the form of surgery and "physical rehabilitation."  U.S.S.G. § 1B1.1, Application Note 1(L).  Moreover, the Fourth Circuit has held that a torn ligament in the shoulder, which required corrective surgery, constituted a serious bodily injury.  See United States v. Hampton, 628 F.3d 654, 660 (4th Cir. 2010)("Atkinson's injury to his rotator cuff and ligament in his shoulder required medical attention and six weeks of

physical therapy.  Under the Guidelines' definition, this constitutes a 'serious bodily injury.'"

(quoting U.S.S.G. § 1B1.1)).  Accordingly, Rodella's torn ligament, which required surgery and

physical therapy, constitutes a "serious bodily injury."  U.S.S.G. § 1B1.1.

While the jury did not find beyond a reasonable doubt that Tafoya suffered a bodily

injury, see Verdict at 1, there is sufficient evidence to find by a preponderance of the evidence

that Tafoya suffered a serious bodily injury.  The Supreme Court has held that, at sentencing, a

court may consider conduct underlying a charge of which the defendant was acquitted as long as

the conduct can be proven by a preponderance of the evidence.  See United States v. Watts,

519 U.S. at 157 ("We therefore hold that a jury's verdict of acquittal does not prevent the

sentencing court from considering conduct underlying the acquitted charge, so long as that

conduct has been proved by a preponderance of the evidence."); United States v. Sandoval, 506

F. Supp. 2d 582, 591 (D.N.M. 2007)(Browning, J.)("[A] court can consider uncharged,

dismissed, and acquitted conduct that a preponderance of the evidence supports in determining

whether to enhance a sentence."); United States v. Zuni, 506 F. Supp. 2d 663, 665 (D.N.M.

2007)(Browning, J)("[N]ot only can the sentencing court consider conduct for which the

defendant was acquitted, the sentencing court, under the Guidelines, makes findings about that

conduct by a preponderance of the evidence."), aff'd, 273 F. App'x 733 (10th Cir. 2008).  Here,

a preponderance of the evidence establishes that Tafoya suffered a serious bodily injury.

After the incident, Tafoya indicated, on the Rio Arriba County Detention Center's inmate

screening form, that he was experiencing pain in his thumb.  See Rio Arriba County Detention

Center Inmate Screening at 4, filed January 14, 2015 (Doc. 159-2).  Tafoya had to undergo

surgery on October 7, 2014.  See PSR ¶ 20.  He is required to wear a splint for three months and

undergo occupational therapy.   See PSR ¶ 20.   This is sufficient evidence to find by a

preponderance of the evidence that Tafoya suffered a serious bodily injury because of Rodella's conduct.

It is not necessary for the Court to determine whether Tafoya injured his thumb when wrestling with Rodella in the vehicle or when Rodella, Jr. threw him to the ground.  The Application Notes to U.S.S.G. § 2A2.2 state that the offense must "involve[] . . . serious bodily injury."  U.S.S.G. § 2A2.2, Application Note 1 (emphasis added).  It is not necessary that Rodella directly caused the injury as long as the injury occurred during the assault.  In United States v. La Rosa, 236 F. App'x 584 (11th Cir. 2007)(unpublished), the United States Court of Appeals for the Eleventh Circuit held that § 2A2.2 applied, because a serious bodily injury occurred when the defendant rammed a Border Patrol boat and then attempted to flee.  See 236 F. App'x at 590-91.  During the chase, which occurred after the ramming, one of the Border Patrol agents crushed his finger while attempting to secure ammunition on his boat's forward cabin.  See United States v. La Rosa, 236 F. App'x at 590.  The Eleventh Circuit held that, because the agent's finger was crushed during the assault against the Border Patrol, the agent's injury was a serious bodily injury under § 2A2.2.  See United States v. La Rosa, 236 F. App'x at 590-91.  It does not matter whether Rodella or Rodella, Jr. actually caused the injury.  All that matters is that injury occurred during the assault, which it did.  Additionally, even if Tafoya's thumb was injured when Rodella, Jr. threw Tafoya to the ground and subdued him, Rodella's actions still caused this injury, because Rodella ordered Rodella, Jr. to pull Tafoya out of the vehicle and to restrain him.  See 1st Addendum at 4.

Additionally, the Court will apply U.S.S.G. § 2A2.2, because Rodella intended to commit another felony.  Without explanation, the United States argues: "The jury found that Defendant acted with intent to deprive the victim of his civil rights, contrary to 18 U.S.C. § 242.  That fact

alone should cement the application of §2A2.2." Response at 2.  The United States appears to be arguing that Rodella committed the assault while intending to commit another felony.  Section 2A2.2 applies if the assault involved "an intent to commit another felony."  U.S.S.G. § 2A2.2, Application Note 1.  While the United States is slightly misguided, because § 2A2.2 requires the intent to commit another felony and not just an intent to violate a person's civil rights, the Court concludes that Rodella intended to commit another felony.

Section 2A2.2 states that "'[a]ggravated assault' means a felonious assault that involved . . . an intent to commit another felony."  U.S.S.G. § 2A2.2, Application Note 1.  The relevant issue here is what level of intent is required to trigger § 2A2.2's application.  There are two potential interpretations of § 2A2.2's intent requirement.  First, it could be that the necessary intent is only the intent required to commit the second offense.  Thus, if a defendant committed a second felony during the commission of a felonious assault, § 2A2.2 will always apply.  Second, it could be that the defendant must specifically intend to commit a second felony during the commission of the felonious assault.  Under this definition, § 2A2.2 would apply if the second offense were a specific intent crime or if the defendant committed a felonious assault with the specific intent -- i.e. the purpose -- to commit a second felony.  The Court believes that the second definition is correct.[8]

_____

[8]The Court spoke with the United States Sentencing Commission to see if it had comments on the correct interpretation of the intent to commit another felony prong.  The Commission suggested that § 2A2.2 requires the felonious assault to be done with the purpose of committing another felony -- i.e. the reason the defendant committed the felonious assault was to commit another felony.  Thus, if a defendant beat someone to rape them, § 2A2.2 would apply; or, if a defendant threatened someone with a gun to rob them, it would apply.  Under this definition, however, § 2A2.2 would not apply if a defendant committed a second felony, during the relevant conduct of a felonious assault, and the second felony was a specific intent crime.  The Court believes that the Commission's suggested interpretation is too narrow and is contrary to § 2A2.2's language.  Section 2A2.2 does not state that it requires the felonious assault be committed to commit another felony or the felonious assault is for the purpose of committing

Under the first definition, § 2A2.2 would apply in almost every case in which a defendant was convicted of two offenses and at least one offense constituted a felonious assault. The only time in which § 2A2.2 would not apply is if one conviction did not fall within the relevant conduct of the felonious assault. See United States v. Eretza-Flores, 233 F. App'x 696, 697-98 (9th Cir. 2007)(unpublished)(holding that, because illegal re-entry offense concluded before the assault on a federal officer occurred, there was no intent to commit another felony). Criminal offenses rarely travel alone. If a defendant can be convicted of one felony, there are likely several felonies which can be brought for the defendant's conduct. This reality becomes even truer when state felonies are considered. See United States v. Ranaldson, 386 F. App'x 419, 429 (4th Cir. 2010)(applying § 2A2.2 because of an intent to commit a state felony); United States v. Pinto, No. CR 09-0056 JJB/SCR, 2013 WL 2147234, at *4 (M.D. La Mar. 13, 2013) (Riedlinger, M.J.)(same). A defendant's conduct could lead to the application of several state and federal felonies, and that fact alone would trigger § 2A2.2's application.

The first interpretation would also render other Guidelines' provisions meaningless. It would render U.S.S.G. § 2A2.3 inapplicable to felonious assaults. Section 2A2.3 applies to minor assaults, and the Background to the provision states that it applies "to any felonious assault not covered by § 2A2.2." See U.S.S.G. § 2A2.3, Background. If the commission of another felony during a felonious assault, which could be found by a preponderance of the evidence at sentencing, triggered § 2A2.2's application, § 2A2.3 would never apply to any

---

another felony. It merely requires "a felony assault that involved . . . an intent to commit another felony." U.S.S.G. § 2A2.2, Application Note 1 (emphasis added). The language of "involved" and "an intent to commit" is broader than a "for the purpose of" standard. Because a specific intent crime requires an intent to commit a felony, assuming the crime is a felony and not a misdemeanor, if a specific intent crime occurs during the commission of a felonious assault, the assault "involved . . . an intent to commit another felony." U.S.S.G. § 2A2.2, Application Note 1. The Commission's suggested interpretation is too narrow in light of the provision's language.

felonious assaults, because every felonious assault likely involves the commission of another felony -- either state or federal.  This interpretation would essentially read out the other three prongs that trigger § 2A2.2's application -- dangerous weapon with an intent to cause bodily injury; serious bodily injury; or strangling, suffocating, or attempting to do so -- because almost every felonious assault would involve the commission of another felony.  Courts, however, regularly apply § 2A2.2 based on one of the prongs other than an intent to commit another felony.[9]  Because interpreting § 2A2.2's intent to commit another felony prong as requiring only the necessary mens rea to commit the other felony would make § 2A2.2 applicable in almost every felonious assault case, would render certain Guidelines provisions meaningless, and is contrary to the manner in which courts apply § 2A2.2, the Court will not adopt this interpretation.

The Court believes that § 2A2.2 should apply if a defendant commits another felony that has a specific intent mens rea or if the defendant specifically intended to commit the other felony -- i.e. the purpose of the assault was to commit another felony.  This interpretation prevents § 2A2.2 from applying in almost every case, from rendering other provisions meaningless, and is consistent with the manner in which courts have applied § 2A2.2.

