IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | No. 14-CR-02783-JB |
| THOMAS R. RODELLA, | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE TO MOTION
FOR SENTENCE REDUCTION PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

Defendant Thomas R. Rodella has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release, relying in part on the threat posed by the COVID-19 pandemic. The United States respectfully opposes the motion. This Court should deny the motion with prejudice because Defendant has not met his burden of establishing that a sentence reduction is warranted under the statute.

**Factual Background**

On September 26, 2014, Defendant was convicted of one count of deprivation of civil rights contrary to 18 U.S.C. § 242 and one count of use of a firearm in furtherance of a crime of violence contrary to 18 U.S.C. § 924(c). This Court sentenced him to 121 months of imprisonment. Defendant has served 69 months of that sentence. He now moves under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction resulting in his immediate release from the custody of the Bureau of Prisons (BOP), relying on the threat posed by the COVID-19 pandemic.

**I. BOP's Response to the COVID-19 Pandemic**

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive

disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for

medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred 4,680 inmates to home confinement, which is an increase of 164% since March 2020. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP

must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II. Defendant's Conviction and Request for a Sentence Reduction

On March 11, 2014, while serving as the Sheriff of Rio Arriba County, Defendant violated the civil rights of 26-year-old Michael Tafoya. Defendant and his son chased down Tafoya's vehicle in their private, unmarked Jeep on the back roads of Rio Arriba County. When they cornered Tafoya in a private drive, Defendant exited the Jeep and leapt into Tafoya's car and put a gun to Tafoya's head. Defendant's son pulled Tafoya out of the car, threw him on the ground and told him that Defendant was the sheriff. When Tafoya asked to see a badge, Defendant struck him across the face with the badge, saying, "Here's my badge, mother fucker." In its case-in-chief at trial, the United States called several witnesses who testified that Defendant had treated them in a hostile or frightening manner in other roadside encounters. A jury convicted Defendant of one count of deprivation of civil rights contrary to 18 U.S.C. § 242 and one count of use of a firearm in furtherance of a crime of violence contrary to 18 U.S.C. § 924(c) on September 26, 2014. This Court sentenced him to 121 months of imprisonment.

Defendant has served 69 months of that sentence at Seagoville Federal Correctional Institution in Dallas County, Texas. Seagoville FCI has confirmed active cases of COVID-19 among inmates and staff. Defendant states that he has exhausted his administrative remedy by requesting compassionate release through the Bureau of Prisons. The United States has not verified Defendant's assertions, and reserves the right to supplement this Response upon

5

additional information, but in this Response the United States assumes Defendant's representations are correct.

On June 22, 2020, Defendant filed a motion with this Court seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A). As grounds, Defendant claims that his hypertension, lupus, and hemochromatosis, and the side effects of three medications he takes to treat his hypertension and post-traumatic stress disorder, make him particularly vulnerable to becoming seriously ill from COVID if he contracts it.

**Legal Framework**

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that

(i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[1]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

**Argument**

Defendant's motion for a reduction of his sentence should be denied for two reasons. First, Defendant has not identified "extraordinary and compelling reasons" for that reduction within the meaning of § 3582(c)(1)(A) and the Sentencing Commission's policy statement.

---

[1] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

Second, Defendant poses a significant danger to the public and the statutory § 3553(a) sentencing factors do not weigh in favor of his release.

### A. Defendant Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction.

Defendant's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify

compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020);; *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").[2] To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

Defendant's hypertension does not constitute an extraordinary and compelling reason justifying his release. The Center for Disease Control's most recent guidance distinguishes pulmonary hypertension from more common hypertension (high blood pressure). *See* https://www.cdc.gov/coronavirus/. Pulmonary hypertension is considered a serious heart condition, and increases a person's risk of severe illness from COVID-19. Hypertension (high

---

[2] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

blood pressure) *may* increase the risk of severe illness from COVID-19.[3]  Defendant's high

blood pressure is described as "benign, essential."  Doc. 247, p. 7.  The doctor's notes state,

"[blood pressure] well controlled, no chest pain, no [shortness of breath], no swelling, no

dyspnea."  *Id*.  While scientist have limited knowledge about the impact of underlying medical

conditions on a patient's outcomes from COVID-19, and our understanding changes rapidly, at

this time it appears that Defendant's benign, well-controlled high blood pressure does not

constitute an extraordinary and compelling justification for his release.

Defendant claims that he "has developed the extremely serious autoimmune disorder,

lupus."  Doc. 247, p. 3.  The medical records he has submitted provide no support for his claim.

