UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JUL 27 2020

MITCHELL R. ELFERS
CLERK

UNITED STATES OF AMERICA
    Plaintiff,

V.

Case No.: 14-CR-02783-JB

Thomas R. Rodella
    Defendant

### MR. RODELLA'S REPLY TO UNITED STATES' RESPONSE FOR SENTENCE REDUCTION AND ADDENDUM TO UNITED STATES' RESPONSE TO MOTION FOR SENTENCE REDUCTION PURSUANT TO 18 U.S.C. § 3582 (c)(1)(A)(i)

Mr. Rodella opposes the government's July 06, 2020, filing and July 08, 2020, Addendum, and moves this Court to grant the requested compassionate release. In support, Mr. Rodella shows that:

1. On April 04, 2020, Mr. Rodella filed an electronic request to the Warden asking her to modify and reduce his sentence pursuant to 18 U.S.C. §3582(c)(1)(A). On April 10, 2020, the Warden denied his request.
2. That according to 18 U.S.C. §3582(c)(1)(A), Mr. Rodella has exhausted his Administrative Remedies by having 30 days pass from his request to the Warden, and filed his Pro Se motion for sentence reduction pursuant to U.S.C. §3582(c)(1)(A)(i).
3. On April 08, 2020, and again on June 17, 2020, Mr. Rodella filed a motion for the appointment of counsel pursuant to 18 U.S.C. 3006A. The purpose was to have counsel help him file for compassionate release.
4. Mr. Rodella received the government's response in opposition to defendant's motion for compassionate release, dated July 06, 2020.
5. Mr. Rodella received an addendum to the government's response, filed under seal, dated July 08, 2020.

### MR. RODELLA RESPONDS TO THE GOVERNMENT'S RESPONSE

The Government stated that:

1) "this Court should deny the motion with prejudice because Defendant has not met his burden of establishing that a sentence reduction is warranted under the statute."

According to §3582(c)(1)(A)(i), the statute lays out the requirement that, (i) extraordinary and compelling reasons warrant such a reduction; or [...] and that such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission [...]. In §994(a)(2) and (t), the Commission is authorized to describe what should be considered "extraordinary and compelling reasons" for sentence reduction, including the criteria to be applied and a list of specific examples.

In turn, the Commission promulgated the policy statement of §1B1.13, which defines "extraordinary and compelling reasons" for compassionate release. It states:

> The Commission has conducted an in-depth review of this topic, including consideration of Bureau of Prisons data documenting lengthy review of compassionate release applications and low approval rates, as well as two reports issued by the Department of Justice Office of the Inspector General that are critical of the Bureau of Prison's implementation of its compassionate release program. See U.S. Department of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program, I-2013-006 (April 2013); U.S. Department of Justice, Office of the Inspector General, The Impact of the Aging Inmate Population on the Federal Bureau of Prisons, E-15-05 (May 2015). In February 2016, **the Commission held a public hearing on compassionate release and received testimony from witnesses and experts about the need to broaden the criteria for eligibility, to add guidance to the medical criteria, and to remove other administrative hurdles that limit the availability of compassionate release for otherwise eligible defendants.** (Emphasis added)
> 
> The amendment revises §1B1.13 in several ways. First, the amendment broadens the Commission's guidance on what should be considered "extraordinary and compelling reasons" for compassionate release. It provides four categories of criteria: "Medical Condition of the Defendant," "Age of the Defendant," "Family Circumstances," and "Other Reasons."
> 
> The "Medical Condition of the Defendant" category has two prongs: one for defendants with terminal illness, and one that applies to defendants with a debilitating condition. For the first subcategory, the amendment clarifies that terminal illness means "a serious and advanced illness with an end of life trajectory," and it explicitly states that a "specific prognosis of life expectancy (i.e. a probability of death within a specific time period) is not required." These changes respond to testimony and public comment on the challenges associated with diagnosing terminal illness. In particular,

while an end-of-life trajectory may be determined by
medical professionals with some certainty, it is extremely difficult to determine death within a specific
time period. For that reason, the Commission concluded that
requiring a specified prognosis (such as the 18-month
prognosis in the Bureau of Prisons' program statement) is
unnecessarily restrictive both in terms of the administrative review and the scope of eligibility for compassionate
release applications. For added clarity, the amendment also
provides a non-exhaustive list of illnesses that may qualify
as a terminal illness.