First, this interpretation is consistent with § 2A2.2's language.  The Tenth Circuit differentiates between general and specific intent crimes as follows:  "A specific intent crime is one in which an act was committed voluntarily and purposely with the specific intent to do something the law forbids.  In contrast, a general intent crime is one in which an act was done

_____

[9]Based on a WestlawNext search, only 8 of the 510 cases that cite § 2A2.2 apply the provision under the intent to commit another felony prong.  While all 510 cases that cite § 2A2.2 do not apply the Aggravated Assault Guideline, that only 8 cases apply § 2A2.2 under the intent to commit another felony is indicative of the fact that this prong does not subsume the other three prongs and that most courts apply § 2A2.2 under one of the prongs other than an intent to commit another felony.

voluntarily and intentionally, and not because of mistake or accident." United States v. Zunie, 444 F.3d 1230, 1234 (10th Cir. 2006)(quoting United States v. Blair, 54 F.3d 639, 642 (10th Cir. 1995))(internal quotation marks omitted). Section 2A2.2 does not say that an aggravated assault involves the commission of another felony or the intent to commit conduct which could be classified as a felony. Instead, it states that an aggravated assault involves "an intent to commit a felony." U.S.S.G. § 2A2.2, Application Note 1. The intent is to commit a felony, i.e. the intent "to do something the law forbids." United States v. Zunie, 444 F.3d at 1234 (internal quotation marks omitted). Applying § 2A2.2's intent to commit another felony to specific intent crimes is consistent with § 2A2.2's text. Applying § 2A2.2 when a defendant commits the felony with the specific intent to commit another felony, or for the purpose of committing another felony, is also consistent with the text. If a person assaults someone to commit a general intent felony, he or she committed the assault with the intent to commit the other felony. Section 2A2.2 would thus apply if a person assaulted a federal officer for the purpose of keeping possession of drugs, see United States v. Rue, 988 F.2d 94 (10th Cir. 1993)(applying § 2A2.2 when federal inmate assaulted officer to maintain possession of drug paraphernalia), but it would not apply if a defendant just happened to be in possession of drugs when he or she assaulted someone, see, e.g., United States v. Williams, 403 F.3d 1188, 1194 (10th Cir. 2005)("'Being a felon in possession of a firearm is a general intent crime." (quoting United States v. Klein, 13 F.3d 1182, 1183 (8th Cir. 1994)(internal quotation marks omitted)); State v. Sylvia, 845 So. 2d 358, 364 (La. 2003)("Unlawful possession of cocaine is a general intent crime."); City of Overland Park v. McBride, 861 P.2d 1323, 1326 (Kan. 1993)(holding that possession of marijuana is a general intent crime).

Second, while almost every criminal conduct could be classified as felonious under a number of state and federal statutes, when it comes to assault, most of these felonies are general intent crimes.  An assault is a general intent crime.  See, e.g., United States v. Zunie, 444 F.3d at 1233 ("We have previously held that assault resulting in serious bodily injury is a general intent crime.").  By limiting § 2A2.2's application to another felony that is a specific intent crime, or to felonies that a defendant specifically intended to commit, § 2A2.2 will not apply in almost every case in which a felonious assault occurs.

Third, and related to the second, this definition will keep § 2A2.3 relevant and will not subsume the other prongs in § 2A2.2.  A felonious assault can still occur that does not involve an intent to commit another felony; thus, § 2A2.3 will apply to some felonious assaults.  See U.S.S.G. § 2A2.3, Background ("This section applies to . . . any felonious assault not covered by § 2A2.2 (Aggravated Assault).").  Additionally, many aggravated assaults will likely occur, because they involve the use of a dangerous weapon with an intent to cause bodily injury; serious bodily injury; or strangling, suffocating, or attempting to strangle or suffocate, without an intent to commit another felony.  Consequently, the other three prongs are still relevant and are not subsumed by the intent to commit another felony prong.

Fourth, this definition is consistent with the manner in which courts have applied § 2A2.2.  In United States v. Rue, the Tenth Circuit applied § 2A2.2, because of an intent to commit another felony, when a federal prison inmate stabbed a prison guard with a syringe to prevent the guard from taking away the syringe and the drugs inside the syringe.  See 988 F.2d at 95.  The Tenth Circuit held that § 2A2.2 applied, because the inmate committed the assault with the intent to possess the drugs and the syringe.  See 988 F.2d at 97.  Or in other words, the purpose of assaulting the guard was to maintain possession of the syringe and the drugs.

Similarly, in United State v. Webster, No. 94-3186, 68 F.3d 484 (10th Cir. Oct. 20, 1995)(table opinion)(unpublished), the defendant assaulted a prison guard when the guard attempted to take away the defendant's homemade plexiglass knife.  See No. 94-3186, 68 F.3d 484, at *2, n.5. The Tenth Circuit affirmed the district court's application of § 2A2.2 by holding that the defendant assaulted the guard with the intent to possess the knife, in violation of 18 U.S.C. § 1791(a)(2).  See No. 94-3186, 68 F.3d 484, at *3.  The defendant's purpose in assaulting the guard was thus to possess the knife.

In United States v. Thompson, 60 F.3d 514 (8th Cir. 1995), Drug Enforcement Administration ("DEA") agents stopped the defendant in the St. Louis, Missouri, airport while carrying $16,843.00 in cash.  See 60 F.3d at 515.  The DEA agents seized the money as drug-related currency and took the defendant into a room for questioning.  See 60 F.3d at 515-16.  While being interviewed, the defendant hit one of the agents in the head -- knocking him unconscious -- grabbed the cash, and ran into another agent, whom he "bowled . . . over," while attempting to escape.  60 F.3d at 516.  The United States Court of Appeals for the Eighth Circuit affirmed the district court's application of § 2A2.2, holding that "the record fully supports the district court's conclusion that [the defendant] struck [the DEA agent] in order to facilitate the robbery of the seized drug proceeds."  60 F.3d at 518 (emphasis added).  The purpose of the assault on the agent was to steal the seized drug proceeds.

In United States v. Robles, 557 F. App'x 355 (5th Cir. 2014)(unpublished), the defendant, in an attempt to flee to Mexico, drove a car into a metal barricade, got out of the car, and then charged at a border patrol agent, knocking the agent down.  See 557 F. App'x at 356. The Fifth Circuit affirmed the district court's application of § 2A2.2 by holding that the defendant assaulted the border patrol agent with the intent to use a vehicle to evade arrest.  See

557 F. App'x at 358-59.  The defendant, thus, assaulted the officer with the specific intent to evade arrest.  In United States v. Burns, No. 95-2480, 78 F.3d 589 (8th Cir. Mar. 8, 1996), the defendant parked his car behind the victim's car, preventing her from being able to drive away. See id. at *1.  The defendant then got out of his car -- wearing only shoes, socks, and an unbuttoned shirt -- and approached the victim's car.  See id. at *1.  The defendant attempted to open the victim's car door, but was unable to do so, because it was locked; the defendant then began to masturbate and pound on the driver's side window until the victim drove away.  See id. at *1.  The Eighth Circuit affirmed the district court's application of § 2A2.2, because the defendant assaulted the victim -- by pounding on the car window -- with the intent to either rape or assault her.  See id. at *2.  The defendant, thus, committed the assault with the specific intent to rape or assault the victim.

In Munger v. United States, 827 F. Supp. 100 (N.D.N.Y. 1992)(McAvoy, J.), the defendant set a cross on fire directly across the street from an interracial couple's house while shouting racial slurs, curses, and threats, and while brandishing a noose.  See 827 F. Supp. at 102.  The husband approached the burning cross with an axe to cut the cross down.  See id. at 102.  An altercation occurred, and the defendant ended up chasing the couple into their home while screaming death threats and obscenities.  See 827 F. Supp. at 102.  The defendant then punched his arm through a glass window in an attempt to reach the couple.  See id. at 102.  The Honorable Thomas J. McAvoy, United States Chief Judge for the Northern District of New York, applied § 2A2.2, because the assault against the couple "was committed in furtherance of at least four felonies": conspiring to violate their civil rights -- in violation of 18 U.S.C. § 241 -- interference with their housing rights resulting in bodily injury-- in violation of 42 U.S.C. § 3631(b)(1) -- interference with their housing rights by force or threat of force -- in violation of

42 U.S.C. § 36(b)(1) -- and use fire in the commission of a felony -- in violation of 18 U.S.C. § 844(h)(1).  See 827 F. Supp. at 104.  In committing the assault, the defendant specifically intended to violate their civil rights and interfere with their housing rights.[10]  Additionally, 18 U.S.C. § 844(h)(1) is a specific intent crime.  Section 844(h)(1) states: "Whoever . . . uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States, or . . . shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years."  18 U.S.C. § 844(h)(1).  18 U.S.C. § 844(h)(1) requires a defendant to use the fire "to commit any felony," i.e. for the specific intent to commit a felony.  18 U.S.C. § 844(h)(1).

In United States v. Richardson, 386 F. App'x 419 (4th Cir. 2010), the defendant attacked a police officer who attempted to arrest him, and, during the struggle, the defendant attempted to unholster the officer's weapon and attempted to grab another officer's rifle.  See 386 F. App'x at 421.  The Fourth Circuit affirmed the district court's application of § 2A2.2, because, during the assault, the defendant attempted to disarm a law enforcement officer, which is a felony under West Virginia law.  See 386 F. App'x at 429.  The relevant West Virginia statute states: "A person who intentionally disarms or attempts to disarm a law-enforcement officer, . . . acting in his or her official capacity, is guilty of a felony."  W. Va. Code Ann. § 61-5-17.  Similarly, in United States v. Pinto, a border patrol agent attempted to arrest the defendant, and the defendant began to claw at the agent, resisted arrest, and attempted to pull the agent's gun out of its holster.  See 2013 WL 2147234, at *2.  The Honorable Stephen C. Riedlinger, United States Magistrate

---

[10]While Judge McAvoy stated that the assault was committed "in furtherance" of the other felonies, Munger v. United States, 827 F. Supp. at 103, by being committed in furtherance of the felonies, the assault was committed with the specific intent to commit these other felonies. If an act is done to further the commission of a felony, the act is done for the purpose of committing the other felony -- i.e. the specific intent to commit the other felony.  Thus, by committing an assault in furtherance of another felony, a defendant commits the assault with the specific intent to commit the other felony.

Judge for the Middle District of Louisiana, recommended that § 2A2.2 apply, because, during the assault on the border patrol agent, the defendant intended to commit another felony: attempting to disarm a law enforcement officer.  See 2013 WL 2147234, at *4.  The Honorable James J. Brady, United States District Judge for the Middle District of Louisiana, adopted Judge Riedlinger's recommendations.  See United States v. Pinto, No. CR 09-0056, JJB/SCR, 2013 WL 2147226, at *1 (M.D. La. May 15, 2013)(Brady, J.).  The relevant Louisiana statute in that case states:

> Disarming of a peace officer is committed when an offender, through use of force or threat of force, and without the consent of the peace officer, takes possession of any law enforcement equipment from the person of a peace officer . . . , when the offender has reasonable grounds to believe that the victim is a peace officer acting in the performance of his duty.

La. Rev. Stat. Ann. 14:34.6.