Defendant's list of health problems tracked by the Bureau of Prisons does not mention lupus or

any other autoimmune disorder.  *Id*., pp. 7-9.  Defendant attaches a blood test result from Quest

Diagnostics that finds a speckled pattern of antinuclear antibodies (ANA).  *Id*., p. 12.  The report

states that the speckled pattern is "associated with mixed connective tissue disease (MCTD),

systemic lupus erythematosus (SLE), Sjogren's syndrome, dermatomyositis, and systemic

sclerosis/polymyositis overlap."  *Id*.  The speckled pattern is not diagnostic of any disorder, and

also appears in individuals with no autoimmune disorder.  *See* Exhibit 1 ("Antinuclear Antibody

Test Normal Range & Interpretation," page 5,

https://www.medicinenet.com/antinuclear_antibody/article.htm ("The speckled pattern is seen in

many conditions and in people who do not have any autoimmune disease.")).  Defendant's

physicians apparently did not see that his overall condition warranted further testing.  The blood

test result does not show the presence of an autoimmune disorder.

Defendant's hemochromatosis does not constitute an extraordinary and compelling

reason for his release.  Hemochromatosis is not a risk factor per CDC guidance.  Defendant

---

[3] Counsel believes that common hypertension was not on the CDC list at all until June 26, 2020.
On June 26, 2020, the CDC added a list of chronic conditions that "*might* increase a person's risk
of severe illness," including hypertension.  *See* https://www.cdc.gov/media/releases/2020/p0625-
update-expands-covid-19.html (emphasis in original).  Counsel will notify the Court if
Department of Justice guidance requires a change in position.

admits that his hemochromatosis does not adversely affect him, noting that he is not currently under treatment for the condition but that it "could become a problem at a later time." Doc 247, pp. 3-4.

Defendant's three medications do not constitute an extraordinary and compelling reason for his release. The medications are not listed as risk factors by CDC. Defendant does not explain what combined side effects they have. He has not supplied medical records showing the side effects, nor has he supplied documentation connecting those side effects to COVID-19 outcomes.

For these reasons, Defendant has failed to establish an "extraordinary and compelling reason" for a sentence reduction under § 3582(c). The motion should be denied.

**B.     Defendant Still Poses a Significant Danger to the Safety of the Community and the § 3553(A) Factors Strongly Weigh Against his Release.**

Alternatively, Defendant's request for a sentence reduction should be denied because he has failed to demonstrate that he is not a danger to the safety of the community or otherwise merits release under the § 3553(a) factors.

At the present time, it is apparent that, but for the COVID-19 pandemic, Defendant would present no basis for compassionate release. His medical ailments are well-controlled and do not present any impediment to his ability to provide self-care in the institution. The only question, then, is whether the risk of COVID-19 changes that assessment. The government acknowledges that Defendant presents a risk factor identified by the CDC as a condition that *may* increase the risk of severe injury or death were the inmate to contract COVID-19.

However, Defendant is not entitled to relief. This Court must consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community. At present, Defendant's medical conditions are appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19.

Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

Defendant would pose a danger to public safety if released. This Court should deny a sentence reduction on that basis alone. In its sentencing memorandum, the United States documented Defendant's 20-year history of abuse of power and unchecked aggression. *See* Doc. 148, incorporated herein by reference. The conduct that gave rise to his current imprisonment included an unnecessary and high-speed car chase, brandishing a firearm and putting it to the head of a terrified young man, and an unwarranted physical assault upon the young man once he was subdued on the ground. As the Court noted in denying Defendant's motion for bond pending appeal, Defendant "intentionally committed a violent act against another person and threatened to kill that person as he begged for his life; if the crime was exceptional in any way, it is its outrageousness." Doc. 216.

In addition, the § 3553(a) factors strongly disfavor a sentence reduction. Defendant has not provided a plan showing how his life would be different if he were released. He has 50 months, or more than forty percent of his sentence, left to serve. His crimes were serious, his sentence was just, and his high blood pressure is "well controlled."

Accordingly, in light of Defendant's record and the totality of relevant circumstances, this Court should deny the motion for a sentence reduction.

## Conclusion

For these reasons, this Court should deny Defendant's motion for a sentence reduction on the merits. The United States respectfully requests leave to file addenda should BOP supply supplemental information or opinions material to this discussion.

Respectfully submitted,

JOHN C. ANDERSON
United States Attorney

*/s/*
Jeremy Peña
Assistant United States Attorney
201 Third St. NW, Suite 900
Albuquerque, NM 87102
(505) 224-1451
(505) 346-7296 fax

I HEREBY CERTIFY that on July 6, 2020, I filed wthe foregoing electronically through the CM/ECF system, and promptly mailed it to Movant at the address he provided.

*/s/ Filed Electronically*
Jeremy Peña, Assistant U.S. Attorney