For the non-terminal medical category, the amendment provides
three broad criteria to include defendants who are (i) suffering
from a serious condition, (ii) suffering from a serious functional or cognitive impairment, or (iii) experiencing deteriorating health because of the aging process, for whom the
medical condition substantially diminishes the defendant's
ability to provide self-care within a correctional facility
and from which he or she is not expected to recover. The
primary change to this category is the addition of prong (II)
regarding a serious functional or cognitive impairment. **This
additional prong is intended to include a wide variety of
permanent, serious impairments and disabilities, whether
functional or cognitive, that make life in prison overly
difficult for certain inmates.** (Emphasis added).

The amendment also adds an age-based category ("Age of the
Defendant") for eligibility in §1B1.13. This new category would
apply if the defendant (i) is at least 65 years old, (ii) is
experiencing a serious deterioration in health because of the
aging process, and (iii) has served at least 10 years or 75
percent of his or her term of imprisonment (whichever is less).
The age-based category resembles criteria in the Bureau of
Prisons' program statement, but adds a limitation that the
defendant must be experiencing seriously deteriorating health
because of the aging process. The amendment also clarifies that
the time-served aspect should be applied with regard to "which
ever is less," an important distinction from the Bureau of
Prisons' criteria, which has limited application to only those
elderly offenders serving significant terms of imprisonment.

The Commission determined that 65 years should be the age for
eligibility under the age-based category after considering the
Commission's recidivism research, **which finds that inmates aged
65 years and older exhibit a very low rate of recidivism (13.3%)
as compared to other age groups. The Commission expects that the
broadening of the medical conditions categories, cited above,
will lead to increased eligibility for inmates who suffer from
certain conditions or impairments, and who experience a diminished ability to provide self-care in prison, regardless of
their age.** (Emphasis added)

2. Mr. Rodella listed the health issues affecting him:

   a) Hypertension - the government correctly identifies hypertension as being on the Center for Disease Control's list as a chronic condition "that might increase a person's risk of severe illness."

3) Lupus and Rehumatic Disease - The last two doctor's visits (12/2018 and 12/2019), Mr. Rodella had, he told Dr. Mateware that the soles of his feet were in constant pain, especially at night, and that numbness radiated from his ankles to his calves. Mr. Rodella's concern was the intensity of the pain. Many nights he was unable to sleep, and during the day the pain often kept him bed-ridden. Dr. Mateware stated that it may be rheumatoid arthritis, diabetes, or kidney issues. This time Dr. Mateware ordered lab work on Mr. Rodella. (See Exhibits 2A,B,C)

4) The government states "the speckled pattern is not diagnostic of any disorder, and also appears in individuals with no autoimmune disorder. What the government fails to share with the Court is what Mr. Rodella has made abundantly clear. "Ultimately, the ANA result **MUST** (emphasis) be interpreted in the specific context of an indiviaual patient's symptoms, underlying medical conditions, and other test results. The government, in forming its' opinion, relies on his conclusive interpretation of the ANA results, and considers nothing else, when in fact the article clearly states other factors must be considered.

5) The government correctly states, "Covid-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy." Everything after that borders on the absurd. The BOP has a BOP Covid-19 Action Plan. It also has a Pandemic Influenze Plan. The government goes as far as to identify that the BOP is "presently governed by Phase Seven of the Action Plan." The following is a summary of the affect of these plans and steps:
   A) As of July 19, 2020, 1,179 inmates at FCI Seagoville have been infected by Covid-19, by far the worst infection in the BOP. Of 1,680 inmates assigned to FCI Seagoville, 1,179 are infected, in excess of 70%, while the U.S. general population has a 1% infection rate.
   B) The government offers, "taken together, all of these measures are designed to mitigate sharply the risks of Covid-19 transmission in a BOP institution." If implemented correctly, Mr. Rodella agrees that the outcome of the pandemic in FCI Seagoville could be dramatically different.

While these practices are not wholly responsible for the catastrophe that envelops FCI Seagoville, they are clearly factors in creating it:
   a) Hand soap in the restrooms is continuously running out.
   b) Several times a day. inmates are standing in a line sometimes a mere inches from one another. For example, inmates daily wait in

        lines for meals, laundry pick-up, commissary, temperature checks, use of the computers, telephones, town hall meetings, just to cite a few cases.

    c) Inmates are dependent on BOP staff for the sanitation of their clothes and bedding.

    d) Dayrooms that were designed for lounges, have been filled with bunk beds, creating additional living quarters, in an already crowded environment.

    e) Cleaning supplies, bleach, cloth wipes, and other cleaning chemicals are limited so as to create shortages. Bleach has been watered down to a point that it no longer smells like bleach.