In both United States v. Richardson and United States v. Pinto, the other felonies involved specific intent crimes.  The Louisiana statute from United States v. Pinto explicitly states that the defendant had to know, or at least have "reasonable grounds to believe," that the peace officer "is a peace officer acting in performance of his duty."  La. Rev. Stat. Ann. 14:34.6. The West Virginia statute from United States v. Richardson does not state whether the defendant had to know that the officer was a law enforcement officer, but normal canons of statutory construction would suggest that it requires a defendant to know.  See W. Va. Code Ann. § 61-5-17.  The Court has previously noted that, when a statute provides the required mens rea, that mens rea should apply to each subsequent element that is listed in the statute.  See United States v. Harry, No. CR 10-1915, 2014 WL 6065677, at *10 (D.N.M. Oct. 14, 2014) (Browning, J.).  The West Virginia statute states: "A person who intentionally disarms or attempts to disarm a law-enforcement officer, . . . acting in his or her official capacity."  W. Va.

Code Ann. § 61-5-17.  The intentionally mens rea attaches not only to the act of disarming, but also to the law-enforcement officer element and acting in his or her official capacity element. See United States v. Harry, 2014 WL 6065677, at *10.  The West Virginia statute requires the defendant to attempt to disarm someone that he or she knew was a law enforcement officer. Because the West Virginia and Louisiana statutes require the defendant to know or reasonably believe that the person being disarmed is a law enforcement officer, they are specific intent crimes, because they require an intent "to do something the law forbids" -- disarm a law enforcement officer -- rather than merely committing an act.  United States v. Zunie, 444 F.3d at 1234 ("A specific intent crime is one in which an act was committed voluntarily and purposely with the specific intent to do something the law forbids.  In contrast, a general intent crime is one in which an act was done voluntarily and intentionally, and not because of mistake or accident." (citation omitted)(internal quotation marks omitted)).[11]

In United States v. Caplett, 338 F. App'x 571 (9th Cir. 2009)(unpublished), the Ninth Circuit vacated the district court's application of § 2A2.2 and remanded the case.  See 338 F. App'x at 573.  The Ninth Circuit did not provide the facts of the case.  See 338 F. App'x

---

[11]The Sentencing Commission's suggested interpretation -- that the felonious assault was for the purpose of committing another felony -- would be inconsistent with the results in United States v. Richardson and United States v. Pinto.  In both cases, it cannot be said that the defendants assaulted the officers for the purpose of disarming the officers.  Rather, the assault began, and then, during the assault, the defendants attempted to disarm the officers.  The defendants thus committed felonious assaults that involved the commission of other felonies. The second felonies were specific intent crimes, which under the Court's test would result in § 2A2.2's application.  In both situations, however, it does not appear that the defendants' purposes in committing the felonious assaults were to disarm the officers.  Rather, the defendants' purposes appear to be to evade arrest.  The purpose of attempting to disarm the officers was the same -- to avoid being arrested.  Only the Court's test -- and not the Commission's suggested interpretation -- is consistent with United States v. Richardson's and United States v. Pinto's results.  While harmony with prior cases is not the goal, it does suggest that other courts have read the Guidelines, as written, in a manner that is contrary to the Commission's suggested interpretation.

at 572 n.1 ("Because the parties are familiar with the factual and procedural background, we do not recite it here, except as necessary to aid in understanding this disposition.").  From the facts provided, it appears that the defendant assaulted a federal officer and then, a short time later, used methamphetamine.  See 338 F. App'x at 572.  It is unclear whether the defendant possessed the drugs during the assault on the officer.  The Ninth Circuit held that the defendant's use of the methamphetamine was "incidental and unrelated to the assault."  228 F. App'x at 573.  In addressing the defendant's possession of methamphetamine, the Ninth Circuit held that "there is no evidence in the record to support a finding that [the defendant] committed the assault with the specific intent to commit the state felony of possession of methamphetamine."  338 F. App'x at 573 (emphasis added).  The Ninth Circuit distinguished United States v. Rue by noting that, there, "the assault directly 'involved' Rue's possession of the contraband, which was a felony." United States v. Caplett, 338 F. App'x at 573 (quoting United States v. Rue, 988 F.2d at 95). The Ninth Circuit stated that, in United States v. Rue, the defendant possessed the drugs during the assault and that it was, thus during the relevant conduct of the assault.  See United States v. Caplett, 338 F. App'x at 573.  The Ninth Circuit noted that, in United States v. Caplett, "the connection between [the defendant's] assault and his possession of methamphetamine is much more attenuated than in Rue."  338 F. App'x at 573.  Assuming that, in United States v. Caplett, the defendant possessed the methamphetamine during the assault, but the assault was not committed for the specific intent of possessing the drugs, then United States v. Caplett's holding is in accordance with the Court's interpretation of § 2A2.2.[12]

---

[12]Even if the defendant did not possess the drugs during the assault, United States v. Caplett's holding is still consistent with the Court's interpretation, because the possession did not occur during the relevant conduct of the assault, and because there was still no specific intent to possess the drugs.

These cases are consistent with the Court's interpretation.  They either involved a specific intent to commit another felony, see United States v. Rue, 988 F.2d at 95; United State v. Webster, No. 94-3186, 68 F.3d 484, at *1; United States v. Thompson, 60 F.3d at 514; United States v. Robles, 557 F. App'x at 355; United States v. Burns, No. 95-2480, 78 F.3d 589, at *1; Munger v. United States, 827 F. Supp. at 104, or involved another felony that is a specific intent crime, see United States v. Richardson, 386 F. App'x at 429; United States v. Pinto, 2013 WL 2147234, at *4.  Accordingly, the Court concludes that § 2A2.2's fourth prong -- "intent to commit another felony" -- applies when the other felony is a specific intent felony or when the defendant specifically intended to commit the other felony.  The provision's language supports this test; it prevents other provisions from being meaningless; it prevents § 2A2.2 from applying to every felonious assault; and it is consistent with other court's application of § 2A2.2.

With this interpretation, Rodella intended to commit another felony.  The 18 U.S.C. § 242 violation is the relevant felonious assault.  By violating § 242, Rodella also violated 18 U.S.C. § 924(c), because he brandished a firearm during a crime of violence, which was the § 242 violation.  While not every provision within 18 U.S.C. § 924(c) is a specific intent crime, see United States v. Brown, 915 F.2d 219, 225 (6th Cir. 990)(holding that 18 U.S.C. § 924(c)(1) is a general intent crime when the defendant merely uses a firearm during a crime of violence); United States v. Dare, 425 F.3d 634, 641 n.3 (9th Cir. 2005)(holding that discharging a firearm is a general intent crime under § 924(c)), if a defendant brandished a firearm during a crime of violence, the § 924(c) violation is a specific intent crime, see Dean v. United States, 556 U.S. 568, 579 (2009)(Stevens, J., dissenting)("Similarly, clause (ii) mandates an enhanced penalty for brandishing a firearm only upon proof that a defendant had the specific intent to intimidate."); United States v. Goldstein, No. CR 2:10-0525 JAD/PAL, 2014 WL 1168969, at *6-7 (D. Nev.

Mar. 21, 2014)(Dorsey, J.)(concluding that, if a defendant brandishes a firearm during a crime of violence, § 924(c)(1) violation is a specific intent crime). Here, Rodella brandished a firearm by displaying it for the purpose of intimidating Tafoya. Rodella has not objected to the seven-year minimum sentence under 18 U.S.C. § 924(c)(1)(A)(ii) for brandishing a firearm. Rodella was thus convicted of a specific intent crime. Because Rodella was convicted of a specific intent crime in connection with his felonious assault, Rodella intended to commit another felony.

Additionally, § 2A2.2 applies because Rodella committed a felonious assault with the specific intent to unlawfully arrest Tafoya while acting under the color of law. The Guidelines provision for Offenses Involving Individual Rights states that the base offense level can be "the offense from the offense guideline applicable to any underlying offense" U.S.S.G. § 2H1.1(a)(1). The Application Notes define "[o]ffense guideline applicable to any underlying offense" to mean "the offense guideline applicable to any conduct established by the offense of conviction that constitutes an offense under federal, state, or local law." U.S.S.G. § 2H1.1, Application Note 1. Section 2A2.2 states that it applies if there is "a felonious assault that involved . . . an intent to commit another felony." U.S.S.G. § 2A2.2, Application Note 1. Section 2A2.2 does not say that the felonious assault has to be a federal felony, but instead, merely requires a felonious assault. This felonious assault may be a state law assault. See United States v. Woodlee, 136 F.3d 1399, 1407 (10th Cir. 1998)(holding that § 2A2.2 applies, because defendant's conduct would constitute a felonious assault under Oklahoma state law); United States v. Willis, 550 F. App'x 763, 765 (11th Cir. 2013)(unpublished)(applying § 2A2.2, because the defendant's conduct qualified as a felonious assault under Alabama state law). New Mexico state law defines aggravated assault as, among other things, "unlawfully assaulting or striking at another with a deadly weapon." N.M. Stat. Ann. § 30-3-2(A). New Mexico state law

defines assault as, among other things, "any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery."  N.M. Stat. Ann. § 30-3-1(B).  Aggravated assault, under New Mexico law, thus, "requires proof that defendant threatened or engaged in menacing conduct with a deadly weapon toward a victim, causing the victim to believe he or she was about to be in danger of receiving an immediate battery."  State v. Bachicha, 1991-NMCA-014 ¶ 9, 808 P.2d 51, 54.

Here, Rodella's conduct qualifies as aggravated assault under New Mexico state law.  He pointed a gun at Tafoya's face, and, when Tafoya begged Rodella not to kill him, Rodella said: "It's too late."  PSR ¶ 11, at 5.  Rodella thus engaged in threatening or menacing conduct with a deadly weapon towards Tafoya, and Tafoya believed that he was in danger of being shot in the face.  Consequently, Rodella committed a felonious assault for § 2A2.2 purposes.  Rodella's specific intent in committing this felonious assault -- his purpose in assaulting Tafoya -- was to conduct an unlawful arrest under the color of law.  The jury found that Rodella unlawfully arrested Tafoya, in violation of 18 U.S.C. § 242.  See Verdict at 1.  The reason Rodella assaulted Tafoya was to conduct this unlawful arrest.  His specific intent in committing the felonious assault was to commit another felony: the unlawful arrest.  Rodella thus committed a felonious assault with the specific intent to commit another felony.[13]  Accordingly, in addition to the

---

[13]Because Rodella's purpose in committing the felonious assault was to commit another felony, under the Sentencing Commission's suggested interpretation, the result would be the same in this case whether the Court used the Court's test or the Commission's suggested interpretation.  Section 2A2.2 applies, because the felonious assault involved an intent to commit another felony.

serious bodily injury prong, § 2A2.2 applies because Rodella intended to commit another felony.[14]

## II.   **RODELLA PHYSICALLY RESTRAINED TAFOYA.**

Rodella physically restrained Tafoya.  U.S.S.G. § 3A1.3 states that, "[i]f a victim was physically restrained in the course of the offense, increase [the offense level] by 2 levels." U.S.S.G. § 3A1.3.  Rodella makes three objections to § 3A1.3's application.  First, he argues that Rodella, Jr. restrained Tafoya, after "any civil rights violation had concluded."  Objections at 5. Second, Rodella argues that Rodella, Jr.'s restraining of Tafoya was not a crime, because the restraining "was important for the safety of everyone."  Objections at 5.  Third, Rodella argues that § 3A1.3 requires that he used physical force or some other compulsion to restrain Tafoya, which did not occur, because Rodella, Jr. did the restraining.  See Objections at 5.  Rodella is mistaken on each point.