6) The government once again has "modified" Mr. Rodella's trial testimony in an effort to enhance a situation that never occurred, nor was there testimony to support their assertion. As this Honorable Court may recall, when Mr. Rodella's defense attorney on cross examination asked Michael Tafoya if Mr. Rodella has "pointed the gun to his head", Mr. Tafoya simply responded "No". Clearly Mr. Rodella did not point a gun to Mr. Tofoya's head. What is clear is the blot this testimony put on Mr. Rodella's character. The following story speaks to Mr. Rodella's <u>true</u> character concerning the safety of others. As the Court may remember from Mr. Rodella's trial, the Tafoya incident began with several unsafe acts on the highway. Putting his safety aside, Mr. Rodella endeavored to stop a potentially dangerous situation before it got worse.

Norberto Aranda (18311-051) wrote an email to the Warden, Mr. Harmon, telling of a situation that he witnessed at Seagoville FCI in July of 2017 (Exhibit 3) "On July 21, 2017, I was walking out of the rec. yard for the 0920 hrs. move. James Sparkman (88204-280) and I were together. As we were nearing the road that leads to the commissary, C.O. Ramos was securing the gate after having driven through it in a utility-like vehicle. C.O. Ramos was busy locking the gate and had his back to the vehicle so he never saw the vehicle rolling back. As the vehicle continued rolling back, it was picking up speed. It was then that I saw Tommy Rodella (78448-051) running toward C.O. Ramos and trying to get his attention by yelling at him. Mr. Rodella got behind the vehicle before it hit C.O. Ramos, and pushing against the vehicle he was able to stop it just before it struck C.O. Ramos. The vehicle came within 2 feet of striking C.O. Ramos and in my opinion the vehicle would have pinned him against the gate minimally causing injuries to both his legs." This view is from Mr. Aranda who

also states, "I have been in prison several times adding up to too many years and I have never seen an inmate put himself in harm's way to protect an officer." No one can deny that Mr. Rodella's actions in saving this officer are of themselves "extraordinary and compelling", and deserving of this Court's attention. Once again, Mr. Rodella had the opportunity to blend into his environment as did the hundreds of inmates on the yard that day, but he chose differently. He ran towards danger as he has before. And made a difference. This is Mr. Rodella's true character.

7) The government states: "defendant's motion for a reduction of his sentence should be denied for two reasons." Then it goes on to state "defendant has not identified "extraordinary and compelling reasons" for a sentence reduction. Further, the government states, "for that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories state from §1B1.13:

(ii) The defendant is –

(I) suffering from a serious physical or mental condition,

(II) suffering from a serious functional or cognative impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self care within the environment of a correctional facility and from which he or she is not expected to recover.

Unfortunately, the Government misquoted the relevant issues leaving item (III) off of their list. Nonetheless, it is clear from §1B1.13 and its amendments that Mr. Rodella specifically qualifies. It is important to read the information that the Sentencing Commission provides for guidance (U.S.C.S. Appendix C amendments to the Guidelines Manual, 2019). After quoting §1B1.13 (Supra), the Commission continues: The primary change to this category is the addition of prong (II) regarding a serious functional or cognitive impairment. **This additional prong is intended to include a <u>WIDE</u> variety of permanent, serious impairments and disabilities, whether functional or cognitive, that make life in prison overly difficult for certain inmates (emphasis added).**

The government complains that Mr. Rodella's Covid-19 related concerns do not constitute "extraordinary and compelling reasons" under the Compassionate Release Statute.

However, the policy statement (U.S.S.G. §1B1.13) includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons"..."The standard is met if the defendant is (1) suffering from a serious physical or medical condition, (2) suffering from a serious functional or cognitive impairment, or (3) experiencing deteriorating physical or mental health because of the aging process, any of which substantially diminishes the ability of the defendant to provide self-care within the environment of the correctional facility, and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, Ent. N. 1(A)ii.

Mr. Rodella presents health records (Exhibit 4) that show that he has been diagnosed with Hypertension and takes Lisinopril 20mg, two tablets daily (Exhibit 5). The Center for Disease Control website (CDC.GOV) lists several co-morbidities that are a concern to older citizens who might contract Covid-19. Hypertension (High Blood Pressure) has been listed since at least February, 2020.