First, Rodella does not explain why "any civil rights violation had concluded" when Rodella, Jr. pulled Tafoya out of the car, threw him to the ground, twisted his arm behind his back, and shoved his face against the ground.  Objections at 5.  The jury found that Rodella unlawfully arrested Tafoya.  See Verdict at 1.  Rodella, Jr. held Tafoya against the ground before other officers arrived to handcuff and arrest Tafoya.  Rodella's unlawful arrest of Tafoya continued through when Tafoya was formally arrested, which occurred after Rodella, Jr.

---

[14]One might argue that 18 U.S.C. § 924(c)(1)(A)(ii) cannot be another felony for § 2A2.2 purposes, because it is merely a sentencing enhancement and not a separate felony.  The Supreme Court, in Castillo v. United States, 530 U.S. 120 (2000), rejected this argument by holding that § 924(c)(1) provides elements of a separate offense and that it is not merely a sentencing enhancement.  See 530 U.S. at 121.  See also Alleyne v. United, 133 S. Ct. 2151 (2013)("Similarly, because the fact of brandishing aggravates the legally prescribed range of allowable sentences, it constitutes an element of a separate, aggravated offense . . . ."); United States v. Rentz, No. 12-4169, 2015 WL 430918, at *9 (10th Cir. Feb. 3, 2015)(Kelly, J., concurring)("But § 924(c) is not a sentence-enhancement provision."  (citing Rosemond v. United States, 134 S. Ct. 1240, 1247 (2014)).

restrained Tafoya.   Thus, Rodella's civil rights violation had not concluded when he ordered

Rodella, Jr. to restrain Tafoya and when Rodella, Jr. held Tafoya against the ground.   In the same

way, Rodella's offense had not concluded when the Rio Arriba Sheriff deputies arrested Tafoya.

See PSR ¶¶ 14-15, at 6 (noting that Tafoya was handcuffed and taken to the Rio Arriba Sheriff's

office).

Second, whether Rodella, Jr. was justified in restraining Tafoya is irrelevant.   Several

United States Courts of Appeals have held that the lawfulness of the arrest or physical restraint

of a victim is irrelevant to § 3A1.3's application.   See United States v. Carson, 560 F.3d 566, 588

(6th Cir. 2009)("To the extent that the district court thought that the lawfulness of the arrest

precluded application of § 3A1.3, it committed legal error."); United States v. Clayton, 172 F.3d

347, 353 (5th Cir. 1999)("[W]e agree with the Fourth Circuit that the lawfulness of the

defendant's restraint of the victim at the time the unreasonable or excessive force occurs is not a

concern implicated by U.S.S.G. § 3A1.3."); United States v. Evans, No. 95-5714, 85 F.3d 617,

at *1-2 (4th Cir. Apr. 23, 1996)(table opinion)(unpublished)(holding that the lawfulness of an

arrest is not a deciding factor in determining § 3A1.3's application).   Even assuming that

Rodella, Jr. was justified in restraining Tafoya, § 3A1.3 still applies, because the lawfulness of

the physical restraint is irrelevant to § 3A1.3's application.[15]   This same logic applies to the

---

[15]While the lawfulness of physically restraining a victim is irrelevant to § 3A1.3's
application, Rodella, Jr. was not, by a preponderance of the evidence, justified in restraining
Tafoya.   Rodella argues that Rodella, Jr. restrained Tafoya "for the safety of everyone."
Objections at 5.   This statement misconstrues the facts, because the only reason anyone was in
danger was because of Rodella's actions and not Tafoya's.   Rodella was attempting to point his
gun in Tafoya's face while Tafoya begged for his life.   See PSR ¶ 11, at 5.   Tafoya also grabbed
Rodella's wrist to keep the gun away from his face.   See PSR ¶ 11, at 5.   At that point, Rodella,
Jr. pulled Tafoya out of the car and restrained him.   See PSR ¶ 12, at 5-6.   The only person
whose safety was at risk was Tafoya, and Rodella was the one who risked Tafoya's safety by
pointing a gun in his face.   If Rodella, Jr. wanted to restrain someone to protect everyone
involved, he should have restrained Rodella -- the one assaulting Tafoya with a deadly weapon --

sheriff deputies arresting Tafoya.  Even if the deputies lawfully arrested Tafoya, Tafoya being

physically restrained by the handcuffs can lead to § 3A1.3's application.

Third, it does not matter that Rodella, Jr., and not Rodella, physically restrained Tafoya.

The Tenth Circuit defined the term forcible restraint in United States v. Checora.

> [W]e first conclude that by "forcible," the Commission meant the defendant must use physical force or another form of compulsion to achieve the restraint.  This reading is consistent with our previous decisions regarding physical restraint. Similarly, we conclude the Commission intended "restraint" to mean the defendant's conduct must hold the victim back from some action, procedure, or course, prevent the victim from doing something, or otherwise keep the victim within bounds or under control.  As we recently stated, keeping someone from doing something is inherent within the concept of restraint.

United States v. Checora, 175 F.3d at 790-91 (alterations omitted)(citations omitted)(internal

quotation marks omitted).  Rodella argues that this definition from United State v. Checora

shows that § 3A1.3 is inapplicable, because the Tenth Circuit requires the defendant to do the

restraining, and, here, Rodella, Jr. restrained Tafoya.  See Objections at 5.  Rodella's argument

ignores both the holding of United States v. Checora, which applied § 3A1.3 to two

co-defendants who did not do the restraining, and the Tenth Circuit's application of relevant

conduct to § 3A1.3.

The Tenth Circuit has held that § 3A1.3 applies if the defendant physically restrained the

victim during any conduct that qualifies as relevant conduct under U.S.S.G. § 1B1.3.  See United

States v. Holbert, 285 F.3d at 1262-63 ("We hold that, for the purpose of applying § 3A1.3, the

defendant must have physically restrained a victim in the course of the offense, and that the

---

and not Tafoya -- the victim.  It is unlikely that, at Rodella's orders, Rodella, Jr. was justified in grabbing a victim of a crime and restraining him.  This situation is analogous to a person robbing a convenience store with a gun, pointing the gun at the store clerk, and then ordering someone else to physically restrain the clerk to defuse the situation.  Just because the restraining defused the situation does not mean that it was lawful.  In the same way, just because Rodella, Jr.'s restraining of Tafoya defused the situation does not mean that the restraining was lawful.

course of the offense includes any conduct for which the defendant is accountable under § 1B1.3

(Relevant Conduct).").   The Guidelines define relevant conduct broadly.  <u>See</u> U.S.S.G. § 1B1.3.

> **(a)** **Chapters Two (Offense Conduct) and Three (Adjustments).**  Unless otherwise specified, . . . adjustments in Chapter Three, shall be determined on the basis of the following:
>
>> **(1)(A)** all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>>
>> **(B)** in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,
>>
>> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>>
>> . . .
>>
>> **(3)** all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions . . . .

U.S.S.G. § 1B1.3(a).   Section 3A1.3's application is determined by "all acts" that Rodella

"committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused . . .

during the commission of the offense."  U.S.S.G § 1B1.3(a).

       According to Rodella's interview with the Federal Bureau of Investigation on June 4,

2014, he ordered Rodella, Jr. to pull Tafoya out of the vehicle and to restrain him.  <u>See</u> 1st

Addendum at 4.  Following Rodella's command, Rodella, Jr. pulled Tafoya out of the car, threw

him on the ground, and then pinned him against the ground.  <u>See</u> PSR ¶ 12, at 6; Transcript of

Trial at 305:14-22 (taken September 22, 2014)(Neda, Tafoya)("Trial Day 1 Tr.")("Q.  Now,

when he asked that you what position were you in?  A.  I was still on the ground.  Q.  Face

down?  A.  Yes.  Q.  And where was the younger man?  A.  He was on top of me.  Q.  Okay.  On

your back?  A.  Yes, he was on my back.").  Rodella, thus, "commanded" and "willfully" caused

Tafoya to be restrained during the commission of the offense by ordering Rodella, Jr. to pin

Tafoya on the ground.  U.S.S.G. § 1B1.3(a).  Furthermore, when Sergeant Gutierrez arrived at

the scene of the incident, Rodella ordered him to arrest Tafoya and to place him in Sergeant

Gutierrez' vehicle.  See Transcript of Trial at 244:3-8 (Taken September 23, 2014)(Peña,

Gutierrez)("Trial Day 2 Tr.")("Q.  No[w], did [Rodella] instruct you to do anything with respect

Michael Tafoya?  A.  Yes.  Q.  What did he tell you to do?  A.  To I believe to place him in my

vehicle and to place him under arrest.").  Tafoya was then handcuffed and arrested.  See PSR

¶¶ 14-15.  Accordingly, Rodella commanded and willfully caused Tafoya to be physically

restrained by ordering Gutierrez to arrest Tafoya.

     Section 3A1.3's application in this case is consistent with United States v. Checora.

There, two of the four defendants chased the victim and tackled him to prevent him from

escaping.  See 175 F.3d at 790.  The Tenth Circuit, in an opinion that the Honorable John C.

Porfilio, United States Circuit Judge for the Tenth Circuit, authored, and Judge Tacha and then-

Chief Judge Seymour joined,  reasoned that, by tackling the victim, the defendants "forcibly

denied him freedom of movement."  175 F.3d at 791.  The Tenth Circuit held that the fact that

the restraint was brief did not alter its conclusion, because "the 'Guidelines do not distinguish

between long and short-term restraint.'"  175 F.3d at 791 (quoting United States v. Foppe, 993

F.2d 1444, 1452 (9th Cir. 1993)).  The Tenth Circuit went on to hold that § 3A1.3 applied to two

co-defendants who did not tackle the victim, because under § 1B1.3(a)(1)(B) -- the relevant

conduct provision -- the two defendants were liable for the foreseeable actions of their co-

defendants.  See United States v. Checora, 175 F.3d at 791.  United States v. Checora, thus,

stands for the propositions that § 3A1.3 applies when a person tackles a victim to prevent the victim from escaping and that relevant conduct of § 1B1.3 can lead § 3A1.3's application.