The Sentencing Commission has spoken at length about the easing of the criteria for "extraordinary and compelling", (page 6, Supra) in § 1B1.13. Referring to prong (II), the U.S.S.C. says, "The primary change to this category is the addition of prong (II) regarding a serious functional or cognitive impairment. **This additional prong is intended to include a wide variety of permanent, serious impairments and disabilities, whether functional or cognitive, that makes life in prison overly difficult for certain inmates. (Emphasis added).** Since the C.D.C. finds that hypertension is a serious functional impairment, when combined with Covid-19, and for an inmate approaching 60 years old (October, 2021), it would also make life in prison overly difficult (as it already has for Mr. Rodella's cellmate, James Gianetta, who passed away from Covid-19 the week of July 13, 2020.

The BOP is <u>not</u> set up to handle a health crisis of this magnitude. As stated previously, Seagoville FCI has the worst Covid-19 numbers in the nation. Mr. Rodella respectfully requests that the Honorable Court release him for compassionate reasons before Covid-19 strikes again.

Respectfully submitted on July 22, 2020, by:

*signature*
Thomas R. Rodella, Pro Se
Reg.# 78448-051
Federal Correctional Institution
P.O. Box 9000
Seagoville, TX 75159

## CERTIFICATE OF SERVICE

I certify that on July 22, 2020. I filed the foregoing motion with the Clerk of the Court of the District of New Mexico and all parties by entering it into the CM/ECF mailing system.

*signature*
Thomas R. Rodella, Pro Se
Reg. # 78448.051



Report Status: Final

RODELLA, THOMAS

| Patient Information | Specimen Information | Client Information |
|---|---|---|
| **RODELLA, THOMAS**<br>DOB: 10/30/1961  AGE: 58<br>Gender: M  Fasting: N<br>Phone: NG<br>Patient ID: NG | Specimen: DL778831R<br>Requisition: 7095121<br><br>Collected: 12/12/2019 / 07:12 CST<br>Received: 12/13/2019 / 00:05 CST<br>Reported: 12/14/2019 / 23:14 CST | Client #: 33826  IR21MAIL<br>MATEWARE, G<br>FEDERAL CORRECTIONAL INST<br>2113 N HIGHWAY 175<br>SEAGOVILLE, TX 75159-2237 |

| Test Name | In Range | Out Of Range | Reference Range | Lab |
|---|---|---|---|---|
| URINALYSIS REFLEX | | | | IG |
|   COLOR | YELLOW | | YELLOW | |
|   APPEARANCE | CLEAR | | CLEAR | |
|   SPECIFIC GRAVITY | 1.020 | | 1.001-1.035 | |
|   PH | 6.0 | | 5.0-8.0 | |
|   GLUCOSE | NEGATIVE | | NEGATIVE | |
|   BILIRUBIN | NEGATIVE | | NEGATIVE | |
|   KETONES | NEGATIVE | | NEGATIVE | |
|   OCCULT BLOOD | NEGATIVE | | NEGATIVE | |
|   PROTEIN | NEGATIVE | | NEGATIVE | |
|   NITRITE | NEGATIVE | | NEGATIVE | |
|   LEUKOCYTE ESTERASE | NEGATIVE | | NEGATIVE | |
| FOLATE, SERUM | 11.3 | | ng/mL<br>Reference Range<br>Low:         <3.4<br>Borderline:  3.4-5.4<br>Normal:      >5.4 | IG |

CLIENT SERVICES: 866.697.8378          SPECIMEN: DL778831R                    PAGE 1 OF 2
Quest, Quest Diagnostics, the associated logo and all associated Quest Diagnostics marks are the trademarks of Quest Diagnostics.

EXHIBIT 1A



Quest Diagnostics

Report Status: Final

RODELLA, THOMAS

| Patient Information | Specimen Information | Client Information |
|---|---|---|
| RODELLA, THOMAS<br><br>DOB: 10/30/1961  AGE: 58<br>Gender:  M    Fasting: N<br>Patient ID: NG | Specimen: DL778831R<br>Collected: 12/12/2019 / 07:12 CST<br>Received: 12/13/2019 / 00:05 CST<br>Reported: 12/14/2019 / 23:14 CST | Client #: 33826<br>MATEWARE, G |