Here, Rodella, Jr. tackled Tafoya and then held him against the ground to prevent him from escaping.  See PSR ¶ 12, at 5-6.  Rodella, Jr. thus physically restrained Tafoya.  See United States v. Checora, 175 F.3d at 791.  Gutierrez later handcuffed Tafoya and placed him in his car. See Trial Day 2 Tr. at 244:3-8 (Peña, Gutierrez).   Consequently, Gutierrez also physically restrained Tafoya.  See U.S.S.G. § 1B1.1, Application Note 1(K) (defining physically restrained as "the forcible restraint of the victim such as by being tied, bound, or locked up").  Rodella ordered both Rodella, Jr. and Gutierrez to restrain or arrest Tafoya.  See 1st Addendum at 4; Trial Day 2 Tr. at 244:3-8 (Peña, Gutierrez).  Rodella thus "commanded" and "willfully caused" Tafoya to be physically restrained.  U.S.S.G. § 1B1.3.  Accordingly, Rodella is liable -- for sentencing purposes -- for the physical restraining of Tafoya, and § 3A1.3 applies.

## III.   RODELLA WAS A LEADER UNDER U.S.S.G § 3B1.1.

Rodella was a leader under U.S.S.G. § 3B1.1.  Section 3B1.1 applies if Rodella "was an organizer, leader, manager, or supervisor in any criminal activity."  U.S.S.G. § 3B1.1(c).  The application notes to § 3B1.1 lists a number of factors that the Court should consider in determining its application.  See U.S.S.G. § 3B1.1, Application Note 4.

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, Application Note 4.  The Tenth Circuit has stated that "[f]unctioning as a leader requires an element of control over underlings, particularly in the form of recruitment and direction."  United States v. Wardell, 591 F.3d at 1304.  Here, Rodella directed Rodella, Jr.

When Tafoya took off in his car, after stopping on the side of the road, Rodella told Rodella, Jr. to follow Tafoya's car, which Tafoya, Jr. did.  See PSR ¶ 19, at 6-7.  Rodella also ordered Rodella, Jr. to pull Tafoya out of his car and restrain him, which Rodella, Jr. also did. See 1st Addendum at 4.  Rodella was, thus, able to exercise "an element of control" over Rodella, Jr. "in the form of . . . direction."  United States v. Wardell, 591 F.3d at 1304. Consequently, Rodella is a leader under § 3B1.1.

Rodella does not argue that he did not exercise control over Rodella, Jr.  Instead, Rodella argues that, because Rodella, Jr. cannot be criminally responsible for the offense, he is not a criminal participant under § 3B1.1.  See Objections at 6-8.  Rodella contends that, because the United States dismissed the charges against Rodella, Jr., it "is bound by its prior determination and estopped from arguing that this guideline is" applicable.[16]  Objections at 6.  Rodella also argues that, because Rodella, Jr. is not a law enforcement officer, he cannot be a criminal "participant in acting under color of law to deprive a person of his constitutional rights to be free from the unreasonable seizure of a law enforcement officer."  Objections at 7.  In the same way, Rodella argues that Rodella, Jr. could not be a participant in possessing and brandishing a firearm.  See Objections at 7-8.  Rodella relies on a United States Circuit Court for the District of Columbia case, United States v. Williams, to argued that, because Rodella, Jr. could not participate in Rodella's crimes, § 3B1.1 does not apply.  See Objections at 7.

Rodella is correct that § 3B1.1 requires another participant to apply, but is mistaken in believing that, because the United States dismissed the charges against Rodella, Jr., he cannot be a participant.  Section 3B1.1 defines participant as "a person who is criminally responsible for

---

[16]In his Objections, Rodella states: "The United States is bound by its prior determination and estopped from arguing that this guideline is inapplicable."  Objections at 6.  Rodella likely intended to say that the United States is estopped from arguing that § 3B1.1 is applicable.

the commission of the offense, but need not have been convicted."   U.S.S.G. § 3B1.1, Application Note 1.  Rodella, Jr. can be a participant under § 3B1.1 even though he was not convicted.  See U.S.S.G. § 3B1.1, Application Note 1.  That the United States dropped the charges against Rodella, Jr. is irrelevant.  The United States Courts of Appeals for the Sixth and Eighth Circuits have held that a person can be a participant under § 3B1.1, even though the criminal charges against the person were dropped.  See United States v. Salas, 281 F. App'x 496, 500 (6th Cir. 2008)(unpublished)("That the district court dismissed the indictment against Zelaya is of no import.  Most significantly, the Guidelines state that '[a] participant is a person who is criminally responsible for the commission of the offense, but need not have been convicted.'" (internal quotation marks omitted)(emphasis in United States v. Salas but not in source)(quoting U.S.S.G. § 3B1.1, Application Note 1)); United States v. Mayer, 130 F.3d 338, 340 n.2 (8th Cir. 1997)("While the charges against Stathoulopoulos were dismissed, he is considered a 'participant' for section 3B1.1 purposes.").  Accordingly, Rodella, Jr. can be a participant even though the charges against him were dropped.

Additionally, it is irrelevant that Rodella, Jr. is not a law enforcement officer for two reasons.  First, Rodella, Jr. can be convicted under 18 U.S.C. § 242.  The Supreme Court has held that "[p]rivate persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of" 18 U.S.C. § 242, and that "[i]t is enough that he is a willful participant in joint activity with the State or its agents."  United States v. Price, 383 U.S. 787, 794 (1966).  Here, Rodella, Jr. willfully participated with Rodella in unlawfully arresting Tafoya and in using excessive force against Tafoya.  He can thus be convicted under 18 U.S.C. § 242, even though he is a private citizen.  See United States v. Price, 383 U.S. at 794.  Second, relevant conduct can be considered in determining whether a person is a participant under

§ 3B1.1.  Tenth Circuit has held that "a 'participant' need not have committed the same criminal offense as the defendant; it is enough that the 'participant' was criminally involved in -- and, therefore, culpable for -- the same relevant conduct, as that concept is explicated in U.S.S.G. § 1B1.3."  United States v. Powers, 578 F. App'x 763, 782 (10th Cir. 2014)(unpublished).  See United States v. VanMeter, 278 F.3d 1156, 1166 (10th Cir. 2002)("It makes no difference Mr. Pralle may not have been responsible for violating 18 U.S.C. § 666.  The district court correctly applied the aggravating adjustment based on Mr. VanMeter's supervision of Mr. Pralle's other relevant crimes.").  Here, Rodella Jr. drove aggressively in pursuing Tafoya, brandished a firearm in approaching Tafoya's vehicle, forcibly pulled Tafoya out of his car, and threw Tafoya to the ground.  Rodella Jr.'s actions qualify as criminal even if they are crimes for which Rodella, Jr. was not convicted.  See U.S.S.G. § 3B1.1, Application Note 1 (stating that a participant "is a person who is criminally responsible for the commission of the offense, but need not have been convicted").

Rodella's reliance on United States v. Williams is misplaced.  There, the District of Columbia Circuit held that a person is a participant under § 3B1.1 only if he or she participated in the offense for which the defendant was convicted, and not merely participated in relevant conduct to the offense.  See United States v. Williams, 891 F.2d at 924-25.  The District of Columbia Circuit held that, because the defendant was convicted of being in possession of a sawed-off shotgun, and not for being the manager of a drug house, his conduct in managing the drug house could not be considered in determining whether he was a leader, organizer, or manager.  See 891 F.2d at 925.  Since United States v. Williams was decided, the Sentencing Guidelines Committee amended the relevant conduct provision to clarify that a court could consider relevant conduct in determining § 3B1.1's application.  In United States v. Caballero,

936 F.2d 1292 (D.C. Cir. 1991), the District of Columbia Circuit recognized that <u>United States v. Williams</u>' holding is contrary to the Guidelines amendment, and, thus, is no longer good law. <u>See</u> 936 F.2d at 1298.  Consequently, Rodella's argument that Rodella, Jr. cannot be a participant lacks a sound basis in the applicable law, because good law does not support that he could not be guilty of the offenses for which Rodella was convicted.  Because Rodella directed Rodella, Jr.'s actions in violating Tafoya's constitutional rights, Rodella is a leader under § 3B1.1, and the Court will overrule Rodella's objection.

## IV.   <u>RODELLA OBSTRUCTED  JUSTICE</u>.

Rodella obstructed justice.  Rodella argues that the report that he provided to the State Police showed his observations of the event and that the United States must prove that his actions hindered the investigation.  <u>See</u> Objections at 8-9.  Rodella is mistaken on both points.  U.S.S.G. § 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.  The application notes to § 3C1.1 provides a non-exhaustive list of conduct that warrants § 3C1.1's application.  <u>See</u> U.S.S.G. § 3C1.1, Application Note 4.  One example is "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding."  U.S.S.G. § 3C1.1, Application Note 4(C).  Section 3C1.1 applies in this case, because Rodella produced a false document during an official investigation.

After Rodella learned that the State Police were investigating Tafoya's complaint about the March 11, 2014, incident, Rodella provided the State Police with a false report to include in

its investigation.  See 1st Addendum at 5.  In this report, Rodella states multiple times that, during the March 11, 2014, incident, he identified himself as the sheriff while holding out his badge.  See Supplemental -- Case No. SO-14-000310, filed November 18, 2014 (Doc. 148-6)("Rodella Report").  He states that, after Tafoya pulled his vehicle over to the side of the road, Rodella "exited the passenger side and identified [himself] by holding [his] badge directly in front of [him]," and that he "continued to hold [his] badge in front of [him] as [he] approached the green Mazda."  Rodella Report at 1.  Rodella states that, when Tafoya's vehicle reached the end of the dirt road, he "approached the vehicle displaying [his] badge and identifying [himself] as the Sheriff," and that he "continued to identify [himself] in a loud voice and display [his] badge."  Rodella Report at 2.  He states that, after Tafoya's vehicle came to a stop, Rodella "quickly ran to the passenger side of the vehicle and continued to audibly identify [himself] as the Sheriff."  Rodella Report at 2.

This report is contrary to the evidence that was presented at trial.  When Tafoya stopped on the side of the road and Rodella approached his car, Rodella did not have a badge displayed and was motioning to Tafoya in a manner that indicated that he wanted to fight.  See PSR ¶ 7, at 4-5.  At trial, Tafoya testified that Rodella did not display his badge when he pulled over to the side of the road.  See Trial Day 1 Tr. at 290:9-14 (Neda, Tafoya)("Q.  Did one show a badge to you?  A.  No.  Q.  On the side of that road?  A.  No.  Q.  Are you certain of that?  A.  I'm certain.").  Similarly, when Tafoya's vehicle came to a stop at the end of the dirt road, Rodella was not displaying a badge.  See Trial Day 1 Tr. at 301:13-14 (Neda, Tafoya)("Q.  Did you see any badges?  A.  No, I did not.").  In fact, Rodella did not show Tafoya his badge until after Rodella, Jr. had pulled Tafoya out the vehicle and pinned him to the ground.  See PSR ¶ 13, at 6.