## Endocrinology

| Test Name | Result | Reference Range | Lab |
|---|---|---|---|
| QUESTASSURED 25-OH VIT D  (D2,D3) | | | |
| VITAMIN D, 25-OH, TOTAL | 25 L | 30-100 ng/mL | Z3E |

(Note) 25-OHD3 indicates both endogenous production and supplementation. 25-OHD2 is an indicator of exogenous sources, such as diet or supplementation. Therapy is based on measurement of Total 25-OHD, with levels <20 ng/mL indicative of Vitamin D deficiency, while levels between 20 ng/mL and 30 ng/mL suggest insufficiency. Optimal levels are > or = 30 ng/mL.

| VITAMIN D, 25-OH, D3 | 25 | ng/mL | |
|---|---|---|---|

Reference range: Not established

| VITAMIN D, 25-OH, D2 | <4 | ng/mL | |
|---|---|---|---|

(Note) Reference range: Not established

Physician Comments:

## Immunology

| Test Name | Result | Reference Range | Lab |
|---|---|---|---|
| ANA SCREEN, IFA W/REFL TITER AND PATTERN | | | |
| ANA SCREEN, IFA | POSITIVE | NEGATIVE | IG |

ANA IFA is a first line screen for detecting the presence of up to approximately 150 autoantibodies in various autoimmune diseases. A positive ANA IFA result is suggestive of autoimmune disease and reflexes to titer and pattern. Further laboratory testing may be considered if clinically indicated.

For additional information, please refer to http://education.QuestDiagnostics.com/faq/FAQ177 (This link is being provided for informational/educational purposes only.)

| ANTINUCLEAR ANTIBODIES TITER AND PATTERN | | | |
|---|---|---|---|
| ANA TITER | 1:40 H | titer | IG |

A low level ANA titer may be present in pre-clinical autoimmune diseases and normal individuals.

```
Reference Range
<1:40         Negative
1:40-1:80     Low Antibody Level
>1:80         Elevated Antibody Level
```

| ANA PATTERN | Nuclear, Speckled | | |
|---|---|---|---|

Speckled pattern is associated with mixed connective tissue disease (MCTD), systemic lupus erythematosus (SLE), Sjogren's syndrome, dermatomyositis, and systemic sclerosis/polymyositis overlap.

AC-2,4,5,29: Speckled

International Consensus on ANA Patterns (https://doi.org/10.1515/cclm-2018-0052)

Physician Comments:

**PERFORMING SITE:**
IG    QUEST DIAGNOSTICS-IRVING, 4770 REGENT BLVD., IRVING, TX 75063-2445 Laboratory Director: ROBERT L BRECKENRIDGE,MD, CLIA: 45D0697943
Z3E   MEDFUSION, 2501 SOUTH STATE HIGHWAY 121 SUITE 1100, LEWISVILLE, TX 75067-8188 Laboratory Director: BENTON R MIDDLEMAN,MD, CLIA: 45D2004217

CLIENT SERVICES: 866.697.8378

SPECIMEN: DL778831R

PAGE 2 OF 2

Quest, Quest Diagnostics, the associated logo and all associated Quest Diagnostics marks are the trademarks of Quest Diagnostics.

EXHIBIT 1B

 **Federal Bureau of Prisons**

**FMC Butner**
1000 Old Highway NC 75
Butner, NC 27509
919-575-3900 x5707

Name RODELLA, THOMAS
Reg # 78448-051
DOB 10/30/1961
Sex M

Facility FCI Seagoville
Order Unit A01-313L
Provider G. Mateware, MD

*** Sensitive But Unclassified ***
Collected 12/12/2019 11:16
Received 12/13/2019 09:41
Reported 12/13/2019 15:08
LIS ID 339191357

| | CHEMISTRY | | |
|---|---|---|---|
| Sodium | 143 | 136-145 | mmol/L |
| Potassium | 5.1 | 3.5-5.1 | mmol/L |
| Chloride | 107 | 98-107 | mmol/L |
| CO2 | 25 | 21-32 | mmol/L |
| BUN | 16 | 7-26 | mg/dL |
| Creatinine | 1.24 | 0.60-1.30 | mg/dL |
| eGFR (IDMS) | 60 | | |

GFR units measured as mL/min/1.73 m^2. if African American, multiply by 1.210. A calculated GFR <60 suggests a chronic kidney disease if found over a 3 month period.