When Rodella finally showed Tafoya his badge, he hit Tafoya on the face with it and said: "[Y]ou want to see my badge mother fucker?  Here's my badge."  PSR ¶ 13, at 6.

In his report, Rodella stated that he continuously displayed his badge to Tafoya, see Rodella Report at 1-2, but the evidence at trial shows that is not true.  Rodella's account in the report is false.  The report is false.  Rodella produced the report for the State Police after he learned that the State Police was investigating him for the March 11, 2014, incident.  See 1st Addendum at 5.  Rodella, thus, filed a false report during an official investigation.  According to § 3C1.1's application notes, filing a false report during an official investigation constitutes obstruction of justice and warrants § 3C1.1's application.  See U.S.S.G. § 3C1.1, Application Note 4(C) ("The following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies . . . **(C)** producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding . . . .").  Accordingly, Rodella obstructed justice and § 3C1.1 applies.

Rodella argues that § 3C1.1 does not apply unless the United States can show that filing the false report impeded the State Police's investigation.  See Objections at 9.  To support this contention, Rodella cites United States v. Mason, 168 F. App'x 905 (11th Cir. 2006)(unpublished).  See Objections at 8.  There, the Eleventh Circuit stated: "When the district court applies the obstruction of justice enhancement, 'it should note specifically what each defendant did, why that conduct warrants the enhancement, and, if applicable, how that conduct actually hindered the investigation or prosecution of the offense.'"  United States v. Mason, 168 F. App'x at 907 (quoting United States v. Alpert, 28 F.3d 1104, at 1108 (11th Cir. 1994)(en banc)).  The Eleventh Circuit did not state that, every time a district court applies § 3C1.1, it should state how the defendant's conduct hindered the investigation, but instead, "if applicable,"

a district court should state how the defendant's conduct hindered the investigation.  United

States v. Mason, F. App'x at 907.  Certain examples of obstruction of justice in § 3C1.1's

application notes explicitly require the defendant's conduct to hinder an investigation or

prosecution.  See U.S.S.G. § 3G1.1, Application Note 4.  These include:

> **(D)**    destroying or concealing . . . evidence that is material to an official
> investigation or judicial proceeding (e.g., shredding a document or
> destroying ledgers upon learning that an official investigation has
> commenced or is about to commence), or attempting to do so; however, if
> such conduct occurred contemporaneously with arrest (e.g., attempting to
> swallow or throw away a controlled substance), it shall not, standing
> alone, be sufficient to warrant an adjustment for obstruction unless it
> results in a material hindrance to the official investigation or prosecution
> of the instant offense or the sentencing of the offender;
>
> . . .
>
> **(G)**    providing a materially false statement to a law enforcement officer that
> significantly obstructed or impeded the official investigation or
> prosecution of the instant offense;

U.S.S.G. § 3C1.1, Application Note 4 (emphasis added).  Application Note 5 states that

"providing a false name or identification document at arrest" does not constitute obstruction of

justice, "except where such conduct actually resulted in a significant hindrance to the

investigation or prosecution of the instant offense."  U.S.S.G. § 3C1.1, Application Note 5(A)

(emphasis added).  Application Note 4(C) -- "producing or attempting to produce a false, altered,

or counterfeit document or record during an official investigation or judicial proceeding" -- does

not require the defendant's conduct to impede or hinder the investigation.  U.S.S.G. § 3C1.1,

Application Note 4(C).  Because Rodella's conduct qualifies as obstruction of justice under

Application Note 4(C), the United States is not required to show that his conduct hindered or

impeded the State Police's investigation.  Accordingly, § 3C1.1 applies, and Rodella's objection

is overruled.

The USPO initially based § 3C1.1's application on Rodella's failure to disclose his assets in addition to his false report.  See 1st Addendum at 5.  Section 3C1.1's application notes state that "providing materially false information to a probation officer in respect to a presentence or other investigation for the court" constitutes obstruction of justice.  See U.S.S.G. 3C1.1, Application Note 4(H).  Rodella told the USPO that he would provide it with his financial records, but had not done so when the USPO calculated his Guideline Sentencing range.  Since that time, Rodella provided the Court and the USPO with his financial records.  See 2d Addendum at 1-4.  Because Rodella has provided the Court and USPO with the financial records that he promised, he has not made a materially false statement to a probation officer, and this basis for the obstruction of justice enhancement does not apply.  In any case, because Rodella provided the State Police with a false report during its investigation of him, § 3C1.1 applies.

## V.     **THE COURT WILL NOT DEPART DOWNWARD.**

The Court will not depart downward.  With a criminal history category of I and an offense level of 31, Rodella's Guidelines range is 108 to 135 months imprisonment.  With the mandatory seven-year minimum for violating 18 U.S.C. § 924(c)(1)(A)(ii), Rodella's total Guidelines range is 192 to 219 months imprisonment.  Rodella argues that, because of his medical condition, the Court should depart downward from the Sentencing Guideline range.  See Objections at 9-11.[17]  Rodella suffers from hemochromatosis, which "can cause the body to absorb too much iron from food and the excess is then stored in other organs, especially the liver, heart and pancreas."  PSR ¶ 56, at 12.  The PSR notes that the excess of iron "can poison these

---

[17]In the Objections, Rodella argues that the Court should grant a downward departure and a variance, because of his medical conditions, his good character, and to prevent disproportionate sentencing disparities.  See Objections at 9-13.  At the hearing, Rodella clarified that his departure argument was based on his medical condition while his variance argument was based on his good character and sentencing disparities.  See Tr. at 25:8-18 (Gorence, Court).

organs leading to life-threatening conditions, such as, cancer, heart arrhythmias and cirrhosis."
PSR ¶ 56, at 12.  Hemochromatosis treatment "requires doctors to safely and effectively remove
blood from your body on a regular basis to reduce iron levels."  PSR ¶ 56, at 12.

A downward departure "is warranted if the case is 'unusual enough for it to fall outside
the heartland of cases in the Guidelines.'"  United States v. Velazco-Barraza, No. CR 10-2217
JB, 2013 WL 311843, at *9 (D.N.M. Jan. 11, 2013)(Browning, J.)(quoting Koon v. United
States, 518 U.S. at 92).  This case is not outside the heartland that the Court sees, that other
judges in this district see, and that federal judges throughout the nation see.  While Rodella's
medical condition may be significant, it is not so severe to fall outside the heartland of conditions
that criminal defendants face.  Rodella can function normally, and it appears that his condition
does not interfere with his life.  Rodella will require regular treatment for his hemochromatosis,
but the Bureau of Prisons ("BOP") is more than capable of providing the necessary treatment.
The Court has personally visited the medical facilities at multiple BOP facilities, and the Court's
experience is that the BOP has been very good at accommodating the needs of its inmates.

The Court will deny the request for a departure.  While a departure for medical conditions
is certainly authorized under the Guidelines, the court is having trouble squaring his allegations
of poor health with his run for reelection for sheriff in 2014 and the physical action that took
place in this case; he was and is healthy enough to present himself to the voters for public office
and he was able to physically assault Tafoya.  In any case, the Court chooses not to depart,
because the Court concludes that a departure is not warranted under the facts and circumstances
here.  Unfortunately, the nation's prisons contain many who have health problems.  The Court is
having trouble distinguishing this case from the many others that come before the Court, before
the other judges in the district, and, indeed, before federal judges throughout the nation.  This

case fits into the heartland of cases that federal judges see.  Thus, even though the Guidelines authorize departures for medical conditions, the Court does not believe a departure is warranted under the facts of this case, and the Court will exercise its discretion not to depart because the case remains a heartland case.  Accordingly, the Court will decline to depart downward.  The Court will, however, take Rodella's health into consideration when it addresses Rodella's request for a variance.

## VI.    THE COURT WILL VARY DOWNWARD.

The Court will vary downward and will sentence Rodella to 121-months imprisonment. As the Court noted, the Guidelines Sentencing range is 108 to 135 months imprisonment, which results in a total of 192 to 219 months imprisonment when the mandatory seven years for violating 18 U.S.C. § 924(c)(1)(A)(ii) is included.  The Court will vary the equivalent of 10 offense levels, giving the Court a working offense level of 21.  A criminal history category of I and offense level of 21 results in a Guidelines range of 37 to 46 months imprisonment.  With the mandatory seven years of imprisonment for violating 18 U.S.C. § 924(c)(1)(A)(ii), the Court's working sentencing range is 121 to 130 months imprisonment.  The Court will sentence to the low end of this working range and will sentence Rodella to 121-months imprisonment.

Rodella argues that the Court should vary downward, because of his good character and to prevent sentencing disparities.  The Court agrees, and concludes that the factors set forth in 18 U.S.C. § 3553(a)(1) call for a downward variance from the Guidelines range.  There are a number of factors that place downward pressure on Rodella's sentencing range.  The Court has identified about twenty-two to twenty-three factors; some overlap, and some factors support both a variance and a Guidelines sentence.  First, the Court has received numerous letters from

Rodella's supporters detailing his good deeds and requesting the Court's lenience.[18]  While many see Rodella as a very bad person, as with most defendants before the Court, his character is more complex, and there are some good characteristics in his life.  Many wrote asking the Court not to impose any imprisonment, because of Rodella's good character.  While the Court is confident that Mr. Gorence has explained to Rodella that he will not walk out of federal court without a sentence of imprisonment, and indeed, Rodella is asking for a sentence of eight years, these requests for no imprisonment show that a Guidelines sentence would likely be viewed as excessive for Rodella, and the perception of Rodella by many puts downward pressure on the sentence.

Second, and closely tied to the first, the Court must craft a sentence that is sufficient to reflect the 18 U.S.C. § 3553(a) factors but not greater than necessary to achieve those purposes.  This factor always puts downward pressure on every sentence, and it particularly does here.  The Court does not sentence Rodella to seventeen years, because such a sentence would not accurately reflect § 3553(a)'s factors.