| | | | |
|---|---|---|---|
| Calcium | 9.8 | 8.4-10.2 | mg/dL |
| Glucose | 95 | 70-109 | mg/dL |
| AST | 19 | 5-34 | U/L |
| ALT | 26 | 8-55 | U/L |
| Alkaline Phosphatase | 73 | 40-140 | U/L |
| Bilirubin, Total | 0.7 | 0.2-1.0 | mg/dL |
| Total Protein | 7.2 | 6.4-8.3 | g/dL |
| Albumin | 4.4 | 3.5-5.0 | g/dL |
| Globulin | 2.8 | | g/dL |
| Alb/Glob Ratio | 1.57 | 1.00-2.30 | |
| Anion Gap | 11.0 | 9.0-19.0 | |
| BUN/Creat Ratio | 13.0 | 5.0-30.0 | |
| Cholesterol | 189 | <200 | mg/dL |
| Triglycerides | 116 | <150 | mg/dL |
| HDL Cholesterol | 51 | 40-60 | mg/dL |
| LDL Cholesterol (calc) | 115 | <130 | mg/dL |
| Chol/HDL Ratio | 3.7 | 0.0-4.0 | |

| | SPECIAL CHEMISTRY | | |
|---|---|---|---|
| T4, Free | 0.94 | 0.70-1.80 | ng/dL |
| TSH | 2.813 | 0.350-4.940 | uIU/mL |

| | HEMATOLOGY | | |
|---|---|---|---|
| WBC | 4.7 | 4.0-11.0 | K/uL |
| RBC | 5.24 | 4.50-6.00 | M/uL |
| Hemoglobin | 15.7 | 13.5-18.0 | g/dL |
| Hematocrit | 46.4 | 40.0-52.0 | % |
| MCV | 88.7 | 80.0-100.0 | fL |

FLAG LEGEND    L=Low    Ll=Low Critical    H=High    H!=High Critical    A=Abnormal    A!=Abnormal Critical

Page 1 of 2

EXHIBIT 2A

 **Federal Bureau of Prisons**

**FMC Butner**
1000 Old Highway NC 75
Butner, NC 27509
919-575-3900 x5707

*** Sensitive But Unclassified ***

**Name** RODELLA, THOMAS
**Reg #** 78448-051
**DOB** 10/30/1961
**Sex** M

**Facility** FCI Seagoville
**Order Unit** A01-313L
**Provider** G. Mateware, MD

Collected 12/12/2019 11:16
Received 12/13/2019 09:41
Reported 12/13/2019 15:08
LIS ID  339191357

## HEMATOLOGY

| Test | Result | Reference | Units |
|---|---|---|---|
| MCH | 29.9 | 25.4-34.6 | pg |
| MCHC | 33.8 | 31.0-37.0 | g/dL |
| RDW | 12.9 | 11.0-15.0 | % |
| Platelet | 188 | 150-400 | K/uL |
| MPV | 8.3 | 7.0-11.0 | fL |
| Neutrophils # | 2.6 | 1.5-7.1 | K/uL |
| Lymphocytes # | 1.4 | 0.9-3.3 | K/uL |
| Monocytes # | 0.6 | 0.3-1.1 | K/uL |
| Eosinophils # | 0.2 | 0.0-0.7 | K/uL |
| Basophils # | 0.1 | 0.0-0.2 | K/uL |
| Neutrophils % | 54.7 | | % |

Therapeutic decision making should be based on absolute values, rather than percentages

| Test | Result | Units |
|---|---|---|
| Lymphocytes % | 29.0 | % |
| Monocytes % | 11.9 | % |
| Eosinophils % | 3.3 | % |
| Basophils % | 1.1 | % |

**FLAG LEGEND**  L=Low  L!=Low Critical  H=High  H!=High Critical  A=Abnormal  A!=Abnormal Critical

Page 2 of 2

EXHIBIT 2B

 **Federal Bureau of Prisons**

**FMC Butner**
1000 Old Highway NC 75
Butner, NC 27509
919-575-3900 x5707

Name RODELLA, THOMAS
Reg # 78448-051
DOB 10/30/1961
Sex M

Facility FCI Seagoville
Order Unit A01-313L
Provider G. Mateware, MD

*** Sensitive But Unclassified ***

Collected 12/12/2019 11:16
Received 12/13/2019 09:42
Reported 12/13/2019 12:41
LIS ID 339192172