Third, the Court's task, as a district court, is not to come to the courtroom and come up with a reasonable sentence, but to craft a sentence that reflects that § 3553(a) factors.  United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)("A district court's job is not to impose a reasonable sentence.  Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)."  (alterations

---

[18]The Court received 344 letters supporting Rodella.  It also received one letter criticizing Rodella.  See Letter From Huey P. Crepelle, Jr. to Federal Court Judge (sent Sept. 28, 2014), filed September 28, 2014 (Doc. 173).  It took the Court three days to read all of the letters.  Additionally, assuming all of the letters came from individuals in Rio Arriba County -- which they did not -- close to 1% of the population in Rio Arriba County sent letters attesting to Rodella's good character and good deeds.  See Rio Arriba County, New Mexico, Wikipedia.org, http://en.wikipedia.org/wiki/Rio_Arriba_County,_New_Mexico  (last  visited  Jan.  29, 2015)(noting that the estimated population of Rio Arriba County in 2013 was 40,072).

omitted)(quoting <u>United States v. Wilms</u>, 495 F.3d 277 (6th Cir. 2007)).  Nonetheless, a number of the § 3553(a) factors -- seriousness of the offense, promote respect for the law, provide just punishment, and others -- help the Court, in the end, arrive at a reasonable sentence.  The Court is concerned that a seventeen year sentence not only does not reflect the § 3553(a) factors, but it would not be a reasonable sentence.

Fourth, after reviewing the letters, the Court is convinced that Rodella has committed many good deeds in his life.  While his detractors suggest that Rodella did all of his good deeds to others in the community for politically motivated reasons to help his and his wife's political careers, the Court is not convinced that Rodella did all of his good deeds for political reasons. While he no doubt did some for political reasons, people's good works often have mixed motives, and the Court believes that, based on the many stories in the letters sent to the Court, many of Rodella's good deeds were faith based or otherwise acts with sincere charitable motives.

Fifth, in Rodella's case, many of the goals of § 3553(a) factors can be served as well by supervised release as by imprisonment.  If he has no gun, he is not likely to be in a position to commit the gun offense that he, in a rash moment, committed in the case.  The Court can impose conditions -- such as anger management, no firearms, search of his vehicles -- that are as likely to reduce some risk and serve the § 3553(a) factors as imprisonment.  Supervised release can be used to ensure that Rodella does not do something like this again.

Sixth, it is important that the Court's sentence avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.  The Court has carefully reviewed the cases that Rodella has brought to the Court's attention as well as the criminal cases that the Court has had over the last twelve years.  If the Court were to sentence Rodella to seventeen years, the sentence itself would create a sentence disparity.  While

this factor most often puts pressure on the Court to hang around the Guidelines range, in this area, a Guidelines sentence would be disproportionate to others it has given and other federal judges have given, and would be an outlier.

Seventh, the Court is going to impose a substantial fine in this case -- one that is not only in the Guidelines range, but is at the high end of the Guidelines range: $200,000.00.  Even if the Court were to give Rodella the sentence he requests, his imprisonment and supervised release will cost the taxpayers more  money than the amount of the fine, and Rodella has considerable resources, even if the Court divides his wealth in half under Community Property precepts. Because a fine of this magnitude is punitive, it is unnecessary to continue to punish Rodella with as much incarceration as the Guidelines suggest.  The substantial fine in this case puts downward pressure on the need to incarcerate Rodella.

Eighth, as long as Rodella is not a law enforcement officer, it is unlikely the Court needs to use incarceration to protect the public from Rodella.  Because he is a felon and cannot carry a gun, it is unlikely he will ever be a police officer again.  The Court concludes that it does not need to emphasize the protect-the-public factor much in Rodella's case and use incarceration to reflect that factor.  While general deterrence is always important to protect the public, any sentence that Rodella receives in this case -- including the one that he requests -- is adequate to serve the purpose of protecting the public.  Because Rodella is not likely going to be able to commit a similar crime, a lengthy sentence is not necessary to protect the public.

Ninth, for many of the reasons that the Court has already given and will give, a Guidelines sentence would not be a just punishment.  A Guidelines sentence would be excessive and, by most, be perceived to be excessive.  The need to craft a just sentence puts downward pressure on the sentence.

Tenth, Rodella's medical condition -- hemochromatosis -- puts downward pressure on his sentence.   While his condition is not severe enough to warrant a departure, it warrants consideration in deciding whether to vary.  It is likely at some point to be debilitating.  While Rodella's crime is serious and warrants a long prison sentence, it does not need to be a life sentence.   Assuming that his medical conditions will shorten his life, and considering that non-white fifty-three-year-old males in New Mexico have a life expectancy of  75.4 years, <u>see</u> N.M. Stat. Ann. Life Expectancy Table (2011 Pocket Supp.)(noting that non-white fifty-three year old male is expected to live another 22.4 years), a seventeen year sentence is too close to a life sentence.

Eleventh, and perhaps most important, a Guidelines sentence would be disproportionate and out of line with what other federal courts have done in criminal civil rights cases and that the Court has done in several cases.   The Guidelines range suggests a sentence that is disproportionate to those given in similar cases.  In his Objections, Rodella listed a number of cases in which defendants received between 33-and 120-month sentences for 18 U.S.C. § 242 violations.  <u>See</u> Objections at 10-13 (citing <u>United States v. Livoti</u>, 196 F.3d at  322 (2d Cir. 1999)(upholding a 90-month sentence when a defendant placed a man in a chokehold until dead); <u>United States v. Brugman</u>, 364 F.3d at 613 (5th Cir. 2004)(upholding a 27-month sentence when a border patrol agent knocked a two people to the ground and kicked them); <u>United States v. Christian</u>, 342 F.3d at 744 (7th Cir. 2004)(upholding a 33-month sentence when a defendant had a person pinned to a chair while he punched the person in the face); <u>United States v. Mohr</u>, 318 F.3d at 613 (4th Cir. 2003)(upholding a 120-month sentence when a defendant released a police dog on two homeless men who had their hands in the air and were surrounded by police officers); <u>United States v. Wilson</u>, 344 F. App'x at 134 (6th Cir. 2009)(upholding a 33-month

sentence when a defendant subjected a jail inmate to inhuman conditions)).  While no defendant

used a firearm in those cases, one case resulted in the victim's death.  See United States v. Livoti,

196 F.3d at  322.  In that case, the Honorable Shira A. Scheindlin, United States District Judge

for the Southern District of New York, who has heard many high-profile cases involving civil

rights and the New York City Police Department, see Jeffrey Toobin, Rights and Wrongs: A

Judge Takes on Stop-and-Frisk, The New Yorker (May 27, 2013), http://www.newyorker.com/

magazine/2013/05/27/rights-and-wrongs-2, did not give more than 90 months imprisonment

when there had been a death, see United States v. Livoti, 196 F.3d at 325.  The Guidelines range

is also excessive compared to the 18 U.S.C. § 242 cases that the Court has had.  See United

States v. Frazier, 2013 WL 499245, at *1 (sentencing defendant, under a plea agreement, to three

years of probation for striking a person in the head and neck with a flashlight); United States v.

Chavez, No. CR 12-3290, Clerk's Minutes, filed March 3, 2014 (Doc. 106)(sentencing a

defendant to 12 months as to Count 1 and 18 months imprisonment as to Count 2, to run

concurrently, pursuant to a plea agreement); United States v. Gould, No. CR 03-2274, Clerk's

Minutes, filed May 6, 2009 (Doc. 439)(sentencing a defendant to 96 months imprisonment after

convicted of Counts 1, 2, 3, and 4 at trial and after he rejected a plea offer of less than ten years);

United States v. Gould, No. CR 03-2274, Clerk's Minutes, filed June 25, 2007

(Doc. 400)(sentencing co-defendant to eight months imprisonment pursuant to plea agreement

and after co-defendant cooperated with the United States); United States v. Gould, No. CR 03-

2274, Clerk's Minutes, filed June 25, 2007 (Doc. 401)(sentencing co-defendant to eight months

imprisonment pursuant to plea agreement and after co-defendant cooperated with the United

States).  The Guidelines range of 192 to 219 months is substantially larger than the sentences

from any of these cases.  The Court focuses on three cases in particular.  The 120-month

sentence in United States v. Mohr seems to begin to support a good range for a total sentence. The 33-month sentence in United States v. Wilson seems to support a good sentence for just the civil rights violation without the firearm offense. And the sentence should probably be north of the one in United States v. Gould to reflect the firearm count.

Twelfth, the severity of the crime puts downward pressure. The Guidelines range is closer to the ranges that the Court sees for rapes and murders. Indeed, for some murders and manslaughters, the sentences would be much lower than the Guidelines sentence here. While Rodella used a firearm during the crime and a civil rights crime is a serious crime, no life was lost nor was someone violently sexually assaulted.

Thirteenth, the thing that drives the Guidelines sentence so high is the use of a firearm. While the Court must respect Congress' decision that civil rights crimes and crimes in general that involve firearms deserves a more severe sentence, the seven-year mandatory sentence here for Count 2 drives the overall Guidelines range too high for the crimes here. The Court needs to mitigate the overall sentence when it can -- on the civil rights violation -- because it cannot do anything about the sentence for Count 2. The Court can craft a sentence that gives full respect to what Congress requires when a firearm is involved, that is an adequate sentence on just the civil rights violation, and still is a considerable variance for the overall Guidelines range.

Fourteenth, Rodella has received a number of commendations for his role as a law enforcement officer. These commendations indicate that he saw action in some violent situations and acted bravely and professionally. New Mexico is a state with violence, particularly in certain areas, and he has apprehended suspects in stressful situations without loss of life to others. He was involved as an officer in some crimes by others where others committed

egregious acts of violence and yet he acted heroically to defuse the situations without further loss or injury.

Fifteenth, any time a federal court has to sentence a police officer, it is not a good day for the officer, for his or her family, or for the community.  Any sentence that the Court will give in this case -- including the one Rodella asks the Court to give -- will be bad for him.  When Rodella first proudly put on the uniform of a New Mexico State Police officer, and follow his father into a career of law enforcement, he did not see his career ending the way it does today. Rodella has always seen himself as a law enforcement officer who chases criminal, and has not seen himself as a criminal.  Nor has he ever desired people in his community to see him as a criminal.  This conviction and sentence will be bad for Rodella's psyche.  And while the Court is confident that the BOP will protect his physical safety, anytime a police officer is sent to prison there is a concern.  There is no need to incarcerate Rodella longer than necessary.

Sixteenth, as the many letters that the Court has received indicate, the incarceration of Rodella will have an impact on many in the community.  Many see him as a good man and do not see any incarceration as just.  The Court can vary considerably, to mitigate the impact his absence will have on the community, and still reflect adequately the § 3553(a) factors.