## CHEMISTRY

| Test | Flag | Result | Reference | Units |
|---|---|---|---|---|
| Uric Acid | | 6.5 | 3.5-7.2 | mg/dL |
| CRP | L | 0.1 | 0.5-1.0 | mg/dL |
| Rheumatoid Factor | | <15.0 | 0.0-20.0 | IU/mL |

## SPECIAL CHEMISTRY

| Test | Result | Reference | Units |
|---|---|---|---|
| Vitamin B12 | 292 | 213-816 | pg/mL |

**FLAG LEGEND**  L=Low  L!=Low Critical  H=High  H!=High Critical  A=Abnormal  A!=Abnormal Critical

Page 1 of 1

EXHIBIT 2C

TRULINCS 18311051 - ARANDA, NORBERTO PANDO - Unit: SEA-A-A

---

FROM: 18311051
TO: Warden
SUBJECT: ***Request to Staff*** ARANDA, NORBERTO, Reg# 18311051, SEA-A-A
DATE: 10/27/2017 02:12:27 PM

To: Ms. Martha Underwood
Inmate Work Assignment: Unit Orderly

I submitted correspondence to Mr. Harmon on August 30, 2017, and never received confirmation that my e-mail had been received, nor did I receive a response. For that reason I am now sending you my correspondence, in hopes of receiving a reply. On July 21, 2017, I was walking out of the yard for the 0920 hours move. James Sparkman, 88204-280, and I were together. As we were nearing the road that leads to the commissary, Corrections Officer Ramos was securing the gate after having driven through it in a utility-like vehicle. C.O. Ramos was busy locking the gate and had his back to the vehicle so he never saw the vehicle rolling back. As the vehicle continued rolling back, it was picking up speed. It was then that I saw Tommy Rodella, 78448-051, running toward C.O. Ramos, and trying to get his attention by yelling at him. Rodella got behind the vehicle before it hit C.O. Ramos, and pushing against the vehicle he was able to stop it just before it struck C.O. Ramos. The vehicle came within 2 feet of striking C.O. Ramos and in my opinion, the vehicle would have pinned him against the gate, minimally causing injuries to both his legs. Afterward I asked Rodella why he put himself in harms way by positioning himself between the vehicle and the gate. Rodella said he was certain C.O. Ramos would have been injured and because he never saw the vehicle rolling toward him, he thought there might have been a question what he was doing in the vehicle had he gotten on and stepped on the brake. Because I haven't heard anything regarding Rodella's efforts, I wanted to bring it to your attention. Imagine those many officers who suffer great injury or loss of life. Had someone like Rodella stepped in, the carnage and mayhem would be minimized, if not done away with all together. An incident such as this creates havoc not only for the department but the officer's family as well. If I may add, I have been in prison several times, adding up to too many years and I have never seen an inmate put himself in harm's way to protect an officer. I pray this means something to you and your officers. If you have any questions, we stand ready to answer them. Thank you for your time and attention to my letter.