Seventeenth, Rodella's mother is advanced in age and will likely not be around when Rodella gets out of prison.  It is likely the sentencing will be the last time he will be able to spend time with her.  This reality is a harsh consequence of the sentence, and there is no need to elongate it to reflect the § 3553(a) goals.  Eighteenth, the incarceration will impact a handful of Rodella's extended family, for which he plays a patriarchal role.  Rodella's close family will suffer hardship from his incarceration.  Rodella, Jr., who has a close relationship with his father and is apparently dealing with his own problems, will especially suffer during the time in which

Rodella is in prison.  Anytime fathers are put in prison, it is difficult for their family, but it will be particularly hard here, where Rodella was so involved his children's lives.  Nineteenth, Rodella has been married for twenty-eight years to his current wife.  She will suffer, and he, knowing that he has placed hardship on her, will suffer too.

Twentieth, one of the people that wrote the Court said that Rodella is like the Dallas Cowboys: people either like him or hate him.  That observation is probably true for many people who are in public office.  It is important that a federal court in sentencing makes certain that its sentence is not because the defendant is unpopular.  The need to make certain that there is an appearance of justice -- as well as actual justice -- puts downward pressure on the sentence.

Twenty-first, the sentence should promote respect for the law.  The Guidelines range is high for Rodella's crime.  If the Court were to give Rodella a Guidelines sentence, the Court is convinced the community would view such a sentence as harsh and, in in most eyes, unduly so for what he has done.

Twenty-second, a Guidelines sentence is not necessary to afford deterrence.  As to specific deterrence, with his criminal conviction, Rodella will likely never serve as a law enforcement officer again, and, unless the voters of Rio Arriba County try to put him back in the sheriff's office, he will not be placed in another situation in which he can commit a similar crime.  As to general deterrence, any sentence that Rodella will receive -- even the one he seeks -- will serve that purpose.

Finally, during his time as Sheriff, Rodella was passionate about addressing the drug problems in Rio Arriba County, which is a problem in the area and one that Rodella appears to genuinely care about solving.  Espanola, the largest city in Rio Arriba County, is known for its

heroine problem, and the Court has had to deal with an endless number of drug cases coming out of there.  No one disputes that Rodella worked hard to deal with this problem in his community.

Despite these numerous factors placing downward pressure on the sentence, there are a number of factors that place upward pressure and call for a sentence within the Guidelines range. Again, some of these are not discrete and overlap, and some also put downward pressure on the sentence.  First, the seriousness of the crimes places upward pressure on the sentence.  Our criminal justice system creates a system in which people in law enforcement prevent crime and seek justice when a crime is committed.  Our system works well with murders, rapes, robberies, and most other crimes.  When someone kills or rapes, the criminal justice system knows how to take care of the crime.  When a law enforcement officer commits a crime, however, the system has failed, because the very people whom we have entrusted to protect the citizenship from crime are subjecting citizens to crime.  A law enforcement officer's violation of the law is not comparable to an ordinary criminal's violation.  Civil rights crimes go to the core of our system and endanger the entire structure of our government and are a threat to the republic, not just one or two violations.  Rodella's civil rights crimes are severe by that measurement alone.  Also, Rodella's crime is severe at a specific level.  He used a firearm during the offense.  Rodella pointed a gun at Tafoya's face and head while Tafoya had no idea that he was a law enforcement officer.  Rodella frightened Tafoya with his car and by pointing a gun at him.  Rodella subjected Tafoya to severe terror that his life was about to end.  When Tafoya begged for his life, Rodella told him: "It's too late."  This crime is terrorizing in its own right and serious.  Additionally, by requiring a mandatory seven year imprisonment under 18 U.S.C. § 924(c)(1)(A)(ii), Congress has indicated that it wants harsher punishments for crimes of violence that involve firearms.

Second, the tricky part of crafting Rodella's sentence is, with a seven year mandatory sentence for County 2, varying a lot without completely undermining the conduct on Count 1. Rodella wants the Court to give him only 12 months for that Count -- a 96 month variance.  To be a just sentence, however, the total sentence must also promote respect for the civil rights violation.  A 12-month sentence for that Count would not do that given the seriousness of the crime.

Third, while the Court has already said that it needs to vary to bring Rodella's sentence in line with sentences for other criminal civil rights crimes in the nation and in New Mexico, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct still has a gravitational pull toward a Guidelines sentence.  He used a firearm.  He went to trial.  He has refused to accept responsibility.  He should probably be at the top end of the actual range for criminal civil rights violations.

Fourth, many of Rodella's good deeds that are stated in his support letters may have been politically motivated to build political support for himself or for his wife.  Some of the good deeds are less of a testament to Rodella's character and more of a testament to his desire for him and his wife to be in public office.  Rodella is a complex man, and the Court is not incarcerating a man with an unblemished record even when he superficially appears to be doing good for someone.

Fifth, general deterrence places upward pressure.  Even if Rodella will likely never violate another person's constitutional rights, a serious sentence on Count 1 sends a message to all law enforcement officers to not abuse their positions.  Only one year for Count 1 does not send a good signal on the importance of police not violating the civil rights of the nation's citizens.

Sixth, Rodella has abused his authority on multiple occasions.  As the United States outlines in the U.S. Sentencing Memo., while serving as a State Police officer, Rodella abused his position often in exchange for votes for his wife.  See U.S. Sentencing Memo. at 2.  Rodella fixed traffic tickets to gain political support for his wife.  See U.S. Sentencing Memo. at 2.  As the Court read all the documents in his personal files about the ticket fixing, they made the Court sad that he would engage in such petty corruption and, as a supervisor of twenty-four other officers, the corruption was so widespread.  Perhaps if his supervisors had taken his actions more seriously, Rodella would not be where he is today.  Additionally, he falsified leave records.  Finally, he abused his position as a State Police officer to cover what he did.

Seventh, he brutalized his former wife.  Eight, he abused drugs as a police officer.  Ninth, he violated Jicarilla Tribal poaching laws and then used his position as a State Police officer in an attempt to influence the Jicarilla police officer who issued him a citation.   See U.S. Sentencing Memo. at 2.  Tenth, as a Rio Arriba County Magistrate, Rodella abused his position, and the Supreme Court of New Mexico eventually ordered him permanently removed from the bench.  See U.S. Sentencing Memo. at 3-4; In re Rodella, 2008-NMSC-050, 190 P3d 388.  Ninth, as was shown at trial, Rodella abused his authority as sheriff by bullying citizens who did not show him the respect that he believed he deserved or who challenged his authority even if they did not know he was a law enforcement officer.  He was a jerk to many citizens.  While he did many good things as a police officer, he was not a model police officer.

Eleventh, while the Court believes that Rodella's health is a factor that puts downward pressure on the sentence, the Court does not think that it puts much downward pressure.  The BOP can deal with his health concerns.  They can do the necessary blood draws.

Twelfth, and closely related to the last factor, Rodella has dealt well with his health problems.  He is capable of living a vigorous life with his medical problems.  He will figure out a way to persevere.

The number of factors calling for downward pressure outweighs the factors calling for a sentence within the Guidelines range.  Accordingly, the Court will vary the equivalent of 10 offense levels, producing a working offense level of 21.  A criminal history category of I and working offense level of 21 result in a Guidelines range of 37 to 46 months imprisonment.  With the mandatory seven years of imprisonment for violating 18 U.S.C. § 924(c)(1)(A)(ii), the working sentencing range is 121 to 130 months imprisonment.  The Court will sentence to the low end of this range, and will sentence Rodella to 121-months imprisonment.  This sentence adequately reflects the factors outlined in 18 U.S.C. § 3553(a).  It is adequate to reflect the seriousness of the offense, promote respect for the law, and provides just punishment for the offense.  See 18 U.S.C. § 3553(a)(2)(A).  A 121-month sentence provides general and specific deterrence, and adequately protects the public.  See 18 U.S.C. § 3553(a)(2)(B)-(C).  It also prevents disparities between defendants who have been found guilty of similar crimes.  See 18 U.S.C. § 3553(a)(6).  With the imposition of supervised release, Rodella can receive the necessary education and training to avoid future problems with the law.  See 18 U.S.C. § 3553(a)(2)(D).  Accordingly, the Court will sentence Rodella to 121-months imprisonment. The Court will also order him to pay a $200,000.00 fine.  The Guidelines fine range for Rodella is $20,000.00 to $200,000.00.  The statutory maximum fine is $250,000.00.  See 18 U.S.C. § 3571(b).  Rodella's net worth is $658,275.48.  See 2d Addendum at 2.  Halving that for community property, his personal net worth is $329,137.74.  He can pay a fine.  It costs $29,291.62 to incarcerate Rodella for a year; at 121 months, that is $295,357.17.  He will be on

supervised release for three years, which costs $3,162.03 per year.  Rodella's supervised release will cost the taxpayers about $9,486.09.

## VII.    **TAFOYA IS ENTITLED TO RESTITUTION.**

Tafoya is entitled to restitution.  Rodella's main argument against paying restitution is that Tafoya did not suffer a bodily injury.  See Objections at 3.  He also argues that Tafoya's choice not to work caused his lost wages.  See Objections at 3.  Because the Court has concluded that Tafoya suffered a serious bodily injury, the Court will overrule Rodella's first objection. Additionally, there is sufficient evidence to find that Rodella caused Tafoya's lost wages.  At the hearing on Rodella's first motion for new trial, Lisa Bronowicz, the Human Resources Director at Tafoya's work, testified that Tafoya was asked to take a leave of absence from work, because of the trial and how it was interfering with his work schedule.  See Transcript of Hearing at 81:4-82:12 (taken November 13, 2014)("1st New Trial Tr.")(Gorence, Bronowicz).  Ms. Bronowicz testified that, after the trial, Tafoya requested to take a further leave of absence to have surgery on his thumb.  See 1st New Trial Tr. at 82:21-83:7 (Gorence, Bronowicz).  Tafoya first had to miss work to prepare for and attend Rodella's trial.  Tafoya then missed more work to have surgery to repair an injury that Rodella caused.  Rodella thus caused Tafoya's lost wages. Accordingly, restitution is warranted, and the Court will order Rodella to pay $7,135.88 in restitution to the New Mexico Victims Reparation Commission to compensate the Commission for the money it expended on Tafoya's medical expenses and $3,200.00 in restitution to Tafoya for lost wages.  Rodella's objection is thus overruled.

**IT IS ORDERED** that the Defendant's Objections to the Presentence Report and Sentencing Memorandum, filed January 12, 2015 (Doc. 157), is overruled in part and sustained in part.  Rodella is sentenced to 121-months imprisonment.  Rodella must also pay a $200,000.00

fine.   Additionally, Rodella must pay $7,135.88 in restitution to the New Mexico Victims

Reparation Commission and $3,200.00 in restitution to Tafoya.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Tara C. Neda
Jeremy Peña
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Robert J. Gorence
Louren M. Oliveros
Gorence & Oliveros PC
Albuquerque, New Mexico

      *Attorneys for the Defendant*