EXHIBIT 3

**Bureau of Prisons**
**Health Services**
**Health Problems**

Reg #: 78448-051          Inmate Name: RODELLA, THOMAS R

## Current

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|
| **Hereditary hemochromatosis** | | | | | | |
| 02/16/2016 12:19 EST Resto, William MD/CD | III | ICD-9 | 275.01 | 04/01/2015 | Current | 04/01/2015 |
| Feb 16 2016 Refers has hx of Hemochromatosis x 5 years. Refers has had multiples phlevotomies. April 02 2105 iron 88, ferritin 191. Need repeat labs | | | | | | |
| 04/01/2015 14:23 EST Allen, Garry FNP | III | ICD-9 | 275.01 | 04/01/2015 | Current | 04/01/2015 |
| **Posttraumatic stress disorder** | | | | | | |
| 11/10/2015 12:53 EST Ngwang, Roland MD/MPH | I | ICD-9 | 309.81 | 11/10/2015 | Current | 11/10/2015 |
| **Depressive DO, not elsewhere classified** | | | | | | |
| 02/16/2016 12:20 EST Resto, William MD/CD | I | ICD-9 | 311 | 04/01/2015 | Current | 04/01/2015 |
| No suicide ideas on Feb 16 2016 | | | | | | |
| 04/01/2015 14:24 EST Allen, Garry FNP | I | ICD-9 | 311 | 04/01/2015 | Current | 04/01/2015 |
| **Hypertension, Benign Essential** | | | | | | |
| 02/16/2016 12:19 EST Resto, William MD/CD | III | ICD-9 | 401.1 | 04/01/2015 | Current | 04/01/2015 |
| Feb 16 2016 BP well controlled, no chest pain, no sob, no swelling, No dyspnea | | | | | | |
| 04/01/2015 14:23 EST Allen, Garry FNP | III | ICD-9 | 401.1 | 04/01/2015 | Current | 04/01/2015 |
| **Esophageal reflux** | | | | | | |
| 02/16/2016 12:20 EST Resto, William MD/CD | III | ICD-9 | 530.81 | 04/01/2015 | Current | 04/01/2015 |
| Feb 16 2106 no abd pain, no heart burn, no rectal bleeding | | | | | | |
| 04/01/2015 14:23 EST Allen, Garry FNP | III | ICD-9 | 530.81 | 04/01/2015 | Current | 04/01/2015 |
| **Impacted cerumen** | | | | | | |
| 09/06/2016 12:28 EST Mohon, Jenny ANPc | | ICD-10 | H6120 | 09/06/2016 | Current | |
| **Acute sinusitis** | | | | | | |
| 08/09/2016 12:25 EST Brockman, L. PA-C | | ICD-10 | J0190 | 08/09/2016 | Current | |
| **Unsatisfactory restoration of tooth** | | | | | | |
| 06/04/2019 13:16 EST Perez, Pedro Jr. DDS | | ICD-10 | K0850 | 06/04/2019 | Current | |
| #21 note bruxism. | | | | | | |
| **Developmental odontogenic cysts** | | | | | | |
| 12/01/2016 13:43 EST Perez, Pedro Jr. DDS | | ICD-10 | K090 | 12/01/2016 | Current | |
| Possible radicular cyst, cementoma or condensing osteoitis. | | | | | | |
| 10/17/2016 13:45 EST Perez, Pedro Jr. DDS | | ICD-10 | K090 | 10/17/2016 | Current | |

Generated 05/19/2020 10:34 by Brown, Jeremy HIT         Bureau of Prisons - SEA         Page 1 of 3

Exhibit 4

| Inmate Name: | RODELLA, THOMAS R | | | Reg #: | 78448-051 |
|---|---|---|---|---|---|
| Date of Birth: | 10/30/1961 | Sex: M | Race: WHITE | Facility: | SEA |
| Encounter Date: | 02/04/2020 11:13 | Provider: | Perez, Pedro Jr. DDS | Unit: | A01 |

| Rx# | Medication | Stop Date | SIG |
|---|---|---|---|
| 240632-SEA | Lisinopril 20 MG Tab | 12/04/2020 | Take two tablets (40 MG) by mouth daily |
| 240642-SEA | Prazosin Cap 2 MG | 12/04/2020 | Take two capsules (4 MG) by mouth at bedtime |
| 240643-SEA | Sertraline HCl 50 MG Tab | 06/02/2020 | Take three tablets (150 MG) by mouth each day *consent form on file * ***self carry*** |

**Other Active IVs:**

| Rx# | Medication | Stop Date | SIG |
|---|---|---|---|

No IVs to be Reconciled.

**Other Active OTCs:**

| Medication | OTC Source | Start Date | Stop Date |
|---|---|---|---|

No OTCs to be Reconciled.

**Allergies**
Morphine Sulfate

**Disposition:**
Follow-up at Sick Call as Needed

**Other:**
Patient was informed of today's procedure, benefits and risks were explained, understanding was confirmed, and consent for the procedure and use of local anesthetic was granted prior to care.

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 02/04/2020 | Counseling | Access to Care | Perez, Pedro | Verbalizes Understanding |
| 02/04/2020 | Counseling | Diagnosis | Perez, Pedro | Verbalizes Understanding |
| 02/04/2020 | Counseling | Pain Management | Perez, Pedro | Verbalizes Understanding |
| 02/04/2020 | Counseling | Post-operative Care | Perez, Pedro | Verbalizes Understanding |

**Copay Required:** Yes  **Cosign Required:** No
**Telephone/Verbal Order:** No

Completed by Perez, Pedro Jr. DDS on 02/04/2020 11:24

EXHIBITS



Thomas R. Radella
78948-051
Federal Correctional Institution
P.O. Box 9000
Seagoville, Texas
75159-9000

RECEIVED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO
JUL 27 2020
MITCHELL R. ELFERS
CLERK

United States District Court
District of New Mexico
333 Lomas Blvd. N.W.
Albuquerque, New Mexico
87102